1
ROBBINS GELLER RUDMAN
  & DOWD LLP
2
PATRICK J. COUGHLIN (111070)
DAVID W. MITCHELL (199706)
3
ALEXANDRA S. BERNAY (211068)
CARMEN A. MEDICI (248417)
4
CARISSA J. DOLAN (303887)
655 West Broadway, Suite 1900
5
San Diego, CA 92101
Telephone: 619/231-1058
6
619/231-7423 (fax)
patc@rgrdlaw.com
7
davidm@rgrdlaw.com
xanb@rgrdlaw.com
8
cmedici@rgrdlaw.com
cdolan@rgrdlaw.com
9

Attorneys for Plaintiff
10

UNITED STATES DISTRICT COURT
11

SOUTHERN DISTRICT OF CALIFORNIA
12

| | |
|---|---|
| PERSIAN GULF INC., Individually and on Behalf of All Others Similarly Situated, | Case No. 3:15-cv-01749-L-BGS |
| | CLASS ACTION |
| Plaintiff, | |
| vs. | COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S CARTWRIGHT ACT AND UNFAIR COMPETITION LAW REVISED PURSUANT TO ORDER OF THE COURT DATED MARCH 18, 2016 |
| BP WEST COAST PRODUCTS LLC; CHEVRON U.S.A. INC.; TESORO REFINING & MARKETING COMPANY LLC; EQUILON ENTERPRISES LLC (D/B/A SHELL OIL PRODUCTS US); EXXONMOBIL REFINING & SUPPLY COMPANY; VALERO MARKETING AND SUPPLY COMPANY; CONOCOPHILLIPS; ALON USA ENERGY, INC.; KERN OIL & REFINING CO. and DOES 1-25, inclusive, | |
| Defendants. | DEMAND FOR JURY TRIAL |

1129894_2

Plaintiff Persian Gulf Inc. ("Persian Gulf" or "plaintiff") hereby brings this action for damages and other relief against defendants BP West Coast Products LLC ("BP West"); Chevron U.S.A. Inc. ("Chevron"); Tesoro Refining & Marketing Company LLC ("Tesoro"); Equilon Enterprises LLC (d/b/a Shell Oil Products US) ("Shell"); ExxonMobil Refining & Supply Company ("ExxonMobile"); Valero Marketing and Supply Company ("Valero")[1]; ConocoPhillips; Alon USA Energy, Inc. ("Alon"); and Kern Oil & Refining Co. ("Kern Oil") ( collectively "defendants") for violations of California's Cartwright Act (California Business & Professions Code §16700, *et seq*.) and Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code §17200, *et seq*.).  Plaintiff makes all allegations upon information and belief except as to those paragraphs that are based on plaintiff Persian Gulf's personal knowledge.

## THE CONSPIRACY

1.      For years Californians have seen tremendous spikes in gasoline prices, seemingly untethered to normal market forces of supply and demand. Various reasons have been posited for these giant spikes, including the unique nature of California's gas market.  However, a number of spikes over the years were not the result of California's market structure (though perhaps enabled by it), but instead are the result of anticompetitive conduct on the part of the major gas refineries operating in the state.

2.      In early 2012 the crude oil markets experienced a suspicious combination of rising production, falling demand, increasing inventories and increasing prices. The suspicious circumstances were detailed in a June 2012 report by McCullough Research, which found that sudden price shifts provided "a significant windfall for

---

[1]   As per the Court's Order of March 18, 2016 (Dkt. No. 51) granting the parties Joint Motion, this Complaint substitutes Defendant Valero Marketing and Supply Company in place of previously-named Defendant Valero Energy Corporation.

COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S CARTWRIGHT ACT AND UNFAIR COMPETITION LAW REVISED PURSUANT TO ORDER OF THE COURT DATED MARCH 18, 2016          - 1 -          3:15-cv-01749-L-BGS

refineries and retailers on the West Coast."[2]  The refineries blamed the increased prices on decreased supply because of a fire at a Washington BP refinery and other maintenance shutdowns in California.  The evidence, however, did not to support that theory.  Instead, the fire and shutdowns were cover for the refiners' scheme to create a false shortage in order to force prices up and reap windfall profits.

3.     Data from the Energy Information Administration ("EIA") during that time showed that the refineries serving West Coast states had capacity on hand to meet significant shortfalls, such as one  caused by a fire or a shutdown because of unscheduled maintenance.  In such a highly concentrated industry, "a single actor or a very few actors acting together can set the price in the market."  *Id.* at 5.  Because the market is so concentrated, the West Coast is highly sensitive to fluctuations in supply, and primed for manipulation.  After the fire at the Washington plant, the degree of market concentration increased significantly.  With the market so concentrated, the timing of the various unscheduled maintenance shutdowns in the California refineries in early 2012 becomes suspect.  "In a competitive market, maintenance would have been delayed to take advantage of the rising West Coast prices."  *Id.*

4.     In May and October of 2012, California saw two massive gasoline price spikes, resulting in California consumers paying more than $4 a gallon – and in some areas more than $5 a gallon.  These spikes occurred while the rest of the country experienced a decline in gas prices.

5.     Another report issued soon after the October 2012 spike by McCullough Research concluded that during the May and October spikes there were market anomalies present, and that during those two periods gas refiners in California were

---

[2]   Robert McCullough, *Analysis of West Coast Gasoline Prices*, McCullough Research (June 5, 2012) at 2, *available at* www.mresearch.com/pdfs/470.pdf.

COMPLAINT FOR VIOLATIONS OF                    - 2 -                    3:15-cv-01749-L-BGS
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

1  seeing an "enormous windfall profit."[3]  Further, the report determined that in both the

2  May and October spikes, "the underlying data now available contradicts the industry

3  explanations."  *Id.* at 1.

4        6.    The report urged an investigation into the spikes, which was then picked

5  up by several Democratic senators.  Those senators wrote to then-Attorney General

6  Eric H. Holder, Jr. and asked the Department of Justice to investigate "possible market

7  manipulation and false reporting by oil refineries which may have created a perception

8  of a supply shortage, when in fact refineries were producing."[4]  The senators further

9  noted that "[a]nomalous, uncompetitive market dynamics may have forced West

10  Coast drivers to pay $1.3 billion more at the pump during the May 2012 price spike

11  than they should have, according to an analysis by McCullough Research. Even a one

12  cent per gallon increase in gasoline prices cost California consumers an extra $150

13  million per year, according to the Federal Trade Commission (FTC)."  *Id.*  That

14  investigation is ongoing.

15        7.    Senator Dianne Feinstein also wrote to the Federal Trade Commission

16  ("FTC") requesting an investigation.  Senator Feinstein expressed concern that the

17  FTC had failed "to take action to protect California consumers from malicious trading

18  schemes in the California gasoline market."[5] She requested that the FTC "open an

19  immediate investigation into price spikes in California, to begin collecting relevant

20

---

21  [3]  Robert McCullough, Sean Long & Jil Heimensen, *May and October 2012
22  Gasoline Price Spikes on the West Coast*, McCullough Research (Nov. 15, 2012)
("McCullough Report") at 20, *available at* http://www.mresearch.com/pdfs/489.pdf.

23  [4]  Press Release, Maria Cantwell United States Senator for Washington, *6 West Coast
Senators Urge DOJ Investigate Western Gas Price Spike* (Nov. 27, 2007), *available at*
24  http://www.cantwell.senate.gov/public/index.cfm/press-releases?ID=7e55a196-cfbb-4b2b-b03f-d7bc52013ab1.

25  [5]  Letter from Senator Dianne Feinstein to FTC Chairman Jon Leibowitz (Oct. 7,
26  2012), *available at* http://www.feinstein.senate.gov/public/index.cfm/press-releases?ID=64731006-6bc2-406e-ba27-dc423a2aae9a.

27
28  COMPLAINT FOR VIOLATIONS OF          - 3 -          3:15-cv-01749-L-BGS
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

1129894_2

data on California's gasoline markets, and to establish a permanent market monitoring team." *Id.* She also requested that the "FTC immediately seek data sharing agreements that will allow it to monitor gasoline and oil markets actively and effectively. Data on prices, trading activity, refinery output, demand, stocks, and other information are vital to determine if trading activities reflect fraud, manipulation, or other malicious trading practices." *Id.*

8. Senator Feinstein closed her letter with a call for serious and aggressive enforcement: "California's consumers are all too familiar with energy price spikes which cannot be explained by market fundamentals, and which turn out years later to have been the result of malicious and manipulative trading activity. . . . I call on the FTC to act immediately and aggressively to protect California's consumers." *Id.* To date, while it is believed investigations are ongoing, no action has been taken regarding the May and October 2012 spikes, despite significant evidence that the price spikes were the result of manipulative and collusive conduct by defendants.

9. In addition to the 2012 spikes, on June 30, 2015, evidence was presented at the California Energy Commission's Petroleum Market Advisory Committee meeting in Berkeley that demonstrated that more recent spikes in gas prices appear to again not be based on normal market forces but instead are part of a broader anticompetitive scheme by the defendants.

10. According to Consumer Watchdog, a non-profit consumer advocacy group, since February 2015, California retail gasoline prices have risen by more than $1.25 per gallon. In Southern California, the gap with average U.S. gasoline prices hit an unprecedented $1.30 per gallon.

11. A series of reports by Consumer Watchdog has chronicled how oil refiners in the state have dried up the market and reaped profits through unprecedented exports of gasoline from California and by taking an unprecedented

COMPLAINT FOR VIOLATIONS OF
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

- 4 -

3:15-cv-01749-L-BGS

1  number of refineries off line for suspicious, frequently unscheduled maintenance.  By

2  controlling and shrinking local supplies of gasoline, the refiners steadily increase their

3  California profits, even as drivers in other parts of the country enjoy moderate prices.

4       12.    As a direct result of the anticompetitive and unlawful conduct alleged

5  herein, plaintiff and the Class (as defined below) paid, and have continued to pay,

6  artificially inflated prices for gasoline from at least February 2012 through the present.

7  **Details of the May and October 2012 Price Spikes**

8       13.    In May 2012, the price of gas spiked and affected prices in California,

9  Oregon and Washington.  Refiners blamed the May spike on the February 18, 2012

10  fire at Cherry Point refinery in Washington state.  In October 2012, the price of gas

11  again spiked, which the refiners blamed on an August 6, 2012 fire at Chevron's

12  Richmond refinery.  The length of delay between the cause and effect makes these

13  explanations suspect, because if a decline in product levels causes price increases,

14  prices should have risen soon after the outages and not two or three months later.

15  Further, inventories actually ***increased*** up to and during the price spikes, which, in a

16  competitive market, should have brought prices down.  As the McCullough Report

17  notes, "[t]he argument that the price spikes on the West Coast are caused by supply

18  shortages is contradicted by the increasing gasoline inventories during the period of

19  extraordinary prices."  *Id*. at 1.

20       14.    Analysts have been skeptical of the industry's justifications for the

21  radical price increases, with some speculating that the companies are artificially

22  increasing pump prices.  *See* Joseph Rose, *Oregon, Washington Gas Prices Face*

23  *'Prolonged Period' of Increases After Chevron Refinery Fire*, The Oregonian (Aug.

24  21, 2012), *available at* http://blog.oregonlive.com/commuting/2012/08/oregon_

25  washington_gas_prices_f.html.

26

27

28

COMPLAINT FOR VIOLATIONS OF
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

- 5 -

3:15-cv-01749-L-BGS

15.    Consumer Watchdog said that the report raises the specter of "criminal conduct" "reminiscent of the Enron-like manipulation of the California energy market." Ronald D. White, *Consumer advocates say refineries may have falsified information*, L.A. Times (Nov. 16, 2012), *available at* http://articles.latimes.com/2012/nov/16/business/la-fi-mo-call-for-investigation-20121116.

16.    The refineries' explanation for the price spikes is not consistent with the principles of supply and demand and is inconsistent with the structure of the industry. The California refinery system as a whole had plenty of stock and capacity to manage several plant shutdowns.  Refineries' production schedules are not perfectly matched to changes in seasonal demand – gas sales peak in the summer months, while gas production is relatively flat over the year with a dip in February.  Typically, the market has adjusted smoothly to the seasonal factors and gas prices remain stable (tracking the cost of crude and other inputs) even when sales exceed production, with the price spikes in 2012 being exceptions.

17.    In light of the increased output (*see* ¶13, *supra*), the refineries' explanation that the price increases were due to a supply shortage caused by the refinery outages makes no sense.

18.    Take for example the Richmond refinery, which was blamed for the October 2012 gas spike.  Data tracking the Richmond refinery's FCC and TKC (measurable components of the gas oil processing at the refinery) demonstrate that the Richmond refinery was in fact still emitting mono-nitrogen oxides ("NOx") during this period of "closure." McCullough Report at 12.[6]  These inconsistencies bring into

---

[6]    During other cases of market manipulation in California, announcements by power producers about plant outages "have been discovered to be intentionally unreliable." *See United States v. Reliant Energy Servs., Inc.*, No. 04-cr-125, Indictment (N.D. Cal. Apr. 8, 2004) (Dkt. No. 1) at 5 (where Reliant was charged with disseminating false and misleading rumors and information about the availability and maintenance status of the defendant's power plants).

1129894_2

COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S CARTWRIGHT ACT AND UNFAIR COMPETITION LAW REVISED PURSUANT TO ORDER OF THE COURT DATED MARCH 18, 2016

- 6 -

3:15-cv-01749-L-BGS

1  doubt the accuracy and reliability of the maintenance and outage reports provided by

2  the refineries to California.  Similarly, Shell's Martinez refinery reported a shutdown

3  from April 27 to May 16, but the emissions data indicates that the refinery started

4  operating sometime between May 6th and May 11th.

5       19.    This evidence indicates that the producers had coordinated operations.

6  Since the West Coast is essentially an "island" in the realm of refineries, with

7  ownership concentration in seven major firms (each of which is vertically integrated),

8  the possibility of market power is enhanced.  A review of the NOx emissions levels

9  plausibly demonstrates that California refineries had either:  (i) a production

10 relationship; and/or (ii) an agreement to allocate production targets over time in order

11 to maintain higher prices.[7]

12      20.    Below is a chart that reports the $R^2$ from regressions between NOx

13 emissions from eleven of the California refineries, revealing a pattern consistent with

14 coordinated production levels between refineries.  If there was no coordination, the

15 data would likely reflect normal seasonal patterns with all refineries increasing and

16 decreasing production at similar times, but that is not present here, as there is no

17 seasonal correlation among the refineries.

18

19

20

21

22

23

24

---

[7]    NOx is routinely monitored at refineries. It is a by-product of the production
25 process.  When units are off-line, no chemical reactions are taking place and no
   emissions result.  Where the suspect units were previously taken off line, the
26 emissions report showed zero pounds of emissions.  "This was not the case in May
   2012."  McCullough Report at 12.

27

28

COMPLAINT FOR VIOLATIONS OF          - 7 -              3:15-cv-01749-L-BGS
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16  McCullough Report at 18.

17       21.    October 2012 prices were $0.66 a gallon higher than they would be

18  normally, given the historical patterns of oil prices and gas inventories.  In the past,

19  sales for the month of October have averaged more than one billion gallons per

20  month. If the historical averages held and the numbers were adjusted for variations in

21  the market for fixed costs, this would mean defendants received windfall profits of

22  about $25 million a day.  Using the same overcharge calculation, consumers paid

23  approximately $1.3 billion more at the pump during the May 2012 price spike than

24  they should have absent the defendants' conduct.

25
26
27

28  COMPLAINT FOR VIOLATIONS OF          - 8 -          3:15-cv-01749-L-BGS
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

22.     This windfall is supported by historical data.  *See* Jamie Court & Liza Tucker, *New Report: Oil Refiners' Profits Spike With Gasoline Price Spikes*, Consumer Watchdog (May 5, 2015), *available at* http://www.consumerwatchdog.org /newsrelease/new-report-oil-refiners%E2%80%99-profits-spike-gasoline-price-spikes (finding that profits for Tesoro and Valero were "twice as high as the refiners' average quarterly profit in quarters where gasoline prices spiked"); *id.* (quoting a Chevron General Manager, who stated:  "Margins increased earnings by $435 million driven by unplanned industry downtime and tight product supply on the US West Coast.").

23.     Below is a chart comparing actual retail gas prices to forecasted retail prices:



McCullough Report at 19.

24.     The California Energy Commission later claimed that a minor plant problem (a "power failure" or "flaring") at ExxonMobil's Torrance refinery was to blame for the instantaenous increase in wholesale prices in October 2012.[8]  However, evidence shows that the price began spiking before the Torrance refinery's issues were

---

[8]    Robert McCullough, *The Year of Living Dangerously: Retail Gasoline Prices and Fundamentals*, McCullough Research (July 2, 2013) ("2013 McCullough Report") at 1, *available at* http://www.mresearch.com/pdfs/521.pdf.

COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S CARTWRIGHT ACT AND UNFAIR COMPETITION LAW REVISED PURSUANT TO ORDER OF THE COURT DATED MARCH 18, 2016

- 9 -

3:15-cv-01749-L-BGS

1    publicly announced.  The explanation that the price spiked $0.35 a gallon within 45

2    minutes of the first substantive coverage by the media is contrary to how the market

3    typically reacted to this type of news.  Indeed, the Torrance facility reported 27 other

4    similar events in 2012, none of which set off price increases anywhere near the scale

5    of those seen on October 1st.

6        25.    The evidence indicates that the major oil companies likely had advance,

7    secret notice that gas supplies were about run low in October 2012.  After the

8    Torrance facility "flare" on October 1st, "'all the majors came out and bought.'" 2013

9    McCullough Report at 8.  The major oil companies would not have bought in the open

10   market based on the information available at the time in the marketplace, which

11   indicated only a minor problem at the plant. Instead, this run up would have happened

12   only if ExxonMobil informed its competitors of operating problems prior to informing

13   the regulators and media.  Additionally, the NOx data does not support evidence of a

14   full plant closure and press releases by the company overstated the problem.

15       26.    Not surprisingly, the Western States Petroleum Association ("WSPA"),

16   an industry group made up of the defendants here and detailed below, at ¶¶54-63,

17   issued a critique of the McCullough Report several months after it was published.

18   McCullough Research issued a rebuttal, noting that the WSPA's report "does not offer

19   an explanation for the price spikes, nor does it perform any analyses that would justify

20   its opinions."[9]  Further, the McCullough Rebuttal noted that "WSPA's response

21   provides no explanation, additional data, or statistical analyses for the price spikes in

22   May and October 2012. Its proposed variable changes are neither substantive nor

23   explanatory." *Id*. at 16.  Moreover, McCullough noted that based on its "experience

24

25   [9]   *See* Robert McCullough, *Response to McCullough Research Report May and
     October 2012 Gasoline Price Spikes on the West Coast*: *A Rebuttal by McCullough
26   Research*, McCullough Research (Feb. 25, 2013) ("McCullough Rebuttal") at 1,
     *available at* http://www.mresearch.com/pdfs/511.pdf.

27

28   COMPLAINT FOR VIOLATIONS OF          - 10 -                3:15-cv-01749-L-BGS
     CALIFORNIA'S CARTWRIGHT ACT AND
     UNFAIR COMPETITION LAW REVISED
     PURSUANT TO ORDER OF THE COURT
     DATED MARCH 18, 2016

1    with Enron, we suggest that erroneous information in the media can be a form of

2    market manipulation. . . .  Since little information is available on refinery operations,

3    an erroneous press release may have significant impacts on market prices. . . .  [T]here

4    is evidence that this was a factor in both May and October 2012." *Id*. at 16-17.

5              27.    Another way in which the refineries agreed to control the supply was by

6    using a "short squeeze."  In October 2012, *Reuters*, citing numerous sources, reported

7    that the behavior of the spike in gasoline prices was consistent with what would have

8    occurred if there were a "short squeeze" intended to drive up prices, with parties

9    intentionally withholding supply after one supplier had run out of fuel. Erwin Seba,

10   *RPT-Traders see signs of squeeze behind L.A. gasoline spike*, Reuters (Oct. 5, 2012),

11   *available          at*          http://www.reuters.com/article/2012/10/06/gasoline-squeeze-

12   idUSL1E8L5HZA20121006.  Indeed, industry sources told *Reuters* that "fundamental

13   factors alone" could not explain the price increase.  *Id.*

14             28.    Senator Feinstein's letter to the FTC also addressed the possible short

15   squeeze.   She requested that "the FTC immediately initiate an investigation to

16   determine if the price spike in Southern California this week results from an illegal

17   short squeeze."  *See* n.4, *supra*.  She further noted that "[m]ultiple trade sources say

18   Tesoro Corporation was caught short on supply.  In the severely concentrated Los

19   Angeles gasoline market, the few sellers were reportedly able to squeeze Tesoro either

20   through collusion or use of market power. . . .  Publically available data appears to

21   confirm that market fundamentals are not to blame for rising gas prices in California."

22   *Id.*

23   **Details of the 2015 Price Spikes**

24             29.    Like the 2012 spikes, a series of suspicious refinery closures and

25   slowdowns preceded the recent spikes in price, defying input costs.  This conduct

26   continues.  According to industry insiders, refinery maintenance schedules were

27

28

COMPLAINT FOR VIOLATIONS OF          - 11 -                3:15-cv-01749-L-BGS
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

1    inexplicably moved forward, despite a lack of local supply.  "California's oil refiners

2    are the only industry in America that make a fortune when their factories break

3    down," said Jamie Court, president of Consumer Watchdog. "The oil companies are

4    acknowledging to investors that that they have been getting fat off the shutdowns in

5    their own refineries even as they refuse to appear before legislators in Sacramento."[10]

6        30.    Another method the West Coast refineries use to control and restrict

7    supply and drive up price is exporting gasoline outside of California.  In December

8    2014 refineries exported the most gasoline in history.  June data, still being examined,

9    shows another record export month. Californians paid $3.6 billion more for their

10   gasoline than the average U.S. motorist based on the added pump price from February

11   through May of 2015.  "Oil companies created a shortage by selling abroad, and then

12   shutting down refineries, and have made billions at the expense of Californians who

13   are paying a huge premium due to the state's low inventories," Consumer Watchdog's

14   Cody Rosenfield said.

15       31.    In the month of December, West Coast refiners exported 2.7 million

16   barrels, or 113 million gallons of gasoline.  The exports also constituted the most

17   exports in a quarter, ever. During the fourth quarter of 2014, oil companies exported

18   an amount that represents almost a third of California's current gasoline supply.

19       32.    As to refinery shutdowns and capacity reductions, memos from West

20   Coast oil refiners from the 1990s and released in 2011 by Senator Ron Wyden

21   (D. Or.) suggest that the practice of reducing capacity is a deliberate business strategy

22   that has been employed by the refineries for a number of years. An internal Chevron

23   memo, for example, stated:  "'A senior energy analyst at the recent API [American

24

25   [10]  *Tesoro CEO Admits Refinery "Disruption" and Shutdowns = Big Profits, Echoing Chevron Statements About Pump Spike*, Consumer Watchdog (May 8, 2015), *available at* http://www.consumerwatchdog.org/newsrelease/tesoro-ceo-admits-refinery-%E2%80%9Cdisruption%E2%80%9D-and-shutdowns-big-profits-echoing-chevron-statem.

26

27

28

COMPLAINT FOR VIOLATIONS OF
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

- 12 -

3:15-cv-01749-L-BGS

1  Petroleum Institute] convention warned that if the U.S. petroleum industry doesn't

2  reduce its refining capacity, it will never see any substantial increase in refinery

3  margins.'" [11]

4      33.    A letter to a number of western state attorneys general noted that: "Since

5  the beginning of February, California's fourteen oil refineries have suffered ten

6  serious slowdowns or shutdowns, many due to questionable causes or timing.  The

7  timing of these overlapping outages raises questions about their true necessity, and

8  about whether some refinery capacity may have been taken off line in order to drive

9  up prices and profits for oil refiners at [a] time when some of their crude operations

10  have been yielding less profits." [12]

---

[11]  *Pump Jacking California's Protection:  The Threat of Oil Industry Influence & Market Manipulation*, Consumer Watchdog (Dec. 15, 2014) at 7, *available at* http://www.consumerwatchdog.org/resources/OilIndustryManipulationReport.pdf.

[12]  Letter from Jaime Court, Liza Tucker and Cody Rosenfield to States Attorneys (May 21, 2015), *available at* http://www.consumerwatchdog.org/resources/ltrusattorneyspricemanip5-21-15ltrhd2_0.pdf.

COMPLAINT FOR VIOLATIONS OF        - 13 -        3:15-cv-01749-L-BGS
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

34.     The following chart details the recent suspicious plant closings:

| Date | Company | Refinery | Amount of Statewide Capacity | Type of Outage | Claimed Reason | Industry Sources |
|---|---|---|---|---|---|---|
| 2/2/2015 | Tesoro | Martinez | 8.70% | Unplanned | Tesoro said it would close its Martinez refinery in the face of a steelworkers' strike for "safety" reasons. | Refineries can run without a full staff once operations are well under way. Weeks later Tesoro's CEO, Geoff Goff, told investors that the company could continue to operate its refineries indefinitely with reduced staffing levels despite the strike. Steelworkers complained that management increasingly used contract workers to run refineries. They would have also been available to run the Martinez facility, raising questions about the "safety" reason for full closure of Martinez. |
| 2/18/2015 | ExxonMobil | Torrance | 7.80% | Unplanned | An "incident" on the Torrance refinery's premises. | Major explosion and fire blew off sections of a 12-story electrostatic precipitator that cuts pollution. Industry sources said the refinery had made operating errors that led to the accident and that the refinery will not come back on line again until July or August. Company reputedly may not bring facility back on line at all, or close it down completely. That would further reduce the state's refining capacity. |
| 4/17/2015 | Tesoro | Martinez | 8.70% | Unplanned | Never publicly disclosed. | A fire prompted a shutdown of a gas oil hydrotreater for several days. |

COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S CARTWRIGHT ACT AND UNFAIR COMPETITION LAW REVISED PURSUANT TO ORDER OF THE COURT DATED MARCH 18, 2016

- 14 -

3:15-cv-01749-L-BGS

| Date | Company | Refinery | Amount of Statewide Capacity | Type of Outage | Claimed Reason | Industry Sources |
|---|---|---|---|---|---|---|
| 4/21/2015 | Chevron | Richmond | 12.90% | Unplanned | Chevron notifies local officials of the shutdown of an unspecified unit and said flaring was part of "normal refinery operations." | No information. |
| 4/21/2015 | Tesoro | Martinez | 8.70% | Unplanned | Never disclosed. | Offline temporarily due to "operational glitches." |
| 4/23/2015 | Chevron | El Segundo | 14.50% | Planned | Company would not comment. | Chevron reportedly had an "unplanned" problem with one reformer unit and moved up planned maintenance schedule. The outage will last until at least mid-June and could include an unknown number of other units. The necessity of the maintenance and how much capacity is or will be affected is unclear. |
| 5/9/2015 | Tesoro | Martinez | 8.70% | Unplanned | Never disclosed. | Two compressors out on May 9 and 10. |
| 5/13/2015 | Phillips 66 | Wilmington | 7.30% | Planned | None; would not identify units. | Work may focus on hydrocracker used for diesel production, which was scheduled to have maintenance in June. Unclear if related to the failure of a nearby hydrogen plant that supplies this blending component. No information about effect on production output. |
| 5/18/2015 | Phillips 66 | San Francisco | 4.10% | Unplanned | Phillips 66 does not reveal reasons, but states operations continue. | Flaring triggered by an unplanned breakdown. Effect on production output unknown. |

| Date | Company | Refinery | Amount of Statewide Capacity | Type of Outage | Claimed Reason | Industry Sources |
|------|---------|----------|------------------------------|----------------|----------------|------------------|
| 5/19/2015 | Tesoro | Martinez | 8.70% | Unplanned | Declined to identify unit involved, said only that plant operations continue. | No information. |
| 5/19/2015 | Tesoro | Carson | 12.60% | Planned | Never disclosed. | Due to planned maintenance on a hydrotreater. Company set to perform work on hydrocracker in July. No information on effect on production output. |

*See* n.11, *supra* at 4-6.

35.    Unsurprisingly, the first quarter of 2015 was one of the most profitable for California refiners in recent history. "Despite refiners' claims that their costs were rising, profits per barrel of gasoline in California actually increased by a staggering amount – disputing industry assertions that higher costs were merely being passed to consumers."[13]

36.    Tesoro, the state's second biggest refiner, shut down its Martinez refinery in early February and had to buy gasoline on the spot market to fulfill contracts, yet it still made a first quarter 2015 profit of $119 million. Tesoro's CEO Greg Goff trumpeted this news:  "In California, crack spreads [difference between crude oil costs and wholesale prices] have improved related to the unplanned and planned refinery maintenance activities."  He also noted:  "There's no question that during the first quarter with what happened to Tesoro as a result of the disruption at the Martinez refinery because of the labor disruption and then with other operating and planned

---

[13]    *Consumer Watchdog's Analysis for the California Attorney General and California Energy Commission's Protection Market Advisory Committee*, Consumer Watchdog    (June    30,    2015)    at    6,    *available    at* http://www.consumerwatchdog.org/resources/wholesalegasolinemanipulaitonanalysis.pdf.

1129894_2

COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S CARTWRIGHT ACT AND UNFAIR COMPETITION LAW REVISED PURSUANT TO ORDER OF THE COURT DATED MARCH 18, 2016    - 16 -    3:15-cv-01749-L-BGS

1    maintenance things across the whole system, it was very supportive to the margin

2    environment there."[14]

3        37.    Jeff Gustavson, a Chevron general manager made similar comments on

4    an investor call. "Margins increased earnings by $435 million driven by unplanned

5    industry downtime and tight product supply on the US West Coast."[15]

6        38.    Materials presented on June 30, 2015 by the California Energy

7    Commission support the fact that "[r]efinery problems have been significant and

8    sustained during 2015," and that "[t]hese issues have occurred with a backdrop of

9    lower-than normal inventory levels." [16]  The Commission also noted:  "Strong price

10   spikes at refinery wholesale level quickly transferred through to distribution terminals

11   and retail."  *Id.*

12       39.    The following chart shows the low gasoline inventory levels, which can

13   "exacerbate price responses to refinery issues."  Further aggravating the issue,

14   refineries know that running on short supply of California's special CARB-complaint

15   gasoline (gasoline with 5.7% ethanol as an oxygenate), which is not generally

16   imported into the state, creates a situation where a substitute is not generally available,

17   so when a refinery goes down, gas prices go up and the refineries profit.

18

19   _____

20   [14]  *Tesoro (TSO) Gregory James Goff on Q1 2015 Results – Earnings Call Transcript*
     (May 8, 2015), *available at* http://seekingalpha.com/article/3160256-tesoro-tso-
21   gregory-james-goff-on-q1-2015-results-earnings-call-transcript?page=4&p=qanda
     &l=last.

22   [15]  *Consumer Watchdog Asks US Attorneys To Investigate Refinery "Maintenance"*
     *Issues Driving CA Gas Price Spikes*, Reuters (May 21, 2015), *available at* http://
23   www.reuters.com/article/2015/05/21/watchdog-refineries-idUSnPn25pM5j+84+
     PRN20150521.

24
     [16]  Gordon Schremp, *Recent Fuel Price Trends, Market Overview & Contributing*
25   *Factors:  Petroleum Market Advisory Committee Meeting* (June 30, 2015), *available*
     *at*            http://www.energy.ca.gov/assessments/petroleum_market/2015-06-30/
26   presentations/Recent_Fuel_Price_Trends_Market_Overview_and_Contributing_
     Factors.pdf.

27
28   COMPLAINT FOR VIOLATIONS OF              - 17 -              3:15-cv-01749-L-BGS
     CALIFORNIA'S CARTWRIGHT ACT AND
     UNFAIR COMPETITION LAW REVISED
     PURSUANT TO ORDER OF THE COURT
     DATED MARCH 18, 2016

*Id.*

## BACKGROUND ON WEST COAST REFINERIES

**Gas Market in California Is Vulnerable to Manipulation Because of Its Structure and Characteristics**

40.　In addition to the factual data detailed above, which details production coordination between some refineries as well as the windfall profits achieved during the spikes, other characteristics of the market make collusion particularly attractive in this market.  Specifically, the market: (1) has high barriers to entry; (2) has inelasticity of demand; and (3) is highly concentrated.

**High Barriers to Entry**

41.　A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing.  Where there are significant barriers to entry, however, new entrants are less likely to enter the market.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

42.　There are substantial barriers that preclude, reduce, or make entry more difficult into the gasoline market.  A new entrant into the business would face costly

1129894_2

COMPLAINT FOR VIOLATIONS OF
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

- 18 -

3:15-cv-01749-L-BGS

and lengthy start-up costs, including multi-million dollar costs associated with research and development, manufacturing plants and equipment, energy, transportation, distribution, infrastructure, skilled labor and long-standing customer relationships.

43.    In addition to the costs of building a new refinery, given the nature of the product and California's unusual position in the market, any new entrant would have to comply with the various and complex regulations, including environmental regulations, imposed by state and federal agencies.  Compliance with the regulations would require extensive testing and the receipt of government approvals, all of which would take years.

44.    Barriers to entry have only grown in the years since the Senate Report was issued.[17]

**The Demand for Gasoline in California Is Inelastic**

45.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "elastic" if an increase in the price of a product results in diminished revenues, with declines in the quantity sold of that product outweighing the effects of higher prices.  For products with a highly elastic demand, customers have many feasible alternatives for cheaper products of similar quality, and cut purchases sharply in the face of even a small price increase.

46.    For a cartel to profit from raising prices above competitive levels, market demand must be relatively less elastic at competitive prices where an increase in price would result in a net increase in profit.  A less elastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without

---

[17]    Jamie Court, Cody Rosenfield and Liza Tucker, *Price Spiked: How Oil Refiners Gouge California and What It Costs*, Consumer Watchdog (last visited June 26, 2015) at 2, *available at* http://www.consumerwatchdog.org/resources/PriceSpiked.pdf.

COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S CARTWRIGHT ACT AND UNFAIR COMPETITION LAW REVISED PURSUANT TO ORDER OF THE COURT DATED MARCH 18, 2016

- 19 -

3:15-cv-01749-L-BGS

1   triggering customer substitution and sufficient lost sales revenues as to offset the

2   beneficial effect of higher prices on profits for products they still continue to sell.

3       47.    Gasoline sales are highly inelastic.  People and businesses tend to have

4   set driving patterns and purchase a similar amount of gasoline no matter what the

5   price.  A 2002 report by the Senate Majority Staff of the Permanent Subcommittee on

6   Investigations, has noted that "demand for gasoline in California is inelastic." [18]

7   **The Market for Gasoline in California Is Highly Concentrated**

8       48.    The West Coast is an "island" in the North American gasoline market

9   because there are no gas pipelines across the Rockies.  California itself is a smaller

10  island within the West Coast because California law mandates a specific formulation

11  for gas during spring and summer months.  There are 19 refineries on the West Coast,

12  but ownership is concentrated with major oil companies owning two or three

13  refineries each.  This is exactly the type of environment where market power is likely

14  to exist.

---

[18] United States Senate, *Majority Staff of the Permanent Subcommittee on Investigations, Gas Prices: How are they really set?* ("Senate Report") (released Apr. 30 & May 2, 2002) at 106, *available at* http://www.hsgac.senate.gov/subcommittees/investigations/hearings/gas-prices_how-are-they-really-set.

COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S CARTWRIGHT ACT AND UNFAIR COMPETITION LAW REVISED PURSUANT TO ORDER OF THE COURT DATED MARCH 18, 2016
    - 20 -    3:15-cv-01749-L-BGS





Western States Petroleum Association, *available at* https://www.wspa.org/sites/default/files/uploads/documents/Energy%20Alerts/WSPA%20General%20Fact%20Sheet.pdf (last visited June 29, 2015).

49.     The Senate Report noted that California is the second largest gasoline market in the world, following only the United States as a whole.  As in other markets, the Senate Report noted "[a] small decrease in supply will produce a large increase in price."  Senate Report at 106.  Further, the report noted that the California refining industry is an oligopoly where the top two refiners control nearly half the state's capacity, the top four "refiners owned nearly 80 percent of California capacity," and the top seven players (all of which are defendants herein) account for more than 92% of the market.[19]  The Senate Report cites a number of documents from a lawsuit brought against the refiners in 1996 alleging an anticompetitive scheme by the refiners

---

[19]     *See* California Energy Commission, *Gasoline Market Share in California for 2014* (updated Apr. 2015), *available at* http://energyalmanac.ca.gov/gasoline/market_share/index.html.

COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S CARTWRIGHT ACT AND UNFAIR COMPETITION LAW REVISED PURSUANT TO ORDER OF THE COURT DATED MARCH 18, 2016

- 21 -

3:15-cv-01749-L-BGS

1   in relation to gasoline meeting the specifications of the California Air Resources
2   Board ("CARB").  The Senate Report concluded that the evidence produced in the
3   case showed recognition by a number of the refiners and petroleum industry
4   consultants that the small number of large refiners in California possess a significant
5   degree of market power.

6        50.    For example, a document generated by Chevron in 1993 as part of a
7   strategic study that was produced during discovery in *Aguilar v. Atlantic Richfield*
8   *Co.*, No. 700810 (Cal. Super. Ct., San Diego Cnty.), and referred to in the Senate
9   Report, also states that a few large refiners dominate the West Coast and have a
10  significant effect on the market.  The Chevron document contrasts the high returns of
11  the refiners in the West Coast market with the lower returns of refiners in the Gulf
12  Coast and attributes the difference, in part, to the concentrated nature of the West
13  Coast market:  "USWC market appears to allow better average returns than USGC
14  [Gulf Coast].  The better performers generate [returns on capital employed] greater
15  than 12% . . . . ***Market is dominated by a limited number of large, committed***
16  ***refiner/marketers whose individual actions can have significant market impact***."
17  Senate Report at 109 (emphasis in original).

18       51.    Another document relied upon by the Senate in its report was an "Energy
19  Briefing Note" that was generated in 1996 by the PIRA Energy Group, a petroleum
20  industry consulting organization, and presented to all of its "retainer clients,"
21  including Mobil, regarding the impact of the introduction of CARB-compliant
22  gasoline on refining margins.  *Id.* at 109-110.  The Briefing Note reported that the
23  supply/demand balance in California was likely to be "tight," and would remain so,
24  partially as a result of the market structure in which a few refiners in the state had
25  sufficient market power and motivation to maintain prices above marginal costs:  "The
26  CARB 2 balance appears to be tight in California.  Add in the remoteness of the

27
28

COMPLAINT FOR VIOLATIONS OF
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

- 22 -

3:15-cv-01749-L-BGS

California market, the unique characteristics of CARB 2, the requirement for domestic shippers to use higher cost Jones Act shipping, ***and the small number of companies involved, all of whom share a motivation to recoup costs and not undermine the market.  The implication is that prices on average will do quite a bit more than cover marginal costs***, which will mainly comprise the incremental oxygenate cost, although not during the extended phase-in period." *Id.* at 110 (emphasis in original).

52.    As the Senate Report found, "this PIRA memo presents a classic description of a market failure.  In a purely competitive market, prices do not rise above marginal costs, which are the costs of producing an additional unit of the product." *Id.*

53.    The Senate Report, in looking at California, found "the high degree of vertical integration between the refining and marketing sectors raises prices within the state and raises the barriers for others to enter into the market or import gasoline, thus helping to keep the supply/demand balance tight and to sustain higher prices." *Id*. at 111.

**Opportunity to Collude – Trade Associations**

54.    Defendants BP West, Chevron, Tesoro, Shell, ExxonMobil, Valero, ConocoPhillips, Alon and Kern Oil, various of their subsidiaries and defendant-affiliated entities  are all members of an interconnected group of trade associations and organizations engaged in extensive lobbying and other activities related to the gas market.   These associations, which hold regular meetings, provide numerous opportunities for defendants to conspire.

55.    Since the early 1900s, oil and gas companies such as Alon USA, Chevron USA, ConocoPhilips, ExxonMobil, Shell, Tesoro Corporation, and Valero have been members of industry trade associations such as the WSPA; American Petroleum Institute ("API"); American Fuel & Petrochemical Manufacturers ("AFPM"); Society

1129894_2

COMPLAINT FOR VIOLATIONS OF
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016                    - 23 -                    3:15-cv-01749-L-BGS

of Independent Gasoline Marketers of America ("SIGMA"); and Petroleum Marketers Association of America ("PMAA").  These trade associations are dominated and controlled by the defendants, as their representatives, predecessors and affiliates actively participated in the trade associations' management and oversight.  Further, most of the revenue earned by the trade associations comes from membership fees and other payments from defendants related to research, lobbying, trade shows, and conferences.  While the stated purpose of these trade associations is to ensure that consumers continue to have reliable access to petroleum and petroleum products, plaintiff alleges certain members of these trade organizations have conspired amongst themselves to use these trade organizations to engage in anticompetitive discussions involving pricing, supply and production levels.

56.    The trade associations provided a mechanism and venue through which the conspiracy was facilitated, implemented and monitored.  Defendants met regularly prior to and following the price spikes in May and October 2012, attending sponsored meetings, conventions, and conferences hosted by these associations.

57.    For example, Chevron, ConocoPhillips, ExxonMobil Corporation, Shell Oil Products Company, Tesoro and Valero are all members of WSPA.  The dates that WSPA held meetings and conferences include but are not limited to: January 13-14, 2010; October 6, 2010; February 1-3, 2011; October 4-6, 2011; October 2-3, 2012; and October 1-2, 2013.

58.    Chevron Products Company and defendants ConocoPhilips (board member), ExxonMobil (board member) and Shell are all members of API.  The dates that API held meetings and conferences include but are not limited to: April 26-28, 2010; November 15-17, 2010; May 16-18, 2011; November 14-16, 2011; March 19-23, 2012; November 12-16, 2012; November 11-13, 2013; and April 22-26, 2013.

COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S CARTWRIGHT ACT AND UNFAIR COMPETITION LAW REVISED PURSUANT TO ORDER OF THE COURT DATED MARCH 18, 2016

- 24 -

3:15-cv-01749-L-BGS

59.     Alon USA, Chevron Products Company, Shell Chemical Company, Tesoro Corporation, and defendants ConocoPhilips, ExxonMobil and Valero's parent company (board member) are all members of AFPM.  The dates that AFPM held meetings and conferences include but are not limited to: March 28-30, 2010; March 27-29, 2011; April 2-3, 2012; March 11-13, 2012; March 24-26, 2013; and March 17-19, 2013.

60.     Alon, Inc., Chevron Corporation, Shell Oil, Valero and defendants ExxonMobil and Tesoro are all members of SIGMA.  The dates that SIGMA held meetings and conferences include but are not limited to: April 29-May 2, 2010; July 19-21, 2010; November 12-14, 2010; and November 3-6, 2011.

61.     Defendants ExxonMobil and Shell and Chevron Products Company and Valero Marketing and Supply Company are all members of PMAA.  The dates that PMAA had meetings and conferences include but are not limited to: October 4-5, 2010; September 30-October 1, 2011; February 22-24, 2011; and February 21-23, 2012.

62.     Not surprisingly, through various organizations, such as WSPA and API, defendants also are active in lobbying efforts related to the gas industry.  WSPA and API  members recognized their common interests in promoting the interests of the industry as a whole and collaborated in lobbying regulatory agencies to further such interests.  Because members have a convenient forum to consult each other regarding policy positions, they can ensure that they maintain a united stance.

63.     For example, from 2010-2013, ConocoPhilips spent $48,289,514 for lobbying efforts; Valero spent $2,903,000; Tesoro spent  $4,547,287; and ExxonMobil spent $51,570,000.  Likewise, API also spent $32,550,000 lobbying the oil and gas industry for the same period.  *See* Center for Responsive Politics, *available at* http://www.opensecrets.org (last visited June 29, 2015).

**Investigations**

64.     Senators and representatives have urged the government to delve into the price spikes over the years.  For example, following the issuance of the McCullough Report, Rep. Peter DeFazio of Oregon wrote the then-attorney general Eric Holder calling the lack of progress on an investigation into high West Coast gas prices "intolerable."[20]  DeFazio noted in the letter that he had written "to the so-called Gas Price Fraud Working Group calling for an investigation. Nothing happened.  I wrote to the president and raised the issue of market manipulation by California refineries. Nothing. It's time for the Department of Justice to step up and do what they are supposed to do: crack down on, or at least investigate, illegal energy market activity." *Id.*

65.     DeFazio continued: "Basically, this independent research shows that California refineries were misleading the public.  Refinery outages and maintenance shutdowns just provided a convenient excuse and explanation for 'declining' gas production so they could jack up the price of refined gasoline . . . .  Hugely profitable oil companies who continue to look for every opportunity to rip off American drivers need to be held accountable for their blatant market manipulation. Enough is enough. Serious action is needed now."  *Id.*

66.     DeFazio's letter further claimed "these devastatingly high gas prices on the West Coast appear to be a result of market abuses by a handful of California refineries – not the 'dynamics of supply and demand' as the oil and gas industry has facetiously claimed for decades while laughing all the way to the bank."  The

---

[20]   Press Release, Congressman Peter DeFazio Representing the 4th District of Oregon, *DeFazio to AG Holder:  Lack of Progress on Gas Price Investigation is "Intolerable"* (Nov. 19, 2012), *available at* http://defazio.house.gov/media-center /press-releases/defazio-to-ag-holder-lack-of-progress-on-gas-price-investigation-is.

COMPLAINT FOR VIOLATIONS OF
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

- 26 -

3:15-cv-01749-L-BGS

1   Congressman further noted:  "The behavior of California refineries over the last six

2   months has been suspicious at best and malicious at worst." *Id.*

3        67.    In April 2011, then-Attorney General Holder announced the creation of

4   the Oil and Gas Price Fraud Working Group ("Working Group") "to help identify

5   civil or criminal violations in the oil and gasoline markets, and to ensure that

6   American consumers are not harmed by unlawful conduct."[21]

7        68.    The Working Group is co-chaired by the Commodities Futures Trading

8   Commission, FTC and the National Association of Attorneys General.   Other

9   Working Group members include the Department of the Treasury, the Federal Reserve

10  Board, the Securities and Exchange Commission, the Department of Justice's

11  Criminal Division, Civil Division, and Antitrust Division, the Federal Bureau of

12  Investigations, the United States Attorney's Office for the Western District of New

13  York, the Executive Office for United States Attorneys, as well as the Departments of

14  Agriculture and Energy.

15       69.    When the Working Group was formed, the intention was to explore

16  whether there was any evidence of manipulation of oil and gas prices, collusion, fraud,

17  or misrepresentations at the retail or wholesale levels that would violate state or

18  federal laws and that has harmed consumers or the federal government as a purchaser

19  of oil and gas, and to evaluate developments in commodities markets, including an

20  examination of investor practices, supply and demand factors, and the role of

21  speculators and index traders in oil futures markets.

22       70.    To date, the Working Group has issued no reports regarding the May and

23  October price spikes, although it is believed that based on calls to action by members

24  of Congress, an investigation is ongoing.

---

[21]   United States Department of Justice, *Protecting Consumers at the Pump: The Oil and Gas Price Fraud Working Group* (Apr. 22, 2011), *available at* http://www.justice.gov/opa/blog/protecting-consumers-pump-oil-and-gas-price-fraud-working-group.

COMPLAINT FOR VIOLATIONS OF            - 27 -            3:15-cv-01749-L-BGS
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

1

**VENUE AND JURISDICTION**

2       71.     This Complaint is filed, and these proceedings are instituted, pursuant to

3   Cal. Bus. & Prof. Code §§16750(a) and 17203 to obtain relief and recover damages

4   that plaintiff and members of the Class have sustained due to defendants' violations,

5   as hereinafter alleged, of the Cartwright Act and the UCL.

6       72.     This Court has personal jurisdiction over each of the defendants as co-

7   conspirators as a result of the acts of any of the defendants occurring in California in

8   connection with defendants' violations of the Cartwright Act and/or the UCL.  No

9   portion of this Complaint is brought pursuant to federal law.  California law applies to

10  plaintiff's and the Class members' claims.

11      73.     All defendants conduct business in the state and are within the

12  jurisdiction of the Court for purposes of service of process.

13      74.     Greater than two-thirds of the members of the proposed plaintiff class are

14  citizens of California.

15      75.     Venue is proper in this County pursuant to the provisions of Cal. Bus. &

16  Prof. Code §16750(a) and California Code of Civil Procedure §§395(a) and 395.5.

17      76.     Plaintiff is a resident of San Diego County and many of the unlawful acts

18  occurred in California and, more particularly, in San Diego County.  All defendants do

19  business in San Diego County and venue is proper in the Central Division of this

20  Court.

21

**PARTIES**

22      77.     Plaintiff Persian Gulf Inc., d/b/a a "76" gas station, is a California-based

23  corporation with its principal place of business in Escondido, California.  During the

24  Class Period, Persian Gulf directly purchased gasoline from one or more of the

25  defendant refineries.

26

27

1129894_2

28

COMPLAINT FOR VIOLATIONS OF
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

- 28 -

3:15-cv-01749-L-BGS

78.     Defendant BP West Coast Products LLC owns and operates a network of gas and fueling stations in California, Oregon, Washington, Nevada, and Arizona.  It was founded in 1978 and is based in La Palma, California.  BP West operates as a subsidiary of BP p.l.c.

79.     Defendant Chevron U.S.A. Inc. explores, extracts, and produces crude oil, natural gas, and natural gas liquids.  Chevron also refines, markets, and distributes products derived from petroleum, other than natural gas liquids.  Chevron was formerly known as Gulf Oil Corporation.  Chevron is based in San Ramon, California, and operates as a subsidiary of Chevron Corporation.  Chevron runs two refineries, one in Richmond and one in El Segundo.  According to Chevron, its Richmond refinery is among the country's largest and most important refineries, processing up to 240,000 barrels of crude oil a day – more than any other Bay Area refinery.

80.     Defendant Tesoro Refining & Marketing Company LLC offers refining and marketing of motor fuels and petroleum products.  Tesoro was formerly known as Tesoro West Coast Company, LLC and changed its name to Tesoro Refining & Marketing Company LLC in January 2002.  Tesoro, incorporated in 1996, is based in San Antonio, Texas, and operates as a subsidiary of Tesoro Corporation.  Tesoro runs the Los Angeles and Martinez refinery, the second largest refinery in Northern California.

81.     Defendant Equilon Enterprises LLC (d/b/a Shell Oil Products US) operates refineries and crude oil pipelines in the western United States and markets petroleum products via Shell-branded outlets in the West and Midwest.  Shell's Martinez refinery has been in operation since 1915.

82.     Defendant ExxonMobil Refining & Supply Company operates as a subsidiary of Exxon Mobil Corporation.  The ExxonMobil Torrance refinery covers 750 acres, employs approximately 650 employees and 550 contractors, processes an

COMPLAINT FOR VIOLATIONS OF
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

- 29 -

3:15-cv-01749-L-BGS

1   average of 155,000 barrels of crude oil per day and produces 1.8 billion gallons of

2   gasoline per year.

3        83.   Defendant Valero Marketing and Supply Company refines and markets

4   crude oil in the United States and internationally.  Its refining activities include

5   refining operations, wholesale marketing, product supply and distribution, and

6   transportation operations primarily in the Gulf Coast, Mid-Continent, West Coast, and

7   northeast regions.  The company is based in San Antonio, Texas. Valero Marketing

8   and Supply Company operates as a subsidiary of Valero Energy Corporation.

9        84.   Defendant ConocoPhillips operates the San Francisco refinery, which is

10  comprised of two facilities linked by a 200-mile pipeline: the Santa Maria facility is

11  located in Arroyo Grande, California, while the Rodeo facility is in the San Francisco

12  Bay Area.  ConocoPhillips is based in Houston, Texas.

13       85.   Defendant Alon USA Energy, Inc., headquartered in Dallas, Texas, is an

14  independent refiner and marketer of petroleum products, operating primarily in the

15  South Central, Southwestern and Western regions of the United States.  Rosedale

16  Highway refinery has been in operation for more than 70 years.  The Alon Bakersfield

17  refinery has a capacity of 70,000 barrels per day and comprises more than 600 acres of

18  land.

19       86.   Defendant Kern Oil & Refining Co. operates as an oil refining and

20  marketing company.  It produces and supplies gasoline and diesel fuel to customers

21  primarily in California.  Kern Oil was formerly known as Kern County Refinery, Inc.

22  and changed its name to Kern Oil & Refining Co. in January 1982.  Kern Oil was

23  founded in 1934 and is based in Bakersfield, California, with an additional office in

24  Long Beach, California.

25       87.   Each of the defendants is a participant in the California gasoline refinery

26  market.

27

28

COMPLAINT FOR VIOLATIONS OF
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

- 30 -

3:15-cv-01749-L-BGS

88.     The true names and capacities of defendants sued herein under California Code of Civil Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiff, who therefore sues these defendants by such fictitious names. Plaintiff will seek to amend this Complaint and include these Doe defendants' true names and capacities when they are ascertained.  Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by the Class.

## CLASS ALLEGATIONS

89.     Plaintiff brings this action individually and as a class action under the provisions of §382 of the California Code of Civil Procedure on behalf of the members of the following Class:

> All persons or entities that purchased gasoline directly from a defendant during the Class Period (February 1, 2012 to present) and were damaged thereby.  Excluded from the Class are defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, governmental entities and instrumentalities of the government, states and their subdivisions, agencies and instrumentalities.

90.     The Class is ascertainable and is one for which records should readily exist.

91.     Plaintiff does not know the exact size of the Class, but because the nature of the trade and commerce involved, plaintiff believes that there are hundreds or thousands of Class members as above described, the exact number and their identities being known to defendants and their co-conspirators.

92.     There is a well-defined community of interest among plaintiff and the members of the Class.  Because defendants have acted in a manner generally applicable to the Class, questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual members of the Class.  Such generally applicable conduct is inherent in defendants' wrongful and anticompetitive conduct.

1129894_2

COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S CARTWRIGHT ACT AND UNFAIR COMPETITION LAW REVISED PURSUANT TO ORDER OF THE COURT DATED MARCH 18, 2016

- 31 -

3:15-cv-01749-L-BGS

93.     Among the questions of law and fact common to the Class are: (a) whether defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of gasoline in California; (b) the identity of the participants of the alleged conspiracy; (c) the duration of the conspiracy alleged herein and the acts performed by defendants and their co-conspirators in furtherance of the conspiracy; (d) whether the alleged conspiracy violated the Cartwright Act; (e) whether the alleged conspiracy violated the UCL; (f) whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of plaintiff and the other members of the Class; (g) the effect of defendants' alleged conspiracy on the prices of gasoline in California during the Class Period; (h) the appropriate class-wide measure of damages; and (i) the appropriate nature of class-wide injunctive or other equitable relief.

94.     There are no defenses of a unique nature that may be asserted against plaintiff Persian Gulf individually, as distinguished from the other members of the Class, and the relief sought is common to the Class.

95.     Plaintiff Persian Gulf is a member of the Class and its claims are typical of the claims of the other members of the Class.  Plaintiff was damaged by the same wrongful conduct of defendants.

96.     Plaintiff will fairly and adequately protect the interests of other Class members because it has no interests that are antagonistic to, or that conflict with, those of any other Class member.  Plaintiff Persian Gulf is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent it and the other members of the Class.

97.     A class action is the superior method for the fair and efficient adjudication of this controversy.  Class treatment will enable a large number of

1129894_2

COMPLAINT FOR VIOLATIONS OF
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016                    - 32 -                    3:15-cv-01749-L-BGS

1  similarly situated parties to prosecute their claims in a single forum simultaneously,

2  efficiently, and without the unnecessary duplication of evidence, effort and expense

3  that would result if individual actions were pursued.

4      98.    This case is also manageable as a class action. Plaintiff knows of no

5  difficulty to be encountered in the prosecution of this action that would preclude its

6  maintenance as a class action.

7      99.    Defendants' unlawful acts alleged in this Complaint had a substantial

8  effect on commerce and caused antitrust injury to plaintiff and the Class.

9      100.    Defendants' unlawful acts had the purpose and effect of manipulating the

10  price of gasoline sold in California.

11      101.    As a direct result of defendants' violations, plaintiff and the members of

12  the Class have been damaged in their property or business.

13      102.    As a direct and foreseeable result of defendants' unlawful anticompetitive

14  acts, the price of gasoline sold in California was manipulated and inflated.

15              **ANTICOMPETITIVE CONDUCT BY THE DEFENDANTS**

16      103.    Defendants are horizontal competitors.

17      104.    The conspiracy consisted of a continuing agreement, understanding, or

18  concerted action between and among defendants and their co-conspirators in

19  furtherance of which defendants fixed, maintained, or made artificial prices for

20  gasoline sold in California during the Class Period.   Defendants' conspiracy

21  constitutes a *per se* violation of the Cartwright Act and is an unreasonable and

22  unlawful restraint of trade and an unlawful, unfair or fraudulent practice under the

23  UCL.

24      105.    At all relevant times, other corporations, individuals and entities willingly

25  conspired with defendants in their unlawful and illegal conduct.   Numerous

26  individuals and entities participated actively during the course of and in furtherance of

27

28

1   the scheme described herein.  The individuals and entities acted in concert by joint

2   ventures and by acting as agents for principals, in order to advance the objectives of

3   the scheme to benefit defendants and themselves through the manipulation of gasoline

4   prices in California.

5                    **PLAINTIFF'S CLAIMS ARE TIMELY**

6          106.   Plaintiff brings its claims within the statute of limitations.

7          107.   Even though plaintiff's claims are timely, facts indicating defendants

8   were engaging in misconduct that caused gasoline prices in California to be artificially

9   manipulated were actively concealed by defendants.

10   **PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY**

11          108.   Plaintiff has suffered significant injury as a result of defendants' gasoline

12   price manipulation conspiracy.

13          109.   Defendants' price-fixing conspiracy had the following effects, among

14   others: (a) price competition has been restrained or eliminated with respect to gasoline

15   sold in California; (b) the price of gasoline sold in California has been fixed, raised,

16   maintained, or stabilized at artificially inflated levels; and (c) purchasers of gasoline

17   sold in California have been deprived of free and open competition.  During the Class

18   Period, plaintiff and the members of the Class paid supracompetitive prices for

19   gasoline sold in California.

20          110.   By reason of the alleged violations of California laws, plaintiff and the

21   members of the Class have sustained injury to their businesses or property, having

22   paid higher prices for gasoline sold in California than they would have paid in the

23   absence of defendants' illegal contract, combination, or conspiracy, and, as a result,

24   have suffered damages in an amount presently undetermined.  This is an antitrust

25   injury of the type that the antitrust laws were meant to punish and prevent.

26

27

1129894_2

28

COMPLAINT FOR VIOLATIONS OF
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

- 34 -                          3:15-cv-01749-L-BGS

111.   In formulating and effectuating the contract, combination, or conspiracy, defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to fix, maintain, suppress, inflate, and otherwise make artificial the price of gasoline sold in California.

112.   Plaintiff suffered antitrust injury in that it paid more for gasoline from defendants than it would have paid had the manipulation not occurred.

113.   Injury to plaintiff and the Class also resulted from defendants' deprivation of the benefits of free and open competition in the market for gasoline sales.

114.   Plaintiff suffered antitrust injury as a result of defendants' actions.

## COUNT I

## Violations of the Cartwright Act

115.   Plaintiff incorporates by reference the preceding allegations.

116.   The acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code §16700, *et seq*.

117.   It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California, the purchasers reside in California, the refineries at issue are in the state and because other overt acts in furtherance of the conspiracy and overcharges flowing from those acts occurred in California.

118.   As detailed above, the anticompetitive conduct described constitutes a per se violation of California's antitrust laws and is an unreasonable and unlawful restraint of trade.  The anticompetitive effects of defendants' conduct far outweigh any purported non-pretextual, pro-competitive justification.

119.   As a proximate result of defendants' unlawful conduct, plaintiff and the members of the Class it seeks to represent have been injured in their business or

1129894_2

COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S CARTWRIGHT ACT AND UNFAIR COMPETITION LAW REVISED PURSUANT TO ORDER OF THE COURT DATED MARCH 18, 2016                - 35 -                3:15-cv-01749-L-BGS

1  property in violation of the Cartwright Act, Cal. Bus. & Prof. Code §16700, *et seq.*, by

2  paying supracompetitive prices for gasoline during the Class Period.   Such

3  overcharges are the type of injury the antitrust laws were designed to prevent and flow

4  directly from defendants' unlawful conduct.   Plaintiff Persian Gulf and members of

5  the Class are proper entities to bring a case concerning this conduct.

6      120.   Plaintiff and members of the Class have standing to and hereby seek

7  monetary relief, including treble damages, together with other relief, as well as

8  attorneys' fees and costs, as redress for defendants' Cartwright Act violations.

9                              **COUNT II**

10              **Violations of the Unfair Competition Law**

11      121.   Plaintiff incorporates by reference the preceding allegations.

12      122.   Plaintiff brings this claim under §§17203 and 17204 of the Cal. Bus. &

13  Prof. Code to enjoin, and obtain restitution and disgorgement of all monetary gains

14  that resulted from acts that violated §17200 of the Cal. Bus. & Prof. Code, commonly

15  known as the UCL.

16      123.   Plaintiff and the members of the Class have standing to bring this action

17  under the UCL because they have been harmed and have suffered injury by being

18  forced to pay inflated, supracompetitive prices for gasoline sold in California during

19  the Class Period.

20      124.   In formulating and carrying out the alleged agreement, understanding and

21  conspiracy, defendants and their co-conspirators did those things that they combined

22  and conspired to do, including but not limited to, the acts, practices and course of

23  conduct set forth herein, and these acts constitute unfair competition in violation of the

24  UCL.

25      125.   Defendants' conspiracy had the following effects, among others: (a) price

26  competition in the market for gasoline sold in California during the Class Period was

27

28

1 restrained, suppressed, and/or eliminated; (b) prices for gasoline sold in California
2 during the Class Period sold by defendants and their co-conspirators have been fixed,
3 raised, maintained, and stabilized at artificially high, non-competitive levels; and (c)
4 plaintiff and members of the Class who purchased gasoline sold in California during
5 the Class Period directly from defendants have been deprived of the benefits of free
6 and open competition.

7  126.  As a direct and proximate result of defendants' anticompetitive conduct,
8 plaintiff and members of the Class have been injured in their business or property by
9 paying more for gasoline sold in California during the Class Period purchased directly
10 from defendants than they would have paid the absence of the conspiracy.

11  127.  The anticompetitive behavior, as described above, is unfair,
12 unconscionable, unlawful, and fraudulent, and in any event it is a violation of the
13 policy or spirit of the UCL.

**PRAYER FOR RELIEF**

15  WHEREFORE, plaintiff prays that the Court:

16  A.  Certify this lawsuit as a class action pursuant to §382 of the California
17 Code of Civil Procedure, and enter an order appointing plaintiff as the class
18 representative and plaintiff's counsel as class counsel;

19  B.  Enter a judgment awarding plaintiff and the Class damages against
20 defendants as a result of defendants' unlawful conduct alleged in this Complaint, plus
21 treble damages and all other available damages, including any statutory or liquidated
22 damages or otherwise;

23  C.  Award to plaintiff and the Class their costs of suit, including reasonable
24 attorneys' and experts' fees and expenses; and

25  D.  Award any other and further relief as the Court may deem just and
26 proper.

27
1129894_2
28 COMPLAINT FOR VIOLATIONS OF
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

- 37 -

3:15-cv-01749-L-BGS

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a trial by jury on all issues that can be tried to a jury.

DATED: March 24, 2016

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
DAVID W. MITCHELL
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
CARISSA J. DOLAN

s/ Alexandra S. Bernay
ALEXANDRA S. BERNAY

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

1129894_2

COMPLAINT FOR VIOLATIONS OF
CALIFORNIA'S CARTWRIGHT ACT AND
UNFAIR COMPETITION LAW REVISED
PURSUANT TO ORDER OF THE COURT
DATED MARCH 18, 2016

- 38 -

3:15-cv-01749-L-BGS