UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERSIAN GULF INC., Individually and on Behalf of All Others Similarly Situated,<br><br>                                   Plaintiff,<br><br>v.<br><br>BP WEST COAST PRODUCTS LLC; CHEVRON U.S.A. INC.; TESORO REFINING & MARKETING COMPANY LLC; EQUILON ENTERPRISES LLC (D/B/A SHELL OIL PRODUCTS US); EXXONMOBIL REFINING & SUPPLY COMPANY; VALERO MARKETING AND SUPPLY COMPANY; CONOCOPHILLIPS; ALON USA ENERGY, INC.; and DOES 1-25, inclusive,<br><br>                                   Defendants. | Case No.:  3:15-cv-01749-L-BGS<br><br>**ORDER GRANTING WITH LEAVE TO AMEND DEFENDANTS' MOTION TO DISMISS [Doc. 47]** |

Pending before the Court in this antitrust action is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff filed an opposition and Defendants replied. The Court decides the matter on the papers submitted and without

oral argument pursuant to Civil Local Rule 7.1.d.1. For the reasons which follow, the Defendants' motion is granted with leave to amend.

## I. BACKGROUND

Plaintiff, Persian Gulf, Inc. operates a gas station. (Pl.'s Compl. ¶77 [Doc. 56].) During the alleged conspiracy, Plaintiff directly purchased gasoline from one or more of the Defendants' refineries. (*Id*.) The Defendants include: BP West Coast Products LLC. ("BP"), Chevron U.S.A. Inc. ("Chevron"), Tesoro Refining & Marketing Company LLC ("Tesoro"), Equilon Enterprises LLC. (d/b/a Shell Oil Products US) ("Shell"), ExxonMobil Refining & Supply Co. ("ExxonMobil"), Valero Marketing and Supply Co. ("Valero"), ConocoPhillips ("Phillips"), and Alon USA Energy, Inc. ("Alon"). The Defendants are all participants in the California gasoline refinery market. (*Id*. at ¶87.)

Plaintiff contends that the Defendants, as horizontal competitors, were part of a conspiracy that consisted of a continuing agreement, understanding, or concerted action to fix, maintain, or make artificial prices for gasoline sold in California. (Compl. ¶¶103-104.) Plaintiff contends that the alleged conspiracy violated the Cartwright Act, Cal. Bus. & Prof. Code §16700 *et seq*., and the Unfair Competition Law, Cal. Bus. & Prof. Code §17200 *et seq*. (*Id*. at ¶104.) The Plaintiff did not allege when the conspiracy was formed; however, the alleged class period is from February of 2012 through the present. (*Id*. at ¶89.) The Plaintiff's arguments are primarily based on events that occurred during May and October of 2012, December of 2014, and throughout 2015. (*See* Compl.)

In May and October of 2012, California gasoline prices spiked above $4 per gallon.[1] (Compl. ¶4.) In October, based on historical patterns of oil prices and inventories, the price per gallon was $0.66 higher than it would have normally been. (*Id*. at ¶21.) According to the complaint, the Defendants blamed the price spikes on several refinery shutdowns that had caused a decrease in supply. A fire at BP's Cherry Point

---

[1] According to the complaint, in some areas, the price per gallon was above $5 (Compl. ¶4.)

refinery was primarily blamed for the spike in May. (*Id*. at ¶¶2, 13.) A fire at Chevron's Richmond refinery was primarily blamed for the spike in October. (*Id*. at ¶13.)

Plaintiff contends that the refinery shutdowns were used as "cover" for the Defendants' scheme to create a false shortage in order to drive up the prices of gasoline in May and October of 2012. (Compl. at ¶2.) Plaintiff offered the following factual allegations as the basis for this conclusion: (1) instead of decreasing, inventories increased leading up to and during the price spikes (*id*. at ¶13); (2) the refineries had sufficient capacity to manage several shutdowns (*id*. at ¶3); (3) Chevron's Richmond facility was emitting mono-nitrogen oxides during the refinery closure (a possible indication that the refinery was actually operating during the closure) (*id*. at ¶18); and (4) although a refinery owned by Shell reported a shutdown from April 27 to May 16, emissions data indicated that the refinery started operating sometime between May 6 and 11 (*id*.).

The Plaintiff further alleged that in October 2012, a possible "short squeeze"[2] might have occurred when one supplier was caught short on supply. (Compl. at ¶27.) Also, in October, "flaring" at ExxonMobil's Torrance refinery was blamed for an instantaneous increase in wholesale prices. (*Id*. at ¶24.) According to the complaint, the Torrance refinery had reported similar events at other times, none of which had caused a comparable increase in prices. (*Id*.)

Finally, Plaintiff alleged that the Defendants exported gasoline out of California to restrict supply and drive up the price. (Compl. at ¶30.) According to the complaint, in December of 2014, another period of increased prices, the Defendants exported a record amount of gasoline out of California.[3] (*Id*.)

---

[2] A short squeeze is a rapid increase in price that occurs when there is a lack of supply and an excess of demand.

[3] Refineries exported 2.7 million gasoline barrels (equivalent to 113 million gallons). (Compl. at ¶30.)

Since February of 2015, California gasoline retail prices have increased by more than $1.25. (Compl. at ¶10.) The complaint included details of eleven refinery closures and/or shutdowns that preceded the 2015 price spikes. (*Id*. at ¶34.) Eight of the refinery issues were listed as unplanned. (*Id*.)

Several individuals (including U.S. Senators) and organizations have requested an investigation into the price spikes. (Compl. at ¶64.) Additionally, a federal investigation was commenced by the Oil and Gas Price Fraud Working Group ("Working Group"), which was created in April of 2011. (*Id*. at ¶67.) So far, the Working Group has not brought any actions or released any reports. (*Id*. at ¶70.)

Plaintiff brought this action against the Defendants in the Superior Court of the State of California claiming the Defendants violated the Cartwright Act and the Unfair Competition Law. Plaintiff primarily alleged a price-fixing conspiracy among the Defendants. The Defendants removed the case to federal court under 28 U.S.C. §§ 1332, 1453, and 1441. The Defendants now move to dismiss the complaint in its entirety, pursuant to Fed. R. Civ. P. 12(b)(6).

## II.     LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).

Generally, the Court does not "require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Instead, the allegations in the complaint "must be

enough to raise a right to relief above the speculative level." *Id*. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

"Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556).

The court must accept all allegations of material fact as true and construe them in the light most favorable to the nonmoving party. *Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007). Material allegations, even if doubtful in fact, are assumed to be true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Accordingly, "[a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations and citation omitted). On the other hand, legal conclusions, even if cast in the form of factual allegations, "are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).

### III. DISCUSSION

In support of dismissal, Defendants argue that Plaintiff failed to allege facts sufficient to support its conspiracy claims under the Cartwright Act and the UCL. Although the Plaintiff counters that the allegations are sufficient, the Court is not persuaded.

"A bare allegation of a conspiracy is almost impossible to defend against, particularly where the defendants are large institutions with hundreds of employees entering into contracts and agreements daily." *Kendall* v. *Visa U.S.A., Inc.,* 518 F.3d

1042, 1047 (9th Cir. 2008) (applying the Sherman Act).[4] Complaints that "fail[] to plead any evidentiary facts beyond parallel conduct to prove [the] allegation of a conspiracy," are subject to dismissal. *See*, *e.g.*, *id.* at 1048. Stating an antitrust violation claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Accordingly, the question before the Court is whether Plaintiff pled "sufficient facts to provide a plausible basis from which [the Court] can infer the alleged agreements' existence." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) (applying the Sherman Act). "The crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (internal quotation marks and citation omitted). "[T]o allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a specific time, place, or person involved in the alleged conspiracies to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Kendall*, 518 F.3d at 1047 (internal quotation marks and citation omitted).

  A party relying on indirect evidence to prove an alleged conspiracy usually uses some form of parallel conduct between the alleged conspirators. *See*, *e.g.*, *In re Musical*, 798 F.3d at 1193; *see also Kendall*, 518 F.3d at 1048. However, parallel conduct is not enough to plead a conspiracy. *Twombly*, 550 U.S. at 556. ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.") Although "parallel conduct … may constitute circumstantial evidence of anticompetitive behavior," "[m]ere allegations of parallel conduct—even consciously parallel conduct—are insufficient to state a claim." *In re Musical*, 798 F.3d at 1193. In addition to alleging parallel conduct, "[a] plaintiff[] must plead 'something more', 'some further factual enhancement', 'a

---

[4] The Cartwright Act, California's antitrust law, is analogous to Section 1 of the Sherman Act, 15 U.S.C. § 1. Analysis under the Cartwright Act Section 16700 is identical to the analysis under Section 1 of the Sherman Act. *Name.Space, Inc. v. ICANN*, 795 F.3d 1124, n.5 (9th Cir. 2015).

further circumstance pointing toward a meeting of the minds' of the alleged conspirators." *Id*. (quoting *Twombly*, 550 U.S. at 557.) "[W]ithout that further circumstance … an account of a defendant's commercial efforts stays in neutral territory." *Twombly*, 550 U.S. at 557. "The inadequacy of showing parallel conduct … without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id*. at 554. "When allegations of parallel conduct are set out in order to make [an antitrust] claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id*. at 557. Accordingly, "[a]llegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of [] antitrust laws." *Kendall*, 518 F.3d at 1049. For this reason, certain plus factors are required to distinguished permissible parallel conduct from impermissible conspiracy. *In re Musical* 798 F.3d, at 1194. "Whereas parallel conduct is as consistent with independent action as with conspiracy, plus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action" *Id*. Here, Plaintiff "lack[s] direct evidence of horizontal agreements" among the Defendants. *See In re Musical*, 798 F.3d at 1193.

    *May and October of 2012 Price Spikes.* Plaintiff alleged that the class period began in February of 2012 when a fire occurred at BP's Cherry Point refinery. (Compl. at ¶¶89, 13.) The fire at BP's refinery was blamed for the May price spike. (*Id*. at ¶13.) The October price spike was primarily blamed on Chevron's Richmond refinery. (*Id*.) The Plaintiff alleged that the Defendants used refinery shutdowns as "cover" for a scheme to create a false shortage in order to drive up the prices of gasoline. (*Id*. at ¶2.) Although the Defendants blamed the 2012 price spikes on a supply decrease caused by refinery shutdowns; incongruously, inventories increased leading up to and during the price spikes. (*Id*. at ¶13.) The Plaintiff did not specify which of the Defendants had blamed the

price spikes on refinery issues, when these statements were initially made, or include any facts concerning prices charged by the Defendants.

Next, an issue at an ExxonMobil refinery was blamed for the increase in wholesale prices that occurred in early October. (Compl. at ¶24.) Although, the California Energy Commission[5] claimed that the refinery issue caused the price increase, the price allegedly began spiking before the refinery issue was publically announced. (*Id.*) Additionally, the market reaction was contrary to how the market would normally have reacted to such news. (*Id.*) After the ExxonMobil refinery issue, the major oil companies bought gasoline on the open market, which the companies normally would not have done based on available information. (*Id.* at ¶25.) Plaintiff contends that the above facts are "evidence [indicating] that the major oil companies likely had advance, secret notice that gas supplies were about [to] run low in October 2012." (*Id.*) This appears contrary to Plaintiff's allegation elsewhere in the complaint that "inventories actually increased up to and during the price spikes." (*Id.* at ¶13.)

The complaint also detailed a "short squeeze" that occurred in October of 2012 when Tesoro was caught short on supply. (Compl. at ¶¶27-28.) The sellers were reportedly able to squeeze Tesoro either through collusion or use of market power. (*Id.* at ¶28.)[6]

*November 2012 through November 2014.* The complaint did not include any facts about the conspiracy or conspirators from November 2012 through November 2014. It does not appear that there were any refinery issues that were used as "cover" to increase prices, nor any action by the Defendants to restrict and control the supply, in order to increase prices. Plaintiff alleged generally that the Defendants formed a conspiracy, which was active during November 2012 through November 2014. (Compl. ¶12) ("[P]laintiff and the Class [] paid, and have continued to pay, artificially inflated prices

---

[5] The California Energy Commission is a California government agency.
[6] Although Tesoro is the alleged victim of the "short squeeze", it is also alleged to be a co-conspirator.

for gasoline from at least February 2012 through the present."). No allegations are offered to support this conclusion. Plaintiff failed to allege any form of parallel conduct by the Defendants during this two year period.

*December of 2014.* The Defendants controlled and restricted supply in California by exporting gasoline out of the State. (Compl. at ¶30.) Plaintiff, did not allege which Defendants exported more than normal amounts of gasoline. The Plaintiff contends that, absent an agreement, the large export would be against the Defendants' self-interest. (Opp'n at 3:3-5.) However, "action[s] that would seem against self-interest in a competitive market may just as well reflect market interdependence giving rise to conscious parallelism." *In re Musical*, 798 F.3d at 1195. Such actions, "once initiated, can spread through a market without any prior agreement." *Id*. A decrease in supply could increase all Defendants' margins. Such actions could therefore be described as "rational, legal business behavior." *Kendall*, 518 F.3d at 1049. Because independent rational business behavior appears to be just as plausible as a conspiracy, the allegation is factually insufficient.

*2015 Price Spikes.* According to the complaint, refinery closures and shutdowns caused the price spikes in 2015. A series of "suspicious" refinery closures and shutdowns preceded the price spikes. (Compl. at ¶29.) The refinery issues occurred in February, April, and May of 2015. (*Id*. at ¶34.) The complaint included details of eleven refinery issues during 2015. (*Id*.) Tesoro's refineries had six of the eleven problems, Chevron's had two, Phillips's had two, and ExxonMobil's refinery had one. (*Id*.) ExxonMobil and Chevron are the only companies that also had refinery problems blamed for the price spikes in 2012. The alleged conspirators' conduct in 2015 is different than their alleged conduct in 2012. In 2012, the Defendants allegedly had a scheme to create a false shortage, whereas, in 2015, they restricted and controlled the supply of gasoline. (*Id*. at ¶¶2, 29-30.) Unlike in 2012, in 2015, refinery shutdowns and/or closures in fact decreased the supply of gasoline. (*Id*. at ¶38.) In this regard, a Senate Report held that "[a] small decrease in supply will produce a large increase in price." (*Id*. at ¶49.)

*Additional Factors.* The complaint included a description of the California gasoline market. (Compl. at ¶40.) Plaintiff labeled the structure and characteristics of the market as one of the plus factors. (Opp'n at 20:7-16.) The structure and characteristics of the gasoline market in California include: (1) high barriers of entry; (2) inelastic demand for the product; and (3) high concentration. (Compl. at ¶40.) Although the market is vulnerable to manipulation and collusion, this does not necessarily suggest an illegal agreement, because the structure of the market could also have contributed to permissible parallel conduct. Plaintiff acknowledged that "[i]n such a highly concentrated industry, a single actor or a very few actors acting together can set the price in the market" (*Id.* at ¶3) (internal quotations marks and citation omitted), and that the "[m]arket is dominated by a limited number of large, committed refiner/marketers whose individual actions can have significant market impact" (*Id.* at ¶50) (internal quotations and citation omitted). "In an interdependent market [such as the California gasoline market], companies base their actions in part on the anticipated reactions of their competitors … [B]ecause of this mutual awareness, [] firms may arrive at identical decisions independently." *In re Musical*, 798 F.3d at 1193. Moreover, "[b]ecause the market is so concentrated, the West Coast is highly sensitive to fluctuations in supply." (Compl. at ¶3.) The nature of the California gasoline market therefore does not necessarily support a conspiracy.

The Defendants are members of several trade associations. (Compl. at ¶54.) Plaintiff contends that the trade associations were a place where the Defendants had the opportunity to collude and plan the alleged conspiracy. (Opp'n at 4:3-5.) The Defendants had meetings throughout the alleged conspiracy period. (Compl. at ¶¶57-61.) "[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement," *In re Musical*, 798 F.3d at 1196, because "trade associations often serve legitimate functions," *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999). The allegations of trade association membership are therefore insufficient to state a Cartwright Act claim.

Next, in support of the conspiracy claim, Plaintiff also relied on a federal investigation. In April of 2011, the Department of Justice created the Working Group to help identify civil or criminal violations in the oil and gasoline markets across the country. (*Id*. at ¶¶67-70.) The Working Group was created before the first alleged price spike in May of 2012, and its investigation expands beyond refineries. (*See* generally *id*. at ¶¶67-70.) Allegations of a government investigation do not necessarily suggest a collusive agreement. *In re Musical*, 798 F.3d at 1196. Plaintiff's reliance here on the Working Group's investigation is insufficient to support the conspiracy claim. For the same reasons, the U.S. Senators' request to investigate the gasoline price spikes also does not necessarily suggest a collusive agreement. Like the Working Group investigation, the Senators' request was not limited to an investigation of potential antitrust violations.[7]

For the foregoing reasons, the Court finds that Plaintiff did not allege sufficient facts to "nudge [its] claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Therefore, the motion to dismiss the Cartwright Act claim is granted. *See id*.

**Unfair Competition Law**

The UCL claim is entirely derivative of the Cartwright Act claim. Accordingly, as Plaintiff failed to plead a plausible antitrust claim, the motion to dismiss the UCL claim is granted as well.

**Leave to Amend**

The Court must next consider whether the Plaintiff should be granted leave to amend. *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, *Inc.*, 806 F.2d 1393, 1401 (9th Cir. 2004). Rule 15 advises leave to amend shall be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). "This policy is to be applied with extreme liberality." *Eminence*

---

[7] For example, Senator Maria Cantwell stated that if the misleading reports of refinery shutdowns and supply shortages in 2012 were accurate, they would violate the FTC August 2009 Rule against "false or misleading public announcements of planned pricing or output decisions." (*See* Def.'s Request for Jud. Notice, Ex. E. [Doc. 47-2].)

*Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (internal quotation marks and citation omitted).

> In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc. – the leave sought should, as the rules require, be freely given.

*Foman v. Davis*, 371 U.S. 178, 182 (1962) (internal quotation marks and citation omitted). Dismissal without leave to amend is not appropriate unless it is clear the complaint cannot be saved by amendment. *Id.* Because it appears that the Plaintiff may be able to amend the complaint to allege sufficient facts, leave to amend is granted.

### Discovery Request

Plaintiff requested an opportunity to conduct discovery but did not specify the scope. (Opp'n at 21:20-23). "[D]iscovery in antitrust cases frequently causes substantial expenditures." *Kendall*, 518 F.3d at 1047; *see also Twombly*, 550 U.S. at 559, ("[t]he threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings."). Without a specific proposal, the Court is not inclined to grant Plaintiff's request for pre-answer discovery.

### IV.   CONCLUSION AND ORDER

Defendants' motion to dismiss is granted with leave to amend. If Plaintiff wishes to file an amended complaint, it must do so no later than **August 11, 2016**. Defendants shall file a response, if any, to the first amended complaint within the time set forth in Federal Rule of Civil Procedure 15(a)(3).

**IT IS SO ORDERED.**

Dated:  July 14, 2016

_____
Hon. M. James Lorenz
United States District Judge