1  ROBBINS GELLER RUDMAN
       & DOWD LLP
2  PATRICK J. COUGHLIN (111070)
   DAVID W. MITCHELL (199706)
3  ALEXANDRA S. BERNAY (211068)
   CARMEN A. MEDICI (248417)
4  CARISSA J. DOLAN (303887)
   655 West Broadway, Suite 1900
5  San Diego, CA 92101
   Telephone: 619/231-1058
6  619/231-7423 (fax)
   patc@rgrdlaw.com
7  davidm@rgrdlaw.com
   xanb@rgrdlaw.com
8  cmedici@rgrdlaw.com
   cdolan@rgrdlaw.com
9       – and –
   ARMEN ZOHRABIAN (230492)
10 Post Montgomery Center
   One Montgomery Street, Suite 1800
11 San Francisco, CA 94104
   Telephone: 415/288-4545
12 415/288-4534 (fax)
   azohrabian@rgrdlaw.com
13
   Attorneys for Plaintiff

14                    UNITED STATES DISTRICT COURT

15                  SOUTHERN DISTRICT OF CALIFORNIA

16

| | |
|---|---|
| 17 PERSIAN GULF INC., Individually and on Behalf of All Others Similarly Situated, | Case No. 3:15-cv-01749-L-BGS |
| 18                Plaintiff, | <u>CLASS ACTION</u> |
| 19     vs. | FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S |
| 20 BP WEST COAST PRODUCTS LLC; CHEVRON U.S.A. INC.; TESORO | CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW |
| 21 REFINING & MARKETING COMPANY LLC; EQUILON | |
| 22 ENTERPRISES LLC (D/B/A SHELL OIL PRODUCTS US); EXXONMOBIL | |
| 23 REFINING & SUPPLY COMPANY; VALERO MARKETING AND | |
| 24 SUPPLY COMPANY; CONOCOPHILLIPS; ALON USA | |
| 25 ENERGY, INC. and DOES 1-25, inclusive, | <u>DEMAND FOR JURY TRIAL</u> |
| 26           Defendants. | |

27

28

Plaintiff Persian Gulf Inc. ("Persian Gulf" or "Plaintiff") hereby brings this action for damages and other relief against defendants BP West Coast Products LLC ("BP West"); Chevron U.S.A. Inc. ("Chevron"); Tesoro Refining & Marketing Company LLC ("Tesoro"); Equilon Enterprises LLC (d/b/a Shell Oil Products US) ("Shell"); ExxonMobil Refining & Supply Company ("ExxonMobil"); Valero Marketing and Supply Company ("Valero"); and ConocoPhillips ("Phillips"); Alon USA Energy, Inc. ("Alon") ( collectively, "Defendants") for violations of the Sherman Act (15 U.S.C. §1), California's Cartwright Act (California Business & Professions Code §16700, *et seq*.), and California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code §17200, *et seq*.). Plaintiff makes all allegations upon information and belief except as to those paragraphs that are based on Plaintiff Persian Gulf's personal knowledge.

## THE CONSPIRACY

1. For years Californians have seen tremendous spikes in gasoline prices, seemingly untethered to normal market forces of supply and demand. Various reasons have been posited for these giant spikes, including the unique nature of California's gas market. However, a number of spikes over the years were not the result of California's market structure (though perhaps enabled by it), but instead are the result of anticompetitive conduct on the part of the major gas refineries operating in the state.

**2012 Price Spikes**

2. In early 2012, the crude oil markets experienced a suspicious combination of rising production, falling demand, increasing inventories and increasing prices. The suspicious circumstances were detailed in a June 2012 report by McCullough Research, which found that sudden price shifts provided "a significant

windfall for refineries and retailers on the West Coast."[1]  In June 2012, through the Western States Petroleum Association ("WSPA"),[2] the industry blamed the increased prices on decreased supply because of a fire at a Washington BP refinery and other maintenance shutdowns in California.[3]  The evidence, however, did not to support that theory.  Instead, the fire and shutdowns, which alone cannot explain the decrease in supply or the spike in prices, were cover for the refiners' scheme to create a false shortage in order to force prices up and reap windfall profits.

3.     Data from the Energy Information Administration ("EIA") during that time showed that the refineries serving West Coast states had capacity on hand to meet significant shortfalls, such as one caused by a fire or a shutdown because of unscheduled maintenance.  Had this supply been released as would be expected in a rationally functioning marketplace, West Coast gasoline customers would not have paid gas prices so out of touch with the rest of the county.  In such a highly concentrated industry, "a single actor or a very few actors acting together can set the price in the market."  6/5/12 McCullough Report at 5.  Because the market is so concentrated, the West Coast is highly sensitive to fluctuations in supply, and primed for manipulation.  After the fire at the Washington plant, the degree of market concentration increased significantly.  With the market so concentrated, the timing of the various unscheduled maintenance shutdowns in the California refineries in early

---

[1]    Robert McCullough, *Analysis of West Coast Gasoline Prices*, McCullough Research (June 5, 2012) ("6/5/12 McCullough Report") at 2, *available at* www.mresearch.com/pdfs/470.pdf.

[2]    Defendants BP, Chevron, Tesoro, Shell, Exxon Mobil, Valero and Phillips are members of WSPA.

[3]    *See* Robert McCullough, *Response to McCullough Research Report May and October 2012 Gasoline Price Spikes on the West Coast: A Rebuttal by McCullough Research*, McCullough Research (Feb. 25, 2013) "McCullough Rebuttal") at 4, *available at* http://www.mresearch.com/pdfs/511.pdf.

2012 becomes suspect. "In a competitive market, maintenance would have been delayed to take advantage of the rising West Coast prices." *Id.*

4.     In May and October of 2012, while certain refineries were dealing with purportedly unplanned refinery outages, other Defendants acted against their economic self-interest by not postponing scheduled maintenance. As a result of Defendants' conspiracy, California saw two massive gasoline price spikes, resulting in California consumers paying more than $4 a gallon – and in some areas more than $5 a gallon. These spikes occurred while the rest of the country experienced a decline in gas prices.

5.     Another report issued soon after the October 2012 spike by McCullough Research concluded that during the May and October spikes there were market anomalies present, and that during those two periods gas refiners in California were seeing an "enormous windfall profit."[4] Further, the report determined that in both the May and October spikes, "the underlying data now available contradicts the industry explanations." *Id.* at 1.

6.     The report urged an investigation into the spikes, which was then picked up by several senators. Those senators wrote to then-Attorney General Eric H. Holder, Jr. and asked the Department of Justice to investigate "possible market manipulation and false reporting by oil refineries which may have created a perception of a supply shortage, when in fact refineries were producing."[5] Additionally, the letter stated:

---

[4]   Robert McCullough, Sean Long & Jil Heimensen, *May and October 2012 Gasoline Price Spikes on the West Coast*, McCullough Research (Nov. 15, 2012) ("11/15/12 McCullough Report") at 20, *available at* http://www.mresearch.com/pdfs/489.pdf.

[5]   Press Release, Maria Cantwell United States Senator for Washington, *6 West Coast Senators Urge DOJ Investigate Western Gas Price Spike* (Nov. 27, 2012), *available at* http://www.cantwell.senate.gov/public/index.cfm/press-releases?ID=7e55a196-cfbb-4b2b-b03f-d7bc52013ab1. Here and throughout, emphasis is added and citations are omitted unless otherwise noted.

We hope the Justice Department and members of the Oil and Gas Price Fraud Working Group will launch a refinery-by-refinery level probe. According to this new analysis by McCullough Research, supply shortages following refinery fires and other unexpected outages at West Coast refineries did not cause the May and October gas price spikes. ***During these periods inventories were either increasing or remaining level at historic five-year averages during the highest price spikes. In addition, an exhaustive review of California refinery emissions data revealed inconsistencies between when refineries were actually producing petroleum products and when maintenance shutdowns were publicly reported. Potentially market-making information, misleading reports of shutdowns could create or exacerbate a perceived supply shortage and artificially drive market prices to unjustifiably high levels. If these findings are accurate, which could only be confirmed through subpoenaed records, they would violate the FTC August 2009 Rule against "false or misleading public announcements of planned pricing or output decisions," and be subject to fines of up to $1 million a day per violation.***

The senators further noted that "[a]nomalous, uncompetitive market dynamics may have forced West Coast drivers to pay $1.3 billion more at the pump during the May 2012 price spike than they should have, according to an analysis by McCullough Research. Even a one cent per gallon increase in gasoline prices cost California consumers an extra $150 million per year, according to the Federal Trade Commission (FTC)." *Id.* Moreover, the senators also wrote: "While we applaud the Working Group for convening in April 2011, we see scant evidence that its members are policing these markets as required by law or cracking down on other practices that may be illegal and hurting consumers." That investigation is ongoing.[6]

7. Senator Dianne Feinstein also wrote to the Federal Trade Commission ("FTC") requesting an investigation. Senator Feinstein expressed concern that the FTC had failed "to take action to protect California consumers from malicious trading

---

[6] Despite sending FOIA requests to every entity that is a member of the Oil and Gas Price Fraud Working Group more than a year ago, counsel for Persian Gulf has not received any response from any entity that indicates that anything was done by the Working Group to investigate the extreme price of gasoline and unusual market circumstances in the West Coast gasoline market.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

- 4 -

3:15-cv-01749-L-BGS

schemes in the California gasoline market."[7]  She requested that the FTC "open an immediate investigation into price spikes in California, to begin collecting relevant data on California's gasoline markets, and to establish a permanent market monitoring team."  *Id.*  She also requested that the "FTC immediately seek data sharing agreements that will allow it to monitor gasoline and oil markets actively and effectively.  Data on prices, trading activity, refinery output, demand, stocks, and other information are vital to determine if trading activities reflect fraud, manipulation, or other malicious trading practices."  *Id.*

8.    Senator Feinstein closed her letter with a call for serious and aggressive enforcement:  "California's consumers are all too familiar with energy price spikes which cannot be explained by market fundamentals, and which turn out years later to have been the result of malicious and manipulative trading activity. . . .  I call on the FTC to act immediately and aggressively to protect California's consumers."  *Id.*  To date, while it is believed investigations are ongoing, no action has been taken regarding the May and October 2012 spikes, despite significant evidence that the price spikes were the result of manipulative and collusive conduct by Defendants.[8]

**Defendants' Conspiracy During Late 2014 Through the Present**

9.    In addition to the 2012 spikes, there is significant evidence that Defendants again engaged in anticompetitive conduct in late 2014 through the present. Spikes in the price of gasoline from conduct occurring in late 2014 into 2015 appear to again not be based on normal market forces; rather, the economic and

---

[7]  Letter from Senator Dianne Feinstein to FTC Chairman Jon Leibowitz (Oct. 7, 2012), *available at* http://www.feinstein.senate.gov/public/index.cfm/press-releases ?ID=64731006-6bc2-406e-ba27-dc423a2aae9a.

[8]  Counsel for plaintiffs requested that Senator Feinstein's office provide it with any documents that it had received pursuant to any requests it may have made of any of the defendants here, and followed up on that letter, but have not yet received a response.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

- 5 -

3:15-cv-01749-L-BGS

circumstantial evidence indicates that Defendants once again took advantage of market conditions.

10. This action, therefore, can be viewed as a single conspiracy taking place during two time periods or, conversely, as two conspiracies of similar design taking place during two distinct time periods.

11. In late February 2015, within the span of a week, California gasoline prices increased by $0.25 per gallon, and by more than $1.00 per gallon within the space of a month, despite crude oil costs remaining low[9] and national gasoline prices rising only moderately. In 2015, the historical relationship between gas prices and crude oil prices fell apart.[10] According to "*Up Like A Rocket, Down Like a Feather: The State of California's Gasoline Market*," a March 23, 2015 Background Paper, created for an oversight hearing in the California Senate Transportation and Housing and Energy, Utilities and Communications Committees, the factors typically offered to explain the price differential in gasoline prices between California and the rest of the country *did not* account for the higher rates California's consumers were paying:

> California gas prices are generally higher than those of the rest of the nation. Some of the reasons for the higher prices are well documented: California has a particular fuel blend necessary for the state to meet its air-quality obligations; California taxes are higher; transportation fuels have recently been included in California's cap-and-trade program to reduce greenhouse gases. ***But those factors don't explain recent events where California prices have risen much faster than the rest of the nation's. In mid-March, regular-grade California gasoline was selling for about $3.44/gallon compared with $2.49/gallon for the nation as a whole, which is two to three times the normal premium***.[11]

---

[9] *See* September 2011 FTC Report which concluded that crude oil prices were the primary driver of gasoline prices in America, available at https://www.ftc.gov/news-events/press-releases/2011/09/ftc-issues-new-report-gasoline-prices-and-petroleum-industry. As common sense would dictate, the price charged by gasoline station owners, like the Plaintiff here, tracks the price they are charged by refiners for gasoline.

[10] McCullough Research, *Market Power in West Coast Gasoline Markets: An Update* (Sept. 9, 2015), at 2.

[11] *Up Like A Rocket, Down Like a Feather: The State of California's Gasoline Market*, at 2-3, An Oversight Hearing of the California Senate Transportation and

FIRST AMENDED COMPLAINT FOR - 6 - 3:15-cv-01749-L-BGS VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

12.     While California's consumers suffered the costs of Defendants' collusive behavior, which was unexplainable by regular supply and demand forces, refiners' margins skyrocketed:

> So who has benefitted from the higher prices paid by California drivers? The premium that Californians have been paying over the past month has gone to the refiners.   The California Energy Commission (CEC) estimates the composition of the cost of gasoline, breaking it down into the cost of crude, distribution costs and profits, refinery costs and profits, and taxes and fees.  Their recent data shows the refinery margin (e.g., the revenue from the sale of a gallon of gasoline that goes towards refining) has ***increased by more than 400%, from $0.26/gallon in early March 2014 to $1.32/gallon one year later*** (see chart below).  During that time the cost of crude oil in a gallon of gas has declined by $1.50, while the other major cost components did not change significantly.  While the steep drop in crude oil prices had been a big benefit to California drivers, as a result of California's tight gasoline supplies, the biggest beneficiary of the steep fall in crude oil prices is now the refiners.[12]

13.     Buoyed by a series of suspect events at West Coast refineries as detailed below, refinery profits in 2015 again reached historically unprecedented levels. Consumer Watchdog, a non-profit consumer advocacy group which represented the California Assembly on the Gasoline Pricing Task Force had its work summarized in a March 13, 2016 article:

> The profits: An analysis (so far unchallenged) by the Consumer Watchdog advocacy group found the state's second-largest refiner, Tesoro, also known as tsocorp, netted $1.9 billion in profits last year from California refining operations.  At a time when crude oil prices were lower than they've been in half a generation, Tesoro, maker of 27 percent of this state's gas (marketed under the USA and Shell labels, among others), took in $423 million in fourth-quarter profits alone.

> Meanwhile, Valero, the state's No. 3 refiner, netted $852 million in California last year.  Valero is the only refiner reporting California-specific data.  Its 2015 profits were four times Valero's average annual take since 2010, which was just over $216 million per year.

> Chevron, the state's gasoline-producing leader with a 28 percent market share, does not break out California operations, but had worldwide refining profits last year of $3.1 billion.  More than half the company's worldwide refining is here.

Housing and Energy, Utilities and Communications Committees (Mar. 23, 2015), *available at* http://seuc.senate.ca.gov/20132014informationalhearings.

[12] *Id*. at 3.

1188005.28

Refining profits in California, then, set records even as the price of crude oil dropped sharply through the year to generation-low levels, along with the profits of most other oil companies. Many responded by laying off more than 200,000 workers and decreasing investments in oil exploration.[13]



**July 2014**

Refiner: $0.47

Crude: $2.58

July 14, 2014 price: $4.09 per gallon

**July 2015**

Refiner: $1.61

Crude: $1.35

July 13, 2015 price: $3.88 per gallon

14. The $1.9 billion Tesoro made during fiscal year 2015 in California alone was its best year by over a ***billion dollars***.[14] These results followed the record profits Tesoro made in the second quarter of 2015. "Analysis of Tesoro's earnings released today showed that the company made more California refining profit in the second quarter than ever in the company's history. Based on the number of barrels the company refined in California, and the profits they made from each barrel, Consumer Watchdog calculates that the company's second quarter California refiner profits were a record high of $668 million, crushing their prior record of $415 million in the

---

[13] *Gas Price-Gouging Indications Grow Stronger*, LA Daily News (Feb. 22, 2016), *available at* http://www.dailynews.com/opinion/20160222/gas-price-gouging-indications-grow-stronger-thomas-elias&template=printart.

[14] Tesoro Corporation Reports Record Fourth Quarter and Record Full Year Results for 2015, News Release – Tesoro Corporation (Feb. 1, 2016); Consumer Watchdog, Tesoro Reports Record California Profits After California Price Spike (Feb. 2, 2016).

second quarter of 2007. This number is four times higher than their average California profit since 2005 of $138 million."[15]

15.    As oil refiners in the state squeezed the market and reaped supracompetitive profits through unprecedented exports of gasoline from California and by taking an unprecedented number of refineries off line for suspicious, frequently unscheduled maintenance, West Coast consumers paid over $9 billion more for gasoline in 2015 than they would have in the absence of collusive activity. By controlling and creating apparent shortages of local supplies of gasoline, the refiners steadily increase their California profits, even as drivers in other parts of the country enjoy moderate prices.

16.    As a direct result of the anticompetitive and unlawful agreement between Defendants to increase gas prices, including through supply constraints (*e.g.*, exporting gas products, not importing sufficient gas products and maintaining low reserves), pretextual and/or wilful refinery outages and roiling the markets by injecting misinformation as alleged herein, Plaintiff and the Class (as preliminarily defined below) paid artificially inflated prices for gasoline in 2012 and for periods during 2015-2016.

17.    Defendants recognize that reducing production and injecting uncertainty into the gas market increase profits and margins. And the industry has a history of anticompetitive conduct relating to refinery shutdowns and capacity reductions, memos from West Coast oil refiners from the 1990s and released in 2011 by Senator Ron Wyden (D. Or.) suggest that the practice of reducing capacity is a ***deliberate business strategy*** that has been employed by the refineries for a number of years. An internal Chevron memo, for example, stated: "'A senior energy analyst at the recent

---

[15]    Tesoro Corporation Reports 2015 Second Quarter Record Results, News Release – Tesoro Corporation (Aug. 5, 2015); Consumer Watchdog, Tesoro Reports Record California Profits After California Price Spike _ Consumer Watchdog (Aug. 5, 2015).

API [American Petroleum Institute] convention warned that if the U.S. petroleum industry doesn't reduce its refining capacity, it will never see any substantial increase in refinery margins.'"[16]  This is a plus factor lending plausibility to Plaintiff's allegations.  Additional plus factors are detailed *infra* at ¶¶82-119.

18.     Various refiners have echoed a similar sentiment to API's warning.  For example, Tesoro, the state's second biggest refiner, shut down its Martinez refinery in early February 2015 and had to buy gasoline on the spot market to fulfill contracts, yet it still made a first quarter 2015 profit of $119 million.  Tesoro's CEO Greg Goff trumpeted this news: "In California, crack spreads [difference between crude oil costs and wholesale prices] have improved related to the unplanned and planned refinery maintenance activities."  He also noted: "There's no question that during the first quarter with what happened to Tesoro as a result of the disruption at the Martinez refinery because of the labor disruption and then with other operating and planned maintenance things across the whole system, it was very supportive to the margin environment there."[17]

19.     Jeff Gustavson, a Chevron general manager, made similar comments on an investor call. "Margins increased earnings by $435 million driven by unplanned industry downtime and tight product supply on the U.S. West Coast."[18]

20.     Although Chevron does not break out its California profits, 54% of the company's refining occurs in the state, so it follows that its refining profits reflect the

[16]  *Pump Jacking California's Protection:  The Threat of Oil Industry Influence & Market Manipulation*, Consumer Watchdog (Dec. 15, 2014) at 7, *available at* http://www.consumerwatchdog.org/resources/OilIndustryManipulationReport.pdf.

[17]  *Tesoro (TSO) Gregory James Goff on Q1 2015 Results – Earnings Call Transcript* (May 8, 2015), *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=79122&p =irol-transcriptsarchive.

[18]  *Consumer Watchdog Asks US Attorneys To Investigate Refinery "Maintenance" Issues Driving CA Gas Price Spikes,* PR Newswire (May 21, 2015), *available at* http://www.prnewswire.com/news-releases/consumer-watchdog-asks-us-attorneys-to-investigate-refinery-maintenance-issues-driving-ca-gas-price-spikes-300087636.html.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

- 10 -

3:15-cv-01749-L-BGS

state of its California business.  In Q2 2015, Chevron made $731 million in profit on its United States refining, representing a 41% increase over the same quarter the prior year and double the company's average quarterly profits since 2005.  During the Q2 2015 earnings call, Chevron executive Frank Mount acknowledged, "Tight product supply, primarily on the West Coast, boosted refining and marketing margins and increased earnings by $165 million between quarters."  These increased margins were achieved at the expense of California consumers, whose gas prices rose as inventory declined – a shortage manufactured by California gasoline refiners through collusion and market manipulation.

21.     During its Q2 2015 conference call, Gary Simmons, a Valero executive, stated, "So to me, a lot of what happens on the West Coast, will be supply driven.  And, some of these refinery outages that we've been seeing, will they continue or not, will really determine how strong the West Coast market will be."

22.     Refinery profits continued to skyrocket.  During the third quarter, Chevron reported that its refining profits for the first three quarters were $2.6 billion, a year over year increase of $900 million.[19]  So too with Tesoro:

> Analysis of Tesoro's 3rd quarter financial results show that California's second largest oil refiner had its best quarter ever in the state.  According to Consumer Watchdog's analysis of data provided by Tesoro, the company made $770 million in the 3rd quarter in California.  The number is twice what they made in the same quarter last year, and over four times more than their average quarterly California profit since 2005 of $169 million.
>
> *          *          *
>
> Analysis shows that Tesoro also made a near record $16.03 per barrel profits in California.  The company made just $6.75 in the same quarter of 2014.  Over the last ten years their average per barrel profit has been $5.24.[20]

---

[19]   http://chevron.com/investor/events-presentations (Events and Presentations, Event – Details, 2015, 2015 2Q Earnings Transcript).

[20]   http://www.consumerwatchdog.org/newsrelease/tesoro-valero-report-best-3rd-quarter-ever-california-refining-record-gasoline-price-spi

23.     Valero's refinery profits in 3Q15 were unprecedented:

The company's 3rd Quarter of 2015 represented the most profitable quarter of California refining for Valero since the company began providing California profits. The company made $342 million in California alone. The amount is fourteen times higher than the same quarter last year, when it made $24 Million on California refining.

*     *     *

Valero's per barrel profits also jumped to near record highs. The company made $13.54 for every barrel they refined in California – over three times more than the average profit per barrel since 2005 – $4.02. In the 3rd quarter of 2014, the company made $1.16 per barrel.[21]

24.     Tom Nimbley, the CEO of PBF Energy (the company that purchased the Torrance refinery from Exxon) stated on a July 29, 2016 investor conference call that he believed Exxon had decided not to run the refinery in California:

Second part of your question, this is a culture issue. I said this to the people of Torrance. The hardware is unbelievably good. Exxon spent a ton of money fixing things that they obviously had problems with. As I look at Torrance, this is a facility that has somewhat been under a black cloud for a period of time because Exxon – *I personally believe – Exxon probably had made a decision that they were not going to run a single refinery operation in the state of California.*[22]

During the same conference call, Nimbley also stated:

So at the end of the day, we can make those switches. *But the bottom line is there's too much clean product. And the only way you can solve that problem is by reducing the amount of clean product that you make.*

**The State of California Investigates**
**Petroleum Markets to Determine the**
**Causes of Volatility in California's**
**Energy Markets**

25.     Since the filing of Plaintiff's original complaint in July 2015, California created the Petroleum Market Advisory Committee ("PMAC"). The California

---

[21]  http://www.prnewswire.com/news-releases/excessive-ca-gas-prices-fuel-best-refining-profits-ever-for-valero-14x-more-than-same-quarter-last-year-says-consumer-watchdog-300168070.html.

[22]  Thomson Reuters Streetevents, Edited Transcript, PBF-Q2 2016 PBF Energy Inc Earnings Call (July 29, 2016).

1188005
FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE SHERMAN ACT,
CALIFORNIA'S CARTWRIGHT ACT, AND
UNFAIR COMPETITION LAW
- 12 -
3:15-cv-01749-L-BGS

1    Energy Commission established PMAC to monitor gas prices in California and
2    provide expert advice in case of market manipulation. Among other things, PMAC is
3    charged with creating solutions to gas price volatility.[23]

4        26.    During the December 2014 and February 2015 meetings, members of
5    PMAC requested the California Energy Commission to provide data collected from
6    the petroleum industry to facilitate the Committee's mission. Rather than working
7    with the PMAC to discover the causes of California's gas crisis, a February 24, 2015
8    letter from the WSPA flatly rejected the Committee's request. That letter reads in
9    relevant part:

> WSPA writes to you today to oppose CEC disclosure of information in
> response to recent data requests to California Energy Commission
> ("CEC") staff by members of the CEC Petroleum Market Advisory
> Committee ("PMAC").
>
> During the PMAC's meetings on both December 16, 2014 and February
> 10, 2015, PMAC members orally requested that CEC staff provide as
> much data as possible, in order for the PMAC to accomplish the
> committee's mission – including non-aggregated, proprietary, and
> confidential petroleum industry data to the PMAC. This sensitive and
> highly confidential data is protected by the terms of the Petroleum
> Industry Information Reporting Act of 1980 ("PIIRA"), the CEC's own
> disclosure regulations, and the California Public Records Act ("CPRA").
> These long-settled California legal requirements are exceptionally strong
> and CEC may not deviate from them by providing protected data to the
> PMAC.
>
> At the February 10th meeting, CEC staff member Ryan Eggers delivered
> a presentation regarding the data collection activities of the CEC's
> Transportation Fuels Data Unit, which highlighted the three types of data
> collected: data collected pursuant to PIIRA; data collected from
> proprietary sources via subscriptions; and data collected from public
> sources of information. WSPA and its members have a long history of
> working cooperatively with the CEC to provide confidential data
> pursuant to PIIRA.
>
> PMAC members have now requested that CEC staff provide members
> access to all three types of data collected by the CEC, including non-
> aggregated, company-specific data. However, PIIRA, the CEC's

---

[23] http://www.prnewswire.com/news-releases/consumer-watchdog-presents-evidence
-to-attorney-general--state-of-oil-refiners-unprecedented-market-manipulation-to-
artificially-raise-gas-prices-300106941.html; http://www. consumerwatchdog. org/
newsrelease/californians-overpay-10-billion-gasoline-2015-consumer-watchdog-
shows-oil-refiners-rig-m.

1188005.28    FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE SHERMAN ACT,
CALIFORNIA'S CARTWRIGHT ACT, AND
UNFAIR COMPETITION LAW

disclosure regulations, and the CPRA all recognize the sensitive and highly confidential nature of this type of data, and were specifically designed to protect it, ensuring that no "unfair competitive disadvantage to the person supplying the information" will result from data collection. Cal. Pub. Res. Code § 25364(b).[24]

27.     WSPA reiterated its refusal to provide the PMAC such information in an October 8, 2015 letter in which it also refused to participate in a then-upcoming workshop.  That letter provides in relevant part:

In response to your recent invitation that WSPA participate in the Petroleum Market Advisory Committee's (PMAC) October 13 workshop regarding gasoline prices in California, WSP A must decline.

In particular, you asked WSPA to address supply chain disruptions, how the market and industry respond to these disruptions, and possible solutions to this pricing behavior. While WSP A and its members have a long history of working cooperatively with the CEC-and we hope to continue to do so-WSPA is not in a position to respond to these issues. As you know, WSPA is a non-profit trade association representing twenty-five companies many of whom are market competitors in the petroleum industry.  As such, WSPA's function is limited to public education and government advocacy regarding industry-wide issues. WSPA has no specific information about supply chain disruptions or pricing behavior unique to specific members or market participants. Thus, while WSPA must respectfully decline your invitation, we have notified our members about your workshop, and invite you to follow up with those individual market participants.

*     *     *

As the PMAC workshop nears, I have enclosed a copy of WSPA's February 24,2015, letter reiterating the critical importance of ensuring that the confidentiality provisions of PIIRA and the CEC's disclosure regulations are followed.[25]

28.     WSPA's refusal to testify or produce information requested by the PMAC keeps pertinent information private and inaccessible and works to harm members of the class and the California customer to the benefit of the gasoline refiner. The evidence the PMAC sought was not available from other accessible sources.

---

[24]  http://www.energy.ca.gov/assessments/petroleum_market/2015-10-13/comments/PMAC_2-15_Meeting-WSPA_Comments.pdf.

[25]  http://www.energy.ca.gov/assessments/petroleum_market/2015-10-13/comments/Pillsbury_WSPA_letter.pdf.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

- 14 -

3:15-cv-01749-L-BGS

**Defendants Receive Subpoenas**
**Regarding the Anticompetitive**
**Conduct Alleged by Plaintiff**

29.    In May 2016, California's Attorney General Kamala Harris subpoenaed Defendants Exxon, Chevron, Tesoro, Shell, Valero and Phillips seeking information about gasoline supplies, pricing and refinery shutdowns that could create supply shortages.[26]  These subpoenas seek information ***directly related*** to the claims in Plaintiff's Complaint.  Counsel for Plaintiff requested any materials produced to the Attorney General from the Attorney General's office, but were denied any documents. Defendants have also rejected all requests for information related to the ongoing California investigation.  The Court too denied a request to compel Defendants to produce the documents to Plaintiff.  Dkt. No. 73.  The materials produced by Exxon, Chevron, Tesoro, Shell, Valero and Phillips  likely contain information, to date not publicly available, which would provide further support for Plaintiff's claims.

30.    Earlier, on January 8, 2015, 21 California State Senators wrote to California's Attorney General expressing their concern that oil companies were manipulating gasoline prices.  That letter stated:

> We are writing to express concern over potential manipulation of gasoline prices by oil companies and their subsidiaries in the state as our landmark cap-and-trade program goes into effect for transportation fuels. We request that the Department of Justice monitor, and if warranted, open an investigation into these practices.

> This is a concern shared by experts and consumers across California.  In a letter sent last month by the Consumers Union to the California Energy Commission, they wrote, "it would be unfortunate if the oil industry attempted to manipulate prices in order to deliver on its promise of a 'hidden gas tax' even if market forces and regulatory compliance did not require such a result."

> *      *      *

> In addition, there are fail-safe mechanisms in the cap-and-trade regulation itself to ensure costs are managed and consumers are protected.  The program, has reserve prices and other mechanisms that temper any large fluctuations in the market.  Nonetheless, we are

---

[26]  Others may have also been subpoenaed according to published reports.

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE SHERMAN ACT,
CALIFORNIA'S CARTWRIGHT ACT, AND
UNFAIR COMPETITION LAW

- 15 -

3:15-cv-01749-L-BGS

concerned that gas price changes may result from artificial intervention and manipulation by those opposed to California's clean energy and climate policies, and not outside market forces.

Therefore, we request that the Department of Justice closely monitor, and if appropriate, open an investigation into the activities of the affected industries to stop any attempted manipulation and to assure the public that gasoline prices at the pump are properly set.[27]

## DETAILS OF THE 2012 PRICE SPIKES

31.     In May 2012, the price of gas spiked and affected prices in California, Oregon and Washington.  The industry blamed the May spike on the February 18, 2012 fire at Cherry Point refinery in Washington state.[28]  This explanation is pretextual: the length of delay between the decline in product levels and the price increase was far outside of historical norms.  If there was a meaningful decrease in supply, all things equal, the gasoline market would reflect that with an increase in price immediately or soon thereafter.  A delay of that length simply means that the explanation was untrue and that there must be another explanation.

32.     According to the Associated Press, an investigation into the BP Cherry Point refinery fire by the Washington Department of Labor & Industries found six workplace safety violations, one of which was determined to be a "willful violation."[29]

33.     Similarly, Chevron used a pretextual explanation for an August 6, 2012 fire at its Richmond refinery, which it claimed was one reason for the spike in gas

---

[27] http://sd24.senate.ca.gov/sites/sd24.senate.ca.gov/files/1-8-15%20Letter%20to%20Kamala%20Harris.pdf.

[28] *High Gas Prices in the Northwest*, *Straight Talk*, KGW-TV, Portland, Oregon, June 23, 2012; McCullough Rebuttal at 4.

[29] *BP fined $81,500 for safety violations at Washington refinery*, Associated Press (Aug. 30, 2012), *available at* http://www.oregonlive.com/pacific-northwest-news/index.ssf/2012/08/bp_fined_81500_for_safety_viol.html.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

3:15-cv-01749-L-BGS

1188005

prices in August 2012. However supply was not affected as the lost production was more than made up by increased production at other refineries.[30]

34. In October 2012, California gas prices spiked again, this time on rumors of a gasoline shortage. The California Energy Commission later claimed that a minor plant problem (a "power failure" or "flaring") at ExxonMobil's Torrance refinery was to blame for the instantaneous increase in wholesale prices in October 2012.[31] However, the facts demonstrate that the price began spiking before the Torrance refinery's issues were publicly announced. The explanation that the price spiked $0.35 a gallon within 45 minutes of the first substantive coverage by the media is contrary to how the market typically would or even could react to this type of news. Indeed, the Torrance facility reported 27 other similar events in 2012, none of which set off price increases anywhere near the scale of those seen on October 1st. Moreover, Exxon's explanation for the outage of a disruption in power is suspect given that Southern California Edison said there was barely a blip in the electrical flow on October 1, 2012.

35. The evidence indicates that the major oil companies likely had advance, secret notice that Exxon would report problems with its Torrance refinery in October 2012. After the Torrance facility "flare" on October 1st, "'all the majors came out and bought.'" 2013 McCullough Report at 8. The major oil companies would not have bought in the open market based on the information available at the time in the marketplace, which indicated only a minor problem at the plant. Instead, this run up would have happened only if ExxonMobil informed its competitors of operating

---

[30] Tokar, Dylan, *Gas Prices Increase After Richmond Refinery Fire*, The Daily Californian. (Aug. 15, 2012), *available at*, www.dailycal.org/2012/08/15/gasprices-increase-after-richmond-refinery-fire

[31] Robert McCullough, *The Year of Living Dangerously: Retail Gasoline Prices and Fundamentals*, McCullough Research (July 2, 2013) ("2013 McCullough Report") at 1, *available at* http://www.mresearch.com/pdfs/521.pdf.

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE SHERMAN ACT,
CALIFORNIA'S CARTWRIGHT ACT, AND
UNFAIR COMPETITION LAW

3:15-cv-01749-L-BGS

problems prior to informing the regulators and media. Additionally, the NOx data do not support evidence of a full plant closure and press releases by the company overstated the problem.

36. The industry's pretextual explanations of supply shortages is contradicted by the data, because inventories actually *increased* up to and during the price spikes in 2012. In a competitive market, this should have brought the prices down.[32] Despite widespread public calls for an explanation for the spikes, no economically sensible explanation has yet been given.

37. The following chart details the suspicious plant closings in 2012, while the price of gasoline spiked and maintained high levels compared to the rest of the country:

| Date | Company | Refinery | Amount of Statewide Capacity | Type of Outage | Claimed Reason | Industry Sources |
|------|---------|----------|------------------------------|----------------|----------------|------------------|
| 2/17/12 | BP | Cherry Point, WA | 20% | Unplanned | Fire | The May price spike was blamed on the outage at Cherry Point, the third largest refinery on the West Coast. The early May restart encountered problems and was halted. Ultimately, this refinery reopened on May 31 after repairs and maintenance were completed. |
| 4/20/12 | Alon | Bakersfield | 3.2% | Planned | Hydrocracker restarted | No information |

---

[32] McCullough Report at 1 ("The argument that the price spikes on the West Coast are cause by supply shortages is contradicted by the increasing gasoline inventories during the period of extraordinary prices.")

1188005.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

3:15-cv-01749-L-BGS

| Date | Company | Refinery | Amount of Statewide Capacity | Type of Outage | Claimed Reason | Industry Sources |
|---|---|---|---|---|---|---|
| 4/27/12 | Shell | Martinez | 7.62% | Planned | Maintenance | Shell claimed that the refinery was shut down until May 16, 2012, yet NOx emissions data show that the refinery in fact started operating again sometime between May 6 and May 11, 2012. |
| 5/2/12 | Tesoro | Martinez | 8.70% | Planned | Hydrocracker repair | No information |
| 5/12/12 | Chevron | Richmond | 12.90% | Planned | Seasonal maintenance | Blamed for May price spike along with BP's Cherry Point refinery outage in February. Chevron announced that it would be taken offline from May 12 to May 26, but the NOx emissions data show otherwise during that period. |
| 5/15/12 | BP | Carson | 12.96% | Planned | Planned flaring | BP reported in a filing with state pollution regulators on May 15 a planned flaring scheduled to take place from May 15-21. |
| 8/6/12 | Chevron | Richmond | 12.90% | Unplanned | Fire | After a fire, Chevron shut down its Richmond refinery, the largest refinery in the state. The refinery remained offline for several months, operating at 60% capacity. A Chevron spokesperson said the fire was one factor that caused the price increase in August among others, including the price of crude oil. However, data collected by the California Energy |

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

3:15-cv-01749-L-BGS

| Date | Company | Refinery | Amount of Statewide Capacity | Type of Outage | Claimed Reason | Industry Sources |
|------|---------|----------|------------------------------|----------------|----------------|------------------|
| | | | | | | Commission showed that increased production at other refineries more than made up for the Richmond loss. Chevron agreed to pay $2 million in fines and restitution and pleaded no contest to six charges in connection with the fire. |
| 10/1/12 | ExxonMobil | Torrance | 7.8% | Unplanned | Power failure | This outage was blamed for the October price spike, yet the price began spiking prior to its public release, indicating that other oil companies had advance, secret notice. The shutdown lasted four days. Although Exxon claimed there was a disruption in power, Southern California Edison said there was barely a blip in the electrical flow that day. |

38.     Analysts have been skeptical of the industry's justifications for the radical price increases, with some concluding the companies are artificially increasing pump prices and calling for government investigation.[33]     In analyzing the circumstances of the gasoline market in California in 2012, Consumer Watchdog president Jamie Court said that the suspicious justifications for refinery shutdowns and slowdowns (in many cases in which emissions reports showed there were none)

---

[33] *See* Joseph Rose, *Oregon, Washington Gas Prices Face 'Prolonged Period' of Increases After Chevron Refinery Fire*, The Oregonian (Aug. 21, 2012), *available at* http://blog.oregonlive.com/commuting/2012/08/oregon_washington_gas_prices_ f.html

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

- 20 -

3:15-cv-01749-L-BGS

raised the specter of "criminal conduct" "reminiscent of the Enron-like manipulation of the California energy market."[34]

39.    The industry's explanation for the price spikes is not consistent with the principles of supply and demand and is inconsistent with the structure of the industry. The California refinery system as a whole had plenty of stock and capacity to manage several plant shutdowns.  For example, as noted above, after a fire resulted in a shutdown of its Richmond refinery in August 2012, a Chevron spokeswoman said the fire was one reason for the increase in gas prices that month.[35]  However, data collected by the California Energy Commission showed that increased production at other refineries more than made up for the Richmond loss.[36]  Chevron later agreed to pay $2 million in fines and restitution and pleaded no contest to charges filed by the Attorney General and District Attorney in connection with the fire.  The charges included failing to correct deficiencies in equipment and failing to require the use of certain equipment to protect employees from potential harm.[37]

40.    Refineries' production schedules are not perfectly matched to changes in seasonal demand – gas sales peak in the summer months, while gas production is relatively flat over the year with a dip in February.  Typically, the market has adjusted smoothly to the seasonal factors and gas prices remain stable (tracking the cost of

---

[34]  Ronald D. White, *Consumer advocates say refineries may have falsified information*, L.A. Times (Nov. 16, 2012), *available at* http://articles.latimes.com/2012/nov/16/business/la-fi-mo-call-for-investigation-20121116

[35]  Tokar, Dylan, *Gas Prices Increase After Richmond Refinery Fire*. The Daily Californian. (Aug. 15, 2012), *available at*, www.dailycal.org/2012/08/15/gasprices-increase-after-richmond-refinery-fire.

[36]  *Id.*

[37]  *Chevron Pays $2m in Fines and Pleads No Contest to Richmond Fire Charges*, *The Guardian* (Aug. 5, 2013) , *available at* https://www.theguardian.com/business/2013/aug/05/chevron-fines-charges-richmond-fire-california.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

- 21 -

3:15-cv-01749-L-BGS

crude and other inputs) even when sales exceed production, with the price spikes in 2012 being exceptions.

41.    In light of the increased output (*see* ¶36, *supra*), the industry's explanation that the price increases were due to a supply shortage caused by the refinery outages makes no sense, and is likely a pretext to cover-up their anticompetitive activities.

42.    Irregularities in Defendants' record keeping bring into doubt the accuracy and reliability of the maintenance and outage reports provided by the refineries to California. For instance, the Richmond refinery outage in May 2012 was blamed in part for the spike in gas prices that month. Chevron reported that it would shut down for planned maintenance from May 12 to May 26, 2012. But while the plant was supposedly closed, data tracking the Richmond refinery's FCC and TKC (measurable components of the gas oil processing at the refinery) demonstrate that the Richmond refinery was in fact still emitting mono-nitrogen oxides ("NOx") during this period of "closure" in May 2012. When those same units had been taken offline previously, no emissions resulted, as would be consistent with a factory that was not refining gasoline. McCullough Report at 12.[38] The emissions data, however, contradict the claim that the refinery was not producing during the closure period. Similarly, Shell's Martinez refinery reported a shutdown from April 27 to May 16, but the emissions data indicate that the refinery started operating sometime between May 6th and May 11th.

43.    October 2012 prices were $0.66 a gallon higher than they would be normally, given the historical patterns of oil prices and gas inventories. In the past,

---

[38]   During other cases of energy market manipulation in California, announcements by power producers about plant outages "have been discovered to be intentionally unreliable." *See United States v. Reliant Energy Servs., Inc.*, No. 04-cr-125, Indictment (N.D. Cal. Apr. 8, 2004) (Dkt. No. 1) at 5 (where Reliant was charged with disseminating false and misleading rumors and information about the availability and maintenance status of the defendant's power plants).

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

3:15-cv-01749-L-BGS

sales for the month of October have averaged more than one billion gallons per month. If the historical averages held and the numbers were adjusted for variations in the market for fixed costs, this would mean Defendants received windfall profits of about $25 million a day. Using the same overcharge calculation, consumers paid approximately $1.3 billion more at the pump during the May 2012 price spike than they should have absent the Defendants' conduct.

44. Defendants have a strong interest in creating artificial shortfalls of gasoline as a decrease in supply can result in a large windfall profit. *See* Jamie Court & Liza Tucker, *New Report: Oil Refiners' Profits Spike With Gasoline Price Spikes*, Consumer Watchdog (May 5, 2015), *available at* http://www.consumerwatchdog.org /newsrelease/new-report-oil-refiners%E2%80%99-profits-spike-gasoline-price-spikes (finding that profits for Tesoro and Valero were "twice as high as the refiners' average quarterly profit in quarters where gasoline prices spiked"); *id.* (quoting a Chevron General Manager, who stated: "Margins increased earnings by $435 million driven by unplanned industry downtime and tight product supply on the US West Coast.").

45. Below is a chart comparing actual retail gas prices to forecasted retail prices:



FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

3:15-cv-01749-L-BGS

1    McCullough Report at 19.

2        46.    Pretextual explanations such as those provided by Defendants here

3    support an inference of conspiracy, particularly when coupled with evidence related to

4    the outsized profile, information sharing and the gas market structures. *See infra*,

5    ¶¶82-119.

6        47.    Not surprisingly, the WSPA, an industry group made up of the

7    Defendants here issued a critique of the McCullough Report several months after it

8    was published. McCullough Research issued a rebuttal, noting that the WSPA's report

9    "does not offer an explanation for the price spikes, nor does it perform any analyses

10   that would justify its opinions."[39]   Further, the McCullough Rebuttal noted that

11   "WSPA's response provides no explanation, additional data, or statistical analyses for

12   the price spikes in May and October 2012.  Its proposed variable changes are neither

13   substantive nor explanatory." *Id*. at 16.  Moreover, McCullough noted that based on

14   its "experience with Enron, we suggest that erroneous information in the media can be

15   a form of market manipulation. . . .  Since little information is available on refinery

16   operations, an erroneous press release may have significant impacts on market

17   prices. . . .  [T]here is evidence that this was a factor in both May and October 2012."

18   *Id*. at 16-17.  As noted above in ¶¶26, 27, WSPA has refused the request of the PMAC

19   to provide the type of data that would help explain these anomolous events.

20                    **DETAILS OF THE 2015 PRICE SPIKES**

21       48.    Like the 2012 spikes, a series of suspicious refinery closures and

22   slowdowns preceded 2015 spikes in price, defying input costs and natural supply and

23   demand economics.  On February 2, 2015, Tesoro shut down its Martinez refinery in

24   the face of a steelworkers' strike, citing "safety" reasons, rather than allowing it to run

25   at less than full capacity during planned maintenance.  Weeks later, Tesoro CEO

26

27   [39]   McCullough Rebuttal at 1.

Geoff Goff told investors that the company could continue to operate refineries indefinitely with reduced staffing levels despite the strike. Indeed, Tesoro's CEO responded to the strikes by saying, "And we feel very comfortable that we can continue on running with the staffing levels we have, the trained and experience people have operating the refineries for – and it's a very long period of time."[40]

**2015 Refinery Issues**

49. The use of refinery outages to drive price spikes continued through 2015. As the *Los Angeles Times* reported on December 21, 2015:

> While motorists nationwide are enjoying gas at $1.99, the L.A. average climbed to $2.87 and could continue rising as delays plague repairs at Exxon Mobil's Torrance plant, which has been operating at less than 20% capacity since a February explosion. The statewide average was $2.72.

> The plant was expected to return to full service by mid-February. But now the latest projections are that repairs will not be completed until as late as April 1.

> In addition, Tesoro's Carson refinery and Chevron's El Segundo site reported unplanned outages, as well as maintenance downtime, within the last month. Compounding the problem is an unplanned outage at Chevron's Richmond plant in Northern California and a storm-damaged Tesoro plant in Anacortes, Wash.

> Gordon Schremp, a senior fuels analyst for the California Energy Commission, said in all, about 30% of the state's refining capacity is offline.

> "In a phrase," Schremp said, "chronic refinery problems continue, unfortunately."[41]

50. Then, on February 18, 2015, ExxonMobil shut down its Torrance refinery – which supplies approximately 10 percent of California's gasoline – after an explosion.[42] According to industry insiders, refinery maintenance schedules were

---

[40] Thomson Reuters Streetevents, Edited Transcript, TSO - Q4 2014 Tesoro Corp Earnings Call, (Feb. 12, 2015) *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=79122&p=irol-transcriptsarchive.

[41] http://www.latimes.com/business/la-fi-gasoline-prices-20151221-story.html

[42] *Up Like A Rocket, Down Like a Feather: The State of California's Gasoline Market*, at 1.

inexplicably moved forward, despite an apparent lack of local supply. "California's oil refiners are the only industry in America that make a fortune when their factories break down," said Jamie Court, president of Consumer Watchdog. "The oil companies are acknowledging to investors that that they have been getting fat off the shutdowns in their own refineries even as they refuse to appear before legislators in Sacramento."[43]

51. After investigating the Torrance refinery in the wake of its closure, the Division of Occupational Safety and Health (DOSH) (hereafter, "Cal/OSHA") fined ExxonMobil $566,600 for 19 workplace health and safety violations six of which were determined to be willful. On August 13, 2015, Cal/OSHA issued a press release stating that, "Six of these serious violations were also classified as willful because Cal/OSHA found that Exxon did not take action to eliminate known hazardous conditions at the refinery and intentionally failed to comply with state safety standards."[44]

52. An August 13, 2015 article in the *DailyBreeze* described the egregious and willful lapses at the Torrance refinery and the results of the Cal/OSHA investigation as follows:

> Officials with the state Department of Industrial Relations said the "investigation revealed severe lapses in Exxon's safety protocols."
>
> "It's pretty rare for a compliance officer to issue one wilful citation, let alone six willful citations," said Clyde Trombettas, who heads up the department's process safety management unit, which is responsible for inspecting chemical plants and refineries in California.

---

[43] *Tesoro CEO Admits Refinery "Disruption" and Shutdowns = Big Profits, Echoing Chevron Statements About Pump Spike*, Consumer Watchdog (May 8, 2015), *available at* http://www.consumerwatchdog.org/newsrelease/tesoro-ceo-admits-refinery-%E2%80%9Cdisruption%E2%80%9D-and-shutdowns-big-profits-echoing-chevron-statem.

[44] Department of Industrial Relations, State of California, News Release No.: 2015-76 (Aug. 13, 2015).

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE SHERMAN ACT,
CALIFORNIA'S CARTWRIGHT ACT, AND
UNFAIR COMPETITION LAW

"An employer has to be pretty egregious for us to do something like that," he added. "It's trying to send a message that we need to take these things seriously."

Indeed, the unusual number of serious citations appears to have prompted the county District's Attorney's Office to request copies of the citations for possible criminal prosecution, Trombettas said.

A spokeswoman for the district attorney noted that the agency does not usually confirm the initiation of criminal investigations; she then declined comment.

But the CAL/OSHA announcement revealed stunning and deliberate lapses in fixing potentially dangerous conditions. CAL/OSHA said Thursday the blast was due to a release of hydrocarbons from the refinery's fluid catalytic cracker unit into its electrostatic precipitator. The hydrocarbons ignited and caused the explosion that injured four workers and hurled debris and contamination over a wide area of Torrance.[45]

53. A letter to a number of western state attorneys general noted that: "Since the beginning of February, California's fourteen oil refineries have suffered ten serious slowdowns or shutdowns, many due to questionable causes or timing. The timing of these overlapping outages raises questions about their true necessity, and about whether some refinery capacity may have been taken off line in order to drive up prices and profits for oil refiners at [a] time when some of their crude operations have been yielding less profits."[46]

---

[45] *State fines ExxonMobil $566,600 for serious safety violations in wake of Torrance refinery explosion*, Daily Breeze (Aug. 8, 2015) *available at* http://www.dailybreeze.com/general-news/20150813/state-fines-exxonmobil-566600-for-serious-safety-violations-in-wake-of-torrance-refinery-explosion

[46] Letter from Jaime Court, Liza Tucker and Cody Rosenfield to States Attorneys General (May 21, 2015), *available at* http://www.consumerwatchdog.org/resources/ltrusattorneyspricemanip5-21-15ltrhd2_0.pdf.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

- 27 -

3:15-cv-01749-L-BGS

54. The following chart details the suspicious plant closings in 2015:

| Date | Company | Refinery | Amount of Statewide Capacity | Type of Outage | Claimed Reason | Industry Sources |
|------|---------|----------|------------------------------|----------------|----------------|------------------|
| 2/2/2015 | Tesoro | Martinez | 8.70% | Unplanned | Tesoro said it would close its Martinez refinery in the face of a steelworkers' strike for "safety" reasons. | Refineries can run without a full staff once operations are well under way. Weeks later Tesoro's CEO, Geoff Goff, told investors that the company could continue to operate its refineries indefinitely with reduced staffing levels despite the strike. Steelworkers complained that management increasingly used contract workers to run refineries. They would have also been available to run the Martinez facility, raising questions about the "safety" reason for full closure of Martinez. |
| 2/18/2015 | ExxonMobil | Torrance | 7.80% | Unplanned | An "incident" on the Torrance refinery's premises. | Major explosion and fire blew off sections of a 12-story electrostatic precipitator that cuts pollution. An independent federal agency cited a series of management deficiencies as the cause of the explosion. In September 2015, ExxonMobil announced it was selling the refinery to PBF Energy. The refinery had been operating at less than 20 percent capacity for months and was not repaired until mid-2016. |

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

3:15-cv-01749-L-BGS

| Date | Company | Refinery | Amount of Statewide Capacity | Type of Outage | Claimed Reason | Industry Sources |
|---|---|---|---|---|---|---|
| 4/17/2015 | Tesoro | Martinez | 8.70% | Unplanned | Never publicly disclosed. | A fire prompted a shutdown of a gas oil hydrotreater for several days. |
| 4/21/2015 | Chevron | Richmond | 12.90% | Unplanned | Chevron notifies local officials of the shutdown of an unspecified unit and said flaring was part of "normal refinery operations." | No information. |
| 4/21/2015 | Tesoro | Martinez | 8.70% | Unplanned | Never disclosed. | Offline temporarily due to "operational glitches." |
| 4/23/2015 | Chevron | El Segundo | 14.50% | Planned | Company would not comment. | Chevron reportedly had an "unplanned" problem with one reformer unit and moved up planned maintenance schedule. The outage was scheduled to last until at least mid-June and was reported to include an unknown number of other units. The necessity of the maintenance was unclear. |
| 5/9/2015 | Tesoro | Martinez | 8.70% | Unplanned | Never disclosed. | Two compressors out on May 9 and 10. |
| 5/13/2015 | Phillips 66 | Wilmington | 7.30% | Planned | None; would not identify units. | Work may focus on hydrocracker used for diesel production, which was scheduled to have maintenance in June. Unclear if related to the failure of a nearby hydrogen plant that supplies this blending component. No information about effect on production output. |

1188005.2

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE SHERMAN ACT,
CALIFORNIA'S CARTWRIGHT ACT, AND
UNFAIR COMPETITION LAW

3:15-cv-01749-L-BGS

| Date | Company | Refinery | Amount of Statewide Capacity | Type of Outage | Claimed Reason | Industry Sources |
|------|---------|----------|------------------------------|----------------|----------------|------------------|
| 5/18/2015 | Phillips 66 | San Francisco | 4.10% | Unplanned | Phillips 66 does not reveal reasons, but states operations continue. | Flaring triggered by an unplanned breakdown. Effect on production output unknown. |
| 5/19/2015 | Tesoro | Martinez | 8.70% | Unplanned | Declined to identify unit involved, said only that plant operations continue. | No information. |
| 5/19/2015 | Tesoro | Carson | 12.60% | Planned | Never disclosed. | Due to planned maintenance on a hydrotreater. Company set to perform work on hydrocracker in July. No information on effect on production output. |
| 10/15* (exact date unknown) | Chevron | Richmond | 12.90% | Planned | Chevron began carrying out a large-scale turnaround on an FCC and alkylation unit which was set to wrap up in January 2016 | No information |
| 11/15* (exact date unknown) | Chevron | El Segundo | 14.50% | Unplanned | No comment | In late November, a crude unit at the plan was taken offline following a small mechanical fire. Repairs were still incomplete as of the end of 2015. |
| 11/20/15 | Tesoro | Carson | 12.60% | Unplanned | Not disclosed | Traders spoke of reports on December 28, 2015 that the FCC had been restarted. On the same day, a Tesoro spokesperson declined to comment except to say unplanned maintenance was ongoing at both the Carson and Wilmington portions of |

1188005.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

3:15-cv-01749-L-BGS

| Date | Company | Refinery | Amount of Statewide Capacity | Type of Outage | Claimed Reason | Industry Sources |
|------|---------|----------|------------------------------|----------------|----------------|------------------|
| | | | | | | the complex as of that date. |
| 12/12/15 | Chevron | El Segundo | 14.50% | Unplanned | Not disclosed | Due to an upset, Chevron was reportedly forced to reduce rates on an FCC. |
| 12/15/15 | Tesoro | Martinez | 8.70% | Unplanned | Loss of steam generation unit | Tesoro did not identify the units affected but trade sources said the incident downed an FCC. |
| 12/22/15 | Tesoro | Wilmington | 5.10% | Unplanned | Not disclosed | Motor fire led to the breakdown of an alkylation unit |

**Defendants Drive Up Prices by Exporting Even When Supplies Are Low**

55.     In addition to controlling and restricting supply through suspicious refinery shutdowns in 2015, West Coast refineries continued their scheme of driving up prices by exporting gasoline outside of California.  In December 2014, refineries' exports reached another historical high.  In December 2014, West Coast refiners exported 2.7 million barrels, or 113 million gallons of gasoline.  The exports also constituted the most exports in a quarter, ever.  During the fourth quarter of 2014, oil companies exported an amount that represents almost a third of California's current gasoline supply.  "Oil companies created a shortage by selling abroad, and then shutting down refineries, and have made billions at the expense of Californians who are paying a huge premium due to the state's low inventories," Consumer Watchdog's Cody Rosenfield has said.

56.     Exxon Mobil, despite having shut down its Torrance refinery for the better part of the year in 2015, nonetheless *increased* its sales of gasoline in California

by nearly four percent compared with 2014. It did so through exchange agreements with its competitors to use their refineries, including Tesoro, that signaled to the other refiners that Torrance would not be online for a long period of time.[47] The market, however, was left in the dark, as ExxonMobil provided misinformation that the refinery would come back online at various points in the year.[48]

57. Materials at a June 30, 2015 meeting by the California Energy Commission noted: "Strong price spikes at refinery wholesale level quickly transferred through to distribution terminals and retail." *Id.*[49]

58. The following chart shows the low gasoline inventory levels, which can "exacerbate price responses to refinery issues." Further aggravating the issue, refineries know that running on short supply of California's special CARB-complaint gasoline (gasoline with 5.7% ethanol as an oxygenate), which is not generally imported into the state, creates a situation in which a substitute is not generally available, so when a refinery goes down, gas prices go up and the refineries profit.

---

[47] Jamie Court & Cody Rosenfield, *Consumer Watchdog Calls for Sunlight On Big Oil Refiners to Avert CA Gasoline Price Spikes; State Energy Commission Panel to Make Recommendations on Transparency for Refiners* (Apr. 22, 2016), *available at* http://www.consumerwatchdog.org/newsrelease/consumer-watchdog-calls-sunlight-big-oil-refiners-avert-ca-gasoline-price-spikes-state-e.

[48] *Id.*

[49] Gordon Schremp, *Recent Fuel Price Trends, Market Overview & Contributing Factors: Petroleum Market Advisory Committee Meeting* (June 30, 2015), at 40 *available at* http://www.energy.ca.gov/assessments/petroleum_market/2015-06-30/presentations/Recent_Fuel_Price_Trends_Market_Overview_and_Contributing_Factors.pdf.





*Id.*

59.     A shutdown at Exxon Mobile's only California refinery in February 2015 reduced gas supply in Southern California and depleted the State's already-short reserves.  But with its Torrance refinery offline, Exxon decided to hide one of the company's only U.S. flagged tankers in Singapore instead of using the ship to import gasoline and relieve the shortage.[50]  Exxon could have made up the Torrance deficit by using its tanker to transport fuel to California from out-of-state or international refineries.  But rather than bring badly-needed imports to the market during the height of Southern California's gasoline price spike and summer driving season, Exxon kept the S/R American Progress in the U.S. Gulf Coast for four months before idling it in Singapore for seventy days.[51]  By making its tanker unavailable at a critical time,

---

[50.]  Cody Rosenfield, *Against the Tide: How Missing Tankers Pumped Up Gas Prices and Refiner Profits*, Consumer Watchdog (Feb. 8, 2016) *available at* www.consumerwatchdog.org/resources/reportagainstthetide.pdf.

[51]  *Id.* at 9.

Exxon ensured that California gasoline supplies were kept short, driving up prices and Exxon's profits.[52]

60.     During the time its Torrance refinery was shut down, Exxon imported just twelve million gallons of gasoline, an amount equivalent to only three days of production at the Torrance facility.[53]  By contrast, the lost production that resulted from the Torrance shutdown during this period was over 800 million gallons, or 20% of Southern California's refining capacity.[54]  As data from the California State Lands Commission show, Exxon purchased gasoline from other California refiners until it was forced to import gasoline to meet contractual obligations, rather than import to resupply the market, as confirmed by the industry news service Platts.[55]  Only three of the 32 confirmed gasoline shipments to California during the Torrance shutdown were shipments for Exxon: one shipment in March, one in April, and one in August.[56]



52  *Id.* at 8.

53  *Id.* at 2.

54  *Id.* at 7.

55  *Id.* at 2.

56  *Id.* at 7.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

- 34 -

3:15-cv-01749-L-BGS

61. During this time Exxon did, however, continue to import other products that it relies on, such as Alkylate.[57] Exxon purchased the gasoline it mixes with Alkylate to provide premium gasoline to the Southern California market from other companies instead of importing it.[58] As the industry news service Platts observed, "ExxonMobil has been buying barrels from other refiners and trade houses to meet its commitments."[59]



ExxonMobil Import Breakdown
Gasoline (12.3M gallons)
Alkylate (56M gallons)

62. In June and July of 2015, imports of gasoline to California came to an abrupt halt when California inventory was declining toward its lowest point.[60] Concurrently, exports increased.[61]

---

[57] *Id.* at 5.

[58] *Id.*

[59] *Id.* at 7.

[60] *Id.* at 12-14.

[61] *Id.*

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

- 35 -

3:15-cv-01749-L-BGS



63.    Similarly, pursuant to the alleged agreement to decrease supplies, refiners in California continued exporting gas products out of the state.  As reported by the *Daily News* on July 27, 2015:

On June 25, just one week before many California motorists began paying upwards of $4.30 per gallon for gasoline, the Bahamian-flagged tanker Teesta Spirit left Los Angeles headed for ports on the west coast of Mexico carrying more 300,000 barrels of gasoline refined in California.

The Teesta Spirit was just one of nine large tankers that left California ports carrying gasoline to places like Mexico and Chile between June 25 and July 23, at a time when oil companies were raising prices by as much as $1 per gallon in some regions.

Altogether, oil companies like Chevron and Phillips 66 shipped about 100 million gallons (42 gallons per barrel) of gasoline out of California during that time span.

The industry explained its huge price increases, levied this time primarily in Southern California, by citing a shortage caused partly by a February explosion that disabled a pollution monitoring unit at Exxon Mobil's refinery in Torrance.  No one explained why it should take more than five months to fix that machinery.

Executives of the industry's Western States Petroleum Association did not respond to repeated telephone attempts to get their explanations for this and for the gasoline exports, which amounted to sending away almost three full days' statewide supply of gasoline.

As the oil companies were shipping out that fuel, they reaped unprecedented profits reportedly approaching $1.50 for every gallon of gasoline they sold at the higher prices.

Prices, said WSPA President Catherine Reheis-Boyd in a letter responding to a previous column that alleged gasoline price gouging, are a result of supply and demand.

This may be true, but there's ample evidence the oil firms she represents create some of the shortages they cite as a cause of pricing volatility.

It's not just the continued exports and any problems at Exxon Mobil in Torrance. They ascribed another price spike earlier this year to shutdowns at refineries in the Martinez/Benicia area northeast of San Francisco. Labor issues, they said, forced those shutdowns. But former employees of one of those plants reported they've been kept open during previous, similar labor disputes and could have stayed open this year, too.

Said Reheis-Boyd, "All of the many government investigations . . . in recent years have concluded that supply and demand are the primary reason (sic) gas prices go up and down."

Shipping information makes it clear any recent shortage was created at least in part by the companies themselves. Here are some examples: The Atlantic Queen left Long Beach headed for Mexico on June 25 with a capacity of over 398,000 barrels of gas. The Iver Exact, only slightly smaller, left San Francisco Bay heading for Mexico on June 28. The larger Pudu left Long Beach for South and Central America on July 7.

Several other tanker departures from both Northern and Southern California ports were scheduled through the first week of August. How can the industry claim it has short supplies while it's shipping gas to foreign countries?

Why should California residents suffer the pollution produced by gasoline refineries if the owners of those plants manipulate prices by sending gasoline to foreign users?

Said Jamie Court, president of the Consumer Watchdog advocacy group, "Oil refiners have kept the state running on empty and now they are sending fuel refined in California abroad just as the specter of low inventories drives huge price increases."[62]

64. On May 15, 2015, during the middle of this gas shortage and major price spike in Southern California, the S/R American Progress arrived empty in Los Angeles from the U.S. Gulf.[63] The S/R American Progress is a Jones Act vessel,

---

[62] *Gas being exported from California despite 'shortage': Thomas Elias*, Los Angeles Daily News (July 27, 2015), *available at* http://www.dailynews.com/opinion/20150727/gas-being-exported-from-california-despite-shortage-thomas-elias.

[63] Cody Rosenfield, *Against the Tide: How Missing Tankers Pumped Up Gas Prices and Refiner Profits*, Consumer Watchdog Presentation to Petroleum Market Advisory

which makes it one of a select few ships allowed under federal regulations to carry petroleum products between U.S. ports. Such tankers very rarely go to foreign ports, as these trips are a waste of these rare ships' limited resources. Yet on June 20th, 2015, Exxon sent the tanker from Los Angeles all the way to Singapore, where the S/R American Progress idled and roamed aimlessly until August 31st.[64]



65. Singapore is a major international gas hub, where Exxon owns one of the largest refineries in the world – a refinery that produces more than twice as many barrels per day as the largest refinery in California.[65] Moreover, the gasoline Exxon's Singapore refinery produces can be used in California.[66] Although the S/R American Progress returned to Los Angeles with a full tank of product during a time when California desperately needed gasoline imports, the tanker entered the city's port but left without unloading, delivering its gas shipment to Florida instead.[67]

Committee (Feb. 8, 2016), at 13 *available at* http://www.energy.ca.gov/assessments/petroleum market/2016-02-08/presentations/Consumer_Watchdog.pdf..

[64] *Id*. at 13.

[65] *Id.* at 15.

[66] *Id.* at 16.

[67] *Id.* at 13.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW
- 38 -
3:15-cv-01749-L-BGS

66. The gas industry claims that a shortage of "Jones Act" ships prevents it from importing more gasoline to California.[68] "Jones Act" ships fly U.S. flags and are the only tankers qualified under federal regulations to import gas from other U.S. ports.[69] That Exxon kept one of its only "Jones Act" tankers capable of resupplying the California market idle halfway across the world during a time of extreme need for domestic imports makes Exxon's purpose clear: to manipulate the gasoline market in California by creating an artificial shortage of gas supply that would drive up demand, prices, and profits. Exxon's two false Los Angeles deliveries – bringing the S/R Progress into the city's harbor twice without unloading gas: once empty from the Gulf, and once full from Singapore – show the company's deliberate effort to mislead and dissemble its market manipulation.[70]

67. Exxon only imported gasoline when it could no longer buy gasoline from third parties and was at risk of failing its contractual obligations.[71] Using a ship called the FPMC 21, Exxon brought gasoline from Singapore to Los Angeles on August 2nd, showing that the company *was* able to resupply the Southern California market during the period its Torrance refinery was down.[72] Yet Exxon otherwise made no effort to import gasoline to make up for lost production.

68. Exxon's failure to resupply the California market, when it easily could have, occurred while other companies like Chevron were exporting gasoline from California to further diminish supply, suggesting a collusive effort to manipulate the

---

[68] Cody Rosenfield, *Against the Tide: How Missing Tankers Pumped Up Gas Prices and Refiner Profits*, Consumer Watchdog (Feb. 8, 2016), *available at* www.consumerwatchdog.org/resources/reportagainstthetide.pdf.

[69] *Id.* at 9.

[70] *Id*.

[71] *Id*.

[72] *Id.*

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

- 39 -

3:15-cv-01749-L-BGS

gasoline market and drive up profits.[73]  During the first three quarters of 2015, for example, Chevron exported six days' worth of California gasoline supply.[74]  Although Chevron controls only 28% of the market's refining capacity, it was responsible for 66% of all gasoline and additive exports from California during this period.[75]



California Exports of Gasoline & Components by Company

Valero (5 million gallons)

Shell (67 million gallons)

Chevron (253 million gallons)



73 *Id.*

74 *Id.*

75 *Id.*

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

- 40 -

3:15-cv-01749-L-BGS

69.     Consumer Watchdog also tracked Chevron's imports which further suggests a pattern by oil refiners to artificially constrain gas supplies to California's market and thereby raise prices.  Based on documents obtained pursuant to public records requests from the California State Lands Commission's shipping records, found that Chevron exported *250 million gallons of gas* while gas prices reached $4.20 in Southern California in the summer of 2015.  Consumer Watchdog's Jaime Court said, "Chevron, during the period we charted last year, brought only three ships in to make up for about three days of lost capacity at that one refinery and it's been out 360 days right now. So when you don't make the gasoline you promise and you don't bring ships in to backfill it, it's going to run the inventory levels way down."[76]

70.     Consumer Watchdog also reviewed export data and found that between August and September 2015 that California's refiners exported over 80 million gallons of refined petroleum products.  In a September 3, 2015 press release, Consumer Watchdog stated:

> Consumer Watchdog's review of industry data also shows that during the last week six tankers are or have loaded up to 2 days of Californians' petroleum supplies at California refineries for foreign export.  The capacity of the ships, which are carrying California refined products as opposed to crude oil, totals over 80 million gallons, which is two days of the state's fragile gasoline supply.
>
> Below are the ships that have left California with refined products over the last two weeks.[77]

---

[76]  *Why Are You Paying $.77 More for a Gallon of Gas*, Consumer Watchdog (Feb. 8, 2016), *available at* http://www.consumerwatchdog.org/story/why-are-you-paying-77-more-gallon-gas.

[77]  *Labor Day CA Gouging Gap At Pump Rises To $5.3 Billion*, Consumer Watchdog (Sept. 3, 2015), *available at* http://www.consumerwatchdog.org/newsrelease/labor-day-ca-gouging-gap-pump-rises-53-billion-february-oil-refiners-exporting-amid-gaso.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

3:15-cv-01749-L-BGS

1188005.28

| Ship | capacity (gallons) | Flag | Destination Port | Status |
|---|---|---|---|---|
| Miss Mariarosaria | 13,604,858 | Malta | n/a | Filled up at Chevron in SF, on high seas |
| Gotland Sofia | 13,306,344 | Bahamas | Mexico | Filling up in SF |
| BW Tiger | 13,736,944 | Singapore | n/a | Filled up at Phillips 66 in SF, headed to sea |
| Nord Guardian | 13,597,461 | Denmark | United Kingdom/Continent | Filled up at Chevron SF, on high seas |
| Hafnia Crux | 14,954,016 | Denmark | S & C America | Filling up in SF |
| Atlantic Queen | 13,771,710 | China | S & C America | Filled up in SF, headed to sea |
| **Total Gallons:** | **82,971,333** | | | |

71.     California refiners' illicit profits are the direct result of Defendants' agreement to constrain supply or inject uncertainty into the market, inter alia, Exxon's decision not to use its available tanker to resupply the market after its Torrance refinery's shutdown created a gasoline shortage in Southern California. The foregoing shows that Exxon and the other large refiners in California calibrated the imports and exports of gasoline to inflate gasoline prices and corporate profits artificially. Moreover, refiners hid information about imports and exports to create an unnecessarily volatile gas market and to drive up prices.[78]

72.     Analysts have been hamstrung from assessing additional supracompetitive price spikes in the California gasoline market by the lack of public disclosure of data including outages and maintenance schedules, among other matters.[79] The lack of transparency also facilitates collusion:

> "Though the industry is far more consolidated than it was 15 years ago, another complicating factor is the total lack of industry transparency. Refineries keep tight control over data concerning their industry and operations. The California Energy Commission, which is the state's primary energy policy and planning agency, does not release any public estimates of days of supply. Indeed, it is not even clear that the agency has the data necessary to make this calculation with 100 percent accuracy.
>
> This information would be critical to know in case of a statewide or national disaster. No real time collection of data exists. The EIA's inventory data is three months behind, and this federal agency does not keep track of current days of supply. No federal or state agency maintains centralized information on current or historical refinery status,

---

[78]  *Id.*

[79]  Jamie Court, Cody Rosenfield and Liza Tucker, *PriceSpiked: How Oil Refiners Gouge Californians on Their Gasoline and What it Costs*, Consumer Watchdog, at 6 *available at* http://www.consumerwatchdog.org/resources/PriceSpiked.pdf.

whether a refinery is closed, for how long, whether the refinery had an accident, how much of its capacity the refinery is utilizing, and how big its gas reserves are on hand. Thus the public remains in the dark on refinery operations, and traders can run up the price of gas more easily on mere speculation."[80]

73.    At the same time, refineries keep tight control over data concerning their industry and operations. The California Energy Commission, which is the state's primary energy policy and planning agency, does not release any public estimates of days of supply. No real-time collection of data exists. The EIA's inventory data is three months behind, and this federal agency does not keep track of current days of supply. No federal or state agency maintains centralized information on current or historical refinery status, whether a refinery is closed, for how long, if they had an accident, how much capacity is being utilized, and how big gas reserves are. Thus, the public remains in the dark on refinery operations.[81] Defendants are able to take advantage of the dearth of information on refinery operations, thus allowing prices to be run up on mere speculation and misinformation. By contrast, refiners are aware of much of this information through exchange agreements, which are agreements that allow refiners to exchange petroleum products with other refiners at an agreed rate of exchange. Through such agreements, refiners acquire refined products to supplement supply to their customers when they are short on supply. The exchange agreements signal to the other refiners the amount of time a refinery will be offline. This type of signaling is a recognized plus factor.

74.    Bob van der Valk, senior editor of the Bakken Oil Business Journal, reached a similar conclusion, "[w]e have an ill-equipped market, so it is prime to be manipulated and it is being manipulated."[82]

---

[80] *Id*. at 8.

[81] *Id*. at 9.

[82] *Experts Tell Panel Why Gas Is So Expensive In California*, Consumer Watchdog (Feb. 8, 2016), *available at* http://www.consumerwatchdog.org/story/expertstellpanelwhygassoexpensivecalifornia.

**Refiners' Supracompetitive and
Unprecedented Profits in 2015**

75.     Data from 2015 reveal that Californians paid over ***$9 billion*** more for their gasoline than they should have as a result of Defendants' scheme.  The first quarter of 2015 was one of the most profitable for California refiners in recent history. "Despite refiners' claims that their costs were rising, profits per barrel of gasoline in California actually increased by a staggering amount – disputing industry assertions that higher costs were merely being passed to consumers."[83]

76.     In 2015, average refiner margins in California were nearly $1.00 per gallon,[84] or more than double their 16-year average margins of 48 cents per gallon. During the week of July 13, 2015, oil refiners made a record $1.61 per gallon.[85] Although the price of crude oil in 2015 dropped to more than half of what it was for much of 2014, refiners increased their profit margins rather than passing on the savings to consumers.[86]  The two refiners which break out California-specific profits, Tesoro and Valero, reported record profits in 2015.  Tesoro made $1.9 billion on California refining for the year, which was its best year ever by over $1 billion. Valero tripled its average profits over the last five years with its $852 million in California profits in 2015.[87]

---

[83]  *Consumer Watchdog's Analysis for the California Attorney General and California Energy Commission's Protection Market Advisory Committee*, Consumer Watchdog (June 30, 2015), at 6, *available at* http://www.consumerwatchdog.org/ resources/wholesalegasolinemanipulaitonanalysis.pdf.

[84]  California Energy Commission Estimated 2015 Gasoline Price Breakdown & Margins Details, *available at* http://www.energy.ca.govalmanac/margins/index.php.

[85]  Cody Rosenfield and Liza Tucker, *Golden State Gouge, the Summer of Record Refining Profits* (Aug. 5, 2015) *available at* http://www.consumerwatchdog.org/ resources/thegoldenstategouge.pdf.

[86]  *Id.*;   http://www.energy.ca.gov/almanac/transportation_data/gasoline/margins/ index.php.

[87]  Transcript of the February 8, 2016 meeting of the Petroleum Market Advisory Committee,   at   96   (Feb   8,   2016),   *available   at* http://docketpublic.energy.ca.gov/PublicDocuments/15-PMAC-

**The Price Differential Between
Wholesale and Retail Gas Prices
Reached Historic Highs in 2016**

77. In August 2016, though the price of gas on California's wholesale market was the lowest in the United States, the state had the highest gasoline prices. The discrepancy between wholesale and retail prices is the second highest in history following the Great Recession's spread in October 2008:

> "If we have the lowest wholesale price for gasoline we should also have the lowest retail price for gasoline," said Jaime Court, founder of Consumer Watchdog. "The fact that we have the lowest wholesale price for gasoline and the highest retail price for gasoline means that oil refiners are ripping us off."

> Except in October 2008, when the nation was struggling with the great recession, the gap between wholesale and retail market prices is the widest it has been.

> "Usually, it's about 80 cents difference between the wholesale and the street price," said Cody Rosenfeld, a researcher for Consumer Watchdog. "But right now in California, we're charging $1.60 more per gallon of gasoline than the wholesale price. It's really unheard of. It's 70 cents more than the usual difference."[88]

78. Consumer Watchdog attributed the differential to the unprecedented profits California refineries are reaping in an August 4, 2016 press release:

> Today oil refiner Tesoro reported $332 million in profits from California oil refining during the second quarter. Valero had reported $141 million in state oil refining profits during the second quarter, nearly triple its average quarterly profit of $57 million. These are the only two refiners that report California-only oil refining profits.

> Consumer Watchdog said the high profits from the state refiners that report them helps to explain the odd, extreme current gap between retail and wholesale gasoline prices in the state.

> Currently, California's wholesale market for gasoline, where oil refiners trade gas, is the cheapest in the country, but California drivers have been paying the highest price in the nation for a gallon of gasoline on the street.

---

01/TN210317_20160216T094854_Transcript_of_the_020816_Meeting_of_the_Petrol eum_Market_Adviso.pdf.

[88] *California Gas Prices Draw Ire Of Consumer Advocates*, Erik Anderson, KPBS (Aug. 4, 2016), *available at* http://www.kpbs.org/news/2016/aug/04/california-gas-prices-draw-ire-consumer-advocates/.

1188005 28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

3:15-cv-01749-L-BGS

The price of gas at the pump in California usually costs 88 cents more than the price on the wholesale market. Today, drivers are paying $1.58 more than the wholesale market, a windfall for refiners, who are pocketing most of that extra cost.

"With all of California's refineries back online, drivers should be paying 70 cents less at the pump," said Consumer Watchdog researcher Cody Rosenfield. "There's no shortage. There are no refinery problems. Where are the savings for consumers?"

On the California wholesale "spot" market where refiners trade large amounts of gasoline, a gallon costs $1.17, the lowest in the country, and 18 cents less than in Chicago, due to an overabundance of supply. Despite that, street prices in California are 45 cents more per gallon than in Chicago.[89]

**Historically Unprecedented Differences Between California's Gas Prices and the Rest of the Country**

79. An August 19, 2015 article in the Sacramento Bee noted, "California's current average gasoline price is 98 cents more per gallon than the U.S. average, and was as much as $1.30 more this year. This gap is unprecedented. Over the 15 years that data have been collected, the price gap has averaged 28 cents."[90]

80. The Los Angeles Time's Ivan Penn detailed the record sustained discrepancy between California's prices and the prices of gasoline outside the state throughout the U.S. in a June 30, 2016 article:

Gas prices in California typically run higher than the rest of the country due to higher-than-average taxes and fees, requirements to produce special low-pollution blends and the relatively small number of refineries in the state.

But last summer the gap between the Los Angeles area prices and the rest of the country set records.

---

[89] *CA Oil Refiners Pump Up Profits Through Lowest Wholesale Gasoline Price in USA And Highest Retail Prices; Refinery CEO Investor Comments Points To Market Rigging*, Consumer Watchdog (Aug. 4, 2016), *available at* http://www.consumerwatchdog.org/newsrelease/ca-oil-refiners-pump-profits-through-lowest-wholesale-gasoline-price-usa-and-highest-ret.

[90] *Another View_ Big Oil is gouging Californians*, _The Sacramento Bee (Aug. 18, 2016), *available at* http://www.sacbee.com/opinion/oped/soapbox/article31551845.html.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

For instance, California refineries reaped an average of 49.3 cents on a gallon of gasoline from 1999 to 2014, according to the California Energy Commission. But in summer 2015, the average ballooned to 88.8 cents, triggered when the refinery troubles in February of that year disabled 7% of the state's capacity at a time of low inventories.

Gas prices remain higher than expected, about 68 cents higher in the L.A. area than the rest of the nation.[91]

**Simultaneous Gas Price Increases in 2016**

81.    Additional indicia of an agreement between Defendants is based on the simultaneous increase of gas prices in February of 2016. "Oil refiners made billions extra last year because of our pain at the pump and after a short respite the pain is going to continue. What's remarkable is that the four major oil refiners all raised the prices to their branded stations, 75% of the Southern California market, in unison and by nearly the same amount. When four refiners control nearly 80% of the gasoline production[92] and 75% of the stations in the area this market is rigged for refiners' profit and drivers' pain."[93]

---

[91]    *California Attorney General Subpoenas Oil Refiners In Gas-Price Probe*, Ivan Penn, Los Angeles Times (Jun. 30, 2016), *available at* http://www.latimes.com/business/la-fi-oil-refineries-subpoenas-20160630-snap-story.html.

[92]    According to the California Energy Commission, defendants Tesoro, Chvron, Valero and Phillips have 27%, 26%, 12% and 11% of the CARB gasoline refining market, respectively. http://www.energy.ca.gov/almanac/petroleum_data/refineries.html

[93]    *Consumer Watchdog Tells So Cal Drivers Fill Up Now, Gas Prices To Rise Quickly As Major Refiners Switch to Summer Blend And Raise Prices On Their Dealers By 37 Cents Over Night*, Consumer Watchdog (Feb. 2, 2016), *available at* http://www.consumerwatchdog.org/newsrelease/consumer-watchdog-tells-so-cal-drivers-fill-now-gas-prices-rise-quickly-major-refiners-s.

## NUMEROUS PLUS FACTORS EXIST WHICH
## ARE PROBATIVE OF CONSPIRACY

**The Gas Market in California Is Vulnerable
to Manipulation Because of Its Structure
and Characteristics**

82.     In addition to the factual data detailed above, which details production coordination between some refineries as well as the windfall profits achieved during the spikes, other characteristics of the market make collusion particularly attractive in this market. Specifically, the market: (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) presents ample opportunities to collude. Moreover, Defendants have provided pretextual explanations for their conduct; have acted against their economic interest and are the subject of multiple governmental investigations.

**High Barriers to Entry**

83.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. Where there are significant barriers to entry, however, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

84.     There are substantial barriers that preclude, reduce, or make entry more difficult into the gasoline market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, manufacturing plants and equipment, energy, transportation, distribution, infrastructure, skilled labor and long-standing customer relationships.

85.     In addition to the costs of building a new refinery, given the nature of the product and California's unusual position in the market, any new entrant would have to comply with the various and complex regulations, including environmental

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE SHERMAN ACT,
CALIFORNIA'S CARTWRIGHT ACT, AND
UNFAIR COMPETITION LAW

- 48 -

3:15-cv-01749-L-BGS

regulations, imposed by state and federal agencies. Compliance with the regulations would require extensive testing and the receipt of government approvals, all of which would take years.

86.    Barriers to entry have only grown in the years since the Senate Report was issued in 2002.[94]

**The Demand for Gasoline in California Is Inelastic**

87.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "elastic" if an increase in the price of a product results in diminished revenues, with declines in the quantity sold of that product outweighing the effects of higher prices. For products with a highly elastic demand, customers have many feasible alternatives for cheaper products of similar quality, and cut purchases sharply in the face of even a small price increase.

88.    For a cartel to profit from raising prices above competitive levels, market demand must be relatively less elastic at competitive prices where an increase in price would result in a net increase in profit. A less elastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and sufficient lost sales revenues as to offset the beneficial effect of higher prices on profits for products they still continue to sell.

89.    Gasoline sales are highly inelastic. People and businesses tend to have set driving patterns and purchase a similar amount of gasoline no matter what the price. A 2002 report by the Senate Majority Staff of the Permanent Subcommittee on Investigations, has noted that "demand for gasoline in California is inelastic."[95]

---

[94]    Jamie Court, Cody Rosenfield and Liza Tucker, *Price Spiked: How Oil Refiners Gouge California and What It Costs*, Consumer Watchdog at 2, *available at* http://www.consumerwatchdog.org/resources/PriceSpiked.pdf.

[95]    United States Senate, *Gas Prices: How are they really set?* Report Prepared by the Majority Staff of the Permanent Subcommittee on Investigations ("Senate Report")

1188005.2
FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE SHERMAN ACT,
CALIFORNIA'S CARTWRIGHT ACT, AND
UNFAIR COMPETITION LAW
- 49 -
3:15-cv-01749-L-BGS

**The Market for Gasoline in
California Is Highly Concentrated**

90.     The West Coast is an "island" in the North American gasoline market because there are no gas pipelines across the Rockies.  California itself is a smaller island within the West Coast because California law mandates a specific formulation for gas during spring and summer months.  There are 19 refineries on the West Coast, but ownership is concentrated with major oil companies owning two or three refineries each.  This is exactly the type of environment where market power is likely to exist.



Western States Petroleum Association Fact Sheet (Jan 2009), *available at* https://www.wspa.org/sites/default/files/uploads/documents/Energy%20Alerts/WSPA%20General%20Fact%20Sheet.pdf.

---

(released Apr. 30 & May 2, 2002) at 106, *available at* http://www.hsgac.senate.gov/subcommittees/investigations/hearings/gas-prices_how-are-they-really-set.

1188005.2

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE SHERMAN ACT,
CALIFORNIA'S CARTWRIGHT ACT, AND
UNFAIR COMPETITION LAW

- 50 -

3:15-cv-01749-L-BGS

91.    The Senate Report noted that California is the second largest gasoline market in the world, following only the United States as a whole.  As in other markets, the Senate Report noted "[a] small decrease in supply will produce a large increase in price."  Senate Report at 106.  Further, the report noted that the California refining industry is an oligopoly where the top two refiners control nearly half the state's capacity, the top four "refiners owned nearly 80 percent of California capacity," and the top seven players (all of which are defendants herein) account for more than 92% of the market.[96]  The Senate Report cites a number of documents from a lawsuit brought against the refiners in 1996 alleging an anticompetitive scheme by the refiners in relation to gasoline meeting the specifications of the California Air Resources Board ("CARB").  The Senate Report concluded that the evidence produced in the case showed recognition by a number of the refiners and petroleum industry consultants that the small number of large refiners in California possess a significant degree of market power.

92.    For example, a document generated by Chevron in 1993 as part of a strategic study that was produced during discovery in *Aguilar v. Atlantic Richfield Co.*, No. 700810 (Cal. Super. Ct., San Diego Cnty.), and referred to in the Senate Report, also states that a few large refiners dominate the West Coast and have a significant effect on the market.  The Chevron document contrasts the high returns of the refiners in the West Coast market with the lower returns of refiners in the Gulf Coast and attributes the difference, in part, to the concentrated nature of the West Coast market:  "USWC market appears to allow better average returns than USGC [Gulf Coast].  The better performers generate [returns on capital employed] greater than 12% . . . . ***Market is dominated by a limited number of large, committed***

---

[96]    *See* California Energy Commission, *Gasoline Market Share in California for 2014* (updated Apr. 2015), *available at* http://www.energy.ca.gov/almanac/transportation _data/gasoline/market_share/.

1188005.28    FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW    3:15-cv-01749-L-BGS

*refiner/marketers whose individual actions can have significant market impact*."
Senate Report at 109 (434) (emphasis in original).

93.    Another document relied upon by the Senate in its report was an "Energy Briefing Note" that was generated in 1996 by the PIRA Energy Group, a petroleum industry consulting organization, and presented to all of its "retainer clients," including Mobil, regarding the impact of the introduction of CARB-compliant gasoline on refining margins. *Id.* at 109-110 (434-435).  The Briefing Note reported that the supply/demand balance in California was likely to be "tight," and would remain so, partially as a result of the market structure in which a few refiners in the state had sufficient market power and motivation to maintain prices above marginal costs: "The CARB 2 balance appears to be tight in California.  Add in the remoteness of the California market, the unique characteristics of CARB 2, the requirement for domestic shippers to use higher cost Jones Act shipping, *and the small number of companies involved, all of whom share a motivation to recoup costs and not undermine the market.  The implication is that prices on average will do quite a bit more than cover marginal costs*, which will mainly comprise the incremental oxygenate cost, although not during the extended phase-in period." *Id.* at 110 (435) (emphasis in original).

94.    As the Senate Report found, "[t]his PIRA memo presents a classic description of a market failure.  In a purely competitive market, prices do not rise above marginal costs, which are the costs of producing an additional unit of the product." *Id.*

95.    The Senate Report, in looking at California, found "the high degree of vertical integration between the refining and marketing sectors raises prices within the state and raises the barriers for others to enter into the market or import gasoline, thus helping to keep the supply/demand balance tight and to sustain higher prices." *Id.* at 111 (436).

96. But none of the unique attributes of California's market explain the sustained supracompetitive gas prices.

**California's Special Gasoline Formulation Does Not Account for Sustained Supracompetitive Prices**

97. On August 16, 2016, Edie Chang, Deputy Executive Officer of California Environmental Protection Agency's Air Resource Board, detailed the following reasons why California's reformulated gasoline requirements do not explain the price spikes in 2015:

> ARB does not believe the California Reformulated Gasoline (CaRFG) rule was a significant factor in the recent gasoline price spike:
>
> - CaRFG regulations have remained unchanged since 2012
>
> - Prior supply disruptions and associated price increases (under the same CaRFG rules) have been much shorter in duration
>
> - There is significant global refining capacity that can make California Reformulated Gasoline Blendstock for Oxygenate Blending (CARBOB)
>
> - California refiners routinely assert that the State's refineries have excess gasoline production capacity and that the industry is highly exposed to import competition if compliance costs under AB 32 become too great.
>
> - Like the PMAC we are concerned with the length and magnitude of the California vs. national gasoline price differentials that have occurred since early 2015, but we have yet to see convincing evidence that the proposed mechanism is an appropriate way to address price differentials.[97]

**Opportunity to Collude – Trade Associations**

98. Defendants BP West, Chevron, Tesoro, Shell, ExxonMobil, Valero, ConocoPhillips, Alon and Kern Oil, various of their subsidiaries and defendant-affiliated entities are all members of an interconnected group of trade associations

---

[97] PMAC_Air_Resources_Board_Presentation. Discussion of Allowing Non- CARB Gasoline Use as a Price Pressure Relief Valve to Reduce Price Spikes in CA (Aug. 16, 2016), *available at* http://www.energy.ca.gov/assessments/petroleum_market/2016-08-16/2016-08-16_presentations.php.

and organizations engaged in extensive lobbying and other activities related to the gas market. These associations, which hold regular meetings, provide numerous opportunities for Defendants to conspire.

99. Since the early 1900s, oil and gas companies such as Alon USA, Chevron USA, ConocoPhilips, ExxonMobil, Shell, Tesoro Corporation, and Valero have been members of industry trade associations such as the WSPA; American Petroleum Institute ("API"); American Fuel & Petrochemical Manufacturers ("AFPM"); Society of Independent Gasoline Marketers of America ("SIGMA"); and Petroleum Marketers Association of America ("PMAA"). These trade associations are dominated and controlled by the Defendants, as their representatives, predecessors and affiliates actively participated in the trade associations' management and oversight. Further, most of the revenue earned by the trade associations comes from membership fees and other payments from Defendants related to research, lobbying, trade shows, and conferences. While the stated purpose of these trade associations is to ensure that consumers continue to have reliable access to petroleum and petroleum products, Plaintiff alleges certain members of these trade organizations have conspired amongst themselves to use these trade organizations to engage in anticompetitive discussions involving pricing, supply and production levels.

100. The trade associations provided a mechanism and venue through which the conspiracy was facilitated, implemented and monitored. Defendants met regularly prior to and following the price spikes in May and October 2012, as well as in 2014, 2015 and 2016 attending sponsored meetings, conventions, and conferences hosted by these associations.

101. For example, Chevron, ConocoPhillips, ExxonMobil Corporation, Shell Oil Products Company, Tesoro and Valero are all members of WSPA. The dates that WSPA held meetings and conferences include but are not limited to: January 13-14,

1188005.28

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE SHERMAN ACT,
CALIFORNIA'S CARTWRIGHT ACT, AND
UNFAIR COMPETITION LAW

3:15-cv-01749-L-BGS

2010; October 6, 2010; February 1-3, 2011; October 4-6, 2011; October 2-3, 2012; and October 1-2, 2013 and February 12-13, 2015.

102.    Chevron Products Company and defendants ConocoPhilips (board member), ExxonMobil (board member) and Shell are all members of API.  The dates that API held meetings and conferences include but are not limited to: April 26-28, 2010; November 15-17, 2010; May 16-18, 2011; November 14-16, 2011; March 19-23, 2012; November 12-16, 2012; November 11-13, 2013; April 22-26, 2013; January 9, 2015; February 12, 2015; March 12, 2015; April 9, 2015; May 19, 2015; June 16, 2015; July 21, 2015; August 18, 2015; September 15, 2015; October 20, 2015; January 19, 2016; February 16, 2016; March 15, 2016; April 19, 2016; May 17, 2016; June 21, 2016; July 19, 2016; and August 16, 2016.

103.    Alon USA, Chevron Products Company, Shell Chemical Company, Tesoro Corporation, and defendants ConocoPhilips, ExxonMobil and Valero's parent company (board member) are all members of AFPM.  The dates that AFPM held meetings and conferences include but are not limited to: March 28-30, 2010; March 27-29, 2011; April 2-3, 2012; March 11-13, 2012; March 24-26, 2013; March 17-19, 2013; March 23-25, 2014; March 22-24, 2015; and March 13-15, 2016.

104.    Alon, Inc., Chevron Corporation, Shell Oil, Valero and defendants ExxonMobil and Tesoro are all members of SIGMA.  The dates that SIGMA held meetings and conferences include but are not limited to: April 29-May 2, 2010; July 19-21, 2010; November 12-14, 2010; and November 3-6, 2011.  In 2014, SIGMA held an Executive Leadership Conference on January 26-29, 2014 along with other conferences throughout the year.  In 2015, SIGMA held their Executive Leadership Conference on February 8-11.  SIGMA also advertised their Masters Programs and Field Trips as "One to two day intensive training programs for fuel marketing leaders and executives."  Similarly, they described their Share Groups as "One and a half-day

1188005.28    FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

3:15-cv-01749-L-BGS

1  subject-focused training, information sharing, and networking programs for

2  employees of fuel marketing businesses."

3       105.   Defendants ExxonMobil and Shell and Chevron Products Company and

4  Valero Marketing and Supply Company are all members of PMAA.  The dates that

5  PMAA had meetings and conferences include, but are not limited to: October 4-5,

6  2010; September 30-October 1, 2011; February 22-24, 2011; February 21-23, 2012;

7  April 15-16, 2014; May 13-15, 2014; July 29-31, 2014; August 6-8, 2014; September

8  23-24 , 2014; October 6,7, 7-10, 15, 28-29, 2014; December 5-8, 9-10, 2014; August

9  5-7, 20-23, 31, 2015; September 8-10, 11-12, 13-16, 15, 16, 20-22, 21-23, 21-23, 22-

10  23, 28-30, 2015; and October 10-11, 11-14, 21, 27-28, 2015

11       106.   Not surprisingly, through various organizations, such as WSPA and API,

12  Defendants also are active in lobbying efforts related to the gas industry.  WSPA and

13  API members recognized their common interests in promoting the interests of the

14  industry as a whole and collaborated in lobbying regulatory agencies to further such

15  interests.  Because members have a convenient forum to consult each other regarding

16  policy positions, they can ensure that they maintain a united stance.

17       107.   For example, from 2010-2013, ConocoPhilips spent $48,289,514 for

18  lobbying efforts; Valero spent $2,903,000; Tesoro spent $4,547,287; and ExxonMobil

19  spent $51,570,000.  Likewise, API also spent $32,550,000 lobbying the oil and gas

20  industry for the same period.[98]

21  **Opportunity to Collude –**
   **Information Sharing Services**
22  **Allow Defendants to Share Pricing**
   **Information and Signal One Another**

23

24       108.   The Defendants also have ample opportunity to share pricing information

25  with each other. One manner in which Defendants do this is through OPIS, a market

26  _____

27  [98]    *See* Center for Responsive Politics, *available at* http://www.opensecrets.org (last
   visited June 29, 2015).

price information service whose client list includes most if not all of the Defendants, the top 200 oil companies, thousands of distributors, traders, government and commercial buyers and sellers of petroleum products worldwide. http://www.opisnet.com/about/opis.aspx. OPIS provides real-time and historical spot, wholesale/rack and retail fuel prices for the refined products, renewable fuels, and natural gas and gas liquids (LPG) industries. In addition, OPIS delivers exclusive news and insightful analysis on the upstream, midstream and downstream oil markets. http://www.opisnet.com/. OPIS maintains the world's most comprehensive database of U.S. wholesale petroleum prices, publishing more than 30,000 rack prices each day at over 1,500 terminals in nearly 400 market locations. *Id.* Through OPIS, Defendants are able to share and access real time information about spot fuel gasoline prices, wholesale rack fuel prices, and retail fuel prices.

109. Another opportunity Defendants have to collude is through Platts, another market intelligence company available to all Defendants. Like OPIS, Platts has a wealth of information about gasoline prices in all steps of the supply chain. More concerning is the "Platts eWindow," which brings an immediacy to Platts price discovery process that can't be experienced anywhere else. Its real-time trading grid layout gives an enhanced, at-a-glance view of all named bids, offers and transaction data shared during the Platts Market on Close (MOC) price assessment process. http://www.platts.com/products/marketdataewindow. According to Platts, this system allows Defendants to "monitor market activity – know who is participating and use the information to analyze your performance against specific participants or the rest of the market. The data is available in near real time, allowing you to see developments as they happen" and "gain new levels of market transparency – see all trade data and every unmatched bid and offer."

110. Both Platts and OPIS provide Defendants with sophisticated platforms which enables Defendants to both share gasoline pricing information and gives

1188005.28 FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, CALIFORNIA'S CARTWRIGHT ACT, AND UNFAIR COMPETITION LAW

3:15-cv-01749-L-BGS

defendants the ability monitor the market to ensure that the market is not flooded with excess gasoline which might drive down prices

**Defendants Have Provided Pretextual
Explanations for Their Anticompetitive Conduct**

111. Throughout the Class Period Defendants have provided multiple, pretextual explanations related to their conduct. As detailed above, a fire at the Cherry Point refinery was blamed for the May 2012 price spike even though the length of delay between the decline in product levels and the price increase was far outside of historical norms. Similarly, when there was a fire at the Richmond refinery, it was blamed for a spike in August 2012. But supply was not affected as the lost production was more than made up by increased production at other refineries, thus calling into question the purported cause. The public was also provided with pretextual explanations of supply shortages being the cause of the October 2012 spikes, but this explanation is also contradicted by the data, because inventories actually *increased* up to and during the price spikes in 2012. In a competitive market, this should have brought the prices down.

**Defendants Have Acted Against Their
Independent Self Interest**

112. Indicative of defendants' conspiratorial conduct are various actions taken against each individual defendant's economic self-interest. Defendants have acted against their independent economic interest in numerous ways including by exporting gas out of California including during periods where California's gasoline prices were the highest in the nation. *See supra* ¶¶15, 55-63. Jones Act vessels have come to California without gasoline, despite the fact that stocks were running low. *See supra* ¶¶63-66. Furthermore, Defendants have decreased production, *i.e.*, supply, by going forward with unnecessary maintenance procedures when other refineries were inoperable due to purportedly unplanned outages. *See supra* ¶¶3, 15, 18. Indeed, the CEO of the company that acquired Exxon's Torrance refinery stated that he

"personally believe[d]" that "Exxon probably had made a decision that they were not going to run a single refinery operation in the state of California." Furthermore, a number of refineries permitted dangerous conditions at refineries to fester which predictably materialized into shutdowns resulting in costly supply decreases. *See supra* ¶¶39, 51-52.

**Additional Investigations into
Defendants' Conduct**

113.    Senators and representatives have urged the government to delve into the price spikes over the years. For example, following the issuance of the McCullough Report, Rep. Peter DeFazio of Oregon wrote the then United States Attorney General Eric Holder calling the lack of progress on an investigation into high West Coast gas prices "intolerable."[99] DeFazio noted in the letter that he had written "to the so-called Gas Price Fraud Working Group calling for an investigation. Nothing happened. I wrote to the president and raised the issue of market manipulation by California refineries. Nothing. It's time for the Department of Justice to step up and do what they are supposed to do: crack down on, or at least investigate, illegal energy market activity." *Id.*

114.    DeFazio continued: "Basically, this independent research shows that California refineries were misleading the public. Refinery outages and maintenance shutdowns just provided a convenient excuse and explanation for 'declining' gas production so they could jack up the price of refined gasoline . . . . Hugely profitable oil companies who continue to look for every opportunity to rip off American drivers need to be held accountable for their blatant market manipulation. Enough is enough. Serious action is needed now." *Id.*

---

[99]    Press Release, Congressman Peter DeFazio Representing the 4th District of Oregon, *DeFazio to AG Holder:  Lack of Progress on Gas Price Investigation is "Intolerable"* (Nov. 19, 2012), *available at* http://defazio.house.gov/search/ node/Lack%20of%20Progress%20on%20Gas%20Price%20Investigation%20is%20 Intolerable.

115.   DeFazio's letter further claimed "these devastatingly high gas prices on the West Coast appear to be a result of market abuses by a handful of California refineries – not the 'dynamics of supply and demand' as the oil and gas industry has facetiously claimed for decades while laughing all the way to the bank."   The Congressman further noted:  "The behavior of California refineries over the last six months has been suspicious at best and malicious at worst."  *Id.*

116.   In April 2011, then-Attorney General Holder announced the creation of the Oil and Gas Price Fraud Working Group ("Working Group") "to help identify civil or criminal violations in the oil and gasoline markets, and to ensure that American consumers are not harmed by unlawful conduct."[100]

117.   The Working Group is co-chaired by the Commodities Futures Trading Commission, FTC and the National Association of Attorneys General.   Other Working Group members include the Department of the Treasury, the Federal Reserve Board, the Securities and Exchange Commission, the Department of Justice's Criminal Division, Civil Division, and Antitrust Division, the Federal Bureau of Investigations, the United States Attorney's Office for the Western District of New York, the Executive Office for United States Attorneys, as well as the Departments of Agriculture and Energy.

118.   When the Working Group was formed, the intention was to explore whether there was any evidence of manipulation of oil and gas prices, collusion, fraud, or misrepresentations at the retail or wholesale levels that would violate state or federal laws and that has harmed consumers or the federal government as a purchaser of oil and gas, and to evaluate developments in commodities markets, including an

---

[100] United States Department of Justice, *Protecting Consumers at the Pump:The Oil and Gas Price Fraud Working Group* (Apr. 22, 2011), *available at* http://www.justice. gov/opa/blog/protecting-consumers-pump-oil-and-gas-price-fraud-working-group.

FIRST AMENDED COMPLAINT FOR                - 60 -                    3:15-cv-01749-L-BGS
VIOLATIONS OF THE SHERMAN ACT,
CALIFORNIA'S CARTWRIGHT ACT, AND
UNFAIR COMPETITION LAW

1188005.2

examination of investor practices, supply and demand factors, and the role of speculators and index traders in oil futures markets.

119.    To date, the Working Group has issued no reports regarding the May and October price spikes, although it is believed that based on calls to action by members of Congress, an investigation is ongoing.

## VENUE AND JURISDICTION

120.    This Court has jurisdiction over this case pursuant to 28 U.S.C. §1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1711, *et seq*., which vests original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds $5 million and where the citizenship of any member of the class of plaintiffs is different from that of any defendant.    The $5 million amount in controversy and diverse-citizenship requirements of CAFA are satisfied in this case.

121.    Venue is proper in this District pursuant to §12 of the Clayton Act (15 U.S.C. §22), and 28 U.S.C. §1391(b)-(d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants resides in, is licensed to do business in, is doing business in, had agents in, or is found or transacts business in, this District.

122.    This Court has personal jurisdiction over each of the Defendants because, *inter alia*, each of the Defendants: (a) transacted business throughout the United States, including in this District; (b) provided services related to credit cards and/or charge cards throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

123. Defendants engaged in conduct inside the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

124. The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

125. The anticompetitive conduct, and its effects on U.S. commerce described herein, proximately caused antitrust injury to Plaintiff and members of the Class in the United States.

126. By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Class.

127. Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States, including Plaintiff and members of the Class.

## PARTIES

128. Plaintiff Persian Gulf Inc., d/b/a as "76" gas station, is a California-based corporation with its principal place of business in Escondido, California. During the Class Period, Persian Gulf directly purchased gasoline from one or more of the defendant refineries.

129. Defendant BP West Coast Products LLC owns and operates a network of gas and fueling stations in California, Oregon, Washington, Nevada, and Arizona. It was founded in 1978 and is based in La Palma, California. BP West operates as a subsidiary of BP p.l.c.

130. Defendant Chevron U.S.A. Inc. explores, extracts, and produces crude oil, natural gas, and natural gas liquids. Chevron also refines, markets, and distributes products derived from petroleum, other than natural gas liquids. Chevron was

formerly known as Gulf Oil Corporation. Chevron is based in San Ramon, California, and operates as a subsidiary of Chevron Corporation. Chevron runs two refineries, one in Richmond and one in El Segundo. According to Chevron, its Richmond refinery is among the country's largest and most important refineries, processing up to 240,000 barrels of crude oil a day – more than any other Bay Area refinery.

131. Defendant Tesoro Refining & Marketing Company LLC offers refining and marketing of motor fuels and petroleum products. Tesoro was formerly known as Tesoro West Coast Company, LLC and changed its name to Tesoro Refining & Marketing Company LLC in January 2002. Tesoro, incorporated in 1996, is based in San Antonio, Texas, and operates as a subsidiary of Tesoro Corporation. Tesoro runs the Los Angeles and Martinez refinery, the second largest refinery in Northern California.

132. Defendant Equilon Enterprises LLC (d/b/a Shell Oil Products US) operates refineries and crude oil pipelines in the western United States and markets petroleum products via Shell-branded outlets in the West and Midwest. Shell's Martinez refinery has been in operation since 1915.

133. Defendant ExxonMobil Refining & Supply Company operates as a subsidiary of Exxon Mobil Corporation. The ExxonMobil Torrance refinery covers 750 acres, employs approximately 650 employees and 550 contractors, processes an average of 155,000 barrels of crude oil per day and produces 1.8 billion gallons of gasoline per year.

134. Defendant Valero Marketing and Supply Company refines and markets crude oil in the United States and internationally. Its refining activities include refining operations, wholesale marketing, product supply and distribution, and transportation operations primarily in the Gulf Coast, Mid-Continent, West Coast, and northeast regions. The company is based in San Antonio, Texas. Valero Marketing and Supply Company operates as a subsidiary of Valero Energy Corporation.

135.    Defendant ConocoPhillips operates the San Francisco refinery, which is comprised of two facilities linked by a 200-mile pipeline: the Santa Maria facility is located in Arroyo Grande, California, while the Rodeo facility is in the San Francisco Bay Area.  ConocoPhillips is based in Houston, Texas.

136.    Defendant Alon USA Energy, Inc., headquartered in Dallas, Texas, is an independent refiner and marketer of petroleum products, operating primarily in the South Central, Southwestern and Western regions of the United States.  Rosedale Highway refinery has been in operation for more than 70 years.  The Alon Bakersfield refinery has a capacity of 70,000 barrels per day and comprises more than 600 acres of land.

137.    Each of the defendants is a participant in the California gasoline refinery market.

138.    Does 1 through 25, inclusive, are presently not known to Plaintiff, who therefore sues these defendants by such fictitious names.  Plaintiff will seek to amend this Complaint and include these Doe defendants' true names and capacities when they are ascertained.  Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by the Class.

## CLASS ALLEGATIONS

139.    Plaintiff bring this action as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all Class members, defined as:. All persons or entities that purchased gasoline directly from a defendant during the Class Period (February 2012 through the end December 2012 and December 2014 to present) and were damaged thereby.  Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, governmental entities and instrumentalities of the government, states and their subdivisions, agencies and instrumentalities

140.   The Class consists of merchants located throughout California. While Plaintiff does not know the exact number of the members of the Class, Plaintiff believes there are (at least) hundreds of thousands if not millions of members in the Class, thus the members of the Class are so numerous that joinder of all Class members is completely impracticable, if not impossible. The exact number of Class members is not presently known, but can be determined through appropriate discovery.

141.   Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in antitrust class actions.

142.   Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

143.   Plaintiff has no interests that are adverse or antagonistic to those of the Class.

144.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by many individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to individually seek redress for the wrongful conduct alleged in this Complaint.

145.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

146.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting any individual members of the Class. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the Class members, thereby making appropriate relief with

respect to the Class as a whole Common questions include: (a) whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of gasoline in California; (b) the identity of the participants of the alleged conspiracy; (c) the duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy; (d) whether the alleged conspiracy violated the Sherman Act; (e) whether the alleged conspiracy violated the Cartwright Act; (f) whether the alleged conspiracy violated the UCL; (g) whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the other members of the Class; (h) the effect of defendants' alleged conspiracy on the prices of gasoline in California during the Class Period; (i) the appropriate class-wide measure of damages; and (j) the appropriate nature of class-wide injunctive or other equitable relief.

147. Plaintiff Persian Gulf is a member of the Class and its claims are typical of the claims of the other members of the Class. Plaintiff was damaged by the same wrongful conduct of defendants.

148. This case is also manageable as a class action. Plaintiff knows of no difficulty to be encountered in the prosecution of this action that would preclude its maintenance as a class action.

149. Defendants' unlawful acts alleged in this Complaint had a substantial effect on commerce and caused antitrust injury to Plaintiff and the Class.

150. Defendants' unlawful acts had the purpose and effect of manipulating the price of gasoline sold in California.

151. As a direct result of Defendants' violations, Plaintiff and the members of the Class have been damaged in their property or business.

152. As a direct and foreseeable result of defendants' unlawful anticompetitive acts, the price of gasoline sold in California was manipulated and inflated.

## ANTICOMPETITIVE CONDUCT BY THE DEFENDANTS

153.   Defendants are horizontal competitors.

154.   The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, or made artificial prices for gasoline sold in California during the Class Period through supply constraints (*e.g.*, exporting gas products, not importing sufficient gas products and maintaining low gas reserves), pretextual and/or wilful refinery outages and roiling the markets by injecting misinformation.  Defendants' conspiracy constitutes a *per se* violation of the Sherman Act and the Cartwright Act and is an unreasonable and unlawful restraint of trade and an unlawful, unfair or fraudulent practice under the UCL.

155.   At all relevant times, other corporations, individuals and entities willingly conspired with Defendants in their unlawful and illegal conduct.   Numerous individuals and entities participated actively during the course of and in furtherance of the scheme described herein.  The individuals and entities acted in concert by joint ventures and by acting as agents for principals, in order to advance the objectives of the scheme to benefit Defendants and themselves through the manipulation of gasoline prices in California.

## PLAINTIFF'S CLAIMS ARE TIMELY

156.   Plaintiff brings its claims within the statute of limitations.

157.   Even though Plaintiff's claims are timely, facts indicating Defendants were engaging in misconduct that caused gasoline prices in California to be artificially manipulated were actively concealed by defendants.

## PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY

158.   Plaintiff has suffered significant injury as a result of Defendants' gasoline price manipulation conspiracy.

1188005.28    FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE SHERMAN ACT,
CALIFORNIA'S CARTWRIGHT ACT, AND
UNFAIR COMPETITION LAW

3:15-cv-01749-L-BGS

159.   Defendants' price-fixing conspiracy had the following effects, among others: (a) price competition has been restrained or eliminated with respect to gasoline sold in California; (b) the price of gasoline sold in California has been fixed, raised, maintained, or stabilized at artificially inflated levels; and (c) purchasers of gasoline sold in California have been deprived of free and open competition.  During the Class Period, Plaintiff and the members of the Class paid supracompetitive prices for gasoline sold in California.

160.   By reason of the alleged violations, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for gasoline sold in California than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

161.   In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to fix, maintain, suppress, inflate, and otherwise make artificial the price of gasoline sold in California.

162.   Plaintiff suffered antitrust injury in that it paid more for gasoline from Defendants than it would have paid had the manipulation not occurred.

163.   Injury to Plaintiff and the Class also resulted from Defendants' deprivation of the benefits of free and open competition in the market for gasoline sales.

164.   Plaintiff suffered antitrust injury as a result of Defendants' actions.

1188005.28

3:15-cv-01749-L-BGS

# COUNT I

## Violations of §1 of the Sherman Antitrust Act
### 15 U.S.C. §1

165.    Plaintiff hereby incorporates paragraphs 1 through 164 as though fully set forth herein.

166.    Defendants, and their co-conspirators, entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of §1 of the Sherman Antitrust Act, 15 U.S.C. §1.  The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants artificially fixed, raised, maintained and/or stabilized the prices for gasoline in California.

167.    Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between, and among Defendants and other unnamed co-conspirators.  Defendants' conspiracy is a per se violation of the Sherman Antitrust Act and is, in any event, an unreasonable and unlawful restraint of trade.

168.    There is no legitimate business justification for, or procompetitive benefit caused by, Defendants' unreasonable restraint of trade.    Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

169.    Defendants' conspiracy, and the resulting impact on the prices of gasoline, occurred in and affected interstate commerce and commerce in and between the Territories of the United States.

170.    As a direct, intended, foreseeable, and proximate result of Defendants' conspiracy and overt acts taken in furtherance thereof, Plaintiff and each member of the Class have suffered injury to their business or property.  Plaintiff's and each Class member's damages are directly attributable to Defendants' conduct, which resulted in

all Class members paying for more for gasoline during the relevant period than they would not have otherwise paid, but for Defendants' agreement.

171.  Plaintiff's and the Class's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful. Plaintiff and the Class are entitled to treble damages, attorneys' fees, reasonable expenses, and cost of suit for the violations of the Sherman Antitrust Act.

## COUNT II

### Violations of the Cartwright Act

172.  Plaintiff incorporates by reference the preceding allegations.

173.  The acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code §16700, *et seq*.

174.  It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California, the purchasers reside in California, the refineries at issue are in the state and because other overt acts in furtherance of the conspiracy and overcharges flowing from those acts occurred in California.

175.  As detailed above, the anticompetitive conduct described constitutes a per se violation of California's antitrust laws and is an unreasonable and unlawful restraint of trade.  The anticompetitive effects of Defendants' conduct far outweigh any purported non-pretextual, pro-competitive justification.

176.  As a proximate result of Defendants' unlawful conduct, Plaintiff and the members of the Class it seeks to represent have been injured in their business or property in violation of the Cartwright Act, Cal. Bus. & Prof. Code §16700, *et seq*., by paying supracompetitive prices for gasoline during the Class Period.   Such overcharges are the type of injury the antitrust laws were designed to prevent and flow directly from Defendants' unlawful conduct.  Plaintiff Persian Gulf and members of the Class are proper entities to bring a case concerning this conduct.

177. Plaintiff and members of the Class have standing to and hereby seek monetary relief, including treble damages, together with other relief, as well as attorneys' fees and costs, as redress for Defendants' Cartwright Act violations.

## COUNT III

## Violations of the Unfair Competition Law

178. Plaintiff incorporates by reference the preceding allegations.

179. Plaintiff brings this claim under §§17203 and 17204 of the Cal. Bus. & Prof. Code to enjoin, and obtain restitution and disgorgement of all monetary gains that resulted from acts that violated §17200 of the Cal. Bus. & Prof. Code, commonly known as the UCL.

180. Plaintiff and the members of the Class have standing to bring this action under the UCL because they have been harmed and have suffered injury by being forced to pay inflated, supracompetitive prices for gasoline sold in California during the Class Period.

181. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to, the acts, practices and course of conduct set forth herein, and these acts constitute unfair competition in violation of the UCL.

182. Defendants' conspiracy had the following effects, among others: (a) price competition in the market for gasoline sold in California during the Class Period was restrained, suppressed, and/or eliminated; (b) prices for gasoline sold in California during the Class Period sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels; and (c) Plaintiff and members of the Class who purchased gasoline sold in California during the Class Period directly from Defendants have been deprived of the benefits of free and open competition.

1   183.   As a direct and proximate result of Defendants' anticompetitive conduct,

2   Plaintiff and members of the Class have been injured in their business or property by

3   paying more for gasoline sold in California during the Class Period purchased directly

4   from Defendants than they would have paid the absence of the conspiracy.

5   **PRAYER FOR RELIEF**

6   WHEREFORE, Plaintiff, on behalf of themselves and the Class, pray that the

7   Court:

8   A.   Determine that this action may be maintained as a class action pursuant

9   to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and direct that reasonable notice of this

10  action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class, and declare

11  Plaintiff Persian Gulf representative of the Class;

12  B.   Conduct expedited discovery proceedings leading to a prompt trial on the

13  merits before a jury on all claims and defenses;

14  C.   Enter joint and several judgments against Defendants and in favor of

15  Plaintiff and the Class;

16  D.   Award Plaintiff and the Class damages (*i.e.*, three times overcharges) in

17  an amount to be determined at trial, plus interest in accordance with law;

18  E.   Award Plaintiff and the Class their costs of suit, including reasonable

19  attorneys' fees as provided by law;

20  F.   Order that Defendants, their directors, officers, employees, agents,

21  successors, members, and all persons in active concert and participation with them be

22  enjoined and restrained from, in any manner, directly or indirectly, committing any

23  additional violations of the law as alleged herein; and

24  G.   Award such further and additional relief as is necessary to correct for the

25  anti-competitive market effects caused by Defendants' unlawful conduct, as the Court

26  may deem just and proper under the circumstances.

27

1188005

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE SHERMAN ACT,
CALIFORNIA'S CARTWRIGHT ACT, AND
UNFAIR COMPETITION LAW

3:15-cv-01749-L-BGS

# JURY DEMAND

Plaintiff seeks trial by jury of all matters so triable.

DATED: September 22, 2016

ROBBINS GELLER RUDMAN
   & DOWD LLP
PATRICK J. COUGHLIN
DAVID W. MITCHELL
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
CARISSA J. DOLAN

s/ Alexandra S. Bernay
ALEXANDRA S. BERNAY

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
ARMEN ZOHRABIAN
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

Attorneys for Plaintiff

1188005.28    FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE SHERMAN ACT,
CALIFORNIA'S CARTWRIGHT ACT, AND
UNFAIR COMPETITION LAW

- 73 -

3:15-cv-01749-L-BGS