1  DANIEL G. SWANSON, SBN 116556
   dswanson@gibsondunn.com
2  STEVEN E. SLETTEN, SBN 107571
   ssletten@gibsondunn.com
3  DAVID S. HAN, SBN 247789
   dhan@gibsondunn.com
4  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
5  Los Angeles, CA 90071-3197
   Telephone:  213.229.7000
6  Facsimile:  213.229.7520

7  Attorneys for Defendant
   CHEVRON U.S.A. INC.

8  [Additional Counsel on Signature Pages]

9

10             UNITED STATES DISTRICT COURT

11          SOUTHERN DISTRICT OF CALIFORNIA

12

| 13 | PERSIAN GULF INC., individually and on behalf of all others similarly situated, | CASE NO. 3:15-cv-01749-L-BGS |
|---|---|---|
| 14 | | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JOINT MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| 15 | Plaintiff, | |
| 16 | v. | [Fed. R. Civ. P. 12(b)(6)] |
| 17 | BP WEST COAST PRODUCTS LLC; CHEVRON U.S.A. INC.; TESORO REFINING & MARKETING | |
| 18 | COMPANY LLC; EQUILON ENTERPRISES LLC (D/B/A SHELL | **SPECIAL BRIEFING SCHEDULE ORDERED PER LOCAL RULE 7.1(E):** |
| 19 | OIL PRODUCTS US); EXXONMOBIL REFINING & SUPPLY COMPANY; | **Pursuant to Court Order (Dkt. 80), Defendants' Joint Motion to Dismiss** |
| 20 | VALERO MARKETING & SUPPLY COMPANY; CONOCOPHILLIPS; | **FAC shall be filed and served no later than October 17, 2016** |
| 21 | ALON USA ENERGY, INC. and DOES 1-25, inclusive, | |
| 22 | Defendants. | **Hearing:** |
| 23 | | Date:  Dec. 5, 2016<br>Time:  10:30 a.m. |
| 24 | | Place:  Courtroom 5B<br>Judge:  Hon. M. James Lorenz |

25

26

27

28

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................................... 1

II.  SUMMARY OF PLEADED FACTS........................................................... 3

III. THE APPLICABLE LEGAL STANDARD ................................................. 5

IV.  ARGUMENT................................................................................................ 7

    A.   Plaintiff's Enlarged Pleading Fails to Allege Any Plausible Claims ........ 7

        1.   The Conspiracy Claim Still Relies Entirely on Speculation and Conjecture Rather than Facts ...................................................... 7

        2.   Plaintiff Still Fails to Plead Parallel Conduct Among Defendants ........................................................................................ 8

    B.   The So-called Plus-Factors—Those Already Considered and the Few New Facts Alleged—Do Not Support an Inference of Collusion ............................................................................................... 10

        1.   Market Structure ............................................................................ 10

        2.   Trade Association Activity ............................................................. 11

        3.   Acting Against Defendants' Self Interest ...................................... 12

        4.   "Supracompetitive" Prices and Excess Profits .............................. 14

        5.   Government Investigations ............................................................. 15

        6.   The Statements Now Labeled as "Pretext" Do Not Give Rise to an Inference of Collusion ........................................................... 15

        7.   There are No Facts Pleaded Suggesting that the Independent Data Gathering and Publishing Services Provided Any Opportunity Whatsoever for Defendants to Collude .................... 17

    C.   Plaintiff's Theory About the 2012 Price Increases Does Not Make Sense. ................................................................................................. 18

    D.   Plaintiff's Theory About the Price Increases in 2015 Also Does Not Make Sense ...................................................................................... 19

        1.   February/March 2015 Price Increases ........................................... 19

        2.   April-May 2015, July-Aug 2015 and Dec. 2015 Price Increases......................................................................................... 21

        3.   Exxon's Use of Exchange Agreements to Acquire Gasoline from Other Defendants Suggest Nothing About a Conspiracy ..... 23

i

Gibson, Dunn & Crutcher LLP

# TABLE OF CONTENTS

1

Page

2  E.  The FAC Should Now Be Dismissed with Prejudice ..............................24

3 V.  CONCLUSION .........................................................................................25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

MEMORANDUM OF POINTS & AUTHORITIES
CASE NO. 15-CV-01749

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Aguilar v. Atl. Richfield Co.*,
25 Cal. 4th 826 (2001) .................................................................. 24

*Amey, Inc. v. Gulf Abstract & Title, Inc.*,
758 F.2d 1486 (11th Cir. 1985) ...................................................... 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................ 5

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) ..................................................... 14, 17

*In re Beef Indus. Antitrust Litig.*,
907 F.2d 510 (5th Cir. 1990) ........................................................... 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................... 1, 3, 5, 6, 7, 8, 11, 16

*In re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383 (3d Cir. 2015) ..................................................... 14, 16

*City of Moundridge v. Exxon Mobil Corp.*,
429 F. Supp. 2d 117 (D.D.C. 2006) ............................................... 16

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d. 1011 (N.D. Cal 2007) .......................................... 15

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ............................... 1, 5, 6, 12, 13

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005) ....................................................... 10

*Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ....................................................................... 12

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ................... 1, 6, 9, 10, 11, 12, 13, 15

*Name.Space, Inc. v. ICANN*,
795 F.3d 1124 (9th Cir. 2015) ......................................................... 6

iii

# TABLE OF AUTHORITIES

Page(s)

*Navarro v. Block*,
250 F.3d 729 (9th Cir. 2001) ............................................................... 5

*Rebel Oil Co. v. Atl. Richfield Co.*,
146 F.3d 1088 (9th Cir. 1998) ........................................................... 11

*Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*,
799 F. Supp. 840 (N.D. Ill. 1990), *aff'd*, 971 F.2d 37 (7th Cir. 1992) .................... 14

*Rutman Wine Co. v. E. & J. Gallo Winery*,
829 F.2d 729 (9th Cir. 1987) ............................................................... 5

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009) ............................................................. 17

*U.S. v. Chas. Pfizer & Co.*,
367 F. Supp. 91 (S.D.N.Y. 1973) ....................................................... 14

*U.S. v. U.S. Gypsum Co.*,
438 U.S. 422 (1978) .......................................................................... 17

*William O. Gilley Enters. v. Atl. Richfield Co.*,
588 F.3d 659 (9th Cir. 2009) ............................................................. 24

*Zucco Partners, LLC v. Gigimarc Corp*,
552 F.3d. 981 (9th Cir. 2009) ............................................................ 24

**Regulations**

13 Cal. Code Regs. § 2262.4 ............................................................... 9

**Other Authorities**

Gordon Schremp, "Recent Fuel Price Trends, Market Overview &
Contributing Factors:  Petroleum Market Advisory Committee
Meeting, Cal. Energy Comm'n (June 30, 2015), available at
http://www.energy.ca.gov/assessments/petroleum_market/2015-06-
30/presentations/Recent_Fuel_Price_Trends_Market_Overview_and_
Contributing_Factors.pdf.................................................................20, 21, 22, 23

# TABLE OF AUTHORITIES

Page(s)

Press Release, Consumer Watchdog, "Consumer Watchdog Tells So Cal
    Drivers Fill Up Now, Gas Prices to Rise Quickly as Major Refiners
    Switch to Summer Blend and Raise Prices on Their Dealers by 37
    Cents Overnight" (Feb. 25, 2016), *available at*
    http://www.consumerwatchdog.org/ newsrelease/consumer-watchdog-
    tells-so-cal-drivers-fill-now-gas-prices-rise-quickly-major-refiners-s .......................9

Robert McCullough, "Analysis of West Coast Gasoline Prices,"
    McCullough Research (June 5, 2012), available at
    http://www.mresearch.com/pdfs/470.pdf. ......................................................... 18, 19

MEMORANDUM OF POINTS & AUTHORITIES
CASE NO. 15-CV-01749

Gibson, Dunn &
Crutcher LLP

## I.    INTRODUCTION

By its July 14, 2016 Order Granting with Leave to Amend Defendants' Motion to Dismiss (Dkt. No. 66, hereinafter "Order"), this Court dismissed Plaintiff's first attempt to plead antitrust conspiracy claims against the Defendants, citing the well-settled principle of law that such claims must be pled with "sufficient facts to provide a plausible basis from which [the Court] can infer the alleged agreements' existence." Order at p. 6 (citing *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015), hereinafter "*Musical Instruments*").  Plaintiff's First Amended Complaint (hereinafter, "FAC") fails again to allege the necessary facts. Notwithstanding the added words to the FAC, there is not a single pleaded fact that identifies *any* actual agreement between *any* of the Defendants at *any* point in time to fix or raise the price of gasoline in California.  This Court already concluded that Plaintiff "lack[s] direct evidence of horizontal agreements" among the Defendants (Order at p. 7), and Plaintiff now has abandoned any claim that its circumstantial evidence answers the basic questions about the nature of an actual agreement, such as the specific time, place and persons involved in the alleged conspiracy.  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

Nor do the additional allegations in the FAC in any way "[point] toward a meeting of the minds of the alleged conspirators."  Order at p. 7 (citing *Musical Instruments*, 798 F.3d at 1193) (internal quotations omitted).  Without facts that show that there was an agreement among the Defendants, the Plaintiff must plead facts showing that the Defendants engaged in parallel conduct to fix or raise prices *and* that there is strong circumstantial evidence to suggest the existence of "a preceding agreement, not merely parallel conduct that could just as well be independent action." Order at p. 7 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)) (emphasis added).  There are, however, no allegations of parallel pricing or other parallel conduct among the Defendants.  Moreover, all of the conduct described in the FAC is as easily (indeed more readily) explained by market forces and independent business behavior

than by collusion.  In fact, the business conduct described in the FAC has independent motivations that are as obvious today as they were when the original complaint was filed and dismissed.

The facts pled in the FAC largely track the facts this Court already considered and found to be insufficient to state a price fixing claim.  For example:

- The FAC still pleads no facts about the nature of the claimed conspiracy, including when it was formed, who planned and executed it, and how it operated.  *See* Order at p. 6.

- The FAC relies on speculation about "opportunit[ies] to collude" at trade association meetings when such events raise no legitimate inference of collusion.  *Id.* at p. 10.

- The FAC fails to explain the two-year "gap" in conspiratorial activity during 2013 and 2014 (*id.* at p. 8) and instead now makes the facially unreasonable claim that there are two distinct conspiracy periods.

- The FAC again argues that the concentrated structure of the California gasoline-refining market makes it vulnerable to manipulation and collusion, but the Court already held that the nature of the market may lead to interdependent decisions and "does not necessarily support a conspiracy." *Id.* at p. 10.

- The FAC continues to refer to investigations of the oil and gas industry at the state and federal level, some provoked by the same consumer advocacy group speculation on which Plaintiff so heavily relies, but nothing has ever come of those investigations, and the Court has already concluded that they "do not necessarily suggest a collusive agreement."  *Id.* at p 11.

- The FAC claims that the refinery-production issues and export and import activities support an inference of conspiracy, but the Court already considered these facts (*id.* at pp. 2-3) and found them just as likely to be the

1   product of "market interdependence" and "rational, legal business behavior"

2   (*id.* at p. 9).

3   Plaintiff has added no facts in the FAC that "nudge [its] claim [] across the line

4   from conceivable to plausible" (*id.* at p. 11 (citing *Twombly*, 550 U.S. at 570)), and the

5   added allegations only underscore just how inconceivable and implausible its

6   conspiracy claim is.  Accordingly, the Court should now dismiss the FAC with

7   prejudice.

8   ## II.   SUMMARY OF PLEADED FACTS

9   Plaintiff in its amended pleading has not materially altered the factual theory of

10   its conspiracy claim against Defendants.  The alleged conspiracy revolves around three

11   distinct time periods:  (1) May/June 2012; (2) October 2012; and (3) February 2015

12   through early 2016.  As to each, Plaintiff alleges that the Defendants were able to

13   artificially increase gas prices in California "through supply constraints . . . pretextual

14   and/or wilful [sic] refinery outages and roiling the markets by injecting

15   misinformation[.]"  FAC ¶ 16.  Plaintiff refers repeatedly to the "Defendants'

16   conspiracy" (*see, e.g.*, *id.* ¶ 4), but offers no facts that reveal any details about that

17   alleged conspiracy (when it occurred, who was involved, where it was hatched, etc.),

18   because there are no such facts.  Instead, Plaintiff spends the majority of the FAC

19   attempting to build a circumstantial case revolving around so-called "plus factors" it

20   argues can lead to a conclusion that the Defendants (or at least some of them, although

21   it is not clear which ones) conspired during the key time periods in ways to increase

22   gas prices.  The FAC's allegations are, however, inconsistent and contradictory, and

23   nothing pled in the FAC adds substance to the conspiracy allegations—Plaintiff still

24   relies entirely on speculation and the drawing of illogical inferences from facts that are

25   just as likely to arise in the context of independent (or interdependent) action and

26   robust competition in a concentrated market.

27   While a number of changes and revisions are scattered throughout the FAC, the

28   majority of the new allegations in the FAC can be found at paragraphs 20-30 and 59-

81.[1]  These additions include references to additional secondary sources complaining about high gas prices and reporting on fluctuations in profitability in the downstream oil and gas business (FAC ¶¶ 11-13), complaints by California lawmakers and the initiation of an investigation this year by the California State Attorney General of some Defendants (*id.* ¶¶ 29-30), more discussion about exports and imports of gasoline in California (*id.* ¶¶ 55-74), and an alleged failure by industry participants and trade associations (*e.g.*, WSPA) to publicly disclose confidential, proprietary information allegedly relevant to the increase in gas prices at certain points in time (*id.* ¶¶ 26-28, 47).  Plaintiff has also persisted in its facially implausible suggestion of carefully timed fires and explosions by adding the claim that certain Defendants supposedly engaged in "willful" safety violations apparently with the goal of securing refinery shutdowns and reductions in supply.  *Id.* ¶¶ 32, 51-52.

As discussed more fully below, these additional allegations inject no new facts from which an actual unlawful agreement emerges or that lead to a reasonable and plausible conclusion that Defendants engaged in a price-fixing conspiracy.  In fact, a number of revisions incorporated into the FAC only underscore why Plaintiff's allegation of conspiracy here lacks merit and is both unreasonable and untenable.  This includes the new theory about there being two distinct conspiracy periods separated by two years, during which, despite the existence of the same "plus factors," the Defendants apparently chose (for reasons unexplained) not to conspire and raise prices.  These and other changes in the FAC make abundantly clear that the claim of

---

[1]  A computer-generated comparison of Plaintiff's Complaint (Dkt. No. 56, hereinafter "Compl.") and the FAC is concurrently filed herewith, for the Court's convenience, as Exhibit 1 to Defendants' Request for Judicial Notice (hereinafter "RJN").  The changes marked in red show language that was deleted, the changes marked in green show language that is moved from one place in the original Complaint to a new location in the FAC, and the changes marked in blue reflect new language in the FAC (with the caveat that some of the "new" language may be a revised version of language that was stricken and marked red but revived in an amended form somewhere else in the document).

conspiracy not only still lacks basic factual support, but also that it remains both counter-factual and illogical.[2]

### III.   THE APPLICABLE LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001); *see also Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) (the motion "enable[s] defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery.")  Although "heightened fact pleading of specifics" is not required, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also id.* (plaintiffs must elevate their claims "from conceivable to plausible").  To do so, a plaintiff must plead more than just "ultimate facts" and "legal conclusions," but must also "plead the necessary evidentiary facts to support those conclusions." *Kendall*, 518 F.3d at 1047-48; *see also id.* at 1048 ("a naked assertion of [wrongdoing] . . . without some further factual enhancement" is not plausible) (internal citation omitted).

Conspiracy is an essential element of Plaintiff's case. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  These important pleading requirements apply with particular force in antitrust conspiracy cases "because discovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case." *Kendall*, 518 F.3d at 1047; *see also Twombly*, 550 U.S. at 558 ("[I]t is one thing to be cautious before dismissing an antitrust complaint, but quite another to forget that proceeding to

---

[2] While the FAC should be dismissed with prejudice as against all Defendants for all of the reasons set forth herein, it bears noting that the FAC contains virtually no individualized allegations about Defendants Alon USA Energy, Inc. or BP West Coast Products LLC.  The failure to allege anything of substance about multiple market participants alleged to be members of the hypothesized conspiracy is yet another strong indication that the conspiracy does not exist and is an additional reason why the FAC should be dismissed with prejudice.

Gibson, Dunn &
Crutcher LLP

antitrust discovery can be expensive.") (internal citation omitted).  Thus, where, as here, an antitrust conspiracy is claimed, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556; *see also id.* at 556-57 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."); Order at 6 ("Complaints that 'fail[] to plead any evidentiary facts beyond parallel conduct to prove [the] allegation of a conspiracy,' are subject to dismissal.") (quoting *Kendall*, 518 F.3d at 1048); *id.* ("[m]ere allegations of parallel conduct—*even consciously parallel conduct*—are insufficient to state a claim") (quoting *Musical Instruments*, 798 F.3d at 1193) (emphasis added).

The Ninth Circuit has in fact emphasized—and this Court has likewise noted—that "[a] bare allegation of a conspiracy is almost impossible to defend against, particularly where the defendants [like the Defendants involved here] are large institutions with hundreds of employees entering into contracts and agreements daily." *Kendall*, 518 F.3d at 1047; Order at 5 (same).  An antitrust plaintiff thus "must plead 'something more'" than just parallel conduct:  "'some further factual enhancement', 'a further circumstance pointing toward a meeting of the minds' of the alleged conspirators."  Order at 6-7 (quoting *Musical Instruments*, 798 F.3d at 1193).  Therefore, "[t]o allege an agreement between antitrust co-conspirators, [a] complaint must allege facts such as a specific time, place, or person involved in the alleged conspiracies to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin."  Order at 6 (quoting *Kendall*, 518 F.3d at 1047).

Plaintiff's failure to meet these requirements as to its Sherman Act claim dooms Plaintiff's Cartwright Act claim as well, because, as the Court recognized, "[t]he Cartwright Act . . . is analogous to Section 1 of the Sherman Act," and "[a]nalysis under the Cartwright Act . . . is identical to the analysis under Section 1 of the Sherman Act."  Order at 6 n.4 (citing *Name.Space, Inc. v. ICANN*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015)).  Further, the Court previously found that Plaintiff's UCL

claim was "entirely derivative" of its antitrust claim and thus dismissed the UCL claim because Plaintiff had "failed to plead a plausible antitrust claim."  Order at 11. Plaintiff's UCL allegations in the FAC are essentially unchanged from its prior complaint (*compare* FAC ¶¶ 178-83 *with* Compl. ¶¶ 121-27), and thus its UCL claim once again falls with its antitrust claims.

## IV.   ARGUMENT

### A.   Plaintiff's Enlarged Pleading Fails to Allege Any Plausible Claims

The rule from the United States Supreme Court in *Twombly* and related cases from the Ninth Circuit and elsewhere is clear:  without facts that make an inference of concerted action plausible in a context where interdependent unilateral conduct by companies operating in a concentrated market structure is conceded, there can be no conspiracy claim.  Plaintiff continues to plead its case "upon information and belief" (FAC ¶ 1) as did the plaintiffs in *Twombly*.  550 U.S. at 551, 564.  But the FAC is not only inadequate from a pure pleading standpoint, it is internally inconsistent, contradictory, and nearly incoherent in a number of respects.

### 1.   The Conspiracy Claim Still Relies Entirely on Speculation and Conjecture Rather than Facts

The volume of citations to secondary sources has increased significantly in the FAC, but simply adding to the volume of opinions expressed by self-proclaimed industry experts (*e.g.*, McCullough) and consumer advocates (*e.g.*, Jamie Court and his "Consumer Watchdog" group) lends neither substance nor legitimacy to the claims asserted.  Repeating speculation and opinion over and over again does not turn otherwise deficient allegations into facts.  When the many new references to the views and opinions of Consumer Watchdog (*see* FAC ¶¶ 14, 22, 23, 25, 56, 59, 64, 70, 74, 76, 77, 78, 79, and 81) are considered with the many references to Consumer Watchdog carried over from the initial complaint (*see id.* ¶¶ 17, 19, 38, 44, 50, 53, 72 and 75), it becomes obvious that Plaintiff relies heavily on the opinions, speculation and conjecture of Jamie Court and his consumer-advocate group, not hard facts that

1  suggest any actual evidence or inference of collusive conduct.  There is, of course,

2  nothing wrong with consumer activism, but it hardly forms a valid basis on which to

3  pursue an antitrust-conspiracy claim against the entire gasoline refining industry in the

4  State of California.

5       The same still holds true for all of Plaintiff's references to politicians who have

6  expressed their individual views about the price of gasoline in California.  In addition

7  to what has already been cited in the initial complaint, Plaintiff adds (1) specific

8  language from a letter sent by certain Senators to then Attorney General Eric Holder

9  (FAC ¶ 6); and (2) a letter from certain California State Senators to the California

10  Attorney General (*id.* ¶ 30).  These communications reflect concerns originating in the

11  political arena and are similar to, and in some respects rely upon, the speculation of the

12  consumer advocates.  None of these sources, however, claims any first-hand

13  knowledge of illegal conduct and the political grievances expressed here are

14  comparable to those rejected in *Twombly* as a basis for pleading collusion.  550 U.S. at

15  591-592 (Stevens, J., dissenting) (discussing allegations in the complaint about a letter

16  from a Congressman to the Justice Department requesting an investigation into

17  possible collusion by defendants).

18      **2.**    **Plaintiff Still Fails to Plead Parallel Conduct Among Defendants**

19       When claiming the existence of a conspiracy to raise prices without a shred of

20  evidence of any agreement between the co-conspirators, it would seem obvious that a

21  threshold pleading requirement would be that Defendants engaged in parallel conduct

22  to raise prices.  *See, e.g.*, *In re Beef Indus. Antitrust Litig.*, 907 F.2d 510, 514 (5th Cir.

23  1990) ("When an antitrust plaintiff relies on circumstantial evidence of conscious

24  parallelism to prove a § 1 claim, he must first demonstrate that the defendants' actions

25  were parallel" and "[plaintiffs] have not done this.").  Here, despite the fact that

26  Plaintiff is a gasoline retailer that "directly purchased gasoline from one or more of the

27  defendant refineries" (FAC ¶ 128), Plaintiff points to no parallel pricing by any of its

28  suppliers and has no other tenable theory of parallel conduct.  Instead, Plaintiff relies

on various references to *average* price increases at *retail—i.e.*, the prices set by "merchants" like the Plaintiff (to which the class is now limited by the FAC revisions, *see id.* ¶ 139) at particular points in time during 2012 and 2015 without any allegation that Defendants engaged in parallel *wholesale* price increases.  Like the original complaint, the FAC nowhere explains how increases in *average* market prices can provide evidence of collusion.  Nor does Plaintiff cite to other alleged parallel activity that would suggest any understanding (tacit or otherwise) among the Defendants.  If Plaintiff cannot identify and plead any apparently suspicious parallel activity by the Defendants (or any of them), the Court can terminate the inquiry as Plaintiff never even gets to the next stage of the analysis involving the assessment of "plus factors." *Musical Instruments*, 798 F.3d at 1193-94.  Put differently, plus factors are irrelevant without some clearly identified parallel activity that raises a suspicion of collusion among market competitors.

The vague reference to a single alleged instance in February 2016 when four unidentified Defendants allegedly raised wholesale prices and charged branded stations "nearly the same amount" hardly provides evidence of sustained parallel conduct sufficient to suggest a price fixing conspiracy.  FAC ¶ 81.  Plaintiff bases this allegation solely on a press release issued by Jamie Court (Consumer Watchdog) (*id.* ¶ 81 & n.93), but omits the portion of the press release reporting the reason for the simultaneous price changes was the switch on February 23-24, 2016 (as required by California regulations, *see, e.g.*, 13 Cal. Code Regs. § 2262.4) from lower-priced winter blends of gasoline to "summer blends," which are higher priced because they are more expensive to make.  *See* RJN, Ex. 2 [Press Release, Consumer Watchdog, "Consumer Watchdog Tells So Cal Drivers Fill Up Now, Gas Prices to Rise Quickly as Major Refiners Switch to Summer Blend and Raise Prices on Their Dealers by 37 Cents Overnight" (Feb. 25, 2016), *available at* http://www.consumerwatchdog.org/ newsrelease/consumer-watchdog-tells-so-cal-drivers-fill-now-gas-prices-rise-quickly- major-refiners-s] ("The price hike accompanies the transition to summer blends of

gasoline, which are being delivered by oil refiners to branded gasoline stations beginning today.").[3]

## B.     The So-called Plus-Factors—Those Already Considered and the Few New Facts Alleged—Do Not Support an Inference of Collusion

The vast majority of alleged "plus" factors in the FAC are taken, oftentimes nearly verbatim, from Plaintiff's initial Complaint.  These factors were insufficient to state a claim previously, and they do not add up to a conspiracy case in the FAC.  And the few new factors pled in the FAC add nothing to the analysis and do not save Plaintiff's failed conspiracy allegations.

### 1.     Market Structure

Plaintiff again contends that a conspiracy may be inferred from certain "characteristics of the market"—namely, that it "has high barriers to entry," "has inelasticity of demand," and "is highly concentrated."  FAC ¶ 82.  But these allegations remain unchanged from Plaintiff's prior Complaint.  *Compare id.* ¶¶ 82-95 *with* Compl. ¶¶ 41-53.  As this Court previously held, these types of allegations "do[] not necessarily suggest an illegal agreement, because the structure of the market could also have contributed to *permissible parallel conduct*."  Order at 10 (emphasis added). As the Court explained, "the California gasoline market" is "an interdependent market," in which "companies base their actions in part on the anticipated reactions of their competitors . . . . [B]ecause of this mutual awareness, [] *firms may arrive at identical decisions independently*."  Order at 10 (quoting *Musical Instruments*, 798 F.3d at 1193) (emphasis added).  Thus, "[t]he nature of the California gasoline market . . . does not necessarily support a conspiracy."  *Id.*

---

[3]  In evaluating a motion to dismiss, the Court may consider, in addition to the specific allegations in the complaint, "documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (internal citation omitted).  All of the materials attached to Defendants' Request for Judicial Notice filed herewith were referenced in the FAC.

Indeed, Plaintiff concedes that the California market structure generated perfectly lawful pricing during December 2012 through December 2014.  And the exact same structure requires Plaintiff to acknowledge that price fluctuations before and after this time do not require collusive behavior, but instead can readily flow from the actions of individual competitors:  Plaintiff alleges that "[b]ecause the market is so concentrated, the West Coast is highly sensitive to fluctuations in supply[.]"  FAC ¶ 3.  "In such a highly concentrated industry, 'a single actor . . . can set the price in the market.'"  *Id.*  And it cites a California Senate Report stating that the "[m]arket is dominated by a limited number of large, committed refiner/marketers whose individual actions can have significant market impact."  *Id.* ¶ 92.  Thus, as Plaintiff admits, "when a refinery goes down, gas prices go up and the refineries profit."  *Id.* ¶ 58.  Even assuming for purposes of this Motion the existence of an oligopolistic market structure as alleged by Plaintiff, an oligopoly is a "market condition in which sellers are so few that the actions *of any of them* will materially affect price[.]"  *Rebel Oil Co. v. Atl. Richfield Co.*, 146 F.3d 1088, 1091 (9th Cir. 1998) (emphasis added).  When individual competitors in such a market take advantage of changed conditions to enhance profits, this is known as "interdependent" behavior and that "does not entail collusion."  *Musical Instruments*, 798 F.3d at 1195.  Interdependent conduct is not a basis for pleading conspiracy because it is "in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."  *Twombly,* 550 U.S. at 554.

## 2.      Trade Association Activity

Plaintiff's allegations regarding Defendants' participation in trade associations are similarly "insufficient to state a[n antitrust] claim."  Order at 10.  As in the initial Complaint, Plaintiff again alleges that trade association meetings "provide[d] numerous opportunities for Defendants to conspire" and, once again, identifies the dates of various meetings.  FAC ¶¶ 98-107; *compare id. with* Compl. ¶¶ 54-63.  But such allegations, as the Court already held, are not enough.  Order at 10.  The only new

Gibson, Dunn &
Crutcher LLP

allegation as to trade associations concerns the SIGMA association, which Plaintiff states "described their Share Groups as 'One and a half-day subject-focused training, information sharing, and networking programs for employees of fuel marketing businesses.'" FAC ¶ 104. This adds nothing to Plaintiff's claim, however, and cannot support an inference of collusion because the Ninth Circuit has held that "mere participation in trade-organization meetings"—even "*where information is exchanged and strategies are advocated*"—"does not suggest an illegal agreement." *Musical Instruments*, 798 F.3d at 1196 (emphasis added).

### 3.  Acting Against Defendants' Self Interest

Another plus factor, according to Plaintiff, is that Defendants have supposedly "acted against their independent economic interest . . . by exporting gas out of California including during periods where California's gasoline prices were the highest in the nation." FAC ¶ 112. These allegations were already rejected, *see* Order at 9, and the few additional facts alleged in the FAC on this topic do not cure the deficiency. For example, the FAC adds allegations about exports made by Chevron U.S.A. during times when gasoline supplies were supposedly low. *Id.* ¶¶ 68-69. But these allegations lack "the necessary evidentiary facts to support th[e] conclusion [of conspiracy]." *Kendall*, 518 F.3d at 1047-48; *see also* Order at 6. The fact of export sales is consistent with a "perfectly competitive" market, (*see Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582 n.6 (1986)), and the FAC offers no details—*i.e.*, the "further factual enhancement" required by the Ninth Circuit (*Kendall*, 518 F.3d at 1047-48)—suggesting that Chevron U.S.A. or any of the other Defendants somehow coordinated their export decisions. Plaintiff has again failed to allege "facts, "such as a specific time, place, or person involved," detailing the alleged conspiracy. Order at 6.

Plaintiff also adds new allegations—all drawn from an unsubstantiated and speculative Consumer Watchdog "report" (*see* FAC nn.63-73)—that ExxonMobil failed to "bring badly-needed imports to the market during the height of Southern

Gibson, Dunn & Crutcher LLP

California's gasoline price spike and summer driving season."  FAC ¶ 59; *see also id.* ¶¶ 60-61, 64-67 (alleging that ExxonMobil used a tanker that could have been used to import California-compliant gasoline from Singapore to deliver gasoline to Florida instead).  These additional "facts" do not add substance to the pleading because Plaintiff also acknowledges that during the period ExxonMobil's Torrance refinery was disabled, ExxonMobil *did* import gasoline and related products as needed to "meet [its] contractual obligations."  *See id.* ¶ 60 ("Exxon purchased gasoline from other California refiners until it was forced to import gasoline to meet contractual obligations."); *id.* ¶ 61 (Exxon imported alkylate used "to provide premium gasoline to the Southern California market."); *id.* ¶ 67 ("Exxon only imported gasoline when it could no longer buy gasoline from third parties and was at risk of failing its contractual obligations.").  Plaintiff therefore concedes that ExxonMobil imported enough gasoline to meet all of its obligations and alleges no facts suggesting that ExxonMobil did not seek to cover those obligations in the most cost effective manner available to it.  Such actions are hardly against ExxonMobil's independent economic interest and do not at all suggest a conspiracy among the defendants.

The "excessive export" and "insufficient imports" allegations also fail to support any reasonable inference of anticompetitive collusion because, as the Court previously recognized, "[a] decrease in [gasoline] supply could *increase all Defendants' margins.*"  Order at 9 (emphasis added).  Thus, any reduction in supply—through exports or otherwise—would *not* be against any individual Defendant's self-interest, but would instead reflect "rational, legal business behavior" that was not the product of a conspiracy.  *Id.* (quoting *Kendall*, 518 F.3d at 1049).  Moreover, in light of the structure of the gasoline market as alleged by Plaintiff, certain actions—such as the exports alleged by Plaintiff—"'once initiated, can spread through a market *without any prior agreement,*'" and this "may just as well reflect market interdependence giving rise to conscious parallelism."  *Id.* (quoting *Musical Instruments*, 798 F.3d at 1195) (emphasis added).  This reasoning from the Court's Order again governs here, and

Plaintiff's allegations regarding the Defendants' alleged self-interest and exports do not support its conspiracy claim.

### 4. "Supracompetitive" Prices and Excess Profits

Plaintiff also contends that "supracompetitive" prices and high profits suggest a conspiracy here. *See* FAC ¶¶ 75-76, 77-78, 97. Again, these allegations are no different from the failed allegations in Plaintiff's initial Complaint. *Compare id. with* Compl. ¶¶ 35-37, 22. Although Plaintiff adds inflammatory allegations about certain Defendants' profits and margins, in 2015 (*see* FAC ¶¶ 14, 22, 23 and 76), this new data does not resolve the fundamental issue with Plaintiff's supracompetitive-pricing allegations: high profits and margins alone in no way suggests collusion as to pricing. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 134-35 (3d Cir. 1999) ("Profit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired to fix pricing[.]"); *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 799 F. Supp. 840, 844 (N.D. Ill. 1990) (supracompetitive profit allegations alone are not probative of collusion), *aff'd*, 971 F.2d 37, 52 (7th Cir. 1992); *U.S. v. Chas. Pfizer & Co.*, 367 F. Supp. 91, 101 n.14 (S.D.N.Y. 1973) ("This court is not convinced that excess profits demonstrate guilt any more than nominal profits prove innocence of a price-fixing charge.").

Plaintiff claims that language from the Environmental Protection Agency, which allegedly identified "reasons why California's reformulated gasoline requirements d[id] not explain . . . price spikes in 2015" is evidence from which inference of a conspiracy in 2015 can be drawn. FAC ¶ 97. But this is a *non sequitur*. Even if "reformulated gasoline requirements" did not explain the alleged 2015 price increases, it does not follow rationally or logically that Defendants then must have conspired to raise those prices. Rather, "supracompetitive prices," such as those alleged in 2015, may be "maintain[ed] . . . through rational, interdependent decision-making, as opposed to unlawful concerted action." *In re Chocolate Confectionary Antitrust Litig.*,

Gibson, Dunn & Crutcher LLP

801 F.3d 383, 397 (3d Cir. 2015).  The new EPA-related allegations thus do nothing to save Plaintiff's claims.

### 5.  Government Investigations

Plaintiff persists in pointing to a variety of state and federal actual or threatened investigations as evidence of antitrust violations and to support an inference of collusion.  But the only "new" fact here is a recent investigation initiated by the California Attorney General's office earlier this year, and that changes nothing.  As the Court has already concluded, "[a]llegations of a government investigation do not necessarily suggest a collusive agreement."  Order at p. 11 (citing *Musical Instruments*, 798 F.3d at 1196).  *See also In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d. 1011, 1024 (N.D. Cal 2007) (subpoenas served on the defendants in a grand jury investigation carry "no weight in pleading an antitrust conspiracy claim").

### 6.  The Statements Now Labeled as "Pretext" Do Not Give Rise to an Inference of Collusion

Plaintiff claims that unplanned refinery outages were "pretextual" explanations for spikes in gasoline prices in 2012.  *See, e.g.*, FAC ¶¶ 31-36, 41.  Use of the descriptive term "pretext" is a new feature of the FAC, but simply labeling these actions as "pretext" does not affect the analysis or lead to a different outcome.  These allegations themselves remain largely unchanged from the prior complaint, which the Court rejected as insufficient to support anticompetitive-conspiracy claims:  "The Plaintiff alleged that the Defendants used refinery shutdowns as 'cover' for a scheme to create a false shortage in order to drive up the prices of gasoline.  Although the Defendants blamed the 2012 price spikes on a supply decrease caused by refinery shutdowns; incongruously, inventories increased leading up to and during the price spikes."  Order at 3, 7; *see also id.* at 10 ("For the foregoing reasons, the Court finds that Plaintiff did not allege sufficient facts to 'nudge [its] claim[] across the line from conceivable to plausible.'").

Indeed, the Court specifically noted that Plaintiff failed to "specify which of the Defendants had blamed the price spikes on refinery issues, when these statements were initially made, or include any facts concerning prices charged by the Defendants." *Id.* at 7-8. And despite having months to amend its complaint, Plaintiff does not (and cannot) cure these deficiencies in its FAC. Notably, Plaintiff cannot point to a single statement by any Defendant that the price spikes in 2012 resulted solely from a supply shortage caused by unplanned refinery outages. Plaintiff does point to a statement made by a Chevron U.S.A. spokeswoman in the aftermath of a fire at Chevron U.S.A.'s Richmond refinery in August 2012 that—as Plaintiff acknowledges— "the fire was ***one reason*** for the increase in gas prices that month." FAC ¶ 39.[4] Nor does Plaintiff identify when any such statements were made, or any facts regarding the prices each Defendant charged during the alleged spikes in May, August, and October of 2012. Accordingly, Plaintiff's generic and conclusory allegations that the explanations for the price spikes in 2012 are pretextual are insufficient to "'nudge [Plaintiff's] claim[] across the line from conceivable to plausible.'" *See* Order at 10 (citing *Twombly*, 550 U.S. at 570); *see also id.* at 7-8.

Moreover, even if Plaintiff could provide specific allegations as to each Defendant's alleged pretextual explanation for the 2012 price spikes, "[f]or evidence of pretext to support an inference of conspiracy . . . it must be supported by *additional evidence* of opportunity to conspire, direct evidence of an agreement, or other circumstantial evidence of restraint of trade." *City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 134 (D.D.C. 2006) (emphasis added); *see also In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d at 411-12 ("[A]llegations of pretext

---

[4] Plaintiff also alleges that "Exxon's explanation for the outage of a disruption in power is suspect given that Southern California Edison said there was barely a blip in the electrical flow on October 1, 2012." FAC ¶ 34. Yet Plaintiff provides no cite to this allegation, and can rely only on a statement made by the California Energy Commission—not Exxon Mobil—"that a minor plant problem (a 'power failure' or 'flaring') at ExxonMobil's Torrance refinery was to blame for the instantaneous increase in wholesale prices in October 2012." *Id.*

must be accompanied by other traditional conspiracy evidence or economic evidence to create a reasonable inference of a conspiracy.").  Here, as discussed [*supra* at pp. 9-14], Plaintiff has failed to plead any plausible facts that Defendants conspired to fix gasoline prices, that Defendants entered into any agreement, or that any Defendants engaged in any efforts to impermissibly restrain trade.  Plaintiff's argument that the explanations for the 2012 price spikes (now dressed up with the term "pretextual") support an inference of conspiracy again fails.

### 7.     There are No Facts Pleaded Suggesting that the Independent Data Gathering and Publishing Services Provided Any Opportunity Whatsoever for Defendants to Collude

In the FAC, Plaintiff adds allegations that the Defendants are members of, and have access to information collected by, two industry information services "OPIS" and "Platts."  FAC ¶¶ 108-109.  But these types of data-gathering services are routine, exist in many industries, and do not suggest collusion.  *See, e.g.*, *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 906-07 (6th Cir. 2009) (airlines accused of colluding about travel agent commissions had access to Airline Reporting Corporation (ARC), which served as an information clearinghouse for many categories of industry information including commission rates paid to agents, and noting that "defendants' access to ARC does not suggest a viable means to collude on commission rates"); *see also U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) (exchange of price data can "render markets more, rather than less, competitive"); *In re Baby Food Antitrust Litig.*, 166 F.3d at 126 ("Exchange of pricing information by itself is an insufficient basis upon which to allow an inference of agreement to fix prices.") (citing *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1505 (11th Cir. 1985)).  Nothing in the FAC identifies any suspicious activity in relation to these data sources, including whether there is any way to use them as a vehicle to collude on price.  Moreover, these two energy-industry information sources have been around for decades (Platts for over 100 years), their publications are available to anyone who chooses to purchase a

subscription, and to Defendants' knowledge there has never been a claim asserted that they serve as tools to facilitate coordination and collusion among industry participants. It is not enough to point to the mere existence of these services, without more, as sufficient evidence of collusion.

## C.   Plaintiff's Theory About the 2012 Price Increases Does Not Make Sense.

Plaintiff alleges that the Defendants kept gasoline supplies artificially low during 2012 by (1) carrying out suspicious unscheduled maintenance, and (2) not delaying long-scheduled maintenance in order to take advantage of price increases and maximize profits.  FAC ¶¶ 3-4, 37, 42.  Yet Plaintiff also alleges that there was no supply shortage in 2012 and that prices rose because of Defendants' wrongdoing.  In particular, Plaintiff claims that certain Defendants "blamed" the 2012 price increases on fires that occurred months earlier (*id.* ¶¶ 2, 31, 37), and other Defendants misrepresented that refineries were offline for days when they were in fact operating (*id.* ¶ 42).  Plaintiff also points to price increases that occurred contemporaneously with a "suspicious combination" of (1) increased production, (2) reduced demand, and (3) higher inventories.  *Id.* ¶ 2.  But the data provided by Plaintiff in the FAC flatly refutes these allegations.  In fact, the chart of 2012 refinery operations (*id.* ¶ 37) reveals nothing "suspicious" whatsoever.  None of the eight "outages" listed were suspicious in nature.  Five were routine *scheduled* maintenance events and three were unscheduled outages arising from obviously unexpected conditions—the BP Cherry Point fire in February, the Chevron Richmond fire in August, and the Exxon Torrance power disruption in October.[5]  The 2012 "facts" as alleged do not suggest any

---

[5] Plaintiff's source Robert McCullough acknowledges that price increases followed these supply constricting events (RJN, Ex. 4 [Robert McCullough, "Analysis of West Coast Gasoline Prices" (June 5, 2012)] at 142), and Plaintiff previously has recognized the legitimacy of these unexpected events, claiming instead without factual support that some planned and unexpected plant closures were "longer than necessary" or came at a "suspicious" time.  *See, e.g.*, FAC ¶¶ 2-4; Pl.'s Opp'n to Defs.' Mot. to Dismiss (Dkt. No. 58) at 7.  McCullough, on the other hand, agrees that it is "impossible to judge to what degree these [outages] could have been

(Cont'd on next page)

Gibson, Dunn &
Crutcher LLP

1   misconduct at all, and certainly are not sufficient to support any reasonable inference

2   of conspiracy to increase prices.[6]   And as noted above, there is nothing about the

3   statements made by any of the Defendants during 2012 that suggest "pretext" on which

4   a conspiracy claim can rationally be founded.  (*See supra* at pp. 15-16.)

5   **D.    Plaintiff's Theory About the Price Increases in 2015 Also Does Not Make**

6   **Sense**

7           Plaintiff contends that Defendants colluded to reduce California's gasoline

8   supply (and thereby increase prices) throughout the period from late December 2014

9   through mid-2016.  FAC ¶ 9.  Yet Plaintiff alleges no specific facts constituting any

10   such agreement, and  instead, claims that an agreement can be inferred from

11   California's market structure along with other circumstantial evidence, such as:  (1)

12   refiners maintaining low inventory reserves; (2) a purportedly "unprecedented"

13   number of refinery outages, which Plaintiff characterize as "suspicious" and "willful";

14   (3) refiners allegedly choosing not to import enough gasoline to "restock the market";

15   and (4) refiners exporting gasoline out of California.  *Id.* ¶¶ 11, 15, 16, 48-50, 53-55,

16   58-60, 62-65, 67-68, 70-71.  Plaintiff has failed, however, to support the broad

17   conclusory assertions of the FAC:  that Defendants conspired to raise gasoline prices in

18   2015.  Given the structure of California's gasoline market, Plaintiff's allegations are

19   fully consistent with rational, independent decision-making by Defendants, and thus,

20   the allegations do not support any inference of conspiracy.

21           **1.    February/March 2015 Price Increases**

22           Plaintiff asserts that a spike in California gasoline prices from late February into

23   March 2015 was not justified by market factors (such as crude oil costs, taxes or the

24   _____

     *(Cont'd from previous page)*

25   delayed."  RJN, Ex. 4 [Robert McCullough, "Analysis of West Coast Gasoline

26   Prices" (June 5, 2012)] at 145.

27   6   The Court observed that Plaintiff's contentions about the reasons for and facts
     regarding the October 2012 price spike appear contradictory (Order at p. 8) and

28   they still are.

Gibson, Dunn &
Crutcher LLP

costs of complying with California's unique gasoline blend requirements).  FAC ¶ 11. But Plaintiff's allegations of low inventory levels (*id.* ¶ 58), excessive exports of refined product (*id.* ¶ 55), and "suspicious . . . closures and slowdowns" (*id.* ¶¶ 48, 54) fail to state a conspiracy claim for numerous reasons.  First, as in Plaintiff's initial complaint, the FAC includes no facts indicating there was any improper coordination among Defendants in their inventory or export decisions in late 2014 or early 2015. Second, while Plaintiff makes the conclusory assertion that "a series of suspicious" refinery outages "preceded" the February-March 2015 price spike, it identifies only *one* allegedly "suspicious" outage prior to March 2015—a shutdown of the Tesoro Martinez refinery between February 2 and March 27 due to a strike (while ongoing, scheduled maintenance had already taken half of the refinery offline).  FAC ¶ 48; RJN, Ex. 3 [Gordon Schremp, "Recent Fuel Price Trends, Market Overview & Contributing Factors" (June 30, 2015)] at 121.  Plaintiff alleges no facts to support any inference that Tesoro's decisions regarding the Martinez refinery were collusive and not in its independent best interests.

Plaintiff's allegation that the price spike in February-March 2015 must have been the result of a conspiracy because it purportedly cannot be accounted for by typical market factors ignores two additional critical facts alleged and incorporated in the FAC:  (1) The supply shock that resulted from the February 18, 2015 explosion that Plaintiff concedes essentially shut down the ExxonMobil Torrance refinery, representing the loss of nearly 10% of California's refining capacity, and 20% of Southern California's refining capacity (*see* FAC ¶¶ 49-50, 58-59); and (2) the fact that "California gasoline prices normally increase at the start of each year," and indeed there had been seasonal increases of "a minimum of 60 cents per gallon" beginning in late January *each year since 2011*," with such price increases "due to a number of factors," including that the "[t]ransition from winter to summer gasoline decreases gasoline production capability of refineries by 5 to 8 percent," beginning "the second week of February for Southern California and a month later for Northern California."

1    RJN, Ex. 3 [Gordon Schremp, "Recent Fuel Price Trends, Market Overview &

2    Contributing Factors" (June 30, 2015)] at 119-120.

3        **2.    April-May 2015, July-Aug 2015 and Dec. 2015 Price Increases**

4        Plaintiff alleges that Defendants conspired to fix prices for the rest of 2015 (and

5    into 2016), despite the fact that the FAC reflects the prices increasing in April-May

6    2015 and July-August 2015, interspersed with periods of falling prices in June 2015,

7    and during the period August-December 2015, when there was another brief, small

8    price rise and then a price fall.  FAC ¶ 58.  Plaintiff asserts that a price fixing

9    conspiracy can be inferred from:  (1) ExxonMobil's alleged misrepresentations about

10   when the Torrance refinery would be back on line ("no one explained" why it took so

11   long) (*id.* ¶¶ 49-50, 56, 63) and its corresponding failure to make up the lost production

12   by timely increasing its imports (*id.* ¶¶ 59-61, 64-68, 71); (2) numerous allegedly

13   "questionable" slowdowns or shutdowns that were not in the refiners' independent

14   economic interest given then-existing market conditions (*id.* ¶¶ 49-50, 53-54); and (3)

15   gasoline imports by all Defendants were less than they should have been (and exports,

16   in particular, by Chevron, were larger than they should have been) because it

17   supposedly would have been in each Defendant's independent economic interest to

18   *increase* imports and reduce exports when local supplies were low and prices high.  *Id.*

19   ¶¶ 62-63, 67-70.  None of these allegations supports an inference of conspiracy.

20       First, whatever the reasons for the timing of the ExxonMobil Torrance refinery

21   to come back on line, Plaintiff alleges no facts to support an inference that

22   ExxonMobil's decisions regarding the repair operations at the Torrance refinery were

23   not made independently, and ignores the undisputed regulatory constraints to operate

24   pending investigations into the incident.  And Plaintiff alleges no facts to support the

25   hypothesis that ExxonMobil did not act independently and in its own self-interest in

26   connection with its decisions regarding importing foreign product or purchasing fuel in

27   California to meet its contractual requirements after the Torrance refinery incident.

28   Plaintiff makes no claim suggesting that it was more expensive for ExxonMobil to

purchase gasoline in California instead of importing it from abroad.  Nonetheless, Plaintiff apparently believes that ExxonMobil's objective should have been to increase local supplies by importing product from outside California to help bring down prices. FAC ¶¶ 59-61.  But that suggests a disregard of ExxonMobil's own self-interest and there is no allegation that it was more expensive or otherwise less efficient for ExxonMobil to purchase gasoline in California instead of importing it from abroad. ExxonMobil's perfectly rational decision to buy locally cannot support the inter-company conspiracy claim Plaintiff has alleged.

Second, while Plaintiff again asserts that there were "suspicious closures or slowdowns" at other refineries, Plaintiff fails to plead any specific facts to support this claim and, in particular, fails to allege any facts to demonstrate that any of the identified refinery events (whether planned or unplanned) were not operationally and economically appropriate.  FAC ¶¶ 48-50, 53-54.  Instead, Plaintiff relies on the vague, conclusory assertion that "according to [unspecified] industry insiders, refinery maintenance schedules were inexplicably moved forward" in 2015, but the FAC says nothing about which refiners allegedly "moved forward" scheduled maintenance, when they did so, by how much, and why such decisions were supposedly "inexplicable" and the product of collusion.  *Id.* ¶ 50.  Instead, Plaintiff can only once again rely on its own speculation that it was economically irrational for refiners not to defer all maintenance because prices were high.  *Id.*

Finally, Plaintiff has pled no facts supporting the assertion that market-wide import and export levels during 2015 plausibly suggest an inference of conspiracy to restrain supply.  Initially, with respect to imports, the June 30, 2015 presentation from the California Energy Commission's Gordon Schremp demonstrates that the facts are nearly the opposite of the conclusion asserted by Plaintiff.  *See* RJN, Ex. 3 [Gordon Schremp, "Recent Fuel Price Trends, Market Overview & Contributing Factors" (June 30, 2015)].  Following the ExxonMobil Torrance explosion, imports *skyrocketed*:

1   during the period from March 27 through June 19, 2015, imports were over *600%*

2   *higher* than the same period in 2014, and at their highest level since 2007. *Id.* at 130.

3   　　　And with respect to exports, Plaintiff fails to allege that export levels during the

4   period were abnormally high, and, in particular, while it focuses on Chevron having

5   the largest share of exports, Plaintiff alleges no facts suggesting that the gasoline

6   Chevron exported was even CARB-compliant (*i.e.*, that it could have been sold in

7   California) or that Chevron colluded with anyone in its export decisions. *See* FAC ¶¶

8   63, 68-70.  Thus, contrary to Plaintiff's conclusory assertion that gasoline price

9   movements in 2015 were so economically irrational that it could reasonably be

10  inferred they were caused by a conspiracy to restrain supply, the California Energy

11  Commission's market analyst, Mr. Schremp, summarized that they were the result of

12  ordinary market supply-and-demand factors in light of the unusual supply constraint

13  triggered by the ExxonMobil Torrance refinery's explosion knocking 10% of

14  California supply (and 20% of Southern California's) offline for over a year.  RJN, Ex.

15  3 [Gordon Schremp, "Recent Fuel Price Trends, Market Overview & Contributing

16  Factors" (June 30, 2015)] at 139.

17  　　**3.**　　**Exxon's Use of Exchange Agreements to Acquire Gasoline from**

18  　　　　　**Other Defendants Suggest Nothing About a Conspiracy**

19  　　　Plaintiff asserts that ExxonMobil's purchase of gasoline from certain of the

20  Defendants, following the ExxonMobil Torrance refinery explosion, pursuant to

21  exchange agreements constitutes a "plus factor" supporting an inference of conspiracy

22  because, by making those purchases, ExxonMobil secretly signaled to the other

23  Defendants that the Torrance refinery would remain offline for much longer than

24  ExxonMobil was "publicly representing."  FAC ¶¶ 56, 73.  Leaving aside that Plaintiff

25  alleges no facts showing either (1) any "public representation" by ExxonMobil as to

26  how long the Torrance refinery would be offline or (2) any undisclosed knowledge by

27  ExxonMobil that the refinery would be offline longer than "represented," California

28  courts have repeatedly rejected Plaintiff's contention that exchange agreements are, in

and of themselves, a "plus factor" supporting an inference of conspiracy.  Plaintiff actually refers to a case in the FAC at paragraph 92 that awards summary judgment on antitrust conspiracy claims alleging that the defendant petroleum companies colluded to restrain supply of CARB-compliant gasoline in California because "exchange agreements have long been recognized as procompetitive in purpose and effect, enabling or facilitating companies to compete in product and/or geographical and/or temporal markets in which they otherwise could not or would not compete as efficiently or at all."  *Aguilar v. Atl. Richfield Co.*, 25 Cal. 4th 826, 863-64 (2001); *see also William O. Gilley Enters. v. Atl. Richfield Co.*, 588 F.3d 659, 663-67 (9th Cir. 2009) (affirming order granting motion to dismiss antitrust claim where complaint "do[es] not clearly allege that the exchange agreements themselves constitute a restraint of trade or suggest why defendants' actions were collusive, rather than independent action" and because the *Aguilar* decision precluded plaintiff's theory that the "network of exchange agreements" allowed defendants to carry out an unlawful conspiracy to "coordinate their production and output" of CARB gasoline) (internal quotations and citation omitted).

**E.     The FAC Should Now Be Dismissed with Prejudice**

The Court granted Plaintiff the opportunity to re-plead its claim with facts showing the existence of an anticompetitive agreement among the Defendants to fix or raise gasoline prices.  The FAC fails (again) to plead facts that lead to a reasonable inference of an unlawful horizontal price fixing agreement.  This Court has broad discretion to now dismiss the FAC with prejudice, and Defendants urge the Court to do so at this time and bring this meritless conspiracy claim to an appropriate conclusion. *See Zucco Partners, LLC v. Gigimarc Corp*, 552 F.3d. 981, 1007 (9th Cir. 2009) ("[W]here the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, the district court's discretion to deny leave to amend is particularly broad.") (internal citations omitted).

Gibson, Dunn & Crutcher LLP

# V.    CONCLUSION

For all the foregoing reasons, Defendants respectfully request that Persian Gulf's First Amended Complaint be dismissed, in its entirety, with prejudice.

Dated: October 17, 2016                           DANIEL G. SWANSON
                                                  STEVEN E. SLETTEN
                                                  DAVID S. HAN
                                                  GIBSON, DUNN & CRUTCHER LLP


                                                  By:   s/ Steven E. Sletten
                                                          STEVEN E. SLETTEN

                                                  Attorneys for Defendant CHEVRON U.S.A.
                                                  INC.
                                                  Email:  ssletten@gibsondunn.com


                                                  JONES DAY LLP


                                                  By:   s/ David C. Kiernan
                                                          DAVID C. KIERNAN

                                                  Attorneys for Defendant
                                                  TESORO REFINING & MARKETING
                                                  COMPANY LLC
                                                  Email:  dkiernan@jonesday.com


                                                  MORGAN LEWIS & BOCKIUS LLP


                                                  By:   s/ Kent M. Roger
                                                          KENT M. ROGER

                                                  Attorneys for Defendant
                                                  EQUILON ENTERPRISES LLC
                                                  doing business as SHELL OIL PRODUCTS US
                                                  Email:  kent.roger@morganlewis.com

25

1

2

O'MELVENY & MEYERS

3
By:   s/ Charles C. Lifland
4
CHARLES C. LIFLAND

5   Attorneys for Defendant
EXXON MOBIL REFINING & SUPPLY CO.
6   Email:  clifland@omm.com

7

8   WILSON TURNER KOSMO LLP

9

10  By:   s/ Robin A. Wofford
ROBIN A. WOFFORD
11
Attorneys for Defendant
12  EXXON MOBIL REFINING & SUPPLY CO.
Email:  rwofford@wilsonturnerkosmo.com
13

14  COZEN O'CONNOR

15

16  By:   s/ Michael De Leeuw
17  MICHAEL DE LEEUW

18  Attorneys for Defendant
19  ALON U.S.A. ENERGY, INC.
Email:  mdeleeuw@cozen.com
20  SULLIVAN & CROMWELL

21

22  By:   s/ Diane L. McGimsey
DIANE L. MCGIMSEY
23

24  Attorneys for Defendant
BP WEST COAST PRODUCTS LLC
25  Email:  mcgimseyd@sullcrom.com

26

27

28

Gibson, Dunn &
Crutcher LLP

MEMORANDUM OF POINTS & AUTHORITIES
CASE NO. 15-CV-01749

NORTON ROSE FULBRIGHT

By:   s/ John C. Gray
               JOHN C. GRAY

Attorneys for Defendant
CONOCO PHILIPS
Email:  john.gray@nortonrosefulbright.com

GLYNN & FINLEY LLP

By:   s/ Robert Phelps
             ROBERT PHELPS

Attorneys for Defendant
VALERO MARKETING AND SUPPLY
COMPANY
Email:  bphelps@glynnfinley.com

**Signature Certification**

Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures Manual, I hereby certify that the content of this document is acceptable to David C. Kiernan, counsel for Tesoro Refining & Marketing Company, LLC; Kent M. Roger, counsel for Equilon Enterprises LLC doing business as Shell Oil Products US; Charles C. Lifland, counsel for Exxon Mobil Refining & Supply Co.; Robin A. Wofford, counsel for Exxon Mobil Refining & Supply Co.; Michael De Leeuw, counsel for Alon U.S.A. Energy, Inc.; Diane Lee McGimsey, counsel for BP West Coast Products LLC; Robert Phelps, counsel for Valero Marketing and Supply Company; and John C. Gray, counsel for Conoco Phillips, and that I have obtained each of the foregoing persons' authorization to affix his or her electronic signature to this document.

By:   s/ Steven E. Sletten
             STEVEN E. SLETTEN

MEMORANDUM OF POINTS & AUTHORITIES
CASE NO. 15-CV-01749