ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN (111070)
DAVID W. MITCHELL (199706)
ALEXANDRA S. BERNAY (211068)
CARMEN A. MEDICI (248417)
CARISSA J. DOLAN (303887)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
patc@rgrdlaw.com
davidm@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com
cdolan@rgrdlaw.com
     – and –
ARMEN ZOHRABIAN (230492)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
azohrabian@rgrdlaw.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERSIAN GULF INC., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> BP WEST COAST PRODUCTS LLC, et al., <br><br> Defendants. | Case No. 3:15-cv-01749-L-BGS <br><br> <u>CLASS ACTION</u> <br><br> PLAINTIFF'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT <br><br> DATE:     December 5, 2016 <br> TIME:     10:30 a.m. <br> CTRM:    5B <br> JUDGE:   Hon. M. James Lorenz |

1205757_2

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ......................................................................... 1

II. LEGAL STANDARDS ................................................................. 3

III. RELEVANT FACTS ..................................................................... 4

    A. Plaintiff Adequately Alleges Parallel Conduct .................... 4

        1. Parallel Price Spikes ................................................. 4

        2. Parallel Shutdowns in 2012 and 2015 ...................... 5

        3. Parallel Supply Restraints Through Increasing Gasoline Exports and Decreasing Imports .................... 6

        4. Parallel Refusal to Provide Information ..................... 6

    B. Plaintiff Provides Numerous Plus Factors Supporting a Plausible Inference of Conspiracy ........................................ 7

        1. Defendants' Sustained and Historically Unprecedented Profits Coupled with Historic Differentials Between Wholesale and Retail Prices in California and Historic Price Differentials Between California and the Rest of the Country All Support an Inference of Conspiracy ................ 7

        2. Defendants' Pretextual Explanations Support an Inference of Conspiracy ........................................... 8

        3. Defendants' Actions Against Their Self Interest Including Massive Exports During Shortages Are a Plus Factor ...................................................................... 9

        4. The Amended Complaint Alleges Market Conditions that Support the Inference of a Conspiracy ..................... 10

        5. The High Levels of Inter-Firm Communications Through Exchange Agreements, Trade Associations and Information Sharing Is a Plus Factor ......................... 10

        6. The California Attorney General's Investigation into Collusion in the Petroleum Industry, Testimony at the PMAC and Defendants' Refusal to Appear Before the Committee Supports a Reasonable Expectation that Discovery Will Reveal Evidence of an Illegal Agreement ...... 11

IV. ARGUMENT ............................................................................. 12

    A. Defendants' Arguments Against Parallel Conduct Are Weak .......... 12

PLAINTIFF'S OPPOSITION TO DEFS' JOINT
MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT

- i -

3:15-cv-01749-L-BGS

1

2                                                                          **Page**

3
        B.      Plaintiff Adequately Alleges Numerous Plus Factors Probative
4               of Conspiracy ................................................................................ 14

5               1.      Defendants' Sustained and Historically Unprecedented
                        Refinery Margins Point to Collusion ........................................ 15
6
                2.      Defendants' Arguments Against Their Pretextual
7                       Explanations Are Flawed ........................................................... 16

8               3.      Defendants' Arguments on Their Economically Irrational
                        Exports Are Flawed .................................................................... 17
9
                4.      Defendants' Arguments Against Market Structure Are
10                      Incorrect ..................................................................................... 21

11              5.      Defendants' Arguments Against Information Exchanges
                        and Trade Associations Are Inapt ............................................. 22
12
                6.      Defendants' Arguments Against California's
13                      Investigations into Refinery Pricing Fail .................................. 24

14   V.     LEAVE TO AMEND SHOULD BE GRANTED IF THE COURT
            GRANTS ANY PART OF DEFENDANTS' MOTION ............................. 25
15
     VI.    CONCLUSION ............................................................................................ 25
16

17

18

19

20

21

22

23

24

25

26

27

28
     PLAINTIFF'S OPPOSITION TO DEFS' JOINT          - ii -                    3:15-cv-01749-L-BGS
     MOTION TO DISMISS PLAINTIFF'S FIRST
     AMENDED COMPLAINT

1

## TABLE OF AUTHORITIES

2
**Page**

3
**CASES**

4
5
*Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*,
No. C 04-2266 JW (PVT), 2009 U.S. Dist. LEXIS 14330
6
(N.D. Cal. Feb. 5, 2009) ................................................................. 15

7
*Aguilar v. Atlantic Richfield Co.*,
25 Cal. 4th 826 (Cal. 2001) ........................................................... 22

8
9
*Am. Chiropractic v. Trigon Healthcare*,
367 F.3d 212 (4th Cir. 2004) ........................................................... 2

10
11
*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946) ...................................................................... 15

12
13
*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ..................................................................... 4

14
15
*B & R Supermarket, Inc. v. Visa, Inc.*,
No. C 16-01150 WHA, 2016 U.S. Dist. LEXIS 136204
16
(N.D. Cal. Sept. 30, 2016) ........................................................ 15, 23

17
*Behrend v. Comcast Corp.*,
532 F. Supp. 2d 735 (E.D. Pa. 2007) ............................................. 21

18
19
*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................*passim*

20
21
*Brennan v. Concord EFS, Inc.*,
369 F. Supp. 2d 1127 (N.D. Cal. 2005) .......................................... 13

22
23
*City of Moundridge v. Exxon Mobil Corp.*,
429 F. Supp. 2d 117 (D.D.C. 2006) ................................................ 17

24
25
*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ......................................................................... 4

26
27
*Estate of Le Baron v. Rohm & Haas Co.*,
441 F.2d 575 (9th Cir. 1971) .......................................................... 16

28

PLAINTIFF'S OPPOSITION TO DEFS' JOINT
MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT

- iii -

3:15-cv-01749-L-BGS

1

2
**Page**

3

*Fragale & Sons Beverage Co. v. Dill*,
   760 F.2d 469 (3d Cir. 1985) .................................................................. 17

*Gilley Enters. v. Atl. Richfield Co.*,
   588 F.3d 659 (9th Cir. 2009) ................................................................ 23

*Hargrave v. Univ. of Wash.*,
   No. C14-0376JLR, 2014 U.S. Dist. LEXIS 80952
   (W.D. Wash. June 12, 2014) ................................................................... 4

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999) ................................................... 15, 16, 24

*In re Beef Ind. Antitrust Litig.*,
   907 F.2d 510 (5th Cir. 1990) ................................................................ 14

*In re Cathode RayTube (CRT) Antitrust Litig.*,
   738 F. Supp. 2d 1011 (N.D. Cal. 2010) .............................................. 4, 5

*In re Chocolate Confectionary Antitrust Litig.*,
   801 F.3d 383 (3d Cir. 2015) ........................................................... 16, 17

*In re Citric Acid Litig.*,
   191 F.3d 1090 (9th Cir. 1999) .............................................................. 14

*In re Coordinated Pretrial Proceedings in Petroleum
   Prods. Antitrust Litig.*,
   656 F. Supp. 1296 (C.D. Cal. 1986) ..................................................... 14

*In re Coordinated Pretrial Proceedings in Petroleum
   Prods. Antitrust Litig.*,
   906 F.2d 432 (9th Cir. 1990) ........................................... 14, 20, 21, 23

*In re Domestic Airline Travel Antitrust Litig.*,
   No. 15-mc-01404-CKK, MDL Dkt. No. 2656,
   slip op. (D.D.C. Oct. 28, 2016) ...................................... 19, 21, 22

*In re Flash Memory Antitrust Litig.*,
   643 F. Supp. 2d 1133 (N.D. Cal. 2009) ............................................... 21

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFS' JOINT          - iv -               3:15-cv-01749-L-BGS
MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT

**Page**

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...................................................... 3

*In re Graphics Processing Units Antitrust Litig.*,
    540 F. Supp. 2d 1085 (N.D. Cal. 2007) ...................................................... 2

*In re Linerboard Antitrust Litig.*,
    504 F. Supp. 2d 38 (E.D. Pa. 2007) ......................................................... 17

*In re Lithium Ion Batteries Antitrust Litig.*,
    No. 13-MD-2420 YGR, 2014 U.S. Dist. LEXIS 7516
    (N.D. Cal. Jan. 21, 2014) ......................................................................... 22

*In re Musical Instruments & Equip. Antitrust Litig*,
    798 F.3d 1186 (9th Cir. 2015) ..................................................... 14, 15, 23

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    580 F. Supp. 2d 896 (N.D. Cal. 2008) ...................................................... 21

*In re Tableware Antitrust Litig.*,
    363 F. Supp. 2d 1203 (N.D. Cal. 2005) .................................................... 24

*In re Tableware Antitrust Litig.*,
    484 F. Supp. 2d 1059 (N.D. Cal. 2007) ...................................................... 2

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009) .................................................................... 24

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*,
    865 F. Supp. 2d 1002 (C.D. Cal. 2011) .................................................... 23

*Interstate Circuit, Inc. v. United States*,
    306 U.S. 208, 59 S. Ct. 467 (1939) .......................................................... 12

*Merck-Medco Managed Care v. Rite Aid Corp.*,
    No. 98-2847, 1999 WL 691840 (4th Cir. 1999) .......................................... 6

*Milliken & Co. v. CNA Holdings, Inc.*,
    No. 3:08-CV-578, 2011 U.S. Dist. LEXIS 87677
    (W.D.N.C. Aug. 8, 2011) ......................................................................... 24

PLAINTIFF'S OPPOSITION TO DEFS' JOINT     - v -         3:15-cv-01749-L-BGS
MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT

Page

*Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*,
No. 15-cv-00595-BAS (MDD), 2016 WL 739797
(S.D. Cal. Feb. 25, 2016) ..................................................................... 25

*Reserve Supply Corp. v. Owens Corning Fiberglass Corp.*,
799 F. Supp. 840 (N.D. Ill. 1990),
*aff'd*, 971 F.2d 37 (7th Cir. 1992) ................................................ 15, 16

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ................................................................ 4

*Starr v. Sony BMG Music Entm't*,
592 F.3d 314 (2d Cir. 2010) ................................................................ 24

*U.S. v. Chas. Pfizer & Co.*,
367 F. Supp. 91 (S.D.N.Y. 1973) ........................................................ 15

*United Union of Roofers, Waterproofers and Allied Trades
No. 40 v. Ins. Corp. of Am.*,
919 F.2d 1398 (9th Cir. 1990) ............................................................. 25

**STATUTES, RULES AND REGULATIONS**

California Government Code
§11180, *et seq.* ................................................................................... 24

Federal Rules of Civil Procedure
Rule 8 ......................................................................................................... 3
Rule 8(a) ................................................................................................... 4
Rule 9(b) ................................................................................................... 3
Rule 12(b)(6) ............................................................................................ 3

# I.    INTRODUCTION

The redline of the Amended Complaint Defendants submitted with their motion to dismiss (Dkt. No. 81-5) reflects Plaintiff's considerable effort to address the Court's Opinion and Order.[1]   In the Amended Complaint (the "AC"), Plaintiff responded to the Court's directive by adding factual detail about specific instances of acts in furtherance of a conspiracy, unexplained and unexplainable by Defendants regarding their joint commitment to anticompetitive conduct which has cost California gas purchasers billions.  The AC provides a plausible theory of conspiracy, supported by numerous plus factors, which provide the bridge from Defendants (uncontested) stair-step price increases to a plausible inference of conspiracy at the pleading stage.  And Defendants, rather than posit alternative reasons for their suspicious conduct, attempt to cabin Plaintiff's allegations and attack each on a piecemeal basis, arguing that each alone does not indicate illegal coordinated activity.   But as the AC's specific allegations show, nothing--not normal economic forces nor the structure of California's market explain the extreme and anticompetitive price spikes this state has endured.

All of this evidence is marshaled in the AC is despite Defendants' best efforts to avoid providing any information to regulators or consumers as to why Californians are paying billions more for gasoline compared to the rest of the country.  Despite the lack of transparency in the refinery industry, which was furthered by Defendants' refusal to cooperate with any inquiries into why gas prices are so out-of-touch in California (including an unwillingness to testify in front of the Petroleum Market Advisory Committee ("PMAC") and refusal to publicly explain their conduct), the AC plausibly alleges that Defendants conspired with each other (the "who") to restrain the supply of

---

[1]   Order Granting with Leave to Amend Defendants' Motion to Dismiss ("Order") (Dkt. No. 66).  As Defendants' own redline attests, the AC incorporates nearly 1600 changes.  Declaration of Steven Sletten in Support of Defendants' Request for Judicial Notice in Support of Defendants' Joint Motion to Dismiss Plaintiff's First Amended Complaint ("Sletten Decl."), Ex. 1 (Dkt. No. 81-5).

1   gas by restraining refinery capacity (through pretextual and willful refinery

2   shutdowns) and increasing exports while restricting imports (the "what" and "how")

3   against their own individual economic interest, which impacted California's market

4   throughout 2012, late 2014 and through 2015 and beyond (the "when" and "where").

5   Specific characteristics of the California gasoline market making it susceptible to

6   collusion and specific examples of completely unexplained market anomalies that

7   would only make sense in the context of a conspiracy, are detailed throughout the AC.

8          Rather than attack Plaintiff's overarching conspiracy head-on, Defendants

9   resort to complaints that the sources relied upon in the AC do not plead direct

10  evidence of conspiracy and must be based on "first-hand knowledge of illegal

11  conduct."  Defs' Mot. at 8.  Of course, the proverbial "smoking gun" is rare[2], for if

12  first-hand knowledge were required, few conspiracies, which by their  nature are

13  concealed, would survive a motion to dismiss.[3]  Moreover, Defendants' last-ditch *ad*

14  *hominem* attacks which attempt to denigrate and disparage some of the sources relied

15  upon in the AC, are wholly improper at the pleading stage.  Procedural impropriety

16  aside, the Defendants are flatly wrong as the experts – a widely cited preeminent

17  consumer rights agency and a well-respected national expert who has worked in the

18  industry for decades – have meticulously compiled detailed evidence related to the

19  often Byzantine business practices of Defendants.   Both Dr. McCullough and

20  representatives from Consumer Watchdog have painstakingly worked for years

21  investigating Defendants' conduct in an effort to explain why gasoline costs so much

22  more in California than in the rest of the country, and through extensive fact-

23  gathering, witness interviews and data analysis, have demonstrated that no explanation

24
25  [2]   *See Am. Chiropractic v. Trigon Healthcare*, 367 F.3d 212, 227 (4th Cir. 2004) (noting "[d]irect evidence is extremely rare in antitrust cases and is usually referred to as the 'smoking gun'").

26
27  [3]   *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1059, 1072 (N.D. Cal. 2007); *In re Graphics Processing Units Antitrust Litig.* ("*GPU II*"), 540 F. Supp. 2d 1085, 1096 (N.D. Cal. 2007).

28

PLAINTIFF'S OPPOSITION TO DEFS' JOINT          - 2 -               3:15-cv-01749-L-BGS
MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT

1   makes more sense than Defendants agreeing among themselves to restrict the supply

2   of gasoline (or create the illusion of a supply shortage) in order to drive up the price of

3   gasoline on the West Coast.

4        Yet despite the major amendments made, Defendants are reduced to slinging

5   mud and making the very same arguments they made in seeking to dismiss the

6   original complaint.  They claim the conspiracy does not make sense – without

7   providing any credible pro-competitive explanation (as they must) for their conduct or

8   explanation for the dislocation of prices in California compared to the rest of the

9   country.  Such arguments fail.  Defendants cannot challenge plausibility by asserting

10   that Plaintiff has not wholly foreclosed the possibility that their conduct was lawful.

11   *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Plaintiff here has pleaded

12   significant factual and economic evidence raising a reasonable expectation that

13   discovery will uncover a conspiracy between Defendants.  *Id*.  Because of the

14   complex and important factual and legal issues raised by Plaintiff's AC and

15   Defendants' motion to dismiss, Plaintiff requests oral argument.

## II.  LEGAL STANDARDS

17        "Generally, the Court does not 'require heightened fact pleading of specifics,

18   but only enough facts to state a claim to relief that is plausible on its face.'"[4]  Order at

19   4 (quoting *Twombly*, 550 U.S. at 570).   As the Ninth Circuit has explained,

20   plausibility, not probability (contrary to Defendants' implications otherwise), is the

21   appropriate standard on a motion to dismiss and weighing Defendants' extra-

22   complaint-explanations is inappropriate except in the following circumstance:

> If there are two alternative explanations, one advanced by defendant and
> the other advanced by plaintiff, both of which are plausible, plaintiff's
> complaint survives a motion to dismiss under Rule 12(b)(6).  Plaintiff's
> complaint may be dismissed only when defendant's plausible alternative
> explanation is so convincing that plaintiff's explanation is ***implausible***.
> The standard at this stage of the litigation is not that plaintiff's

---

[4]   "[A]llegations of antitrust conspiracy are governed by Rule 8, and not the
heightened standard of Rule 9(b)."  *In re Graphics Processing Units Antitrust Litig.*
("*GPU I*"), 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007).

1
2
3
4

> explanation must be true or even probable. The factual allegations of the complaint need only "plausibly suggest an entitlement to relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951 (2009). As the Court wrote in *Twombly*, Rule 8(a) "***does not impose a probability requirement at the pleading stage***; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" to support the allegations. *Twombly*, 550 U.S. at 556 (emphasis in original).

5 *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011).[5]  Indeed, "*Twombly* and *Iqbal*

6 are not meant to be impassible sentinels barring the paths of all who would climb the

7 courthouse steps. Even under the more stringent 'plausibility' standard, the court is

8 not permitted to weigh competing inferences . . . ."  *Hargrave v. Univ. of Wash.*, No.

9 C14-0376JLR, 2014 U.S. Dist. LEXIS 80952, at *10 (W.D. Wash. June 12, 2014).

10 Furthermore, the Court must view a complaint's allegations as a whole, not piecemeal,

11 as Defendants do here.[6]  *See In re Cathode RayTube (CRT) Antitrust Litig.*, 738 F.

12 Supp. 2d 1011, 1019 (N.D. Cal. 2010) ("*CRT*").

13 **III.   RELEVANT FACTS**

14    **A.    Plaintiff Adequately Alleges Parallel Conduct**

15       **1.    Parallel Price Spikes**

16    The AC alleges, and Defendants do not and cannot reasonably refute, the

17 economic evidence: there were parallel price spikes by the defendants far outside of

18 historical norms in May 2012 and October 2012, despite rising inventories. *See, e.g.*,

19 ¶¶4-6, 31, 34, 36.[7]  The AC also adds evidentiary facts about the historically

20 unprecedented price spikes that harmed California's gasoline purchasers in February

21 2015. *See, e.g.*, ¶¶9, 11, 48-50. That month, gasoline prices – a suitable proxy for the

22 price refiners charge (*see* §IV.A., *infra*) – soared $0.25 per gallon in a week and by

23

---

24 [5]   Unless noted otherwise all emphasis is added and citations are omitted.

25 [6]   *See also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699
26 (1962) ("[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. . . .  The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").

27 [7]   References to "¶__" or "¶¶__" are to the AC, unless otherwise noted.

28

PLAINTIFF'S OPPOSITION TO DEFS' JOINT        - 4 -        3:15-cv-01749-L-BGS
MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT

1    more than $1.00 within a month while the crude oil costs remained low and
2    nationwide gasoline prices rose only moderately.  ¶11.  As the AC alleges, regulators
3    recognized that none of the explanations typically proffered explain the difference
4    between gas prices in California and the rest of the country, which had grown to
5    between two and three times larger than the "normal premium."  *Id.*; *see also* ¶97.
6    Parallel price spikes occurred again in February 2016 when Tesoro, Chevron, Valero
7    and Phillips all raised the prices at their branded stations in unison.  ¶81.  With these
8    specific allegations of parallel pricing conduct, Plaintiff now only has to has to
9    provide plausible circumstantial evidence of conspiracy, when viewed in the light
10   most favorable to Plaintiff, to nudge the Complaint across the line from possible to
11   plausible.  *Twombly*, 550 U.S. at 570.

12          **2.      Parallel Shutdowns in 2012 and 2015**

13          Based on data from the Energy Information Administration, the AC alleges that
14   Defendants created false shortages of gasoline supply by refusing to release available
15   capacity when refineries were taken off-line.  ¶3.  This action, depriving Defendants
16   of profits during a time of short supply, is against Defendants' economic interests and
17   does not make sense absent an agreement.  The AC adds facts that refiners embraced a
18   parallel strategy of coordinated restraints of refinery capacity designed to and having
19   the effect of increasing margins as advocated by the American Petroleum Institute.
20   ¶17.  The AC also adds public statements by Defendants recognizing the benefits
21   supply constraints had on their bottom lines, which  served as  signals to other
22   refiners.   ¶18.   For example, Tesoro's CEO stated in May 2015 that refinery
23   disruptions are "very supportive to the margin environment there."  ¶18.  Around the
24   same time, Chevron made similar comments, stating "unplanned industry downtime
25   and tight product supply" increased earnings by $435 million.  ¶19.  The following
26   quarter, Chevron reiterated that tight product supply on the West Coast boosted
27   refinery margins.   ¶20.   Valero similarly signaled that supply constraints from

28

continuing refinery outages "will really determine how strong the West Coast market will be." ¶21. And the CEO of PBF Energy, the company that purchased Exxon's Torrance refinery, stated that "Exxon probably had made a decision that they were not going to run a single refinery operation in the state of California." ¶24.

### 3. Parallel Supply Restraints Through Increasing Gasoline Exports and Decreasing Imports

The AC details West Coast refiners' record exports of gasoline during times when gas prices in California were much higher than the rest of the nation. ¶¶55-74. Defendants ignore these allegations because they are exactly the type of actions against economic interest which tend to exclude the possibility of independent action and are classic indicators of conspiratorial conduct.[8] Plaintiff references a detailed factual analysis conducted by Consumer Watchdog concluding that Exxon failed to use its Jones Act tanker to import gasoline to California to relieve a gas shortage, even though the tanker went to Singapore (where Exxon has a refinery that produces California grade fuel), returned to California with fuel, and then left to deliver it to Florida. ¶¶59-60, 64-67. Further, the AC alleges that "oil companies like Chevron and Phillips 66 shipped about 100 million gallons (42 gallons per barrel) of gasoline" between late June to late July 2015. ¶¶63, 70-71. The AC also adds that as exports were increasing in June and July of 2015, California's refineries halted imports which further drained the state's gasoline inventories. ¶62. Contrary to Defendants' bare assertions and excuses (or, in many cases, lack of excuses), these are specific acts, with the who, what, when where and why *Twombly* requires.

### 4. Parallel Refusal to Provide Information

Defendants' refusal to comply with government inquiries furthers the lack of transparency to the public and regulators in California's refinery industry and

---

[8] *See Merck-Medco Managed Care v. Rite Aid Corp.*, No. 98-2847, 1999 WL 691840, at \*10 (4th Cir. 1999) (such evidence is "perhaps the strongest plus factor indicative of a conspiracy").

1  facilitates collusion.  ¶¶72-73.  Refiners have refused to appear before the legislature

2  in Sacramento.  ¶50.  Indeed, in December 2014 and February 2015, PMAC requested

3  company-specific data from the California Energy Commission but the Western State

4  Petroleum Association ("WSPA") – whose members include all of the named

5  defendants save Alon – refused.[9]  ¶26.  WSPA again refused to testify in October

6  2015 when PMAC requested publicly-unavailable information concerning industry

7  responses to supply chain disruptions.  ¶¶27-28.  By May 2016, California's Attorney

8  General – whose Antitrust Chief is a PMAC member – issued subpoenas against every

9  defendant here save BP West and Alon seeking information on gasoline supplies,

10  pricing and refinery shutdowns.[10]  ¶29.  Though refiners have refused to testify and

11  maintain strict control over data concerning their operations such as gasoline supply

12  and refinery status, this information is known between refiners through their use of

13  exchange agreements which signal refinery status and supply.  ¶73; *see also* ¶56.

14  **B.     Plaintiff Provides Numerous Plus Factors Supporting a
            Plausible Inference of Conspiracy**

15

16  **1.     Defendants' Sustained and Historically
            Unprecedented Profits Coupled with Historic
            Differentials Between Wholesale and Retail Prices in
17          California and Historic Price Differentials Between
            California and the Rest of the Country All Support an
18          Inference of Conspiracy**

19      The AC provides detailed information regarding the unprecedented profits

20  reaped by Defendants during the class period.  ¶¶12-14, 18-20, 22-23, 44-45, 75-80,

21  97.  The evidence shows that Defendants reaped windfall profits in May and October

22  of 2012 compared to their expected profits based on oil prices and inventories.  ¶¶44-

23  45.  In 2015, rather than compete and attempt to gain market share by passing along

24  some portion of the low crude oil prices to consumers, Defendants instead maintained

25  their agreement and jointly reaped record profits.  ¶¶75-76.  In the summer of 2015

26  ―――――――――――――――

27  [9]    https://www.wspa.org/member-list.

28  [10]   Published reports suggest other unnamed entities have been subpoenaed.  ¶29 n.26.

alone, Defendants raked in an average of 88.8 cents per gallon of gasoline, compared with an average of 49.3 cents per gallon from 1999 to 2014.  ¶¶79-80. And in 2016, despite the fact that wholesale prices for California gasoline were the lowest in the nation, the prices charged to gas stations and retail prices for gasoline were the highest in the country.  This discrepancy between wholesale and retail gas prices was the second highest in history following the Great Recession's spread in October 2008. ¶77.  Ordinarily, the difference between retail prices and wholesale prices is 88 cents, but in the summer of 2016, drivers were paying $1.58 more than the wholesale price, providing a windfall for Defendants.  ¶78. Defendants again only make fringe attacks on these allegations, unable to come up with any possible story (aside from conspiracy) that makes any sense for this extreme market dislocation.

### 2. Defendants' Pretextual Explanations Support an Inference of Conspiracy

There are allegations that tend to show Defendants have provided pretextual explanations related to their conduct.  As one example, the industry blamed a May 2012 price spike on a February 2012 fire at the Cherry Point refinery, but the length of delay between the decline in available gas and the price spike was far outside of historical norms.  ¶31.  The AC adds evidentiary details concerning repeated refinery outages in 2012, each used as a part of a larger scheme to drive up prices and accrue windfall profits, including regulatory findings that certain shutdowns resulted from "willful" violations.  ¶¶32-47; *see also* ¶29.  The AC alleges that in 2012 NOx data indicated that refiners were continuing to operate plants and produce gasoline, contradicting Defendants' maintenance and outage reports, and that prices rose even while Defendants' supplies were increasing.  ¶42; *see also* ¶¶31-41.  The NOx emissions levels plausibly demonstrate that Defendants either had a production agreement and/or an agreement to allocate production targets over time to artificially keep supply low and keep prices high.  Either is an agreement in restraint of trade and in furtherance of the conspiracy.  Once again, Defendants offer no plausible

PLAINTIFF'S OPPOSITION TO DEFS' JOINT      - 8 -              3:15-cv-01749-L-BGS
MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT

1   alternative explanation for how this could have possibly happened, nor can they do

2   anything but ignore these allegations.  Similarly, willful refinery outages used to

3   increase prices, which Defendants cannot and do not explain away, persisted in 2015.

4   ¶¶49-54.  For example, Tesoro refused to operate its refinery during a strike even

5   though its CEO had stated that it was comfortable running the refinery with the

6   reduced staffing levels.  ¶48; *see also* ¶63 ("But former employees of one of those

7   plants reported they've been kept open during previous, similar labor disputes and

8   could have stayed open this year, too.").  Moreover, following the shutdown of

9   Exxon's Torrance refinery, which supplied some 10% of California's gasoline, other

10  refineries moved their maintenance schedules forward.  This move restrained supplies

11  and made little economic sense in a competitive market, where one would expect a

12  rational competitor to maintain or increase supply to take advantage of higher prices

13  and the ability to gain market share.  ¶50.  Defendants again provide no reasonable

14  rationale for this behavior.  Additionally, the AC (as compared to the original

15  Complaint) adds details from regulators who determined that Exxon *willfully* failed to

16  take actions necessary to eliminate hazardous conditions, increasing the chances of a

17  supply disruption.  ¶¶51-52.

18          **3.    Defendants' Actions Against Their Self Interest
                    Including Massive Exports During Shortages Are a
19                  Plus Factor**

20          Defendants, against any rational economic action, exported gasoline *from*

21  *California to other states* when California's prices were the highest in the nation.

22  Moreover, other Defendants shut down refineries when prices were high from other

23  refinery closures and several defendants were found to be willfully reckless in taking

24  care of refineries, so much so that the CEO of the company who purchased Exxon's

25  refinery stated that Exxon appeared to *not operate* its refinery in California.  ¶24.

26  These actions make little economic sense but for the existence of a conspiracy to

27  restrain supply.

28

1205757_2   PLAINTIFF'S OPPOSITION TO DEFS' JOINT        - 9 -              3:15-cv-01749-L-BGS
            MOTION TO DISMISS PLAINTIFF'S FIRST
            AMENDED COMPLAINT

As to refinery outages, the AC alleges that during the 2012 price spikes, rather than postpone scheduled but unnecessary maintenance, refineries did not take advantage of the rising prices but instead chose to decrease supply by taking their plants off line.  ¶¶3-4.  Further, the AC alleges that there was sufficient inventory on hand to make up for the shortfall.  ¶¶3, 6 ("During these periods inventories were either increasing or remaining level at historic five-year averages during the highest price spikes.").  These allegations point to a concerted decision to restrict supply to heighten margins and realize supracompetitive profits as Defendants' employees have repeatedly stated.  *See supra* §III.B.2.  The allegations of conspiracy are all the more compelling because in a competitive market (even with oligopolies), firms respond to price increases by increasing supply.  Here, contrary to market incentives, and despite historic and sustained margins, just the opposite happened.

### 4.    The Amended Complaint Alleges Market Conditions that Support the Inference of a Conspiracy

The AC alleges that the market for gasoline in California is highly concentrated. The structure of California's gas markets including high entry barriers (¶¶83-86), demand inelasticity (¶¶87-89, 91) and high concentration (¶¶90-96) facilitate agreements such as the supply restrictions and price-fixing as alleged herein. Defendants do not dispute the existence of these characteristics.

### 5.    The High Levels of Inter-Firm Communications Through Exchange Agreements, Trade Associations and Information Sharing Is a Plus Factor

The AC adds facts showing that Defendants have rampant inter-firm communications which include *inventory and pricing information*.  One particularly troubling form of information sharing was through "exchange agreements," which were agreements between Defendants whereby one refinery contracts with another for the purchase of gasoline under certain circumstances, such as outages.  This practice not only acts to stabilize the price of gasoline, but also allows each party to see

PLAINTIFF'S OPPOSITION TO DEFS' JOINT       - 10 -                    3:15-cv-01749-L-BGS
MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT

1  inventory levels and other sensitive market information such as how long a refinery

2  would be offline.  ¶¶56, 73.

3        Additionally, the AC adds allegations that Defendants had other avenues to

4  exchange pricing information including through OPIS and Platts, two market

5  intelligence companies that report gasoline pricing information and provide

6  defendants with a platform to monitor price and supply.  ¶¶108-109.  Moreover, the

7  AC adds further details about Defendants' membership in and attendance at meetings

8  held by the WSPA, the American Petroleum Institute, the American Fuel &

9  Petrochemical Manufacturers, the Society of Independent Gasoline Marketers of

10  America and the Petroleum Marketers Association of America.  ¶¶98-107.  The AC

11  alleges that Defendants are all members of "an interconnected group of trade

12  associations" that provide "numerous opportunities for Defendants to conspire."  ¶98.

13  The AC also sets forth specific details alleging the dates of certain meetings (¶¶101-

14  105) while alleging that various trade organizations are "dominated and controlled by

15  the Defendants" who "have conspired amongst themselves to use these trade

16  organizations to engage in anticompetitive discussions involving pricing, supply and

17  production levels."  ¶99.  Further, the AC details the massive expenditures Defendants

18  have made in lobbying efforts and have worked together to promote interests of the

19  industry through coordinated lobbying.  ¶107.

20        **6.**    **The California Attorney General's Investigation into**

21              **Collusion in the Petroleum Industry, Testimony at the PMAC and Defendants' Refusal to Appear Before the**

22              **Committee Supports a Reasonable Expectation that Discovery Will Reveal Evidence of an Illegal**

23              **Agreement**

24        After Plaintiff's Complaint was filed, in May 2016, California's Attorney

25  General Kamala Harris subpoenaed Defendants Exxon, Chevron, Tesoro, Shell,

26  Valero and Phillips seeking information about gasoline supplies, pricing and refinery

27  shutdowns that could create supply shortages.  ¶29.  The subpoena further reinforces

28  the plausibility of Plaintiff's claim because Kathleen Foote, Senior Assistant Attorney

PLAINTIFF'S OPPOSITION TO DEFS' JOINT    - 11 -          3:15-cv-01749-L-BGS
MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT

General and Antitrust Chief at the California Attorney General's Office, is one of PMAC's members.[11]  As alleged, the California Energy Commission established the PMAC, a panel of experts, to analyze gas prices and the impacts on consumers.  ¶25.  Indeed, PMAC has expressed concern about the magnitude and duration of the price spikes that have impacted California's markets since 2015.  ¶97.  The WSPA has refused calls to appear before PMAC further strengthening the inference of conspiracy.[12]  That California's Attorney General – whose Chief Antitrust attorney sat on the committee that reviewed the presentation Defendants submit for judicial notice – chose to subpoena information related to the claims in Plaintiff's first complaint reinforces "a reasonable expectation that discovery will reveal evidence of an illegal agreement."[13]  *Twombly*, 550 U.S. at 556; Defendants' Request for Judicial Notice in Support of Defendants' Joint Motion to Dismiss Plaintiff's First Amended Complaint ("Defs' RJN"), Ex. 3 (Dkt. No. 81-7).

## IV.    ARGUMENT

### A.    Defendants' Arguments Against Parallel Conduct Are Weak

Defendants speciously contend that no allegations of  parallel conduct are alleged.  Defs' Mot. at 8-9.  This is false.  The Court's prior opinion plainly recognized that the Complaint alleged parallel conduct, particularly stair-step pricing conduct as the entire opinion is based on this premise, stating "certain plus factors are required to distinguished permissible parallel conduct from impermissible

---

[11]  http://newsroom.haas.berkeley.edu/news-release/california-energy-commission-appoints-energy-institute-haass-severin-borenstein-chair.

[12]  *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226, 59 S. Ct. 467, 474 (1939) (in analyzing the inferences of conspiracy to be drawn from a refusal to testify "[s]ilence then becomes evidence of the most convincing character").

[13]  Plaintiff requested any materials produced to the Attorney General from the Attorney General's office, but were denied any documents.  Defendants have also rejected all requests for information related to the ongoing California investigation. The Court too denied a request to compel Defendants to produce the documents to Plaintiff.  Dkt. No. 73.

1    conspiracy." Order at 7. It further held that in the initial Complaint Plaintiff had not
2    alleged "sufficient facts to 'nudge [its] claim[] across the line from conceivable to
3    plausible.'" Order at 11 (citing *Twombly*, 550 U.S. at 570). Here, Plaintiff has
4    provided additional, significant evidence of parallel conduct in 2012, 2015 and 2016
5    along with multiple plus factors that plainly move the needle from possible to
6    plausible. *Supra* §III.A.1-4; *see also* ¶¶34, 57, 77-78, 81.

7        Defendants single out an allegation (¶81) regarding simultaneous price
8    increases charged to branded stations in February 2016, claiming that plaintiff omitted
9    a portion of the press release purportedly explaining the reason for the simultaneous
10   increase. Defs' Mot. at 9-10. However, the article suggests that the simultaneous
11   increase in gas prices was suspicious and not entirely explained by the change from
12   winter to summer blend gasoline. *See* Sletten Decl., Ex. 2 (Dkt. No. 81-6). The
13   article notes that unbranded stations, such as Costco, had not yet increased their prices
14   and would not do so for a few days despite the fact that the transition to summer
15   blends of gasoline was effective as of the date of the article (February 25, 2016). *Id.*
16   Moreover, Defendants' counter factual narrative (filled with pretextual explanations
17   for their conduct) conflicts with the AC's allegation that California's reformulated
18   gasoline blend does not account for the price spikes in 2015. ¶97. Defendants'
19   argument is factual and inappropriate for resolution at this stage. *See Brennan v.*
20   *Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1133 (N.D. Cal. 2005) ("Whatever [the]
21   merits of these [procompetitive] arguments, they are intrinsically factual . . . and
22   inappropriate for resolution at the motion to dismiss stage.").

23       Without any authority, unmoored from common sense, Defendants also assert
24   that increases to average retail prices cannot provide evidence of collusion. Defs'
25   Mot. at 8-9. But the very materials Defendants submit confirm that "price spikes at
26   refinery wholesale level quickly transferred through to distribution terminals and
27   retail." *Compare* Sletten Decl., Ex. 3 at 40 of 41 (Dkt. No. 81-7) *with* ¶57.
28

Defendants' argument also ignores that "the high degree of vertical integration between the refining and marketing sectors" such that the average prices charged at retail reflect changes in prices at the refinery level. ¶95. Moreover, in a price-fixing conspiracy involving many of the Defendants here, the Ninth Circuit considered the expert's findings concerning average retail gas prices and concluded that "'wholesale [gas] prices play a major part in an decision to set retail prices, and we therefore can assume the defendants' wholesale prices had a tendency to follow a similar pattern.'" *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.* ("*Petroleum Prods. II*"), 906 F.2d 432, 442 n.4 (9th Cir. 1990) (citing *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 656 F. Supp. 1296, 1300 (C.D. Cal. 1986)).   Thus, Plaintiff plausibly alleges a conspiracy by referring to both retail and wholesale gas prices.

## B.   Plaintiff Adequately Alleges Numerous Plus Factors Probative of Conspiracy

Because Plaintiff has plausibly alleged parallel conduct by Defendants, the next stage of analysis involves the assessment the multiple, compelling "plus factors" Plaintiff alleges that add to the plausibility calculus.   "Plus factors coupled with parallel conduct can take a complaint from merely possible to plausible." *In re Musical Instruments & Equip. Antitrust Litig*, 798 F.3d 1186, 1194 n.7 (9th Cir. 2015) (citing *In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999)).[14]   As Judge Alsup recently held, "Our court of appeals explained that 'plus factors' are 'economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action'   A court must 'consider each purported plus factor in turn and cumulatively to determine whether plaintiffs have alleged

---

[14]   Defendants' citation to *In re Beef Ind. Antitrust Litig.*, 907 F.2d 510, 514 (5th Cir. 1990), is misguided.   In that appeal from a grant of summary judgment, there was no evidence related to parallel conduct.   Moreover, the pre-*Twombly* decision also found that various significant pricing factors existed to explain the uniformity of beef prices and that the cattlemen plaintiffs had failed to produce related to those factors during the summary judgment proceedings. *Id.*

PLAINTIFF'S OPPOSITION TO DEFS' JOINT MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT       - 14 -       3:15-cv-01749-L-BGS

nonconclusory facts sufficient to state a [Section 1] claim.'" *B & R Supermarket, Inc. v. Visa, Inc.*, No. C 16-01150 WHA, 2016 U.S. Dist. LEXIS 136204, at *19 (N.D. Cal. Sept. 30, 2016) (citing *Musical Instruments*, 798 F.3d at 1194).

### 1. Defendants' Sustained and Historically Unprecedented Refinery Margins Point to Collusion

As detailed in §III.B.1, the abnormal profits, variance with national prices and wholesale-retail spreads alleged all point to collusion. *See Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*, No. C 04-2266 JW (PVT), 2009 U.S. Dist. LEXIS 14330, at *6 (N.D. Cal. Feb. 5, 2009) (finding that if the defendant's profits proved extraordinary, it "can be circumstantial evidence of a conspiracy to fix – or otherwise artificially inflate – prices); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 804-05 (1946) (recognizing that extraordinary profits during a period of declining costs followed by reduced prices when new competition made itself felt, constituted "circumstantial evidence of the existence of a conspiracy").

Defendants bizarrely refer to these facts as "inflammatory allegations" (Defs' Mot. at 14). These allegations of extreme profiteering derive from publicly-available information, including Defendants' own earnings data. Relying on a series of cases outside of this Circuit, Defendants contend that evidence of excess profits "alone in no way suggests collusion as to pricing."[15] This argument fails for two reasons. First, Plaintiff is not relying on evidence of excess profits ***alone***. Rather, the anomalous profits during periods of spikes in gas prices is but one factor of many. Second, this is an incorrect statement of the law, and each of the cases Defendants cite is inapposite. *Chas. Pfizer & Co*. involved the criminal "beyond a reasonable doubt" standard. 367 F. Supp. at 101. In *Baby Food*, which involved the summary judgment standard of review, there was no evidence of extraordinary profits, as there is here. 166 F.3d at

---

[15]  Defs' Mot. at 14 (citing *In re Baby Food Antitrust Litig*., 166 F.3d 112, 134-35 (3d Cir. 1999); *Reserve Supply Corp. v. Owens Corning Fiberglass Corp.*, 799 F. Supp. 840, 844 (N.D. Ill. 1990), *aff'd*, 971 F.2d 37, 52 (7th Cir. 1992); *U.S. v. Chas. Pfizer & Co*., 367 F. Supp. 91, 101 n.14 (S.D.N.Y. 1973)).

1    134.  Rather, the expert simply opined that the interest of enhancing profits motivated

2    the defendants to conspire without making any reference to the evidence in the case.

3    *Id.*[16]

4            Here, Plaintiff alleges Defendants' profits were anomalous given such factors as

5    oil prices (*i.e.*, declining costs), inventories, wholesale gas prices, and historical profit

6    margins.  ¶¶12-14, 18-20, 22-23, 44-45, 75-80, 97.  Defendants offer no explanation

7    for the supracompetitive prices and extraordinary profits.  Instead, they isolate a single

8    allegation stating that California's reformulated gasoline requirements do not explain

9    the 2015 price spikes, and, citing another case involving the summary judgment

10   standard, they contend that supracompetitive prices "may be" the result of "'rational,

11   independent decision-making, as opposed to unlawful concerted action.'"  Defs' Mot.

12   at 14-15 (citing *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 397 (3d

13   Cir. 2015)).  But this is irrelevant.  Here, however, the supracompetitive prices are not

14   explained by California's reformulated gasoline requirements, and the AC contradicts

15   exactly that, alleging that California's reformulated gasoline rules do not explain the

16   price spikes alleged.  ¶97.

17           **2.    Defendants' Arguments Against Their Pretextual**
                     **Explanations Are Flawed**

18

19           Defendants fault Plaintiff for not pointing to a statement that the price spikes in

20   2012 "resulted solely from a supply shortage caused by unplanned refinery outages."

21   Defs' Mot. at 16.  This misses the point.  There is no such requirement that pretextual

22   explanations must be wholly false.  And in fact, Defendants' authorities support

23   ────────────────────

24   [16]  In *Reserve Supply*, another summary judgment case, the court in fact stated that the
     argument about the probative value of supracompetitive profits "might have merit" if
25   there had been evidence of joint action on the part of the defendants, which was not
     found in that case.  *Reserve Supply*, 799 F. Supp. at 844.  Moreover, citing to *Estate of*
26   *Le Baron*, the court suggested that profits could be probative of collusion if there were
     evidence they were anomalous, as Plaintiff has shown here.  *Id.* ([The plaintiff's]
27   allegations suffer from a lack of meaningful analysis in terms of . . . whether the
     producers reaped profits 'during a period of declining costs . . . .'") (citing *Estate of Le*
     *Baron v. Rohm & Haas Co.*, 441 F.2d 575, 578 (9th Cir. 1971)).
28

PLAINTIFF'S OPPOSITION TO DEFS' JOINT      - 16 -                3:15-cv-01749-L-BGS
MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT

Plaintiff.  In *City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 133-34 (D.D.C. 2006), the court noted that "pretextual reasons given for a defendant's actions can give rise to an inference of a conspiracy in certain cases."  *Id*. at 133.   In *Moundridge* the court declined to enjoin certain gas companies because in that case, unlike here, plaintiffs provided "no evidence to rebut the claim that the hurricanes affected the price of natural gas or even to show that the defendants lied about the reason for the increase in the price of natural gas." *Id*. at 134.  Here, Plaintiff has set forth compelling economic evidence as well as numerous plus factors supporting the allegations regarding Defendants' pretextual explanations.   Defendants also cite *Chocolate Confectionary*, 801 F.3d at 411, an affirmance of a summary judgment opinion that makes the unremarkable statement that "pretext alone does not create a reasonable inference of a conspiracy."  Of course, Plaintiff is not relying on pretext alone.

Unlike Defendants' inapposite cases, *In re Linerboard Antitrust Litig*., 504 F. Supp. 2d 38 (E.D. Pa. 2007), is instructive.  There, the plaintiffs alleged that a defendant "invited" its competitors to increase prices by using a strategy of taking "market downtime" at its plants to reduce production and inventory of linerboard. *Id*. at 42.  Defendants did in fact take downtime at their plants, but their executives made public statements to the effect that the downtime was undertaken to reduce excessive inventories. *Id*. at 57.  Plaintiffs alleged that this explanation was pretextual.  The court explained that "evidence of pretextual explanations for price increases or output restrictions, 'if believed by a jury, would disprove the likelihood of independent action.'" *Id*. at 53 (quoting *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 474 (3d Cir. 1985)).

### 3.  Defendants' Arguments on Their Economically Irrational Exports Are Flawed

Contrary to Defendants' contention, the Court did not already reject Plaintiff's allegations regarding actions taken by Defendants that were against their self-interest.

1   *See* Defs' Mot. at 12.  Rather, the Court, addressing different, more limited allegations

2   regarding actions taken in late 2014 found that the allegations, "could therefore be

3   described as 'rational, legal business behavior.'"  Order at 9.  But the new allegations

4   in the AC are not simply focused on actions in December 2014, but instead provide a

5   detailed examination of Defendants' suspect conduct that are contrary to each

6   Defendant's economic self-interest.  The AC explains – in detail – how in order to

7   decrease supplies of gasoline in California (and thus ensure continued high prices)

8   Defendants exported large amounts of gas out of the state.  The AC details how in

9   2015, while a shortage was gripping the state, Exxon sent a Jones Act tanker (with

10  California-formulated gas) all the way to Singapore and back to Los Angeles without

11  ever unloading its gasoline despite the high prices there.  ¶65.  The AC explains that

12  Exxon's failure to resupply the California market, when it easily could have, occurred

13  while other companies like Chevron were exporting gasoline from California to

14  further diminish supply, suggesting a collusive effort to manipulate the gasoline

15  market and drive up profits.  A review of Lands Commission records further revealed

16  that while gas prices in California were skyrocketing during the summer of 2015,

17  Chevron was exporting about 250 million gallons of gas.  ¶69.  Evidence of collusion

18  can be seen because these exports, during a time of rising prices, do not make sense

19  from an economic standpoint unless they were done as part of a large conspiracy.

20  Why forgo profits at home by exporting gas when the market is clamoring for a

21  supply and prices are high?

22       Defendants characterize the low inventory reserves, suspicious refinery outages,

23  reduced imports and increased exports allegations as independent.  Defs' Mot. at 19-

24  23.  In this vein, they claim the AC does not allege improper coordination.  Defs' Mot.

25  at 19.  But Defendants ignore the statements refiners repeated on the benefit of supply

26  restrains to their bottom line.  ¶¶18-21.  These statements echo the strategy of

27  reducing refining capacity the American Petroleum Industry articulated for the

28

PLAINTIFF'S OPPOSITION TO DEFS' JOINT      - 18 -                3:15-cv-01749-L-BGS
MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT

industry in 1998.  ¶17.  Further, the strategy of supply restrictions to benefit margins works only if all follow through, further supporting the plausibility of an agreement.

Throughout their brief, Defendants inject improper factual questions on "undisputed regulatory requirements," import-export data and the causes of the prices. Defs' Mot. at 21-23; Defs' RJN, Ex. 3 at 130 (Dkt. No. 81-7 at 31 of 41).  Such arguments are inappropriate before discovery especially since Defendants refer to a presentation that presents import data for the entire West Coast.  *Id.*  Further, on the next page, this presentation shows ***exports*** of gasoline from California were 600% higher in February 2015 and almost double in March 2015 what they were in 2014. Defs' RJN, Ex. 3 at 131 (Dkt. No. 81-7 at 32 of 41); *see also id.* at 6 (reformulated prices differences between California and the rest of the country are almost twice as high as the prior high).

This is similar to the situation in the recent *Airline* case where plaintiffs argued that evidence related to defendants' efforts to limit capacity on domestic flights (which relied heavily on public statements about the importance of limiting available seats to restrict supply in order to increase price) was evidence of actions against their self-interest.  "While this behavior may be explained by other factors . . . it is at least some evidence that supports Plaintiffs' claim that this trend was the result of Defendants' collusion to limit capacity growth."  *In re Domestic Airline Travel Antitrust Litig.*, No. 15-mc-01404-CKK, MDL Dkt. No. 2656, slip op. (D.D.C. Oct. 28, 2016), at 23.

As Plaintiff alleges, Defendants' illicit profits are the direct result of their agreement to constrain supply and/or inject uncertainty into the market through, *inter alia*, Exxon's decision not to use its available tanker to resupply the market after its Torrance refinery's shutdown created a gasoline shortage in Southern California. Exxon and the other large refiners in California calibrated the imports and exports of gasoline to inflate gasoline prices and corporate profits artificially.  Moreover, refiners

1  hid information about imports and exports to create an unnecessarily volatile gas

2  market in order to drive up prices.[17]

3        Defendants' response to these new and detailed allegations is not to engage

4  these allegations, but rather to discount the source of the information and blithely

5  claim the details do not add substance to the AC.  And Defendants ignore that

6  regulators found Exxon's outage to be willful.  Exxon's deliberate recklessness is

7  probative of Plaintiff's allegations that Exxon had decided not to run its refinery in

8  2015.  ¶24.  Again, these acts are probative of Defendants' agreement and strategy to

9  reduce supply.

10        Defendants also wrongly claim the Court has already determined issues related

11  to exports, ignoring the significant new factual allegations added in the AC.  Plaintiff

12  has added pages of detailed information regarding exports of gasoline being used as a

13  means by which Defendants drove up prices in 2015.  *See* ¶¶55-74.  The Court's

14  previous order found the earlier – much more limited allegations – to be "factually

15  insufficient."  Order at 9.  The new and fully developed facts regarding exports

16  suggest Defendants acted against their economic interest in a manner more consistent

17  with a conspiracy.

18        Defendants' scheme of artificially inflating prices through supply constraints

19  and pretextual and willful refinery outages is highly reminiscent of the conspiratorial

20  conduct in *Petroleum Prods.*  There, the plaintiffs argued that the defendant refineries,

21  many of which are defendants here, engaged in scheme to reduce the domestic supply

22  of petroleum products in part by means of an exchange of information concerning

23  projected supply and demand.  *Petroleum Prods. II*, 906 F.2d at 460.  Like the

24  statements by the Defendants here (*see* ¶¶18-21, 24), the plaintiffs in *Petroleum*

25  _____

26  [17]  Defendants' argument that Plaintiff has conceded that Exxon imported enough
gasoline to cover its contractual allegations misses the point.  Def's Mot. at 13.  There

27  is no allegation that Exxon in fact imported enough gasoline to meet its obligations,
only that it would do so when it was in jeopardy of failing to meet its contracts.  *See*

28  ¶67.

PLAINTIFF'S OPPOSITION TO DEFS' JOINT        - 20 -        3:15-cv-01749-L-BGS
MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT

*Products II* pointed to, *inter alia*, a statement by a Shell official who concluded that a "'conservative' program of refinery expansion would avoid 'throwing surplus products into the market place,'" and an Exxon memorandum which "noted that Exxon considered the 'spare capacity problem to be the single most important problem facing the refining segment of our business over the next several years." 906 F.2d at 462.  The Ninth Circuit reversed the district court's decision granting summary judgment in favor of defendants, finding that "the evidence supports the conclusions that (1) in the early 1970s several of the [defendants] began taking steps to reduce excess capacity; (2) they did so with the intent and effect of reducing the strength of the independent sector of the market; (3) during this period the [defendants] exchanged information concerning supply forecasts and production levels, and (4) the shortage of refining capacity, as well as the foreign activities of several of the [defendants] . . . resulted in supply shortages and upward price pressure." *Id.* at 463.

### 4.   Defendants' Arguments Against Market Structure Are Incorrect

Courts recognize that market concentration and evidence of supracompetitive prices support the plausibility of a price-fixing conspiracy.  *See In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1145 (N.D. Cal. 2009) (citing *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) ("*SRAM*")); *see also Behrend v. Comcast Corp.*, 532 F. Supp. 2d 735, 739-40, 742 (E.D. Pa. 2007) (court considered allegations as to market structure and barriers to entry).  As they did before, Defendants claim that allegations regarding characteristics of the market cannot support a finding of plausibility.  *See* Defs' Mot. at 10. Allegations regarding the market structure, however, do not stand alone.  When placed in context and considered along with the other detailed plus factors alleged, these allegations support Plaintiff's position.  *See e.g.*, ¶¶83-86, 97-98.

The recent *Airline* case is instructive.  In *Airline*, the court upheld plaintiffs' complaint and found market structure allegations factors to consider in evaluating

PLAINTIFF'S OPPOSITION TO DEFS' JOINT MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

- 21 -

3:15-cv-01749-L-BGS

1   plaintiffs' claims.  "While Plaintiffs' general allegations regarding the nature of the

2   airline industry do not serve as conclusive proof of an antitrust conspiracy, the

3   consolidation within the market, the concentration of common stockowners,

4   Defendants' ability to monitor other airlines' fare structure and pricing, and past

5   industry practice of using CMIs are all factors that the Court considers at this stage of

6   the proceeding in reaching its determination as to whether Plaintiffs sufficiently pled a

7   plausible antitrust conspiracy."  *Airline*, slip op., at 17.  This Court's Order did not

8   discount Plaintiff's market structure allegations, but instead merely found such

9   allegations do "not necessarily suggest an illegal agreement."  Order at 10.

10       Defendants falsely claim Plaintiff "concedes that the California market structure

11   generated perfectly lawful pricing during December 2012 through December 2014."

12   Defs' Mot. at 11.  This is a gross mischaracterization of the AC.  Plaintiff has brought

13   suit claiming two conspiratorial periods based on a good faith basis supported by

14   numerous facts and analysis.  Plaintiff has never conceded that the period from

15   December 2012 through December 2014 was "perfectly lawful" but instead, mindful

16   of their obligations under the federal rules and this Court's Order, pleaded only the

17   conduct for which it has factual and legal support.  This is not a concession, but

18   instead proper pleading.[18]

19       **5.   Defendants' Arguments Against Information**
          **Exchanges and Trade Associations Are Inapt**

20

21       Defendants argue that the California Supreme Court's decision in *Aguilar v.*

22   *Atlantic Richfield Co.*, 25 Cal. 4th 826 (Cal. 2001), found exchange agreements to

23   have procompetitive benefits but ignore that decision was made on a fully developed

---

24   [18]   *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 U.S.
      Dist. LEXIS 7516, at *76-*77 (N.D. Cal. Jan. 21, 2014) (rejecting defendants'
25   arguments regarding the length of the class period, stating that gaps during the class
      period "reflect, at most, problems of proof that Plaintiffs may face at a later stage" of
26   the proceedings, that sparse allegations during the class period can be "plausibly
      explained by increased care and efficiency in the operation of the conspiracy," and
27   that "[n]othing in the pleadings requires the Court to conclude that the alleged
      conspiracy abruptly ceased to operate in this period.").

28

PLAINTIFF'S OPPOSITION TO DEFS' JOINT         - 22 -         3:15-cv-01749-L-BGS
MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT

1    summary judgment record.  Defs' Mot. at 23-24.  Moreover, the Ninth Circuit

2    recognized that exchange agreements could be used to facilitate coordinated activity

3    had the *Gilley* state court decision not been preclusive.  *Gilley Enters. v. Atl. Richfield*

4    *Co.*, 588 F.3d 659, 665 (9th Cir. 2009); *see also Petroleum Prods. II*, 906 F.2d at 462.

5         While it is true, as the Court noted in its Order, that "'[m]ere participation in

6    trade-organization meetings where information is exchanged and strategies are

7    advocated does not suggest an illegal agreement.'"  Order at 10 (citing *Musical*

8    *Instruments*, 798 F.3d at 1196).  Plaintiff pleads more that simple participation.  As in

9    *B & R Supermarket*, "[t]he amended complaint here, however, alleges more than mere

10   participation.  Combined with the other plus factors discussed herein, the allegations

11   regarding opportunities to collude support the plausibility of the impermissible

12   conspiracy alleged."  *B & R Supermarket*, 2016 U.S. Dist. LEXIS 136204, at *13.

13   Here, Plaintiff details how the defendants are members of interconnected trade

14   organizations, dominated and controlled by Defendants that provide a venue for

15   conspiratorial conduct to flourish.  Plaintiff provides the dates and locations of

16   meetings and conferences attended by Defendants prior to and following the price

17   spikes in May and October 2012, as well as in 2014, 2015 and 2016.  ¶¶98-105.

18   These allegations support an inference of conspiracy.  *See In re WellPoint, Inc. Out-*

19   *of-Network "UCR" Rates Litig.*, 865 F. Supp. 2d 1002, 1026 (C.D. Cal. 2011).

20        Plaintiff's allegations regarding industry information exchange services are

21   similarly supportive of the conspiracy alleged.  While Defendants attempt to

22   downplay participation in these services, the AC alleges that these information-

23   sharing services allow Defendants to share price information and as a place to signal

24   one another on matters of price.  "Through OPIS, Defendants are able to share and

25   access real time information about spot fuel gasoline prices, wholesale rack fuel

26   prices, and retail fuel prices."  ¶108.  Defendants do not deny that Platts and OPIS

27   allow them access to pricing information.  Nor do they deny that they use these

28

PLAINTIFF'S OPPOSITION TO DEFS' JOINT          - 23 -          3:15-cv-01749-L-BGS
MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT

services.  Instead, Defendants cite out-of-Circuit cases that stand for the unremarkable proposition that exchange of price data alone is not enough to allow an inference of an agreement to fix prices.  *See Baby Food*, 166 F.3d at 126; *see also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 906-07 (6th Cir. 2009) (finding access to an information clearinghouse did not provide agents with information to collude on commission rates before such reductions occurred because such information was not available through the service).  In concert with the other, numerous plus factors alleged in the AC, allegations regarding trade group participation and Defendants' involvement with Platts and OPIS  supports denial of Defendants' motion.

### 6.   Defendants' Arguments Against California's Investigations into Refinery Pricing Fail

The Attorney General's investigation, which included subpoenas to Exxon, Chevron, Tesoro, Shell, Valero and Phillips, therefore provides support for Plaintiff's conspiracy claims.[19]  While it is true that government investigations standing alone, will not satisfy an antitrust plaintiff's pleading burden, "such evidence may, however, be used to bolster the plausibility of §1 claim, as Plaintiff has done in the instant case."  *Milliken & Co. v. CNA Holdings, Inc.*, No. 3:08-CV-578, 2011 U.S. Dist. LEXIS 87677, at *39-*40 (W.D.N.C. Aug. 8, 2011) (citing *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324-25 (2d Cir. 2010) (finding that investigations by New York State Attorney General and DOJ Antitrust into defendants' price-fixing support plausibility of §1 claim)); *In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005) ("A plaintiff may surely rely on governmental investigations, but must also . . . undertake his own reasonable inquiry and frame his complaint with

---

[19]   The Attorney General is the State's chief law enforcement officer and has a duty to see state laws are enforced, and is specifically authorized to bring actions.  The Attorney General also possesses broad pre-litigation powers under California Government Code section 11180, *et seq.* to investigate and prosecute actions concerning: (a) all matters relating to the business activities and subjects under the jurisdiction of the department; (b) violations of any law or rule or order of the department; and (c) such other matters as may be provided by law.

allegations of his own design."). Here, the fact that the Attorney General has issued subpoenas to Defendants related to the very allegations central to Plaintiff's complaint provides support for a finding of collusive conduct.

## V.   LEAVE TO AMEND SHOULD BE GRANTED IF THE COURT GRANTS ANY PART OF DEFENDANTS' MOTION

Should the Court determine that the AC is in any way deficient, Plaintiff respectfully requests leave to amend. "Denial of a request to amend is only proper when it 'would be clearly frivolous, unduly prejudicial, cause undue delay or a finding of bad faith is made.'" *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, No. 15-cv-00595-BAS (MDD), 2016 WL 739797 at *1 (S.D. Cal. Feb. 25, 2016) (citing *United Union of Roofers, Waterproofers and Allied Trades No. 40 v. Ins. Corp. of Am.*, 919 F.2d 1398, 1402 (9th Cir. 1990)).

Defendants argue futility but make no showing amendment would be futile. Defs' Mot. at 24. Because the results of California's Attorney General's investigation have not yet been made public and because additional meetings of the PMAC will be held to assess competition and disruptions in California's gasoline markets, Plaintiff respectfully requests leave to amend should the Court find the AC wanting.

## VI.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety or, at a minimum, allow Plaintiff to amend should any part of the AC be dismissed.

DATED: November 11, 2016             ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                     PATRICK J. COUGHLIN
                                     DAVID W. MITCHELL
                                     ALEXANDRA S. BERNAY
                                     CARMEN A. MEDICI
                                     CARISSA J. DOLAN


                                          s/ Patrick J. Coughlin
                                     PATRICK J. COUGHLIN

PLAINTIFF'S OPPOSITION TO DEFS' JOINT          - 25 -          3:15-cv-01749-L-BGS
MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
ARMEN ZOHRABIAN
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

Attorneys for Plaintiff

1205757_2

PLAINTIFF'S OPPOSITION TO DEFS' JOINT
MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT

- 26 -

3:15-cv-01749-L-BGS