# EXHIBIT 1

Exhibit 1
Page 1

BakerHostetler

Baker&Hostetler LLP

2929 Arch Street
Cira Centre, 12th Floor
Philadelphia, PA 19104-2891

T 215.568.3100
F 215.568.3439
www.bakerlaw.com

Carl W. Hittinger
direct dial: 215.564.2898
chittinger@bakerlaw.com

April 25, 2019

**VIA E-MAIL**

Alexandra S. Bernay, Esq.
Robbins Gellar Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
GasRefiners@rgrdlaw.com

George C. Aguilar, Esq.
Robbins Arroyo LLP
5040 Shoreham Place
San Diego, CA 92122
ConsumerPlaintiffs@robbinsarroyo.com

*Re: Persian Gulf, Inc. v. BP West Coast Products, LLC, et al., No. 3:15-cv-01749-L-AGS*
*Bartlett v. BP West Coast Products, LLC, et al., No. 18-cv-01374-L-AGS*

Dear Counsel:

We are providing this letter in connection with the production by Alon USA Energy, Inc. ("Alon") of documents Bates-numbered ALON0000001 through ALON0005858. The production includes filings by Alon with the Securities and Exchange Commission, press releases issued by Alon, and transcripts of investor conference calls. It also includes an agreement to sell gasoline to Shell Oil Products US, a letter terminating that agreement, and reports generated from Alon's database showing (a) Alon's inventory of gasoline in California during the relevant time period, (b) Alon's gasoline sales in California during the relevant time period, (c) Alon's production of gasoline at its California refineries during the relevant time period, (d) Alon's purchases of gasoline in California during the relevant time period, (e) Alon's financial information pertaining to its California operations during the relevant time period, and (f) maintenance records pertaining to Alon's California refineries during the relevant time

*Atlanta Chicago Cincinnati Cleveland Columbus Costa Mesa Denver*
*Houston Los Angeles New York Orlando Philadelphia Seattle Washington, DC*

Exhibit 1
Page 2

period. Please note that the documents Bates numbered ALON0003663 through ALON0005858 have been designated "Confidential – For Counsel Only" pursuant to the protective order.

Alon is producing documents in the foregoing categories without strict regard for the relevant time period because they provide useful context and it is not unduly burdensome for Alon to do so. However, this production by Alon does not waive, and is made without prejudice to, Alon's asserted objection(s) to searching for or producing other documents outside the time period relevant to this litigation. Alon is also producing some documents that contain information about petroleum products that are not relevant to this litigation—which concerns only California gasoline—to facilitate the expeditious production of documents responsive to the plaintiffs' discovery requests. Again, the production of such documents in this instance does not waive, and is made without prejudice to, Alon's asserted objection(s) to searching for or producing other documents or information not relevant to Alon's refining of gasoline in California.

In the following paragraphs, we provide you with a road map to this document production in order to call your attention to specific aspects of the documents demonstrating that the allegations in plaintiffs' complaints with respect to Alon are simply not consistent with the history of Alon's refining operations in California. We also note that the contents of the documents are consistent with Alon's verified interrogatory answers served on April 22, 2019.

## A. GUIDE TO ALON'S DOCUMENT PRODUCTION

Alon acquires Paramount and Long Beach refineries in 2006, producing principally asphalt

The documents indicate that, in 2006, Alon acquired Paramount Petroleum Corporation, including a heavy crude oil refinery in Paramount, California, and Edgington Oil Company, including a heavy crude oil refinery in Long Beach, California (collectively, these two Los Angeles-area refinery facilities, which were connected to each other via pipeline, will be referred to as "Paramount").[1] The Paramount facility was a "hydroskimming" refinery, but the Long Beach facility was a lower-complexity "topping" refinery that produced asphalt as its only finished product, with the remainder of its output being vacuum gas oil.[2] In the late 2000s, the bulk of the crude oil refined at Alon's two California refineries was converted to asphalt, fuel oil, and sulfur, with the remainder converted to higher value products (including gasoline, diesel fuel, and jet fuel) and unfinished products.[3]

Because asphalt was the principal finished product of Alon's California refineries, Alon primarily and consistently operated those refineries to optimize asphalt production in response to conditions in the asphalt market, according to the documents. Refinery throughput was increased or decreased based on demand for asphalt and asphalt production costs (including Alon's cost to

[1] ALON0000282-83; ALON0002634-35.
[2] ALON0000441.
[3] *E.g.*, ALON0000283-84.

purchase crude oil). It appears that Alon even shut down Paramount on occasion during the "low season" for asphalt demand, as warranted by the economics of operating its facilities when the demand for asphalt was low and the cost of producing asphalt was high.[4]

In an effort to realize higher margins by improving the refineries' yield of lighter finished products and reducing the yield of unfinished products, the documents indicate that Alon began to explore the possibility of designing and building a hydrocracker at Paramount, in the hope of bringing the hydrocracker on-line in late 2010.[5] However, Alon did not proceed with the costly project of designing and building a hydrocracker at Paramount when the opportunity arose to purchase an existing refinery facility in Bakersfield that already included a hydrocracker.[6] Both when Alon was evaluating building a new hydrocracker and when it was evaluating how to configure the existing hydrocracker in Bakersfield, in trying to improve its refineries' yield of lighter finished products, Alon consistently prioritized distillate fuel oil—principally diesel fuel—rather than gasoline, according to the documents.[7]

Alon acquires inactive Bakersfield refinery in 2010
to process vacuum gas oil from Paramount in Bakersfield hydrocracker

The documents show that in June 2010, Alon purchased the Bakersfield refinery ("Bakersfield") from Big West of California, LLC, a subsidiary of Flying J, Inc., through a bidding process in the context of Flying J's bankruptcy.[8] According to press reports, Big West had shut down Bakersfield in January 2009 when its parent company's bankruptcy filing made it impossible to procure sufficient crude oil supplies to continue operations.[9] But whatever the reason, the refinery was not operating when Alon acquired it in 2010.[10]

Bakersfield was a "coking" refinery, with equipment for different processes including distillation, hydrocracking, and coking.[11] During the process of acquiring and restarting Bakersfield, the documents indicate that Alon consistently stated its intentions for the facility. It would not be used to refine crude oil; instead, Bakersfield would be run as part of an integrated refinery operation with Paramount, and it would be used for its hydrocracking capacity to further refine the vacuum gas oil produced in Paramount's asphalt-production operations into lighter

---

[4] ALON0002668; ALON0002680; ALON0003159; ALON0003172, 3173-74; ALON0003185-86; ALON0003199; ALON0003211; ALON0003246-47; ALON0003264; ALON0000900; ALON0003326-27; ALON0003343; ALON0003358, 3360; ALON0002907; ALON0003376, 3378, 3384-85.
[5] ALON0000283; ALON0003092; ALON0003108, 3116, 3117.
[6] ALON0002784.
[7] ALON0003165; ALON0002751; ALON0003217-18; ALON0003249; ALON0003290-91; ALON0003312; ALON0003331; ALON0003367; ALON0003382.
[8] ALON0002747; ALON0002751; ALON0002768; ALON0002784.
[9] "Big West could sell this summer," Bakersfield.com, May 13, 2009 (accessed at https://www.bakersfield.com/news/memo-big-west-could-sell-this-summer/article_53e75b2f-be3e-5117-9164-425a6fb086ab.html).
[10] ALON0003202-03 (discussing the steps Alon would need to take to "get the plant up and running").
[11] ALON0001095.

finished products such as diesel fuel, jet fuel, and gasoline.[12] Alon relied on rail or trucks to transport the vacuum gas oil to Bakersfield, as there was no available pipeline connection.[13]

Alon operates Bakersfield hydrocracker from June to December 2011

The documents also provide a chronology of Alon's operations in Bakersfield. After acquiring Bakersfield, Alon made capital expenditures of approximately $52 million to complete the work needed to integrate the Bakersfield hydrocracker unit with Alon's Paramount operations.[14] Alon first started the reconfigured Bakersfield hydrocracker in late June 2011 and began processing vacuum gas oil from Paramount.[15] Although Alon thereby succeeded in increasing its overall light product yields in California, it determined that the Bakersfield hydrocracker's performance could be improved with minor revisions, so it announced in November 2011 that it had scheduled a two-week shutdown of Bakersfield for that purpose in December.[16]

Because of low margins in its primary asphalt market, the documents show, Alon made the decision to shut down *all* of its California refineries in December 2011, with the expectation of restarting them early in the second quarter of 2012.[17] During the winter season, it was more economical for Alon to supply its asphalt business by purchasing low-cost product from other suppliers and by shipping asphalt from its own refinery in Big Spring, Texas, which had access to less expensive crude oil.[18] By March 2012, Alon was preparing to restart the California refineries as planned, but it was constrained by a 30- to 45-day lead time to purchase the crude oil needed to restart Paramount.[19]

Alon operates Bakersfield hydrocracker from June to November-December 2012

The documents indicate that with the advent of high-demand asphalt season, Alon was able to restart Paramount in April 2012 and then—once Paramount was again producing vacuum gas oil as a feedstock for the Bakersfield hydrocracker—restarted Bakersfield in June 2012.[20] By November 2012, however, Alon announced its decision to suspend all refining operations in California once again because of poor conditions in the asphalt market.[21] Alon shut down operations at Paramount in late October 2012 and at Bakersfield in November-December 2012.[22]

---

[12] ALON0003199; ALON0003232; ALON0003298; ALON0002872.
[13] ALON0003217; ALON0003250; ALON0003276, 3281; ALON0003298; ALON0003312.
[14] ALON0001167.
[15] ALON0002843; ALON0003276; ALON0002860; ALON0002861; ALON0003290; ALON0001120.
[16] ALON0002872; ALON0003309, 3312.
[17] ALON0002883; ALON0003326-27.
[18] ALON0003326.
[19] ALON0003329-30.
[20] ALON0002893; ALON0003343; ALON0002900; ALON0003358.
[21] ALON0002907; ALON0003376, 3378.
[22] ALON0002914; ALON0001361.

<u>Alon has not refined crude oil in California since 2012</u>

In late 2012, Alon began to explore the possibility of transporting light crude oil from the mid-continent into California to enable Bakersfield to operate independently from Paramount, according to the documents. Alon's stated intention was to be able to refine crude oil in Bakersfield instead of depending on a supply of vacuum gas oil from Paramount, thereby freeing itself of the cost of transporting the gas oil from Paramount to Bakersfield, as well as the economic vagaries of asphalt production on the West Coast.[23] To refine crude oil at Bakersfield, Alon planned to operate the vacuum distillation unit at that refinery after performing the necessary turnaround work to bring it back on-line since it had been idle since before Alon acquired it, as well as continuing to operate the hydrocracker.[24] To implement this plan, Alon submitted permit applications to develop a rail terminal at Bakersfield and ship light mid-continent crudes into Bakersfield by rail.[25] However, those plans never came to fruition, and Alon did not process crude oil in California after 2012.[26] Because of delays and difficulties in obtaining the necessary permits to develop a rail terminal, among other reasons, Alon was not able to implement its plan to bring light mid-continent crude oil to California, and operations at Bakersfield (as well as Paramount) were never restarted.[27]

## B. COMPARISON WITH ALLEGATIONS IN THE COMPLAINTS

All of the information set forth above is publicly available on the internet; accordingly, you, as plaintiffs' counsel, could—and should—have reviewed it before filing the complaints. Moreover, you likely did review the bulk of this information, or at least had it in your possession, because the plaintiffs appear to have produced in this litigation many of the same documents that we have collected and relied on for purposes of this letter. And numerous articles in the public press, particularly the local press in Bakersfield, cover the same subject matter in a manner consistent with the documents produced by Alon. Therefore, we fail to understand why you would sign pleadings that are contradicted by facts that you knew or should have known at the time.

Paragraph 4 of Persian Gulf's First Amended Complaint[28] alleges, "In May and October 2012, while certain refineries were dealing with purportedly unplanned refinery outages, other Defendants acted against their economic self-interest by not postponing scheduled maintenance." This allegation—perhaps the key allegation underpinning the complaints—is totally inconsistent with the timeline of Alon's California operations. The documents indicate that Alon took all of its refining operations off-line in December 2011, restarted them in the period from April to June

[23] ALON0003378-79, 3380-82.
[24] ALON0003384.
[25] ALON0002907; ALON0002914; ALON0003392.
[26] ALON0002255, 2257; ALON0003499; ALON0003029.
[27] ALON0002993; ALON0003525, 3530; ALON0002383; ALON0002509.
[28] We cite only to Persian Gulf's First Amended Complaint in this letter because the allegations of the Consolidated Complaint in the *Bartlett* matter are substantially identical to Persian Gulf's allegations.

2012, and did not shut them down again until November-December 2012. Further, there is no evidence set forth to support the allegation that Alon "postponed" any "scheduled maintenance" at Bakersfield during the period from May to October 2012, as Bakersfield was in operation from May 2012 onward.

Paragraph 9 alleges, "In addition to the 2012 spikes, there is significant evidence that Defendants again engaged in anticompetitive conduct in late 2014 through the present." Given that Alon did not conduct refining operations in California after December 2012, this allegation has no conceivable application as to Alon, which could not have engaged in anticompetitive conduct (or reaped any real benefit) in a market in which it no longer participated.

Paragraph 37 contains a chart characterized as describing "suspicious plant closings in 2012," which includes the sole allegation anywhere in the complaint attributing specific conduct to Alon. As to Alon, that chart states:

| Date | Company | Refinery | Amount of Statewide Capacity | Type of Outage | Claimed Reason | Industry Sources |
|---|---|---|---|---|---|---|
| 4/20/12 | Alon | Bakersfield | 3.2% | Planned | Hydrocracker restarted | No information |

The allegation that Alon initiated a planned shutdown of Bakersfield on April 20, 2012 for the "claimed reason" of "hydrocracker restarted" is simply false. As the documents show, Alon shut Bakersfield down temporarily in December 2011—well before any of the allegedly "suspicious plant closings" noted in ¶ 37—to perform additional work on a hydrocracker that had just been restarted in June 2011 after a prolonged period of inactivity that began under the facility's prior owner. Further, Alon shut down *all* of its California refining operations in December 2011 because of adverse conditions in the asphalt market, and by spring 2012 it was bringing those operations back on line, not shutting them down for a planned restart of the Bakersfield hydrocracker. In short, the timeline of Alon's California refining operations bears no relationship to the other purported events contained in the chart in ¶ 37 and does not reasonably support any inference of conspiracy or concerted action with other defendants. (We note that the comparable chart in ¶ 54, which purports to identify "suspicious plant closings in 2015," does not mention Alon at all. That is as it should be, since Alon had ceased refining operations in California at the end of 2012.)

Paragraph 112 alleges that "Defendants have decreased production, *i.e.*, supply, by going forward with unnecessary maintenance procedures when other refineries were inoperable due to purportedly unplanned outages." For the same reasons stated above, this allegation makes no sense, particularly as applied to Alon. According to the documents, Alon had planned to take the

Bakersfield hydrocracker—which was not even refining crude oil, but rather vacuum gas oil from Paramount—off-line in December 2011 for approximately two weeks to improve its performance. But Alon also took Paramount off-line in December 2011 because of poor margins for Paramount's main product, asphalt. And without vacuum gas oil as a byproduct from Paramount to serve as the feedstock for the Bakersfield hydrocracker, there was no reason for Alon to bring Bakersfield back on line until there was an economic justification for restarting operations at Paramount. That had occurred by the following spring of 2012, and the refineries were then promptly restarted. Thus, the documents do not contain any evidence that supports the allegation that Alon "decreased production" by engaging in "unnecessary maintenance procedures"—or any maintenance procedures—when other refineries were supposedly not operating.

Paragraph 137 alleges that Alon, along with the other defendants, "is a participant in the California gasoline refinery market." Even when Persian Gulf originally filed this case in 2015, that statement had already been inaccurate for two and a half years, since Alon had not refined oil in California since the end of 2012.

## C. LACK OF CONTRARY EVIDENCE IN PLAINTIFFS' DISCOVERY RESPONSES OR DOCUMENT PRODUCTIONS

After reviewing plaintiffs' interrogatory answers and document productions to date, we have seen no evidence that contradicts the timeline set forth in the publicly available documents concerning Alon and described above. The only potential source that we have seen for the false allegation that Alon shut down Bakersfield on April 20, 2012 is the McCullough Research memorandum of June 5, 2012 entitled "Analysis of West Coast Gasoline Prices."[29] The second page of that document includes a table somewhat similar to the chart set forth at ¶ 37 of Persian Gulf's First Amended Complaint and appears to state that Alon shut down Bakersfield on April 20, 2012 because "Hydrocracker Restared" [*sic*]. However, the McCullough document cites to no other source for that information, and none is evident to us in plaintiffs' document productions.

Regardless of where—if anywhere—McCullough Research obtained this inaccurate information concerning Alon, you possessed ample, publicly available documentation informing you, as officers of the court, that it was incorrect at the time you filed the operative complaints in these lawsuits. Similarly, the plaintiffs have produced no documentary or other evidentiary support for any of their allegations as to Alon. Plaintiffs appear to acknowledge, correctly, that the California Attorney General did not subpoena Alon in connection with investigations into gasoline prices in California (Persian Gulf First Amended Complaint, ¶ 29). And even during the relatively short period when it was a participant in the California gasoline refining market, Alon

[29] PG0039343-47. As far as we can tell, this McCullough document does not appear in the indirect purchaser plaintiffs' production.

does not appear to have had a significant share of the total gasoline refining capacity in the state, let alone on the West Coast.

In light of these considerations, we question whether the factual contentions about Alon in these complaints that you signed "have evidentiary support or … will likely have evidentiary support after a reasonable opportunity for further investigation or discovery," as required by Federal Rule of Civil Procedure 11(b)(3). On the contrary, it appears to us that you knew or should have known when the complaints were filed that the factual contentions concerning Alon had no evidentiary support and no reasonable prospect of garnering evidentiary support in the future. **We request, therefore, that you immediately dismiss all claims against Alon, with prejudice.**

If plaintiffs are unwilling to dismiss their claims against Alon, we will assume that to mean that plaintiffs have some evidence to support their factual contentions that they have not yet disclosed or produced in response to Alon's written discovery requests. In that event, we believe it would be incumbent on the parties to meet and confer one final time concerning those requests before Alon files a motion to compel to point out these serious deficiencies to Magistrate Judge Schopler. As we discussed last week, we would suggest holding that meet-and-confer during the week of April 29th. Please let us know some days and times that would be convenient for you, either during that week or early the following week.

Thank you for your anticipated prompt response.

Sincerely,

Carl W. Hittinger

# EXHIBIT 2

Exhibit 2
Page 10

Table of Contents

---

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2007**

**OR**

☐ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM ________________ TO ________________.**

**Commission file number: 001-32567**

# ALON USA ENERGY, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **74-2966572** |
|---|---|
| (State of incorporation) | (I.R.S. Employer Identification No.) |
| **7616 LBJ Freeway, Suite 300, Dallas, Texas** | **75251** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (972) 367-3600

Securities registered pursuant to Section 12 (b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $0.01 per share | New York Stock Exchange |

Securities registered pursuant to Section 12 (g) of the Act: None

Indicate by check mark if the registrant is a well-known, seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer ☐ | Accelerated filer ☑ | Non-accelerated filer ☐<br>(Do not check if a smaller reporting company) | Smaller reporting company ☐ |
|---|---|---|---|

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). Yes ☐ No ☑

The aggregate market value for the Registrant's common stock held by non-affiliates as of June 30, 2007, the last day of the Registrant's most recently completed second fiscal quarter was $476,724,814.

As of March 1, 2008, 46,808,444 shares of the registrant's common stock, $0.01 par value, were outstanding.

Documents incorporated by reference: Proxy statement of the registrant relating to the Registrant's 2008 annual meeting of stockholders, which is incorporated into Part III of this Form 10-K.

---

ALON0000273

ALON0000274

Exhibit 2
Page 12

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| PART I | | |
| ITEMS 1. AND 2. | BUSINESS AND PROPERTIES | 1 |
| ITEM 1A. | RISK FACTORS | 22 |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS | 30 |
| ITEM 3. | LEGAL PROCEEDINGS | 30 |
| ITEM 4. | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 30 |
| PART II | | |
| ITEM 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASE OF EQUITY SECURITIES | 31 |
| ITEM 6. | SELECTED FINANCIAL DATA | 33 |
| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 35 |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 66 |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 67 |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 67 |
| ITEM 9A. | CONTROLS AND PROCEDURES | 67 |
| ITEM 9B. | OTHER INFORMATION | 68 |
| PART III | | |
| ITEM 10. | DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT | 69 |
| ITEM 11. | EXECUTIVE COMPENSATION | 69 |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 69 |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 69 |
| ITEM 14. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 69 |
| PART IV | | |
| ITEM 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 70 |

First Amendment to Second Amended and Restated Credit Agreement
Subsidiaries
Consent of KPMG LLP
Certification of Chief Executive Officer Pursuant to Section 302
Certification of Chief Financial Officer Pursuant to Section 302
Certification of CEO and CFO Pursuant to Section 906

Table of Contents

# PART I

## ITEMS 1. AND 2. BUSINESS AND PROPERTIES.

***Statements in this Annual Report on Form 10-K, including those in Items 1 and 2, "Business and Properties," and Item 3, "Legal Proceedings," that are not historical in nature should be deemed forward-looking statements that are inherently uncertain. See "Forward-Looking Statements" in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 for a discussion of forward-looking statements and of factors that could cause actual outcomes and results to differ materially from those projected.***

## COMPANY OVERVIEW

In this Annual Report, the words "we," "our" and "us" refer to Alon USA Energy, Inc. and its consolidated subsidiaries or to Alon USA Energy, Inc. or an individual subsidiary, and not to any other person.

We are a Delaware corporation formed in 2000 to acquire the Big Spring, Texas refinery and related pipeline, terminal and marketing assets from Atofina Petrochemicals, Inc., or FINA. In 2006, we acquired three additional refineries in Paramount and Long Beach, California and Willbridge, Oregon, together with the related pipeline, terminal and marketing assets, through the acquisitions of Paramount Petroleum Corporation and Edgington Oil Company. As of December 31, 2007, we operated 307 convenience stores in Central and West Texas and New Mexico, primarily under the 7-Eleven and FINA brand names. Our convenience stores typically offer merchandise, food products and motor fuels. Our principal executive offices are located at 7616 LBJ Freeway, Suite 300, Dallas, Texas 75251, and our telephone number is (972) 367-3600. Our website can be found at www.alonusa.com.

On July 28, 2005, our stock began trading on the New York Stock Exchange under the trading symbol "ALJ." We are a controlled company under the rules and regulations of the New York Stock Exchange because Alon Israel Oil Company, Ltd. ("Alon Israel") owns approximately 72.3% of our outstanding common stock. Alon Israel, an Israeli limited liability company, is the largest services and trade company in Israel. Alon Israel entered the gasoline marketing and convenience store business in Israel in 1989 and has grown to become a leading marketer of petroleum products and one of the largest operators of retail gasoline and convenience stores in Israel. Alon Israel is a controlling shareholder of Blue Square Israel, Ltd., a leading retailer in Israel, which is listed on the New York Stock Exchange and the Tel Aviv Stock Exchange and also of Dor Alon Energy in Israel, a leading Israeli marketer, developer and operator of gas stations and shopping centers.

We file annual, quarterly and current reports and proxy statements, and file or furnish other information, with the Securities Exchange Commission ("SEC"). Our SEC filings are available to the public over the Internet at the SEC's web site at www.sec.gov. In addition, we make our SEC filings available free of charge through our internet website at www.alonusa.com as soon as reasonably practicable after we electronically file, or furnish, such material with the SEC. In addition, we will provide copies of our filings free of charge to our stockholders upon request to Alon USA Energy, Inc., Attention: Investor Relations, 7616 LBJ Freeway, Suite 300, Dallas, Texas 75251. We have also made the following documents available free of charge through our internet website at www.alonusa.com:

- Compensation Committee Charter;
- Audit Committee Charter;
- Corporate Governance Guidelines; and
- Code of Business Conduct and Ethics.

We submitted our annual certification concerning corporate governance to the New York Stock Exchange on May 21, 2007 pursuant to section 303A.12(a) of the New York Stock Exchange Listed Company Manual.

**BUSINESS**

We are an independent refiner and marketer of petroleum products operating primarily in the South Central, Southwestern and Western regions of the United States. Our four sour and heavy crude oil refineries are located in Texas, California and Oregon and have a combined throughput capacity of approximately 170,000 barrels per day ("bpd"). Our refineries produce petroleum products including various grades of gasoline, diesel fuel, jet fuel, petrochemicals, petrochemical feedstocks, asphalt, and other petroleum-based products.

Following the acquisitions of Paramount Petroleum Corporation and Edgington Oil Company in 2006, we began reporting our operating results in three operating segments: (i) refining and marketing, (ii) asphalt and (iii) retail. Additional information regarding our operating segments and properties is presented in Note 6 to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

**Refining and Marketing**

Our refining and marketing segment includes three sour and heavy crude oil refineries that are located in Big Spring, Texas, and Paramount and Long Beach, California. We operate the two California refineries as one integrated refinery. These three refineries have a combined throughput capacity of approximately 158,000 bpd. At these refineries we refine crude oil into petroleum products, including gasoline, diesel, jet fuel, petrochemicals, feedstocks and asphalts, which are marketed primarily in the South Central, Southwestern and Western United States.

*Big Spring Refinery*

Our Big Spring refinery has a crude oil throughput capacity of 70,000 bpd and is located on 1,306 acres in the Permian Basin in West Texas. In industry terms, our Big Spring refinery is characterized as a "cracking refinery." Major processing units at our Big Spring refinery include fluid catalytic cracking ("FCC"), naphtha reforming, vacuum distillation, hydrotreating and alkylation units.

On February 18, 2008, an explosion in the area of the propylene splitter unit of the Big Spring refinery destroyed the propylene recovery unit and damaged equipment in the alkylation and gas concentration units. The cause of the explosion has not yet been determined. Our Big Spring refinery has not resumed operations since the explosion, but our current expectation is to resume partial operations by the end of March 2008.

Our Big Spring refinery has the capability to process substantial volumes of less expensive high-sulfur, or sour, crude oils to produce a high percentage of light, high-value refined products. Typically, sour crude oil has accounted for approximately 92.0% of the Big Spring refinery's crude oil input.

Our Big Spring refinery produces gasoline, ultra low sulfur diesel, jet fuel, petrochemicals, petrochemical feedstocks, asphalt and other petroleum products. This refinery typically converts approximately 90.0% of its feedstock into finished products such as gasoline, diesel, jet fuel and petrochemicals, with the remaining 10.0% primarily converted to asphalt and liquefied petroleum gas.

During each full year of operations since our acquisition from FINA, we have averaged over 90% utilization of our Big Spring refinery's crude oil throughput capacity. The following table summarizes historical throughput and production data for our Big Spring refinery:

Table of Contents

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2007 | | 2006 | | 2005 | |
| | Bpd | % | Bpd | % | Bpd | % |
| Refinery throughput: | | | | | | |
| Sour crude | 58,607 | 86.0 | 58,529 | 89.4 | 55,643 | 86.0 |
| Sweet crude | 5,017 | 7.4 | 2,987 | 4.6 | 5,072 | 7.8 |
| Blendstocks | 4,521 | 6.6 | 3,897 | 6.0 | 4,040 | 6.2 |
| Total refinery throughput (1) | 68,145 | 100.0 | 65,413 | 100.0 | 64,755 | 100.0 |
| Refinery production: | | | | | | |
| Gasoline | 32,135 | 47.5 | 29,671 | 46.0 | 29,499 | 45.8 |
| Diesel/jet | 19,676 | 29.1 | 20,651 | 32.0 | 21,903 | 34.0 |
| Asphalt | 7,620 | 11.3 | 6,147 | 9.5 | 5,824 | 9.1 |
| Petrochemicals | 3,980 | 5.9 | 4,465 | 6.9 | 4,256 | 6.6 |
| Other | 4,190 | 6.2 | 3,627 | 5.6 | 2,911 | 4.5 |
| Total refinery production (2) | 67,601 | 100.0 | 64,561 | 100.0 | 64,393 | 100.0 |
| Refinery utilization (3) | 92.5% | | 90.8% | | 94.3% | |

(1) Total refinery throughput represents the total of crude oil and blendstock inputs in the refinery production process.

(2) Total refinery production represents the bpd of various finished products produced from processing oil and other refinery feedstocks through the crude unit and other conversion units at our Big Spring refinery.

(3) Refinery utilization represents average daily crude oil throughput divided by crude oil capacity, excluding planned periods of downtime for maintenance and turnarounds. In March 2005, we expanded the crude oil throughput capacity of the Big Spring refinery from 62,000 bpd to 70,000 bpd.

Refinery throughput and production for 2007 reflects the effects of downtime associated with a scheduled reformer regeneration in January 2007, scheduled maintenance in the third quarter of 2007 and restrictions on throughput caused by limited hydrogen production due to operational issues in the catalytic reformer which were resolved by a reformer regeneration completed in January 2008. Refinery throughput and production for 2006 reflects the effects of downtime associated with a planned turnaround in May 2006 for the installation and start-up of equipment to permit the Big Spring refinery to satisfy the ultra low sulfur diesel standards of the U.S. Environmental Protection Agency ("EPA") and of reduced crude oil capacity due to a restriction in the crude vacuum tower heater during the months of June to December of 2006. Due to the vacuum tower heater restriction, average refinery throughput for the last two quarters of 2006 was 67,400 bpd compared to 70,529 bpd for the first quarter of 2006. Refinery throughput and production for 2005 reflects the effect of the downtime associated with a planned major turnaround and refinery expansion in the first quarter 2005. Following the expansion, refinery throughput increased to an average of 70,419 bpd for the last three quarters of 2005, compared to an average throughput of 47,447 bpd for the first quarter 2005.

*Big Spring Refinery Raw Material Supply*

Sour crude oil has typically accounted for more than 90% of our crude oil input at the Big Spring refinery, of which approximately 93% was West Texas Sour ("WTS") crude oil. In late 2006, we began to use different crudes and feedstocks shipped from the Texas Gulf Coast on the Amdel pipeline to diversify our crude sources and to improve production yields. As a result, in 2007 WTS decreased to approximately 77% of the Big Spring Refinery's sour crude oil input. Our Big Spring refinery is the closest refinery in proximity to Midland, Texas, which is the largest origination terminal for West Texas crude oil. We believe this location provides us with the lowest transportation cost differential for West Texas crude oil of any refinery.

Approximately 68% of our Big Spring refinery's crude oil input requirements are purchased through term contracts with several suppliers, including major oil companies. These term contracts are generally short-term in nature with arrangements that contain market-responsive pricing provisions and provisions for renegotiation or cancellation by either party. A small amount of locally gathered crude oil is also delivered directly to our Big

Table of Contents

Spring refinery. The remainder of the Big Spring refinery's crude oil input requirements are purchased on the spot market. In addition, access to the Amdel and White Oil pipeline gives us the ability to optimize our refinery crude slate by transporting foreign and domestic crude oils to our Big Spring refinery from the Gulf Coast when the economics for processing those crude oils are more favorable than processing locally-sourced crude oils. Other feedstocks, including butane, isobutane and asphalt blending components, are delivered by truck and railcar, and a majority of our natural gas is delivered by a pipeline in which we own a 63% interest.

*Crude Oil Pipelines*

We receive WTS crude oil and West Texas Intermediate ("WTI"), a light sweet crude oil, primarily from regional common carrier pipelines. We also have access to offshore domestic and foreign crude oils available on the Gulf Coast through the Amdel and White Oil pipelines. This combination of access to Permian Basin crude oil and foreign and offshore domestic crude oil from the Gulf Coast allows us to optimize our Big Spring refinery's crude oil supply at any given time. The crude oil pipelines we utilize consist of the following:

| Crude Oil Pipelines | Status | Miles | Connections |
|---|---|---|---|
| Amdel | Sunoco Throughput | 504 | Midland and Nederland |
| White Oil | Sunoco Throughput | 25 | Garden City (Amdel) and Big Spring |
| Mesa Interconnect | Owned | 4 | Mesa pipeline and Big Spring |
| Centurion | Owned (leased to Centurion) | 3 | Centurion pipeline and Big Spring |

The 504-mile bi-directional Amdel pipeline and the 25-mile White Oil pipeline connect our refinery to Nederland, Texas, which is located on the Gulf Coast, and to Midland, Texas. Permian Basin crude oil is delivered to our Big Spring refinery through the 4-mile long, 16-inch diameter Mesa Interconnect pipeline which is connected to the Mesa pipeline system, a common carrier, and through our 3-mile long, 12-inch diameter connection pipeline which is leased to Centurion Pipeline L.P. ("Centurion") and connected to the Centurion 12-inch and 8-inch diameter pipeline system from Midland, Texas to Roberts Junction in Texas.

On March 1, 2006, we sold our Amdel and White Oil crude pipelines, which had been inactive since December 2002, to an affiliate of Sunoco, Inc. ("Sunoco"), for a total consideration of approximately $68.0 million. In conjunction with the sale of the Amdel and White Oil pipelines, we entered into a 10-year pipeline Throughput and Deficiency Agreement with Sunoco, with an option to extend the agreement by four additional thirty-month periods. The Throughput and Deficiency Agreement allows us to maintain crude oil transportation rights on the pipelines from the Gulf Coast and from Midland, Texas to the Big Spring refinery. Pursuant to the Throughput and Deficiency Agreement, we have agreed to ship a minimum of 15,000 bpd on the pipelines during the term of the agreement. We commenced shipments of crude oil through the Amdel and White Oil pipelines under this agreement in October 2006.

To further diversify crude oil delivery sources to our Big Spring refinery, we entered into a 15-year arrangement with Centurion in June 2006. Pursuant to this arrangement, Centurion will provide us with crude oil transportation pipeline capacity, and we ship a minimum of 21,500 bpd of crude oil from Midland, Texas to our Big Spring refinery using Centurion's approximately 40-mile long pipeline system from Midland to Roberts Junction and our 3-mile pipeline from Roberts Junction to the Big Spring refinery which we lease to Centurion. We commenced shipments of crude oil through these pipelines in November 2006.

*Big Spring Refinery Production*

*Gasoline.* In 2007, gasoline accounted for approximately 47.5% of our Big Spring refinery's production. We produce various grades of gasoline, ranging from 84 sub-octane regular unleaded to 93 octane premium unleaded, and use a computerized component blending system to optimize gasoline blending. We intend to complete our ultra low sulfur gasoline project in the third quarter of 2009 following which our gasoline produced at the Big Spring refinery will comply with the EPA's ultra low sulfur gasoline standard of 30 parts per million ("ppm"). Our Big Spring refinery is capable of producing specially formulated fuels, such as those required in the El Paso, Dallas/Fort Worth and Arizona markets.

Table of Contents

*Distillates*. In 2007, diesel and jet fuel accounted for approximately 29.1% of our Big Spring refinery's production. Following completion of our ultra low sulfur diesel project in May 2006, all of the on-road specification diesel fuel we produce meets the EPA's ultra low sulfur diesel standard of 15 ppm. Our jet fuel production conforms to the JP-8 grade military specifications required by the Air Force bases to which we market our jet fuel.

*Asphalt*. Asphalt accounted for approximately 11.3% of our Big Spring refinery's production in 2007. Approximately 62.0% of our Big Spring refinery's asphalt production is blended paving grades and 38.0% is asphalt blendstocks. We have an exclusive license to use FINA's asphalt blending technology in West Texas, Arizona, New Mexico and Colorado and a non-exclusive license in Idaho, Montana, Nevada, North Dakota, Utah and Wyoming. Exclusivity under this fully-paid license remains in effect as long as we continue to purchase our rubber modifiers from FINA, although we may purchase rubber modifiers from other sources and maintain such exclusivity if FINA does not provide competitive pricing on these products. Because FINA ceased supplying rubber modifiers in the United States in the first quarter of 2005, we have been purchasing rubber modifiers from other sources since that time. Our asphalt facilities are capable of producing up to 29 different product formulations, including both polymer modified asphalt ("PMA") and ground tire rubber ("GTR") asphalt. Asphalt produced at the Big Spring refinery is transferred to our asphalt segment at prices substantially determined by reference to the cost of crude oil, which is intended to approximate bulk wholesale market prices.

*Petrochemical Feedstocks and Other*. We produce propane, propylene, certain aromatics, specialty solvents and benzene for use as petrochemical feedstocks, along with other by-products such as sulfur and carbon black oil. Our Big Spring refinery has sulfur processing capabilities of approximately two tons per thousand bpd of crude oil capacity, which is above the average for cracking refineries and aids in our ability to produce low-sulfur motor fuels with relatively low investment while continuing to process significant amounts of sour crude oil.

*Big Spring Refinery Transportation Fuel Marketing*

Our refining and marketing segment sales include sales of refined products from our Big Spring refinery in both the wholesale rack and bulk markets. Our marketing of transportation fuels produced at our Big Spring refinery is focused on four states in the Southwestern and South Central regions of the United States through our physically integrated system.

We market transportation fuels produced at our Big Spring refinery in West and Central Texas, Oklahoma, New Mexico and Arizona. We refer to these areas as our physically integrated system because our FINA-branded and unbranded distributors in this region are supplied with motor fuels produced at our Big Spring refinery and distributed through a network of pipelines and terminals which we either own or have access to through leases or long-term throughput agreements. Our physically integrated system includes more than 625 of the approximately 1,080 FINA-branded retail sites that we supply, including approximately 90.0% of our retail segment convenience stores. Our refining and marketing segment also markets motor fuels in East Texas, which we refer to as our non-integrated system because we supply our branded and unbranded distributors in this region with motor fuels we obtain from third parties.

*Branded Transportation Fuel Marketing*. We primarily market gasoline and diesel fuels through a network of approximately 1,080 locations under the FINA brand name, which includes our 307 convenience stores located in Texas and New Mexico, which are primarily 7-Eleven and FINA branded. During 2007, we sold over 29,000 bpd of gasoline and diesel fuel as branded fuels. Approximately 56.0% of our branded fuel sales are in West Texas and Central Texas.

The FINA brand is a recognized trade name in the Southwestern and South Central United States, where motor fuels have been marketed under the FINA brand since 1963. We have an exclusive license through July 2012 to use the FINA name and related trademarks in connection with the production and sale (including resale by distributors) of gasoline, diesel and other fuels within Texas, Oklahoma, New Mexico, Arizona, Arkansas, Louisiana, Colorado and Utah. Prior to the expiration of this license, we intend to review our alternatives for branding our transportation fuel, including seeking to extend our license with FINA or developing our own brand.

*Unbranded Transportation Fuel Marketing*. We presently sell a majority of the diesel fuel and approximately 15.0% of the gasoline produced at our Big Spring refinery on an unbranded basis. During 2007, we sold over 10,000 bpd of our

Table of Contents

Big Spring refinery's diesel fuel and gasoline production as unbranded fuels, which were largely sold through our physically integrated system.

*Jet Fuel Marketing*. We market substantially all the jet fuel produced at our Big Spring refinery as JP-8 grade to the Defense Energy Supply Center ("DESC"). All DESC contracts are for a one-year term and are awarded through a competitive bidding process. We have traditionally bid for contracts to supply Dyess Air Force Base in Abilene, Texas and Sheppard Air Force Base in Wichita Falls, Texas. Jet fuel production in excess of existing contracts is sold through unbranded rack sales.

*Product Supply Sales*. We sell transportation fuel production in excess of our branded and unbranded marketing needs through bulk sales and exchange channels. These bulk sales and exchange arrangements are entered into with various oil companies and traders and are transported through our product pipeline network or truck deliveries. Our petrochemical feedstock and other petroleum product production is sold to a wide customer base and is transported through truck and railcars.

*Big Spring Product Pipelines*

The product pipelines we utilize to deliver refined products from our Big Spring refinery are linked to the major third-party product pipelines in the geographic area around our Big Spring refinery. These pipelines provide us flexibility to optimize product flows into multiple regional markets. This product pipeline network can also (1) receive additional transportation fuel products from the Gulf Coast through the Delek product terminal and Magellan pipelines, (2) deliver and receive products to and from the Magellan system, our connection to the Group III, or mid-continent markets, and (3) deliver products to the New Mexico and Arizona markets through third-party systems. The following table describes the product pipelines which we utilize:

| Product Pipelines | Access | Miles | Connections | Expiration Date |
|---|---|---|---|---|
| Plains (1) | Lease | 38 | Coahoma and Midland | 2012 |
| Fin-Tex | HEP throughput | 137 | Midland and Orla (Holly) | 2020 |
| Holly | Lease | 133 | Orla and El Paso | 2018 |
| Trust | HEP throughput | 332 | Big Spring/Abilene/Wichita Falls | 2020 |
| Dyess JP-8 | HEP throughput | 2 | Abilene and Dyess Air Force Base | 2020 |
| River | HEP throughput | 47 | Wichita Falls and Duncan (Magellan) | 2020 |
| Carswell | Owned | 148 | Abilene and Fort Worth | N/A |

(1) The description of the Plains pipeline does not include a 4-mile pipeline that we own connecting Big Spring and Coahoma, Texas.

In February 2005, we completed the contribution of our Fin-Tex, Trust, River and Dyess JP-8 product pipelines, and certain of our product terminals connected to these pipelines to Holly Energy Partners, LP ("HEP"). Simultaneous with this transaction, we entered into a Pipelines and Terminal Agreement with HEP with an initial term of 15 years and three subsequent five year renewal terms exercisable at our sole discretion. Pursuant to the Pipelines and Terminal Agreement, we have agreed to transport and store minimum volumes of refined products in the pipelines and terminals and to pay specified tariffs and fees for such transportation and storage during the term of the agreement. See Note 5 of our consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

The Plains, Fin-Tex and Holly pipelines make up the Fin-Tex system. Our access to the Plains and Holly pipelines is secured by pipeline leases, while our access to the Fin-Tex pipeline is provided through our Pipelines and Terminals Agreement with HEP. The Fin-Tex system transports product from the Big Spring refinery to El Paso, Texas and allows product to be placed in Tucson and Phoenix, Arizona through the third-party Kinder Morgan pipeline. The Fin-Tex system also gives us access to the Albuquerque and Bloomfield, New Mexico markets. We deliver physical barrels to El Paso and receive, through an exchange agreement with Navajo Refining Company, physical barrels in Albuquerque and Bloomfield.

Table of Contents

The Trust pipeline connects our Big Spring refinery to terminals in Abilene and Wichita Falls, while the River pipeline connects the terminal in Wichita Falls to our Duncan, Oklahoma terminal. At Duncan, the River pipeline connects into the Magellan pipeline system for sales into Group III, or mid-continent, markets. The Trust and River pipeline system is a bi-directional pipeline system which we access through our Pipelines and Terminals Agreement with HEP.

The Dyess JP-8 pipeline connects the Abilene terminal to Dyess Air Force Base. Our access to this pipeline is also provided through our Pipelines and Terminals Agreement with HEP.

Our Carswell pipeline system runs from Abilene to Fort Worth, Texas. The Carswell pipeline is currently inactive.

*Product Terminals*

We primarily utilize the following six product terminals for delivery of transportation fuels produced at our Big Spring refinery, of which three are owned and three are accessed through our Pipelines and Terminal Agreement with HEP:

| Terminals | Access | Working Capacity (1) | Supply Source | Mode of Delivery |
|---|---|---|---|---|
| Big Spring, Texas (2) | Owned | 331 | Pipeline/refinery | Pipeline/truck |
| Abilene, Texas | HEP | 111 | Pipeline | Pipeline/truck |
| Wichita Falls, Texas | HEP | 155 | Pipeline | Truck |
| Duncan, Oklahoma | Owned (3) | 154 | Pipeline | Pipeline |
| Orla, Texas | HEP | 116 | Pipeline | Pipeline |
| Southlake, Texas | Owned | 212 | Pipeline | Truck |
| Total | | 1,079 | | |

(1) Measured in thousands of barrels.

(2) Includes the tankage located at our Big Spring refinery.

(3) The terminal is owned, but the underlying real property is leased.

All six terminals we access are physically integrated with our Big Spring refinery through the product pipelines we utilize. Four of these six terminals, Big Spring, Abilene, Wichita Falls and Southlake, are equipped with truck loading racks. The other two terminals, Duncan, Oklahoma and Orla, Texas, are used for delivering shipments into third-party pipeline systems. Our Southlake terminal, located between Fort Worth and Dallas, became part of our integrated system in January 2008. The Southlake terminal is supplied pursuant to a throughput agreement with Nustar Logistics, LP ("Nustar") whereby we have agreed to ship 2,000 bpd of product from the HEP-owned Wichita Falls, Texas terminal to the Southlake terminal through Nustar's pipeline. Upgrades made to the Southlake terminal allow it to be supplied with reformulated blendstock (RBOB) produced at our Big Spring refinery. We also directly access three other terminals located in El Paso, Texas and Tucson and Phoenix, Arizona.

*West Coast Refineries and Terminals*

On August 4, 2006, we completed the purchase of the stock of Paramount Petroleum Corporation, a heavy crude oil refining company. Paramount Petroleum Corporation's assets included two refineries located in Paramount, California and Willbridge, Oregon with a combined refining capacity of 66,000 bpd, seven asphalt terminals located in Washington (Richmond Beach), California (Elk Grove and Mojave), Arizona (Phoenix, Fredonia and Flagstaff), and Nevada (Fernley) (50% interest), and a 50% interest in Wright Asphalt Products Company ("Wright"), which specializes in patented ground tire rubber modified asphalt products. Total consideration for the acquisition consisted of $497.2 million, including the retirement of all of the Paramount Petroleum Corporation debt at closing of $182.6 million and working capital of $157.1 million.

Table of Contents

On September 28, 2006, we completed the acquisition of Edgington Oil Company, a heavy crude oil refining company located in Long Beach, California. Edgington Oil Company's assets included a topping refinery with a nameplate capacity of approximately 40,000 bpd. Total consideration for the acquisition consisted of $93.6 million in cash, including $34.4 million for the value of certain inventories at closing.

Our refineries located in Paramount and Long Beach are included in our refining and marketing segment, while our refinery in Willbridge is included in our asphalt segment.

Our Paramount refinery has a crude oil throughput capacity of 54,000 bpd and is located on 63 acres in Paramount, California. In industry terms, the Paramount refinery is characterized as a "hydroskimming refinery."

Our Long Beach refinery has a crude oil throughput capacity of 40,000 bpd and is located on 19 acres in Long Beach, California. Prior to our acquisition of Edgington Oil Company, the Long Beach refinery averaged approximately 9,000 bpd of throughput, which we increased to an average of 16,300 bpd of throughput for 2007. In industry terms, the Long Beach refinery is characterized as a "topping refinery."

Our Paramount and Long Beach refineries have the capability to process substantial volumes of less expensive sour crude oils. In 2007 at the California refineries, sour crude oil accounted for approximately 33.9% of crude oil input at these refineries and heavy crude oil accounted for 66.1%. The Paramount and Long Beach refineries are connected by a pipeline we own. Asphalt is the only finished product produced at the Long Beach refinery. Approximately 60.0% of the unfinished motor fuels, jet fuel and other products produced at the Long Beach refinery in 2007 were transferred to the Paramount refinery via our pipeline connection and by trucks for final processing and marketing, with the remainder sold to other area refineries and third parties. Because we operate the Long Beach refinery as an extension of the Paramount refinery and due to their physical proximity to one another, we refer to these refineries collectively as our "California refineries." Major processing units at the California refineries include naphtha reforming, vacuum distillation, hydrotreating and Isom units.

Our California refineries produce CARBOB gasoline, CARB diesel, jet fuel, asphalt and other petroleum products. In 2007, these refineries converted approximately 34.2% of crude oil into higher value products such as gasoline, diesel and jet fuel, with 60.7% converted to asphalt, fuel oil and sulfur. The remaining 5.1% of production was sold as unfinished feedstocks to other refineries and third parties.

As reflected in our 2007 production results, the California refineries still produce a significant amount of unfinished products. Unfinished products typically provide lower margins than finished products. In order to realize the higher margins realizable for the sale of these finished products, we have begun the work necessary to bring online a naphtha hydrotreater located at the Paramount refinery. The naphtha hydrotreater will allow us to increase our production of distillates and gasoline and to produce less unfinished products. We anticipate that the naphtha hydrotreater project will be completed in the fourth quarter of 2008. Additionally, we have begun the detailed engineering phase that will be required to design and construct a mild hydrocracker at the Paramount refinery which will allow us to process the remaining unfinished products into distillates and gasoline. We anticipate that the hydrocracker project will be completed in the fourth quarter of 2010.

In 2007 we averaged approximately 85.9% utilization of our crude oil throughput capacity. The following table summarizes 2007 and 2006 throughput and production data for our California refineries on a combined basis.

| | Year Ended December 31, 2007 | | Period Ended December 31, 2006 (1) | |
|---|---|---|---|---|
| | bpd | % | bpd | % |
| Refinery throughput: | | | | |
| Sour crude | 20,839 | 33.7 | 37,171 | 61.9 |
| Heavy crude | 40,700 | 65.9 | 22,533 | 37.5 |
| Blendstocks | 223 | 0.4 | 362 | 0.6 |
| Total refinery throughput (2) | 61,762 | 100.0 | 60,066 | 100.0 |
| Refinery production: | | | | |
| Gasoline | 7,318 | 12.1 | 6,806 | 11.6 |

Table of Contents

| | Year Ended December 31, 2007 | | Period Ended December 31, 2006 | |
|---|---|---|---|---|
| | bpd | % | bpd | % |
| Diesel/jet | 13,360 | 22.1 | 11,026 | 18.9 |
| Asphalt | 19,006 | 31.5 | 19,500 | 33.3 |
| Other | 793 | 1.3 | 12,126 | 20.7 |
| Light Unfinished | 3,071 | 5.1 | 6,144 | 10.5 |
| Heavy Unfinished | 16,793 | 27.9 | 2,938 | 5.0 |
| Total refinery production (3) | 60,341 | 100.0 | 58,540 | 100.0 |
| Refinery utilization (4) | | 85.9% | | 83.8% |

(1) 2006 data includes our Paramount refinery for the period from August 1, 2006 through December 31, 2006 and our Long Beach refinery for the period from September 28, 2006 through December 31, 2006.

(2) Total refinery throughput represents the total of crude oil and blendstock inputs in the refinery production process.

(3) Total refinery production represents the bpd of various finished products produced from processing crude oil and other refinery feedstocks through the crude units and other conversion units at our California refineries.

(4) Refinery utilization represents average daily crude oil throughput divided by crude oil capacity, excluding planned periods of downtime for maintenance and turnarounds. Reflects the effects of downtime associated with a planned turnaround of our No. 2 crude unit at the Paramount refinery in March and April 2007.

In September 2007, our Long Beach refinery achieved throughput of 35,000 bpd upon the startup of the No. 1 crude unit. In November 2007, the No. 2 crude unit at the Long Beach refinery was taken offline for a planned turnaround. In addition, we continuously evaluate and optimize throughput at our California refineries based on the topping and hydroskimming margins environment.

*California Refineries Raw Material Supply*

For 2007, sour crude oil accounted for approximately 33.9% of our crude oil input of which approximately 47.0% of sour crude oil was California sour crude oil. Heavy crude oil has accounted for approximately 66.1% of our crude oil input of which approximately 50.0% of heavy crude oil was local California heavy crude oil. As a result of the proximity of the Paramount and Long Beach refineries to the Port of Los Angeles and the Port of Long Beach, we have access to a variety of domestic and foreign crude oils that are available on the West Coast. Our California refineries receive crude oil primarily from common carrier, private carrier and our owned pipelines. Approximately 68% of our California refineries' crude oil input requirements are purchased through term contracts with several suppliers, including major oil companies. These term contracts are both short-term and long-term in nature with arrangements that contain market-responsive pricing provisions and provisions for renegotiation or cancellation by either party. The remainder of the California refineries' crude oil input requirements are purchased on the spot market. Other feedstocks, including butane and gasoline blendstocks, are delivered by truck and pipeline.

*Crude Oil Pipelines*

The crude oil pipelines we utilize provide our California refineries access to California and foreign crude oils and consist of the following:

| Crude Oil Pipelines | Status | Miles | Connections |
|---|---|---|---|
| Paramount Crude | Owned | 2.5 | Paramount and East Hynes Terminal |
| Chevron Crude | Third Party | 15 | Paramount and local gathering system |
| No. 3/No. 4 | Owned | 13 | Long Beach and Long Beach Harbor |
| BP | Third Party | 1 | Long Beach and East Hynes Terminal |

The Paramount refinery is supplied by the Chevron Crude pipeline (heavy sour) and Paramount Crude pipeline (medium/heavy sour). The Long Beach refinery is supplied by the No. 3/No. 4 pipelines (heavy sour) and the BP pipeline (medium sour). As a supplement to our on-site storage facilities, the California refineries lease crude oil storage tanks located at the BP-owned East Hynes, the Plains Dominguez, Long Beach and the Kinder Morgan Carson crude oil terminals. Additionally, we acquire California medium sour crude oil from the West Hynes terminal and utilize the Plains Dominguez and Long Beach terminals pursuant to throughput arrangements. This

combination of storage capacity and throughput arrangements allows the California refineries to receive and optimize the crude slate of waterborne domestic and foreign crude oil, along with California crude oil.

On June 29, 2007, we purchased a crude oil and unfinished products pipeline system from Kinder Morgan, Inc. known as the "Black Oil System" for a purchase price of $4.5 million. The Black Oil System includes approximately 6 miles of active and 13 miles of inactive pipelines in the Long Beach, California area.

*California Refineries Production*

*Gasoline*. In 2007, CARBOB gasoline, all of which is produced or finished at our Paramount refinery, accounted for approximately 13.9% of our California refineries' production. The Paramount refinery utilizes a computerized component blending system to optimize gasoline blending. In addition, our Paramount refinery is capable of producing specially formulated fuels, such as those required in the California, Nevada and Arizona markets.

*Distillates*. In 2007, CARB diesel, Ultra Low EPA diesel, Jet A and military jet fuel, all of which is produced or finished at our Paramount refinery, accounted for approximately 22.1% of our California refineries' production. All of the diesel fuel we produce is ultra low sulfur CARB/EPA diesel. We produce both commercial Jet A and military jet fuel. The military jet fuel conforms to the JP-8 grade military specifications required by the Air Force bases to which we market our jet fuel.

*Asphalt*. In 2007, asphalt accounted for approximately 31.5% of our California refineries' production. Approximately 60.0% of our California refineries' asphalt production is paving grades and 40.0% is roofing asphalt. Asphalt produced at the California refineries is transferred to our asphalt segment at prices substantially determined by reference to the cost of crude oil, which is intended to approximate bulk wholesale market prices.

*Light and Heavy Unfinished Feedstocks*. We produce LPG, naphtha, unfinished distillates, fuel oil and gas oils used as refinery feedstocks, along with other by-products such as sulfur and fuel oil, all of which is sold to third parties via pipeline and truck on either a contract or spot basis.

*California Refineries Transportation Fuel Marketing*

Our refining and marketing segment sales includes sales of refined products from our California refineries in both the wholesale rack and bulk markets. Our marketing of gasoline and diesel fuels is focused on the Southern California market. We market a portion of the CARB diesel produced at our Paramount refinery through the Paramount refinery rack on an unbranded and delivered basis to wholesale distributors. The remainder of our CARB diesel and our CARBOB gasoline production is sold through the spot market and term contracts to other refiners and to third parties and for delivery by pipeline.

We market our jet fuel as Jet A that is sold through the spot market, while our JP-8 is contracted to the DESC. All JP-8 grade is sold to the DESC under one-year contracts awarded through a competitive bidding process. In October, our bid to supply JP-8 to the DESC through our Paramount rack system was accepted. This contract expires in October 2008. Jet-A is delivered to our customers via our Line 145 pipeline.

We sell transportation fuel production in excess of our unbranded marketing needs through bulk sales and exchange channels. These bulk sales and exchange arrangements are entered into with various oil companies and traders and are transported through our product pipeline network to the Kinder Morgan terminal located in Carson, California.

*California Product Pipelines/Terminal*

The Paramount refinery utilizes our Line 145 eight-mile product pipeline and our two-mile leased Line 166 pipeline to ship products to the Kinder Morgan product terminal in Carson, California. The Kinder Morgan product terminal gives us access to the Kinder Morgan product rack, the Kinder Morgan Pacific pipeline to Phoenix, Arizona, and the Kinder Morgan CalNev pipeline to Las Vegas, Nevada.

Table of Contents

The following table describes the product pipelines which we utilize:

| Product Pipelines | Access | Miles | Connections |
|---|---|---|---|
| Line 145 | Owned and Leased | 8 | Paramount to a connection with Line 145 |
| Line 166 | Leased | 2 | Connects to Line 145 to Carson City, California (Kinder Morgan) |

The Paramount refinery also utilizes its own terminal at the refinery to distribute CARB diesel, California Reformulated Gasoline (CaRFG), JP-8 and Jet-A into the local market. This terminal is equipped with a truck loading rack that has permitted volumes of approximately 12,000 bpd of distillate and 13,000 bpd of gasoline.

*California Feedstock Pipelines*

The Paramount refinery operates a feedstock pipeline and terminal system that is used to supply gas oil and other unfinished product to other Los Angeles ("LA") Basin refineries and third party terminals. The Black Oil Pipeline system acquired June 29, 2007 provides our Paramount refinery and other third-party shippers with access to refineries and waterborne terminals. Also, in the fourth quarter of 2007 we began the conversion of our Line 35 pipeline into a feedstock pipeline connecting the Paramount and Long Beach refineries.

The following table describes the components of our feedstock pipeline and terminal system:

| Feedstock Pipelines | Terminal | Access | Tankage (1) | Miles | Connections |
|---|---|---|---|---|---|
| Chevron No.1 | | Leased | | 4 | Connects our Paramount and Long Beach refineries to our Lakewood Terminal |
| | Lakewood | Owned | 110 | | Connects the Chevron No. 1 pipeline to our Line 160 pipeline |
| Line 160 | | Owned | | 7.1 | Connects the Lakewood Terminal to our leased tanks at Kinder Morgan, other refiners and third party customers |
| | Kinder Morgan | Leased | 180 | | Connects to our Black Oil Pipeline for deliveries to other refiners and third party customers |
| Black Oil Pipeline | | Owned | | 19 | Connects the Kinder Morgan Terminal and Plains Pipeline System to LA Basin refiners and waterborne terminals |
| Line 35 | | Owned | | 4.5 | Connects the Long Beach and Paramount refineries |

(1) Measured in thousands of barrels.

**Asphalt**

Due to the capability of our refineries to process heavy and sour crude oil, we have developed our asphalt business to maximize the value of the increased supply of residual oil remaining after we process gasoline and distillate products from these crude oils. We believe our asphalt production capabilities provides the opportunity to realize higher netbacks than those attainable by producing No. 6 Fuel Oil, which is an alternate product that can be obtained by further processing residual oil. In addition, our asphalt production capabilities permit us to realize value from our residual oil without the significant costs and expenses required to construct and operate coker units.

The amount of asphalt produced at our refineries, as a percentage of throughput, varies depending on the configuration of the specific refinery, the crude oils processed at each refinery and the techniques used in the refining process. As part of our efforts to maximize the return generated by the production of asphalt, we have licensed advanced asphalt-blending technology from FINA, with respect to asphalt produced at our Big Spring refinery, and a patented GTR asphalt manufacturing process from Wright with respect to asphalt produced and sold in California.

Table of Contents

Our asphalt segment markets asphalt produced at our three refineries in the refining and marketing segment. Asphalt is transferred to the asphalt segment at prices substantially determined by reference to the cost of crude oil, which is intended to approximate wholesale market prices. During 2007 crude oil prices increased rapidly in the second half of 2007 resulting in increasing transfer prices charged to our asphalt segment. Market prices for asphalt did not keep pace with these increases in transfer prices which resulted in significant losses for our asphalt segment. Our asphalt business was also affected by the effects of contracts that are priced months in advance of delivery. While our asphalt sales continued to exceed the returns that would have been realized by producing No. 6 Fuel Oil, the relationship between realized asphalt prices and our cost of crude in the second half of 2007 was compressed. Factors leading to the weak market prices for asphalt include a weaker demand for asphalt in 2007 primarily due to reduced production by roofing manufacturers and lower prices for Canadian heavy crude oil which allowed refiners producing asphalt using these crude sources to produce asphalt at a lower cost.

While our asphalt results were disappointing in 2007, we continue to believe that the asphalt business is a better alternative to producing No. 6 Fuel Oil or constructing a coker unit, especially due to the expected reduction in asphalt production as a result of the coker unit projects that have been announced by several of our competitors. The combination of decreased asphalt production in our markets and a stabilization of crude prices are expected to improve our asphalt margins.

The asphalt segment also conducts operations at and markets asphalt produced by our fourth refinery located in Willbridge, Oregon. The Willbridge refinery is an asphalt topping refinery located on 42 acres and has a crude oil throughput capacity of 12,000 bpd. Alternatively, the asphalt terminal at Willbridge can be supplied with asphalt produced at the California refineries or purchased from third parties by marine vessel or by rail cars. When operating the Willbridge facility as a refinery, it typically operates two to four months per year at times when cargos of heavy crude oil are available for delivery to the refinery. Heavy crude oil is delivered to the Willbridge refinery through access to an adjacent dock owned by Chevron. The Willbridge refinery processes primarily heavy crude oil with approximately 70% of its production sold as asphalt products. The unfinished products produced by the Willbridge refinery include yields of approximately 5% naphtha and approximately 25% gas oils. Asphalt produced at the Willbridge refinery is sold through our terminal at the Willbridge refinery or delivered by truck and railcar to terminals for further processing and resale. Gas oils and naphtha are sold to local refiners and other third parties and are primarily delivered by barge or rail cars.

In 2007, through our asphalt segment, we sold the asphalt that was produced at our refineries in Texas and California, primarily as either paving asphalt to road and highway construction contractors or as roofing asphalt to either roofing shingle manufacturers or to other industrial users.

*Texas Asphalt Marketing*

Approximately 11.3% of our Big Spring refinery's production in 2007 was asphalt. We can process up to 29 different product formulations, including PMA and GTR asphalts that meet the stringent and varied state highway road paving specifications for use in Texas, New Mexico and Arizona. Based on 2006 data, the Texas Department of Transportation has advised us that we are the second largest supplier of asphalt to the State of Texas, which is the second largest asphalt consuming state in the United States according to the latest available industry data.

Paving grade asphalts are predominantly sold from April through October through competitive bids to contractors involved in government projects. These asphalt sales are primarily made at our asphalt terminal at the Big Spring refinery and are delivered to project sites by truck. Our other asphalt blendstocks are sold to roofing companies and asphalt blenders and delivered by rail throughout the United States, including to our asphalt terminals in Elk Grove, Bakersfield and Mojave, California and Phoenix, Arizona.

*West Coast Asphalt Marketing*

As a result of our acquisitions of Paramount Petroleum Corporation and Edgington Oil Company, our asphalt business was expanded significantly. In 2007, approximately 31.5% of our California refineries' production was

Table of Contents

asphalt and asphalt blendstocks. When operating as a refinery, production at the Willbridge refinery has averaged approximately 70% paving and roofing asphalt products. Our California refineries/terminals produce over 100 different grades of paving and roofing asphalt products. Paving asphalt products include various grades of Performance Graded (PG), Asphalt Cement (AC) and Aged Residue (AR) paving asphalts, cutbacks, emulsions, PMA and GTR. The products meet the California PG specification included in the recently enacted conversion to Federal Highway SHRP PG specifications and our GTR products conform to the specifications of the recently enacted California Assembly Bill 338 which requires usage of GTR asphalt on California road and highways. Roofing asphalt products include oxidized coatings, asphalt fluxes and saturants which are used in the roofing industry to manufacture shingles, roofing roll products and built-up roofing asphalts. The paving and roofing products produced at our refineries can be sold from the on-site asphalt terminal facilities or they can be distributed through and sold at one of our eight asphalt terminals in the western United States.

Sales of paving asphalt are made primarily to paving contractors. Sales to paving contractors can be made either through negotiated contracts or they may result from competitive bidding. Sales of roofing asphalts are made primarily to shingle manufacturers or other industrial users through contracts. Sales of asphalt, particularly paving asphalts, are seasonal. Overall, approximately 71.0% of our West Coast paving asphalt products were sold between April and October 2007.

Asphalt produced at our California refineries is marketed through the following owned asphalt terminals:

| Terminals | Asphalt Storage Capacity (1) | Receipt Capabilities | Delivery Capabilities |
|---|---|---|---|
| California Refineries | 731 | Refinery, Rail, Truck | Rail, Truck |
| Willbridge, OR refinery | 1,129(2) | Refinery, Rail, Truck, Marine | Rail, Truck, Marine |
| Elk Grove, CA | 307 | Rail, Truck | Truck |
| Bakersfield, CA | 183 | Rail, Truck | Truck |
| Mojave, CA | 283 | Rail, Truck | Truck |
| Richmond Beach, WA | 702(2) | Rail, Truck, Marine | Truck, Marine |
| Fernley, NV (3) | 254 | Rail, Truck | Truck |
| Phoenix, AZ | 165 | Rail, Truck | Truck |
| Flagstaff, AZ | 25 | Rail, Truck | Truck |
| Fredonia, AZ | 79 | Truck | Truck |

(1) Measured in thousands of barrels.

(2) Storage figures for Willbridge and Richmond Beach include tanks in service for storage of crude oil, fuel oil or other products.

(3) 50% interest.

Deliveries of asphalt products to our non-refinery terminals are made primarily through leased railcars that are loaded at the California and Big Spring refineries. Asphalt produced at our Willbridge refinery is sold primarily through our terminal located at the refinery but may also be delivered by rail or marine vessel to other terminals.

We also own a 50% interest in Wright, which holds the licensing rights to a patented GTR manufacturing process for paving asphalts. Wright licenses this proprietary technology from Neste/Wright Asphalt Company under a perpetual license that covers all of North America, except California. In California we maintain the exclusive license. Wright's operations consist of sublicensing the patented technology to parties to manufacture the GTR asphalt for Wright to sell at various Alon-owned or third party-owned facilities in Texas, Arizona, Oregon and Oklahoma. Wright also purchases and resells various other paving asphalts in these markets. During 2007, Wright obtained approximately 26% of its asphalt requirements from our refineries and terminals, and the remainder from other refineries. Wright sells GTR and its other asphalt products on either a negotiated contract or competitive bidding basis.

Table of Contents

**Retail**

As of December 31, 2007, we operated 307 owned and leased convenience store sites operating primarily in Central and West Texas and New Mexico. Our convenience stores typically offer various grades of gasoline, diesel fuel, food products, tobacco products, non-alcoholic and alcoholic beverages and general merchandise to the public, primarily under the 7-Eleven and FINA brand names. Substantially all of the motor fuel sold through our retail segment is supplied by our Big Spring refinery.

We are one of the top three independent convenience store chains in each of the cities of Abilene, El Paso, Midland, Odessa, Big Spring and Lubbock, Texas. We also have a significant presence in Waco and Wichita Falls, Texas and Albuquerque, New Mexico.

The following table shows our owned and leased convenience stores by location:

| Location | Owned | Leased | Total |
|---|---|---|---|
| Big Spring, Texas | 6 | 1 | 7 |
| El Paso, Texas | 13 | 75 | 88 |
| Lubbock, Texas | 17 | 5 | 22 |
| Midland, Texas | 9 | 9 | 18 |
| Odessa, Texas | 10 | 25 | 35 |
| Wichita Falls, Texas | 8 | 4 | 12 |
| Abilene, Texas | 32 | 9 | 41 |
| Waco, Texas | 11 | 3 | 14 |
| Albuquerque, New Mexico | 12 | 11 | 23 |
| Other | 30 | 17 | 47 |
| Total stores | 148 | 159 | 307 |

On July 3, 2006, we completed the purchase of 40 retail convenience stores from Good Time Stores, Inc. ("Good Time") in El Paso, Texas. The purchase price for the 40 stores was $27.0 million in cash, including $2.3 million for inventories, and the assumption of certain lease obligations. The acquired stores have been branded 7-Eleven and FINA and our Big Spring refinery supplies these locations with substantially all of their gasoline and diesel needs. This acquisition provided us a leading market share in El Paso and furthered our strategy of strengthening our integrated marketing sector.

On June 29, 2007, we completed the acquisition of Skinny's, Inc., a privately held Abilene, Texas-based company that owned and operated 102 FINA branded convenience stores in Central and West Texas. The total consideration was $75.3 million in cash. Included in the consideration was $5.9 million in inventories and the assumption of indebtedness, all of which was retired in connection with the closing of the transaction. Of the 102 stores, approximately two-thirds are owned and one-third are leased. Since the acquisition, we have re-branded the majority of these stores to the 7-Eleven brand name.

*Convenience Store Management and Employees*. Each of our stores has a store manager who supervises a staff of full-time and part-time employees. The number of employees at each convenience store varies based on the store's size, sales volume and hours of operation. Typically, a geographic group of six to ten stores is managed by a supervisor who reports to a district manager. Five district managers are responsible for a varying number of stores depending on the geographic size of each market and the experience of each district manager. These district managers report to our retail management headquarters in Odessa, Texas, where we have 52 employees. We also maintain an office in Abilene, Texas, where we have 14 employees.

*Distribution and Supply*. The merchandise requirements of our convenience stores are serviced at least weekly by over 100 direct-store delivery, or ("DSD"), vendors. In order to minimize costs and facilitate deliveries, we utilize a single wholesale distributor, McLane Company, Inc., for non-DSD products. We purchase the products from McLane at cost plus an agreed upon percentage mark-up. Our current contract with McLane expires at the end of December 2009. We purchase approximately 55% to 60% of our merchandise for resale from McLane. We typically do not have contracts with our DSD vendors.

*7-Eleven License Agreement.* We are party to a license agreement with 7-Eleven, Inc. which gives us a perpetual license to use the 7-Eleven trademark, service name and trade name in West Texas and a majority of the counties in New Mexico in connection with our convenience store operations. 7-Eleven, Inc. has advised us that we are the largest 7-Eleven licensee in the United States based on the number of stores.

*Technology and Store Automation.* We are in the process of installing a point of sale checkout system for our convenience stores. This system includes scanning, pump control, peripheral device integration and daily operations reporting. This system will enhance our ability to offer a greater variety of promotions with a high degree of flexibility regarding definition (store, group of stores, region, etc.) and duration. We will also be able to receive enhanced management reports that will assist our decision-making processes. We believe this system will allow our convenience store managers to spend less time preparing reports and more time analyzing these reports to improve convenience store operations. This system also includes shortage-control tools. This system will be used as the platform to support other marketing technology projects, including interactive video at the pump and bar code coupons at the pump.

**Competition**

The petroleum refining and marketing industry continues to be highly competitive. Many of our principal competitors are integrated, multi-national oil companies (e.g., Valero, Chevron, ExxonMobil, Shell and ConocoPhillips) and other major independent refining and marketing entities that operate in our market areas. Because of their diversity, integration of operations and larger capitalization, these major competitors may have greater financial and other resources and may have a greater ability to bear the economic risks, operating risks and volatile market conditions associated with the petroleum industry.

Financial returns in the refining and marketing industry depend on the difference between refined product prices and the prices for crude oil and other feedstock, also referred to as refining margins. Refining margins are impacted by, among other things, levels of crude oil and refined product inventories, balance of supply and demand, utilization rates of refineries and global economic and political events.

All of our crude oil and feedstocks are purchased from third-party sources, while some of our vertically-integrated competitors have their own sources of crude oil that they may use to supply their refineries. However, our Big Spring refinery is in close proximity to Midland, Texas, which is the largest origination terminal for West Texas crude oil, which we believe provides us with transportation cost advantages over many of our competitors in this region.

The majority of our refined fuel products produced at our Big Spring refinery are shipped to wholesale distributors within the principal geographic regions of West Texas, Central Texas, Oklahoma, New Mexico and Arizona or to our retail sites within West Texas and New Mexico. Production in excess of our wholesale and retail sales is sold in the spot market and either shipped northeast via the Trust and River pipeline system to distribution points in North Texas and Oklahoma or West via the Fin-Tex pipeline system to El Paso, Texas and distribution points in New Mexico and Arizona. The market for refined products in these regions is also supplied by a number of refiners, including large integrated oil companies or independent refiners that either have refineries located in the region or have pipeline access to these regions. These larger companies typically have greater resources and may have greater flexibility in responding to volatile market conditions or absorbing market changes.

The Longhorn pipeline runs approximately 700 miles from the Houston area of the Gulf Coast to El Paso and has an estimated maximum capacity of 225,000 bpd of refined products. This pipeline provides Gulf Coast refiners, which include some of the world's largest and most complex refineries, and other shippers with improved access to the refined products markets in West Texas and New Mexico. In August 2006, Longhorn Pipeline Holdings LLC, the owner of the Longhorn pipeline, was acquired by Flying J, Inc. Since Flying J's acquisition, we have reduced shipments to El Paso via the Fin-Tex pipeline system, while increasing sales through our Big Spring and Abilene terminals. We do not expect our remaining shipments of refined products to be affected, since they are shipped directly for distribution through contracted FINA-branded locations, including our retail segment, in addition to being used for exchange paybacks for sales in the Albuquerque and Bloomfield, New Mexico markets to which the Longhorn pipeline does not have access.

Table of Contents

The majority of the refined fuel products produced at our California refineries is sold on the spot market and is shipped through our pipeline to the Kinder Morgan Carson terminal where it can be distributed to terminals in Arizona, Nevada and Southern California. The balance of our refined fuel products is sold through our Paramount refinery's truck rack. The market for refined products in these regions is also supplied by a number of refiners, including large integrated oil companies or independent refiners that either have refineries located in the region or have pipeline access to these regions. These larger companies typically have greater resources and may have greater flexibility in responding to volatile market conditions or absorbing market changes.

The principal competitive factors affecting our wholesale marketing business are price and quality of products, reliability and availability of supply and location of distribution points.

We compete in the asphalt market with various refineries including Valero, Shell, Tesoro, U.S. Oil, Western, San Joaquin Refining, Ergon and Holly as well as regional and national asphalt marketing companies that have no associated refining operations such as SEM Materials. The principal factors affecting competitiveness in asphalt markets are cost, supply reliability, consistency of product quality, transportation cost and capability to produce the range of high performance products necessary to meet the requirements of customers.

Our major retail competitors include Valero, Chevron, ConocoPhillips, Susser, Allsups and Western Refining. The principal competitive factors affecting our retail segment are location of stores, product price and quality, appearance and cleanliness of stores and brand identification. We expect to continue to face competition from large, integrated oil companies, as well as from other convenience stores that sell motor fuels. Increasingly, national grocery and dry goods retailers such as Albertson's and Wal-Mart, as well as regional grocers and retailers, are entering the motor fuel retailing business. Many of these competitors are substantially larger than we are, and because of their diversity, integration of operations and greater resources, may be better able to withstand volatile market conditions and lower profitability because of competitive pricing and lower operating costs.

**Government Regulation and Legislation**

*Environmental Controls and Expenditures*

Our operations are subject to extensive and frequently changing federal, state, regional and local laws, regulations and ordinances relating to the protection of the environment, including those governing emissions or discharges to the air and water, the handling and disposal of solid and hazardous waste and the remediation of contamination. We believe our operations are generally in substantial compliance with these requirements. Over the next several years our operations will have to meet new requirements being promulgated by the EPA and the states and jurisdictions in which we operate.

*Environmental Expenditures.* The EPA regulations related to the Clean Air Act require significant reductions in the sulfur content in gasoline and diesel fuel. These regulations required most refineries to reduce sulfur content in gasoline to 30 ppm by January 1, 2004. The regulations allow small refiners to meet the 30 ppm gasoline standard by January 2008, or December 2010 if the small refiner implemented the new diesel sulfur content standard of 15 ppm by June 1, 2006. Prior to the Paramount Petroleum Corporation and Edgington Oil Company acquisitions, we were certified by the EPA as a small refiner for both gasoline and diesel. In May 2006, we completed upgrades at our Big Spring refinery to satisfy the required diesel sulfur content standard. Our expenditures to meet the diesel sulfur standards were approximately $17.9 million.

In November 2006, following consummation of the Paramount Petroleum Corporation and Edgington Oil Company acquisitions, we provided notice to the EPA that we no longer satisfied the criteria for a small refiner. As a result, we were then required to comply with the 30 ppm gasoline sulfur content standards within 30 months. In July 2007, the EPA granted our request to extend this deadline by six months, with the total 36-month period to commence on September 28, 2006, the date on which we acquired the assets of Edgington Oil Company. As a result, we are now required to meet the 30 ppm gasoline sulfur standard in September 2009. We anticipate that compliance with the new gasoline sulfur standards will require capital expenditures of approximately $19.3 million through 2009, of which approximately $1.0 million was spent in 2007. We had previously budgeted these expenditures through December 2010. Gasoline and diesel produced at our Paramount refinery currently meet the gasoline and diesel low sulfur fuel standards.

Table of Contents

In October 2004, Paramount Petroleum Corporation entered into a Stipulated Order for Abatement (SOA) with the South Coast Air Quality Management District (SCAQMD), the air pollution agency for Orange County and the urban portions of Los Angeles, Riverside and San Bernardino counties. The SOA resolved a number of outstanding issues with the SCAQMD and allowed Paramount Petroleum Corporation to modify crude unit process heater permit descriptions and operate these heaters at firing rates sufficient to meet current and anticipated crude oil throughputs. The SOA required that Paramount Petroleum Corporation install NOx control equipment on specified heaters within a prescribed schedule, including installation of equipment in 2007 and 2009. We expect that expenditures totaling $4.5 million, of which $2.2 million was spent in 2007 and $2.3 million is expected to be spent in 2008 and 2009 combined, will be required in order to comply with the SOA.

On November 4, 2005, the SCAQMD adopted a stringent regulatory requirement, Rule 1118, designed to control emissions from refinery flares. We expect that expenditures required to comply with Rule 1118 will be approximately $3.7 million. The Paramount refinery has one flare which is subject to Rule 1118 and will require the installation of continuous emissions monitoring equipment and installation of a vapor recovery system for the flare. The installation of the emissions monitoring equipment was originally required by Rule 1118 to be completed in 2007, however, the South Coast Air Quality Management District's Hearing Board granted additional time to comply. We currently anticipate that the monitoring system will be installed in 2009. Rule 1118 will not apply to our Long Beach refinery.

In 2006, the Governor of California signed into law AB 32, the California Global Warming Solutions Act of 2006. Regulations implementing the goals stated in the law, i.e., the reduction of greenhouse gas emission levels to 1990 levels, have yet to be promulgated. Although development of such regulations is still in a very preliminary stage, it is expected that AB 32 mandated reductions will require increased emission controls on both stationary and non-stationary sources and will result in requirements to significantly reduce greenhouse gases from our California refineries and possibly our other California terminals.

The United States Congress and the EPA also are considering various proposals to reduce greenhouse gas emissions, but none have become law, and presently, there are no federal mandatory greenhouse gas emissions requirements. While it is probable that Congress and/or the EPA will adopt some form of federal mandatory greenhouse gas emission reductions legislation in the future, the timing and specific requirements of any such legislation are uncertain at this time.

In February 2007, the EPA adopted final rules effective as of April 27, 2007, to reduce the levels of benzene in gasoline on a nationwide basis. More specifically, the rule would require that beginning in 2011 refiners meet an annual average gasoline benzene content standard of 0.62% by volume on all gasoline produced, both reformulated and conventional. Gasoline produced at our California refineries already meets the standards being proposed by the EPA. We have not yet determined the capital expenditures that may be necessary to comply with the proposed benzene limits at our Big Spring refinery.

In October 2006, we were contacted by Region 6 of the EPA and invited to enter into discussions under the EPA's National Petroleum Refinery Initiative. This Initiative addresses what the EPA deems to be the most significant Clean Air Act compliance concerns affecting the petroleum refining industry. On February 2, 2007, we committed in writing to enter into discussions with the EPA under the Petroleum Refinery Initiative. To date, the EPA has not made any specific claims or findings against us or any of our refineries, and we have not determined whether we will ultimately enter into a settlement agreement with the EPA. Based on prior settlements that the EPA has reached with other petroleum refineries under the Petroleum Refinery Initiative, we anticipate that the EPA will seek relief in the form of the payment of civil penalties, the installation of air pollution controls and the implementation of environmentally beneficial projects. At this time, we cannot estimate the amount of any such civil penalties or the cost of any required controls or environmentally beneficial projects.

Table of Contents

Conditions may develop that cause additional future capital expenditures at our refineries, product terminals and retail gasoline stations (operating and closed locations) for compliance with the Federal Clean Air Act and other federal, state and local requirements. We cannot currently determine the amounts of such future expenditures.

*Remediation Efforts*. We are currently remediating historical soil and groundwater contamination at our Big Spring refinery pursuant to a compliance plan issued by the Texas Commission on Environmental Quality ("TCEQ"). The compliance plan requires us to investigate and, if necessary, remediate 59 potentially contaminated areas on our refinery property.

The compliance plan also requires us to monitor and treat contaminated groundwater at our Big Spring refinery and some of our terminals, which is currently underway. We estimate that we will be required to spend approximately $3.5 million with respect to the investigation and remediation of our Big Spring refinery and our terminals of which $1.1 million has been spent through December 2007. The costs incurred to comply with the compliance plan are covered, with certain limitations, by an environmental indemnity provided by FINA, which is discussed below.

In April 2007 a pinhole leak in a leased crude oil pipeline allowed crude oil to escape the oil pipeline and enter an adjacent storm water line where it flowed down to Berth 55 of the Long Beach Harbor. We worked with state, federal, and local agencies and its contractors to contain the release within the berth area and clean up the spill. Approximately 225 gallons of crude oil were released, of which an estimated 90% was recovered. The pipeline was replaced and relocated away from the storm water line. The total cost of cleanup and repair was approximately $1.3 million in 2007.

We are currently engaged in four separate remediation projects in the Los Angeles area which are being conducted pursuant to Cleanup and Abatement Orders issued by the Los Angeles Regional Water Quality Control Board. Two projects focus on clean up efforts in and around the Paramount refinery and the Lakewood Tank Farm. Our Paramount subsidiary shares the cost of both these remediation projects with ConocoPhillips, the former owner of the Paramount refinery and Lakewood Tank Farm. Another project focuses on efforts at the Long Beach refinery, with the costs being shared with Apex Oil Co., the former owner of the Long Beach refinery. As part of its acquisition of Pipeline 145, Paramount Petroleum Corporation assumed an active remediation project designed to clean up a leak that occurred on this pipeline prior to Paramount Petroleum Corporation's ownership. Paramount bears the full costs of this pipeline remediation effort. Approximately $1.1 million was spent in 2007 for all of these remediation projects and we estimate that we will be required to spend an additional $1.7 million during 2008 with our portion being approximately $1.0 million.

We also have a limited ongoing remediation program at our Long Beach refinery. In conjunction with our acquisition of the Edgington Oil Company refinery in September 2006, we acquired a seven-year environmental insurance policy, the premiums for which have been prepaid in full. This policy provides us coverage for both known and unknown conditions existing at our Long Beach refinery at the time of our acquisition for off-site, third party bodily injury and property damage claims. The policy limit on a per occurrence and aggregate basis is $15.0 million and has a per occurrence deductible of $0.5 million.

On March 1, 2005, Paramount Petroleum Corporation purchased Chevron's Pacific Northwest Asphalt business. As part of the purchase and sale agreement, the parties agreed to share the remediation costs at the Richmond Beach, Washington and Willbridge, Oregon terminals. Approximately $1.0 million was spent in 2007 for these remediation costs, and we estimate that an additional $1.7 million will be spent during 2008, of which our portion will be $0.5 million.

In addition, we operate 307 owned and leased convenience stores with underground gasoline and diesel fuel storage tanks in West Texas and New Mexico. Compliance with federal and state regulations that govern these storage tanks can be costly. The operation of underground storage tanks also poses various risks, including soil and groundwater contamination. We are currently investigating and remediating leaks from underground storage tanks at some of our convenience stores, and it is possible that we may identify more leaks or contamination in the future that could result in fines or civil liability for us. We have established reserves in our financial statements in respect of these matters to the extent that the associated costs are both probable and reasonably estimable. We cannot assure you, however, that these reserves will prove to be adequate.

**Table of Contents**

*Environmental Indemnity from FINA*. In connection with the acquisition of our Big Spring refinery and other operating assets from FINA in August 2000, FINA agreed, within prescribed limitations, to indemnify us against costs incurred in connection with any remediation that is required as a result of environmental conditions that existed on the acquired properties prior to the closing date of our acquisition. FINA's indemnification obligations for these remediation costs run through August 2010, have a ceiling of $5.0 million per year (with carryover of unused ceiling amounts and unreimbursed environmental costs into subsequent years) and have an aggregate indemnification cap of $20.0 million. Thereafter, we are solely responsible for all additional remediation costs. As of December 31, 2007, the remediation of the properties is on schedule, and we have expended approximately $14.5 million in connection with that remediation and approximately $3.0 million in environmental insurance premiums, all of which has been covered by the FINA indemnity. Subject to a $25 thousand deductible per claim up to an aggregate deductible of $2.0 million, FINA is additionally obligated to indemnify us for third-party claims with respect to environmental matters received by us within ten years of the closing date to the extent such matters relate to FINA's operations on the acquired properties prior to the closing date. FINA is further obligated to indemnify us for environmental fines imposed as a result of FINA's operations on the acquired properties prior to the closing date, provided that such claims are asserted no later than the earlier of ten years from the closing date and the date that the applicable statute of limitations expires. FINA's aggregate indemnification obligations for environmental fines and third-party claims are not subject to a monetary cap. Excluding liabilities retained by FINA as described above, we assumed the environmental liabilities associated with the acquired properties and agreed to indemnify FINA for any environmental claims or costs in connection with our operations at the acquired properties after the closing date.

*Environmental Insurance*. We have also purchased two environmental insurance policies to cover expenditures not covered by the FINA indemnification agreement, the premiums for which have been prepaid in full. Under an environmental clean-up cost containment, or cost cap, policy, we are insured for remediation costs for known conditions at the time of our acquisition of our assets from FINA. This policy has an initial deductible of $20.0 million during the first ten years after the acquisition (coinciding with the FINA indemnity), which deductible is increased by $1.0 million annually during the remainder of the term of the policy. Under an environmental response, compensation and liability insurance policy, or ERCLIP, we are covered for bodily injury, property damage, clean-up costs, legal defense expenses and civil fines and penalties relating to unknown conditions and incidents. The ERCLIP policy is subject to a $1.0 million sublimit on liability for civil fines and penalties and a deductible of $150 thousand or $100 thousand in the case of civil fines or penalties, per incident. Both the cost cap and ERCLIP policies have a term of twenty years and share a maximum aggregate coverage of $40.0 million. The insurer under these policies is The Kemper Insurance Companies, which has experienced significant downgrades of its credit ratings in recent years and is currently in run-off. However, we have no reason to believe at this time that Kemper will be unable to comply with its obligations under these policies. Our insurance broker has advised us that environmental insurance policies with terms in excess of ten years are not currently generally available and that policies with shorter terms are available only at premiums substantially in excess of the premiums paid for our policies with Kemper.

*Environmental Indemnity to HEP*. In connection with the HEP transaction, we entered into an Environmental Agreement with HEP pursuant to which we agreed to indemnify HEP against costs and liabilities incurred by HEP to the extent resulting from the existence of environmental conditions at the pipelines or terminals prior to February 28, 2005 or from violations of environmental laws with respect to the pipelines and terminals occurring prior to February 28, 2005. Our environmental indemnification obligations under the Environmental Agreement expire after February 28, 2015. In addition, our indemnity obligations are subject to HEP first incurring $100 thousand of damages as a result of pre-existing environmental conditions or violations. Our environmental indemnity obligations are further limited to an aggregate indemnification amount of $20.0 million, including any amounts paid by us to HEP with respect to indemnification for breaches of our representations and warranties under a Contribution Agreement entered into as a part of the HEP transaction.

With respect to any remediation required for environmental conditions existing prior to February 28, 2005, we have the option under the Environmental Agreement to perform such remediation ourselves in lieu of indemnifying HEP for their costs of performing such remediation. Pursuant to this option, we are continuing to perform the ongoing remediation at the Wichita Falls terminal which is subject to our environmental indemnity from FINA. Any remediation required under the terms of the Environmental Agreement is limited to the standards under the applicable environmental laws as in effect at February 28, 2005.

Table of Contents

*Environmental Indemnity to Sunoco*. In connection with the sale of the Amdel and White Oil crude oil pipelines, we entered into a Purchase and Sale Agreement with Sunoco pursuant to which we agreed to indemnify Sunoco against costs and liabilities incurred by Sunoco resulting from the existence of environmental conditions at the pipelines prior to March 1, 2006 or from violations of environmental laws with respect to the pipelines occurring prior to March 1, 2006. With respect to any remediation required for environmental conditions existing prior to March 1, 2006, we have the option under the Purchase and Sale Agreement to perform such remediation ourselves in lieu of indemnifying Sunoco for their costs of performing such remediation.

**Other Government Regulation**

The pipelines owned or operated by us and located in Texas are regulated by Department of Transportation rules and our intrastate pipelines are regulated by the Texas Railroad Commission. Within the Texas Railroad Commission, the Pipeline Safety Section of the Gas Services Division administers and enforces the federal and state requirements on our intrastate pipelines. All of our pipelines within Texas are permitted and certified by the Texas Railroad Commission's Gas Services Division.

The California State Fire Marshall's Office enforces federal pipeline regulations for pipelines in the State of California. We are required to have integrity management and other programs in place, and we anticipate spending approximately $2.0 million over the next five years to comply with the regulations. We are also required to have a Pipeline Spill Response Plan for all California pipelines in our system which includes keeping the plan current, training employees to effect the plan and conducting annual, quarterly and more frequent spill drills. We are also required to maintain Certificates of Financial Responsibility with the State of California, Department of Fish and Game, and the Office of Spill Prevention and Response based on a worst case discharge.

As required by the Oil Pollution Act of 1990 and state requirements, marine oil transfer operations at the Richmond Beach Terminal are conducted under the facility's Facility Response Plan (FRP) approved and on file with the EPA, the U.S. Coast Guard, and the Washington Department of Ecology. The FRP provides guidance to facility personnel for emergency responses to oil spills. It provides specific information on internal and external agency and contractor notification requirements, appropriate oil spill response actions, the proper disposal of contaminated materials, hazard evaluation and personnel safety, spill response equipment and material lists, and operator and response personnel training. The Richmond Beach Terminal conducts four training drills per year for the purpose of assessing the adequacy of the Facility Response Plan and the effectiveness of personnel training. In addition to the Facility Response Plan, the Richmond Beach Terminal conducts all transfer operations under a Marine Oil Transfer Operations Manual approved and on file with the U.S. Coast Guard and the Washington Department of Ecology.

The Petroleum Marketing Practices Act, or PMPA, is a federal law that governs the relationship between a refiner and a distributor pursuant to which the refiner permits a distributor to use a trademark in connection with the sale or distribution of motor fuel. We are subject to the provisions of the PMPA because we sublicense the FINA brand to our branded distributors in connection with their distribution and sale of motor fuels. Under the PMPA, we may not terminate or fail to renew these distributor contracts unless certain enumerated preconditions or grounds for termination or nonrenewal are met and we also comply with the prescribed notice requirements. The PMPA provides that our distributors may enforce the provisions of the act through civil actions against us. If we terminate or fail to renew one or more of our distributor contracts in accordance with certain requirements of the PMPA, those distributors may file lawsuits against us to compel continuation of their contracts or to recover damages from us.

**Employees**

As of December 31, 2007, we had approximately 2,697 employees. Approximately 622 employees worked in our refining and marketing segment, of which 542 were employed at our refineries and approximately 80 were employed at our corporate and asphalt offices in Dallas, Texas. Approximately 120 of the 170 employees at our Big Spring refinery are covered by collective bargaining agreements that expire on March 31, 2010. Approximately 2,075 employees worked in our retail segment. None of the employees in our retail segment or in our corporate offices are represented by a union. We consider our relations with our employees to be satisfactory.

Table of Contents

**Properties**

Our principal properties are described above under the captions "Refining and Marketing," "Asphalt" and "Retail" in Item 1. We believe that our facilities are generally adequate for our operations and are maintained in a good state of repair in the ordinary course of business. As of December 31, 2007, we were the lessee under a number of cancelable and non-cancelable leases for certain properties. Our leases are discussed more fully in Note 20 to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

**Executive Officers of the Registrant**

Our current executive officers and key employees (identified by an asterisk), their ages as of January 31, 2008, and their business experience during at least the past five years are set forth below.

| Name | Age | Position |
|---|---|---|
| David Wiessman | 53 | Executive Chairman of the Board of Directors |
| Jeff D. Morris | 56 | Director, President and Chief Executive Officer |
| Claire A. Hart | 52 | Senior Vice President |
| Joseph A. Concienne | 57 | Senior Vice President of Refining and Transportation |
| Alan Moret | 53 | Senior Vice President of Asphalt Operations |
| Shai Even | 39 | Vice President and Chief Financial Officer |
| Jimmy C. Crosby | 48 | Vice President of Refining and Supply |
| Joseph Israel | 36 | Vice President of Mergers and Acquisitions |
| Harlin R. Dean | 41 | Vice President, General Counsel and Secretary |
| Joseph Lipman* | 62 | President and Chief Executive Officer of SCS |

Set forth below is a brief description of the business experience of each of the executive officers and key employees listed above.

*David Wiessman* has served as Executive Chairman of the Board of Directors of Alon since July 2000 and served as President and Chief Executive Officer of Alon USA Energy, Inc. from its formation in 2000 until May 2005. Mr. Wiessman has over 25 years of oil industry and marketing experience. Since 1994, Mr. Wiessman has been Chief Executive Officer, President and a director of Alon Israel. In 1992, Bielsol Investments (1987) Ltd. acquired a 50% interest in Alon Israel. In 1987, Mr. Wiessman became Chief Executive Officer of, and a stockholder in, Bielsol Investments (1987) Ltd. In 1976, after serving in the Israeli Air Force, he became Chief Executive Officer of Bielsol Ltd., a privately-owned Israeli company that owns and operates gasoline stations and owns real estate in Israel. Mr. Wiessman is also Chairman of the Board of Directors of Blue Square-Israel, Ltd., which is listed on the New York Stock Exchange and the Tel Aviv Stock Exchange, Chairman of Blue Square Real Estate Ltd, which is listed on the Tel Aviv Stock Exchange, Acting Chairman of the Board of Directors of Blue Square Investments and Property Chain, Ltd., which is listed on the Tel Aviv Stock Exchange, and Chairman of the Board and President of Dor Alon Energy Israel (1988) Ltd, which is listed on the Tel Aviv Stock Exchange.

*Jeff D. Morris* has served as a director and as our President and Chief Executive Officer since May 2005 and has served as the President and Chief Executive Officer of our subsidiary Alon USA, Inc. since its inception in August 2002 and of our other operating subsidiaries since July 2000. Prior to joining Alon, he held various positions at FINA, where he began his career in 1974. Mr. Morris served as Vice President of FINA's SouthEastern Business Unit from 1998 to 2000 and as Vice President of its SouthWestern Business Unit from 1995 to 1998. In these capacities, he was responsible for both the Big Spring refinery and FINA's Port Arthur refinery and the crude oil gathering assets and marketing activities for both business units.

*Claire A. Hart* has served as our Senior Vice President since January 2004 and served as our Chief Financial Officer and Vice President from August 2000 to January 2004. Prior to joining Alon, he held various positions in the Finance, Accounting and Operations departments of FINA for 13 years, serving as Treasurer from 1998 to August 2000 and as General Manager of Credit Operations from 1997 to 1998.

*Joseph A. Concienne* has served as our Senior Vice President of Refining and Transportation since August 2006 and served as our Vice President of Refining and Transportation from March 2001 to August 2006. His

Table of Contents

primary role is oversight of our Texas refinery and supply system. Prior to joining Alon, Mr. Concienne served as Director of Operations/General Manager for Polyone Corporation in Seabrook, Texas from 1998 to 2001. He served as Vice President/General Manager for Valero Refining and Marketing, Inc. in 1998, and as Manager of Refinery Operations and Refinery Manager for Phibro Energy Refining (now known as Valero Refining and Marketing, Inc.) from 1985 to 1998.

*Alan Moret* has served as our Senior Vice President of Asphalt Operations since August 2006, with responsibility for asphalt operations and marketing at our refineries and asphalt terminals. Prior to joining Alon, Mr. Moret was President of Paramount Petroleum Corporation from November 2001 to August 2006. Prior to joining Paramount Petroleum Corporation, Mr. Moret held various positions with Atlantic Richfield Company, most recently as President of ARCO Crude Trading, Inc. from 1998 to 2000 and as President of ARCO Seaway Pipeline Company from 1997 to 1998.

*Shai Even* has served as a Vice President since May 2005 and as our Chief Financial Officer since December 2004. Mr. Even also served as our Treasurer from August 2003 until March 2007. Prior to joining Alon, Mr. Even served as the Chief Financial Officer of DCL Technologies, Ltd. from 1996 to July 2003 and prior to that worked for KPMG from 1993 to 1996.

*Jimmy C. Crosby* has served as our Vice President of Refining and Supply since August 2006, with responsibility for refinery and supply operations at our California refineries. Mr. Crosby served as our Vice President of Supply and Planning from March 2005 to August 2006, with responsibility for all terminal and refinery supply for our Big Spring refinery's marketing and refinery operations. Mr. Crosby served as our General Manager of Business Development and Planning from August 2000 to March 2005. Prior to joining Alon, Mr. Crosby worked with FINA from 1996 to August 2000 where he last held the position of Manager of Planning and Economics for the Big Spring refinery.

*Joseph Israel* has served as our Vice President of Mergers & Acquisitions since March 2005. Mr. Israel served as our General Manager of Economics and Commerce from September 2000 to March 2005. Prior to joining Alon, Mr. Israel held positions with several Israeli government entities beginning in 1998, including the Israeli Land Administration, the Israeli Fuel Administration and most recently as Commerce Vice President of Israel's Petroleum Energy Infrastructure entity.

*Harlin R. Dean* has served as our General Counsel and Secretary since October 2002 and as Vice President since May 2005. Prior to joining Alon, Mr. Dean practiced corporate and securities law, with a focus on public and private merger and acquisition transactions and public securities offerings, at Brobeck, Phleger & Harrison, LLP, from April 2000 to September 2002, and at Weil, Gotshal & Manges, LLP, from September 1992 to March 2000.

*Joseph Lipman* has served as President and Chief Executive Officer of Southwest Convenience Stores, LLC, or SCS, our subsidiary conducting our retail operations since July 2001. From 1997 to July 2001, Mr. Lipman served as General Manager of Cosmos, a chain of supermarkets in Israel owned by Super-Sol Ltd., where he was responsible for marketing and store operations.

**ITEM 1A. RISK FACTORS.**

You should be aware that the occurrence of any of the events described in this Risk Factors section and elsewhere in this Annual Report on Form 10-K or in any other of our filings with the SEC could have a material adverse effect on our business, financial position, results of operations and cash flows. In evaluating us, you should consider carefully, among other things, the factors and the specific risks set forth below. This annual report contains forward-looking statements that involve risks and uncertainties. See "Forward-Looking Statements" in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 for a discussion of the factors that could cause actual results to differ materially from those projected.

Table of Contents

***The price volatility of crude oil, other feedstocks, refined products and fuel and utility services may have a material adverse effect on our earnings, profitability and cash flows.***

Our refining and marketing earnings, profitability and cash flows from operations depend on the margin above fixed and variable expenses (including the cost of refinery feedstocks, such as crude oil) at which we are able to sell refined products. We enjoyed strong refining margins throughout the first half of 2007 which were followed by rapidly deteriorating margins in the second half of the year, primarily due to a sharp rise in crude oil prices during that period without a corresponding increase in the selling price of our products. Refining margins historically have been volatile, and are likely to continue to be volatile, as a result of a variety of factors, including fluctuations in the prices of crude oil, other feedstocks, refined products and fuel and utility services. Prices of crude oil, other feedstocks and refined products depend on numerous factors beyond our control, including the supply of and demand for crude oil, other feedstocks, gasoline, diesel, asphalt and other refined products. Such supply and demand are affected by, among other things:

- changes in global and local economic conditions;
- domestic and foreign demand for fuel products;
- worldwide political conditions, particularly in significant oil producing regions such as the Middle East, West Africa and Venezuela;
- the level of foreign and domestic production of crude oil and refined products and the level of crude oil, feedstock and refined products imported into the United States;
- utilization rates of U.S. refineries;
- development and marketing of alternative and competing fuels;
- commodities speculation;
- federal and state government regulations; and
- local factors, including market conditions, weather conditions and the level of operations of other refineries and pipelines in our markets.

When the margin between refined product prices and crude oil and other feedstock prices contracts our earnings, profitability and cash flows are negatively affected.

The nature of our business requires us to maintain substantial quantities of crude oil and refined product inventories. Because crude oil and refined products are essentially commodities, we have no control over the changing market value of these inventories. Our inventory is valued at the lower of cost or market value under the LIFO inventory valuation methodology; therefore, if the market value of our inventory were to decline to an amount less than our LIFO cost, we would record a write-down of inventory and a non-cash charge to cost of sales.

In addition, the volatility in costs of fuel, principally natural gas, and other utility services, principally electricity, used by our refineries and other operations affect our operating costs. Fuel and utility prices have been, and will continue to be, affected by factors outside our control, such as supply and demand for fuel and utility services in both local and regional markets. Future increases in fuel and utility prices may have a negative effect on our earnings, profitability and cash flows.

***Our profitability depends, in part, on the sweet/sour crude oil price spread. A decrease in this spread could negatively affect our profitability.***

Because our refineries are configured to process substantial volumes of sour crude oils, our profitability depends, in part, on the price spread between sweet crude oil and sour crude oil, which we refer to as the sweet/sour

Table of Contents

spread. In recent years, higher demand for sweet crude oils resulted in a wider sweet/sour spread. However, a tightening of the sweet/sour spreads could negatively affect our profitability.

***The profitability of our California refineries depends, in part, on the light/heavy crude oil price spread. A decrease in this spread could negatively affect our profitability.***

Our California refineries process significant volumes of heavy crude oils and, as a result, our profitability depends in part on the price spread between light crude oil and heavy crude oil, which we refer to as the light/heavy spread. Because processing light crude oils produces higher percentages of light products, light crude oils typically are priced higher than heavy crude oils. In 2007, the light/heavy spread was tighter than in 2006.

***The dangers inherent in our operations could cause disruptions and could expose us to potentially significant losses, costs or liabilities.***

Our operations are subject to significant hazards and risks inherent in refining operations and in transporting and storing crude oil, intermediate products and refined products. These hazards and risks include, but are not limited to, natural disasters, fires, explosions, pipeline ruptures and spills, third party interference and mechanical failure of equipment at our or third-party facilities, any of which could result in production and distribution difficulties and disruptions, environmental pollution, personal injury or wrongful death claims and other damage to our properties and the properties of others. We experienced such an event on February 18, 2008 when an explosion in the area of the propylene splitter unit at the Big Spring refinery destroyed the propylene recovery unit and damaged equipment in the alkylation and gas concentration units. Our Big Spring refinery has not resumed operations following this explosion, although we expect to resume partial operations by the end of March 2008. The cause of this explosion has not yet been determined and the damage to equipment and disruption to operations, as well as the costs and time necessary to resume operations, may be greater than currently anticipated. In addition, we are currently participating in investigations of this incident by the Occupational Safety and Health Administration ("OSHA"), EPA and TCEQ which may result in civil penalties or other enforcement actions and we may face lawsuits or other third party claims as a result of this incident.

The occurrence of such events at our Big Spring refinery or our California refineries could significantly disrupt our production and distribution of refined products, and any sustained disruption could have a material adverse effect on our business, financial condition and results of operations.

***We are subject to interruptions of supply as a result of our reliance on pipelines for transportation of crude oil and refined products.***

Our refineries receive a substantial percentage of their crude oil and deliver a substantial percentage of their refined products through pipelines. We could experience an interruption of supply or delivery, or an increased cost of receiving crude oil and delivering refined products to market, if the ability of these pipelines to transport crude oil or refined products is disrupted because of accidents, earthquakes, governmental regulation, terrorism, other third-party action or any of the types of events described in the preceding risk factor. Our prolonged inability to use any of the pipelines that we use to transport crude oil or refined products could have a material adverse effect on our business, results of operations and cash flows.

***If the price of crude oil increases significantly, it could reduce our profit on our fixed-price asphalt supply contracts.***

We enter into fixed-price asphalt supply contracts pursuant to which we agree to deliver asphalt to customers at future dates. We set the pricing terms in these agreements based, in part, upon the price of crude oil at the time we enter into each contract. If the price of crude oil increases from the time we enter into the contract to the time we produce the asphalt, our profits from these sales could be adversely affected. For example, in the second half of 2007, WTI crude prices increased from $69.39 per bbl to $98.83 per bbl over a period of three months. Primarily as a result of these increases in the cost of crude, we experienced negative margins from our asphalt sales in the third and fourth quarters of 2007.

Table of Contents

***Our operating results are seasonal and generally lower in the first and fourth quarters of the year.***

Demand for gasoline and asphalt products is generally higher during the summer months than during the winter months due to seasonal increases in highway traffic and road construction work. Seasonal fluctuations in highway traffic also affect motor fuels and merchandise sales in our retail stores. As a result, our operating results for the first and fourth calendar quarters are generally lower than those for the second and third calendar quarters of each year. This seasonality is more pronounced in our asphalt business.

***If the price of crude oil increases significantly, it could limit our ability to purchase enough crude oil to operate our refineries at full capacity.***

We rely in part on borrowings and letters of credit under our revolving credit facilities to purchase crude oil for our refineries. If the price of crude oil continues to increase significantly, we may not have sufficient capacity under our revolving credit facilities to purchase enough crude oil to operate our refineries at full capacity. A failure to operate our refineries at full capacity could adversely affect our profitability and cash flows.

***Changes in our credit profile could affect our relationships with our suppliers, which could have a material adverse effect on our liquidity and our ability to operate our refineries at full capacity.***

Changes in our credit profile could affect the way crude oil suppliers view our ability to make payments and induce them to shorten the payment terms of their invoices with us. Due to the large dollar amounts and volume of our crude oil and other feedstock purchases, any imposition by our suppliers of more burdensome payment terms on us may have a material adverse effect on our liquidity and our ability to make payments to our suppliers. This in turn could cause us to be unable to operate our refineries at full capacity. A failure to operate our refineries at full capacity could adversely affect our profitability and cash flows.

***Competition in the refining and marketing industry is intense, and an increase in competition in the markets in which we sell our products could adversely affect our earnings and profitability.***

We compete with a broad range of companies in our refining and marketing operations. Many of these competitors are integrated, multinational oil companies that are substantially larger than we are. Because of their diversity, integration of operations, larger capitalization, larger and more complex refineries and greater resources, these companies may be better able to withstand disruptions in operations, volatile market conditions, to compete on the basis of price and to obtain crude oil in times of shortage.

***Competition in the asphalt industry is intense, and an increase in competition in the markets in which we sell our asphalt products could adversely affect our earnings and profitability.***

Our asphalt business competes with other refiners and with regional and national asphalt marketing companies. Many of these competitors are larger, more diverse companies with greater resources, providing them advantages in obtaining crude oil and other blendstocks and in competing through bidding processes for asphalt supply contracts.

We compete in large part on our ability to deliver specialized asphalt products which we produce under proprietary technology licenses. Recently, demand for these specialized products has increased due to new specification requirements by state and federal governments. If we were to lose our rights under our technology licenses, or if competing technologies for specialized products are developed by our competitors, our profitability could be adversely affected.

***Competition in the retail industry is intense, and an increase in competition in the markets in which our retail businesses operate could adversely affect our earnings and profitability.***

Our retail operations compete with numerous convenience stores, gasoline service stations, supermarket chains, drug stores, fast food operations and other retail outlets. Increasingly, national high-volume grocery and dry-goods retailers, such as Albertson's and Wal-Mart are entering the gasoline retailing business. Many of these competitors are substantially larger than we are. Because of their diversity, integration of operations and greater resources, these

companies may be better able to withstand volatile market conditions or levels of low or no profitability in the retail segment. In addition, these retailers may use promotional pricing or discounts, both at the pump and in the store, to encourage in-store merchandise sales. These activities by our competitors could adversely affect our profit margins. Additionally, our convenience stores could lose market share, relating to both gasoline and merchandise, to these and other retailers, which could adversely affect our business, results of operations and cash flows.

Our convenience stores compete in large part based on their ability to offer convenience to customers. Consequently, changes in traffic patterns and the type, number and location of competing stores could result in the loss of customers and reduced sales and profitability at affected stores.

***We may incur significant costs to comply with new or changing environmental laws and regulations.***

Our operations are subject to extensive regulatory controls on air emissions, water discharges, waste management and the clean-up of contamination that can require costly compliance measures. We anticipate that compliance with regulations lowering the permitted level of sulfur in gasoline will require us to spend approximately $19.3 million through 2009. Actual costs could, however, significantly exceed current estimates. If we fail to meet environmental requirements, we may be subject to administrative, civil and criminal proceedings by state and federal authorities, as well as civil proceedings by environmental groups and other individuals, which could result in substantial fines and penalties against us as well as governmental or court orders that could alter, limit or stop our operations.

On February 2, 2007, we committed in writing to enter into discussions with the EPA under the National Petroleum Refinery Initiative. To date, the EPA has not made any specific claims or findings against us or any of our refineries and we have not determined whether we will ultimately enter into a settlement agreement with the EPA. Based on prior settlements that the EPA has reached with other petroleum refiners under the Petroleum Refinery Initiative, we anticipate that the EPA will seek relief in the form of the payment of civil penalties, the installation of air pollution controls and the implementation of environmentally beneficial projects. At this time, we cannot estimate the amount of any such civil penalties or the costs of any required controls or environmentally beneficial projects.

In addition, new laws and regulations, new interpretations of existing laws and regulations, increased governmental enforcement or other developments could require us to make additional unforeseen expenditures. Many of these laws and regulations are becoming increasingly stringent, and the cost of compliance with these requirements can be expected to increase over time. We are not able to predict the impact of new or changed laws or regulations or changes in the ways that such laws or regulations are administered, interpreted or enforced. The requirements to be met, as well as the technology and length of time available to meet those requirements, continue to develop and change. To the extent that the costs associated with meeting any of these requirements are substantial and not adequately provided for, our results of operations and cash flows could suffer.

***We may incur significant costs and liabilities with respect to environmental lawsuits and proceedings and any investigation and remediation of existing and future environmental conditions.***

We are currently investigating and remediating, in some cases pursuant to government orders, soil and groundwater contamination at our Big Spring refinery, terminals and convenience stores. Since August 2000, we have spent approximately $14.5 million with respect to the investigation and remediation of our Big Spring refinery and related terminals. We anticipate spending an additional $3.5 million in investigation and remediation expenses in connection with our Big Spring refinery and terminals over the next three years. Since their acquisition, we have spent approximately $3.1 million with respect to the investigation and remediation of our California refineries and related terminals. We anticipate spending an additional $10.0 to $15.0 million in investigation and remediation expenses in connection with our California refineries and terminals over the next five years. There can be no assurances, however, that we will not have to spend more than these anticipated amounts. Our handling and storage of petroleum and hazardous substances may lead to additional contamination at our facilities and facilities to which we send or sent wastes or by-products for treatment or disposal, in which case we may be subject to additional cleanup costs, governmental penalties, and third-party suits alleging personal injury and property damage. Although we have sold three of our pipelines and three of our terminals pursuant to the HEP transaction and two of our pipelines pursuant to the Sunoco transaction, we have agreed, subject to certain limitations, to indemnify HEP and

Sunoco for costs and liabilities that may be incurred by them as a result of environmental conditions existing at the time of the sale. See Items 1 and 2 "Business and Properties — Government Regulation and Legislation — Environmental Indemnity to HEP" and "— Environmental Indemnity to Sunoco." If we are forced to incur costs or pay liabilities in connection with such proceedings and investigations, such costs and payments could be significant and could adversely affect our business, results of operations and cash flows.

***We could incur substantial costs or disruptions in our business if we cannot obtain or maintain necessary permits and authorizations or otherwise comply with health, safety, environmental and other laws and regulations.***

From time to time, we have been sued or investigated for alleged violations of health, safety, environmental and other laws. If a lawsuit or enforcement proceeding were commenced or resolved against us, we could incur significant costs and liabilities. In addition, our operations require numerous permits and authorizations under various laws and regulations. These authorizations and permits are subject to revocation, renewal or modification and can require operational changes to limit impacts or potential impacts on the environment and/or health and safety. A violation of authorization or permit conditions or other legal or regulatory requirements could result in substantial fines, criminal sanctions, permit revocations, injunctions, and/or facility shutdowns. In addition, major modifications of our operations could require modifications to our existing permits or upgrades to our existing pollution control equipment. Any or all of these matters could have a negative effect on our business, results of operations, cash flows or prospects.

***We could encounter significant opposition to our refining operations at our California refineries.***

Our Paramount refinery is located in a residential area. The refinery is located near schools, apartment complexes, private homes and shopping establishments. In addition, our Long Beach refinery is also located in close proximity to other commercial facilities. Any loss of community support for our California refining operations could result in higher than expected expenses in connection with opposing any community action to restrict or terminate the operation of the refinery. Any community action in opposition to our current and planned use of the California refineries (including our plans to construct a hydrocracker for our California refineries) could have a material adverse effect on our business, results of operations and cash flows.

***Certain of our facilities are located in areas that have a history of earthquakes, the occurrence of which could materially impact our operations.***

Our refineries located in California and the related pipeline and asphalt terminals, and to a lesser extent our refinery and operations in Oregon, are located in areas with a history of earthquakes, some of which have been quite severe. In the event of an earthquake that causes damage to our refining, pipeline or asphalt terminal assets, or the infrastructure necessary for the operation of these assets, such as the availability of usable roads, electricity, water, or natural gas, we may experience a significant interruption in our refining and/or marketing operations. Such an interruption could have a material adverse effect on our business, results of operations cash flows.

***Terrorist attacks, threats of war or actual war may negatively affect our operations, financial condition, results of operations and prospects.***

Terrorist attacks, threats of war or actual war, as well as events occurring in response to or in connection with them, may adversely affect our operations, financial condition, results of operations and prospects. Energy-related assets (which could include refineries, terminals and pipelines such as ours) may be at greater risk of future terrorist attacks than other possible targets in the United States. A direct attack on our assets or assets used by us could have a material adverse effect on our operations, financial condition, results of operations and prospects. In addition, any terrorist attack, threats of war or actual war could have an adverse impact on energy prices, including prices for our crude oil and refined products, and an adverse impact on the margins from our refining and marketing operations. In addition, disruption or significant increases in energy prices could result in government-imposed price controls.

Table of Contents

***The occurrence of a release of hazardous materials or a catastrophic event affecting our California refineries could endanger persons living nearby.***

Because our Paramount refinery is located in a residential area, any release of hazardous material or catastrophic event could cause injuries to persons outside the confines of the Paramount refinery. Similarly, any such release or event at our Long Beach refinery could cause injury to persons outside of the Long Beach refinery. In the event that non-employees were injured as a result of such an event, we would be likely to incur substantial legal costs as well as any costs resulting from settlements or adjudication of claims from such injured persons. The extent of these expenses and costs could be in excess of the limits provided by our insurance policies. As a result, any such event could have a material adverse effect on our business, results of operations and cash flows.

***Covenants in our debt instruments could limit our ability to undertake certain types of transactions and adversely affect our liquidity.***

Our credit agreements contain negative and financial covenants and events of default that may limit our financial flexibility and ability to undertake certain types of transactions. For example, we are subject to negative covenants that restrict our activities, including changes in control of Alon or certain of our subsidiaries, restrictions on creating liens, engaging in mergers, consolidations and sales of assets, incurring additional indebtedness, entering into certain lease obligations, making certain capital expenditures, and making certain dividend, debt and other restricted payments. Should we desire to undertake a transaction that is limited by the negative covenants in our credit agreements, we will need to obtain the consent of our lenders or refinance our credit facilities. Such refinancings may not be possible or may not be available on commercially acceptable terms, or at all.

***Our insurance policies do not cover all losses, costs or liabilities that we may experience.***

We maintain significant insurance coverage, but it does not cover all potential losses, costs or liabilities, and our business interruption insurance coverage does not apply unless a business interruption exceeds 45 days. We could suffer losses for uninsurable or uninsured risks or in amounts in excess of our existing insurance coverage. Our ability to obtain and maintain adequate insurance may be affected by conditions in the insurance market over which we have no control. The occurrence of an event that is not fully covered by insurance could have a material adverse effect on our business, financial condition and results of operations.

***We are exposed to risks associated with the credit-worthiness of the insurer of our environmental policies.***

The insurer under three of our environmental policies is The Kemper Insurance Companies, which has experienced significant downgrades of its credit ratings in recent years and is currently in run-off. Of these three policies, two are 20-year policies that were purchased to protect us against expenditures not covered by our indemnification agreement with FINA, and the third policy is a ten-year policy covering our operations subsequent to our acquisition from FINA. Our insurance brokers have advised us that environmental insurance policies with terms in excess of ten years are not currently generally available and that policies with shorter terms are available only at premiums substantially in excess of the premiums paid for our policies with Kemper. Accordingly, we are currently subject to the risk that Kemper will be unable to comply with its obligations under these policies and that comparable insurance may not be available or, if available, only at substantially higher premiums than our current premiums with Kemper.

***If we lose any of our key personnel, our ability to manage our business and continue our growth could be negatively affected.***

Our future performance depends to a significant degree upon the continued contributions of our senior management team and key technical personnel. We do not currently maintain key man life insurance with respect to any member of our senior management team. The loss or unavailability to us of any member of our senior management team or a key technical employee could significantly harm us. We face competition for these

Table of Contents

professionals from our competitors, our customers and other companies operating in our industry. To the extent that the services of members of our senior management team and key technical personnel would be unavailable to us for any reason, we would be required to hire other personnel to manage and operate our company and to develop our products and technology. We cannot assure you that we would be able to locate or employ such qualified personnel on acceptable terms or at all.

***A substantial portion of our refining workforce is unionized, and we may face labor disruptions that would interfere with our operations.***

As of December 31, 2007, we employed approximately 170 people at our Big Spring refinery, approximately 120 of whom were covered by a collective bargaining agreement. The collective bargaining agreement expires March 31, 2010. Our existing labor agreement may not prevent a strike or work stoppage in the future, and any such work stoppage could have a material adverse affect on our results of operation and financial condition.

***We conduct our convenience store business under a license agreement with 7-Eleven, and the loss of this license could adversely affect the results of operations of our retail segment.***

Our convenience store operations are primarily conducted under the 7-Eleven name pursuant to a license agreement between 7-Eleven, Inc. and Alon. 7-Eleven may terminate the agreement if we default on our obligations under the agreement. This termination would result in our convenience stores losing the use of the 7-Eleven brand name, the accompanying 7-Eleven advertising and certain other brand names and products used exclusively by 7-Eleven. Termination of the license agreement could have a material adverse affect on our retail operations.

***We may not be able to successfully execute our strategy of growth through acquisitions.***

A component of our growth strategy is to selectively acquire refining and marketing assets and retail assets in order to increase cash flow and earnings. Our ability to do so will be dependent upon a number of factors, including our ability to identify acceptable acquisition candidates, consummate acquisitions on favorable terms, successfully integrate acquired assets and obtain financing to fund acquisitions and to support our growth and many other factors beyond our control. Risks associated with acquisitions include those relating to:

- diversion of management time and attention from our existing business;
- challenges in managing the increased scope, geographic diversity and complexity of operations;
- difficulties in integrating the financial, technological and management standards, processes, procedures and controls of an acquired business with those of our existing operations;
- liability for known or unknown environmental conditions or other contingent liabilities not covered by indemnification or insurance;
- greater than anticipated expenditures required for compliance with environmental or other regulatory standards or for investments to improve operating results;
- difficulties in achieving anticipated operational improvements;
- incurrence of additional indebtedness to finance acquisitions or capital expenditures relating to acquired assets; and
- issuance of additional equity, which could result in further dilution of the ownership interest of existing stockholders.

We may not be successful in acquiring additional assets, and any acquisitions that we do consummate may not produce the anticipated benefits or may have adverse effects on our business and operating results.

Table of Contents

***We depend upon our subsidiaries for cash to meet our obligations and pay any dividends, and we do not own 100% of the stock of our operating subsidiaries.***

We are a holding company. Our subsidiaries conduct all of our operations and own substantially all of our assets. Consequently, our cash flow and our ability to meet our obligations or pay dividends to our stockholders depend upon the cash flow of our subsidiaries and the payment of funds by our subsidiaries to us in the form of dividends, tax sharing payments or otherwise. Our subsidiaries' ability to make any payments will depend on their earnings, cash flows, the terms of their indebtedness, tax considerations and legal restrictions.

Three of our executive officers, Messrs. Morris, Hart and Concienne, own shares of non-voting stock of two of our subsidiaries, Alon Assets, Inc., or Alon Assets, and Alon USA Operating, Inc., or Alon Operating. As of March 1, 2008, the shares owned by these executive officers represent 6.06% of the aggregate equity interest in these subsidiaries. In addition, these executive officers hold options vesting through 2010 which, if exercised, could increase their aggregate ownership to 8.34% of Alon Assets and Alon Operating. To the extent these two subsidiaries pay dividends to us, Messrs. Morris, Hart and Concienne will be entitled to receive pro rata dividends based on their equity ownership. For additional information, see Item 12 "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters."

Messrs. Morris, Hart and Concienne are parties to stockholders' agreements with Alon Assets and Alon Operating, pursuant to which we may elect or be required to purchase their shares in connection with put/call rights or rights of first refusal contained in those agreements. The purchase price for the shares is generally determined pursuant to certain formulas set forth in the stockholders' agreements, but after July 31, 2010, the purchase price, under certain circumstances involving a termination of, or resignation from, employment would be the fair market value of the shares. For additional information, see Item 12 "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters."

***It may be difficult to serve process on or enforce a United States judgment against certain of our directors.***

All of our directors, other than Messrs. Ron Haddock and Jeff Morris, reside in Israel. In addition, a substantial portion of the assets of these directors are located outside of the United States. As a result, you may have difficulty serving legal process within the United States upon any of these persons. You may also have difficulty enforcing, both in and outside the United States, judgments you may obtain in United States courts against these persons in any action, including actions based upon the civil liability provisions of United States federal or state securities laws. Furthermore, there is substantial doubt that the courts of the State of Israel would enter judgments in original actions brought in those courts predicated on United States federal or state securities laws.

## ITEM 1B. UNRESOLVED STAFF COMMENTS.

None.

## ITEM 3. LEGAL PROCEEDINGS.

In the ordinary conduct of our business, we are subject to periodic lawsuits, investigations and claims, including environmental claims and employee related matters. Although we cannot predict with certainty the ultimate resolution of lawsuits, investigations and claims asserted against us, we do not believe that any currently pending legal proceeding or proceedings to which we are a party will have a material adverse effect on our business, results of operations, cash flows or financial condition.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

There were no matters submitted to a stockholder vote during the third and fourth quarter of 2007.

# EXHIBIT 3

Exhibit 3
Page 44

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2008**

**OR**

☐ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM _________TO_________.**

**Commission file number: 001-32567**

# ALON USA ENERGY, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **74-2966572** |
|---|---|
| (State of incorporation) | (I.R.S. Employer Identification No.) |
| **7616 LBJ Freeway, Suite 300, Dallas, Texas** | **75251** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (972) 367-3600

Securities registered pursuant to Section 12 (b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $0.01 per share | New York Stock Exchange |

Securities registered pursuant to Section 12 (g) of the Act: None

Indicate by check mark if the registrant is a well-known, seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐ Accelerated filer ☑ Non-accelerated filer ☐ (Do not check if a smaller reporting company) Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). Yes ☐ No ☑

The aggregate market value for the registrant's common stock held by non-affiliates as of June 30, 2008, the last day of the registrant's most recently completed second fiscal quarter was $129,481,674.92.

As of March 31, 2009, 46,814,021 shares of the registrant's common stock, $0.01 par value, were outstanding.

Documents incorporated by reference: Proxy statement of the registrant relating to the registrant's 2009 annual meeting of stockholders, which is incorporated into Part III of this Form 10-K.

ALON0000433

Exhibit 3
Page 46

**TABLE OF CONTENTS**

| | Page |
|---|---|
| PART I | |
| ITEMS 1. AND 2. BUSINESS AND PROPERTIES | 1 |
| ITEM 1A. RISK FACTORS | 27 |
| ITEM 1B. UNRESOLVED STAFF COMMENTS | 35 |
| ITEM 3. LEGAL PROCEEDINGS | 35 |
| ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 35 |
| PART II | |
| ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASE OF EQUITY SECURITIES | 36 |
| ITEM 6. SELECTED FINANCIAL DATA | 38 |
| ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 40 |
| ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 73 |
| ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 75 |
| ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 75 |
| ITEM 9A. CONTROLS AND PROCEDURES | 75 |
| ITEM 9B. OTHER INFORMATION | 75 |
| PART III | |
| ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT | 76 |
| ITEM 11. EXECUTIVE COMPENSATION | 76 |
| ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 76 |
| ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 76 |
| ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES | 76 |
| PART IV | |
| ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 77 |

# PART I

## ITEMS 1. AND 2. BUSINESS AND PROPERTIES.

***Statements in this Annual Report on Form 10-K, including those in Items 1 and 2, "Business and Properties," and Item 3, "Legal Proceedings," that are not historical in nature should be deemed forward-looking statements that are inherently uncertain. See "Forward-Looking Statements" in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 for a discussion of forward-looking statements and of factors that could cause actual outcomes and results to differ materially from those projected.***

## COMPANY OVERVIEW

In this Annual Report, the words "we," "our" and "us" refer to Alon USA Energy, Inc. and its consolidated subsidiaries or to Alon USA Energy, Inc. or an individual subsidiary, and not to any other person.

We are a Delaware corporation formed in 2000 to acquire the Big Spring, Texas refinery and related pipeline, terminal and marketing assets from Atofina Petrochemicals, Inc., or FINA. In 2006, we acquired refineries in Paramount and Long Beach, California and Willbridge, Oregon, together with the related pipeline, terminal and marketing assets, through the acquisitions of Paramount Petroleum Corporation and Edgington Oil Company. In 2008, we acquired a refinery in Krotz Springs, Louisiana through the acquisition of Valero Refining Company-Louisiana. As of December 31, 2008, we operated 306 convenience stores in Central and West Texas and New Mexico, primarily under the 7-Eleven and FINA brand names. Our convenience stores typically offer merchandise, food products and motor fuels. Our principal executive offices are located at 7616 LBJ Freeway, Suite 300, Dallas, Texas 75251, and our telephone number is (972) 367-3600. Our website can be found at www.alonusa.com.

On July 28, 2005, our stock began trading on the New York Stock Exchange under the trading symbol "ALJ." We are a controlled company under the rules and regulations of the New York Stock Exchange because Alon Israel Oil Company, Ltd. ("Alon Israel") owns approximately 77.8% of our outstanding common stock. Alon Israel, an Israeli limited liability company, is the largest services and trade company in Israel. Alon Israel entered the gasoline marketing and convenience store business in Israel in 1989 and has grown to become a leading marketer of petroleum products and one of the largest operators of retail gasoline and convenience stores in Israel. Alon Israel is a controlling shareholder of Blue Square Israel, Ltd., a leading retailer in Israel, which is listed on the New York Stock Exchange and the Tel Aviv Stock Exchange and also of Dor Alon Energy, a leading Israeli marketer, developer and operator of gas stations and shopping centers.

We file annual, quarterly and current reports and proxy statements, and file or furnish other information, with the Securities Exchange Commission ("SEC"). Our SEC filings are available to the public over the Internet at the SEC's website at www.sec.gov. In addition, we make our SEC filings available free of charge through our internet website at www.alonusa.com as soon as reasonably practicable after we electronically file, or furnish, such material with the SEC. In addition, we will provide copies of our filings free of charge to our stockholders upon request to Alon USA Energy, Inc., Attention: Investor Relations, 7616 LBJ Freeway, Suite 300, Dallas, Texas 75251. We have also made the following documents available free of charge through our internet website at www.alonusa.com:

- Compensation Committee Charter;
- Audit Committee Charter;
- Corporate Governance Guidelines; and
- Code of Business Conduct and Ethics.

We submitted our annual certification concerning corporate governance to the New York Stock Exchange on May 29, 2008 pursuant to section 303A.12(a) of the New York Stock Exchange Listed Company Manual.

## BUSINESS

We are an independent refiner and marketer of petroleum products operating primarily in the South Central, Southwestern and Western regions of the United States. Our crude oil refineries are located in Texas, California, Oregon and Louisiana and have a combined throughput capacity of approximately 250,000 barrels per day ("bpd"). Our refineries produce petroleum products including various grades of gasoline, diesel fuel, jet fuel, petrochemicals, petrochemical feedstocks, asphalt, and other petroleum-based products.

In the first quarter of 2008, we modified our presentation of segment data to reflect the following three operating segments: (i) refining and unbranded marketing, (ii) asphalt and (iii) retail and branded marketing. The branded marketing segment information historically included as part of the refining and marketing segment has been combined with the retail segment. Prior segment results have been changed to conform with the current year presentation. Additional information regarding our operating segments and properties is presented in Note 6 to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

### Refining and Unbranded Marketing

Our refining and unbranded marketing segment includes sour and heavy crude oil refineries that are located in Big Spring, Texas, and Paramount and Long Beach, California and a light sweet crude oil refinery located in Krotz Springs, Louisiana. Because we operate the Long Beach refinery as an extension of the Paramount refinery and due to their physical proximity to one another, we refer to the Long Beach and Paramount refineries together as our "California refineries." These refineries have a combined throughput capacity of approximately 240,000 bpd. At these refineries we refine crude oil into petroleum products, including gasoline, diesel fuel, jet fuel, petrochemicals, petrochemical feedstocks and asphalts, which are marketed primarily in the South Central, Southwestern and Western United States.

*Big Spring Refinery*

Our Big Spring refinery has a crude oil throughput capacity of 70,000 bpd and is located on 1,306 acres in the Permian Basin in West Texas. In industry terms, our Big Spring refinery is characterized as a "cracking refinery," which generally refers to a refinery utilizing vacuum distillation and catalytic cracking processes in addition to basic distillation, naphtha reforming and hydrotreating processes, to produce higher light product yields through the conversion of heavier fuel oils into gasoline, light distillates and intermediate products.

Major processing units at our Big Spring refinery include fluid catalytic cracking ("FCC"), naphtha reforming, vacuum distillation, hydrotreating and alkylation units.

On February 18, 2008, a fire at the Big Spring refinery destroyed the propylene recovery unit and damaged equipment in the alkylation and gas concentration units. The re-start of the crude unit in a hydroskimming mode began on April 5, 2008 and the Fluid Catalytic Cracking Unit ("FCCU") resumed operations on September 26, 2008. Substantially all of the repairs to the units damaged in the fire have been completed other than the alkylation unit which we expect to be completed by the end of 2009.

Our Big Spring refinery has the capability to process substantial volumes of less expensive high-sulfur, or sour, crude oils to produce a high percentage of light, high-value refined products. Typically, sour crude oil has accounted for approximately 90.0% of the Big Spring refinery's crude oil input.

Our Big Spring refinery produces gasoline, ultra low sulfur diesel, jet fuel, petrochemicals, petrochemical feedstocks, asphalt and other petroleum products. This refinery typically converts approximately 90.0% of its feedstock into finished products such as gasoline, diesel, jet fuel and petrochemicals, with the remaining 10.0% primarily converted to asphalt and liquefied petroleum gas.

During each full year of operations since our acquisition from FINA other than 2008 due to the February 18, 2008 fire, we have averaged over 90% utilization of our Big Spring refinery's crude oil throughout capacity. The following table summarizes historical throughput and production data for our Big Spring refinery:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | | 2007 | | 2006 | |
| | Bpd | % | Bpd | % | Bpd | % |
| Refinery throughput: | | | | | | |
| Sour crude | 31,654 | 83.8 | 58,607 | 86.0 | 58,529 | 89.4 |
| Sweet crude | 4,270 | 11.3 | 5,017 | 7.4 | 2,987 | 4.6 |
| Blendstocks | 1,869 | 4.9 | 4,521 | 6.6 | 3,897 | 6.0 |
| Total refinery throughput (1) | 37,793 | 100.0 | 68,145 | 100.0 | 65,413 | 100.0 |
| Refinery production: | | | | | | |
| Gasoline | 14,266 | 38.4 | 32,135 | 47.5 | 29,671 | 46.0 |
| Diesel/jet | 10,439 | 28.2 | 19,676 | 29.1 | 20,651 | 32.0 |
| Asphalt | 4,850 | 13.1 | 7,620 | 11.3 | 6,147 | 9.5 |
| Petrochemicals | 1,221 | 3.3 | 3,980 | 5.9 | 4,465 | 6.9 |
| Other | 6,298 | 17.0 | 4,190 | 6.2 | 3,627 | 5.6 |
| Total refinery production (2) | 37,074 | 100.0 | 67,601 | 100.0 | 64,561 | 100.0 |
| Refinery utilization (3) | 52.3% | | 92.5% | | 90.8% | |

(1) Total refinery throughput represents the total of crude oil and blendstock inputs in the refinery production process.

(2) Total refinery production represents the bpd of various products produced from processing oil and other refinery feedstocks through the crude unit and other conversion units at our Big Spring refinery.

(3) Refinery utilization represents average daily crude oil throughput divided by crude oil capacity, excluding planned periods of downtime for maintenance and turnarounds.

Refinery throughput and production for 2008 reflects the effects of the downtime associated with the February 18, 2008 fire. Refinery throughput and production for 2007 reflects the effects of downtime associated with a scheduled reformer regeneration in January 2007, scheduled maintenance in the third quarter of 2007 and restrictions on throughput caused by limited hydrogen production due to operational issues in the catalytic reformer which were resolved by a reformer regeneration completed in January 2008. Refinery throughput and production for 2006 reflects the effects of downtime associated with a planned turnaround in May 2006 for the installation and start-up of equipment to permit the Big Spring refinery to satisfy the ultra low sulfur diesel standards of the U.S. Environmental Protection Agency ("EPA") and of reduced crude oil capacity due to a restriction in the crude vacuum tower heater during the months of June to December of 2006. Due to the vacuum tower heater restriction, average refinery throughput for the last two quarters of 2006 was 67,400 bpd compared to 70,529 bpd for the first quarter of 2006.

*Big Spring Refinery Raw Material Supply*

Sour crude oil has typically accounted for more than 90% of our crude oil input at the Big Spring refinery, of which approximately 93% was West Texas Sour ("WTS") crude oil prior to 2007. In late 2006, we began to use different crudes and feedstocks shipped from the Texas Gulf Coast on the Amdel pipeline to diversify our crude sources and to improve production yields. As a result, in 2007 WTS decreased to approximately 77% of the Big Spring Refinery's sour crude oil input. In 2008, WTS decreased to approximately 63% of the Big Spring Refinery's sour crude oil input. Our Big Spring refinery is the closest refinery in proximity to Midland, Texas, which is the largest origination terminal for West Texas crude oil. We believe this location provides us with the lowest transportation cost differential for West Texas crude oil of any refinery.

Approximately 68% of our Big Spring refinery's crude oil input requirements are purchased through term contracts with several suppliers, including major oil companies. These term contracts are generally short-term in nature with arrangements that contain market-responsive pricing provisions and provisions for renegotiation or cancellation by either party. A small amount of locally gathered crude oil is also delivered directly to our Big Spring refinery. The remainder of the Big Spring refinery's crude oil input requirements are purchased on the spot market. In addition, access to the Amdel and White Oil pipelines gives us the ability to optimize our refinery crude slate by transporting foreign and domestic crude oils to our Big Spring refinery from the Gulf Coast when the economics for processing those crude oils are more favorable than processing locally-sourced crude oils. Other feedstocks,

including butane, isobutane and asphalt blending components, are delivered by truck and railcar, and a majority of our natural gas is delivered by a pipeline in which we own a 63% interest.

*Crude Oil Pipelines*

We receive WTS crude oil and West Texas Intermediate ("WTI"), a light sweet crude oil, primarily from regional common carrier pipelines. We also have access to offshore domestic and foreign crude oils available on the Gulf Coast through the Amdel and White Oil pipelines. This combination of access to Permian Basin crude oil and foreign and offshore domestic crude oil from the Gulf Coast allows us to optimize our Big Spring refinery's crude oil supply at any given time. The crude oil pipelines we utilize consist of the following:

| Crude Oil Pipelines | Status | Miles | Connections |
|---|---|---|---|
| Amdel | Sunoco Throughput | 504 | Midland and Nederland |
| White Oil | Sunoco Throughput | 25 | Garden City (Amdel) and Big Spring |
| Mesa Interconnect | Owned | 4 | Mesa pipeline and Big Spring |
| Centurion | Owned (leased to Centurion) | 3 | Centurion pipeline and Big Spring |

The 504-mile bi-directional Amdel pipeline and the 25-mile White Oil pipeline connect our refinery to Nederland, Texas, which is located on the Gulf Coast, and to Midland, Texas. Permian Basin crude oil is delivered to our Big Spring refinery through the 4-mile long, 16-inch diameter Mesa Interconnect pipeline which is connected to the Mesa pipeline system, a common carrier, and through our 3-mile long, 12-inch diameter connection pipeline which is leased to Centurion Pipeline L.P. ("Centurion") and connected to the Centurion 12-inch and 8-inch diameter pipeline system from Midland, Texas to Roberts Junction in Texas.

On March 1, 2006, we sold our Amdel and White Oil crude pipelines, which had been inactive since December 2002, to an affiliate of Sunoco, Inc. ("Sunoco"), for a total consideration of approximately $68.0 million. In conjunction with the sale of the Amdel and White Oil pipelines, we entered into a 10-year pipeline Throughput and Deficiency Agreement with Sunoco, with an option to extend the agreement by four additional thirty-month periods. The Throughput and Deficiency Agreement allows us to maintain crude oil transportation rights on the pipelines from the Gulf Coast and from Midland, Texas to the Big Spring refinery. Pursuant to the Throughput and Deficiency Agreement, we have agreed to ship a minimum of 15,000 bpd on the pipelines during the term of the agreement. We commenced shipments of crude oil through the Amdel and White Oil pipelines under this agreement in October 2006.

To further diversify crude oil delivery sources to our Big Spring refinery, we entered into a 15-year arrangement with Centurion in June 2006. Pursuant to this arrangement, Centurion will provide us with crude oil transportation pipeline capacity, and we ship a minimum of 21,500 bpd of crude oil from Midland, Texas to our Big Spring refinery using Centurion's approximately 40-mile long pipeline system from Midland to Roberts Junction and our 3-mile pipeline from Roberts Junction to the Big Spring refinery which we lease to Centurion. We commenced shipments of crude oil through these pipelines in November 2006.

*Big Spring Refinery Production*

*Gasoline*. In 2008, gasoline accounted for approximately 38.4% of our Big Spring refinery's production. We produce various grades of gasoline, ranging from 84 sub-octane regular unleaded to 93 octane premium unleaded, and use a computerized component blending system to optimize gasoline blending. We intend to complete our ultra low sulfur gasoline project in the second half of 2009 following which our gasoline produced at the Big Spring refinery will comply with the EPA's ultra low sulfur gasoline standard of 30 parts per million ("ppm"). Our Big Spring refinery is capable of producing specially formulated fuels, such as those required in the El Paso, Dallas/Fort Worth and Arizona markets.

*Distillates*. In 2008, diesel and jet fuel accounted for approximately 28.2% of our Big Spring refinery's production. Following completion of our ultra low sulfur diesel project in May 2006, all of the on-road specification diesel fuel we produce meets the EPA's ultra low sulfur diesel standard of 15 ppm. Our jet fuel production conforms to the JP-8 grade military specifications required by the Air Force bases to which we market our jet fuel.

*Asphalt*. Asphalt accounted for approximately 13.1% of our Big Spring refinery's production in 2008. Approximately 24.5% of our Big Spring refinery's asphalt production is blended paving grades and 75.5% is asphalt

blendstocks. We have an exclusive license to use FINA's asphalt blending technology in West Texas, Arizona, New Mexico and Colorado and a non-exclusive license in Idaho, Montana, Nevada, North Dakota, Utah and Wyoming. Exclusivity under this fully-paid license remains in effect as long as we continue to purchase our rubber modifiers from FINA, although we may purchase rubber modifiers from other sources and maintain such exclusivity if FINA does not provide competitive pricing on these products. Because FINA ceased supplying rubber modifiers in the United States in the first quarter of 2005, we have been purchasing rubber modifiers from other sources since that time. Our asphalt facilities are capable of producing up to 30 different product formulations, including both polymer modified asphalt ("PMA") and ground tire rubber ("GTR") asphalt. Asphalt produced at the Big Spring refinery is transferred to our asphalt segment at prices substantially determined by reference to the cost of crude oil, which is intended to approximate bulk wholesale market prices.

*Petrochemical Feedstocks and Other*. We produce propane, propylene, certain aromatics, specialty solvents and benzene for use as petrochemical feedstocks, along with other by-products such as sulfur and carbon black oil. Our Big Spring refinery has sulfur processing capabilities of approximately two tons per thousand bpd of crude oil capacity, which is above the average for cracking refineries and aids in our ability to produce low-sulfur motor fuels with relatively low investment while continuing to process significant amounts of sour crude oil.

*Big Spring Refinery Transportation Fuel Marketing*

Our refining and unbranded marketing segment sales include sales of refined products from our Big Spring refinery in both the wholesale rack and bulk markets. Our marketing of transportation fuels produced at our Big Spring refinery is focused on four states in the Southwestern and South Central regions of the United States through our physically integrated system.

We market transportation fuels produced at our Big Spring refinery in West and Central Texas, Oklahoma, New Mexico and Arizona. We refer to these areas as our physically integrated system because our distributors in this region are supplied with motor fuels produced at our Big Spring refinery and distributed through a network of pipelines and terminals which we either own or have access to through leases or long-term throughput agreements. Other than in 2008 due to the February 18, 2008 fire, approximately 50% of the gasoline and 10% of the diesel motor fuels produced at our Big Spring Refinery are transferred to our retail and branded marketing segments at prices substantially determined by reference to Platts.

*Unbranded Transportation Fuel Marketing*. We presently sell a majority of the diesel fuel and approximately 16.7% of the gasoline produced at our Big Spring refinery on an unbranded basis. During 2008 we sold over 6,851 bpd of our Big Spring refinery's diesel fuel and gasoline production as unbranded fuels, which were largely sold through our physically integrated system. An additional 4,000 bpd was sold on a purchase for resale basis due to the February 18, 2008 fire.

*Jet Fuel Marketing*. We market substantially all the jet fuel produced at our Big Spring refinery as JP-8 grade to the Defense Energy Supply Center ("DESC"). All DESC contracts are for a one-year term and are awarded through a competitive bidding process. We have traditionally bid for contracts to supply Dyess Air Force Base in Abilene, Texas and Sheppard Air Force Base in Wichita Falls, Texas. Jet fuel production in excess of existing contracts is sold through unbranded rack sales.

*Product Supply Sales*. We sell transportation fuel production in excess of our branded and unbranded marketing needs through bulk sales and exchange channels. These bulk sales and exchange arrangements are entered into with various oil companies and traders and are transported through our product pipeline network or truck deliveries. Our petrochemical feedstock and other petroleum product production is sold to a wide customer base and is transported through truck and railcars.

*Big Spring Product Pipelines*

The product pipelines we utilize to deliver refined products from our Big Spring refinery are linked to the major third-party product pipelines in the geographic area around our Big Spring refinery. These pipelines provide us flexibility to optimize product flows into multiple regional markets. This product pipeline network can also (1) receive additional transportation fuel products from the Gulf Coast through the Delek product terminal and Magellan

pipelines, (2) deliver and receive products to and from the Magellan system, our connection to the Group III, or mid-continent markets, and (3) deliver products to the New Mexico and Arizona markets through third-party systems. The following table describes the product pipelines which we utilize:

| Product Pipelines | Access | Miles | Connections | Expiration Date |
|---|---|---|---|---|
| Plains (1) | Lease | 38 | Coahoma and Midland | 2012 |
| Fin-Tex | HEP throughput | 137 | Midland and Orla (Holly) | 2020 |
| Holly | Lease | 133 | Orla and El Paso | 2018 |
| Trust | HEP throughput | 332 | Big Spring/Abilene/Wichita Falls | 2020 |
| Dyess JP-8 | HEP throughput | 2 | Abilene and Dyess Air Force Base | 2020 |
| River | HEP throughput | 47 | Wichita Falls and Duncan (Magellan) | 2020 |
| Carswell | Owned | 148 | Abilene and Fort Worth | N/A |

(1) The description of the Plains pipeline does not include a 4-mile pipeline that we own connecting Big Spring and Coahoma, Texas.

In February 2005, we completed the contribution of our Fin-Tex, Trust, River and Dyess JP-8 product pipelines, and certain of our product terminals connected to these pipelines to Holly Energy Partners, LP ("HEP"). Simultaneous with this transaction, we entered into a Pipelines and Terminal Agreement with HEP with an initial term of 15 years and three subsequent five year renewal terms exercisable at our sole discretion. Pursuant to the Pipelines and Terminal Agreement, we have agreed to transport and store minimum volumes of refined products in the pipelines and terminals and to pay specified tariffs and fees for such transportation and storage during the term of the agreement. See Note 5 of our consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

The Plains, Fin-Tex and Holly pipelines make up the Fin-Tex system. Our access to the Plains and Holly pipelines is secured by pipeline leases, while our access to the Fin-Tex pipeline is provided through our Pipelines and Terminals Agreement with HEP. The Fin-Tex system transports product from the Big Spring refinery to El Paso, Texas and allows product to be placed in Tucson and Phoenix, Arizona through the third-party Kinder Morgan pipeline. The Fin-Tex system also gives us access to the Albuquerque and Bloomfield, New Mexico markets. We deliver physical barrels to El Paso and receive, through an exchange agreement with Navajo Refining Company, physical barrels in Albuquerque and Bloomfield.

The Trust pipeline connects our Big Spring refinery to terminals in Abilene and Wichita Falls, while the River pipeline connects the terminal in Wichita Falls to our Duncan, Oklahoma terminal. At Duncan, the River pipeline connects into the Magellan pipeline system for sales into Group III, or mid-continent, markets. The Trust and River pipeline system is a bi-directional pipeline system which we access through our Pipelines and Terminals Agreement with HEP.

The Dyess JP-8 pipeline connects the Abilene terminal to Dyess Air Force Base. Our access to this pipeline is also provided through our Pipelines and Terminals Agreement with HEP.

Our Carswell pipeline system runs from Abilene to Fort Worth, Texas. The Carswell pipeline is currently inactive.

*Product Terminals*

We primarily utilize the following six product terminals for delivery of transportation fuels produced at our Big Spring refinery, of which two are owned and three are accessed through our Pipelines and Terminal Agreement with HEP:

| Terminals | Access | Working Capacity (1) | Supply Source | Mode of Delivery |
|---|---|---|---|---|
| Big Spring, Texas (2) | Owned | 331 | Pipeline/refinery | Pipeline/truck |
| Abilene, Texas | HEP | 111 | Pipeline | Pipeline/truck |
| Wichita Falls, Texas | HEP | 189 | Pipeline | Truck |
| Duncan, Oklahoma | Owned (3) | 154 | Pipeline | Pipeline |
| Orla, Texas | HEP | 116 | Pipeline | Pipeline |
| Southlake, Texas | Terminalling Agreement | 212 | Pipeline | Truck |
| Total | | 1,113 | | |

(1) Measured in thousands of barrels.

(2) Includes the tankage located at our Big Spring refinery.

(3) The terminal is owned, but the underlying real property is leased.

All six terminals we access are physically integrated with our Big Spring refinery through the product pipelines we utilize. Four of these six terminals, Big Spring, Abilene, Southlake and Wichita Falls, are equipped with truck loading racks. The other two terminals, Duncan, Oklahoma and Orla, Texas, are used for delivering shipments into third-party pipeline systems. The Southlake terminal is supplied pursuant to a throughput agreement with Nustar Logistics, LP ("Nustar") whereby we have agreed to ship 2,000 bpd of product from the HEP-owned Wichita Falls, Texas terminal to the Southlake terminal through Nustar's pipeline. We also directly access three other terminals located in El Paso, Texas and Tucson and Phoenix, Arizona.

*California Refineries and Terminals*

On August 4, 2006, we completed the purchase of the stock of Paramount Petroleum Corporation, a heavy crude oil refining company. Paramount Petroleum Corporation's assets included two refineries located in Paramount, California and Willbridge, Oregon with a combined refining capacity of 66,000 bpd, seven asphalt terminals located in Washington (Richmond Beach), California (Elk Grove and Mojave), Arizona (Phoenix, Fredonia and Flagstaff), and Nevada (Fernley) (50% interest), and a 50% interest in Wright Asphalt Products Company ("Wright"), which specializes in patented ground tire rubber modified asphalt products. Our Paramount refinery has a crude oil throughput capacity of 54,000 bpd and is located on 63 acres in Paramount, California. In industry terms, the Paramount refinery is characterized as a "hydroskimming refinery" which is a more complex refinery configuration than a "topping refinery" (described below), adding naphtha reforming, hydrotreating and other chemical treating processes to the distillation process. In addition to producing vacuum gas oil and asphalt, our Paramount refinery utilizes naphtha reforming and hydrotreating to produce gasoline and distillate products from the light oil streams resulting from the distillation process.

On September 28, 2006, we completed the acquisition of Edgington Oil Company, a heavy crude oil refining company located in Long Beach, California. Edgington Oil Company's assets included a refinery with a nameplate capacity of approximately 40,000 bpd. Our Long Beach refinery has a crude oil throughput capacity of 40,000 bpd and is located on 19 acres in Long Beach, California. In industry terms, the Long Beach refinery is characterized as a "topping refinery" which generally refers to a low complexity refinery configuration consisting primarily of a distillation unit. Distillation is the first step in the refining process – separating crude oil into its constituent petroleum products. The Long Beach refinery utilizes vacuum distillation to produce vacuum gas oil and asphalt.

Our refineries located in Paramount and Long Beach are included in our refining and unbranded marketing segment, while our refinery in Willbridge is included in our asphalt segment. Because we operate the Long Beach refinery as an extension of the Paramount refinery and due to their physical proximity to one another, we refer to the Paramount and Long Beach refineries together as our "California refineries."

Our California refineries have the capability to process substantial volumes of less expensive sour crude oils. In 2008 at the California refineries, sour crude oil accounted for approximately 26.2% of crude oil input and heavy crude oil accounted for 73.8%. The California refineries are connected by pipelines we own. Asphalt is the only finished product produced at the Long Beach refinery. Approximately 56% of the unfinished motor fuels, jet fuel and other products produced at the Long Beach refinery in 2008 were transferred to the Paramount refinery via our

pipeline connection and by trucks for final processing and marketing, with the remainder sold to other area refineries and third parties. Major processing units at the California refineries include naphtha reforming, vacuum distillation, hydrotreating and isomerization units.

Our California refineries produce CARBOB gasoline, CARB diesel, jet fuel, asphalt and other petroleum products. In 2008, these refineries converted approximately 38.5% of crude oil into higher value products such as gasoline, diesel and jet fuel, with 30.5% converted to asphalt, fuel oil and sulfur. The remaining 31.0% of production was sold as unfinished feedstocks to other refineries and third parties.

As reflected in our 2008 production results, the California refineries still produced unfinished products. Unfinished products typically provide lower margins than finished products. In order to realize higher margins for the sale of these finished products, we have completed a refinery upgrade project to bring online a naphtha hydrotreater located at the Paramount refinery. The naphtha hydrotreater allows us to increase our production of distillates and gasoline and to produce less unfinished products.

In 2008, we averaged approximately 46% utilization of our crude oil throughput capacity. The following table summarizes 2008, 2007 and 2006 throughput and production data for our California refineries on a combined basis.

| | Year Ended December 31, | | | | Period Ended December 31, 2006 (1) | |
|---|---|---|---|---|---|---|
| | 2008 | | 2007 | | | |
| | Bpd | % | Bpd | % | Bpd | % |
| Refinery throughput: | | | | | | |
| Sour crude | 8,014 | 25.8 | 20,839 | 33.7 | 37,171 | 61.9 |
| Heavy crude | 22,590 | 72.6 | 40,700 | 65.9 | 22,533 | 37.5 |
| Blendstocks | 495 | 1.6 | 223 | 0.4 | 362 | 0.6 |
| Total refinery throughput (2) | 31,099 | 100.0 | 61,762 | 100.0 | 60,066 | 100.0 |
| Refinery production: | | | | | | |
| Gasoline | 4,141 | 13.7 | 7,318 | 12.1 | 6,806 | 11.6 |
| Diesel/jet | 7,481 | 24.8 | 13,360 | 22.1 | 11,026 | 18.9 |
| Asphalt | 9,214 | 30.5 | 19,006 | 31.5 | 19,500 | 33.3 |
| Light Unfinished | 0 | 0.0 | 3,071 | 5.1 | 6,144 | 10.5 |
| Heavy Unfinished | 9,182 | 30.4 | 16,793 | 27.9 | 2,938 | 5.0 |
| Other | 192 | 0.6 | 793 | 1.3 | 12,126 | 20.7 |
| Total refinery production (3) | 30,210 | 100.0 | 60,341 | 100.0 | 58,540 | 100.0 |
| Refinery utilization (4) | | 46.3% | | 85.9% | | 83.8% |

(1) 2006 data includes our Paramount refinery for the period from August 1, 2006 through December 31, 2006 and our Long Beach refinery for the period from September 28, 2006 through December 31, 2006.

(2) Total refinery throughput represents the total of crude oil and blendstock inputs in the refinery production process.

(3) Total refinery production represents the bpd of various products produced from processing crude oil and other refinery feedstocks through the crude units and other conversion units at our California refineries.

(4) Refinery utilization represents average daily crude oil throughput divided by crude oil capacity, excluding planned periods of downtime for maintenance and turnarounds. Reflects the effects of downtime associated with a planned turnaround of our No. 2 crude unit at the Paramount refinery in March and April 2007 and the downtime to optimize our refining and asphalt economics in 2008.

Our California refineries operated at low rates for 2008 due to historically low West Coast refining margins, a planned turnaround of the Paramount refinery lasting for two months, and a planned revamp and turnaround of the No. 2 crude unit at the Long Beach refinery lasting five months. The Paramount refinery started back up in February 2009 after the completion of a refinery-wide turnaround and the completion of refinery upgrade projects. These projects include the upgrade of an idled naphtha hydrotreater, revamping a naphtha hydrotreater to hydrotreat jet fuel, upgrading crude units' metallurgy, upgrading the refinery's electrical system and the installation of a new flare

gas recovery system. These upgrades will result in the combined Paramount and Long Beach refineries being operated in a hydroskimming mode. In September 2007, our Long Beach refinery achieved throughput of 35,000 bpd upon the startup of the No. 1 crude unit. In November 2007, the No. 2 crude unit at the Long Beach refinery was taken offline for a planned turnaround. In addition, we continuously evaluate and optimize throughput at our California refineries based on the topping and hydroskimming margins environment.

*California Refineries Raw Material Supply*

For 2008, sour crude oil accounted for approximately 26.2% of our crude oil input of which approximately 9.3% was California sour crude oil. Heavy crude oil accounted for approximately 73.8% of our crude oil input of which approximately 39.1% was local California heavy crude oil. As a result of the proximity of the California refineries to the Port of Los Angeles and the Port of Long Beach, we have access to a variety of domestic and foreign crude oils that are available on the West Coast. Our California refineries receive crude oil primarily from common carrier, private carrier and our owned pipelines. Approximately 30.0% of our California refineries' crude oil input requirements are purchased through term contracts with several suppliers, including major oil companies. These term contracts are both short-term and long-term in nature with arrangements that contain market-responsive pricing provisions and provisions for renegotiation or cancellation by either party. The remainder of the California refineries' crude oil input requirements are purchased on the spot market. Other feedstocks, including butane and gasoline blendstocks, are delivered by truck and pipeline.

*Crude Oil Pipelines*

The crude oil pipelines we utilize provide our California refineries access to California and foreign crude oils and consist of the following:

| Crude Oil Pipelines | Status | Miles | Connections |
|---|---|---|---|
| Paramount Crude | Owned | 2.5 | Paramount and East Hynes Terminal |
| Chevron Crude | Third Party | 15 | Paramount and local gathering system |
| No. 3/No. 4 | Owned | 13 | Long Beach and Long Beach Harbor |
| BP | Third Party | 1 | Long Beach and East Hynes Terminal |

The Paramount refinery is supplied by the Chevron Crude pipeline (heavy sour) and Paramount Crude pipeline (medium/heavy sour). The Long Beach refinery is supplied by the No. 3/No. 4 pipelines (heavy sour) and the BP pipeline (medium sour). As a supplement to our on-site storage facilities, the California refineries lease crude oil storage tanks located at the BP-owned East Hynes, the Plains Dominguez, Long Beach and the Kinder Morgan Carson crude oil terminals. Additionally, we acquire California medium sour crude oil from the West Hynes terminal and utilize the Plains Dominguez and Long Beach terminals pursuant to throughput arrangements. This combination of storage capacity and throughput arrangements allows the California refineries to receive and optimize the crude slate of waterborne domestic and foreign crude oil, along with California crude oil.

On June 29, 2007, we purchased a crude oil and unfinished products pipeline system from Kinder Morgan, Inc. known as the "Black Oil System." The Black Oil System includes approximately 6 miles of active and 13 miles of inactive pipelines in the Long Beach, California area. The Black Oil System provides our Paramount refinery and other third-party shippers with access to refineries and waterborne terminals.

*California Refineries Production*

*Gasoline*. In 2008, CARBOB gasoline, all of which is produced or finished at our Paramount refinery, accounted for approximately 18.5% of our California refineries' production. The Paramount refinery utilizes a computerized component blending system to optimize gasoline blending. In addition, our Paramount refinery is capable of producing specially formulated fuels, such as those required in the California, Nevada and Arizona markets.

*Distillates*. In 2008, CARB diesel, Ultra Low Sulfur EPA diesel, Jet A and military jet fuel, all of which is produced or finished at our Paramount refinery, accounted for approximately 26.5% of our California refineries' production. All of the diesel fuel we produce is ultra low sulfur CARB/EPA diesel. We produce both commercial Jet A and military jet fuel. The military jet fuel conforms to the JP-8 grade military specifications required by the Air

Force bases to which we market our jet fuel.

*Asphalt*. In 2008, asphalt accounted for approximately 30.5% of our California refineries' production. Approximately 46% of our California refineries' asphalt production is paving grades and 54% is roofing asphalt. Asphalt produced at the California refineries is transferred to our asphalt segment at prices substantially determined by reference to the cost of crude oil, which is intended to approximate wholesale market prices.

*Light and Heavy Unfinished Feedstocks*. We produce LPG, naphtha, unfinished distillates, fuel oil and gas oils used as refinery feedstocks, along with other by-products such as sulfur and fuel oil, all of which is sold to third parties via pipeline and truck on either a contract or spot basis.

*California Refineries Transportation Fuel Marketing*

Our refining and unbranded marketing segment sales includes sales of refined products from our California refineries in both the wholesale rack and bulk markets. Our marketing of gasoline and diesel fuels is focused on the Southern California market. We market a portion of the CARB gasoline and CARB diesel produced at our Paramount refinery through the Paramount refinery rack on an unbranded and delivered basis to wholesale distributors. The remainder of our CARB diesel and our CARBOB gasoline production is sold through the spot market and term contracts to other refiners and to third parties and for delivery by pipeline.

We market our jet fuel as Jet A that is sold through the spot market, while our JP-8 military jet fuel is contracted to the DESC. All JP-8 grade is sold to the DESC under one-year contracts awarded through a competitive bidding process. Our JP-8 contract expired in October 2008 and was not renewed and, consequently, we have temporarily stopped producing JP-8. We intend to bid for a DESC contract in 2009. Jet-A and JP-8 are delivered to our customers via our Line 145 pipeline or the Paramount rack system.

We sell transportation fuel production in excess of our unbranded marketing needs through bulk sales and exchange channels. These bulk sales and exchange arrangements are entered into with various oil companies and traders and are transported through our product pipeline network to the Kinder Morgan terminal located in Carson, California.

*California Product Pipelines/Terminal*

The Paramount refinery utilizes our Line 145 eight-mile product pipeline and our two-mile leased Line 166 pipeline to ship products to the Kinder Morgan product terminal in Carson, California. The Kinder Morgan product terminal gives us access to the Kinder Morgan product rack, the Kinder Morgan Pacific pipeline to Phoenix, Arizona, and the Kinder Morgan CalNev pipeline to Las Vegas, Nevada.

The following table describes the product pipelines which we utilize:

| Product Pipelines | Access | Miles | Connections |
|---|---|---|---|
| Line 145 | Owned and Leased | 8 | Paramount to a connection with Line 145 |
| Line 166 | Leased | 2 | Connects to Line 145 to Carson City, California (Kinder Morgan) |

The Paramount refinery also utilizes its own terminal at the refinery to distribute CARB diesel, California Reformulated Gasoline (CaRFG), JP-8 and Jet-A into the local market. This terminal is equipped with a truck loading rack that has permitted volumes of approximately 12,000 bpd of distillate and 13,000 bpd of gasoline.

*California Feedstock Pipelines*

The Paramount refinery operates a feedstock pipeline and terminal system that is used to supply gas oil and other unfinished product to other Los Angeles ("LA") Basin refineries and third party terminals. The Black Oil System acquired in June 2007 provides our Paramount refinery and other third-party shippers with access to refineries and waterborne terminals. In the fourth quarter of 2008 we acquired portions of BP's E-12 pipeline and Plain's L-52 pipeline. These are being connected to our Line 35, increasing the integration between our Paramount and Long Beach refineries.

The following table describes the components of our feedstock pipeline and terminal system:

| Feedstock Pipelines | Terminal | Access | Tankage (1) | Miles | Connections |
|---|---|---|---|---|---|
| Chevron No.1 | | Leased | | 4 | Connects our Paramount and Long Beach refineries to our Lakewood Terminal |
| | Lakewood | Owned | 110 | | Connects the Chevron No. 1 pipeline to our Line 160 pipeline |
| Line 160 | | Owned | | 7.1 | Connects the Lakewood Terminal to our leased tanks at Kinder Morgan, other refiners and third party customers |
| | Kinder Morgan | Leased | 180 | | Connects to our Black Oil Pipeline for deliveries to other refiners and third party customers |
| Line 35, L-52, E-12A | | Owned | | 4 | Connects our Long Beach and Paramount Refineries |
| Black Oil Pipeline | | Owned | | 19 | Connects the Kinder Morgan Terminal and Plains Pipeline System to LA Basin refiners and waterborne terminals |

(1) Measured in thousands of barrels.

*Krotz Springs Refinery*

On July 3, 2008, we completed the acquisition of the refinery and related assets located in Krotz Springs, Louisiana through the purchase of all of the capital stock of Valero Refining Company – Louisiana from Valero Energy Corporation ("Valero"). The purchase price was $333.0 million in cash plus approximately $141.5 million for working capital, including inventories. The completion of the Krotz Springs refinery acquisition increased Alon's crude refining capacity by 50% to approximately 250,000 bpd.

The Krotz Springs refinery, with a crude oil capacity of approximately 83,100 bpd, supplies multiple demand centers in the southeastern and northeastern US markets through a pipeline operated by the Colonial Pipeline Company. The second half 2008 refined product mix from the Krotz Springs refinery consisted of approximately 98% light products, with the following yields: 43% gasoline, 46% distillates and light cycle oils, 9% petrochemicals and 2% of heavy products.

Our Krotz Springs refinery is located on approximately 381 acres between Baton Rouge and Lafayette, Louisiana on the Atchafalaya River. In industry terms, the Krotz Springs refinery is characterized as a "mild residual cracking refinery", which generally refers to a refinery utilizing vacuum distillation and catalytic cracking processes in addition to basic distillation and naphtha reforming processes to minimize low quality black oil production and to produce higher light product yields such as gasoline, light distillates and intermediate products.

The Krotz Springs refinery's main processing units include a crude unit and an associated vacuum unit, a fluid catalytic cracking unit, a catalytic reformer unit, a polymerization unit, and an isomerization unit.

Our Krotz Springs refinery has the capability to process substantial volumes of low-sulfur, or sweet, crude oils to produce a high percentage of light, high-value refined products. Typically, sweet crude oil has accounted for 100% of the Krotz Springs refinery's crude oil input.

Our Krotz Springs refinery produces gasoline, high sulfur diesel, jet fuel, kerosene, petrochemicals, petrochemical feedstocks and other petroleum products. This refinery typically converts approximately 96% of its feedstock into finished products such as gasoline, diesel, jet fuel and petrochemicals, with the remaining 4% primarily converted to liquefied petroleum gas.

Since our acquisition of the Krotz Springs refinery, we have averaged approximately 67% utilization of our

crude oil throughput capacity. The following table summarizes 2008 throughput and production data for our Krotz Springs refinery since the date of acquisition.

| | Period Ended December 31, 2008 (1) | |
|---|---|---|
| | Bpd | % |
| Refinery throughput: | | |
| Light sweet crude | 43,361 | 74.5 |
| Heavy sweet crude | 11,979 | 20.6 |
| Blendstocks | 2,844 | 4.9 |
| Total refinery throughput (2) | 58,184 | 100.0 |
| Refinery production: | | |
| Gasoline | 25,195 | 42.8 |
| Diesel/jet | 26,982 | 45.9 |
| Heavy oils | 1,402 | 2.4 |
| Other | 5,258 | 8.9 |
| Total refinery production (3) | 58,837 | 100.0 |
| Refinery utilization (4) | | 66.6% |

(1) 2008 data includes our Krotz Springs refinery for the period from July 1, 2008 through December 31, 2008.

(2) Total refinery throughput represents the total barrels per day of crude oil and blendstock inputs in the refinery production process.

(3) Total refinery production represents the barrels per day of various products produced from processing oil and other refinery feedstocks through the crude unit and other conversion units at our Krotz Springs refinery.

(4) Refinery utilization represents average daily crude oil throughput divided by crude oil capacity, excluding planned periods of downtime for maintenance and turnarounds. Refinery throughput and production for 2008 reflects the effects of shutdowns during hurricanes Gustav and Ike and limited crude supply due to widespread electrical outages following the hurricanes.

*Krotz Springs Refinery Raw Material Supply*

Since our acquisition of the Krotz Springs refinery, sweet crude oil has typically accounted for approximately 100% of our crude oil input at the Krotz Springs refinery, of which approximately 78.4% was Light Louisiana Sweet ("LLS") crude oil and 21.6% was Heavy Louisiana Sweet ("HLS") crude oil. The Krotz Springs refinery has access to various types of domestic and foreign crude oils via a combination of two ExxonMobil pipeline ("EMPCo") systems, barge delivery, or truck rack delivery. Approximately 76.7% of the crude oil is received by pipeline with the remainder received by barge or truck.

We receive HLS crude oil, LLS crude oil and foreign crude oils from two EMPCo pipeline systems. The EMPCo pipeline located to the west of the Krotz Springs refinery is termed the "Southbend/Sunset System," and the EMPCo pipeline located to the east of the Krotz Springs refinery is termed the "Northline System". The Southbend/Sunset System provides HLS crude oil from gathering systems at South Bend, Avery Island, Empire, Grand Isle and Fourchon, Louisiana. All of Southbend/Sunset's current crude oil capacity is delivered to the Krotz Springs refinery. The Northline System delivers LLS and foreign crude oils from the St. James, Louisiana crude oil terminaling complex.

The Krotz Springs refinery also has access to foreign crude oils which arrive at the St. James terminal by direct shipment up the Mississippi River and via offload at the Louisiana Offshore Oil Platform ("LOOP") with delivery to St. James through the LOCAP pipeline. Various Louisiana crude oils can also be delivered by barge, via the Intracoastal Canal, the Atchafalaya River, or directly by truck.

Approximately 78.4% of our Krotz Springs refinery's crude oil input requirements are purchased through term contracts with several suppliers, including major oil companies. At present, a subsidiary of Chevron Corporation is the largest supplier. These term contracts are both short-term and long-term in nature with arrangements that contain market-responsive pricing provisions and provisions for renegotiation or cancellation by either party. The remainder of the Krotz Spring refinery's crude oil input requirements are purchased on the spot market. Other feedstocks,

including butane and secondary feedstocks, are delivered by truck and marine transportation.

*Krotz Springs Refinery Production*

*Gasoline*. In 2008, gasoline accounted for approximately 43% of our Krotz Springs refinery's production. We produce 87 octane regular unleaded gasoline and use a computerized component blending system to optimize gasoline blending. We also purchase 93 octane premium unleaded gasoline for truck rack sales. Our Krotz Springs refinery is capable of producing regular unleaded gasoline grades required in the southeastern and northeastern U.S. markets.

*Distillates*. In 2008, diesel and jet fuel accounted for approximately 46% of our Krotz Springs refinery's production. Historically the Krotz Springs refinery shipped high sulfur distillate blendstock and light cycle oils to certain Valero refineries for processing. In connection with the acquisition, we entered into an offtake agreement with Valero that provides for Valero to purchase, at market prices, certain specified products and other products as may be mutually agreed upon from time to time. These products include regular and premium unleaded gasoline, light cycle oil and straight run diesel. The term of the offtake agreement as it applies to the products produced by the Krotz Springs refinery, is a follows: (i) five years for light cycle oil and straight run diesel; and (ii) one year for regular and premium unleaded gasoline.

*Heavy Oils and Other*. In 2008, we produced slurry oil, LPG, and petrochemical feedstocks, which accounted for approximately 11% of the Krotz Spring refinery's production.

*Krotz Springs Refinery Transportation Fuel Marketing*

Our refining and unbranded marketing segment sales include sales of refined products from our Krotz Springs refinery in both the wholesale rack and bulk markets. Our marketing of gasoline and diesel fuels is focused on the southeastern United States. We market a portion of the diesel and gasoline produced at our Krotz Springs refinery through the Krotz Springs refinery rack on an unbranded basis to wholesale distributors. The remainder of our diesel and gasoline production is sold through the spot market and term contracts to other refiners and to third parties and for delivery by barge or pipeline.

We sell transportation fuel production in excess of our unbranded marketing needs through bulk sales and exchange channels. These bulk sales and exchange arrangements are entered into with various oil companies and traders and are transported to markets on the Mississippi River and the Atchafalaya River as well as to the Colonial Pipeline Company's pipeline.

*Krotz Springs Refinery Product Pipeline*

The Krotz Springs refinery connects to and distributes refined products into the Colonial Pipeline Company ("Colonial") pipeline for distribution by our customers to the southeastern and northeastern United States. The 5,519 mile Colonial pipeline system transports products to 267 marketing terminal located near the major population centers of the southeast and northeastern United States. The Krotz Springs refinery's close proximity to the Colonial pipeline provides us flexibility to optimize product flows into multiple regional markets. Products not shipped through the Colonial pipeline are either transported via barge for sale or for further upgrading or are sold at the Krotz Springs refinery's truck rack. Barges have access to both the Mississippi and Ohio Rivers and can carry refined products for delivery as far north as Evansville, Indiana.

Propylene/propane mix is sold via railcar and truck, to consumers at Mont Belvieu, Texas or in adjacent Louisiana markets. Mixed LPGs are shipped on to an LPG fractionator at Napoleonsville, Louisiana. We pay a fractionation fee and sell the ethane and propane to a regional chemical company under contract, transport the normal butane back to the Krotz Springs refinery via truck for blending, and sell the isobutene and natural gasoline on a spot basis.

**Asphalt**

Our California, Big Spring and Oregon refineries have the capability to process heavy and sour crude oils, and as

a result, we have developed our asphalt business to maximize the value of the additional amount of vacuum tower bottoms (VTB) produced after making gasoline and distillate products from these crude oils. We believe our asphalt production capabilities provides the opportunity to realize higher netbacks than those attainable by producing VTB into No. 6 Fuel Oil, which is an alternate product that can be produced at the refinery. In addition, our asphalt production capabilities permit us to realize value from VTB without the significant costs and expenses required to construct and operate coker units.

The amount of asphalt produced at our refineries, as a percentage of throughput, varies depending on the configuration of the specific refinery, the crude oils processed at each refinery, the techniques used in the refining process and the types and quality of the asphalt produced. As part of our efforts to maximize the return generated by the production of asphalt, we have licensed advanced asphalt-blending technology from FINA, with respect to asphalt produced at our Big Spring refinery, and a patented GTR asphalt manufacturing process from Wright with respect to asphalt produced and sold in California.

Our asphalt segment markets asphalt products produced at our Big Spring and California refineries and at our Willbridge, Oregon refinery. Asphalt produced by the refineries in our refining and unbranded marketing segment is transferred to the asphalt segment at prices substantially determined by reference to the cost of crude oil, which is intended to approximate wholesale market prices. During 2008 crude oil prices increased rapidly in the first half of 2008 resulting in increasing transfer prices charged to our asphalt segment. Market prices for asphalt did not keep pace with these rapid and unprecedented increases in crude oil costs and the resulting asphalt transfer prices which resulted in decreased margins for our asphalt segment. The asphalt business in our Texas market was also affected by the effects of contracts that are priced months in advance of delivery. While our asphalt sales continued to exceed the returns that would have been realized by producing No. 6 Fuel Oil, the relationship between realized asphalt prices in our Texas market and our cost of crude in the first half of 2008 was compressed. Asphalt demand overall was down in 2008, due in part to less state highway work, reduced demand for roofing products and lower prices for Canadian heavy crude oil which allowed refiners producing asphalt using these crude sources to produce asphalt at a lower cost.

We continue to believe that the asphalt business is a better alternative to producing No. 6 Fuel Oil or construction and operation of a coker unit. We believe that asphalt production will be reduced due to several coker unit projects that have been announced by several asphalt producing refineries. We therefore expect the combination of decreased asphalt production in our markets and a stabilization of crude prices to improve our asphalt margins.

The asphalt segment also conducts operations at and markets asphalt produced by our Willbridge, Oregon refinery. The Willbridge refinery is an asphalt topping refinery located on 42 acres in the industrial section of Portland and has a crude oil throughput capacity of 12,000 bpd. Alternatively, the asphalt terminal at Willbridge can be supplied with asphalt produced at the California refineries or purchased from third parties by marine vessel or by rail cars. When operating the Willbridge facility as a refinery, it typically operates two to four months per year at times when cargos of heavy crude oil are available for delivery to the refinery. Heavy crude oil is delivered to the Willbridge refinery through access to an adjacent dock leased by us from Chevron. The Willbridge refinery processes primarily heavy crude oil with approximately 70% of its production being asphalt products. The unfinished products produced by the Willbridge refinery include yields of approximately 5% naphtha and approximately 25% gas oils. Asphalt produced at the Willbridge refinery is sold through our terminal at the Willbridge refinery or delivered by truck and railcar to terminals for further processing and resale. Gas oils and naphtha are sold to local refiners and other third parties and are primarily delivered by barge or rail cars.

In addition to the Willbridge refinery, our asphalt segment includes 11 refinery/terminal locations in Texas (Big Spring), California (Paramount, Long Beach, Elk Grove, Bakersfield and Mojave), Washington (Richmond Beach), Arizona (Phoenix, Flagstaff and Fredonia), Nevada (Fernley) (50% interest) and a 50% interest in Wright.

In 2008, through our asphalt segment, we sold the asphalt that was produced at our refineries in Texas and California, primarily as either paving asphalt to road and materials manufacturers and highway construction/maintenance contractors or as roofing asphalt to either roofing shingle manufacturers or to other industrial users.

*Texas Asphalt Marketing*

Approximately 13.1% of our Big Spring refinery's production in 2008 was asphalt. We can produce or manufacture approximately 30 different product formulations, including PMA and GTR asphalts that meet the

stringent and varied state highway road paving specifications for use in Texas, New Mexico and Arizona. Based on 2007 data, the Texas Department of Transportation has advised us that we are the second largest supplier of asphalt to the State of Texas, which is the second largest asphalt consuming state in the United States according to the latest available industry data.

Paving grade asphalts are predominantly sold from April through October through competitive bids to contractors involved in government projects. These asphalt sales are primarily made at our asphalt terminal at the Big Spring refinery and are delivered to project sites by truck. Our other asphalt blendstocks are sold to roofing companies and asphalt blenders and delivered by rail throughout the United States, including to our asphalt terminals in Elk Grove, Bakersfield and Mojave, California and Phoenix, Arizona.

*West Coast Asphalt Marketing*

As a result of our acquisitions of the California refineries, our asphalt business was expanded significantly. In 2008, approximately 30.5% of our California refineries' production was asphalt and asphalt blendstocks. When operating as a refinery, production at the Willbridge refinery has averaged an approximate 70% paving and roofing asphalt products yield. Our California refineries/terminals produce over 100 different grades of paving and roofing asphalt products. Paving asphalt products include various grades of Performance Graded (PG), Asphalt Cement (AC) and Aged Residue (AR) paving asphalts, cutbacks, emulsions, PMA and GTR. The products meet the California PG specification included in the recently enacted conversion to Federal Highway SHRP asphalt performance grading system (PG). Our GTR products conform to the specifications of the recently enacted California Assembly Bill 338 which requires usage of GTR asphalt on California road and highways. Roofing asphalt products include oxidized coatings, asphalt fluxes and saturants which are used in the roofing industry to manufacture shingles, roofing roll products and built-up roofing asphalts. The paving and roofing products produced at our refineries can be sold from the on-site asphalt terminal facilities or they can be distributed through and sold at one of our eight asphalt terminals in the western United States.

Sales of paving asphalt are made primarily to hot mix asphalt (HMA) materials manufacturers and paving contractors. Sales to HMA manufacturers and paving contractors can be made either through negotiated contracts or they may result from competitive bidding. Sales of roofing asphalts are made primarily to shingle manufacturers or other industrial users through contracts. Sales of asphalt, particularly paving asphalts, are seasonal. Overall, approximately 78% of our West Coast paving asphalt products were sold between April and October 2008.

Asphalt produced at our California refineries is marketed through the following owned asphalt terminals:

| Terminals | Asphalt Storage Capacity (1) | Receipt Capabilities | Delivery Capabilities |
|---|---|---|---|
| California Refineries | 731 | Refinery, Rail, Truck | Rail, Truck |
| Willbridge, OR refinery | 1,129(2) | Refinery, Rail, Truck, Marine | Rail, Truck, Marine |
| Elk Grove, CA | 307 | Rail, Truck | Truck |
| Bakersfield, CA | 183 | Rail, Truck | Truck |
| Mojave, CA | 283 | Rail, Truck | Truck |
| Richmond Beach, WA | 702(2) | Rail, Truck, Marine | Truck, Marine |
| Fernley, NV (3) | 254 | Rail, Truck | Truck |
| Phoenix, AZ | 165 | Rail, Truck | Truck |
| Flagstaff, AZ | 25 | Rail, Truck | Truck |
| Fredonia, AZ | 79 | Truck | Truck |

(1) Measured in thousands of barrels.

(2) Storage figures for Willbridge and Richmond Beach include tanks in service for storage of crude oil, fuel oil or other products.

(3) 50% interest.

Deliveries of asphalt products to our non-refinery terminals are made primarily through common carrier trucks and leased railcars that are loaded at the California and Big Spring refineries. Asphalt produced at our Willbridge refinery is sold primarily through our terminal located at that refinery but may also be delivered by rail or marine vessel to other terminals.

We also own a 50% interest in Wright, which holds the licensing rights to a patented GTR manufacturing process for paving asphalts. Wright licenses this proprietary technology from Neste/Wright Asphalt Company under a perpetual license that covers all of North America, except California. In California we maintain the exclusive license. Wright's operations consist of sublicensing the patented technology to parties to manufacture the GTR asphalt for Wright to sell at various Alon-owned or third party-owned facilities in Texas, Arizona, Oregon and Oklahoma. Wright also purchases and resells various other paving asphalts in these markets. During 2008, Wright obtained approximately 9% of its asphalt requirements from our refineries and terminals, and the remainder from other refineries. Wright sells GTR and its other asphalt products on either a negotiated contract or competitive bidding basis.

**Retail and Branded Marketing**

We are the largest 7-Eleven licensee in the United States, and we are the sole licensee of the FINA brand for motor fuels in the South Central and Southwestern United States. Through our 7-Eleven licensing agreement, we have the exclusive right to operate 7-Eleven convenience stores in substantially all of our existing retail markets and many surrounding areas. We market gasoline and diesel fuel under the FINA brand name and provide brand support and payment services to distributors supplying over 780 locations, including all 295 of our owned stores that sell motor fuel. In markets where we choose not to supply fuel products we also sub-license the FINA brand and provide the same brand support and payment services to distributors supplying approximately 240 additional locations in these regions. Historically, substantially all of the motor fuel sold through our retail business and approximately 55% of the motor fuel marketed in our branded business was supplied by our Big Spring refinery. As a result of the February 18, 2008 fire at our Big Spring refinery, branded marketing primarily acquired motor fuel from third-party suppliers during the period the refinery was down and continued to acquire motor fuels to a lesser extent when the refinery began partial production on April 5, 2008.

*Retail*

As of December 31, 2008, we operated 306 owned and leased convenience store sites operating primarily in Central and West Texas and New Mexico. Our convenience stores typically offer various grades of gasoline, diesel fuel, food products, tobacco products, non-alcoholic and alcoholic beverages and general merchandise to the public, primarily under the 7-Eleven and FINA brand names.

We are one of the top three independent convenience store chains, measured by store count, in each of the cities of Abilene, El Paso, Midland, Odessa, Big Spring and Lubbock, Texas. We also have a significant presence in Waco and Wichita Falls, Texas and Albuquerque, New Mexico.

The following table shows our owned and leased convenience stores by location:

| Location | Owned | Leased | Total |
|---|---|---|---|
| Big Spring, Texas | 6 | 1 | 7 |
| El Paso, Texas | 13 | 74 | 87 |
| Lubbock, Texas | 17 | 5 | 22 |
| Midland, Texas | 9 | 9 | 18 |
| Odessa, Texas | 10 | 25 | 35 |
| Wichita Falls, Texas | 8 | 4 | 12 |
| Abilene, Texas | 33 | 8 | 41 |
| Waco, Texas | 11 | 3 | 14 |
| Albuquerque, New Mexico | 12 | 11 | 23 |
| Other | 29 | 18 | 47 |
| Total stores | 148 | 158 | 306 |

On July 3, 2006, we completed the purchase of 40 retail convenience stores from Good Time Stores, Inc. ("Good Time") in El Paso, Texas. The acquired stores have been branded 7-Eleven and FINA and our Big Spring refinery supplies these locations with substantially all of their gasoline and diesel needs. This acquisition provided us a leading market share in El Paso and furthered our strategy of strengthening our integrated marketing sector.

On June 29, 2007, we completed the acquisition of Skinny's, Inc., a privately held Abilene, Texas-based

company that owned and operated 102 FINA branded convenience stores in Central and West Texas. Of the 102 stores, approximately two-thirds are owned and one-third are leased. Since the acquisition, we have re-branded the majority of these stores to the 7-Eleven brand name.

*Convenience Store Management and Employees.* Each of our stores has a store manager who supervises a staff of full-time and part-time employees. The number of employees at each convenience store varies based on the store's size, sales volume and hours of operation. Typically, a geographic group of six to ten stores is managed by a supervisor who reports to a district manager. Five district managers are responsible for a varying number of stores depending on the geographic size of each market and the experience of each district manager. These district managers report to our retail management headquarters in Odessa, Texas, where we have 55 employees. We also maintain an office in Abilene, Texas, where we have 31 employees.

*Distribution and Supply.* The merchandise requirements of our convenience stores are serviced at least weekly by over 100 direct-store delivery, or ("DSD"), vendors. In order to minimize costs and facilitate deliveries, we utilize a single wholesale distributor, McLane Company, Inc., for non-DSD products. We purchase the products from McLane at cost plus an agreed upon percentage mark-up. Our current supply contract with McLane expires in December 2011. For the year ended December 31, 2008, approximately 50% of our retail merchandise sales were purchased from McLane. We typically do not have contracts with our DSD vendors.

*7-Eleven License Agreement.* We are party to a license agreement with 7-Eleven, Inc. which gives us a perpetual license to use the 7-Eleven trademark, service name and trade name in West Texas and a majority of the counties in New Mexico in connection with our convenience store operations. 7-Eleven, Inc. has advised us that we are the largest 7-Eleven licensee in the United States based on the number of stores.

*Technology and Store Automation.* We have implemented a point-of-sale checkout system at approximately two-thirds of our convenience stores. This system includes merchandise scanning, pump control, peripheral device integration and daily operations reporting. This system enhances our ability to offer a greater variety of promotions with a high degree of flexibility regarding definition (by store, group of stores, region, or other subset of stores) and duration. We also are able to receive enhanced management reports that will assist our decision-making processes. We believe this system will allow our convenience store managers to spend less time preparing reports and more time analyzing these reports to improve convenience store operations. This system also includes shortage-control tools. We plan to use this system as a platform to support other marketing technology projects, including interactive video at the pump and bar-code coupons at the pump.

*Branded Marketing*

Approximately 64% of our branded fuel sales are in West Texas and Central Texas. We sell motor fuel through various terminals to supply approximately 780 locations, including approximately 90% of our retail locations and other FINA-branded independent locations. The FINA brand is a recognized trade name in the Southwestern and South Central United States, where motor fuels have been marketed under the FINA brand since 1963. For the year ended December 31, 2008, we sold 339.1 million gallons of branded motor fuel for distribution to our retail convenience stores and other retail distribution outlets.

Our branded wholesale motor fuel is sold under the FINA brand, and we have an exclusive license through 2012 to use the FINA trademark in the wholesale distribution of motor fuel within Texas, Oklahoma, New Mexico, Arizona, Arkansas, Louisiana, Colorado and Utah. Prior to the expiration of this license, we intend to review our alternatives for branding our transportation fuel, including seeking to extend our license with FINA or developing our own brand.

*Distribution Network and Distributor Arrangements.* We sell motor fuel to our retail locations and to approximately 48 third-party distributors, who then supply and resell to other retail outlets. The supply agreements we maintain with our distributors are generally for three-year terms and usually include 10-day payment terms. All supplied distributors comply with our ratability program, which involves incentives and penalties based on the consistency of their purchases.

*FINA Brand Sub-Licensing.* We also sub-license the FINA brand and provide payment card processing services, advertising programs and loyalty and other marketing programs to approximately 39 distributors supplying approximately 240 additional stores. We offer FINA brand sub-licensing to distributors supplying geographic areas other than our integrated supply system. This sub-licensing program allows us to expand the geographic footprint of the FINA brand, thereby increasing its recognition. Each sub-licensee pays royalties on a per gallon basis and is required to comply with the FINA minimum standards program and utilize our payment card processing services.

*FINA Minimum Standards Program.* We have an established image consistency program where each FINA branded facility in our network is inspected annually by an independent third-party organization. Each facility is evaluated using specific criteria and image scores based upon these criteria and are communicated to the controlling distributor. Any non-complying facilities are enrolled in a specific improvement program to bring the facility up to our FINA standards.

*Payment Card Processing.* We offer payment card processing services to our distributors and FINA-brand sublicensees through a third-party provider, which acts as a clearinghouse with MasterCard, VISA, American Express, Discover and debit card issuers. Our customers' payment card transactions are communicated directly to the third-party provider, which then transmits those transactions to the appropriate card issuers. Our fees payable to MasterCard, VISA, American Express, Discover and debit card issuers are contracted through the third-party provider. Although our fees may vary by card type, we charge our customers, including our retail convenience stores, a percentage-based fee plus a transaction fee for each card type to simplify the fee structure. Our rates are designed to provide a margin on the difference between the fees paid by our distributors and fees charged by the various card associations. The fees are not designed to be a major profit center, but rather to cover overhead and ancillary expenses of maintaining the payment card network system. For MasterCard, VISA, American Express, Discover and debit cards, the third-party provider provides us with daily settlement of transactions. We generally provide our customers with payment or credit for transactions within five days. We also generally retain the settlement funds for such payment and transactions that we process as a credit against any payments due to us from our distributors or sub-licensees. As a result, offering these payment services also reduces our credit risk.

*Technology.* We rely on technology to enhance our operations and provide meaningful data and tools for management to evaluate and manage the profitability of our motor fuel distribution business. We have a licensing arrangement with a third-party provider for payment card processing and clearinghouse services for payment card purchases at many of our retail convenience stores, as well as all of the third-party retail locations supplied by our wholesale distributors or the sub-licensed FINA stores for which we provided branded services. Under our arrangement with the third-party provider, we sub-license the proprietary software to each of these retail locations that provides secure data transfer of payment card transactions directly to the third party provider for daily processing of each payment card transaction at these retail locations. We also license JD Edwards enterprise software tailored for our wholesale business that collects and analyzes the data from each of these payment card transactions that we process, providing our management with valuable information on consumer purchasing tendencies and trends. Additionally, we use a proprietary software program to further break-down and analyze the payment card transactions that we process. We also license pricing optimization software that assists management in modeling and making timely pricing decisions in order to maximize our gross margin in motor fuel sales. In addition, we utilize licensed software to manage our customers' motor fuel purchases and delivery arrangements.

**Competition**

The petroleum refining and marketing industry continues to be highly competitive. Many of our principal competitors are integrated, multi-national oil companies (e.g., Valero, Chevron, ExxonMobil, Shell and ConocoPhillips) and other major independent refining and marketing entities that operate in our market areas. Because of their diversity, integration of operations and larger capitalization, these major competitors may have greater financial and other resources and may have a greater ability to bear the economic risks, operating risks and volatile market conditions associated with the petroleum industry.

Financial returns in the refining and marketing industry depend on the difference between refined product prices and the prices for crude oil and other feedstock, also referred to as refining margins. Refining margins are impacted by, among other things, levels of crude oil and refined product inventories, balance of supply and demand, utilization rates of refineries and global economic and political events.

All of our crude oil and feedstocks are purchased from third-party sources, while some of our vertically-integrated competitors have their own sources of crude oil that they may use to supply their refineries. However, our Big Spring refinery is in close proximity to Midland, Texas, which is the largest origination terminal for West Texas crude oil, which we believe provides us with transportation cost advantages over many of our competitors in this region.

The majority of our refined fuel products produced at our Big Spring refinery are shipped to wholesale distributors within the principal geographic regions of West Texas, Central Texas, Oklahoma, New Mexico and Arizona or to our retail sites within West Texas and New Mexico. Production in excess of our wholesale and retail sales is sold in the spot market and either shipped northeast via the Trust and River pipeline system to distribution points in North Texas and Oklahoma or West via the Fin-Tex pipeline system to El Paso, Texas and distribution points in New Mexico and Arizona. The market for refined products in these regions is also supplied by a number of refiners, including large integrated oil companies or independent refiners that either have refineries located in the region or have pipeline access to these regions. These larger companies typically have greater resources and may have greater flexibility in responding to volatile market conditions or absorbing market changes.

The Longhorn pipeline runs approximately 700 miles from the Houston area of the Gulf Coast to El Paso and has an estimated maximum capacity of 225,000 bpd of refined products. This pipeline provides Gulf Coast refiners, which include some of the world's largest and most complex refineries, and other shippers with improved access to the refined products markets in West Texas and New Mexico. In August 2006, Longhorn Pipeline Holdings LLC, the owner of the Longhorn pipeline, was acquired by Flying J, Inc. Since Flying J's acquisition, we have reduced shipments to El Paso via the Fin-Tex pipeline system, while increasing sales through our Big Spring and Abilene terminals. We do not expect our remaining shipments of refined products to be affected, since they are shipped directly for distribution through contracted FINA-branded locations, including our retail and branded marketing segment, in addition to being used for exchange paybacks for sales in the Albuquerque and Bloomfield, New Mexico markets to which the Longhorn pipeline does not have access. However, on December 22, 2008, Flying J Inc. and certain of it affiliates, including its subsidiary that operates the Longhorn pipeline, filed for bankruptcy. Given this development, there is a substantial uncertainty regarding any future operations of the Longhorn pipeline.

The majority of the refined fuel products produced at our California refineries are sold on the spot market and shipped through our pipeline to the Kinder Morgan Carson terminal where it can be distributed to terminals in Arizona, Nevada and Southern California. The balance of our refined fuel products at our California refineries is sold through our Paramount refinery's truck rack. The market for refined products in these regions is also supplied by a number of refiners, including large integrated oil companies or independent refiners that either have refineries located in the region or have pipeline access to these regions. These larger companies typically have greater resources and may have greater flexibility in responding to volatile market conditions or absorbing market changes.

The majority of our refined fuel products produced at our Krotz Springs refinery are sold on the spot market and shipped through the Colonial pipeline to major demand centers along the southeastern and northeastern United States. Products not shipped through the Colonial pipeline are either transported via barge for sale or for further upgrading or are sold at the Krotz Springs refinery's truck rack. Barges have access to both the Mississippi and Ohio Rivers and can carry refined products for delivery as far north as Evansville, Indiana. The market for refined products in these regions is also supplied by a number of refiners, including large integrated oil companies or independent refiners that either have refineries located in the region or have pipeline access to these regions. These larger companies typically have greater resources and may have greater flexibility in responding to volatile market conditions or absorbing market changes.

The principal competitive factors affecting our wholesale marketing business are price and quality of products, reliability and availability of supply and location of distribution points.

We compete in the asphalt market with various refineries including Valero, Shell, Tesoro, U.S. Oil, Western, San Joaquin Refining, Ergon and Holly as well as regional and national asphalt marketing companies that have no associated refining operations such as SEM Materials although SEM Materials is currently in bankruptcy. The principal factors affecting competitiveness in asphalt markets are cost, supply reliability, consistency of product quality, transportation cost and capability to produce the range of high performance products necessary to meet the

requirements of customers.

Our major retail competitors include Valero, Chevron, ConocoPhillips, Susser, Allsups and Western Refining. The principal competitive factors affecting our retail and branded marketing segment are location of stores, product price and quality, appearance and cleanliness of stores and brand identification. We expect to continue to face competition from large, integrated oil companies, as well as from other convenience stores that sell motor fuels. Increasingly, national grocery and dry goods retailers such as Albertson's and Wal-Mart, as well as regional grocers and retailers, are entering the motor fuel retailing business. Many of these competitors are substantially larger than we are, and because of their diversity, integration of operations and greater resources, may be better able to withstand volatile market conditions and lower profitability because of competitive pricing and lower operating costs.

**Government Regulation and Legislation**

*Environmental Controls and Expenditures*

Our operations are subject to extensive and frequently changing federal, state, regional and local laws, regulations and ordinances relating to the protection of the environment, including those governing emissions or discharges to the air and water, the handling and disposal of solid and hazardous waste and the remediation of contamination. We believe our operations are generally in substantial compliance with these requirements. Over the next several years our operations will have to meet new requirements being promulgated by the EPA and the states and jurisdictions in which we operate.

*Environmental Expenditures*. The EPA regulations related to the Clean Air Act require significant reductions in the sulfur content in gasoline and diesel fuel. These regulations required most refineries to reduce sulfur content in gasoline to 30 ppm by January 1, 2004. The regulations allow small refiners to meet the 30 ppm gasoline standard by January 2008, or December 2010 if the small refiner implemented the new diesel sulfur content standard of 15 ppm by June 1, 2006. Prior to the Paramount Petroleum Corporation and Edgington Oil Company acquisitions, we were certified by the EPA as a small refiner for both gasoline and diesel. In May 2006, we completed upgrades at our Big Spring refinery to satisfy the required diesel sulfur content standard. Our expenditures to meet the diesel sulfur standards were approximately $17.9 million.

In November 2006, following consummation of the Paramount Petroleum Corporation and Edgington Oil Company acquisitions, we provided notice to the EPA that we no longer satisfied the criteria for a small refiner. As a result, we were then required to comply with the 30 ppm gasoline sulfur content standards within 30 months. In July 2007, the EPA granted our request to extend this deadline by six months, with the total 36-month period to commence on September 28, 2006, the date on which we acquired the assets of Edgington Oil Company. As a result, we are now required to meet the 30 ppm gasoline sulfur standard in September 2009. We anticipate that compliance with the new gasoline sulfur standards will require capital expenditures of approximately $21.8 million through 2009, of which approximately $5.2 million was spent in 2008 and $1.0 million was spent in 2007. We had previously budgeted these expenditures through December 2010. Gasoline and diesel produced at our Paramount refinery currently meet the gasoline and diesel low sulfur fuel standards.

In October 2004, Paramount Petroleum Corporation entered into a Stipulated Order for Abatement (SOA) with the South Coast Air Quality Management District (SCAQMD), the air pollution agency for Orange County and the urban portions of Los Angeles, Riverside and San Bernardino counties. The SOA resolved a number of outstanding issues with the SCAQMD and allowed Paramount Petroleum Corporation to modify crude unit process heater permit descriptions and operate these heaters at firing rates sufficient to meet current and anticipated crude oil throughputs. The SOA required that Paramount Petroleum Corporation install NOx control equipment on specified heaters within a prescribed schedule, including installation of equipment in 2007 and 2009. We completed expenditures totaling $4.5 million, of which $2.2 million was spent in 2007, and $2.3 million was spent in 2008, which completed installation of the NOx control equipment to meet the requirements of the SOA.

On November 4, 2005, the SCAQMD adopted a stringent regulatory requirement, Rule 1118, designed to control emissions from refinery flares. We expect that expenditures required to comply with Rule 1118 will be approximately $3.7 million, with approximately $0.7 million spent in 2007 and $2.5 million spent in 2008. The

Paramount refinery has one flare which is subject to Rule 1118 and will require the installation of continuous emissions monitoring equipment and installation of a vapor recovery system for the flare. The installation of the emissions monitoring equipment was originally required by Rule 1118 to be completed in 2007; however, the South Coast Air Quality Management District's Hearing Board granted additional time to comply. We currently anticipate that the monitoring system will be installed in 2009. Rule 1118 will not apply to our Long Beach refinery.

On August 7, 2008 the SCAQMD issued a notice of violation to the Paramount refinery for failing to continuously monitor emissions from the Reformer heaters (H-303, H-304, H-305 and H-306). The exhaust stacks of these four heaters are manifolded together and routed to a single piece of NOx control equipment with a common exhaust stack and continuous emissions monitoring system (CEMS). Each individual heater also has an emergency by-pass stack that is used on rare occasions for safety reasons. The SCAQMD believes that use of emergency by-pass stacks without CEMS monitoring is a violation of SCAQMD rules. Paramount has successfully obtained variance coverage to use the emergency by-pass stacks during startup activities and expects to be able to use the variance process for future relief from rule requirements if necessary. Paramount is pursuing a rule change option with the SCAQMD. Absent a rule change, Paramount will face an approximate cost of $3.5 million.

In 2006, the Governor of California signed into law AB 32, the California Global Warming Solutions Act of 2006. Regulations implementing the goals stated in the law, i.e., the reduction of greenhouse gas emission levels to 1990 levels, have yet to be promulgated. Although development of such regulations is in a preliminary stage, it is expected that AB 32 mandated reductions will require increased emission controls on both stationary and non-stationary sources and will result in requirements to significantly reduce greenhouse gases from our California refineries and possibly our other California terminals.

The United States Congress and the EPA also are considering various proposals to reduce greenhouse gas emissions, but none have become law, and presently, there are no federal mandatory greenhouse gas emissions requirements. While it is probable that Congress and/or the EPA will adopt some form of federal mandatory greenhouse gas emission reductions legislation or regulation in the future, the timing and specific requirements of any such legislation or regulation are uncertain at this time.

In February 2007, the EPA adopted final rules effective as of April 27, 2007, to reduce the levels of benzene in gasoline on a nationwide basis. More specifically, the rule would require that beginning in 2011 refiners meet an annual average gasoline benzene content standard of 0.62% by volume on all gasoline produced, both reformulated and conventional. Gasoline produced at our California refineries already meets the standards established by the EPA. We have not yet determined the capital expenditures that may be necessary to comply with the proposed benzene limits at our Big Spring or Krotz Springs refineries.

In October 2006, we were contacted by Region 6 of the EPA and invited to enter into discussions under the EPA's National Petroleum Refinery Initiative. This Initiative addresses what the EPA deems to be the most significant Clean Air Act compliance concerns affecting the petroleum refining industry. On February 2, 2007, we committed in writing to enter into discussions with the EPA under the Petroleum Refinery Initiative. To date, the EPA has not made any specific claims or findings against us or any of our refineries, and we have not determined whether we will ultimately enter into a settlement agreement with the EPA. Based on prior settlements that the EPA has reached with other petroleum refineries under the Petroleum Refinery Initiative, we anticipate that the EPA will seek relief in the form of the payment of civil penalties, the installation of air pollution controls and the implementation of environmentally beneficial projects. At this time, we cannot estimate the amount of any such civil penalties or the cost of any required controls or environmentally beneficial projects.

The Krotz Springs refinery and Valero finalized the U.S. EPA consent decree in November 2005. In return for agreeing to the consent decree and implementing the reductions in emissions that it specifies, the Krotz Springs refinery secured a release of liability that provides immunity from enforcement actions for alleged past non-compliance. The major project for consent decree compliance is installing NOx controls and monitors on heaters and boilers which is scheduled to be completed in 2011. Other projects include various SO2 and NOx reduction measures. The current best estimate of capital costs is $13.0 million. The Krotz Springs refinery already completed many portions of the consent decree including compliance with particulate emissions from the FCCU, H2S in the fuel gas, LDAR performance, and implementation of Benzene Waste Operations NESHAPS requirements. Because the Krotz Springs refinery remains subject to the Valero consent decree, we entered into an agreement with Valero

at the time of the acquisition allocating responsibilities under the consent decree. The Krotz Spring refinery is responsible for implementing only those portions of the consent decree that are specifically and uniquely applicable to the Krotz Springs refinery. In addition, with respect to certain system-wide emission limitations that apply across all of the Valero refineries, the Krotz Springs refinery was generally allocated emission limitations that did not necessitate substantial capital expenditures for add-on controls.

Conditions may develop that cause additional future capital expenditures at our refineries, product terminals and retail gasoline stations (operating and closed locations) for compliance with the Federal Clean Air Act and other federal, state and local requirements. We cannot currently determine the amounts of such future expenditures.

*Remediation Efforts*. We are currently remediating historical soil and groundwater contamination at our Big Spring refinery pursuant to a compliance plan issued by the Texas Commission on Environmental Quality ("TCEQ"). The compliance plan requires us to investigate and, if necessary, remediate 59 potentially contaminated areas on our refinery property and also requires us to monitor and treat contaminated groundwater at our Big Spring refinery and some of our terminals, which is currently underway. The costs incurred to comply with the compliance plan are covered, with certain limitations, by an environmental indemnity provided by FINA, which is discussed below.

We are currently engaged in four separate remediation projects in the Los Angeles area which are being conducted pursuant to Cleanup and Abatement Orders issued by the Los Angeles Regional Water Quality Control Board. Two projects focus on clean up efforts in and around the Paramount refinery and the Lakewood Tank Farm. Our Paramount subsidiary shares the cost of both these remediation projects with ConocoPhillips, the former owner of the Paramount refinery and Lakewood Tank Farm. Another project focuses on efforts at the Long Beach refinery, with the costs being shared with Apex Oil Co., the former owner of the Long Beach refinery. As part of its acquisition of Pipeline 145, Paramount Petroleum Corporation assumed an active remediation project designed to clean up a leak that occurred on this pipeline prior to Paramount Petroleum Corporation's ownership. Paramount Petroleum Corporation bears the full costs of this pipeline remediation effort. Approximately $1.1 million was spent in 2007 for all of these remediation projects and $1.7 million was spent during 2008 with our portion being approximately $1.0 million.

We also have a limited ongoing remediation program at our Long Beach refinery. In conjunction with our acquisition of the Edgington Oil Company refinery in September 2006, we acquired a seven-year environmental insurance policy, the premiums for which have been prepaid in full. This policy provides us coverage for both known and unknown conditions existing at our Long Beach refinery at the time of our acquisition for off-site, third party bodily injury and property damage claims. The policy limit on a per occurrence and aggregate basis is $15.0 million and has a per occurrence deductible of $0.5 million.

On March 1, 2005, Paramount Petroleum Corporation purchased Chevron's Pacific Northwest Asphalt business. As part of the purchase and sale agreement, the parties agreed to share the remediation costs at the Richmond Beach, Washington and Willbridge, Oregon terminals. Approximately $1.3 million was spent in 2008 for these remediation costs, of which our portion was $0.4 million, and we estimate that an additional $1.0 million will be spent during 2009, of which our portion will be $0.3 million.

In addition, we operate 306 owned and leased convenience stores with underground gasoline and diesel fuel storage tanks in West Texas and New Mexico. Compliance with federal and state regulations that govern these storage tanks can be costly. The operation of underground storage tanks also poses various risks, including soil and groundwater contamination. We are currently investigating and remediating leaks from underground storage tanks at some of our convenience stores, and it is possible that we may identify more leaks or contamination in the future that could result in fines or civil liability for us. We have established reserves in our financial statements in respect of these matters to the extent that the associated costs are both probable and reasonably estimable. We cannot assure

you, however, that these reserves will prove to be adequate.

*Environmental Indemnity from FINA*. In connection with the acquisition of our Big Spring refinery and other operating assets from FINA in August 2000, FINA agreed, within prescribed limitations, to indemnify us against costs incurred in connection with any remediation that is required as a result of environmental conditions that existed on the acquired properties prior to the closing date of our acquisition. FINA's indemnification obligations for these remediation costs run through August 2010, have a ceiling of $5.0 million per year (with carryover of unused ceiling amounts and unreimbursed environmental costs into subsequent years) and have an aggregate indemnification cap of $20.0 million. Thereafter, we are solely responsible for all additional remediation costs. As of December 31, 2008 the remediation of the properties is on schedule, and we have expended approximately $15.7 million in connection with that remediation and approximately $3.0 million in environmental insurance premiums, all of which has been covered by the FINA indemnity. Subject to a $25 thousand deductible per claim up to an aggregate deductible of $2.0 million, FINA is additionally obligated to indemnify us for third-party claims with respect to environmental matters received by us within ten years of the closing date to the extent such matters relate to FINA's operations on the acquired properties prior to the closing date. FINA is further obligated to indemnify us for environmental fines imposed as a result of FINA's operations on the acquired properties prior to the closing date, provided that such claims are asserted no later than the earlier of ten years from the closing date and the date that the applicable statute of limitations expires. FINA's aggregate indemnification obligations for environmental fines and third-party claims are not subject to a monetary cap. Excluding liabilities retained by FINA as described above, we assumed the environmental liabilities associated with the acquired properties and agreed to indemnify FINA for any environmental claims or costs in connection with our operations at the acquired properties after the closing date.

*Environmental Insurance*. We have also purchased two environmental insurance policies to cover expenditures not covered by the FINA indemnification agreement, the premiums for which have been prepaid in full. Under an environmental clean-up cost containment, or cost cap policy, we are insured for remediation costs for known conditions at the time of our acquisition of our assets from FINA. This policy has an initial retention of $20.0 million during the first ten years after the acquisition (coinciding with the FINA indemnity), which retention is increased by $1.0 million annually during the remainder of the term of the policy. Under an environmental response, compensation and liability insurance policy, or ERCLIP, we are covered for bodily injury, property damage, clean-up costs, legal defense expenses and civil fines and penalties relating to unknown conditions and incidents. The ERCLIP policy is subject to a $100 thousand per claim / $1.0 million aggregate sublimit on liability for civil fines and penalties and a retention of $150 thousand per claim in the case of civil fines or penalties. Both the cost cap policy and ERCLIP have a term of twenty years and share a maximum aggregate limit of $40.0 million. The insurer under these policies is The Kemper Insurance Companies, which has experienced significant downgrades of its credit ratings in recent years and is currently in run-off. However, we have no reason to believe at this time that Kemper will be unable to comply with its obligations under these policies. Our insurance broker has advised us that environmental insurance policies with terms in excess of ten years are not currently generally available and that policies with shorter terms are available only at premiums equal to or in excess of the premiums paid for our policies with Kemper.

*Environmental Indemnity to HEP*. In connection with the HEP transaction, we entered into an Environmental Agreement with HEP pursuant to which we agreed to indemnify HEP against costs and liabilities incurred by HEP to the extent resulting from the existence of environmental conditions at the pipelines or terminals prior to February 28, 2005 or from violations of environmental laws with respect to the pipelines and terminals occurring prior to February 28, 2005. Our environmental indemnification obligations under the Environmental Agreement expire after February 28, 2015. In addition, our indemnity obligations are subject to HEP first incurring $100 thousand of damages as a result of pre-existing environmental conditions or violations. Our environmental indemnity obligations are further limited to an aggregate indemnification amount of $20.0 million, including any amounts paid by us to HEP with respect to indemnification for breaches of our representations and warranties under a Contribution Agreement entered into as a part of the HEP transaction.

With respect to any remediation required for environmental conditions existing prior to February 28, 2005, we have the option under the Environmental Agreement to perform such remediation ourselves in lieu of indemnifying HEP for their costs of performing such remediation. Pursuant to this option, we are continuing to perform the ongoing remediation at the Wichita Falls terminal which is subject to our environmental indemnity from FINA. Any remediation required under the terms of the Environmental Agreement is limited to the standards under the applicable environmental laws as in effect at February 28, 2005.

*Environmental Indemnity to Sunoco*. In connection with the sale of the Amdel and White Oil crude oil pipelines, we entered into a Purchase and Sale Agreement with Sunoco pursuant to which we agreed to indemnify Sunoco against costs and liabilities incurred by Sunoco resulting from the existence of environmental conditions at the pipelines prior to March 1, 2006 or from violations of environmental laws with respect to the pipelines occurring prior to March 1, 2006. With respect to any remediation required for environmental conditions existing prior to March 1, 2006, we have the option under the Purchase and Sale Agreement to perform such remediation ourselves in lieu of indemnifying Sunoco for their costs of performing such remediation.

**Other Government Regulation**

The pipelines owned or operated by us and located in Texas are regulated by Department of Transportation rules and our intrastate pipelines are regulated by the Texas Railroad Commission. Within the Texas Railroad Commission, the Pipeline Safety Section of the Gas Services Division administers and enforces the federal and state requirements on our intrastate pipelines. All of our pipelines within Texas are permitted and certified by the Texas Railroad Commission's Gas Services Division.

The California State Fire Marshall's Office enforces federal pipeline regulations for pipelines in the State of California. We are required to have integrity management and other programs in place, and we anticipate spending approximately $2.0 million over the next five years to comply with the regulations. We are also required to have a Pipeline Spill Response Plan for all California pipelines in our system which includes keeping the plan current, training employees to effect the plan and conducting annual, quarterly and more frequent spill drills. We are also required to maintain Certificates of Financial Responsibility with the State of California, Department of Fish and Game, and the Office of Spill Prevention and Response based on a worst case discharge.

As required by the Oil Pollution Act of 1990 and state requirements, marine oil transfer operations at the Richmond Beach Terminal are conducted under the facility's Facility Response Plan ("FRP") approved and on file with the EPA, the U.S. Coast Guard, and the Washington Department of Ecology. The FRP provides guidance to facility personnel for emergency responses to oil spills. It provides specific information on internal and external agency and contractor notification requirements, appropriate oil spill response actions, the proper disposal of contaminated materials, hazard evaluation and personnel safety, spill response equipment and material lists, and operator and response personnel training. The Richmond Beach Terminal conducts four training drills per year for the purpose of assessing the adequacy of the Facility Response Plan and the effectiveness of personnel training. In addition to the Facility Response Plan, the Richmond Beach Terminal conducts all transfer operations under a Marine Oil Transfer Operations Manual approved and on file with the U.S. Coast Guard and the Washington Department of Ecology.

The Petroleum Marketing Practices Act, or PMPA, is a federal law that governs the relationship between a refiner and a distributor pursuant to which the refiner permits a distributor to use a trademark in connection with the sale or distribution of motor fuel. We are subject to the provisions of the PMPA because we sublicense the FINA brand to our branded distributors in connection with their distribution and sale of motor fuels. Under the PMPA, we may not terminate or fail to renew these distributor contracts unless certain enumerated preconditions or grounds for termination or nonrenewal are met and we also comply with the prescribed notice requirements. The PMPA provides that our distributors may enforce the provisions of the act through civil actions against us. If we terminate or fail to renew one or more of our distributor contracts in accordance with certain requirements of the PMPA, those distributors may file lawsuits against us to compel continuation of their contracts or to recover damages from us.

**Employees**

As of December 31, 2008, we had approximately 2,760 employees. Approximately 845 employees worked in our refining and unbranded marketing segment, of which 730 were employed at our refineries and approximately 115 were employed at our corporate offices in Dallas, Texas. Approximately 120 of the 170 employees at our Big Spring refinery are covered by collective bargaining agreements that expire on March 31, 2010. Approximately 1,915 employees worked in our retail and branded marketing segment. None of the employees in our retail and branded marketing segment or in our corporate offices are represented by a union. We consider our relations with our employees to be satisfactory.

**Properties**

Our principal properties are described above under the captions "Refining and Unbranded Marketing," "Asphalt" and "Retail and Branded Marketing" in Item 1. We believe that our facilities are generally adequate for our operations and are maintained in a good state of repair in the ordinary course of business. As of December 31, 2008, we were the lessee under a number of cancelable and non-cancelable leases for certain properties. Our leases are discussed more fully in Note 21 to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

**Executive Officers of the Registrant**

Our current executive officers and key employees (identified by an asterisk), their ages as of January 31, 2009, and their business experience during at least the past five years are set forth below.

| Name | Age | Position |
|---|---|---|
| David Wiessman | 54 | Executive Chairman of the Board of Directors |
| Jeff D. Morris | 57 | Director, President and Chief Executive Officer |
| Shai Even | 40 | Senior Vice President and Chief Financial Officer |
| Joseph Israel | 37 | Chief Operating Officer |
| Claire A. Hart | 53 | Senior Vice President |
| Joseph A. Concienne | 58 | Senior Vice President of Refining |
| Alan Moret | 54 | Senior Vice President of Supply |
| Harlin R. Dean | 42 | Senior Vice President — Legal, General Counsel and Secretary |
| Michael Oster | 37 | Senior Vice President of Mergers and Acquisitions |
| Jimmy C. Crosby | 49 | Vice President of Refining — California Refineries |
| David Foster | 51 | Vice President of Refining — Big Spring |
| William Wuensche | 48 | Vice President of Refining — Krotz Springs |
| William L. Thorpe | 62 | Vice President of Asphalt Operations |
| Kyle McKeen* | 45 | President and Chief Executive Officer of Alon Brands |
| Joseph Lipman* | 63 | President and Chief Executive Officer of SCS |

Set forth below is a brief description of the business experience of each of the executive officers and key employees listed above.

*David Wiessman* has served as Executive Chairman of the Board of Directors of Alon since July 2000 and served as President and Chief Executive Officer of Alon USA Energy, Inc. from its formation in 2000 until May 2005. Mr. Wiessman has over 25 years of oil industry and marketing experience. Since 1994, Mr. Wiessman has been Chief Executive Officer, President and a director of Alon Israel. In 1992, Bielsol Investments (1987) Ltd. acquired a 50% interest in Alon Israel. In 1987, Mr. Wiessman became Chief Executive Officer of, and a stockholder in, Bielsol Investments (1987) Ltd. In 1976, after serving in the Israeli Air Force, he became Chief Executive Officer of Bielsol Ltd., a privately-owned Israeli company that owns and operates gasoline stations and owns real estate in Israel. Mr. Wiessman is also Chairman of the Board of Directors of Blue Square-Israel, Ltd., which is listed on the New York Stock Exchange and the Tel Aviv Stock Exchange, Chairman of Blue Square Real Estate Ltd, which is listed on the Tel Aviv Stock Exchange, Acting Chairman of the Board of Directors of Blue Square Investments and Property Chain, Ltd., which is listed on the Tel Aviv Stock Exchange, and Chairman of the Board and President of Dor Alon Energy Israel (1988) Ltd, which is listed on the Tel Aviv Stock Exchange.

*Jeff D. Morris* has served as a director and as our President and Chief Executive Officer since May 2005 and has served as the President and Chief Executive Officer of our subsidiary Alon USA, Inc. since its inception in August 2002 and of our other operating subsidiaries since July 2000. Prior to joining Alon, he held various positions at FINA, where he began his career in 1974. Mr. Morris served as Vice President of FINA's SouthEastern Business Unit from 1998 to 2000 and as Vice President of its SouthWestern Business Unit from 1995 to 1998. In these capacities, he was responsible for both the Big Spring refinery and FINA's Port Arthur refinery and the crude oil gathering assets and marketing activities for both business units.

*Shai Even* has served as a Senior Vice President since August 2008 and as our Chief Financial Officer since December 2004. Mr. Even served as a Vice President from May 2005 to August 2008 and Treasurer from August 2003 until March 2007. Prior to joining Alon, Mr. Even served as the Chief Financial Officer of DCL Technologies,

ALON0000459

Exhibit 3
Page 72

Ltd. from 1996 to July 2003 and prior to that worked for KPMG from 1993 to 1996.

*Joseph Israel* has served as our Chief Operating Officer since August 2008. Mr. Israel served as our Vice President of Mergers & Acquisitions from March 2005 to August 2008 and as our General Manager of Economics and Commerce from September 2000 to March 2005. Prior to joining Alon, Mr. Israel held positions with several Israeli government entities beginning in 1998, including the Israeli Land Administration, the Israeli Fuel Administration and most recently as Commerce Vice President of Israel's Petroleum Energy Infrastructure entity.

*Claire A. Hart* has served as our Senior Vice President since January 2004 and served as our Chief Financial Officer and Vice President from August 2000 to January 2004. Prior to joining Alon, he held various positions in the Finance, Accounting and Operations departments of FINA for 13 years, serving as Treasurer from 1998 to August 2000 and as General Manager of Credit Operations from 1997 to 1998.

*Joseph A. Concienne* has served as our Senior Vice President of Refining since August 2008 and served as our Senior Vice President of Refining and Transportation from May 2007 to August 2008 and Vice President of Refining and Transportation from March 2001 to May 2007. His primary role is oversight of our Texas refinery and supply system. Prior to joining Alon, Mr. Concienne served as Director of Operations/General Manager for Polyone Corporation in Seabrook, Texas from 1998 to 2001. He served as Vice President/General Manager for Valero Refining and Marketing, Inc. in 1998, and as Manager of Refinery Operations and Refinery Manager for Phibro Energy Refining (now known as Valero Refining and Marketing, Inc.) from 1985 to 1998.

*Alan Moret* has served as our Senior Vice President of Supply since August 2008. Mr. Moret served as our Senior Vice President of Asphalt Operations from August 2006 to August 2008, with responsibility for asphalt operations and marketing at our refineries and asphalt terminals. Prior to joining Alon, Mr. Moret was President of Paramount Petroleum Corporation from November 2001 to August 2006. Prior to joining Paramount Petroleum Corporation, Mr. Moret held various positions with Atlantic Richfield Company, most recently as President of ARCO Crude Trading, Inc. from 1998 to 2000 and as President of ARCO Seaway Pipeline Company from 1997 to 1998.

*Harlin R. Dean* has served as our General Counsel and Secretary since October 2002 and as our Senior Vice President since August 2008. Mr. Dean served as our Vice President from May 2005 to August 2008. Prior to joining Alon, Mr. Dean practiced corporate and securities law, with a focus on public and private merger and acquisition transactions and public securities offerings, at Brobeck, Phleger & Harrison, LLP, from April 2000 to September 2002, and at Weil, Gotshal & Manges, LLP, from September 1992 to March 2000.

*Michael Oster* has served as our Senior Vice President of Mergers and Acquisitions of Alon Energy since August 2008 and General Manager of Commercial Transactions of Alon Energy from January 2003 to August 2008. Prior to joining Alon Energy, Mr. Oster was a partner in the Israeli law firm, Yehuda Raveh and Co.

*Jimmy C. Crosby* has served as our Vice President of Refining — California Refineries since March 2009 and as Vice President of Refining and Supply since May 2007, with responsibility for refinery and supply operations at our California refineries. Mr. Crosby served as our Vice President of Supply and Planning from May 2005 to May 2007, with responsibility for all terminal and refinery supply for our Big Spring refinery's marketing and refinery operations. Mr. Crosby served as our General Manager of Business Development and Planning from August 2000 to May 2005. Prior to joining Alon, Mr. Crosby worked with FINA from 1996 to August 2000 where he last held the position of Manager of Planning and Economics for the Big Spring refinery.

*David Foster* has served as our Vice President of Refining — Big Spring since March 2009, with responsibility for refinery operations at the Big Spring refinery. From April 2007 to March 2009, Mr. Foster served as Vice President of Refining — Big Spring of Alon USA Refining, Inc., our subsidiary conducting our refining operations at the Big Spring refinery. Prior to joining Alon, Mr. Foster was with Houston Refining LP, a subsidiary of Lyondell Chemical Company, from 1993 to April 2007 in a number of Operational and Technology Management positions, most recently serving as Manager of Technical Services.

*William Wuensche* has served as our Vice President of Refining — Krotz Springs since March 2009, with responsibility for refinery operations at the Krotz Springs refinery. Mr. Wuensche joined Alon in July 2008 and from August 2008 to March 2009, Mr. Wuensche served as Vice President of Refining of Alon Refining Krotz Springs, Inc., our subsidiary conducting our refining operations at Krotz Springs. Prior to joining Alon, Mr. Wuensche was with Valero Refining Company-Louisiana from June 2006 to July 2008, as Vice President and General Manager of Valero's Krotz Springs refinery and Valero Refining Company from February 2004 to June 2006, as Vice President and General Manager of Valero's McKee Refinery. Earlier in his career, Mr. Wuensche held various positions of increasing responsibilities in the engineering, economics and planning and refinery operations areas.

*William L. Thorpe* has served as Vice President of Asphalt Operations since August 2008, with responsibility over asphalt marketing and operations, quality control and quality assurance at our refineries and asphalt terminals and safety, security and training at our asphalt terminals. Mr. Thorpe served as the Vice President of Asphalt Marketing of our subsidiary, Paramount Petroleum Corporation, from August 2006 to August 2008. Prior to joining Alon, Mr. Thorpe was with Paramount Petroleum Corporation from 1996 to August 2006 having responsibility for marketing and operations, serving as Senior Vice President. Prior to joining Paramount Petroleum Corporation, Mr. Thorpe held management positions with various companies, including Vice President of Pacific Resources, Inc., Vice President — Sales and Marketing of Marlex Petroleum Corporation, Vice President — Marketing of Charter Oil Company and Vice President — Planning and Development of ConocoPhillips.

*Kyle McKeen* has served as President and Chief Executive Officer of Alon Brands, Inc., our subsidiary that manages our retail operations, since May 2008. From 2005 to 2008, Mr. McKeen served as President and Chief Operating Officer of Carter Energy, an independent energy marketer supporting over 600 retailers by providing fuel supply, merchandising and marketing support, and consulting services. Prior to joining Carter Energy in 2005, Mr. McKeen was a member of the Board of Managers of Alon USA Interests, LLC from September 2002 to 2005 and held numerous positions of increasing responsibilities with Alon Energy, including Vice President of Marketing.

*Joseph Lipman* has served as President and Chief Executive Officer of Southwest Convenience Stores, LLC, or SCS, our subsidiary conducting our retail operations since July 2001. From 1997 to July 2001, Mr. Lipman served as General Manager of Cosmos, a chain of supermarkets in Israel owned by Super-Sol Ltd., where he was responsible for marketing and store operations.

## ITEM 1A. RISK FACTORS.

You should be aware that the occurrence of any of the events described in this Risk Factors section and elsewhere in this Annual Report on Form 10-K or in any other of our filings with the SEC could have a material adverse effect on our business, financial position, results of operations and cash flows. In evaluating us, you should consider carefully, among other things, the factors and the specific risks set forth below. This annual report contains forward-looking statements that involve risks and uncertainties. See "Forward-Looking Statements" in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 for a discussion of the factors that could cause actual results to differ materially from those projected.

***The price volatility of crude oil, other feedstocks, refined products and fuel and utility services may have a material adverse effect on our earnings, profitability and cash flows.***

Our refining and marketing earnings, profitability and cash flows from operations depend primarily on the margin above fixed and variable expenses (including the cost of refinery feedstocks, such as crude oil) at which we are able to sell refined products. We experienced contracting margins in portions of 2008, due to increases in crude oil prices without corresponding increases in the selling price of our products. Refining margins historically have been volatile, and are likely to continue to be volatile, as a result of a variety of factors, including fluctuations in the prices of crude oil, other feedstocks, refined products and fuel and utility services. Prices of crude oil, other feedstocks and refined products depend on numerous factors beyond our control, including the supply of and demand for crude oil, other feedstocks, gasoline, diesel, asphalt and other refined products. Such supply and demand are affected by, among other things:

- changes in global and local economic conditions;
- domestic and foreign demand for fuel products;

- worldwide political conditions, particularly in significant oil producing regions such as the Middle East, West Africa and Venezuela;
- the level of foreign and domestic production of crude oil and refined products and the level of crude oil, feedstock and refined products imported into the United States;
- utilization rates of U.S. refineries;
- development and marketing of alternative and competing fuels;
- commodities speculation;
- federal and state government regulations; and
- local factors, including market conditions, weather conditions and the level of operations of other refineries and pipelines in our markets.

When the margin between refined product prices and crude oil and other feedstock prices contracts our earnings, profitability and cash flows are negatively affected.

The nature of our business requires us to maintain substantial quantities of crude oil and refined product inventories. Because crude oil and refined products are essentially commodities, we have no control over the changing market value of these inventories. Our inventory is valued at the lower of cost or market value under the LIFO inventory valuation methodology; therefore, if the market value of our inventory were to decline to an amount less than our LIFO cost, we would record a write-down of inventory and a non-cash charge to cost of sales.

In addition, the volatility in costs of fuel, principally natural gas, and other utility services, principally electricity, used by our refineries and other operations affect our operating costs. Fuel and utility prices have been, and will continue to be, affected by factors outside our control, such as supply and demand for fuel and utility services in both local and regional markets. Future increases in fuel and utility prices may have a negative effect on our earnings, profitability and cash flows.

***Our profitability depends, in part, on the sweet/sour crude oil price spread. A decrease in this spread could negatively affect our profitability.***

Because our Big Spring and California refineries are configured to process substantial volumes of sour crude oils, our profitability depends, in part, on the price spread between sweet crude oil and sour crude oil, which we refer to as the sweet/sour spread. In recent years, the sweet/sour spread has narrowed and any further tightening of the sweet/sour spreads could negatively affect our profitability.

***The profitability of our California refineries depends, in part, on the light/heavy crude oil price spread. A decrease in this spread could negatively affect our profitability.***

Our California refineries process significant volumes of heavy crude oils and, as a result, our profitability depends in part on the price spread between light crude oil and heavy crude oil, which we refer to as the light/heavy spread. Because processing light crude oils produces higher percentages of light products, light crude oils typically are priced higher than heavy crude oils. In 2008, the light/heavy spread was greater than in 2007, but a tightening of the light/heavy spread would negatively affect profitability.

***The dangers inherent in our operations could cause disruptions and could expose us to potentially significant losses, costs or liabilities.***

Our operations are subject to significant hazards and risks inherent in refining operations and in transporting and storing crude oil, intermediate products and refined products. These hazards and risks include, but are not limited to, natural disasters, fires, explosions, pipeline ruptures and spills, third party interference and mechanical failure of

equipment at our or third-party facilities, any of which could result in production and distribution difficulties and disruptions, environmental pollution, personal injury or wrongful death claims and other damage to our properties and the properties of others. We experienced such an event on February 18, 2008 when a fire at the Big Spring refinery destroyed the propylene recovery unit and damaged equipment in the alkylation and gas concentration units. As a result the Big Spring refinery's crude unit did not operate until April 5, 2008 and the Fluid Catalytic Cracking Unit ("FCCU") did not resume operations until September 26, 2008.

The occurrence of such events at our Big Spring refinery, Krotz Springs refinery or our California refineries could significantly disrupt our production and distribution of refined products, and any sustained disruption could have a material adverse effect on our business, financial condition and results of operations.

***We are subject to interruptions of supply as a result of our reliance on pipelines for transportation of crude oil and refined products.***

Our refineries receive a substantial percentage of their crude oil and deliver a substantial percentage of their refined products through pipelines. We could experience an interruption of supply or delivery, or an increased cost of receiving crude oil and delivering refined products to market, if the ability of these pipelines to transport crude oil or refined products is disrupted because of accidents, earthquakes, hurricanes, governmental regulation, terrorism, other third-party action or any of the types of events described in the preceding risk factor. Our prolonged inability to use any of the pipelines that we use to transport crude oil or refined products could have a material adverse effect on our business, results of operations and cash flows.

***If the price of crude oil increases significantly, it could reduce our profit on our fixed-price asphalt supply contracts.***

We enter into fixed-price asphalt supply contracts pursuant to which we agree to deliver asphalt to customers at future dates. We set the pricing terms in these agreements based, in part, upon the price of crude oil at the time we enter into each contract. If the price of crude oil increases from the time we enter into the contract to the time we produce the asphalt, our profits from these sales could be adversely affected. For example, in the first half of 2008, WTI crude prices increased from $87.15 per bbl to $140.22 per bbl over a period of six months. Primarily as a result of these increases in the cost of crude, we experienced reduced margins from our asphalt sales in the first half of 2008.

***Our operating results are seasonal and generally lower in the first and fourth quarters of the year.***

Demand for gasoline and asphalt products is generally higher during the summer months than during the winter months due to seasonal increases in highway traffic and road construction work. Seasonal fluctuations in highway traffic also affect motor fuels and merchandise sales in our retail stores. As a result, our operating results for the first and fourth calendar quarters are generally lower than those for the second and third calendar quarters of each year. This seasonality is more pronounced in our asphalt business.

***If the price of crude oil increases significantly, it could limit our ability to purchase enough crude oil to operate our refineries at full capacity.***

We rely in part on borrowings and letters of credit under our revolving credit facilities to purchase crude oil for our refineries. If the price of crude oil increases significantly, we may not have sufficient capacity under our revolving credit facilities to purchase enough crude oil to operate our refineries at full capacity. A failure to operate our refineries at full capacity could adversely affect our profitability and cash flows.

***Changes in our credit profile could affect our relationships with our suppliers, which could have a material adverse effect on our liquidity and our ability to operate our refineries at full capacity.***

Changes in our credit profile could affect the way crude oil suppliers view our ability to make payments and induce them to shorten the payment terms for our purchases or require us to post security prior to payment. Due to the large dollar amounts and volume of our crude oil and other feedstock purchases, any imposition by our suppliers of more burdensome payment terms on us may have a material adverse effect on our liquidity and our ability to

make payments to our suppliers. This in turn could cause us to be unable to operate our refineries at full capacity. A failure to operate our refineries at full capacity could adversely affect our profitability and cash flows.

***Competition in the refining and marketing industry is intense, and an increase in competition in the markets in which we sell our products could adversely affect our earnings and profitability.***

We compete with a broad range of companies in our refining and marketing operations. Many of these competitors are integrated, multinational oil companies that are substantially larger than we are. Because of their diversity, integration of operations, larger capitalization, larger and more complex refineries and greater resources, these companies may be better able to withstand disruptions in operations, volatile market conditions, to compete on the basis of price and to obtain crude oil in times of shortage.

***Our indebtedness could adversely affect our financial condition or make us more vulnerable to adverse economic conditions.***

As of December 31, 2008, our consolidated outstanding indebtedness was $1,103.6 million. Our level of indebtedness could have important consequences to you, such as:

- we may be limited in our ability to obtain additional financing to fund our working capital needs, capital expenditures and debt service requirements or our other operational needs;
- we may be limited in our ability to use operating cash flow in other areas of our business because we must dedicate a substantial portion of these funds to make principal and interest payments on our debt;
- we may be at a competitive disadvantage compared to competitors with less leverage since we may be less capable of responding to adverse economic and industry conditions; and
- we may not have sufficient flexibility to react to adverse changes in the economy, our business or the industries in which we operate.

In addition, our ability to make payments on our indebtedness will depend on our ability to generate cash in the future. Our ability to generate cash is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. Our historical financial results have been, and we anticipate that our future financial results will be, subject to fluctuations. We cannot assure you that our business will generate sufficient cash flow from operations or that future borrowings will be available to us in an amount sufficient to enable us to pay our indebtedness or to fund our other liquidity needs. Any inability to pay our debts would require us to pursue one or more alternative strategies, such as selling assets, refinancing or restructuring our indebtedness or selling equity. However, we cannot assure you that any such alternatives would be feasible or prove adequate. Failure to pay our debts could cause us to default on our obligations in respect of our indebtedness and impair our liquidity. Also, some alternatives would require the prior consent of the lenders under our credit facilities, which we may not be able to obtain.

***Competition in the asphalt industry is intense, and an increase in competition in the markets in which we sell our asphalt products could adversely affect our earnings and profitability.***

Our asphalt business competes with other refiners and with regional and national asphalt marketing companies. Many of these competitors are larger, more diverse companies with greater resources, providing them advantages in obtaining crude oil and other blendstocks and in competing through bidding processes for asphalt supply contracts.

We compete in large part on our ability to deliver specialized asphalt products which we produce under proprietary technology licenses. Recently, demand for these specialized products has increased due to new specification requirements by state and federal governments. If we were to lose our rights under our technology licenses, or if competing technologies for specialized products are developed by our competitors, our profitability could be adversely affected.

***Competition in the retail industry is intense, and an increase in competition in the markets in which our retail businesses operate could adversely affect our earnings and profitability.***

Our retail operations compete with numerous convenience stores, gasoline service stations, supermarket chains, drug stores, fast food operations and other retail outlets. Increasingly, national high-volume grocery and dry-goods retailers, such as Albertson's and Wal-Mart are entering the gasoline retailing business. Many of these competitors are substantially larger than we are. Because of their diversity, integration of operations and greater resources, these companies may be better able to withstand volatile market conditions or levels of low or no profitability in the retail and branded marketing segment. In addition, these retailers may use promotional pricing or discounts, both at the pump and in the store, to encourage in-store merchandise sales. These activities by our competitors could adversely affect our profit margins. Additionally, our convenience stores could lose market share, relating to both gasoline and merchandise, to these and other retailers, which could adversely affect our business, results of operations and cash flows.

Our convenience stores compete in large part based on their ability to offer convenience to customers. Consequently, changes in traffic patterns and the type, number and location of competing stores could result in the loss of customers and reduced sales and profitability at affected stores.

***We may incur significant costs to comply with new or changing environmental laws and regulations.***

Our operations are subject to extensive regulatory controls on air emissions, water discharges, waste management and the clean-up of contamination that can require costly compliance measures. We anticipate that compliance with regulations lowering the permitted level of sulfur in gasoline will require us to spend approximately $21.8 million through 2009. Actual costs could, however, significantly exceed current estimates. If we fail to meet environmental requirements, we may be subject to administrative, civil and criminal proceedings by state and federal authorities, as well as civil proceedings by environmental groups and other individuals, which could result in substantial fines and penalties against us as well as governmental or court orders that could alter, limit or stop our operations.

On February 2, 2007, we committed in writing to enter into discussions with the EPA under the National Petroleum Refinery Initiative. To date, the EPA has not made any specific claims or findings against us or any of our refineries and we have not determined whether we will ultimately enter into a settlement agreement with the EPA. Based on prior settlements that the EPA has reached with other petroleum refiners under the Petroleum Refinery Initiative, we anticipate that the EPA will seek relief in the form of the payment of civil penalties, the installation of air pollution controls and the implementation of environmentally beneficial projects. At this time, we cannot estimate the amount of any such civil penalties or the costs of any required controls or environmentally beneficial projects.

In addition, new laws and regulations, new interpretations of existing laws and regulations, increased governmental enforcement or other developments could require us to make additional unforeseen expenditures. Many of these laws and regulations are becoming increasingly stringent, and the cost of compliance with these requirements can be expected to increase over time. We are not able to predict the impact of new or changed laws or regulations or changes in the ways that such laws or regulations are administered, interpreted or enforced. The requirements to be met, as well as the technology and length of time available to meet those requirements, continue to develop and change. To the extent that the costs associated with meeting any of these requirements are substantial and not adequately provided for, our results of operations and cash flows could suffer.

***We may incur significant costs and liabilities with respect to environmental lawsuits and proceedings and any investigation and remediation of existing and future environmental conditions.***

We are currently investigating and remediating, in some cases pursuant to government orders, soil and groundwater contamination at our Big Spring refinery, terminals and convenience stores. Since August 2000, we have spent approximately $18.7 million with respect to the investigation and remediation of our Big Spring refinery and related terminals. We anticipate spending an additional $1.3 million in investigation and remediation expenses in connection with our Big Spring refinery and terminals over the next three years. Since their acquisition, we have spent approximately $5.1 million with respect to the investigation and remediation of our California refineries and

related terminals. We anticipate spending an additional $10.0 to $15.0 million in investigation and remediation expenses in connection with our California refineries and terminals over the next five years. There can be no assurances, however, that we will not have to spend more than these anticipated amounts. Our handling and storage of petroleum and hazardous substances may lead to additional contamination at our facilities and facilities to which we send or sent wastes or by-products for treatment or disposal, in which case we may be subject to additional cleanup costs, governmental penalties, and third-party suits alleging personal injury and property damage. Although we have sold three of our pipelines and three of our terminals pursuant to the HEP transaction and two of our pipelines pursuant to the Sunoco transaction, we have agreed, subject to certain limitations, to indemnify HEP and Sunoco for costs and liabilities that may be incurred by them as a result of environmental conditions existing at the time of the sale. See Items 1 and 2 "Business and Properties — Government Regulation and Legislation — Environmental Indemnity to HEP" and "— Environmental Indemnity to Sunoco." If we are forced to incur costs or pay liabilities in connection with such proceedings and investigations, such costs and payments could be significant and could adversely affect our business, results of operations and cash flows.

***We could incur substantial costs or disruptions in our business if we cannot obtain or maintain necessary permits and authorizations or otherwise comply with health, safety, environmental and other laws and regulations.***

From time to time, we have been sued or investigated for alleged violations of health, safety, environmental and other laws. If a lawsuit or enforcement proceeding were commenced or resolved against us, we could incur significant costs and liabilities. In addition, our operations require numerous permits and authorizations under various laws and regulations. These authorizations and permits are subject to revocation, renewal or modification and can require operational changes to limit impacts or potential impacts on the environment and/or health and safety. A violation of authorization or permit conditions or other legal or regulatory requirements could result in substantial fines, criminal sanctions, permit revocations, injunctions, and/or facility shutdowns. In addition, major modifications of our operations could require modifications to our existing permits or upgrades to our existing pollution control equipment. Any or all of these matters could have a negative effect on our business, results of operations, cash flows or prospects.

***We could encounter significant opposition to our refining operations at our California refineries.***

Our Paramount refinery is located in a residential area. The refinery is located near schools, apartment complexes, private homes and shopping establishments. In addition, our Long Beach refinery is also located in close proximity to other commercial facilities. Any loss of community support for our California refining operations could result in higher than expected expenses in connection with opposing any community action to restrict or terminate the operation of the refinery. Any community action in opposition to our current and planned use of the California refineries (including our plans to construct a hydrocracker for our California refineries) could have a material adverse effect on our business, results of operations and cash flows.

***Certain of our facilities are located in areas that have a history of earthquakes or hurricanes, the occurrence of which could materially impact our operations.***

Our refineries located in California and the related pipeline and asphalt terminals, and to a lesser extent our refinery and operations in Oregon, are located in areas with a history of earthquakes, some of which have been quite severe. In August 2008, Hurricane Gustav made landfall in Louisiana. The Krotz Springs refinery sustained minor physical damage from this storm; however, the regional utilities were affected and, as a result, the Krotz Springs refinery was without electric power for one week. Offshore crude oil production and gathering facilities were impacted by Gustav and a subsequent storm, which temporarily limited the availability of crude oil to the Krotz Springs refinery. In the event of an earthquake or hurricane that causes damage to our refining, pipeline or asphalt terminal assets, or the infrastructure necessary for the operation of these assets, such as the availability of usable roads, electricity, water, or natural gas, we may experience a significant interruption in our refining and/or marketing operations. Such an interruption could have a material adverse effect on our business, results of operations and cash flows.

***Terrorist attacks, threats of war or actual war may negatively affect our operations, financial condition, results of operations and prospects.***

Terrorist attacks, threats of war or actual war, as well as events occurring in response to or in connection with them, may adversely affect our operations, financial condition, results of operations and prospects. Energy-related

assets (which could include refineries, terminals and pipelines such as ours) may be at greater risk of future terrorist attacks than other possible targets in the United States. A direct attack on our assets or assets used by us could have a material adverse effect on our operations, financial condition, results of operations and prospects. In addition, any terrorist attack, threats of war or actual war could have an adverse impact on energy prices, including prices for our crude oil and refined products, and an adverse impact on the margins from our refining and marketing operations. In addition, disruption or significant increases in energy prices could result in government-imposed price controls.

***The occurrence of a release of hazardous materials or a catastrophic event affecting our California refineries could endanger persons living nearby.***

Because our Paramount refinery is located in a residential area, any release of hazardous material or catastrophic event could cause injuries to persons outside the confines of the Paramount refinery. Similarly, any such release or event at our Long Beach refinery could cause injury to persons outside of the Long Beach refinery. In the event that non-employees were injured as a result of such an event, we would be likely to incur substantial legal costs as well as any costs resulting from settlements or adjudication of claims from such injured persons. The extent of these expenses and costs could be in excess of the limits provided by our insurance policies. As a result, any such event could have a material adverse effect on our business, results of operations and cash flows.

***Covenants in our debt instruments could limit our ability to undertake certain types of transactions and adversely affect our liquidity.***

Our credit agreements contain negative and financial covenants and events of default that may limit our financial flexibility and ability to undertake certain types of transactions. For example, we are subject to negative covenants that restrict our activities, including changes in control of Alon or certain of our subsidiaries, restrictions on creating liens, engaging in mergers, consolidations and sales of assets, incurring additional indebtedness, entering into certain lease obligations, making certain capital expenditures, and making certain dividend, debt and other restricted payments. Should we desire to undertake a transaction that is limited by the negative covenants in our credit agreements, we will need to obtain the consent of our lenders or refinance our credit facilities. Such refinancings may not be possible or may not be available on commercially acceptable terms, or at all.

***Our insurance policies do not cover all losses, costs or liabilities that we may experience.***

We maintain significant insurance coverage, but it does not cover all potential losses, costs or liabilities, and our business interruption insurance coverage does not apply unless a business interruption exceeds a period of 45 — 75 days, depending upon the specific policy. We could suffer losses for uninsurable or uninsured risks or in amounts in excess of our existing insurance coverage. Our ability to obtain and maintain adequate insurance may be affected by conditions in the insurance market over which we have no control. The occurrence of an event that is not fully covered by insurance could have a material adverse effect on our business, financial condition and results of operations.

***We are exposed to risks associated with the credit-worthiness of the insurer of our environmental policies.***

The insurer under three of our environmental policies is The Kemper Insurance Companies, which has experienced significant downgrades of its credit ratings in recent years and is currently in run-off. Of these three policies, two are 20-year policies that were purchased to protect us against expenditures not covered by our indemnification agreement with FINA, and the third policy is a ten-year policy covering our operations subsequent to our acquisition from FINA. Our insurance brokers have advised us that environmental insurance policies with terms in excess of ten years are not currently generally available and that policies with shorter terms are available only at premiums substantially in excess of the premiums paid for our policies with Kemper. Accordingly, we are currently subject to the risk that Kemper will be unable to comply with its obligations under these policies and that comparable insurance may not be available or, if available, only at substantially higher premiums than our current premiums with Kemper, although we have no reason at this time to believe that Kemper will not be able to pay our claims in the future.

***If we lose any of our key personnel, our ability to manage our business and continue our growth could be negatively affected.***

Our future performance depends to a significant degree upon the continued contributions of our senior

management team and key technical personnel. We do not currently maintain key man life insurance with respect to any member of our senior management team. The loss or unavailability to us of any member of our senior management team or a key technical employee could significantly harm us. We face competition for these professionals from our competitors, our customers and other companies operating in our industry. To the extent that the services of members of our senior management team and key technical personnel would be unavailable to us for any reason, we would be required to hire other personnel to manage and operate our company and to develop our products and technology. We cannot assure you that we would be able to locate or employ such qualified personnel on acceptable terms or at all.

***A substantial portion of our Big Spring refining workforce is unionized, and we may face labor disruptions that would interfere with our operations.***

As of December 31, 2008, we employed approximately 170 people at our Big Spring refinery, approximately 120 of whom were covered by a collective bargaining agreement. The collective bargaining agreement expires March 31, 2010. Our existing labor agreement may not prevent a strike or work stoppage in the future, and any such work stoppage could have a material adverse affect on our results of operation and financial condition.

***We conduct our convenience store business under a license agreement with 7-Eleven, and the loss of this license could adversely affect the results of operations of our retail and branded marketing segment.***

Our convenience store operations are primarily conducted under the 7-Eleven name pursuant to a license agreement between 7-Eleven, Inc. and Alon. 7-Eleven may terminate the agreement if we default on our obligations under the agreement. This termination would result in our convenience stores losing the use of the 7-Eleven brand name, the accompanying 7-Eleven advertising and certain other brand names and products used exclusively by 7-Eleven. Termination of the license agreement could have a material adverse affect on our retail operations.

***We may not be able to successfully execute our strategy of growth through acquisitions.***

A component of our growth strategy is to selectively acquire refining and marketing assets and retail assets in order to increase cash flow and earnings. Our ability to do so will be dependent upon a number of factors, including our ability to identify acceptable acquisition candidates, consummate acquisitions on favorable terms, successfully integrate acquired assets and obtain financing to fund acquisitions and to support our growth and many other factors beyond our control. Risks associated with acquisitions include those relating to:

- diversion of management time and attention from our existing business;
- challenges in managing the increased scope, geographic diversity and complexity of operations;
- difficulties in integrating the financial, technological and management standards, processes, procedures and controls of an acquired business with those of our existing operations;
- liability for known or unknown environmental conditions or other contingent liabilities not covered by indemnification or insurance;
- greater than anticipated expenditures required for compliance with environmental or other regulatory standards or for investments to improve operating results;
- difficulties in achieving anticipated operational improvements;
- incurrence of additional indebtedness to finance acquisitions or capital expenditures relating to acquired assets; and
- issuance of additional equity, which could result in further dilution of the ownership interest of existing stockholders.

We may not be successful in acquiring additional assets, and any acquisitions that we do consummate may not produce the anticipated benefits or may have adverse effects on our business and operating results.

***We depend upon our subsidiaries for cash to meet our obligations and pay any dividends, and we do not own 100% of the stock of our operating subsidiaries.***

We are a holding company. Our subsidiaries conduct all of our operations and own substantially all of our assets. Consequently, our cash flow and our ability to meet our obligations or pay dividends to our stockholders depend upon the cash flow of our subsidiaries and the payment of funds by our subsidiaries to us in the form of dividends, tax sharing payments or otherwise. Our subsidiaries' ability to make any payments will depend on their earnings, cash flows, the terms of their indebtedness, tax considerations and legal restrictions. Alon Refining Krotz Springs, Inc., which owns and operates the Krotz Springs refinery, is a wholly owned subsidiary of Alon Refining Louisiana, Inc. ("Alon Louisiana"). Alon Israel owns preferred stock of Alon Louisiana with an aggregate par value of $80.0 million which accrues dividends at a rate of 10.75% per annum. Therefore, we are not entitled to receive dividends on our common stock of Alon Louisiana until all accrued preferred dividends are paid in full. No preferred dividends were paid in 2008 and accrued dividends totalled approximately $4.3 million as of December 31, 2008.

Three of our executive officers, Messrs. Morris, Hart and Concienne, own shares of non-voting stock of two of our subsidiaries, Alon Assets, Inc., or Alon Assets, and Alon USA Operating, Inc., or Alon Operating. As of March 1, 2009, the shares owned by these executive officers represent 7.14% of the aggregate equity interest in these subsidiaries. In addition, these executive officers hold options vesting through 2010 which, if exercised, could increase their aggregate ownership to 8.34% of Alon Assets and Alon Operating. To the extent these two subsidiaries pay dividends to us, Messrs. Morris, Hart and Concienne will be entitled to receive pro rata dividends based on their equity ownership. For additional information, see Item 12 "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters."

Messrs. Morris, Hart and Concienne are parties to stockholders' agreements with Alon Assets and Alon Operating, pursuant to which we may elect or be required to purchase their shares in connection with put/call rights or rights of first refusal contained in those agreements. The purchase price for the shares is generally determined pursuant to certain formulas set forth in the stockholders' agreements, but after July 31, 2010, the purchase price, under certain circumstances involving a termination of, or resignation from, employment would be the fair market value of the shares. For additional information, see Item 12 "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters."

***It may be difficult to serve process on or enforce a United States judgment against certain of our directors.***

All of our directors, other than Messrs. Ron Haddock and Jeff Morris, reside in Israel. In addition, a substantial portion of the assets of these directors are located outside of the United States. As a result, you may have difficulty serving legal process within the United States upon any of these persons. You may also have difficulty enforcing, both in and outside the United States, judgments you may obtain in United States courts against these persons in any action, including actions based upon the civil liability provisions of United States federal or state securities laws. Furthermore, there is substantial doubt that the courts of the State of Israel would enter judgments in original actions brought in those courts predicated on United States federal or state securities laws.

**ITEM 1B. UNRESOLVED STAFF COMMENTS.**

None.

**ITEM 3. LEGAL PROCEEDINGS.**

In the ordinary conduct of our business, we are subject to periodic lawsuits, investigations and claims, including environmental claims and employee related matters. Although we cannot predict with certainty the ultimate resolution of lawsuits, investigations and claims asserted against us, we do not believe that any currently pending legal proceeding or proceedings to which we are a party will have a material adverse effect on our business, results of operations, cash flows or financial condition.

**ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.**

There were no matters submitted to a stockholder vote during the fourth quarter of 2008.

# EXHIBIT 4

Exhibit 4
Page 83

Table of Contents

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2010**

**OR**

☐ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM _________ TO _________.**

**Commission file number: 001-32567**

# ALON USA ENERGY, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **74-2966572** |
|---|---|
| (State of incorporation) | (I.R.S. Employer Identification No.) |
| **7616 LBJ Freeway, Suite 300, Dallas, Texas** | **75251** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (972) 367-3600

Securities registered pursuant to Section 12 (b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $0.01 per share | New York Stock Exchange |

Securities registered pursuant to Section 12 (g) of the Act: Series A Preferred Stock, par value $0.01 per share

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer ☐ | Accelerated filer ☑ | Non-accelerated filer ☐ (Do not check if a Smaller reporting company) | Smaller reporting company ☐ |
|---|---|---|---|

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). Yes ☐ No ☑

The aggregate market value for the registrant's common stock held by non-affiliates as of June 30, 2010, the last day of the registrant's most recently completed second fiscal quarter was $74,254,704.

As of March 1, 2011, 55,083,372 shares of the registrant's common stock, $0.01 par value, were outstanding.

Documents incorporated by reference: Proxy statement of the registrant relating to the registrant's 2011 annual meeting of stockholders, which is incorporated into Part III of this Form 10-K.

ALON0000852

Exhibit 4
Page 85

**TABLE OF CONTENTS**

| | Page |
|---|---|
| PART I | |
| ITEMS 1. AND 2. BUSINESS AND PROPERTIES | 1 |
| ITEM 1A. RISK FACTORS | 28 |
| ITEM 1B. UNRESOLVED STAFF COMMENTS | 37 |
| ITEM 3. LEGAL PROCEEDINGS | 37 |
| ITEM 4. RESERVED | 37 |
| PART II | |
| ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 38 |
| ITEM 6. SELECTED FINANCIAL DATA | 40 |
| ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 42 |
| ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 72 |
| ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 73 |
| ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 73 |
| ITEM 9A. CONTROLS AND PROCEDURES | 73 |
| ITEM 9B. OTHER INFORMATION | 74 |
| PART III | |
| ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 75 |
| ITEM 11. EXECUTIVE COMPENSATION | 75 |
| ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 75 |
| ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 75 |
| ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES | 75 |
| PART IV | |
| ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 76 |
| EX-10.22 | |
| EX-10.24 | |
| EX-10.46 | |
| EX-10.56 | |
| EX-10.104 | |
| EX-10.105 | |
| EX-10.106 | |
| EX-10.107 | |
| EX-12.1 | |
| EX-21.1 | |
| EX-23.1 | |
| EX-31.1 | |
| EX-31.2 | |
| EX-32.1 | |

Table of Contents

## PART I

### ITEMS 1. AND 2. BUSINESS AND PROPERTIES.

***Statements in this Annual Report on Form 10-K, including those in Items 1 and 2, "Business and Properties," and Item 3, "Legal Proceedings," that are not historical in nature should be deemed forward-looking statements that are inherently uncertain. See "Forward-Looking Statements" in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 for a discussion of forward-looking statements and of factors that could cause actual outcomes and results to differ materially from those projected.***

### COMPANY OVERVIEW

In this Annual Report, the words "we," "our" and "us" refer to Alon USA Energy, Inc. and its consolidated subsidiaries or to Alon USA Energy, Inc. or an individual subsidiary, and not to any other person.

We are a Delaware corporation formed in 2000 to acquire a crude oil refinery in Big Spring, Texas, and related pipeline, terminal and marketing assets from Atofina Petrochemicals, Inc., or FINA. In 2006, we acquired refineries in Paramount and Long Beach, California and Willbridge, Oregon, together with the related pipeline, terminal and marketing assets, through the acquisitions of Paramount Petroleum Corporation and Edgington Oil Company. In 2008, we acquired a refinery in Krotz Springs, Louisiana through the acquisition of Valero Refining Company-Louisiana. In June 2010, we acquired a refinery in Bakersfield, California, through the purchase of substantially all of the assets of Big West of California, LLC. As of December 31, 2010, we operated 304 convenience stores in Central and West Texas and New Mexico, primarily under the 7-Eleven and FINA brand names. Our convenience stores typically offer merchandise, food products and motor fuels. Our principal executive offices are located at 7616 LBJ Freeway, Suite 300, Dallas, Texas 75251, and our telephone number is (972) 367-3600. Our website can be found at www.alonusa.com.

On July 28, 2005, our stock began trading on the New York Stock Exchange under the trading symbol "ALJ." We are a controlled company under the rules and regulations of the New York Stock Exchange because Alon Israel Oil Company, Ltd. ("Alon Israel") holds more than 50% of the voting power for the election of our directors through its ownership of approximately 75% of our outstanding common stock. Alon Israel, an Israeli limited liability company, is the largest services and trade company in Israel. Alon Israel entered the gasoline marketing and convenience store business in Israel in 1989 and has grown to become a leading marketer of petroleum products and one of the largest operators of retail gasoline and convenience stores in Israel. Alon Israel is a controlling shareholder of Alon Holdings Blue Square-Israel Ltd. ("Blue Square"), a leading retailer in Israel, which is listed on the New York Stock Exchange and the Tel Aviv Stock Exchange, and Blue Square is a controlling shareholder of Dor-Alon Energy in Israel (1988) Ltd. ("Dor-Alon"), a leading Israeli marketer, developer and operator of gas stations and shopping centers, which is listed on the Tel Aviv Stock Exchange.

We file annual, quarterly and current reports and proxy statements, and file or furnish other information, with the Securities Exchange Commission ("SEC"). Our SEC filings are available to the public at the SEC's website at www.sec.gov. In addition, we make our SEC filings available free of charge through our website at www.alonusa.com as soon as reasonably practicable after we file or furnish such material with the SEC. In addition, we will provide copies of our filings free of charge to our stockholders upon request to Alon USA Energy, Inc., Attention: Investor Relations, 7616 LBJ Freeway, Suite 300, Dallas, Texas 75251. We have also made the following documents available free of charge through our website at www.alonusa.com:

- Compensation Committee Charter;
- Audit Committee Charter;
- Corporate Governance Guidelines; and
- Code of Business Conduct and Ethics.

Table of Contents

## BUSINESS

We are an independent refiner and marketer of petroleum products operating primarily in the South Central, Southwestern and Western regions of the United States. Our crude oil refineries are located in Texas, California, Oregon and Louisiana and have a combined throughput capacity of approximately 250,000 barrels per day ("bpd"). Our refineries produce petroleum products including various grades of gasoline, diesel fuel, jet fuel, petrochemicals, petrochemical feedstocks, asphalt, and other petroleum-based products.

Our presentation of segment data reflects our following three operating segments: (i) refining and unbranded marketing, (ii) asphalt and (iii) retail and branded marketing. Additional information regarding our operating segments and properties is presented in Note 5 to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

### Refining and Unbranded Marketing

Our refining and unbranded marketing segment includes sour and heavy crude oil refineries that are located in Big Spring, Texas; and Paramount, Bakersfield and Long Beach, California; and a light sweet crude oil refinery located in Krotz Springs, Louisiana. We refer to the Paramount, Bakersfield and Long Beach refineries together as our "California refineries." These refineries have a combined throughput capacity of approximately 240,000 bpd. At our refineries we refine crude oil into petroleum products, including gasoline, diesel fuel, jet fuel, petrochemicals, feedstocks and asphalts, which are marketed primarily in the South Central, Southwestern and Western United States.

*Big Spring Refinery*

Our Big Spring refinery has a crude oil throughput capacity of 70,000 bpd and is located on 1,306 acres in the Permian Basin in West Texas. In industry terms, our Big Spring refinery is characterized as a "cracking refinery," which generally refers to a refinery utilizing vacuum distillation and catalytic cracking processes in addition to basic distillation, naphtha reforming and hydrotreating processes, to produce higher light product yields through the conversion of heavier fuel oils into gasoline, light distillates and intermediate products.

Major processing units at our Big Spring refinery include fluid catalytic cracking, naphtha reforming, vacuum distillation, hydrotreating and alkylation units.

On February 18, 2008, a fire at the Big Spring refinery destroyed the propylene recovery unit and damaged equipment in the alkylation and gas concentration units. The re-start of the crude unit in a hydroskimming mode began on April 5, 2008 and the Fluid Catalytic Cracking Unit ("FCCU") resumed operations on September 26, 2008. Substantially all of the repairs to the units damaged in the fire were completed by the end of January 2010.

Our Big Spring refinery has the capability to process substantial volumes of less expensive high-sulfur, or sour, crude oils to produce a high percentage of light, high-value refined products. Typically, sour crude oil has accounted for approximately 85.0% of the Big Spring refinery's crude oil input.

Our Big Spring refinery produces ultra-low sulfur gasoline, ultra-low sulfur diesel, jet fuel, petrochemicals, petrochemical feedstocks, asphalt and other petroleum products. This refinery typically converts approximately 90.0% of its feedstock into finished products such as gasoline, diesel, jet fuel and petrochemicals, with the remaining 10.0% primarily converted to asphalt and liquefied petroleum gas.

Table of Contents

The following table summarizes historical throughput and production data for our Big Spring refinery:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2010 | | 2009 | | 2008 | |
| | bpd | % | bpd | % | bpd | % |
| Refinery throughput: | | | | | | |
| Sour crude | 39,349 | 80.2 | 48,340 | 80.8 | 31,654 | 83.8 |
| Sweet crude | 7,288 | 14.9 | 9,238 | 15.4 | 4,270 | 11.3 |
| Blendstocks | 2,391 | 4.9 | 2,292 | 3.8 | 1,869 | 4.9 |
| Total refinery throughput (1) | 49,028 | 100.0 | 59,870 | 100.0 | 37,793 | 100.0 |
| Refinery production: | | | | | | |
| Gasoline | 24,625 | 50.7 | 26,826 | 45.0 | 14,266 | 38.4 |
| Diesel/jet | 15,869 | 32.7 | 19,136 | 32.2 | 10,439 | 28.2 |
| Asphalt | 2,827 | 5.8 | 5,289 | 8.9 | 4,850 | 13.1 |
| Petrochemicals | 2,939 | 6.0 | 2,928 | 4.9 | 1,221 | 3.3 |
| Other | 2,341 | 4.8 | 5,327 | 9.0 | 6,298 | 17.0 |
| Total refinery production (2) | 48,601 | 100.0 | 59,506 | 100.0 | 37,074 | 100.0 |
| Refinery utilization (3) | | 68.2% | | 82.3% | | 52.3% |

(1) Total refinery throughput represents the total barrels per day of crude oil and blendstock inputs in the refinery production process.

(2) Total refinery production represents the barrels per day of various products resulting from the refinery production process.

(3) Refinery utilization represents average daily crude oil throughput divided by crude oil capacity, excluding planned periods of downtime for maintenance and turnarounds.

Refinery throughput and production for 2010 reflects our efforts to implement new operating procedures which reduced throughput rates. Refinery throughput and production for 2009 reflects the effects of downtime associated with a scheduled reformer regeneration in May 2009, an unscheduled reformer regeneration in November 2009 and a scheduled shutdown of the ultra-low sulfur gas unit for completion of our ultra-low sulfur gas project. Refinery throughput and production for 2008 reflects the effects of the downtime associated with the February 18, 2008 fire.

*Big Spring Refinery Raw Material Supply*

Sour crude oil has typically accounted for more than 90% of our crude oil input at the Big Spring refinery, of which approximately 93% was West Texas Sour ("WTS") crude oil prior to 2007. In late 2006, we began to use different crudes and feedstocks shipped from the Texas Gulf Coast on the Amdel pipeline to diversify our crude sources and to improve production yields. As a result, in 2008 WTS was approximately 63% of the Big Spring Refinery's sour crude oil input. WTS was approximately 78% of the Big Spring Refinery's sour crude oil input in 2009 and approximately 84% of the Big Spring Refinery's sour crude oil input in 2010. Our Big Spring refinery is the closest refinery to Midland, Texas, which is the largest origination terminal for West Texas crude oil. We believe this location provides us with the lowest transportation cost differential for West Texas crude oil of any refinery.

More than half of our Big Spring refinery's crude oil input requirements are purchased through term contracts with several suppliers, including major oil companies. These term contracts are generally short-term in nature with arrangements that contain market-responsive pricing provisions and provisions for renegotiation or cancellation by either party. A small amount of locally gathered crude oil is also delivered directly to our Big Spring refinery. The remainder of the Big Spring refinery's crude oil input requirements are purchased on the spot market.

In addition, access to the Amdel and White Oil pipelines gives us the ability to optimize our refinery crude slate by transporting foreign and domestic crude oils to our Big Spring refinery from the Gulf Coast when the economics for processing those crude oils are more favorable than processing locally-sourced crude oils. Other feedstocks, including butane, isobutane and asphalt blending components, are delivered by truck and railcar, and a majority of our natural gas is delivered by a pipeline in which we own a 63% interest.

Table of Contents

*Crude Oil Pipelines*

We receive WTS crude oil and West Texas Intermediate ("WTI"), a light sweet crude oil, primarily from regional common carrier pipelines. We also have access to offshore domestic and foreign crude oils available on the Gulf Coast through the Amdel and White Oil pipelines. This combination of access to Permian Basin crude oil and foreign and offshore domestic crude oil from the Gulf Coast allows us to optimize our Big Spring refinery's crude oil supply at any given time. The crude oil pipelines we utilize consist of the following:

| Crude Oil Pipelines | Status | Miles | Connections |
|---|---|---|---|
| Amdel | Sunoco Throughput | 504 | Midland and Nederland |
| White Oil | Sunoco Throughput | 25 | Garden City (Amdel) and Big Spring |
| Mesa Interconnect | Owned | 4 | Mesa pipeline and Big Spring |
| Centurion | Owned (leased to Centurion) | 3 | Centurion pipeline and Big Spring |

The bi-directional Amdel pipeline and the White Oil pipeline connect our refinery to Nederland, Texas, which is located on the Gulf Coast, and to Midland, Texas. Permian Basin crude oil is delivered to our Big Spring refinery through the Mesa Interconnect pipeline which is connected to the Mesa pipeline system, a common carrier, and through our owned connection pipeline which is leased to Centurion Pipeline L.P. ("Centurion") and connected to the Centurion pipeline system from Midland, Texas to Roberts Junction in Texas.

On March 1, 2006, we sold our Amdel and White Oil crude pipelines to an affiliate of Sunoco, Inc. ("Sunoco") and entered into a 10-year pipeline Throughput and Deficiency Agreement with Sunoco, with an option to extend the agreement by four additional thirty-month periods. The Throughput and Deficiency Agreement allows us to maintain crude oil transportation rights on the pipelines from the Gulf Coast and from Midland, Texas to the Big Spring refinery. Pursuant to the Throughput and Deficiency Agreement, we have agreed to ship a minimum of 15,000 bpd on the pipelines during the term of the agreement. We commenced shipments of crude oil through the Amdel and White Oil pipelines under this agreement in October 2006.

To further diversify crude oil delivery sources to our Big Spring refinery, we entered into a 15-year arrangement with Centurion in June 2006. Pursuant to this arrangement, Centurion will provide us with crude oil transportation pipeline capacity, and we ship a minimum of 21,500 bpd of crude oil from Midland, Texas to our Big Spring refinery using Centurion's pipeline system from Midland to Roberts Junction and our owned pipeline from Roberts Junction to the Big Spring refinery which we lease to Centurion. We commenced shipments of crude oil through these pipelines in November 2006.

*Big Spring Refinery Production*

*Gasoline.* In 2010, gasoline accounted for approximately 50.7% of our Big Spring refinery's production. We produce various grades of gasoline, ranging from 84 sub-octane regular unleaded to 93 octane premium unleaded, and use a computerized component blending system to optimize gasoline blending. We completed our ultra-low sulfur gasoline project in 2009 and gasoline currently produced at the Big Spring refinery complies with the U.S. Environmental Protection Agency's ("EPA") ultra-low sulfur gasoline standard of 30 parts per million ("ppm"). Our Big Spring refinery is capable of producing specially formulated fuels, such as those required in the El Paso, Dallas/Fort Worth and Arizona markets.

*Distillates.* In 2010, diesel and jet fuel accounted for approximately 32.7% of our Big Spring refinery's production. All of the on-road specification diesel fuel we produce meets the EPA's ultra-low sulfur diesel standard of 15 ppm. Our jet fuel production conforms to the JP-8 grade military specifications.

*Asphalt.* Asphalt accounted for approximately 5.8% of our Big Spring refinery's production in 2010. Approximately 39.1% of our Big Spring refinery's asphalt production is blended paving grades and 60.9% is asphalt blendstocks. We have an exclusive license to use FINA's asphalt blending technology in West Texas, Arizona, New Mexico and Colorado and a non-exclusive license in Idaho, Montana, Nevada, North Dakota, Utah and Wyoming. Our asphalt facilities are capable of producing up to 30 different product formulations, including both polymer modified asphalt ("PMA") and ground tire rubber ("GTR") asphalt. Asphalt produced at the Big Spring refinery is transferred to our asphalt segment at prices substantially determined by reference to the cost of crude oil, which is intended to approximate bulk wholesale market prices.

*Petrochemical Feedstocks and Other*. We produce propane, propylene, certain aromatics, specialty solvents and benzene for use as petrochemical feedstocks, along with other by-products such as sulfur and carbon black oil. Our Big Spring refinery has sulfur processing capabilities of approximately two tons per thousand bpd of crude oil capacity, which is above the average for cracking refineries and aids in our ability to produce low sulfur motor fuels while continuing to process significant amounts of sour crude oil.

*Big Spring Refinery Transportation Fuel Marketing*

Our refining and unbranded marketing segment sells refined products from our Big Spring refinery in both the wholesale rack and bulk markets. Our marketing of transportation fuels produced at our Big Spring refinery is focused on portions of Texas, Oklahoma, New Mexico and Arizona through our physically integrated system. We refer to these areas as our 'physically integrated system' because our distributors in this region are supplied with motor fuels produced at our Big Spring refinery and distributed through a network of pipelines and terminals which we either own or have access to through leases or long-term throughput agreements. During 2010, approximately 63% of the gasoline and 22% of the diesel motor fuels produced at our Big Spring Refinery were transferred to our retail and branded marketing segments at prices substantially determined by reference to commodity pricing information published by Platts.

*Unbranded Transportation Fuel Marketing*. We presently sell a majority of the diesel fuel and approximately 20.94% of the gasoline produced at our Big Spring refinery on an unbranded basis. During 2010 we sold over 13,378 bpd of our Big Spring refinery's diesel fuel and gasoline production as unbranded fuels, which were largely sold through our physically integrated system.

*Jet Fuel Marketing*. We market substantially all the jet fuel produced at our Big Spring refinery as JP-8 grade to the Defense Energy Supply Center ("DESC"). All DESC contracts are for a one-year term and are awarded through a competitive bidding process. We have traditionally bid for contracts to supply Dyess Air Force Base in Abilene, Texas and Sheppard Air Force Base in Wichita Falls, Texas. Jet fuel production in excess of existing contracts is sold through unbranded rack sales.

*Product Supply Sales*. We sell transportation fuel production in excess of our branded and unbranded marketing needs through bulk sales and exchange channels. These bulk sales and exchange arrangements are entered into with various oil companies and traders and are transported through our product pipeline network or truck deliveries. Our petrochemical feedstock and other petroleum product production is sold to a wide customer base and is transported through truck and railcars.

*Big Spring Product Pipelines*

The product pipelines we utilize to deliver refined products from our Big Spring refinery are linked to the major third-party product pipelines in the geographic area around our Big Spring refinery. These pipelines provide us flexibility to optimize product flows into multiple regional markets. This product pipeline network can also (1) receive additional transportation fuel products from the Gulf Coast through the Delek product terminal and Magellan pipelines, (2) deliver and receive products to and from the Magellan system, our connection to the Group III, or mid-continent markets, and (3) deliver products to the New Mexico and Arizona markets through third-party systems. The following table describes the product pipelines which we utilize:

| Product Pipelines | Access | Miles | Connections | Expiration Date |
|---|---|---|---|---|
| Plains (1) | Lease | 38 | Coahoma and Midland | 2012 |
| Fin-Tex | HEP throughput | 137 | Midland and Orla (Holly) | 2020 |
| Holly | Lease | 133 | Orla and El Paso | 2022 |
| Trust | HEP throughput | 332 | Big Spring/Abilene/Wichita Falls | 2020 |
| Dyess JP-8 | HEP throughput | 2 | Abilene and Dyess Air Force Base | 2020 |
| River | HEP throughput | 47 | Wichita Falls and Duncan (Magellan) | 2020 |
| Carswell | Owned | 148 | Abilene and Fort Worth | N/A |

(1) The description of the Plains pipeline does not include a 4-mile pipeline that we own connecting Big Spring and Coahoma, Texas.

Table of Contents

In February 2005, we completed the contribution of our Fin-Tex, Trust, River and Dyess JP-8 product pipelines, and certain of our product terminals connected to these pipelines to Holly Energy Partners, LP ("HEP"). Simultaneous with this transaction, we entered into a Pipelines and Terminal Agreement with HEP with an initial term of 15 years and three subsequent five year renewal terms exercisable at our sole discretion. Pursuant to the Pipelines and Terminal Agreement, we have agreed to transport and store minimum volumes of refined products in the pipelines and terminals and to pay specified tariffs and fees for such transportation and storage during the term of the agreement. See Note 4 of our consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

The Plains, Fin-Tex and Holly pipelines make up the Fin-Tex system. Our access to the Plains and Holly pipelines is secured by pipeline leases, while our access to the Fin-Tex pipeline is provided through our Pipelines and Terminals Agreement with HEP. The Fin-Tex system transports product from the Big Spring refinery to El Paso, Texas and allows product to be placed in Tucson and Phoenix, Arizona through the third-party Kinder Morgan pipeline. The Fin-Tex system also gives us access to the Albuquerque and Bloomfield, New Mexico markets. We deliver physical barrels to El Paso and receive, through an exchange agreement with Navajo Refining Company, physical barrels in Albuquerque and Bloomfield.

The Trust pipeline connects our Big Spring refinery to terminals in Abilene and Wichita Falls, while the River pipeline connects the terminal in Wichita Falls to our Duncan, Oklahoma terminal. At Duncan, the River pipeline connects into the Magellan pipeline system for sales into Group III, or mid-continent, markets. The Trust and River pipeline system is a bi-directional pipeline system which we access through our Pipelines and Terminals Agreement with HEP.

The Dyess JP-8 pipeline connects the Abilene terminal to Dyess Air Force Base. Our access to this pipeline is also provided through our Pipelines and Terminals Agreement with HEP.

Our Carswell pipeline system runs from Abilene to Fort Worth, Texas. The Carswell pipeline is currently inactive.

*Product Terminals*

We primarily utilize the following six product terminals for delivery of transportation fuels produced at our Big Spring refinery, of which two are owned and three are accessed through our Pipelines and Terminal Agreement with HEP:

| Terminals | Access | Working Capacity (1) | Supply Source | Mode of Delivery |
|---|---|---|---|---|
| Big Spring, Texas (2) | Owned | 331 | Pipeline/refinery | Pipeline/truck |
| Abilene, Texas | HEP | 111 | Pipeline | Pipeline/truck |
| Wichita Falls, Texas | HEP | 189 | Pipeline | Pipeline/truck |
| Duncan, Oklahoma | Owned (3) | 154 | Pipeline | Pipeline |
| Orla, Texas | HEP | 116 | Pipeline | Pipeline |
| Southlake, Texas | Terminalling Agreement | 212 | Pipeline | Truck |
| Total | | 1,113 | | |

(1) Measured in thousands of barrels.

(2) Includes the tankage located at our Big Spring refinery.

(3) The terminal is owned, but the underlying real property is leased.

All six terminals we access are physically integrated with our Big Spring refinery through the product pipelines we utilize. Four of these six terminals, Big Spring, Abilene, Southlake and Wichita Falls, are equipped with truck loading racks. The other two terminals, Duncan, Oklahoma and Orla, Texas, are used for delivering shipments into third-party pipeline systems. The Southlake terminal is supplied pursuant to a throughput agreement with Nustar Logistics, LP ("Nustar") whereby we have agreed to ship 2,000 bpd of product from the HEP-owned Wichita Falls,

Table of Contents

Texas terminal to the Southlake terminal through Nustar's pipeline. We also directly access three other terminals located in El Paso, Texas and Tucson and Phoenix, Arizona.

*California Refineries and Terminals*

In August 2006 we acquired Paramount Petroleum Corporation. Paramount Petroleum Corporation's assets included two refineries located in Paramount, California and Willbridge, Oregon with a combined refining capacity of 66,000 bpd, seven asphalt terminals located in Washington (Richmond Beach), California (Elk Grove and Mojave), Arizona (Phoenix, Fredonia and Flagstaff), and Nevada (Fernley) (50% interest), and a 50% interest in Wright Asphalt Products Company ("Wright"), which specializes in patented ground tire rubber modified asphalt products. Our Paramount refinery has a crude oil throughput capacity of 54,000 bpd and is located on 63 acres in Paramount, California. In industry terms, the Paramount refinery is characterized as a "hydroskimming refinery" which is a more complex refinery configuration than a "topping refinery" (described below), adding naphtha reforming, hydrotreating and other chemical treating processes to the distillation process. In addition to producing vacuum gas oil and asphalt, our Paramount refinery utilizes naphtha reforming and hydrotreating to produce gasoline and distillate products from the light oil streams resulting from the distillation process.

In September 2006 we acquired Edgington Oil Company. Edgington Oil Company's assets included a refinery located on 19 acres in Long Beach, California with a nameplate capacity of approximately 40,000 bpd. In industry terms, the Long Beach refinery is characterized as a "topping refinery" which generally refers to a low complexity refinery configuration consisting primarily of a distillation unit. Distillation is the first step in the refining process — separating crude oil into its constituent petroleum products. The Long Beach refinery primarily produces vacuum gas oil and asphalt.

In June 2010 we acquired a refinery located in Bakersfield, California from Big West of California, LLC, a subsidiary of Flying J, Inc. The Bakersfield refinery is currently inactive as we work to integrate the operations of the Bakersfield refinery with our Paramount and Long Beach refineries. We plan to process vacuum gas oil produced by the other refineries in the hydrocracker unit located at the Bakersfield refinery. We refer to the Paramount, Bakersfield and Long Beach refineries together as our "California refineries."

Our California refineries are included in our refining and unbranded marketing segment, while our refinery in Willbridge is included in our asphalt segment.

Our California refineries have the capability to process substantial volumes of less expensive sour crude oils. In 2010 at the California refineries, medium sour crude oil accounted for approximately 20.4% of crude oil input and heavy crude oil accounted for 79.6%. We own pipelines connecting the Paramount and Long Beach refineries.

Our California refineries currently produce CARBOB gasoline, CARB diesel, jet fuel, asphalt and other petroleum products. In 2010, these refineries converted approximately 37.0% of crude oil into higher value products such as gasoline, diesel and jet fuel, and 34.6% converted to asphalt, fuel oil and sulfur. The remaining 28.4% of production was sold as unfinished feedstocks to other refineries and third parties.

As reflected in our 2010 production results, the California refineries currently produce unfinished products, which typically provide lower margins than finished products. In order to realize higher margins for the sale of these products, we have completed a refinery upgrade project to bring online a naphtha hydrotreater located at the Paramount refinery. The naphtha hydrotreater allows us to increase our production of distillates and gasoline and to produce less unfinished products.

In 2010, we averaged approximately 25.9% utilization of our California refineries' crude oil throughput capacity. The following table summarizes 2010, 2009 and 2008 throughput and production data for our California refineries on a combined basis (excluding the Bakersfield refinery).

Table of Contents

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2010 | | 2009 | | 2008 | |
| | bpd | % | bpd | % | bpd | % |
| Refinery throughput: | | | | | | |
| Medium sour crude | 3,502 | 19.9 | 13,408 | 43.0 | 8,014 | 25.8 |
| Heavy crude | 13,688 | 77.8 | 17,420 | 55.9 | 22,590 | 72.6 |
| Blendstocks | 406 | 2.3 | 330 | 1.1 | 495 | 1.6 |
| Total refinery throughput (1) | 17,596 | 100.0 | 31,158 | 100.0 | 31,099 | 100.0 |
| Refinery production: | | | | | | |
| Gasoline | 2,629 | 15.4 | 4,920 | 16.2 | 4,141 | 13.7 |
| Diesel/jet | 3,704 | 21.6 | 7,123 | 23.5 | 7,481 | 24.8 |
| Asphalt | 5,919 | 34.6 | 8,976 | 29.5 | 9,214 | 30.5 |
| Light unfinished | — | — | 117 | 0.4 | — | — |
| Heavy unfinished | 4,483 | 26.2 | 8,813 | 29.0 | 9,182 | 30.4 |
| Other | 372 | 2.2 | 418 | 1.4 | 192 | 0.6 |
| Total refinery production (2) | 17,107 | 100.0 | 30,367 | 100.0 | 30,210 | 100.0 |
| Refinery utilization (3) | | 25.9% | | 46.2% | | 46.3% |

(1) Total refinery throughput represents the total barrels per day of crude oil and blendstock inputs in the refinery production process.

(2) Total refinery production represents the barrels per day of various products resulting from the refinery production process.

(3) Refinery utilization represents average daily crude oil throughput divided by crude oil capacity, excluding planned periods of downtime for maintenance and turnarounds, and including effects of downtime to optimize our refining and asphalt economics in 2010, 2009 and 2008.

Our California refineries operated at low rates for 2010, 2009 and 2008 due to continued efforts to optimize asphalt production with demand. Additionally, in 2008 the California refineries were affected by planned turnarounds and the revamp of one of the crude units. The California refineries restarted in February 2009 after the completion of a refinery-wide turnaround and the completion of refinery upgrade projects. These projects included the upgrade of an idled naphtha hydrotreater, revamping a naphtha hydrotreater to hydrotreat jet fuel, upgrading crude units' metallurgy, upgrading the refinery's electrical system and the installation of a new flare gas recovery system. These upgrades resulted in the California refineries being operated in a hydroskimming mode. We continuously evaluate and optimize throughput at our California refineries based on the topping and hydroskimming margins environment.

*California Refineries Raw Material Supply*

For 2010, heavy crude oil accounted for approximately 79.6% of our crude oil input of which approximately 55.8% was California heavy crude oil. As a result of the proximity of the California refineries to the Port of Los Angeles and the Port of Long Beach, we have access to a variety of domestic and foreign crude oils that are available on the West Coast. Our California refineries receive crude oil primarily from common carrier, private carrier and our owned pipelines. The majority of the California refineries' crude oil input requirements are purchased on the spot market. The remainder of our California refineries' crude oil input requirements are purchased through term contracts with several suppliers, including major oil companies. These term contracts are both short-term and long-term in nature with arrangements that contain market-responsive pricing provisions and provisions for renegotiation or cancellation by either party. Other feedstocks, including butane and gasoline blendstocks, are delivered by truck and pipeline.

Table of Contents

*Crude Oil Pipelines*

The crude oil pipelines we utilize consist of the following:

| Crude Oil Pipelines | Status | Miles | Connections |
|---|---|---|---|
| Paramount Crude | Owned | 2.5 | Paramount and East Hynes Terminal |
| Chevron Crude | Third Party | 15 | Paramount and local gathering system |
| No. 3/No. 4 | Owned | 13 | Long Beach and Long Beach Harbor |
| BP | Third Party | 1 | Long Beach and East Hynes Terminal |
| Plains Pipeline | Third Party | 14 | Long Beach and West Hynes Terminal |

The Paramount refinery is supplied by the Chevron Crude pipeline (heavy sour) and Paramount Crude pipeline (medium/heavy sour). The Long Beach refinery is supplied by the No. 3/No. 4 pipelines (heavy sour) and the BP pipeline (medium sour). As a supplement to our on-site storage facilities, we lease storage tanks located at the BP-owned East Hynes, the Plains West Hynes, and the Kinder Morgan Carson crude oil terminals. Additionally, we acquire California medium sour crude oil from the West Hynes terminal and utilize the Plains Dominguez and Long Beach terminals pursuant to throughput arrangements. This combination of storage capacity and throughput arrangements allows the California refineries to receive and optimize the crude slate of waterborne domestic and foreign crude oil, along with California crude oil.

In June 2007, we purchased a crude oil and unfinished products pipeline system from Kinder Morgan, Inc. known as the "Black Oil System." The Black Oil System includes approximately 6 miles of active and 13 miles of inactive pipelines in the Long Beach, California area. The Black Oil System provides our Paramount refinery and other third-party shippers with access to refineries and waterborne terminals.

*California Refineries Production*

*Gasoline*. In 2010, CARBOB gasoline accounted for approximately 17.6% of our California refineries' production. The California refineries utilize a computerized component blending system to optimize gasoline blending. In addition, our California refineries are capable of producing specially formulated fuels, such as those required in the California, Nevada and Arizona markets.

*Distillates*. In 2010, CARB diesel, Ultra-low sulfur EPA diesel, Jet A and military fuels accounted for approximately 11.9% of our California refineries' production. All of the diesel fuel we produce is ultra-low sulfur CARB/EPA diesel. We produce both commercial Jet A and JP-8 grade military jet fuel.

*Asphalt*. In 2010, asphalt accounted for approximately 34.6% of our California refineries' production. Approximately 70.3% of our California refineries' asphalt production is paving grades and 29.4% is roofing asphalt. Asphalt produced at the California refineries is transferred to our asphalt segment at prices substantially determined by reference to the cost of crude oil, which is intended to approximate wholesale market prices.

*Light and Heavy Unfinished Feedstocks*. We produce LPG, naphtha, unfinished distillates, fuel oil and gas oils used as refinery feedstocks, along with other by-products such as sulfur and fuel oil, all of which is sold to third parties via pipeline and truck on either a contract or spot basis.

*California Refineries Transportation Fuel Marketing*

Our refining and unbranded marketing segment sells refined products from our California refineries in both the wholesale rack and bulk markets. Our marketing of gasoline and diesel fuels is focused on the Southern California market. We market a portion of the CARBOB gasoline and CARB diesel produced at our California refineries through the refinery rack on an unbranded and delivered basis to wholesale distributors. The remainder of our CARB diesel and our CARBOB gasoline production is sold through the spot market and term contracts to other refiners and to third parties and for delivery by pipeline.

We market our jet fuel as Jet A that is sold through the spot market, while our JP-8 military jet fuel is contracted to the DESC. All JP-8 grade is sold to the DESC under one-year contracts awarded through a competitive bidding

Table of Contents

process. Our JP-8 contract was not renewed in 2010 and, consequently, we did not produce JP-8. However, in 2010, we were awarded the DESC F76 distillate contract and have also been awarded a JP-8 contract for 2011. All of our light products are delivered to our customers via our Line 145 pipeline or the Paramount rack system.

We sell transportation fuel production in excess of our unbranded marketing needs through bulk sales and exchange channels. These bulk sales and exchange arrangements are entered into with various oil companies and traders and are transported through our product pipeline network to the Kinder Morgan terminal located in Carson, California.

*California Product Pipelines/Terminal*

The Paramount refinery utilizes the Line 145 product pipeline and our Line 166 pipelines to ship products to the Kinder Morgan product terminal in Carson, California. The Kinder Morgan product terminal gives us access to the Kinder Morgan product rack, the Kinder Morgan Pacific pipeline to Phoenix, Arizona, and the Kinder Morgan CalNev pipeline to Las Vegas, Nevada.

The following table describes the product pipelines which we utilize:

| Product Pipelines | Access | Miles | Connections |
|---|---|---|---|
| Line 145 | Owned and Leased | 8 | Paramount to a connection with Line 145 |
| Line 166 | Leased | 2 | Connects Line 145 to City of Carson, California (Kinder Morgan) |

The Paramount refinery also utilizes its own terminal at the refinery to distribute CARB diesel, California Reformulated Gasoline (CaRFG), F76 distillate fuel, JP-8 and Jet-A into the local market. This terminal is equipped with a truck loading rack that has permitted volumes of approximately 12,000 bpd of distillate and 13,000 bpd of gasoline.

*California Feedstock Pipelines*

The Paramount refinery operates a feedstock pipeline and terminal system that is used to supply gas oil and other unfinished product to other Los Angeles Basin refineries and third party terminals. The Black Oil System acquired in June 2007 provides our Paramount refinery and other third-party shippers with access to refineries and waterborne terminals. In 2008 we acquired portions of BP's E-12A pipeline and Plain's L-52 pipeline. These lines are connected to our Line 35, increasing the integration between our Paramount and Long Beach refineries.

Table of Contents

The following table describes the components of our feedstock pipeline and terminal system:

| Feedstock Pipelines | Terminal | Access | Tankage (1) | Miles | Connections |
|---|---|---|---|---|---|
| Chevron No.1 | | Leased | | 4 | Connects our Paramount and Long Beach refineries to our Lakewood Terminal |
| | Lakewood | Owned | 110 | | Connects the Chevron No. 1 pipeline to our Line 160 pipeline |
| Line 160 | | Owned | | 7.1 | Connects the Lakewood Terminal to our leased tanks at Kinder Morgan, other refiners and third party customers |
| | Kinder Morgan | Leased | 180 | | Connects to our Black Oil Pipeline for deliveries to other refiners and third party customers |
| Line 35, L-52, E-12A | | Owned | | 4 | Connects our Long Beach and Paramount Refineries |
| Black Oil Pipeline | | Owned | | 19 | Connects the Kinder Morgan Terminal and Plains Pipeline System to LA Basin refiners and waterborne terminals |
| North of the River pipeline | Mojave Spur | Owned | | 10 | Connects the Kern River Oil Field Mojave Spur to our Bakersfield refinery to provide natural gas to the refinery fuel system and hydrogen plant. |

(1) Measured in thousands of barrels.

*Krotz Springs Refinery*

In July 2008 we acquired Valero Refining Company — Louisiana. Valero Refining Company — Louisiana's assets included a refinery with a nameplate capacity of approximately 83,100 located in Krotz Springs, Louisiana.

The Krotz Springs refinery is strategically located on approximately 381 acres on the Atchafalaya River in central Louisiana at the intersection of two crude oil pipeline systems and has direct access to the Colonial pipeline system ("Colonial Pipeline"), providing us with diversified access to both locally sourced and foreign crude oils, as well as distribution of our products to markets throughout the Southern and Eastern United States and along the Mississippi and Ohio Rivers. In industry terms, the Krotz Springs refinery is characterized as a "mild residual cracking refinery", which generally refers to a refinery utilizing vacuum distillation and catalytic cracking processes in addition to basic distillation and naphtha reforming processes to minimize low quality black oil production and to produce higher light product yields such as gasoline, light distillates and intermediate products.

The Krotz Springs refinery processing units are structured to yield approximately 101.5% of total feedstock input, meaning that for each 100 barrels of crude oil and feedstocks input into the refinery, it produces 101.5 barrels of refined products. Of the 101.5%, on average 99.0% is light finished products such as gasoline and distillates, including diesel and jet fuel, petrochemical feedstocks and liquefied petroleum gas, and the remaining 2.5% is primarily heavy oils.

The Krotz Springs refinery's main processing units include a crude unit and an associated vacuum unit, a fluid catalytic cracking unit, a catalytic reformer unit, a polymerization unit, and an isomerization unit.

Our Krotz Springs refinery has the capability to process substantial volumes of low sulfur, or sweet, crude oils to produce a high percentage of light, high-value refined products. Typically, sweet crude oil has accounted for 100% of the Krotz Springs refinery's crude oil input.

Table of Contents

In 2010, we averaged approximately 46% utilization of our crude oil throughput capacity for the Krotz Springs refinery. The following table summarizes 2010, 2009 and 2008 throughput and production data for our Krotz Springs refinery:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2010 | | 2009 | | 2008 (1) | |
| | bpd | % | bpd | % | bpd | % |
| Refinery throughput: | | | | | | |
| Light sweet crude | 23,810 | 60.7 | 22,942 | 47.5 | 43,361 | 74.5 |
| Heavy sweet crude | 14,535 | 37.0 | 22,258 | 46.0 | 11,979 | 20.6 |
| Blendstocks | 899 | 2.3 | 3,137 | 6.5 | 2,844 | 4.9 |
| Total refinery throughput (2) | 39,244 | 100.0 | 48,337 | 100.0 | 58,184 | 100.0 |
| Refinery production: | | | | | | |
| Gasoline | 15,812 | 40.1 | 22,264 | 45.4 | 25,195 | 42.8 |
| Diesel/jet | 18,986 | 48.2 | 21,318 | 43.4 | 26,982 | 45.9 |
| Heavy oils | 1,515 | 3.8 | 1,238 | 2.5 | 1,402 | 2.4 |
| Other | 3,107 | 7.9 | 4,258 | 8.7 | 5,258 | 8.9 |
| Total refinery production (3) | 39,420 | 100.0 | 49,078 | 100.0 | 58,837 | 100.0 |
| Refinery utilization (4) | | 46.1% | | 65.3% | | 66.6% |

(1) 2008 data includes our Krotz Springs refinery for the period from July 1, 2008 through December 31, 2008.

(2) Total refinery throughput represents the total barrels per day of crude oil and blendstock inputs in the refinery production process.

(3) Total refinery production represents the barrels per day of various products resulting from the refinery production process.

(4) Refinery utilization represents average daily crude oil throughput divided by crude oil capacity, excluding planned periods of downtime for maintenance and turnarounds. Refinery throughput and production for 2010 and 2009 reflects the effects of downtime associated with a shutdown that began in November 2009 and continued into the second quarter of 2010. Refinery throughput and production for 2008 reflects the effects of shutdowns during hurricanes Gustav and Ike and limited crude supply due to widespread electrical outages following the hurricanes.

*Krotz Springs Refinery Raw Material Supply*

In 2010, sweet crude oil accounted for approximately 100% of our crude oil input at the Krotz Springs refinery, of which approximately 62.1% was Light Louisiana Sweet ("LLS") crude oil and 37.9% was Heavy Louisiana Sweet ("HLS") crude oil. The Krotz Springs refinery has access to various types of domestic and foreign crude oils via a combination of two ExxonMobil pipeline ("EMPCo") systems, barge delivery, or truck rack delivery. Approximately 80% of the crude oil is received by pipeline with the remainder received by barge or truck.

We receive HLS, LLS and foreign crude oils from two EMPCo systems, the "Southbend/Sunset System," and "Northline System". The Southbend/Sunset System provides HLS crude oil from gathering systems at South Bend, Avery Island, Empire, Grand Isle and Fourchon, Louisiana. All of Southbend/Sunset's current crude oil capacity is delivered to the Krotz Springs refinery. The Northline System delivers LLS and foreign crude oils from the St. James, Louisiana crude oil terminalling complex.

The Krotz Springs refinery also has access to foreign crude oils from the St. James terminal. Various Louisiana crude oils can also be delivered by barge, via the Intracoastal Canal, the Atchafalaya River, or directly by truck.

Historically, approximately three-quarters of our Krotz Springs refinery's crude oil input requirements are purchased through term contracts with several suppliers. At present, J. Aron and Company ("J. Aron"), through arrangements with various oil

Table of Contents

companies, supplies the majority of Krotz Spring refinery's crude oil input requirements. Other feedstocks, including butane and secondary feedstocks, are delivered by truck and marine transportation.

*Krotz Springs Refinery Production*

*Gasoline.* In 2010, gasoline accounted for approximately 40.1% of our Krotz Springs refinery's production. We produce 87 octane regular unleaded gasoline and use a computerized component blending system to optimize gasoline blending. Our Krotz Springs refinery is capable of producing regular unleaded gasoline grades required in the southern and eastern U.S. markets.

*Distillates.* In 2010, diesel, light cycle oil and jet fuel accounted for approximately 48.2% of our Krotz Springs refinery's production. In connection with the acquisition of the Krotz Springs refinery in 2008, we entered into an offtake agreement with Valero Energy Corporation ("Valero") that provides for Valero to purchase, at market prices, light cycle oil and high sulfur distillate blendstock for a period of five years.

*Heavy Oils and Other.* In 2010, slurry oil, LPG and petrochemical feedstocks accounted for approximately 11.7% of the Krotz Spring refinery's production.

*Krotz Springs Refinery Transportation Fuel Marketing*

Substantially all of the refined products produced by our Krotz Springs refinery are sold to J. Aron as they are produced. We market transportation fuel production through bulk sales and exchange channels. These bulk sales and exchange arrangements are entered into with various oil companies and traders and are transported to markets on the Mississippi River and the Atchafalaya River as well as to the Colonial Pipeline.

Our refining and unbranded marketing segment sales include sales of refined products from our Krotz Springs refinery.

*Krotz Springs Refinery Product Pipelines*

The Krotz Springs refinery connects to and distributes refined products into the Colonial Pipeline for distribution by our customers to the southern and eastern United States. The 5,519 mile Colonial Pipeline transports products to 267 marketing terminals located near the major population centers. The connection to the Colonial Pipeline provides flexibility to optimize product flows into multiple regional markets. Products not shipped through the Colonial Pipeline are either transported via barge for sale or for further upgrading.

*Krotz Springs Refinery Barge, Railcar and Truck*

Products not shipped through the Colonial Pipeline, such as high sulfur diesel sold to Valero pursuant to our offtake agreement with Valero, are either transported via barge for sale or for further processing. Barges have access to both the Mississippi and Ohio Rivers.

Propylene/propane mix is sold via railcar and truck, to consumers at Mont Belvieu, Texas or in adjacent Louisiana markets. Mixed LPGs are shipped on to an LPG fractionator at Napoleonsville, Louisiana. We pay a fractionation fee and sell the ethane and propane to a regional chemical company under contract, transport the normal butane back to the Krotz Springs refinery via truck for blending, and sell the isobutene and natural gasoline on a spot basis.

**Asphalt**

In addition to gasoline and distillates, our California, Big Spring and Willbridge refineries produce significant quantities of vacuum tower bottoms ("VTB"), which we utilize to produce asphalt. We believe our asphalt production capabilities provides the opportunity to realize higher netbacks than those attainable by producing VTB into No. 6 Fuel Oil, which is an alternate product that can be produced at these refineries. In addition, our asphalt production capabilities permit us to realize value from VTB without the significant costs and expenses required to construct and operate coker units.

The amount of asphalt produced at our refineries, as a percentage of throughput, varies depending on the configuration of the specific refinery, the crude oils processed at each refinery, the techniques used in the refining

Table of Contents

process and the type and quality of the asphalt produced. As part of our efforts to maximize the return generated by the production of asphalt, we have licensed advanced asphalt-blending technology from FINA, with respect to asphalt produced at our Big Spring refinery, and a patented GTR asphalt manufacturing process from Wright with respect to asphalt produced and sold in California.

Asphalt produced by our California and Big Spring refineries is transferred to the asphalt segment at prices substantially determined by reference to the cost of crude oil, which is intended to approximate wholesale market prices.

We continue to believe that the asphalt business is a better alternative to producing No. 6 Fuel Oil or construction and operation of a coker unit. We believe that asphalt production in the markets in which we compete will be reduced due to coker unit projects that have been announced or recently completed by several asphalt producing refineries. We therefore expect the combination of decreased asphalt production in our markets and a stabilization of crude prices to improve our asphalt margins.

Our Willbridge refinery is an asphalt topping refinery located on 42 acres in the industrial section of Portland, Oregon, with a crude oil throughput capacity of 12,000 bpd. Alternatively, the Willbridge facility can be operated as an asphalt terminal and supplied with asphalt produced at the California refineries or purchased from third parties. When operating the Willbridge facility as a refinery, it typically operates two to four months per year at times when cargos of heavy crude oil are available. Heavy crude oil is delivered to the Willbridge refinery through an adjacent dock leased by us from Chevron. The Willbridge refinery processes primarily heavy crude oil with approximately 70% of its production being asphalt products. The remaining products produced by the Willbridge refinery include approximately 5% naphtha and approximately 25% gas oils. Asphalt produced at the Willbridge facility is sold through our terminal at the Willbridge refinery or delivered by truck and railcar to terminals for further processing and resale. Gas oils and naphtha are sold to local refiners and other third parties and are primarily delivered by barge or rail cars.

In addition to the Willbridge refinery, our asphalt segment includes 11 refinery/terminal locations in Texas (Big Spring), California (Paramount, Long Beach, Elk Grove, Bakersfield and Mojave), Washington (Richmond Beach), Arizona (Phoenix, Flagstaff and Fredonia), Nevada (Fernley) (50% interest) and a 50% interest in Wright.

In 2010, our asphalt segment sold asphalt produced at our refineries in Texas and California primarily as paving asphalt to road and materials manufacturers and highway construction/maintenance contractors, as GTR, polymer modified or emulsion asphalt to highway maintenance contractors, or as roofing asphalt to either roofing shingle manufacturers or to other industrial users.

*Texas Asphalt Marketing*

Approximately 5.8% of our Big Spring refinery's production in 2010 was asphalt. We can produce or manufacture approximately 30 different product formulations, including PMA and GTR asphalts that meet the stringent and varied state highway road paving specifications for use in Texas, New Mexico and Arizona. Based on 2008 data, the Texas Department of Transportation has advised us that we are one of the largest suppliers of asphalt to the State of Texas, which is the second largest asphalt consuming state in the United States according to the latest available industry data.

Paving grade asphalts are predominantly sold from May through October through competitive bids to contractors involved in government projects. These asphalt sales are primarily made from our asphalt terminal at the Big Spring refinery and are delivered to project sites by truck. Our other asphalt blendstocks are sold to roofing companies and asphalt blenders and delivered by rail throughout the United States, including to our other asphalt terminals.

*West Coast Asphalt Marketing*

In 2010, approximately 34.6% of our California refineries' production was asphalt and asphalt blendstocks. Our California refineries/terminals produce over 100 different grades of paving and roofing asphalt products. Paving asphalt products include various grades of Performance Graded (PG), Asphalt Cement (AC) and Aged Residue (AR) paving asphalts, cutbacks, emulsions, PMA and GTR. These PG products meet the California PG specification

Table of Contents

included in the recently enacted conversion to Federal Highway SHRP asphalt performance grading system (PG). Our GTR products conform to the specifications of the recently enacted California Assembly Bill 338 which requires usage of GTR asphalt on California road and highways. Roofing asphalt products include oxidized coatings, asphalt fluxes and saturants which are used in the roofing industry to manufacture shingles, roofing roll products and built-up roofing asphalts. The paving and roofing products produced at our refineries can be sold from the on-site asphalt terminal facilities or they can be distributed through and sold at one of our eight asphalt terminals in the western United States. Based upon the Asphalt Institute's 2008 data, we are the largest supplier of liquid asphalt in the State of California, which is currently one of the top two largest asphalt consuming states in the United States.

Sales of paving asphalt are made primarily to hot mix asphalt (HMA) materials manufacturers and paving contractors, either through negotiated contracts or they may result from competitive bidding. Sales of roofing asphalts are made primarily to shingle manufacturers or other industrial users through contracts. Sales of asphalt, particularly paving asphalts, are seasonal with approximately 68% of our West Coast paving asphalt products being sold between May and October 2010.

Asphalt produced at our California refineries is marketed through the following owned asphalt terminals:

| Terminals | Asphalt Storage Capacity (1) | Receipt Capabilities | Delivery Capabilities |
|---|---|---|---|
| California Refineries | 731 | Refinery, Rail, Truck | Rail, Truck |
| Willbridge, OR refinery | 1,129(2) | Refinery, Rail, Truck, Marine | Rail, Truck, Marine |
| Elk Grove, CA | 307 | Rail, Truck | Truck |
| Bakersfield, CA | 183 | Rail, Truck | Truck |
| Mojave, CA | 283 | Rail, Truck | Truck |
| Richmond Beach, WA | 702(2) | Rail, Truck, Marine | Truck, Marine |
| Fernley, NV (3) | 254 | Rail, Truck | Truck |
| Phoenix, AZ | 165 | Rail, Truck | Truck |
| Flagstaff, AZ | 25 | Rail, Truck | Truck |
| Fredonia, AZ | 79 | Truck | Truck |

(1) Measured in thousands of barrels.

(2) Storage figures for Willbridge and Richmond Beach include tanks in service for storage of crude oil, fuel oil or other products.

(3) 50% interest.

Deliveries of asphalt products to our non-refinery terminals are made primarily through common carrier trucks and leased railcars that are loaded at the California and Big Spring refineries. Asphalt produced at our Willbridge refinery is sold primarily through our terminal located at that facility but may also be delivered by rail or marine vessel to other terminals.

We also own a 50% interest in Wright, which holds the licensing rights to a patented GTR manufacturing process for paving asphalts. Wright licenses this proprietary technology from Neste/Wright Asphalt Company under a perpetual license that covers all of North America, except California. In California we maintain the exclusive license. Wright's operations consist of sublicensing the patented technology to parties to manufacture the GTR asphalt for Wright to sell at various Alon-owned or third party-owned facilities in Texas, Arizona, Oregon and Oklahoma. Wright also purchases and resells various other paving asphalts in these markets. During 2010, Wright obtained approximately 28.2% of its asphalt requirements from our refineries and terminals. Wright sells GTR and its other asphalt products on either a negotiated contract or competitive bidding basis.

**Retail and Branded Marketing**

We are the largest 7-Eleven licensee in the United States and we are the sole licensee of the FINA brand for motor fuels in the South Central and Southwestern United States. Through our 7-Eleven licensing agreement, we have the exclusive right to operate 7-Eleven convenience stores in substantially all of our existing retail markets and many surrounding areas. We market gasoline and diesel fuel under the FINA brand name and provide brand support and payment services to distributors supplying over 630 locations, including all of our owned stores that sell motor

Table of Contents

fuel. In markets where we choose not to supply fuel products we also sub-license the FINA brand and provide the same brand support and payment services to distributors supplying approximately 260 additional locations. In 2010, approximately 91% of Alon's branded marketing operations, including retail operations, were supplied by our Big Spring refinery.

*Retail*

As of December 31, 2010, we operated 304 owned and leased convenience store sites primarily in Central and West Texas and New Mexico. Our convenience stores typically offer various grades of gasoline, diesel fuel, food products, tobacco products, non-alcoholic and alcoholic beverages and general merchandise to the public, primarily under the 7-Eleven and FINA brand names.

We are one of the top three independent convenience store chains, measured by store count, in each of the cities of Abilene, El Paso, Midland, Odessa, Big Spring and Lubbock, Texas. We also have a significant presence in Waco and Wichita Falls, Texas and Albuquerque, New Mexico.

The following table shows our owned and leased convenience stores by location:

| Location | Owned | Leased | Total |
|---|---|---|---|
| Big Spring, Texas | 6 | 1 | 7 |
| Wichita Falls, Texas | 8 | 4 | 12 |
| Waco, Texas | 11 | 3 | 14 |
| Midland, Texas | 8 | 9 | 17 |
| Lubbock, Texas | 17 | 5 | 22 |
| Albuquerque, New Mexico | 12 | 11 | 23 |
| Odessa, Texas | 11 | 25 | 36 |
| Abilene, Texas | 32 | 9 | 41 |
| El Paso, Texas | 13 | 71 | 84 |
| Other locations in Central and West Texas | 29 | 19 | 48 |
| Total stores | 147 | 157 | 304 |

*Convenience Store Management and Employees*. Each of our stores has a store manager who supervises a staff of full-time and part-time employees. The number of employees at each convenience store varies based on the store's size, sales volume and hours of operation. Typically, a geographic group of six to ten stores is managed by a supervisor who reports to a district manager. Five district managers are responsible for a varying number of stores depending on the geographic size of each market and the experience of each district manager. These district managers report to our retail management headquarters in Odessa, Texas, where we have 58 employees. We also maintain an office in Abilene, Texas, where we have 34 employees.

*Distribution and Supply*. The merchandise requirements of our convenience stores are serviced at least weekly by over 100 direct-store delivery, or ("DSD"), vendors. In order to minimize costs and facilitate deliveries, we utilize a single wholesale distributor, McLane Company, Inc., for non-DSD products. We purchase the products from McLane at cost plus an agreed upon mark-up. Our current supply contract with McLane expires in December 2011. For the year ended December 31, 2010, approximately 50% of our retail merchandise sales were purchased from McLane. We typically do not have contracts with our DSD vendors.

*7-Eleven License Agreement*. We are party to a license agreement with 7-Eleven, Inc. which gives us a perpetual license to use the 7-Eleven trademark, service name and trade name in West Texas and a majority of the counties in New Mexico in connection with our convenience store operations. 7-Eleven, Inc. has advised us that we are the largest 7-Eleven licensee in the United States based on the number of stores.

*Technology and Store Automation*. We have implemented a point-of-sale checkout system at substantially all of our convenience stores and are in the process of implementing the system at our remaining stores. This system includes merchandise scanning, pump control, peripheral device integration, shortage control tools and daily operations reporting. This system enhances our ability to offer a greater variety of promotions with a high degree of flexibility regarding definition (by store, group of stores, region, or other subset of stores) and duration. We also are able to receive enhanced management reports that will assist our decision-making processes. We believe this system

will allow our convenience store managers to spend less time preparing reports and more time analyzing these reports to improve convenience store operations. We plan to use this system as a platform to support other marketing technology projects, including interactive video at the pump and bar-code coupons at the pump.

*Branded Marketing*

Approximately 81% of our branded fuel sales are in West Texas and Central Texas. We sell motor fuel under the FINA brand through various terminals to supply approximately 630 locations, including the majority of our retail locations and other FINA-branded independent locations. The FINA brand is a recognized trade name in the Southwestern and South Central United States, where motor fuels have been marketed under the FINA brand since 1956. For the year ended December 31, 2010, we sold 318.9 million gallons of branded motor fuel for distribution to our retail convenience stores and other retail distribution outlets.

We have an exclusive license through 2012 to use the FINA trademark in the wholesale distribution of motor fuel within Texas, Oklahoma, New Mexico, Arizona, Arkansas, Louisiana, Colorado and Utah. Prior to the expiration of this license, we intend to review our alternatives for branding our transportation fuel, including seeking to extend our license with FINA or developing our own brand.

*Distribution Network and Distributor Arrangements.* We sell motor fuel to our retail locations and to approximately 25 third-party distributors, who then supply and sell to retail outlets. The supply agreements we maintain with our distributors are generally for three-year terms and usually include 10-day payment terms. All supplied distributors comply with our ratability program, which involves incentives and penalties based on the consistency of their purchases.

*FINA Brand Sub-Licensing.* We offer FINA brand sub-licensing to distributors supplying geographic areas other than our integrated supply system. In addition to a license to use the FINA brand, we also provide payment card processing services, advertising programs and loyalty and other marketing programs to 47 distributors supplying approximately 260 additional stores. This sub-licensing program allows us to expand the geographic footprint of the FINA brand, thereby increasing its recognition. Each sub-licensee pays royalties on a per gallon basis, is required to comply with the FINA minimum standards program and utilize our payment card processing services.

*FINA Minimum Standards Program.* We have an established image consistency program where each FINA-branded facility in our network is inspected by an independent third-party organization. Each facility is evaluated using specific criteria and scores based upon these criteria are communicated to the controlling distributor. Any non-complying facilities are enrolled in a specific improvement program to bring the facility up to our FINA standards.

*Payment Card Processing.* We offer payment card processing services to our distributors and FINA-branded sublicensees through a third-party provider, which acts as a clearinghouse with MasterCard, VISA, American Express, Discover and debit card issuers. Payment card transactions are communicated directly to a third-party provider, which then transmits those transactions to the appropriate card issuers. Our fees payable to MasterCard, VISA, American Express, Discover and debit card issuers are contracted through the third-party provider. Although our fees may vary by card type, we charge our customers, including our retail convenience stores, a percentage-based fee plus a transaction fee for each card type to simplify the fee structure. Our rates are designed to provide a margin on the difference between the fees paid by our distributors and fees charged by the various card associations. The fees are not designed to be a major profit center, but rather to cover overhead and ancillary expenses of maintaining the payment card network system. For MasterCard, VISA, American Express, Discover and debit cards, the third-party provider provides us with daily settlement of transactions. We generally provide our customers with payment or credit for transactions within five days. We also generally retain the settlement funds for such payment and transactions that we process as a credit against any payments due to us from our distributors or sub-licensees. As a result, offering these payment services reduces our credit risk.

*Technology.* We rely on technology to enhance our operations and provide meaningful data and tools for management to evaluate and manage the profitability of our motor fuel distribution business. We have a licensing arrangement with a third-party provider for payment card processing and clearinghouse services for payment card purchases at many of our retail convenience stores, as well as all of the third-party retail locations supplied by our wholesale distributors or the sub-licensed FINA stores for which we provided branded services. Under our arrangement with the third-party provider, the proprietary software is provided to each of these retail locations to provide secure data transfer of payment card transactions directly to the third party provider for daily processing of

each payment card transaction at these retail locations. We also license JD Edwards enterprise software tailored for our wholesale business that collects and analyzes the data from each of these payment card transactions that we process, providing our management with valuable information on consumer purchasing tendencies and trends. We use a proprietary software program to further break-down and analyze the payment card transactions that we process. We also license pricing optimization software that assists management in modeling and making timely pricing decisions in order to maximize our gross margin in motor fuel sales. In addition, we utilize licensed software to manage our customers' motor fuel purchases and delivery arrangements.

**Competition**

The petroleum refining and marketing industry continues to be highly competitive. Many of our principal competitors are integrated, multi-national oil companies (e.g., Valero, Chevron, ExxonMobil, Shell and ConocoPhillips) and other major independent refining and marketing entities that operate in our market areas. Because of their diversity, integration of operations and larger capitalization, these major competitors may have greater financial support and diversity with a potential better ability to bear the economic risks, operating risks and volatile market conditions associated with the petroleum industry.

Financial returns in the refining and marketing industry depend on the difference between refined product prices and the prices for crude oil and other feedstock, also referred to as refining margins. Refining margins are impacted by, among other things, levels of crude oil and refined product inventories, balance of supply and demand, utilization rates of refineries and global economic and political events.

All of our crude oil and feedstocks are purchased from third-party sources, while some of our vertically-integrated competitors have their own sources of crude oil that they may use to supply their refineries. However, our Big Spring refinery is in close proximity to Midland, Texas, which is the largest origination terminal for Permian Basin crude oil, which we believe provides us with transportation cost advantages over many of our competitors in this region.

The market for our refined products are generally supplied by a number of refiners, including large integrated oil companies or independent refiners. These larger companies typically have greater resources and may have greater flexibility in responding to volatile market conditions or absorbing market changes.

The Longhorn pipeline runs approximately 700 miles from the Houston area of the Gulf Coast to El Paso and has an estimated maximum capacity of 225,000 bpd of refined products. This pipeline provides Gulf Coast refiners, which include some of the world's largest and most complex refineries, and other shippers with improved access to the refined products markets in West Texas and New Mexico which results in greater competition to our Big Spring refinery. In August 2006, Longhorn Pipeline Holdings LLC, the owner of the Longhorn pipeline, was acquired by Flying J, Inc., ("Flying J"). Since Flying J's acquisition, we have reduced shipments to El Paso via the Fin-Tex pipeline system, while increasing sales through our Big Spring and Abilene terminals. We do not expect our remaining shipments of refined products to be affected since they are shipped directly for distribution through contracted FINA-branded locations or are being used for exchange paybacks for sales in the Albuquerque and Bloomfield, New Mexico markets. In December 2008, Flying J and certain of its affiliates, including its subsidiary that operates the Longhorn pipeline, filed for bankruptcy. In July 2009, Magellan Midstream Partners, L.P. acquired the Longhorn pipeline from Flying J.

The principal competitive factors affecting our wholesale marketing business are price and quality of products, reliability and availability of supply and location of distribution points.

We compete in the asphalt market with various refineries including Valero, Shell, Tesoro, U.S. Oil, Western, San Joaquin Refining, Ergon and Holly as well as regional and national asphalt marketing companies that have little or no associated refining operations such as NuStar Energy LP. The principal factors affecting competitiveness in asphalt markets are cost, supply reliability, consistency of product quality, transportation cost and capability to produce the range of high performance products necessary to meet the requirements of customers.

Our major retail competitors include Valero, Chevron, ConocoPhillips, Susser, Stripes, Circle K, Western Refining and various other independent operators. The principal competitive factors affecting our retail and branded marketing segment are location of stores, product price and quality, appearance and cleanliness of stores and brand identification. We expect to continue to face competition from large, integrated oil companies, as well as from other

Table of Contents

convenience stores that sell motor fuels. Increasingly, national grocery and dry goods retailers such as Albertson's and Wal-Mart, as well as regional grocers and retailers, are entering the motor fuel retailing business. Many of these competitors are substantially larger than we are, and because of their diversity, integration of operations and greater resources, may be better able to withstand volatile market conditions and lower profitability because of competitive pricing and lower operating costs.

**Government Regulation and Legislation**

*Environmental Controls and Expenditures*

Our operations are subject to extensive and frequently changing federal, state, regional and local laws, regulations and ordinances relating to the protection of the environment, including those governing emissions or discharges to the air, water, and land, the handling and disposal of solid and hazardous waste and the remediation of contamination. We believe our operations are generally in substantial compliance with these requirements. Over the next several years our operations will have to meet new requirements being promulgated by the EPA and the states and jurisdictions in which we operate.

*Environmental Expenditures*

*Fuels*

The Clean Air Act and its implementing regulations require significant reductions in the sulfur content in gasoline and diesel fuel. These regulations required most refineries to reduce the sulfur content in gasoline to 30 ppm.

Gasoline and diesel produced at our Big Spring and California refineries currently meet the low sulfur gasoline and diesel fuel standards. Gasoline produced at our Krotz Springs refinery currently meets the low sulfur gasoline standard. Our Krotz Springs refinery does not manufacture low sulfur diesel fuel.

Our gasoline sulfur control schedule at our Big Spring refinery was impacted by the fire that occurred in February 2008. On September 25, 2009, we entered into an Administrative Settlement Agreement with EPA, which gave us an additional 90 days to meet the gasoline sulfur standards at the Big Spring refinery in consideration for our agreement to offset any excess gasoline sulfur during that time. We achieved compliance within the 90-day extension and purchased sulfur credits to offset the excess sulfur in early 2011.

Compliance with the gasoline sulfur standards for the Big Spring refinery required capital expenditures of approximately $35.5 million through 2009, of which approximately $29.3, $5.2, and $1.0 million were spent in 2009, 2008, and 2007 respectively.

In February 2007, the EPA adopted final rules to reduce the levels of benzene in gasoline on a nationwide basis. More specifically, the rule would require that beginning in 2011 refiners meet an annual average gasoline benzene content standard of 0.62%, which may be achieved through the purchase of benzene credits, and that beginning on July 1, 2012, refiners meet a maximum average gasoline benzene concentration of 1.30%, by volume on all gasoline produced, both reformulated and conventional and without benzene credits. Gasoline produced at our California refineries already meets the standards established by the EPA. We have determined that capital expenditures of approximately $8.9 million in 2011 and an additional $27 million (through 2014) will be necessary in order for the Big Spring refinery to install controls to comply with the standards. We have determined that capital expenditures of approximately $10.5 million will be necessary in order for the Krotz Springs refinery to install controls to meet the standards. Under the regulations, the EPA may grant extensions of time to comply with the annual average benzene standard if a refinery demonstrates that unusual circumstances exist that impose extreme hardship and significantly affect the ability of the refinery to comply. We have requested an extension of time to comply with the annual average standard at our Krotz Springs refinery and are awaiting a response from the EPA.

In May 2007, the EPA adopted a final rule that subjects refiners and importers of gasoline to a yearly renewable volume obligation that is based on the national renewable fuel standard. Due to our size, we were exempted from the

Table of Contents

requirements of this rule through December 31, 2010. In February 2010, the EPA finalized new regulations that replace and update the current rules and extend the renewable fuel standard to other finished products (e.g., diesel). Under the rule, we are required to blend renewable fuels (e.g., ethanol) into our finished products or purchase credits in lieu of blending. We are blending ethanol into some of the gasoline and diesel fuels that we manufacture at the Big Spring refinery and the California refineries. We will purchase credits (RINs) to satisfy the balance of our renewable fuel volume obligation for the product that we do not blend with ethanol. At this time, we do not know how many credits we will need or how much they will cost when we will be required to purchase them for compliance.

*Regulations*

Conditions may develop that require additional capital expenditures at our refineries, product terminals and retail gasoline stations (operating and closed locations) for compliance with the Federal Clean Air Act and other federal, state and local requirements. The EPA recently promulgated regulations applicable to emissions of hazardous air pollutants from industrial heaters and boilers and reciprocating internal combustion engines, which may necessitate the installation of controls or additional monitoring at our refineries. In addition, the EPA recently passed greenhouse gas emission regulations, which may necessitate the installation of controls to reduce emissions of greenhouse gases if we construct new equipment or modify existing equipment in such a way that there is a significant increase in greenhouse gas emissions. Finally, the EPA will be finalizing rules applicable to refinery heaters, boilers, and flares that may necessitate the installation of controls or additional monitoring. We cannot currently determine the amounts of such future expenditures.

*Compliance*

On August 7, 2008 the South Coast Air Quality Management District ("SCAQMD") issued a notice of violation to us for failing to continuously monitor emissions from four reformer heaters at the Paramount refinery. We subsequently settled the notice of violation for $30,000. We reached an agreement with the SCAQMD and have accepted permit conditions that required the installation of an automatic fuel shut-off system on each heater. The systems were installed in September 2010 at a cost of $150,000.

Our Bakersfield refinery must comply with a local flare rule, Rule 4311 to limit the emissions of volatile organic compounds (VOC), oxides of nitrogen (NOx), and oxides of sulfur (SOx) from the operation of flares. This refinery has four flares, but we currently only plan to operate three of its flares. Initially, the rule requires monitoring of flare flow and concentrations of sulfur compounds during flaring events. Projects are currently underway to install the required monitoring equipment on the three flares that the refinery will operate at an estimated cost of $785,000. Based on monitoring data that is obtained, additional emission controls could be required.

In 2006, the Governor of California signed into law AB 32, the California Global Warming Solutions Act of 2006. Regulations implementing the goals stated in the law, i.e., the reduction of greenhouse gas emission levels to 1990 levels, have yet to be promulgated. Although development of such regulations is in a preliminary stage and it is possible that legal challenges could delay implementation of any regulations, it is expected that AB 32 mandated reductions will require increased emission controls on both stationary and non-stationary sources and will result in requirements to significantly reduce greenhouse gases from our California refineries and possibly our other California terminals.

Although the U.S. House of Representatives passed the American Clean Energy and Security Act on June 26, 2009, which would have established a market-based "cap-and-trade" system to achieve yearly reductions in greenhouse gas ("GHG") emissions, the 111th United States Congress did not pass comprehensive legislation addressing GHG emissions. While it is possible that Congress will adopt some form of federal mandatory GHG emission reductions legislation in the future, the timing and specific requirements of any such legislation are uncertain at this time, especially in light of several efforts by Republican members of Congress to stall the EPA's efforts to regulate GHGs and repeal the authority of the EPA to regulate GHGs.

In October 2006, we were contacted by Region 6 of the EPA and invited to enter into discussions under the EPA's National Petroleum Refinery Initiative. This initiative addresses what the EPA deems to be the most significant Clean Air Act compliance concerns affecting the petroleum refining industry. To date, 28 refining

Table of Contents

companies (representing over 90% of the U.S. refining capacity) have entered into "global settlements" under the initiative. On February 2, 2007, we committed in writing to enter into discussions with the EPA under the initiative. To date, there have been no specific findings entered against us or any of our refineries by the EPA, and we have not determined whether we will ultimately enter into a "global settlement" with the EPA. If we enter into a global settlement, it would apply to our Big Spring refinery, our Paramount and Long Beach refineries and our Willbridge, Oregon terminal. Based on prior settlements that the EPA has reached with other petroleum refineries under the initiative, we anticipate that the EPA will seek relief in the form of the payment of a civil penalty, the installation of air pollution controls, enhanced operations and maintenance programs, and the implementation of environmentally beneficial projects in consideration for a broad release from liability for violations that may have occurred historically. At this time, we cannot estimate the cost of any required controls or environmentally beneficial projects, but the civil penalty is expected to be comparable to other settling refiners.

The Krotz Springs and Bakersfield refineries became subject to "global settlements" with the EPA under the National Petroleum Refining Initiative, before they were acquired by us. In return for agreeing to the consent decree and implementing the reductions in emissions that it specifies, the refineries secured broad releases of liability that provide immunity from enforcement actions for alleged past non-compliance under each of the Clean Air Act programs covered by the Consent Decree. The major project for consent decree compliance for the Krotz Springs refinery is installing NOx controls and monitors on heaters and boilers which is scheduled to be completed in 2011. Other projects include SO2 and NOx reduction measures from the FCCU. The current estimated capital cost is $13.0 million. If we are unable to meet the agreed upon reductions without add-on controls, our capital costs could increase. The Krotz Springs refinery has completed many portions of the consent decree including compliance with particulate emissions from the FCCU, H2S in the fuel gas, flare operating requirements, Leak Detection and Repair and Benzene Waste Operations NESHAPs program enhancements. Because the Krotz Springs refinery remains subject to the Valero consent decree, we entered into an agreement with Valero at the time of the acquisition allocating responsibilities under the consent decree. We are responsible for implementing only those portions of the consent decree that are specifically and uniquely applicable to the Krotz Springs refinery. In addition, with respect to certain system-wide emission limitations that apply across all of the Valero refineries, the Krotz Springs refinery was generally allocated emission limitations that did not necessitate substantial capital expenditures for add-on controls.

The Bakersfield refinery became subject to a global settlement with the EPA in 2001. Currently, the only continuing requirements are periodic audits of its Leak Detection and Repair program and enhanced sampling and reporting under the Benzene Waste Operations NESHAP. As part of the global settlement, the Bakersfield refinery was required to perform an evaluation of and has accepted subpart J applicability for two of its pre-1973 flares. System modifications may be needed to comply with emission limits. The costs of any such modifications are unknown at this time. The compliance date has been proposed as January 1, 2017, coincident with the compliance date in local flare Rule 4311.

On May 13, 2010, we received a Clean Air Act, Section 114 request for information from the EPA related to sources at the Big Spring refinery that operate under a "flexible permit" issued by the Texas Commission on Environmental Quality ("TCEQ"). On July 15, 2010, the EPA disapproved Texas' "flexible permit" program and contends that sources operating under a flexible permit are not properly permitted and are subject to enforcement. We responded to the EPA's request for information on June 18, 2010 and July 21, 2010. On September 20, 2010 and December 2, 2010, the EPA sent "opportunity to confer" letters to us requesting that we explain our plans to transition to a non-flexible permit and asking us to commit to obtaining a non-flexible permit under an EPA approved permitting program within a specified timeframe and through a transparent process, which provides opportunities for the EPA and third parties to comment. On December 22, 2010 and January 12, 2011, we agreed to make a federally enforceable commitment by March 31, 2011, to apply for a non-flexible permit. The Big Spring refinery is one of over one hundred regulated facilities in Texas that will be required to obtain a new, non-flexible permit.

In May 2009, the EPA conducted an inspection of Big Spring refinery's Risk Management Program (RMP) under Section 112r of the Clean Air Act. In March 2010, we received an inspection report describing findings and alleged violations of the RMP program at the refinery. On June 17, 2010, we responded by requesting additional information concerning other statements in the inspection report. On July 13, 2010, the EPA responded to our request. We have not received any further communication from the EPA concerning the RMP inspection.

Table of Contents

*Remediation Efforts*. We are currently remediating historical soil and groundwater contamination at our Big Spring refinery pursuant to a compliance plan issued by the TCEQ and a RCRA Part B permit. The compliance plan and permit require us to investigate and, if necessary, remediate potentially contaminated areas on refinery property and also requires us to monitor and treat contaminated groundwater at the refinery and some of our terminals. To date, we have substantially completed the remediation of the potentially contaminated areas and continues to monitor and treat groundwater at the site. The costs incurred to comply with the compliance plan were covered, with certain limitations, by an environmental indemnity provided by FINA that covered remediation costs incurred for ten years after the July 2000 closing date and subject to a cap, which is discussed below. We are also remediating historical soil and groundwater contamination at the Hawley, South Lake, and Wichita Falls terminals that we acquired from FINA at the time of the refinery acquisition, which were also covered by the FINA indemnity.

We are currently engaged in four separate remediation projects in the Los Angeles area which are being conducted pursuant to Cleanup and Abatement Orders issued by the Los Angeles Regional Water Quality Control Board ("LARWQCB"). Two projects focus on clean-up efforts in and around the Paramount refinery and the Lakewood Tank Farm. Our Paramount subsidiary shares the cost of both these remediation projects with ConocoPhillips, the former owner of the Paramount refinery and Lakewood Tank Farm. Another project focuses on efforts at the Long Beach refinery, with the costs being shared with Apex Oil Co., the former owner of the Long Beach refinery. As part of our acquisition of Pipeline 145, we assumed an active remediation project designed to clean up a leak that occurred on this pipeline prior to our ownership. A fifth project was added in 2010 when two areas of release were found during a hydrotest of Pipeline 160, which transported gas oil and diesel. Both release areas are in the process of being remediated. The release in one area did not impact groundwater and will be remediated with excavation. The second release point did impact groundwater and will be remediated with LARWQCB oversight. Approximately $1.7 million was spent in 2010 for all of these remediation projects of which our portion was $1.1 million. We estimate that an additional $3.1 million will be spent in 2011 with our portion being approximately $2.2 million.

With respect to the ongoing remediation program at our Long Beach refinery described in the preceding paragraph, in conjunction with our acquisition of the refinery, we acquired a seven-year environmental insurance policy, the premiums for which have been prepaid in full. This policy provides us coverage for both known and unknown conditions existing at the refinery at the time of our acquisition for off-site, third party bodily injury and property damage claims. The policy limit on a per occurrence and aggregate basis is $15.0 million and has a per occurrence deductible of $0.5 million.

On March 1, 2005, our Paramount Petroleum Corporation subsidiary purchased Chevron's Pacific Northwest Asphalt business. As part of the purchase and sale agreement, the parties agreed to share the remediation costs at the Richmond Beach, Washington and Willbridge, Oregon terminals. Approximately $0.5 million was spent in 2010 for these remediation costs, of which our portion was $0.15 million, and we estimate that an additional $0.5 million will be spent during 2011, of which our portion will be $0.16 million.

In addition, a majority of our owned and leased convenience stores have underground gasoline and diesel fuel storage tanks. Compliance with federal and state regulations that govern these storage tanks can be costly. The operation of underground storage tanks also poses various risks, including soil and groundwater contamination. We are currently investigating and remediating leaks from underground storage tanks at some of our convenience stores, and it is possible that we may identify more leaks or contamination in the future that could result in fines or civil liability for us. We have established reserves in our financial statements in respect of these matters to the extent that the associated costs are both probable and reasonably estimable. We cannot assure you, however, that these reserves will prove to be adequate.

*Environmental Indemnity from FINA*. In connection with the acquisition of our Big Spring refinery and other operating assets from FINA in August 2000, FINA agreed, within prescribed limitations, to indemnify us against costs incurred in connection with any remediation that is required as a result of environmental conditions that existed on the acquired properties prior to the closing date of our acquisition. FINA's indemnification obligations for these remediation costs ran through August 2010, had a ceiling of $5.0 million per year (with carryover of unused ceiling amounts and unreimbursed environmental costs into subsequent years) and have an aggregate indemnification cap of $20.0 million. Thereafter, we are solely responsible for all additional remediation costs. As

Table of Contents

of December 31, 2010, the remediation of the properties was on schedule, and we had expended approximately $17.0 million in connection with that remediation and approximately $3.0 million in environmental insurance premiums, all of which were covered by the FINA indemnity.

*Environmental Insurance*. We purchased two environmental insurance policies to cover expenditures not covered by the FINA indemnification agreement, the premiums for which have been paid in full. Under an environmental clean-up cost containment, or cost cap policy, we are insured for remediation costs for known conditions at the time of our acquisition of the Big Spring refinery. This policy has an initial retention of $20.0 million during the first ten years after the acquisition (coinciding with the FINA indemnity), which retention is increased by $1.0 million annually during the remainder of the term of the policy. Under an environmental response, compensation and liability insurance policy, or ERCLIP, we are insured for bodily injury, property damage, clean-up costs, legal defense expenses and civil fines and penalties relating to unknown conditions and incidents. The ERCLIP policy is subject to a $100,000 per claim / $1.0 million aggregate sublimit on liability for civil fines and penalties and a retention of $150,000 per claim in the case of civil fines or penalties. Both the cost cap policy and ERCLIP have a term of twenty years and share a maximum aggregate limit of $40.0 million. The insurer under these policies is The Kemper Insurance Companies, which has experienced significant downgrades of its credit ratings in recent years and is currently in run-off. However, we have no reason to believe at this time that Kemper will be unable to comply with its obligations under these policies. Our insurance broker has advised us that environmental insurance policies with terms in excess of ten years are not currently generally available and that policies with shorter terms are available only at premiums equal to or in excess of the premiums paid for our policies with Kemper.

*Environmental Indemnity to HEP*. In connection with our sale of pipelines and terminals to HEP, we entered into an Environmental Agreement pursuant to which we agreed to indemnify HEP against costs and liabilities incurred by HEP to the extent resulting from the existence of environmental conditions at the pipelines or terminals prior to the sales or from violations of environmental laws with respect to the pipelines and terminals occurring prior to the sale. Our environmental indemnification obligations under the Environmental Agreement expire after February 2015. In addition, our indemnity obligations are subject to HEP first incurring $100,000 of damages as a result of pre-existing environmental conditions or violations. Our environmental indemnity obligations are further limited to an aggregate indemnification amount of $20.0 million, including any amounts paid by us to HEP with respect to indemnification for breaches of our representations and warranties under a Contribution Agreement entered into as a part of the HEP transaction.

With respect to any remediation required for environmental conditions existing prior to the date of sale, we have the option under the Environmental Agreement to perform such remediation ourselves in lieu of indemnifying HEP for their costs of performing such remediation. Pursuant to this option, we are continuing to perform the ongoing remediation at the Wichita Falls terminal. Any remediation required under the terms of the Environmental Agreement is limited to the standards under the applicable environmental laws as in effect at the date of sale.

*Environmental Indemnity to Sunoco*. In connection with the sale of the Amdel and White Oil crude oil pipelines, we entered into a Purchase and Sale Agreement with Sunoco pursuant to which we agreed to indemnify Sunoco against costs and liabilities incurred by Sunoco resulting from the existence of environmental conditions at the pipelines prior to March 1, 2006 or from violations of environmental laws with respect to the pipelines occurring prior to such date. With respect to any remediation required for environmental conditions existing prior to March 1, 2006, we have the option under the Purchase and Sale Agreement to perform such remediation ourselves in lieu of indemnifying Sunoco for their costs of performing such remediation. To date, Sunoco has not made any claims against us under the Purchase and Sale Agreement.

**Other Government Regulation**

The pipelines owned or operated by us and located in Texas are regulated by Department of Transportation rules and our intrastate pipelines are regulated by the Texas Railroad Commission. Within the Texas Railroad Commission, the Pipeline Safety Section of the Gas Services Division administers and enforces the federal and state requirements on our intrastate pipelines. All of our pipelines within Texas are permitted and certified by the Texas Railroad Commission's Gas Services Division.

Table of Contents

The California State Fire Marshall's Office enforces federal pipeline regulations for pipelines in the State of California. We are required to have integrity management and other programs in place, and we anticipate spending approximately $2.0 million over the next five years to comply with the regulations. We are also required to have a Pipeline Spill Response Plan for all California pipelines in our system which includes keeping the plan current, training employees to effect the plan and conducting annual, quarterly and more frequent spill drills. We are also required to maintain Certificates of Financial Responsibility with the State of California, Department of Fish and Game, and the Office of Spill Prevention and Response based on a worst case discharge. We have a Pipeline Spill Response Plan under which our California pipelines operate and believe that we are generally in substantial compliance with the California pipeline requirements.

As required by the Oil Pollution Act of 1990 and state requirements, marine oil transfer operations at the Richmond Beach terminal are conducted under the facility's Facility Response Plan ("FRP") approved and on file with the EPA, the U.S. Coast Guard, and the Washington Department of Ecology. The FRP provides guidance to facility personnel for emergency responses to oil spills. It provides specific information on internal and external agency and contractor notification requirements, appropriate oil spill response actions, the proper disposal of contaminated materials, hazard evaluation and personnel safety, spill response equipment and material lists, and operator and response personnel training. The Richmond Beach terminal conducts four training drills per year for the purpose of assessing the adequacy of the Facility Response Plan and the effectiveness of personnel training. In addition to the Facility Response Plan, the Richmond Beach terminal conducts all transfer operations under a Marine Oil Transfer Operations Manual approved and on file with the U.S. Coast Guard and the Washington Department of Ecology.

The Petroleum Marketing Practices Act, or PMPA, is a federal law that governs the relationship between a refiner and a distributor pursuant to which the refiner permits a distributor to use a trademark in connection with the sale or distribution of motor fuel. We are subject to the provisions of the PMPA because we sublicense the FINA brand to our branded distributors in connection with their distribution and sale of motor fuels. Under the PMPA, we may not terminate or fail to renew these distributor contracts unless certain enumerated preconditions or grounds for termination or nonrenewal are met and we also comply with the prescribed notice requirements. The PMPA provides that our distributors may enforce the provisions of the act through civil actions against us. If we terminate or fail to renew one or more of our distributor contracts in accordance with certain requirements of the PMPA, those distributors may file lawsuits against us to compel continuation of their contracts or to recover damages from us. We have not terminated or failed to renew distribution contracts with our branded distributors.

**Employees**

As of December 31, 2010, we had approximately 2,821 employees. Approximately 723 employees worked in our refining and unbranded marketing segment, of which 628 were employed at our refineries and approximately 95 were employed at our corporate offices in Dallas, Texas. Approximately 122 employees worked in our asphalt segment and approximately 1,976 employees worked in our retail and branded marketing segment.

Approximately 120 of the 170 employees at our Big Spring refinery are covered by collective bargaining agreements that expire on April 1, 2012. None of the employees in our asphalt, retail and branded marketing segment or in our corporate offices are represented by a union. We consider our relations with our employees to be satisfactory.

**Properties**

Our principal properties are described above under the captions "Refining and Unbranded Marketing," "Asphalt" and "Retail and Branded Marketing" in Item 1. We believe that our facilities are generally adequate for our operations and are maintained in a good state of repair in the ordinary course of business. As of December 31, 2010, we were the lessee under a number of cancelable and non-cancelable leases for certain properties. Our leases are discussed more fully in Note 21 to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

Table of Contents

**Executive Officers of the Registrant**

Our current executive officers and key employees (identified by an asterisk), their ages as of March 1, 2011, and their business experience during at least the past five years are set forth below.

| Name | Age | Position |
|---|---|---|
| David Wiessman | 56 | Executive Chairman of the Board of Directors |
| Jeff D. Morris | 59 | Director and Chief Executive Officer |
| Paul Eisman | 55 | President |
| Shai Even | 42 | Senior Vice President and Chief Financial Officer |
| Joseph Israel | 39 | Chief Operating Officer |
| Claire A. Hart | 55 | Senior Vice President |
| Alan Moret | 56 | Senior Vice President of Supply |
| Michael Oster | 39 | Senior Vice President of Mergers and Acquisitions |
| Jimmy C. Crosby* | 51 | Vice President of Refining — Big Spring |
| Ed Juno* | 58 | Vice President of Refining — Paramount |
| William Wuensche* | 50 | Vice President of Refining — Krotz Springs |
| William L. Thorpe* | 64 | Vice President of Asphalt Operations |
| Kyle McKeen* | 47 | President and Chief Executive Officer of Alon Brands |
| Joseph Lipman* | 65 | President and Chief Executive Officer of SCS |

Set forth below is a brief description of the business experience of each of the executive officers and key employees listed above.

*David Wiessman* has served as Executive Chairman of the Board of Directors of Alon since July 2000 and served as President and Chief Executive Officer of Alon from its formation in 2000 until May 2005. Mr. Wiessman has over 25 years of oil industry and marketing experience. Since 1994, Mr. Wiessman has been Chief Executive Officer, President and a director of Alon Israel Oil Company, Ltd., or Alon Israel, Alon's parent company. In 1992, Bielsol Investments (1987) Ltd. acquired a 50% interest in Alon Israel. In 1987, Mr. Wiessman became Chief Executive Officer of, and a stockholder in, Bielsol Investments (1987) Ltd. In 1976, after serving in the Israeli Air Force, he became Chief Executive Officer of Bielsol Ltd., a privately-owned Israeli company that owns and operates gasoline stations and owns real estate in Israel. Mr. Wiessman is also Executive Chairman of the Board of Directors of Alon Holdings Blue Square-Israel, Ltd., which is listed on the New York Stock Exchange, or NYSE, and the Tel Aviv Stock Exchange, or TASE; Executive Chairman of Blue Square Real Estate Ltd., which is listed on the TASE; and Executive Chairman of the Board and President of Dor-Alon Energy in Israel (1988) Ltd., which is listed on the TASE, and all of which are subsidiaries of Alon Israel.

*Jeff D. Morris* has served as a director and as our Chief Executive Officer since May 2005 and has served as Chief Executive Officer of our other operating subsidiaries since July 2000. Mr. Morris also served as our President from May 2005 until March 2010 and President of our other operating subsidiaries from July 2000 until March 2010. Prior to joining Alon, he held various positions at FINA, Inc., where he began his career in 1974. Mr. Morris served as Vice President of FINA's SouthEastern Business Unit from 1998 to 2000 and as Vice President of its SouthWestern Business Unit from 1995 to 1998. In these capacities, he was responsible for both the Big Spring refinery and FINA's Port Arthur refinery and the crude oil gathering assets and marketing activities for both business units. Mr. Morris has also been a director of our subsidiary Alon Refining Krotz Springs, Inc. since 2008.

*Paul Eisman* was appointed to serve as our President in March 2010. Prior to joining Alon, Mr. Eisman was Executive Vice President, Refining & Marketing Operations at Frontier Oil Corporation from 2006 to 2009 and held various positions at KBC Advanced Technologies from 2003 to 2006, including Vice President of North American Operations. During 2002, Mr. Eisman was Senior Vice President of Planning for Valero Energy Corporation following Valero's acquisition of Ultramar Diamond Shamrock. Prior to the acquisition, Mr. Eisman had a 24-year career with Ultramar Diamond Shamrock, serving in many technical and operational roles including Executive Vice President of Corporate Development and Refinery Manager at the McKee refinery.

*Shai Even* has served as a Senior Vice President since August 2008 and as our Chief Financial Officer since December 2004. Mr. Even served as a Vice President from May 2005 to August 2008 and Treasurer from August 2003 until March 2007. Shai Even is the brother of Shlomo Even, one of our directors.

**Table of Contents**

*Joseph Israel* has served as our Chief Operating Officer since August 2008. Mr. Israel served as our Vice President of Mergers & Acquisitions from March 2005 to August 2008 and as our General Manager of Economics and Commerce from September 2000 to March 2005. Prior to joining Alon, Mr. Israel held positions with several Israeli government entities beginning in 1995, including the Israeli Land Administration, the Israeli Fuel Administration and most recently as Economics and Commerce Vice President of Israel's Petroleum Energy Infrastructure entity.

*Claire A. Hart* has served as our Senior Vice President since January 2004 and served as our Chief Financial Officer and Vice President from August 2000 to January 2004. Prior to joining Alon, he held various positions in the Finance, Accounting and Operations departments of FINA for 13 years, serving as Treasurer from 1998 to August 2000 and as General Manager of Credit Operations from 1997 to 1998.

*Alan Moret* has served as our Senior Vice President of Supply since August 2008. Mr. Moret served as our Senior Vice President of Asphalt Operations from August 2006 to August 2008, with responsibility for asphalt operations and marketing at our refineries and asphalt terminals. Prior to joining Alon, Mr. Moret was President of Paramount Petroleum Corporation from November 2001 to August 2006. Prior to joining Paramount Petroleum Corporation, Mr. Moret held various positions with Atlantic Richfield Company, most recently as President of ARCO Crude Trading, Inc. from 1998 to 2000 and as President of ARCO Seaway Pipeline Company from 1997 to 1998.

*Michael Oster* has served as our Senior Vice President of Mergers and Acquisitions of Alon Energy since August 2008 and General Manager of Commercial Transactions of Alon Energy from January 2003 to August 2008. Prior to joining Alon Energy, Mr. Oster was a partner in the Israeli law firm, Yehuda Raveh and Co.

*Jimmy C. Crosby* has served as our Vice President of Refining — Big Spring since January 2010, as Vice President of Refining — California Refineries from March 2009 until January 2010, and as Vice President of Refining and Supply since May 2007, with responsibility for refinery and supply operations at our California refineries. Mr. Crosby served as our Vice President of Supply and Planning from May 2005 to May 2007, with responsibility for all terminal and refinery supply for our Big Spring refinery's marketing and refinery operations. Mr. Crosby served as our General Manager of Business Development and Planning from August 2000 to May 2005. Prior to joining Alon, Mr. Crosby worked with FINA from 1996 to August 2000 where he last held the position of Manager of Planning and Economics for the Big Spring refinery.

*Ed Juno* has served as our Vice President of Refining — Paramount since January 2010. Prior to joining Alon, Mr. Juno has been employed in the refining industry for over 35 years, most recently with Sinclair Oil Corporation as Manager of Sinclair's Wyoming refinery from 2008 to 2009 and as Operations Manager of the Wyoming refinery from 2003 to 2008.

*William Wuensche* has served as our Vice President of Refining — Krotz Springs since March 2009, with responsibility for refinery operations at the Krotz Springs refinery. Mr. Wuensche joined Alon in July 2008 and from August 2008 to March 2009, Mr. Wuensche served as Vice President of Refining of Alon Refining Krotz Springs, Inc., our subsidiary conducting our refining operations at Krotz Springs. Prior to joining Alon, Mr. Wuensche was with Valero Refining Company-Louisiana from June 2006 to July 2008, as Vice President and General Manager of Valero's Krotz Springs refinery and Valero Refining Company from February 2004 to June 2006, as Vice President and General Manager of Valero's McKee Refinery. Earlier in his career, Mr. Wuensche held various positions of increasing responsibilities in the engineering, economics and planning and refinery operations areas.

*William L. Thorpe* has served as Vice President of Asphalt Operations since August 2008, with responsibility over asphalt marketing and operations, quality control and quality assurance at our refineries and asphalt terminals and safety, security and training at our asphalt terminals. Mr. Thorpe served as the Vice President of Asphalt Marketing of our subsidiary, Paramount Petroleum Corporation, from August 2006 to August 2008. Prior to joining Alon, Mr. Thorpe was with Paramount Petroleum Corporation from 1996 to August 2006 having responsibility for marketing and operations, serving as Senior Vice President. Prior to joining Paramount Petroleum Corporation, Mr. Thorpe held management positions with various companies, including Vice President of Pacific Resources, Inc., Vice President — Sales and Marketing of Marlex Petroleum Corporation, Vice President — Marketing of Charter

**Table of Contents**

Oil Company and Manager — Transportation Planning and Development of ConocoPhillips. Mr. Thorpe has served as Vice-Chairman of the Board for the Asphalt Institute and the Asphalt Pavement Association of California and became Chairman of the Board of the Asphalt Institute beginning in 2010.

*Kyle McKeen* has served as President and Chief Executive Officer of Alon Brands, Inc., our subsidiary that manages our retail and branded marketing operations, since May 2008. From 2005 to 2008, Mr. McKeen served as President and Chief Operating Officer of Carter Energy, an independent energy marketer supporting over 600 retailers by providing fuel supply, merchandising and marketing support, and consulting services. Prior to joining Carter Energy in 2005, Mr. McKeen was a member of the Board of Managers of Alon USA Interests, LLC from September 2002 to 2005 and held numerous positions of increasing responsibilities with Alon Energy, including Vice President of Marketing.

*Joseph Lipman* has served as President and Chief Executive Officer of Southwest Convenience Stores, LLC, or SCS, our subsidiary conducting our retail operations since July 2001. From 1997 to July 2001, Mr. Lipman served as General Manager of Cosmos, a chain of supermarkets in Israel owned by Super-Sol Ltd., where he was responsible for marketing and store operations.

Table of Contents

## ITEM 1A. RISK FACTORS.

The occurrence of any of the events described in this Risk Factors section and elsewhere in this Annual Report on Form 10-K or in any other of our filings with the SEC could have a material adverse effect on our business, financial position, results of operations and cash flows. In evaluating an investment in any of our securities, you should consider carefully, among other things, the factors and the specific risks set forth below. This Annual Report on Form 10-K contains forward-looking statements that involve risks and uncertainties. See "Forward-Looking Statements" in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 for a discussion of the factors that could cause actual results to differ materially from those projected.

***The price volatility of crude oil, other feedstocks, refined products and fuel and utility services may have a material adverse effect on our earnings, profitability and cash flows.***

Our refining and marketing earnings, profitability and cash flows from operations depend primarily on the margin above fixed and variable expenses (including the cost of refinery feedstocks, such as crude oil) at which we are able to sell refined products. When the margin between refined product prices and crude oil and other feedstock prices contracts or inverts, as has been the case in recent periods and may continue to be the case in the future, our results of operations and cash flows are negatively affected. Refining margins historically have been volatile, and are likely to continue to be volatile, as a result of a variety of factors including fluctuations in the prices of crude oil, other feedstocks, refined products and fuel and utility services. For example, in the last half of 2008, the price for West Texas Intermediate ("WTI") crude oil fluctuated between $31.27 and $145.31 per barrel, while the price for Gulf Coast unleaded gasoline fluctuated between 76.8 cents per gallon, or cpg, and 474.6 cpg. The direction and timing of changes in prices for crude oil and refined products do not necessarily correlate with one another and it is the relationship between such prices, rather than the nominal amounts of such prices, that has the greatest impact on our results of operations and cash flows. Prices of crude oil, other feedstocks and refined products, and the relationships between such prices and prices for refined products, depend on numerous factors beyond our control, including the supply of and demand for crude oil, other feedstocks, gasoline, diesel, asphalt and other refined products and the relative magnitude and timing of such changes. Such supply and demand are affected by, among other things:

- changes in global and local economic conditions;
- domestic and foreign demand for fuel products;
- worldwide political conditions, particularly in significant oil producing regions such as the Middle East, North and West Africa and Venezuela;
- the level of foreign and domestic production of crude oil and refined products and the level of crude oil, feedstock and refined products imported into the United States;
- utilization rates of U.S. refineries;
- development and marketing of alternative and competing fuels;
- commodities speculation;
- accidents, interruptions in transportation, inclement weather or other events that can cause unscheduled shutdowns or otherwise adversely affect our refineries;
- federal and state government regulations; and
- local factors, including market conditions, weather conditions and the level of operations of other refineries and pipelines in our markets.

Although we continually analyze refinery operating margins at our individual refineries and seek to adjust throughput volumes to optimize our operating results based on market conditions, there are inherent limitations on

Table of Contents

our ability to offset the effects of adverse market conditions. For example, reductions in throughput volumes in a negative operating margin environment may reduce operating losses, but it would not eliminate them because we would still be incurring fixed costs and other variable costs.

The nature of our business requires us to maintain substantial quantities of crude oil and refined product inventories. Because crude oil and refined products are essentially commodities, we have no control over the changing market value of these inventories. Our inventory is valued at the lower of cost or market value under the last-in, first-out ("LIFO") inventory valuation methodology. As a result, if the market value of our inventory were to decline to an amount less than our LIFO cost, we would record a write-down of inventory and a non-cash charge to cost of sales. Our investment in inventory is affected by the general level of crude oil prices, and significant increases in crude oil prices could result in substantial working capital requirements to maintain inventory volumes.

In addition, the volatility in costs of natural gas, electricity and other utility services used by our refineries and other operations affect our operating costs. Utility prices have been, and will continue to be, affected by factors outside our control, such as supply and demand for utility services in both local and regional markets. Future increases in utility prices may have a negative effect on our earnings, profitability and cash flows.

***Our profitability depends, in part, on the sweet/sour crude oil price spread. A decrease in this spread could negatively affect our profitability.***

Because our Big Spring and California refineries are configured to process substantial volumes of sour crude oils, our profitability depends, in part, on the price spread between sweet crude oil and sour crude oil, which we refer to as the sweet/sour spread. In recent years, the sweet/sour spread has significantly narrowed and any further tightening of the sweet/sour spreads could negatively affect our profitability.

***The profitability of our California refineries depends, in part, on the light/heavy crude oil price spread. A decrease in this spread could negatively affect our profitability.***

Our California refineries process significant volumes of heavy crude oils and, as a result, our profitability depends in part on the price spread between light crude oil and heavy crude oil, which we refer to as the light/heavy spread. Because processing light crude oils produces higher percentages of light products, light crude oils typically are priced higher than heavy crude oils. In 2009, the light/heavy spread was less than in 2008 and the light/heavy spread fluctuated in 2010. Any further tightening of the light/heavy spread could negatively affect profitability.

***Our indebtedness could adversely affect our financial condition or make us more vulnerable to adverse economic conditions.***

As of December 31, 2010, our consolidated outstanding indebtedness was $916.3 million. Our level of indebtedness could have significant effects on our business, financial condition and results of operations and cash flows and, consequently, important consequences to your investment in our securities, such as:

- we may be limited in our ability to obtain additional financing to fund our working capital needs, capital expenditures and debt service requirements or our other operational needs;
- we may be limited in our ability to use operating cash flow in other areas of our business because we must dedicate a substantial portion of these funds to make principal and interest payments on our debt;
- we may be at a competitive disadvantage compared to competitors with less leverage since we may be less capable of responding to adverse economic and industry conditions; and
- we may not have sufficient flexibility to react to adverse changes in the economy, our business or the industries in which we operate.

In addition, our ability to make payments on our indebtedness will depend on our ability to generate cash in the future. Our ability to generate cash is subject to general economic and market conditions and financial, competitive, legislative, regulatory and other factors that are beyond our control. We cannot assure you that our business will

Table of Contents

generate sufficient cash to fund our working capital, capital expenditure, debt service and other liquidity needs, which could result in our inability to comply with financial and other covenants contained in our debt agreements, our being unable to repay or pay interest on our indebtedness, and our inability to fund our other liquidity needs. If we are unable to service our debt obligations, fund our other liquidity needs and maintain compliance with our financial and other covenants, we could be forced to curtail our operations, our creditors could accelerate our indebtedness and exercise other remedies and we could be required to pursue one or more alternative strategies, such as selling assets or refinancing or restructuring our indebtedness. However, we cannot assure you that any such alternatives would be feasible or prove adequate.

***The recent recession and credit crisis and related turmoil in the global financial system has had and may continue to have an adverse impact on our business, results of operations and cash flows.***

Our business and profitability are affected by the overall level of demand for our products, which in turn is affected by factors such as overall levels of economic activity and business and consumer confidence and spending. Recent declines in global economic activity and consumer and business confidence and spending have significantly reduced the level of demand for our products. In addition, severe reductions in the availability and increases in the cost of credit have adversely affected our ability to fund our operations and operate our refineries at full capacity, and have adversely affected our operating margins. Together, these factors have had and may continue to have an adverse impact on our business, financial condition, results of operations and cash flows.

Our business is indirectly exposed to risks faced by our suppliers, customers and other business partners. The impact on these constituencies of the risks posed by the recent recession and credit crisis and related turmoil in the global financial system have included or could include interruptions or delays in the performance by counterparties to our contracts, reductions and delays in customer purchases, delays in or the inability of customers to obtain financing to purchase our products and the inability of customers to pay for our products. Any of these events may have an adverse impact on our business, financial condition, results of operations and cash flows.

***The dangers inherent in our operations could cause disruptions and could expose us to potentially significant losses, costs or liabilities.***

Our operations are subject to significant hazards and risks inherent in refining operations and in transporting and storing crude oil, intermediate products and refined products. These hazards and risks include, but are not limited to, natural disasters, fires, explosions, pipeline ruptures and spills, third party interference and mechanical failure of equipment at our or third-party facilities, any of which could result in production and distribution difficulties and disruptions, environmental pollution, personal injury or wrongful death claims and other damage to our properties and the properties of others. We experienced such an event on February 18, 2008 when a fire at the Big Spring refinery destroyed the propylene recovery unit and damaged equipment in the alkylation and gas concentration units. As a result the Big Spring refinery's crude unit did not operate until April 5, 2008 and the FCCU did not resume operations until September 26, 2008.

The occurrence of such events at any of our refineries could significantly disrupt our production and distribution of refined products, and any sustained disruption could have a material adverse effect on our business, financial condition and results of operations.

***We are subject to interruptions of supply as a result of our reliance on pipelines for transportation of crude oil and refined products.***

Our refineries receive a substantial percentage of their crude oil and deliver a substantial percentage of their refined products through pipelines. We could experience an interruption of supply or delivery, or an increased cost of receiving crude oil and delivering refined products to market, if the ability of these pipelines to transport crude oil or refined products is disrupted because of accidents, earthquakes, hurricanes, governmental regulation, terrorism, other third party action or any of the types of events described in the preceding risk factor. Our prolonged inability to use any of the pipelines that we use to transport crude oil or refined products could have a material adverse effect on our business, results of operations and cash flows.

Table of Contents

***If the price of crude oil increases significantly, it could reduce our margin on our fixed-price asphalt supply contracts.***

We enter into fixed-price asphalt supply contracts pursuant to which we agree to deliver asphalt to customers at future dates. We set the pricing terms in these agreements based, in part, upon the price of crude oil at the time we enter into each contract. If the price of crude oil increases from the time we enter into the contract to the time we produce the asphalt, our margins from these sales could be adversely affected. For example, in the first half of 2008, WTI crude prices increased from $87.15 per barrel to $140.22 per barrel over a period of six months. Primarily as a result of these increases in the cost of crude, we experienced reduced margins from our asphalt sales in the first half of 2008.

***Our operating results are seasonal and generally lower in the first and fourth quarters of the year.***

Demand for gasoline and asphalt products is generally higher during the summer months than during the winter months due to seasonal increases in highway traffic and road construction work. Seasonal fluctuations in highway traffic also affect motor fuels and merchandise sales in our retail stores. As a result, our operating results for the first and fourth calendar quarters are generally lower than those for the second and third calendar quarters of each year. This seasonality is most pronounced in our asphalt business.

***If the price of crude oil increases significantly, it could limit our ability to purchase enough crude oil to operate our refineries at full capacity.***

We rely in part on borrowings and letters of credit under our revolving credit facilities to purchase crude oil for our refineries. If the price of crude oil increases significantly, we may not have sufficient capacity under our revolving credit facilities to purchase enough crude oil to operate our refineries at full capacity. A failure to operate our refineries at full capacity could adversely affect our profitability and cash flows.

***Changes in our credit profile could affect our relationships with our suppliers, which could have a material adverse effect on our liquidity and our ability to operate our refineries at full capacity.***

Changes in our credit profile could affect the way crude oil suppliers view our ability to make payments and induce them to shorten the payment terms for our purchases or require us to post security prior to payment. Due to the large dollar amounts and volume of our crude oil and other feedstock purchases, any imposition by our suppliers of more burdensome payment terms on us may have a material adverse effect on our liquidity and our ability to make payments to our suppliers. This, in turn, could cause us to be unable to operate our refineries at full capacity. A failure to operate our refineries at full capacity could adversely affect our profitability and cash flows.

***Competition in the refining and marketing industry is intense, and an increase in competition in the markets in which we sell our products could adversely affect our earnings and profitability.***

We compete with a broad range of companies in our refining and marketing operations. Many of these competitors are integrated, multinational oil companies that are substantially larger than we are. Because of their diversity, integration of operations, larger capitalization, larger and more complex refineries and greater resources, these companies may be better able to withstand disruptions in operations and volatile market conditions, to offer more competitive pricing and to obtain crude oil in times of shortage.

We are not engaged in the exploration and production business and therefore do not produce any of our crude oil feedstocks. Certain of our competitors, however, obtain a portion of their feedstocks from company-owned production. Competitors that have their own crude production are at times able to offset losses from refining operations with profits from producing operations, and may be better positioned to withstand periods of depressed refining margins or feedstock shortages. In addition, we compete with other industries, such as wind, solar and hydropower, that provide alternative means to satisfy the energy and fuel requirements of our industrial, commercial and individual customers. If we are unable to compete effectively with these competitors, both within and outside our industry, there could be a material adverse effect on our business, financial condition, results of operations and cash flows.

Table of Contents

***Competition in the asphalt industry is intense, and an increase in competition in the markets in which we sell our asphalt products could adversely affect our earnings and profitability.***

Our asphalt business competes with other refiners and with regional and national asphalt marketing companies. Many of these competitors are larger, more diverse companies with greater resources, providing them advantages in obtaining crude oil and other blendstocks and in competing through bidding processes for asphalt supply contracts.

We compete in large part on our ability to deliver specialized asphalt products which we produce under proprietary technology licenses. Recently, demand for these specialized products has increased due to new specification requirements by state and federal governments. If we were to lose our rights under our technology licenses, or if competing technologies for specialized products are developed by our competitors, our profitability could be adversely affected.

***Competition in the retail industry is intense, and an increase in competition in the markets in which our retail businesses operate could adversely affect our earnings and profitability.***

Our retail operations compete with numerous convenience stores, gasoline service stations, supermarket chains, drug stores, fast food operations and other retail outlets. Increasingly, national high-volume grocery and dry-goods retailers, such as Albertson's and Wal-Mart are entering the gasoline retailing business. Many of these competitors are substantially larger than we are. Because of their diversity, integration of operations and greater resources, these companies may be better able to withstand volatile market conditions or levels of low or no profitability. In addition, these retailers may use promotional pricing or discounts, both at the pump and in the store, to encourage in-store merchandise sales. These activities by our competitors could adversely affect our profit margins. Additionally, our convenience stores could lose market share, relating to both gasoline and merchandise, to these and other retailers, which could adversely affect our business, results of operations and cash flows. Our convenience stores compete in large part based on their ability to offer convenience to customers. Consequently, changes in traffic patterns and the type, number and location of competing stores could result in the loss of customers and reduced sales and profitability at affected stores.

***We may incur significant costs to comply with new or changing environmental laws and regulations.***

Our operations are subject to extensive regulatory controls on air emissions, water discharges, waste management and the clean-up of contamination that can require costly compliance measures. If we fail to meet environmental requirements, we may be subject to administrative, civil and criminal proceedings by state and federal authorities, as well as civil proceedings by environmental groups and other individuals, which could result in substantial fines and penalties against us as well as governmental or court orders that could alter, limit or stop our operations.

On February 2, 2007, we committed in writing to enter into discussions with the United States Environmental Protection Agency, or EPA, under the National Petroleum Refinery Initiative. To date, the EPA has not made any specific findings against us or any of our refineries, and we have not determined whether we will ultimately enter into a settlement agreement with the EPA. Based on prior settlements that the EPA has reached with other petroleum refiners under the Petroleum Refinery Initiative, we anticipate that the EPA will seek relief in the form of the payment of civil penalties, the installation of air pollution controls and the implementation of environmentally beneficial projects. At this time, we cannot estimate the amount of any such civil penalties or the costs of any required controls or environmentally beneficial projects.

Our Big Spring refinery is one of more than 100 facilities in Texas to receive a Clean Air Act request for information from the EPA relating to the EPA's disapproval of Texas' "flexible permit rule." According to the EPA, the Texas "flexible permit rule" was never approved by the EPA for inclusion in the Texas state clean-air implementation plan and, therefore, emission limitations in Texas flexible permits are not federally enforceable. The EPA indicated that it would consider enforcement against holders of flexible permits that failed to comply with applicable federal requirements on a case-by-case basis. At this time, we have agreed to make a federally enforceable commitment by March 31, 2011 to apply for a non-flexible permit. It is unclear whether we will have any obligation to install new controls.

Table of Contents

The U.S. House of Representatives and the U.S. Senate are in various stages of considering legislation intended to control and reduce emissions of "greenhouse gases," or "GHGs," in the United States. GHGs are certain gases, including carbon dioxide and methane, that may be contributing to warming of the Earth's atmosphere and other climatic changes.

Although it is not possible at this time to predict when the House and Senate may enact climate change legislation, any laws or regulations that may be adopted to restrict or reduce emissions of GHGs would likely require us to incur increased costs. If we are unable to sell our refined products at a price that reflects such increased costs, there could be a material adverse effect on our business, financial condition and results of operations. In addition, any increase in prices of refined products resulting from such increased costs could have an adverse effect on our financial condition, results of operations and cash flows.

In addition to the climate change legislation under consideration by Congress, on December 7, 2009, the EPA issued an endangerment finding that GHGs endanger both public health and welfare, and that GHG emissions from motor vehicles contribute to the threat of climate change. Although the finding itself does not impose requirements on regulated entities, it allowed the EPA and the Department of Transportation to finalize a jointly proposed rule regulating greenhouse gas emissions from vehicles and establishing Corporate Average Fuel Economy standards for light-duty vehicles. National GHG tailpipe standards for passenger cars and light trucks were finalized on April 1, 2010.

Once GHGs became regulated by the EPA for vehicles, they also became regulated pollutants under the Clean Air Act potentially triggering other Clean Air Act requirements. On May 13, 2010, EPA announced a final rule to raise the threshold amount of GHG emissions that a source would have to emit to trigger certain Clean Air Act permitting requirements and the need to install controls to reduce emissions of greenhouse gases. Beginning in January 2011, facilities already subject to the Prevention of Significant Deterioration and Title V operating permit programs that increase their emissions of GHGs by 75,000 tons per year will be required to install control technology, known as "Best Available Control Technology," to address the GHG emissions. Both the endangerment finding and stationary source rule are being challenged, however. If the EPA's actions withstand legal challenge, the new obligations finalized in the stationary source rule could require us to incur increased costs. If we are unable to sell our refined products at a price that captures such increased costs, there could be a material adverse effect on our business, financial condition and results of operations. In addition, any increase in prices of refined products resulting from such increased costs could have an adverse effect on our financial condition, results of operations and cash flows.

In addition, new laws and regulations, new interpretations of existing laws and regulations, increased governmental enforcement or other developments could require us to make additional unforeseen expenditures. Many of these laws and regulations are becoming increasingly stringent, and the cost of compliance with these requirements can be expected to increase over time. We are not able to predict the impact of new or changed laws or regulations or changes in the ways that such laws or regulations are administered, interpreted or enforced. The requirements to be met, as well as the technology and length of time available to meet those requirements, continue to develop and change. To the extent that the costs associated with meeting any of these requirements are substantial and not adequately provided for, our results of operations and cash flows could suffer.

***We may incur significant costs and liabilities with respect to environmental lawsuits and proceedings and any investigation and remediation of existing and future environmental conditions.***

We are currently investigating and remediating, in some cases pursuant to government orders, soil and groundwater contamination at our refineries, terminals and convenience stores. Since August 2000, we have spent approximately $20.0 million with respect to the investigation and remediation of our Big Spring refinery and related terminals. We anticipate spending approximately $7.5 million in investigation and remediation expenses in connection with our Big Spring refinery and terminals over the next 15 years. Since their acquisition, we have spent approximately $9.1 million with respect to the investigation and remediation of our California refineries and related terminals. We anticipate spending an additional $40.5 million in investigation and remediation expenses in connection with our California refineries and terminals over the next 15 years. There can be no assurances, however, that we will not have to spend more than these anticipated amounts. Our handling and storage of petroleum and

Table of Contents

hazardous substances may lead to additional contamination at our facilities and facilities to which we send or sent wastes or by-products for treatment or disposal, in which case we may be subject to additional cleanup costs, governmental penalties, and third-party suits alleging personal injury and property damage. Although we have sold three of our pipelines and three of our terminals to HEP and two of our pipelines pursuant to a transaction with an affiliate of Sunoco, Inc. ("Sunoco"), we have agreed, subject to certain limitations, to indemnify HEP and Sunoco for costs and liabilities that may be incurred by them as a result of environmental conditions existing at the time of the sale. See Items 1 and 2 "Business and Properties—Government Regulation and Legislation—Environmental Indemnity to HEP" and "Business and Properties—Government Regulation and Legislation—Environmental Indemnity to Sunoco." If we are forced to incur costs or pay liabilities in connection with such proceedings and investigations, such costs and payments could be significant and could adversely affect our business, results of operations and cash flows.

***We could incur substantial costs or disruptions in our business if we cannot obtain or maintain necessary permits and authorizations or otherwise comply with health, safety, environmental and other laws and regulations.***

From time to time, we have been sued or investigated for alleged violations of health, safety, environmental and other laws. If a lawsuit or enforcement proceeding were commenced or resolved against us, we could incur significant costs and liabilities. In addition, our operations require numerous permits and authorizations under various laws and regulations. These authorizations and permits are subject to revocation, renewal or modification and can require operational changes to limit impacts or potential impacts on the environment and/or health and safety. A violation of authorization or permit conditions or other legal or regulatory requirements could result in substantial fines, criminal sanctions, permit revocations, injunctions, and/or facility shutdowns. In addition, major modifications of our operations could require modifications to our existing permits or upgrades to our existing pollution control equipment. Any or all of these matters could have a negative effect on our business, results of operations, cash flows or prospects.

***We could encounter significant opposition to operations at our California refineries.***

Our Paramount refinery is located in a residential area. The refinery is located near schools, apartment complexes, private homes and shopping establishments. In addition, our Long Beach refinery is also located in close proximity to other commercial facilities. Any loss of community support for our California refining operations could result in higher than expected expenses in connection with opposing any community action to restrict or terminate the operation of the refinery. Any community action in opposition to our current and planned use of the California refineries could have a material adverse effect on our business, results of operations and cash flows.

***The occurrence of a release of hazardous materials or a catastrophic event affecting our California refineries could endanger persons living nearby.***

Because our California refineries are located in residential areas, any release of hazardous material or catastrophic event could cause injuries to persons outside the confines of these refineries. In the event that persons were injured as a result of such an event, we would likely incur substantial legal costs as well as any costs resulting from settlements or adjudication of claims from such injured persons. The extent of these expenses and costs could be in excess of the limits provided by our insurance policies. As a result, any such event could have a material adverse effect on our business, results of operations and cash flows.

***Certain of our facilities are located in areas that have a history of earthquakes or hurricanes, the occurrence of which could materially impact our operations.***

Our refineries located in California and the related pipeline and asphalt terminals, and to a lesser extent our refinery and operations in Oregon, are located in areas with a history of earthquakes, some of which have been quite severe. Our Krotz Springs refinery is located less than 100 miles from the Gulf Coast. In August 2008, the Krotz Springs refinery sustained minor physical damage from Hurricane Gustav; however, the regional utilities were affected and, as a result, the Krotz Springs refinery was without electric power for one week. Offshore crude oil production and gathering facilities were impacted by Gustav and a subsequent storm, which temporarily limited the availability of crude oil to the Krotz Springs refinery. In the event of an earthquake or hurricane that causes damage to our refining, pipeline or asphalt terminal assets, or the infrastructure necessary for the operation of these assets,

Table of Contents

such as the availability of usable roads, electricity, water, or natural gas, we may experience a significant interruption in our refining and/or marketing operations. Such an interruption could have a material adverse effect on our business, results of operations and cash flows.

***Terrorist attacks, threats of war or actual war may negatively affect our operations, financial condition, results of operations and prospects.***

Terrorist attacks, threats of war or actual war, as well as events occurring in response to or in connection with them, may adversely affect our operations, financial condition, results of operations and prospects. Energy-related assets (which could include refineries, terminals and pipelines such as ours) may be at greater risk of terrorist attacks than other possible targets in the United States. A direct attack on our assets or assets used by us could have a material adverse effect on our operations, financial condition, results of operations and prospects. In addition, any terrorist attack, threats of war or actual war could have an adverse impact on energy prices, including prices for our crude oil and refined products, and an adverse impact on the margins from our refining and marketing operations. In addition, disruption or significant increases in energy prices could result in government-imposed price controls.

***Covenants in our credit agreements could limit our ability to undertake certain types of transactions and adversely affect our liquidity.***

Our credit agreements contain negative and financial covenants and events of default that may limit our financial flexibility and ability to undertake certain types of transactions. For example, we are subject to negative covenants that restrict our activities, including changes in control of Alon or certain of our subsidiaries, restrictions on creating liens, engaging in mergers, consolidations and sales of assets, incurring additional indebtedness, entering into certain lease obligations, making certain capital expenditures, and making certain dividend, debt and other restricted payments. Should we desire to undertake a transaction that is prohibited or limited by our credit agreements, we will need to obtain the consent of our lenders or refinance our credit facilities. Such consents or refinancings may not be possible or may not be available on commercially acceptable terms, or at all.

***Our insurance policies do not cover all losses, costs or liabilities that we may experience.***

We maintain significant insurance coverage, but it does not cover all potential losses, costs or liabilities, and our business interruption insurance coverage does not apply unless a business interruption exceeds a period of 45 to 75 days, depending upon the specific policy. We could suffer losses for uninsurable or uninsured risks or in amounts in excess of our existing insurance coverage. Our ability to obtain and maintain adequate insurance may be affected by conditions in the insurance market over which we have no control. The occurrence of an event that is not fully covered by insurance could have a material adverse effect on our business, financial condition and results of operations.

***We are exposed to risks associated with the credit-worthiness of the insurer of our environmental policies.***

The insurer under two of our environmental policies is The Kemper Insurance Companies, which has experienced significant downgrades of its credit ratings in recent years and is currently in run-off. These two policies are 20-year policies that were purchased to protect us against expenditures not covered by our indemnification agreement with FINA. Our insurance brokers have advised us that environmental insurance policies with terms in excess of ten years are not currently available and that policies with shorter terms are available only at premiums equal to or in excess of the premiums paid for our policies with Kemper. Accordingly, we are currently subject to the risk that Kemper will be unable to comply with its obligations under these policies and that comparable insurance may not be available or, if available, at premiums equal to or in excess of our current premiums with Kemper. However, we have no reason at this time to believe that Kemper will not be able to comply with its obligations under these policies.

Table of Contents

***If we lose any of our key personnel, our ability to manage our business and continue our growth could be negatively affected.***

Our future performance depends to a significant degree upon the continued contributions of our senior management team and key technical personnel. We do not currently maintain key man life insurance with respect to any member of our senior management team. The loss or unavailability to us of any member of our senior management team or a key technical employee could significantly harm us. We face competition for these professionals from our competitors, our customers and other companies operating in our industry. To the extent that the services of members of our senior management team and key technical personnel would be unavailable to us for any reason, we would be required to hire other personnel to manage and operate our company and to develop our products and technology. We cannot assure you that we would be able to locate or employ such qualified personnel on acceptable terms or at all.

***A substantial portion of our Big Spring refinery's workforce is unionized, and we may face labor disruptions that would interfere with our operations.***

As of December 31, 2010, we employed approximately 170 people at our Big Spring refinery, approximately 120 of whom were covered by a collective bargaining agreement. The collective bargaining agreement expires April 1, 2012. Our current labor agreement may not prevent a strike or work stoppage in the future, and any such work stoppage could have a material adverse effect on our results of operation and financial condition.

***We conduct our convenience store business under a license agreement with 7-Eleven, and the loss of this license could adversely affect the results of operations of our retail and branded marketing segment.***

Our convenience store operations are primarily conducted under the 7-Eleven name pursuant to a license agreement between 7-Eleven, Inc. and Alon. 7-Eleven may terminate the agreement if we default on our obligations under the agreement. This termination would result in our convenience stores losing the use of the 7-Eleven brand name, the accompanying 7-Eleven advertising and certain other brand names and products used exclusively by 7-Eleven. Termination of the license agreement could have a material adverse effect on our retail operations.

***We may not be able to successfully execute our strategy of growth through acquisitions.***

A component of our growth strategy is to selectively acquire refining and marketing assets and retail assets in order to increase cash flow and earnings. Our ability to do so will be dependent upon a number of factors, including our ability to identify acceptable acquisition candidates, consummate acquisitions on favorable terms, successfully integrate acquired assets and obtain financing to fund acquisitions and to support our growth and many other factors beyond our control. Risks associated with acquisitions include those relating to:

- diversion of management time and attention from our existing business;
- challenges in managing the increased scope, geographic diversity and complexity of operations;
- difficulties in integrating the financial, technological and management standards, processes, procedures and controls of an acquired business with those of our existing operations;
- liability for known or unknown environmental conditions or other contingent liabilities not covered by indemnification or insurance;
- greater than anticipated expenditures required for compliance with environmental or other regulatory standards or for investments to improve operating results;
- difficulties in achieving anticipated operational improvements;
- incurrence of additional indebtedness to finance acquisitions or capital expenditures relating to acquired assets; and
- issuance of additional equity, which could result in further dilution of the ownership interest of existing stockholders.

Table of Contents

We may not be successful in acquiring additional assets, and any acquisitions that we do consummate may not produce the anticipated benefits or may have adverse effects on our business and operating results.

***We depend upon our subsidiaries for cash to meet our obligations and pay any dividends, and we do not own 100% of the stock of our operating subsidiaries.***

We are a holding company. Our subsidiaries conduct all of our operations and own substantially all of our assets. Consequently, our cash flow and our ability to meet our obligations or pay dividends to our stockholders depend upon the cash flow of our subsidiaries and the payment of funds by our subsidiaries to us in the form of dividends, tax sharing payments or otherwise. Our subsidiaries' ability to make any payments will depend on their earnings, cash flows, the terms of their indebtedness, tax considerations and legal restrictions. Three of our executive officers, Messrs. Morris, Hart and Concienne, own shares of nonvoting stock of two of our subsidiaries, Alon Assets, Inc., or Alon Assets, and Alon USA Operating, Inc., or Alon Operating. As of December 31, 2010, the shares owned by these executive officers represent 6.32% of the aggregate equity interest in these subsidiaries. In addition, these executive officers hold options vesting through 2010 which, if exercised, could increase their aggregate ownership to 6.54% of Alon Assets and Alon Operating. To the extent these two subsidiaries pay dividends to us, Messrs. Morris, Hart and Concienne will be entitled to receive pro rata dividends based on their equity ownership. For additional information, see "Security Ownership of Certain Beneficial Owners and Management." Messrs. Morris, Hart and Concienne are parties to stockholders' agreements with Alon Assets and Alon Operating, pursuant to which we may elect or be required to purchase their shares in connection with put/call rights or rights of first refusal contained in those agreements. The purchase price for the shares is generally determined pursuant to certain formulas set forth in the stockholders' agreements, but after July 31, 2010, the purchase price, under certain circumstances involving a termination of, or resignation from, employment would be the fair market value of the shares. For additional information, see Item 12 "Security Ownership of Certain Beneficial Holders and Management."

***It may be difficult to serve process on or enforce a United States judgment against certain of our directors.***

All of our directors, other than Messrs. Ron Haddock and Jeff Morris, reside in Israel. In addition, a substantial portion of the assets of these directors are located outside of the United States. As a result, you may have difficulty serving legal process within the United States upon any of these persons. You may also have difficulty enforcing, both in and outside the United States, judgments you may obtain in United States courts against these persons in any action, including actions based upon the civil liability provisions of United States federal or state securities laws. Furthermore, there is substantial doubt that the courts of the State of Israel would enter judgments in original actions brought in those courts predicated on United States federal or state securities laws.

**ITEM 1B. UNRESOLVED STAFF COMMENTS.**

None.

**ITEM 3. LEGAL PROCEEDINGS.**

In the ordinary conduct of our business, we are subject to periodic lawsuits, investigations and claims, including environmental claims and employee related matters. Although we cannot predict with certainty the ultimate resolution of lawsuits, investigations and claims asserted against us, we do not believe that any currently pending legal proceeding or proceedings to which we are a party will have a material adverse effect on our business, results of operations, cash flows or financial condition.

**ITEM 4. RESERVED.**

Table of Contents

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

### Market Information

Our common stock is traded on the New York Stock Exchange under the symbol "ALJ."

The following table sets forth the quarterly high and low sales prices of our common stock for each quarterly period within the two most recently completed fiscal years:

| Quarterly Period | High | Low |
|---|---|---|
| **2010** | | |
| Fourth Quarter | $ 6.13 | $ 5.16 |
| Third Quarter | 6.99 | 4.77 |
| Second Quarter | 7.92 | 6.04 |
| First Quarter | 8.08 | 6.52 |
| **2009** | | |
| Fourth Quarter | $ 10.18 | $ 6.60 |
| Third Quarter | 11.20 | 8.20 |
| Second Quarter | 15.90 | 9.92 |
| First Quarter | 15.46 | 8.76 |

### Holders

As of March 1, 2011, there were approximately 26 common stockholders of record.

### Dividends

On April 2, 2009, we paid a regular quarterly cash dividend of $0.04 per share of our common stock. In connection with our cash dividend payment to stockholders, the non-controlling interest stockholders of Alon Assets and Alon Operating received an aggregate cash dividend of $0.144 million.

On June 15, 2009, we paid a regular quarterly cash dividend of $0.04 per share of our common stock. In connection with our cash dividend payment to stockholders, the non-controlling interest stockholders of Alon Assets and Alon Operating received an aggregate cash dividend of $0.144 million.

On September 15, 2009, we paid a regular quarterly cash dividend of $0.04 per share of our common stock. In connection with our cash dividend payment to stockholders, the non-controlling interest stockholders of Alon Assets and Alon Operating received an aggregate cash dividend of $0.144 million.

On December 15, 2009, we paid a regular quarterly cash dividend of $0.04 per share of our common stock. In connection with our cash dividend payment to stockholders, the non-controlling interest stockholders of Alon Assets and Alon Operating received an aggregate cash dividend of $0.144 million.

On March 31, 2010, we paid a regular quarterly cash dividend of $0.04 per share. In connection with our cash dividend payment to stockholders, the non-controlling interest stockholders of Alon Assets and Alon Operating received an aggregate cash dividend of $0.144 million.

On June 15, 2010, we paid a regular quarterly cash dividend of $0.04 per share of our common stock. In connection with our cash dividend payment to stockholders, the non-controlling interest stockholders of Alon Assets and Alon Operating received an aggregate cash dividend of $0.285 million.

Table of Contents

On September 15, 2010, we paid a regular quarterly cash dividend of $0.04 per share of our common stock. In connection with our cash dividend payment to stockholders, the non-controlling interest stockholders of Alon Assets and Alon Operating received an aggregate cash dividend of $0.164 million.

On December 15, 2010, we paid a regular quarterly cash dividend of $0.04 per share of our common stock.

We intend to continue to pay quarterly cash dividends on our common stock at an annual rate of $0.16 per share. However, the declaration and payment of future dividends to holders of our common stock will be at the discretion of our board of directors and will depend upon many factors, including our financial condition, earnings, legal requirements, restrictions in our debt agreements, the terms of our preferred stock and other factors our board of directors deems relevant.

**Recent Sales of Unregistered Securities**

Alon has entered into unregistered sales of equity securities as described in Item 9B of this Form 10-K.

**Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

None.

**Stockholder Return Performance Graph**

The following performance graph compares the cumulative total stockholder return on Alon common stock as traded on the NYSE with the Standard & Poor's 500 Stock Index (the "S&P 500") and our peer group for the cumulative five year period from January 3, 2006 to December 31, 2010, assuming an initial investment of $100 dollars and the reinvestment of all dividends, if any. The "Peer Group" includes Frontier Oil Corporation, Tesoro Petroleum Corp. and Valero Energy Corporation.

ALON0000892

Exhibit 4
Page 125

Table of Contents

**ITEM 6. SELECTED FINANCIAL DATA.**

The following table sets forth selected historical consolidated financial and operating data for our company. The selected historical consolidated statement of operations and consolidated statement of cash flows data for the years ended December 31, 2007 and 2006, and the selected consolidated balance sheet data as of December 31, 2008, 2007 and 2006 are derived from our audited consolidated financial statements, which are not included in this Annual Report on Form 10-K. The selected historical consolidated statement of operations and consolidated statement of cash flows data for the years ended December 31, 2010, 2009 and 2008, and the selected consolidated balance sheet data as of December 31, 2010 and 2009, are derived from our audited consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

Our financial statements include the results of the Krotz Springs refining business from July 1, 2008. As a result of this transaction, the financial and operating data for periods prior to the effective date of this transaction may not be comparable to the data for the years ended December 31, 2010, 2009 and 2008.

The following selected historical consolidated financial and operating data should be read in conjunction with Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and notes thereto included elsewhere in this Annual Report on Form 10-K.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2010 | 2009 | 2008 | 2007 | 2006 |
| | (dollars in thousands, except per share data) | | | | |
| **STATEMENT OF OPERATIONS DATA:** | | | | | |
| Net sales (1) | $4,030,743 | $ 3,915,732 | $ 5,156,706 | $ 4,542,151 | $3,093,890 |
| Operating costs and expenses (1) | 4,192,469 | 3,994,977 | 5,258,153 | 4,363,238 | 2,877,811 |
| Gain on involuntary conversion of assets (2) | — | — | 279,680 | — | — |
| Gain (loss) on disposition of assets (3) | 945 | (1,591) | 45,244 | 7,206 | 63,255 |
| Operating income (loss) | (160,781) | (80,836) | 223,477 | 186,119 | 279,334 |
| Net income (loss) available to common stockholders | (122,932) | (115,156) | 82,883 | 103,936 | 157,368 |
| Earnings (loss) per share, basic | $ (2.27) | $ (2.46) | $ 1.77 | $ 2.22 | $ 3.37 |
| Weighted average shares outstanding, basic | 54,186 | 46,829 | 46,788 | 46,763 | 46,738 |
| Earnings (loss) per share, diluted | $ (2.27) | $ (2.46) | $ 1.72 | $ 2.16 | $ 3.36 |
| Weighted average shares outstanding, diluted | 54,186 | 46,829 | 49,583 | 46,804 | 46,779 |
| Cash dividends per common share | 0.16 | 0.16 | 0.16 | 0.16 | 3.03 |
| **CASH FLOW DATA:** | | | | | |
| Net cash provided by (used in): | | | | | |
| Operating activities | $ 21,330 | $ 283,145 | $ (812) | $ 123,950 | $ 142,977 |
| Investing activities | (40,925) | (138,691) | (610,322) | (147,254) | (421,070) |
| Financing activities | 50,845 | (122,471) | 560,973 | 27,753 | 205,439 |
| **BALANCE SHEET DATA:** | | | | | |
| Cash and cash equivalents and short-term investments | $ 71,687 | $ 40,437 | $ 18,454 | $ 95,911 | $ 64,166 |
| Working capital | 990 | 84,257 | 250,384 | 279,580 | 228,779 |
| Total assets | 2,088,521 | 2,132,789 | 2,413,433 | 1,581,386 | 1,408,785 |
| Total debt | 916,305 | 937,024 | 1,103,569 | 536,615 | 498,669 |
| Total equity | 341,767 | 431,918 | 536,867 | 403,922 | 299,862 |

**Table of Contents**

---

(1) Our buy/sell arrangements involve linked purchases and sales related to refined product contracts entered into to address location, quality or grade requirements. These buy/sell transactions are included on a net basis in net sales in the consolidated statements of operations and profits are recognized when the exchanged product is sold. See Note 2 to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

(2) Gain on involuntary conversion of assets reported in 2008 of $279.7 million represents the insurance proceeds received as a result of the Big Spring refinery fire in excess of the book value of the assets impaired of $25.3 million and demolition and repair expenses of $25.0 million incurred through December 31, 2008.

(3) Gain on disposition of assets reported in 2008 primarily reflects the recognition of all the remaining deferred gain associated with the HEP transaction due to the termination of an indemnification agreement with HEP. Gain on disposition of assets reported in 2007 reflects the recognition of $7.2 million deferred gain recorded primarily in connection with the HEP transaction. Gain on disposition of assets reported in 2006 reflects the $52.5 million gain recognized in connection with the Amdel and White Oil transaction and the recognition of $10.8 million deferred gain recorded in connection with the HEP transaction.

Table of Contents

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.

*The following discussion of our financial condition and results of operations is provided as a supplement to, and should be read in conjunction with, our consolidated financial statements and the notes thereto included elsewhere in this Annual Report on Form 10-K and the other sections of this Annual Report on Form 10-K, including Items 1 and 2 "Business and Properties," and Item 6 "Selected Financial Data."*

### Forward-Looking Statements

Certain statements contained in this report and other materials we file with the SEC, or in other written or oral statements made by us, other than statements of historical fact, are "forward-looking statements" as defined in the Private Securities Litigation Reform Act of 1995. Forward-looking statements relate to matters such as our industry, business strategy, goals and expectations concerning our market position, future operations, margins, profitability, capital expenditures, liquidity and capital resources and other financial and operating information. We have used the words "anticipate," "assume," "believe," "budget," "continue," "could," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project," "will," "future" and similar terms and phrases to identify forward-looking statements.

Forward-looking statements reflect our current expectations regarding future events, results or outcomes. These expectations may or may not be realized. Some of these expectations may be based upon assumptions or judgments that prove to be incorrect. In addition, our business and operations involve numerous risks and uncertainties, many of which are beyond our control, which could result in our expectations not being realized or otherwise materially affect our financial condition, results of operations and cash flows. See Item 1A "Risk Factors."

Actual events, results and outcomes may differ materially from our expectations due to a variety of factors. Although it is not possible to identify all of these factors, they include, among others, the following:

- changes in general economic conditions and capital markets;
- changes in the underlying demand for our products;
- the availability, costs and price volatility of crude oil, other refinery feedstocks and refined products;
- changes in the sweet/sour spread;
- changes in the light/heavy spread;
- changes in the spread between West Texas Intermediate crude oil and Light Louisiana and Heavy Louisiana Sweet crude oils;
- the effects of transactions involving forward contracts and derivative instruments;
- actions of customers and competitors;
- changes in fuel and utility costs incurred by our facilities;
- disruptions due to equipment interruption, pipeline disruptions or failure at our or third-party facilities;
- the execution of planned capital projects;
- adverse changes in the credit ratings assigned to our trade credit and debt instruments;
- the effects of and cost of compliance with current and future state and federal environmental, economic, safety and other laws, policies and regulations;

Table of Contents

- operating hazards, natural disasters, casualty losses and other matters beyond our control;
- realization of synergies and accretion to reported earnings from our acquisition of the Bakersfield refinery;
- integration of the operations and employees of the Bakersfield refinery and the timing of such integration;
- the global financial crisis' impact on our business and financial condition; and
- the other factors discussed in our Annual Report on Form 10-K for the year ended December 31, 2010 under the caption "Risk Factors."

Any one of these factors or a combination of these factors could materially affect our future results of operations and could influence whether any forward-looking statements ultimately prove to be accurate. Our forward-looking statements are not guarantees of future performance, and actual results and future performance may differ materially from those suggested in any forward-looking statements. We do not intend to update these statements unless we are required by the securities laws to do so.

**Overview**

We are an independent refiner and marketer of petroleum products operating primarily in the South Central, Southwestern and Western regions of the United States. Our crude oil refineries are located in Texas, California, Oregon and Louisiana and have a combined throughput capacity of approximately 250,000 barrels per day ("bpd"). Our refineries produce petroleum products including various grades of gasoline, diesel fuel, jet fuel, petrochemicals, petrochemical feedstocks, asphalt, and other petroleum-based products.

*Refining and Unbranded Marketing Segment.* Our refining and unbranded marketing segment includes sour and heavy crude oil refineries that are located in Big Spring, Texas; and Paramount, Bakersfield and Long Beach, California; and a light sweet crude oil refinery located in Krotz Springs, Louisiana. We refer to the Paramount, Bakersfield and Long Beach refineries together as our "California refineries." The refineries in our refining and unbranded marketing segment have a combined throughput capacity of approximately 240,000 bpd. At our refineries we refine crude oil into petroleum products, including gasoline, diesel fuel, jet fuel, petrochemicals, feedstocks and asphalts, which are marketed primarily in the South Central, Southwestern, and Western United States.

We market transportation fuels produced at our Big Spring refinery in West and Central Texas, Oklahoma, New Mexico and Arizona. We refer to our operations in these regions as our "physically integrated system" because we supply our retail and branded marketing segment convenience stores and unbranded distributors in this region with motor fuels produced at our Big Spring refinery and distributed through a network of pipelines and terminals which we either own or have access to through leases or long-term throughput agreements.

We market refined products produced from our California refineries to wholesale distributors, other refiners and third parties primarily on the West Coast. We plan to integrate the Bakersfield hydrocracker unit by processing vacuum gas oil produced at our other California refineries.

The Krotz Springs refinery processing units are structured to yield approximately 101.5% of total feedstock input, meaning that for each 100 barrels of crude oil and feedstocks input into the refinery, it produces 101.5 barrels of refined products. Of the 101.5%, on average 99.0% is light finished products such as gasoline and distillates, including diesel and jet fuel, petrochemical feedstocks and liquefied petroleum gas, and the remaining 2.5% is primarily heavy oils. We market refined products from Krotz Springs to wholesale distributors, other refiners, and third parties. The refinery's location provides access to upriver markets on the Mississippi and Ohio Rivers and its docking facilities along the Atchafalaya River allow barge access. The refinery also uses its direct access to the Colonial Pipeline to transport products to markets in the Southern and Eastern United States.

*Asphalt Segment.* Our asphalt segment markets asphalt produced at our Big Spring and California refineries included in the refining and marketing segment and at our Willbridge, Oregon refinery. Asphalt produced by the refineries in our refining and marketing segment is transferred to the asphalt segment at prices substantially determined by reference to the cost of crude oil, which is intended to approximate wholesale market prices. Our

asphalt segment markets asphalt through 12 refinery/terminal locations in Texas (Big Spring), California (Paramount, Long Beach, Elk Grove, Bakersfield and Mojave), Oregon (Willbridge), Washington (Richmond Beach), Arizona (Phoenix, Flagstaff and Fredonia) and Nevada (Fernley) (50% interest) as well as a 50% interest in Wright Asphalt Products Company, LLC ("Wright"). We produce both paving and roofing grades of asphalt, including performance-graded asphalts, emulsions and cutbacks.

*Retail and Branded Marketing Segment.* Our retail and branded marketing segment operates 304 convenience stores primarily in Central and West Texas and New Mexico. These convenience stores typically offer various grades of gasoline, diesel fuel, general merchandise and food and beverage products to the general public, primarily under the 7-Eleven and FINA brand names. Substantially all of the motor fuel sold through our retail operations and the majority of the motor fuel marketed in our branded business is supplied by our Big Spring refinery. In 2010, approximately 91% of the motor fuel requirements of our branded marketing operations, including retail operations, were supplied by our Big Spring refinery. Branded distributors that are not part of our integrated supply system, primarily in Central Texas, are supplied with motor fuels we obtain from third-party suppliers.

We market gasoline and diesel under the FINA brand name through a network of approximately 630 locations, including our convenience stores. Approximately 63% of the gasoline and 22% of the diesel motor fuel produced at our Big Spring refinery was transferred to our retail and branded marketing segment at prices substantially determined by reference to commodity pricing information published by Platts. Additionally, our retail and branded marketing segment licenses the use of the FINA brand name and provides credit card processing services to approximately 260 licensed locations that are not under fuel supply agreements with us.

**Summary of 2010 Developments**

In March 2010, Alon Refining Krotz Springs ("ARKS") entered into a $65.0 million short-term credit facility with Bank Hapoalim B.M. The short-term credit facility as amended and restated matured on November 15, 2010 and was prepaid in full in October 2010. The proceeds of the short-term credit facility were used in part to prepay the ARKS revolving credit facility.

In March 2010, ARKS terminated its revolving credit facility agreement and repaid all outstanding amounts thereunder. As a result of the prepayment of the ARKS revolving credit facility, a write-off of unamortized debt issuance costs of $6.7 million was recorded as interest expense in the first quarter of 2010.

In April 2010, ARKS entered into a Supply and Offtake Agreement, which was amended on May 26, 2010 (the "Supply and Offtake Agreement") with J. Aron & Company ("J. Aron"), the proceeds of which allowed ARKS to retire part of its obligations under its short-term credit facility and support the operation of the Krotz Springs refinery at a minimum of 72,000 barrels per day. Pursuant to the Supply and Offtake Agreement, (i) J. Aron agreed to sell to ARKS, and ARKS agreed to buy from J. Aron, at market price, crude oil for processing at the Krotz Springs refinery and (ii) ARKS agreed to sell, and J. Aron agreed to buy, at market price, certain refined products produced at the Krotz Springs refinery.

In June 2010, we purchased a refinery in Bakersfield, California from Big West of California, LLC, a subsidiary of Flying J, Inc. The refinery is non-operational at this time and will require turnaround work and additional capital expenditures before it can be returned to operations and integrated with the other California refineries. In connection with the Bakersfield refinery acquisition, the acquisition date fair value of the identifiable net assets acquired exceeded the fair value of the consideration transferred, resulting in a $17.5 million bargain purchase gain.

In October 2010, we completed a registered direct offering of our 8.5% Series A Convertible Preferred Stock for an aggregate offering price of $40.0 million before deducting offering expenses. We used $30.0 million of the proceeds from the offering to prepay in full the ARKS short-term credit facility in October 2010. Also in October 2010, we obtained $23.0 million of letters of credit outside our existing credit facilities.

In December 2010, Southwest Convenience Stores, LLC ("SCS") entered into an amended and restated retail credit facility agreement with Wells Fargo Bank. The facility amended and restated the original credit agreement, dated June 29, 2007, between SCS and Wachovia Bank, the predecessor to Wells Fargo Bank. The amendment to the original credit agreement reinstated the original facility size from $73.4 million to $93.4 million. The facility

Table of Contents

consists of the $73.4 million existing term loan, a $10.0 million additional term loan and $10.0 million of revolving credit capacity. At December 31, 2010, $93.4 million was outstanding under this facility.

**2010 Operations Highlights**

Highlights for 2010 include:

- Combined refinery throughput in 2010 averaged 105,868 bpd, consisting of 49,028 bpd at the Big Spring refinery, 17,596 bpd at the California refineries, and 39,244 bpd at the Krotz Springs refinery compared to a combined average of 139,365 bpd for the same period last year, consisting of 59,870 bpd at the Big Spring refinery, 31,158 bpd at the California refineries, and 48,337 bpd at the Krotz Springs refinery.
- Operating margin at the Big Spring refinery was $6.03 per barrel in 2010, compared to $4.35 per barrel for the same period in 2009. Light product yields increased in 2010 due to the operation of substantially all refinery units that were damaged in the 2008 fire. Light product yields were approximately 89% in 2010, compared to 82% for the same period in 2009.
- Operating margin at the California refineries was $1.08 per barrel in 2010, compared to $1.83 per barrel for the same period in 2009. The operating margin decreased in 2010 due to decreased light product yields and a decrease in the West Coast 3/2/1 crack spread.
- Operating margin at the Krotz Springs refinery was $2.24 per barrel in 2010 compared to $5.66 per barrel for 2009. The lower Krotz Springs refinery operating margin is due primarily to operational effects of the extended turnaround and restart in June 2010 and a higher LLS to WTI spread.
- Gulf Coast 3/2/1 average crack spreads were $8.22 per barrel in 2010, compared to $7.24 per barrel for the same period in 2009. Gulf Coast 2/1/1 high sulfur diesel average crack spreads for the year ended December 31, 2010, was $7.75 per barrel compared to $6.50 per barrel for the same period in 2009. West Coast 3/2/1 average crack spreads for the year ended December 31, 2010, was $13.56 per barrel compared to $13.92 per barrel for the same period in 2009.
- The average sweet/sour spread for 2010 was $2.15 per barrel compared to $1.52 per barrel for the same period in 2009. The average light/heavy spread for 2010 was $9.14 per barrel compared to $5.46 per barrel for the same period in 2009. The average LLS to WTI spread for 2010 was $3.35 per barrel compared to $2.57 per barrel for the same period in 2009.
- Asphalt margins in 2010 averaged $51.06 per ton compared to an average of $46.07 per ton in 2009. The average blended asphalt sales price increased 16.4% from $409.88 per ton in 2009, to $477.26 per ton in 2010, and the average non-blended asphalt sales price increased 91.8% from $170.05 per ton in 2009 to $326.16 per ton in 2010. The blended asphalt sales accounted for 93% of total asphalt sales in 2010 compared to 92% for 2009.
- In our retail and branded marketing segment, retail fuel sales gallons increased by 17.8% from 120.7 million gallons for the year ended December 31, 2009, to 142.2 million gallons for the year ended December 31, 2010. Our branded fuel sales increased by 16.4% from 274.1 million gallons in 2009, to 318.9 million gallons for 2010.

Table of Contents

**Major Influences on Results of Operations**

*Refining and Unbranded Marketing.* Our earnings and cash flow from our refining and unbranded marketing segment are primarily affected by the difference between refined product prices and the prices for crude oil and other feedstocks. The cost to acquire crude oil and other feedstocks and the price of the refined products we ultimately sell depend on numerous factors beyond our control, including the supply of, and demand for, crude oil, gasoline and other refined products which, in turn, depend on, among other factors, changes in domestic and foreign economies, weather conditions, domestic and foreign political affairs, production levels, the availability of imports, the marketing of competitive fuels and government regulation. While our sales and operating revenues fluctuate significantly with movements in crude oil and refined product prices, it is the spread between crude oil and refined product prices, and not necessarily fluctuations in those prices that affect our earnings.

In order to measure our operating performance, we compare our per barrel refinery operating margins to certain industry benchmarks. We compare our Big Spring refinery's per barrel operating margin to the Gulf Coast and Group III, or mid-continent, 3/2/1 crack spreads. A 3/2/1 crack spread in a given region is calculated assuming that three barrels of a benchmark crude oil are converted, or cracked, into two barrels of gasoline and one barrel of diesel. We calculate the Gulf Coast 3/2/1 crack spread using the market values of Gulf Coast conventional gasoline and ultra-low sulfur diesel and the market value of West Texas Intermediate, or WTI, a light, sweet crude oil. We calculate the Group III 3/2/1 crack spread using the market values of Group III conventional gasoline and ultra-low sulfur diesel and the market value of WTI crude oil. We calculate the per barrel operating margin for our Big Spring refinery by dividing the Big Spring refinery's gross margin by its throughput volumes. Gross margin is the difference between net sales and cost of sales (exclusive of substantial unrealized hedge positions and inventory adjustments related to acquisitions).

We compare our California refineries' per barrel operating margin to the West Coast 3/2/1 crack spread. A 3/2/1 crack spread is calculated assuming that three barrels of a benchmark crude oil are converted into two barrels of gasoline and one barrel of diesel. This is calculated using the market values of West Coast LA CARBOB pipeline gasoline, LA ultra-low sulfur pipeline diesel and the market value of WTI crude oil.

We compare our Krotz Springs refinery's per barrel margin to the Gulf Coast 2/1/1 crack spread. The 2/1/1 crack spread is calculated assuming that two barrels of a benchmark crude oil are converted into one barrel of gasoline and one barrel of diesel. We calculate the Gulf Coast 2/1/1 crack spread using the market values of Gulf Coast conventional gasoline and Gulf Coast high sulfur diesel and the market value of WTI crude oil.

Our Big Spring refinery and California refineries are capable of processing substantial volumes of sour crude oil, which has historically cost less than intermediate and sweet crude oils. We measure the cost advantage of refining sour crude oil at our refineries by calculating the difference between the value of WTI crude oil less the value of West Texas Sour, or WTS, a medium, sour crude oil. We refer to this differential as the sweet/sour spread. A widening of the sweet/sour spread can favorably influence the operating margin for our Big Spring and California refineries. In addition, our California refineries are capable of processing significant volumes of heavy crude oils which historically have cost less than light crude oils. We measure the cost advantage of refining heavy crude oils by calculating the difference between the value of WTI crude oil less the value of MAYA crude, which we refer to as the light/heavy spread. A widening of the light/heavy spread can favorably influence the refinery operating margins for our California refineries.

The Krotz Springs refinery has the capability to process substantial volumes of low-sulfur, or sweet, crude oils to produce a high percentage of light, high-value refined products. Sweet crude oil typically comprises 100% of the Krotz Springs refinery's crude oil input. This input is comprised of equal amounts of Heavy Louisiana Sweet, or HLS crude oil, and Light Louisiana Sweet, or LLS crude oil. We measure the cost of refining these lighter sweet crude oils by calculating the difference between the average value of LLS crude oil (which also approximates the value of HLS crude oil) to the average value of WTI crude oil. A narrowing of this spread can favorably influence the refinery operating margins of our Krotz Springs refinery.

The results of operations from our refining and unbranded marketing segment are also significantly affected by our refineries' operating costs, particularly the cost of natural gas used for fuel and the cost of electricity. Natural gas prices have historically been volatile. Typically, electricity prices fluctuate with natural gas prices.

Demand for gasoline products is generally higher during summer months than during winter months due to seasonal increases in highway traffic. As a result, the operating results for our refining and unbranded marketing segment for the first and fourth calendar quarters are generally lower than those for the second and third calendar quarters. The effects of seasonal demand for gasoline are partially offset by seasonality in demand for diesel, which in our region is generally higher in winter months as east-west trucking traffic moves south to avoid winter conditions on northern routes.

Safety, reliability and the environmental performance of our refineries are critical to our financial performance. The financial impact of planned downtime, such as a turnaround or major maintenance project, is mitigated through a diligent planning process that considers product availability, margin environment and the availability of resources to perform the required maintenance.

The nature of our business requires us to maintain substantial quantities of crude oil and refined product inventories. Crude oil and refined products are essentially commodities, and we have no control over the changing market value of these inventories. Because our inventory is valued at the lower of cost or market value under the LIFO inventory valuation methodology, price fluctuations generally have little effect on our financial results.

*Asphalt.* Our earnings from our asphalt segment depend primarily upon the margin between the price at which we sell our asphalt and the transfer prices for asphalt produced at our refineries in the refining and unbranded marketing segment. Asphalt is transferred to our asphalt segment at prices substantially determined by reference to the cost of crude oil, which is intended to approximate wholesale market prices. The asphalt segment also conducts operations at and markets asphalt produced by our refinery located in Willbridge, Oregon. In addition to producing asphalt at our refineries, at times when refining margins are unfavorable we opportunistically purchase asphalt from other producers for resale. A portion of our asphalt sales are made using fixed price contracts for delivery of asphalt products at future dates. Because these contracts are priced at the market prices for asphalt at the time of the contract, a change in the cost of crude oil between the time we enter into the contract and the time we produce the asphalt can positively or negatively influence the earnings of our asphalt segment. Demand for paving asphalt products is higher during warmer months than during colder months due to seasonal increases in road construction work. As a result, the revenues for our asphalt segment for the first and fourth calendar quarters are expected to be lower than those for the second and third calendar quarters.

*Retail and Branded Marketing.* Our earnings and cash flows from our retail and branded marketing segment are primarily affected by merchandise and motor fuel sales and margins at our convenience stores and the motor fuel sales volumes and margins from sales to our FINA-branded distributors, together with licensing and credit card related fees generated from our FINA-branded distributors and licensees. Retail merchandise gross margin is equal to retail merchandise sales less the delivered cost of the retail merchandise, net of vendor discounts and rebates, measured as a percentage of total retail merchandise sales. Retail merchandise sales are driven by convenience, branding and competitive pricing. Motor fuel margin is equal to motor fuel sales less the delivered cost of fuel and motor fuel taxes, measured on a cents per gallon ("cpg") basis. Our motor fuel margins are driven by local supply, demand and competitor pricing. Our convenience store sales are seasonal and peak in the second and third quarters of the year, while the first and fourth quarters usually experience lower overall sales.

**Factors Affecting Comparability**

Our financial condition and operating results over the three year period ended December 31, 2010 have been influenced by the following factors, which are fundamental to understanding comparisons of our period-to-period financial performance.

**Table of Contents**

*Big Spring Refinery Fire*

On February 18, 2008, a fire at the Big Spring refinery destroyed the propylene recovery unit and damaged equipment in the alkylation and gas concentration units. On April 5, 2008, the refinery was able to begin partial operation in a 35,000 bpd hydroskimming mode. The major units brought back on line in April included the crude unit, reformer unit, distillate hydrotreater and jet fuel hydrotreater. The Fluid Catalytic Cracking Unit ("FCCU") returned to normal operating capabilities with the restart on September 26, 2008. Substantially all of the repairs to the units damaged in the fire were completed in 2009 other than the alkylation unit which returned to operations in January 2010.

For the year ended December 31, 2008, we recorded $56.9 million of non-reimbursable costs associated with the fire. The components of net costs associated with fire as of December 31, 2008 included: $51.1 million for expenses incurred from pipeline commitment deficiencies, crude sale losses and other incremental costs; $5.0 million for our third party liability insurance deductible under the insurance policy; and depreciation for the temporarily idled facilities of $0.8 million.

An involuntary pre-tax gain on conversion of assets of $279.7 million was recorded for the insurance proceeds of $330.0 million received in excess of the book value of the assets impaired of $25.3 million and demolition and repair expenses of $25.0 million incurred through December 31, 2008. An additional $55.0 million of insurance proceeds were received in 2008 and January 2009 and this was recorded as business interruption recovery for the year ended December 31, 2008.

*Refinery Acquisitions*

In June 2010, we purchased the Bakersfield, California refinery from Big West of California, LLC, a subsidiary of Flying J, Inc. The refinery is non-operational at this time and will require turnaround work and additional capital expenditures before it can be returned to operations and integrated with other California refineries. In connection with the Bakersfield refinery acquisition, the acquisition date fair value of the identifiable net assets acquired exceeded the fair value of the consideration transferred, resulting in a $17.5 million bargain purchase gain.

In July 2008, we acquired the refining business located in Krotz Springs, Louisiana from Valero. The purchase price was $333.0 million in cash plus $141.5 million for working capital, including inventories. The Krotz Springs refinery, with a nameplate crude capacity of approximately 83,100 bpd, supplies multiple demand centers in the Southern and Eastern United States markets through a pipeline operated by the Colonial Pipeline. The purchase of the Krotz Springs refinery increased property, plant and equipment by $376.7 million, inventories by $145.0 million and debt by $141.5 million. The results of operations for the Krotz Springs refinery have been included in our consolidated statements of operations for the second half of the year ended December 31, 2008.

*Unscheduled Turnaround and Reduced Crude Oil Throughput*

In an effort to match our safety, reliability and the environmental performance initiatives with the current operating margin environment, we accelerated a planned turnaround at our Krotz Springs refinery from the first quarter of 2010 to the fourth quarter of 2009. The refinery resumed operations in June 2010. Throughput at the Big Spring refinery was lower during 2010, as we implemented new operating procedures. The California refineries' throughput was lower during 2010, due to continued efforts to optimize asphalt production with demand and as a result of the shutdown in December 2010 to redeploy resources for the integration of the Bakersfield refinery acquired in June 2010.

*Hurricane Activity*

The aftermath of Hurricanes Gustav and Ike in the third quarter of 2008 resulted in the shutdown of approximately 25% of the refining capacity in the United States which greatly influenced the production and supply of both crude oil and refined products throughout the United States. Hurricane Gustav directly affected our refinery in Krotz Springs, Louisiana causing power outages and crude oil supply disruption.

Table of Contents

*HEP Transaction*

A gain on disposition of assets of $42.9 million in the second quarter of 2008 represented the recognition of all the remaining deferred gain associated with the contribution of certain pipelines and terminals to Holly Energy Partners, LP ("HEP"), in March 2005 and was due to the termination of an indemnification agreement with HEP.

**Results of Operations**

*Net Sales*. Net sales consist primarily of sales of refined petroleum products through our refining and unbranded marketing segment and asphalt segment and sales of merchandise, including food products, and motor fuels, through our retail and branded marketing segment.

For the refining and unbranded marketing segment, net sales consist of gross sales, net of customer rebates, discounts and excise taxes. Net sales for our refining and unbranded marketing segment include intersegment sales to our asphalt and retail and branded marketing segments, which are eliminated through consolidation of our financial statements. Asphalt sales consist of gross sales, net of any discounts and applicable taxes. Retail net sales consist of gross merchandise sales, less rebates, commissions and discounts, and gross fuel sales, including motor fuel taxes. For our petroleum and asphalt products, net sales are mainly affected by crude oil and refined product prices and volume changes caused by operations. Our retail merchandise sales are affected primarily by competition and seasonal influences.

*Cost of Sales*. Refining and unbranded marketing cost of sales includes crude oil and other raw materials, inclusive of transportation costs. Asphalt cost of sales includes costs of purchased asphalt, blending materials and transportation costs. Retail cost of sales includes cost of sales for motor fuels and for merchandise. Motor fuel cost of sales represents the net cost of purchased fuel, including transportation costs and associated motor fuel taxes. Merchandise cost of sales includes the delivered cost of merchandise purchases, net of merchandise rebates and commissions. Cost of sales excludes depreciation and amortization expense.

*Direct Operating Expenses*. Direct operating expenses, which relate to our refining and unbranded marketing and asphalt segments, include costs associated with the actual operations of our refineries, such as energy and utility costs, routine maintenance, labor, insurance and environmental compliance costs. Environmental compliance costs, including monitoring and routine maintenance, are expensed as incurred. All operating costs associated with our crude oil and product pipelines are considered to be transportation costs and are reflected as cost of sales.

*Selling, General and Administrative Expenses*. Selling, general and administrative, or SG&A, expenses consist primarily of costs relating to the operations of our convenience stores, including labor, utilities, maintenance and retail corporate overhead costs. Refining and marketing and asphalt segment corporate overhead and marketing expenses are also included in SG&A expenses.

*Summary Financial Tables*. The following tables provide summary financial data and selected key operating statistics for us and our three operating segments for the years ended December 31, 2010, 2009 and 2008. The summary financial data for our three operating segments does not include certain SG&A expenses and depreciation and amortization related to our corporate headquarters. The following data should be read in conjunction with our consolidated financial statements and the notes thereto included elsewhere in this Annual Report on Form 10-K.