ROBBINS GELLER RUDMAN & DOWD LLP
PATRICK J. COUGHLIN (111070)
STEVEN W. PEPICH (116086)
ALEXANDRA S. BERNAY (211068)
CARMEN A. MEDICI (248417)
LONNIE A. BROWNE (293171)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
patc@rgrdlaw.com
stevep@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com
lbrowne@rgrdlaw.com

Attorneys for Plaintiff Persian Gulf Inc.

[Additional counsel appear on signature page.]

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERSIAN GULF INC., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> BP WEST COAST PRODUCTS LLC, et al., <br><br> Defendants. | Case No. 3:15-cv-01749-TWR-AGS <br><br> <u>CLASS ACTION</u> <br><br> DATE: July 28, 2021 <br> TIME: 1:30 p.m. <br> CTRM: 3A/Third Floor <br> JUDGE: Hon. Todd W. Robinson <br> **Special Briefing Schedule Ordered** |
| RICHARD BARTLETT, et al., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> BP WEST COAST PRODUCTS LLC, et al., <br><br> Defendants. | Lead Case No. 18-cv-01374-TWR-AGS (consolidated with No. 18-cv-01377-TWR-AGS) <br><br> <u>CLASS ACTION</u> |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT ALON USA ENERGY, INC.'S MOTION FOR SUMMARY JUDGMENT

## [FILED UNDER SEAL]

4817-6835-7098.v1

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................... 1

II.     LEGAL STANDARDS .......................................................................... 3

III.    ARGUMENT ......................................................................................... 5

IV.     ALON HAS NOT DEMONSTRATED ENTITLEMENT TO
        SUMMARY JUDGMENT ...................................................................... 5

        A.    Alon's 2012 Shutdown ................................................................. 6

        B.    Alon Repeatedly Spread Misinformation to the Marketplace
              and Perpetuated Uncertainty About Alon's Role in the
              California Gasoline Market ......................................................... 9

        C.    Alon Was in Fact an Active Participant in the California Market ...... 13

        D.    Alon Repeatedly Shared and Received Confidential
              Information with Other Defendants ............................................. 16

        E.    Rather than Compete, Alon Received Favors from Defendants ........ 19

V.      CONCLUSION .................................................................................... 20

4817-6835-7098.v1

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) ...................................................................................... 5

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ...................................................................................... 4

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
620 F.2d 1360 (9th Cir. 1980) ...................................................................... 4

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) (White, J.) .................................................................... 4

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ...................................................................................... 4

*E. & J. Gallo Winery v. Encana Corp.*,
No. CV F 03-5412 AWI LJO, 2005 WL 8172963
(E.D. Cal. Aug. 15, 2005) ............................................................................. 3

*Home Depot U.S.A., Inc. v. E.I. DuPont de Nemours & Co.*,
No. 16-cv-04865-BLF, 2019 WL 3804667
(N.D. Cal. Aug. 13, 2019) ........................................................................... 19

*In re High-Tech Emp. Antitrust Litig.*,
856 F. Supp. 2d 1103 (N.D. Cal. 2012) ........................................................ 4

*Myers v. Allstate Indem. Co.*,
109 F. Supp. 3d 1331 (C.D. Cal 2015) .......................................................... 4

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*,
182 F.3d 157 (2d Cir. 1999) .......................................................................... 3

*Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*,
310 F. Supp. 3d 1089 (S.D. Cal. 2018) ......................................................... 5

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
803 F.3d 1084 (9th Cir. 2015) ...................................................................... 4

4817-6835-7098.v1

|  | Page |
|---|---|

*Tauscher v. Phoenix Bd. of Realtors, Inc.*,
  931 F.3d 959 (9th Cir. 2019) ...........................................................................4

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
  Rule 56(a) ...........................................................................................................3

## I. INTRODUCTION

Instead of meaningfully addressing Plaintiffs'[1] evidence, Alon[2] spills much ink in its motion for summary judgment rehashing its failed Rule 11 motion. Alon returns to previously rejected arguments that Plaintiffs failed to conduct a proper investigation before including them as a named defendant. Nevertheless, as has been the case throughout this litigation, Alon repeatedly regurgitates misleading claims that it is not part of the California gasoline market. At the same time, Alon argues that it is "unique" among the California refiners because its primary product is asphalt rather than gasoline.[3] ECF No. 615-1 at 9. These assertions simply ring hollow. In reality, Alon has more in common with the other California oil refiners than it does not have in common: namely the ability to make (and refrain from making) CARBOB, California's extremely lucrative special blend of gasoline. The ability to make CARBOB – and the choice not to – is a decision made by a producer in the market – and one made here by Alon as a participant in this conspiracy.

Alon tries to escape liability and camouflage its role in the conspiracy by insisting that in 2012 it ceased participating in the California gasoline market. This is misleading. Really, Alon admits that it *chose* to stop refining: "After December 2012, Alon did not conduct any refining operations in California because of

---

[1] "Plaintiffs" refers collectively to Persian Gulf Inc., David Rinaldi, Joshua Ebright and Paul Lee. References to "ECF No." are to the docket in *Persian Gulf Inc.* Case No. 3:15-cv-01749-TWR-AGS. Citations are omitted and added throughout, unless otherwise noted.

[2] "Alon" refers to Alon USA Energy, Inc. "Defendants" refers collectively to BP West Coast Products LLC ("BP"), Chevron U.S.A. Inc. ("CUSA"), Tesoro Refining & Marketing Company LLC ("Tesoro"), Equilon Enterprises LLC (d/b/a Shell Oil Products US) ("Shell"), Exxon Mobil Corporation and ExxonMobil Refining & Supply Co. ("ExxonMobil"), Valero Marketing and Supply Company ("Valero"), and Phillips 66.

[3] *See* Defendant Alon USA Energy, Inc.'s Memorandum of Points and Authorities in Support of its Motion for Summary Judgment, ECF No. 615-1.

unfavorable economic conditions in the asphalt market."[4] ECF No. 615-1 at 12. At a time profits were soaring, rather than expanding its refining activities, Alon voluntarily shut them down. In a move that befuddled at least one market analysist, rather than restarting refining activities as quickly as possible, Alon prolonged the shutdown of its California refineries and repeatedly mislead the market as to its status. In fact, Alon's statements and actions limited the supply of CARBOB in California and purposely perpetuated uncertainty about whether the refinery would come back online and make, among other things, CARBOB gasoline. However, after 2012, Alon's actual status as a market participant was far from finished. Alon continued to **blend** finished CARBOB at the facility, even when it was not actually refining raw petroleum. *Id.* at 12. During this time, the other Defendants and relevant media outlets continued to consider Alon's California refineries as a potential source of CARBOB gasoline. For this reason, Alon was monitored closely by Defendants, and OPIS, just as other California refiners were monitored.

During the class period, Alon repeatedly spread misleading information to the public about its activities. Plaintiffs have produced evidence suggesting that Alon was running its Bakersfield refinery when it publicly claimed otherwise. Alon was repeatedly complicit in exchanging confidential and proprietary information with the other Defendants. Further, Alon participated in various industry trade groups during the class period, which presented another opportunity to collude with the other Defendants.[5] Alon did all this during the same period when every other Defendant

---

[4] Even then, Plaintiffs' evidence suggests that Alon did not in fact cease its refining operations. References to "Ex." are to the exhibits attached to the Declaration of Patrick J. Coughlin in support thereof, filed concurrently. "DEx." references are to the Exhibits attached to the Declaration of Carl W. Hittinger, filed in support of Alon's motion, ECF No. 615-2.

[5] Alon tries to exploit the fact that it was not a member of Western States Petroleum Association, but ignores allegations that it was a member of other, critical trade groups where Plaintiff alleges coordinated conduct could be discussed. Alon was a member of the American Fuel & Petrochemical Manufacturers ("AFPM") at times critical to this case. *See* Defendant Alon USA Energy, Inc.'s Answer to Amended Complaint and Affirmative Defenses, ECF No. 115, ¶¶98-99, 103-104. In fact, Alon

was also shutting down their California refineries amid rising prices. Just like the other Defendants, Alon had the ability to blend and refine gasoline in California during the relevant time Period. Indeed, Alon's actions warrant increased scrutiny because Alon limited its gasoline production far longer than any other refiner. This decision represents one of the largest cumulative actions to reduce CARBOB production in California during the class period.

Alon's motion for summary judgment does little more than proclaim an unsupported decree that Plaintiffs have no evidence regarding Alon's role in this conspiracy. This is false. Plaintiffs have adduced evidence that Alon was part and parcel of the primary overt acts that fueled the alleged conspiracy in the spring of 2012 and thereafter remained an active participant in this conspiracy and the California gasoline market. There is sufficient evidence tending to exclude the possibility of independent, lawful conduct. Alon's motion for summary judgment must be denied.

## II. LEGAL STANDARDS

The party moving for summary judgment has both an initial burden of production and the ultimate burden of proving there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Because summary judgment is a 'drastic device' cutting off a party's right to present its case to a jury, the moving party bears a 'heavy burden' of establishing the absence of any triable issue of material fact." *E. & J. Gallo Winery v. Encana Corp.*, No. CV F 03-5412 AWI LJO, 2005 WL 8172963, at *1 (E.D. Cal. Aug. 15, 2005) (quoting *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999)). "In deciding a motion for summary judgment, the court must

actively met with other Defendants at meetings of trade groups it belonged to. Supply personnel of both Phillips and met together at AFPM events as late as 2016. *See* Ex. 1, PSXPGI01312090. Moreover, Alon personnel would meet other Defendants for "business opportunities" at the trade association meetings like AFPM, DEx. 4, Baker Dep. Tr. at 66:18-67:1; *id.* at 69:13-17; 69:24-70:3; 71:23-72:10; *see also* Ex. 2, ALON0652099.

view the evidence in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Myers v. Allstate Indem. Co.,* 109 F. Supp. 3d 1331, 1335 (C.D. Cal 2015) (citing *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 255 (1986)); *Tauscher v. Phoenix Bd. of Realtors, Inc.*, 931 F.3d 959, 962 (9th Cir. 2019)). "In antitrust cases, these general standards are applied even more stringently and summary judgments granted more sparingly." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1364 (9th Cir. 1980).

Most recently, the Ninth Circuit reaffirmed that "context is key" when considering circumstantial evidence of a conspiracy. *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1089 (9th Cir. 2015). "In antitrust conspiracy cases, 'plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each . . . . [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole . . . ." *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

Alon's motion for summary judgment does not even attempt to meet these high standards. Plaintiffs' evidence demonstrates that Alon was an active member of this conspiracy throughout the class period. Alon has no legitimate basis for summary judgment and ignores all of the evidence to argue that Plaintiffs have not carried a burden that belongs to them. Trial courts should act with caution in granting summary judgment, and they may deny it when there is reason to believe the better course would be to proceed to a full trial. *See Anderson*, 477 U.S. at 255 (White, J., concurring). "It is not enough to move for summary judgment . . . with a conclusory assertion that the [opposing party] has no evidence to prove his case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 328 (1986) (White, J. concurring). "If the moving party fails to discharge this initial burden, summary judgment must be denied, and the court

need not consider the nonmoving party's evidence." *Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 310 F. Supp. 3d 1089, 1104 (S.D. Cal. 2018) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970)).

## III. ARGUMENT

For years, Californians have witnessed spikes in gasoline and diesel fuel prices contrary to normal market forces of supply and demand. As Plaintiffs have detailed, multiple and various anticompetitive acts on the part of the major gasoline refineries on the West Coast are the cause of these anomalous and costly results. This case centers around specific time periods when the gasoline markets experienced a suspicious combination of constant demand, decreased (real or purported) production, increased prices, and increased inventories. "In a normally operating market, competitors use their existing inventory and production capacity to increase their individual market shares and/or to profit from any price increases caused by decreased supply from other competitors." [6] MTD Order at 7. This did not happen here. Instead, "Plaintiff's theory of the case is that Defendants conspired to create a false impression of reduced supply [of gasoline], when in fact they possessed the inventory and production capacity to supply the California market." *Id.* at 7. Another of the conspiracy's hallmarks was "Defendants' uniform practice of keeping to themselves the data concerning their industry and operations, including refinery shutdowns and planned output, while spreading misleading information to the public" because "[l]ack of reliable information renders a concentrated market more susceptible to manipulation." *Id.* at 6.

## IV. ALON HAS NOT DEMONSTRATED ENTITLEMENT TO SUMMARY JUDGMENT

Alon attempts to duck responsibility for its role in the conspiracy by trumpeting the canard that it is "undisputed" that Alon's participation in the California gasoline market ceased at the end of 2012. *See* ECF No. 615-1 at 8. Alon's sole justification is

---

[6] *See* Order Denying Motion to Dismiss ("MTD Order"), ECF No. 86.

that it stopped refining petroleum at its Bakersfield facility at the end of 2012. *Id.* at 16. But this camouflages reality. In fact, Alon remained an active, robust and constant participant in the California gasoline market, and in this conspiracy, throughout the class period, and Plaintiffs have uncovered significant evidence to confirm this.

### A. Alon's 2012 Shutdown

The first period of pronounced price manipulation at issue here occurred in the spring of 2012. A fire at a West Coast BP refinery on February 17, 2012, was closely followed by several other refineries either voluntarily remaining closed or engaging in voluntary maintenance shutdowns. This behavior was highly suspect because, as the Court has observed, in a competitive market, maintenance would have been postponed to take advantage of rising West Coast prices. MTD Order at 11. Leading up to the spring 2012 price spike, Alon participated in "Defendants' uniform practice of keeping to themselves the data concerning their industry and operations, including refinery shutdowns and planned output, while spreading misleading information to the public." MTD Order at 6. For example, on March 8, 2012, Alon issued a press release that represented that: "In light of the weak margin environment, we shut down the California refineries in December to make minor revisions to a hydrocracker . . . ." Ex. 3, ALON0456680 at 6680. Alon has repeated this representation about the December 2011 shutdown, but provides a different justification, contending that the shutdown was "[d]ue to a seasonal downturn in its primary asphalt market."[7] Leaving aside the contradicting explanations, both of these purported justifications are suspect because the representation of a December 2011 shutdown was highly suspect. As noted below, emissions data from the San Joaquin Valley Air Pollution Control District show that Alon's Bakersfield, California refinery was online until at least

_____

[7] *See* Memorandum of Points and Authorities in Support of Alon USA Energy Inc.'s Motion for Sanctions Under Rule 11 and 28 U.S.C. §1927, ECF No. 282-8 at 8.

February 15, 2012.[8] Indeed, instead of clarifying the matter, Alon took the opposite approach. Alon decided it would no longer comment on the day-to-day refinery operations. *See* Ex. 4, Alon Shuts California Refineries' Bakersfield Facility, *Dow Jones Energy Service*, dated January 18, 2012.

In fact, Alon did not shut down its Bakersfield refinery until almost exactly when BP shut down its West Coast refinery due to a fire. Thus, at a time when West Coast gasoline supplies were already constrained due to the BP fire, Alon chose to exacerbate the constraints by shutting down its Bakersfield refinery. This is precisely the kind of "'extreme action'" this Court reasoned would have been against Alon's self-interest "in the absence of an advance agreement" with others to also squeeze the market. MTD Order at 16. Alon's actions were so extreme, one of the analysts covering the company expressed his bewilderment during Alon's March 9, 2012 earnings call:

> I'm struggling a bit to understand why you're not operating the California system here in the first quarter, given what seems to be a decent environment that's developed year-to-date. So can you give us some help on what minimum parameters for crack spreads or crude spreads on the California feedstocks or asphalt margins are required to make that system economically viable?[9]

Ex. 6, ALON0003322 at 3329.

Alon's former Chief Executive Officer ("CEO") and President, Paul Eisman, responded to the question with more subterfuge:

> Yes. Gee, I don't know if I have that number, but I will tell you that you're right. I mean, margins have improved significantly on the West Coast, both as we got through this collapsed issue of these differentials but then also with the shutdowns, both for turnarounds and fires on the West Coast. We've seen significant improvements during

---

[8]  *See* Declaration of Robert F. McCullough ("McCullough Decl. to Rule 11 Opp."), ECF No. 294-13, ¶¶12-13.

[9]  Indeed, Alon appears to have ignored evidence regarding the economic viability of selling gasoline in California in 2012-2013. EAI, Inc. produced a report, given to Alon, concluding that, at then prevailing rates, Alon could have sold gasoline, at least in various parts of California, at a profit. *See* Ex. 5, ALON0046045 at slides 12-17. Inexplicably, Alon seems to have ignored this report, which at a minimum calls into question Alon's claims regarding the economics of operating in the California market.

the first quarter. And if we had known all that in advance, then we'd be running today. But I think the issue is that this happened recently – fairly recently, and you have to gear up to start buying crude. And we've got a 30- to 45-day lead time to purchase crude and plan to get the facilities restarted.

*Id.* at 3329-30. Eisman concealed the fact that according to the emissions data, Alon's Bakersfield refinery was operational at least during the first half of the first quarter of 2012. This fact reveals the deceptiveness of his "lead time" excuse. Moreover, even if Alon needed 30-45 days lead time after the February 17, 2012, BP fire, Bakersfield could have been up and running by early April at the latest. Yet, Alon prolonged the Bakersfield shut down weeks longer, and other refineries followed suit. From April 27, 2012 through August 6, 2012, other Defendants shut down one or more of their California refineries for at least six days.[10]

However, it is hardly clear when exactly Alon actually shut down the refinery. Emissions data from the San Joaquin Valley Air Pollution Control District also directly refutes, and creates an issue of genuine material fact, with respect to Alon's arguments about its refining operations. According to that data, on dates that Alon claims the Bakersfield refinery was closed, the continuous emissions monitoring data reported to the government show it was producing emissions, a sign that the refinery was operational, at least in some capacity, and for some period of time. McCullough Decl. to Rule 11 Opp., ¶¶12-13. The data from the San Joaquin Valley Air Pollution Control District specifically shows refinery operations during a time Alon claimed the refinery was shut down. *See* below:

---

[10] *See* First Amended Complaint for Violations of the Sherman Act, California's Cartwright Act, and Unfair Competition Law, ECF No. 76, ¶37.



*Id.*, ¶12.

This evidence is critical. As explained by Plaintiffs' expert Robert McCullough: "The Bakersfield hydrocracker depends on several other components in the refinery. One of these, the Selas heaters, are essential to the hydrogen generator unit (HGU). The hydrocracker, in turn, requires hydrogen as part of its role in cracking vacuum gasoil into gasoline and diesel." *Id.* at 4. Thus, this data, at a minimum, creates an issue of material fact as to whether Alon was refining product at a time when Alon claims the refinery was shut down.

**B.    Alon Repeatedly Spread Misinformation to the Marketplace and Perpetuated Uncertainty About Alon's Role in the California Gasoline Market**

Alon claims that it is "undisputed that Alon's participation in the California gasoline market ceased at the end of 2012." ECF No. 615-1 at 8. Though Alon has repeated this claim throughout this litigation, the contemporaneous evidence proves otherwise, and the issue is certainly one in dispute. The narrative in the marketplace, spread by Alon's own statements, was that it would resume its refining operations in California. During an earnings call in May 2013, Alon's CEO Eisman stated that with

respect to its California refineries, "[w]e'd put startup sometime in the third quarter, sometime in the third quarter of 2014. But I think, generally, that's the time you can look at some sort of disruption that greatly improved the margins out on the West Coast." Ex. 7, ALON0003399 at 3409. An Alon investor presentation from June 2014 provides that it would be "ceas[ing] refining operations for [an] interim period" – clearly implying that that the refinery will eventually come back online. *See* Ex. 8, TRMC-03287583 at 7598. That same presentation indicates that Alon's three California terminals were "providing services to third part[ies]" and includes discussion surrounding a proposed rail unloading facility that would allow the company options for "providing improved product slate (less asphalt) for refining assets." *Id.* Thus, as of June 2014, Alon intended to make more gasoline and motor fuels. Just a few months later in October 2014, Eisman reiterated Alon's intention to resume refining operations: "[W]e are developing processing alternatives for the Bakersfield refinery. During discussions with the county regarding the permit, we made it clear that our preferred outcome was the eventual restart of the refinery. . . . We certainly would like to see the profitable restart of the Bakersfield refinery, but there is much work to do before we are ready to make that decision." Ex. 9, ALON0003509 at 3513. This is yet another example of Alon confusing the market and investors as to whether its refinery would continue to make gasoline in the near future.

Media reports repeated this narrative – stemming ostensibly from Alon itself. OPIS publications from 2014 and 2016 are examples. An OPIS report from October 2014 provides that during a conference call regarding third quarter earnings and outlook, Eisman indicated that a "rail facility and refinery upgrade" were slated to begin in late 2015, at the earliest. Ex. 10, TRMC-00069859 at 9859. Then on May 5, 2016, OPIS confirmed that the company was only just then deferring a possible restart. "Alon – The company has deferred for now the possible restart of its shuttered 68,000-b/d refinery in Bakersfield, Calif., as well as construction of a crude oil rail

terminal there. Executives said on Feb. 25 it was unlikely the projects would proceed 'in the near future.' The rail terminal received its permit in Sept. 2014 but crude by rail economics began deteriorating as crude values collapsed in 2015. Restart of the refinery was to have followed completion of the rail terminal by about one year." Ex. 11, TRMC-00055032 at 5036. Tellingly, just days after the ExxonMobil Torrance refinery explosion, OPIS cites Alon as a potential source for needed product: "For now, Los Angeles traders and marketers will have to rely on West Coast refineries, besides Torrance and Martinez for gasoline supplies. Besides ExxonMobil and Tesoro, other refiners include Phillips 66, Alon, Shell, Valero." Ex. 12, TRMC-00198827 at 8828. This strongly implies that industry participants still viewed Alon as an active peer and expected a refinery restart.

The view from other Defendants is largely the same. According to internal Tesoro documents Alon was merely "idle" for the time being. *See* Ex. 13, TRMC-00087915 at 7929. Indeed, Alon represented itself having an active presence in California in communications with other Defendants during the same time it now claims it was not a market participant. *See* Ex. 14, CUSA_PG-BAR-000013661-3663. Other Defendants understandably viewed Alon as an active market participant as Alon represented itself as much. In discussions surrounding the nature of the Alon shutdown in April 2012, an employee in Alon's refining divisions confirmed to Phillips 66 that Alon was "getting ready for a restart currently." Ex. 15, ALON0021649 at 1649. *See also* Ex. 16, BPWC-PG-00170855 (January 2013 document from BP continued to track Alon's refinery outages alongside the other Defendants); Ex. 13, TRMC-00087915 at 7929 & Ex. 17, TRMC-00095271 at 5285 (Defendants continue to place Alon's refinery alongside other Defendants when analyzing California production). These 2014 & 2016 Tesoro presentations, note the refinery is merely idle. If Alon was not 'involved in the California gasoline market' as they claim, Defendants would not be interested in tracking its operations. If Alon did not consider itself a part of the California gasoline market, it certainly did not

communicate that to the industry at large, or the public. In light of Alon's commentary not only to the media and price reporting agencies, but to the California refining industry at large, including the other Defendants, the California gasoline market continued to view Alon's California refineries as a potential source of CARBOB gasoline.

Like the other Defendants' outages, Alon repeatedly provided misleading information and statements to the public about whether the refinery would come back online. The record is replete with information regarding statements made about the refinery, its opening and closings, as well as materials showing that during the relevant time period Alon had both, the ability and stated intention to reopen the refinery. Alon's ultimate decision to permanently idle the facility does not negate the nearly four years of public representations that the refinery would be restarted in the near future. This prolonged period of uncertainty about the refinery advanced the conspiracy in the same way the other Defendants' misleading outages did: creating price volatility and keeping out third-party imports to resupply the state during gasoline shortages. As this Court has recognized: "Plaintiff's theory of the case is that Defendants conspired to create a false impression of reduced supply, when in fact they possessed the inventory and production capacity to supply the California market." MTD Order at 7. In addition, "[l]ack of reliable information renders a concentrated market more susceptible to manipulation." *Id.* at 6. It is apparent that Alon committed the primary overt acts that fueled this conspiracy in the spring of 2012: it voluntarily shut down refining activities when it should have been expanding them, it prolonged the shut down when it should have restarted as quickly as possible, it repeatedly spread misleading information to the public about its intent and operational activities – and it did all this during the same period when every other Defendant also shut down their California refineries amid rising prices.

### C. Alon Was in Fact an Active Participant in the California Market

Notwithstanding claims that Alon was not a market participant, the evidence shows that the company benefitted from the conspiracy by continuing to blend and trade gasoline and diesel for sale in California. *See* Ex. 18, SOPUS_PGI_00442258 at 2258; Ex. 19, SOPUS_PGI_00474231 at 4231; Ex. 20, SOPUS_PGI_00377374; Ex. 14, CUSA_PG-BAR-000013661 at 3663; Ex. 21, SOPUS_PGI_00438730 at 8732; Ex. 22, SOPUS_PGI_00058938 at 8939; Ex. 23, EM_PG000001832 at 1833; Ex. 24, TRMC-00201849 at 1850; Ex. 25, TRMC-00034876 at 4880; Ex. 26, VMSC_003379; Ex. 8, TRMC-03287583 at 7598; Ex. 27, Alon 2013 Form 10-K at 7; Ex. 28, Alon 2016 Form 10-K at 5. The company's physical assets were used to store gasoline and diesel, and as a location for selling fuel to third parties. *See id.* Alon admits as much in its motion for summary judgment, noting that it "continued to use equipment at Bakersfield to blend finished gasoline to meet its preexisting contractual commitments in the local market." ECF No. 615-1 at 12. Many of its operations in California were conducted in conjunction with the other Defendants through long-term agreements.[11] Documents from the Defendants, and industry trade publications, show that Alon's operations were closely monitored.[12] Notably, this is owed to the fact that any refinery represents a critical piece of California's production capabilities in the gasoline market. Post 2012, regulators at the California Energy Commission

---

[11] *See* Ex. 18, SOPUS_PGI_00442258 at 2258; Ex. 19, SOPUS_PGI_00474231 at 4231; Ex. 20, SOPUS_PGI_00377374; Ex. 14, CUSA_PG-BAR-000013661 at 3663; Ex. 21, SOPUS_PGI_00438730-8733; Ex. 22, SOPUS_PGI_00058938 at 8939; Ex. 23, EM_PG000001832 at 1833; Ex. 24, TRMC-00201849 at 1850; Ex. 25, TRMC-00034876 at 4880; Ex. 26, VMSC_003379.

[12] *See* Ex. 29, *Oil Market Report*, International Energy Agency (Apr. 12, 2012) at 49; Ex. 30, CUSA_PG-BAR-000030628; Ex. 31, CUSA_PG-BAR-000029965 at 9966; Ex. 10, TRMC-00069859; Ex. 11, TRMC-00055032 at 5036; Ex. 12, TRMC-00198827 at 8828; Ex. 16, BPWC-PG-00170855; Ex. 32, TRMC-01070244; Ex. 13, TRMC-00087915 at 7929 & Ex. 17, TRMC-00095271 at 5285.

continued to reference the Alon refineries as operational until at least 2016, mirroring statements made by the company itself.[13]

Central to Plaintiffs' claims, Alon's continued sales and operations allowed it to benefit from the higher wholesale and retail gasoline prices that resulted from the conspiracy. Documents from 2015 show that Alon continued to form contracts with other Defendants in California during this time. Ex. 22, SOPUS_PGI_00058938 at 8939. Indeed, that same year ExxonMobil reached out to Alon regarding various business opportunities, including the potential to allow Alon access to Exxon's low-sulphur vacuum gasoil[14] ("LSVGO") pipeline customers, who include the other Defendants in this litigation. *See* Ex. 23, EM_PG000001832 at 1833. As vacuum gasoil is a component in production of gasoline, allowing Alon access to Exxon's LSVGO pipeline customers would seemingly allow Alon the opportunity to transact with the other Defendants for a component used in the production of gasoline in California. Such an arrangement creates a uniquely integrated system between and among Defendants, including Alon – consistent with the conspiracy alleged by Plaintiffs. *Id*. Scores of other documents reflect Alon's active, robust participation in the California gasoline market post-2012. *See, e.g.*, Ex. 18, SOPUS_PGI_00442258 (2015 emails between Shell and Paramount[15] discussing ongoing purchase agreement for CARBOB); Ex. 19, SOPUS_PGI_00474231 (December 2015 email from Alon's Supply, Trading, and Business Development lead, George Stutzmann to Shell, writing, "we are in the process of blending 12,000 b of regular gasoline. Do you want additional? . . . Please confirm if you need additional gasoline volumes for January as well . . ."; Ex. 20, SOPUS_PGI_00377374-7376 (trade confirmation dated, August 21,

---

[13] *See* Exs. 33-35.

[14] LSVGO is typically used as a feedstock for fluid catalytic cracking (FCC) units in order to yield gasoline and other high-octane components.

[15] Paramount is one of the two Los Angeles area refineries owned by Alon. *See* ECF No. 615-1 at 9.

3:15-cv-01749-TWR-AGS

2019, that lists Paramount as the seller and Shell as the buyer of 25,000 barrels of CARBOB under long-term existing contract); Ex. 14, CUSA_PG-BAR-000013661 at 3663 (Alon product trader, Edie Atwell emails Chevron's California gas trader, Irene Gessling requesting product and confirming "we have a refinery in Texas, Louisiana, and California"); Ex. 21, SOPUS_PGI_00438730 at 8732 (Emails in 2013 which Shell employees write: "We were just told by the Alon rack the Regular is out till May 1. Premium is available to load . . . Alon is saying that they are working on getting product back into the terminal, and will advise when they have more details."); Ex. 22, SOPUS_PGI_00058938 at 8939 (internal Shell email providing updates on the gasoline market and listing "Bakersfield Alon" under California notes, along with other operational California refineries); Ex. 36, ALON0003663 (Alon letter dated, January 27, 2015, notifying Shell of cancellation of contract for purchase and sale of gasoline, effective January 27, 2016); Ex. 37, ALON0270386 at 0386 (February 2013 email from Alon's Stutzmann confirming Alon's participation in, and intent to continue operations in California. He writes: "California sourcing will need to likely shift to shorter haul routes that do not have yet have unit train capability, such as Permian, New Mexico, Utah, Western Canadian, etc. to be competitive."); Ex. 38, ALON0186148 at 6151 (March 2013 emails, including trade confirmation deal sheet showing Alon bought, and P66 sold 25,000 barrels of alkylate, which is a component in the production of CARBOB gas); Ex. 39, ALON0219214 at 9214 (April 22, 2013 purchase contract showing Valero as the seller and Paramount as the buyer of 25,000 barrels of CARBOB); Ex. 40, ALON0006572 at 6572 (April 2013 emails in which Shell's exchange coordinator asks Alon: "Any updates on regular and premium supply availability at Bakersfield" to which Alon replied, "[a]t Bakersfield we currently have 5000 barrels of Premium and plan to make up to 5000 barrels more."); Ex. 41, ALON0027211 at 7211 (April 2013 email showing Alon bought and Valero sold 25,000 barrels of gasoline); Ex. 42, ALON0950165 at 0165 (BP's Rob Stevens reaches out to Alon showing interest in Alon terminaling facility in Bakersfield.

Stutzmann writes internally: "We will need to create a draft terminaling agreements for Paramount and Bakserfield."); Ex. 43, ALON0010154-0155 (June 2013 emails between Alon and Shell regarding Alon-Shell terminal purchase forecast); and Ex. 44, ALON0014389 at 4389 (Email from P66 Mike Wailes to Alon's Stutzmann: "As discussed, we are currently moving forward with some projects in California and it would be good to have the Alon options to look at side-by-side with these. Please could I get draft term sheets that cover what you outlined at lunch for both Paramount and potentially Long Beach (from November, post Valero) plus the key terms . . . . ").

In its 2016 Form 10-K (year ending December 31, 2015), Alon freely acknowledged that its "California refineries have the capability to produce gasoline, distillates, vacuum gas oil and asphalt." *See* Ex. 28, Alon 2016 10-K at 4. Thus, Alon concedes that it was capable of making gasoline in California or refraining from doing so. Regardless, Alon participated in the California gasoline market by either increasing or decreasing supply, and as evidenced by the myriads of documents produced in this litigation showing Alon's participation therein. This is critical because Plaintiffs allege that one facet of the conspiracy involved Defendants manipulating prices of gasoline in California by cooperatively undersupplying gasoline to the California market. Moreover, also in its 2016 10-K, Alon acknowledged that its "California refineries utilize product pipelines, truck racks and terminals to distribute refined products." *Id.* at 5.

### D. Alon Repeatedly Shared and Received Confidential Information with Other Defendants

Alon claims in a particularly conclusory fashion that "[t]here is no evidence that Alon provided any confidential information to any other Defendants." ECF No. 615-1 at 18. On the contrary, the evidence shows that not only did Alon share confidential and proprietary business information, it did so in violation of its own Code of Business Conduct and Ethics:

> We protect our Company's confidential information. Confidential information includes proprietary information such as our business plans,

> marketing plans, procurement plans, capital budgets, strategic initiatives, other business strategies, sales forecasts, financial forecasts and other financial data, engineering, process and manufacturing ideas and designs, customer and supplier data, trade secrets, books, records, files and databases, as well as any non-public information that might be of use to competitors or harmful to us or our customers if disclosed. It also includes information that suppliers and our customers have entrusted to us on a confidential basis.

*See* Ex. 45, ALON0978301 at 8305.[16] Still, Alon regularly violated its own code of ethics. In one example, Alon improperly shared confidential information with Phillips 66. In late April 2012, a Phillips 66 employee wrote to Mark Denis of Alon, "[l]ast I heard you guys were shut down for economic reasons," and added that as for Phillips' operations, "[w]e are back end of a site wide T/A, looks like we will finish on time as well (five weeks)." Denis replied with information that had not yet been made available to the public, and in violation of Alon's Code of Business Conduct and Ethics he wrote, "[w]e are getting ready for a restart currently." Ex. 15, ALON0021649 at 1650. In response, Curl wrote: "Good to here [sic] you will be restarting the site, be good for the area." *Id.* at 1649. This directly violates Alon's own policy of protecting "any non-public information that might be of use to competitors." Ex. 45, ALON0978301 at 8305. In other words, Curl recognized that a restart of Alon's refinery meant an increase in supply to the already strapped California market. A competitor provided with this type of information ahead of the general market has an unfair advantage in that it's able to make real-time decisions surrounding its purchase and sale of gas, with the foresight that supply is likely to increase in the near future, and which in a competitive market, results in decrease in price. Alon and Defendants mutually provided each other with this type of inside

---

[16] This same document Alon also makes a strange claim regarding antitrust compliance: "We are committed to fostering free market competition and preserving the free enterprise system. We do not discuss or engage in price fixing or bid rigging, allocation of markets, geographically or by customer, or the fixing of production or quotas for production. We also do not exchange information with our competitors regarding prices, market share, cost data, or any other data the exchange of which would be considered in violation of antitrust laws. Questions regarding antitrust matters should be directed to our General Counsel." *Id.* at 8304. Indeed, the evidence suggests Alon violated this policy repeatedly.

information, thereby shielding themselves from competition outside of the conspiracy and other market participants.

In another instance, Valero improperly shared confidential information with Alon. In a 2013 email to Stutzmann with a subject line "Increasing throughput at Long Beach," a Valero employee provided significant details surrounding Valero's refinery maintenance work, including that "[t]he ramp up has been slower than we would have liked, but we now have crude supply opportunities in place to increase to two switches per day." Ex. 46, ALON0011062 at 1062. Again, having this information afforded Alon an opportunity that others outside the conspiracy were not provided – a vision into the proposed re-start of a major refinery's operations, the re-start of which ultimately results in fluctuations in both supply and prices in the California market. Alon also received confidential information regarding the shuttering of Shell's California refinery. Shell wrote, "just a reminder that starting at 1am on Monday, 4/25, we will be shutting down the entire refinery for the week." Ex. 47, ALON0102459 at 2459. In one of the more flagrant violations, an ExxonMobil employee emailed Dave Baker (Alon Trader) to follow up on an earlier conversation about Alon possibly using a certain Exxon formulation to produce CARB diesel. Baker shared, "[w]e produce about 5 – 15 mbd [thousand barrels] of carb diesel depending on refinery operations etc. [and are] ready now (or in the next month or so) to evaluate and make decisions on a new formulation." Ex. 48, ALON0014117 at 4117. Other examples abound. *See, e.g.*, Ex. 49, ALON0014995 (Alon trader Baker sharing with Shell that its Hydrocracker [refinery gasoline production unit] was in the final stages of starting up and informing that Alon had a meeting the following day at which time Baker would "be more precise on 'product rack ready' date."); Ex. 50, ALON0011807 at 1808 (Alon's Stutzmann writes that he "spoke with BP" and they are "exporting a multitude of Canadian crudes and would like to know our limitations." BP then forwards Alon non-public information and asks that it not be forwarded); Ex. 51, ALON0186606 (Internal Alon emails regarding "[i]nteresting talk

w Valero," writing that, "Jeff at Valero has heard that Paramount has been shut down for good. When I told him we were restarting in Q1 sometime he was surprised. . . . I wonder if many folks out there think we are not going to start up again at all."); Ex. 52, ALON0139059 (email comparing Alon and Chevron gas balances measured by cubic feet); Ex. 53, ALON0015206 (emails between Baker and Valero, in which Valero trader informs "we are having a difficult time managing our own rvp issues and suboctane program. In the spirit of helping out a fellow refiner, we can pursue further"); Ex. 54, ALON0027107 at 7109 (emails between Alon and Chevron discussing industry source reporting a power outage at Exxon facility and in which Alon asks Chevron to follow up with Exxon as "this will definitely impact us if it's true."); Ex. 55, ALON0011092 (Shell specifically seeking shutdown/turnaround information for the balance of the year).

### E. Rather than Compete, Alon Received Favors from Defendants

True competitors work to gain an advantage over their rivals and take risks to better their position in the marketplace. Defendants avoided taking risks by sharing the risks amongst themselves, refusing to challenge the status quo. What Alon and the other Defendants did is akin to the "'co-opertition" seen as a plus factor in *Home Depot*, where "they sold titanium dioxide to each other at below market prices and swapped raw materials needed for manufacture." *Home Depot U.S.A., Inc. v. E.I. DuPont de Nemours & Co.*, No. 16-cv-04865-BLF, 2019 WL 3804667, at *9 (N.D. Cal. Aug. 13, 2019). Crucially, this was "conduct that normally would not be expected between market rivals," *id.*, which also describes much of Defendants conduct here. Numerous examples of Defendants performing such anticompetitive favors for one another – favors against their own economic self-interest – are thoroughly detailed in Plaintiffs' Opposition to Defendants' Joint Motion for Summary Judgment. In one compelling instance specific to Alon, Alon's Dave Baker attempts to sell product to Valero and Valero makes an express and unequivocal

statement that the "[p]lanners and blenders don't want it."[17] Ex. 57, ALON0009540 at 9540. Indeed, Valero expresses legitimate business reasons – namely that it was having "a difficult time managing our own rvp issues and suboctane program." *Id*. Still, Valero agreed to pursue [the opportunity] further "in the spirit of helping out a fellow refiner" and stated "the price idea would be ugly." *Id*. Even though Valero had no compelling or economically sensible reason to purchase this product, or "pursue the opportunity further," it did so solely as a favor to its fellow market participant, Alon. Not only were these actions taken against the Defendants' own interests, but they tend to exclude the possibility of independent conduct and demonstrates Alon was part of the conspiracy.

## V. CONCLUSION

Alon downplays and camouflages its role in the California gasoline market and this conspiracy. But Alon repeatedly mislead the market and exchanged confidential information in an attempt to manipulate the gasoline market. Alon's motion, as with the rest of Defendants' summary judgment motions should be denied.

DATED: May 28, 2021

Respectfully submitted,

ROBBINS GELLER RUDMAN
 & DOWD LLP
PATRICK J. COUGHLIN
STEVEN W. PEPICH
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
LONNIE A. BROWNE

s/ Patrick J. Coughlin
PATRICK J. COUGHLIN

---

[17] Though it is actually unclear what product is being exchanged here, deposition testimony suggests it may have been "[l]ight straight run Naphtha," which is described as "the base product of gasoline that needs to be upgraded, needs to be desulfurized and blended and added . . . additives put into it. It's just like straight run gasoline." Ex. 56, Nader Dep. Tr. at 75:7-12.

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

HARTLEY LLP
JASON S. HARTLEY
101 West Broadway, Suite 820
San Diego, CA 92101
Telephone: 619/400-5822
619/400-5832 (fax)

Attorneys for Plaintiff Persian Gulf Inc.

DATED: May 28, 2021

ROBBINS LLP
GEORGE C. AGUILAR
MICHAEL J. NICOUD

s/ George C. Aguilar
GEORGE C. AGUILAR

5040 Shoreham Place
San Diego, CA 92122
Telephone: 619/525-3990
619/525-3991 (fax)

Attorneys for Plaintiffs David Rinaldi,
Joshua Ebright, and Paul Lee

## SIGNATURE CERTIFICATION

Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures Manual, I hereby certify that the content of this document is acceptable to the above signatories, and that I have obtained each of the foregoing person's authorization to affix his or her electronic signatures to this document.

Dated: May 28, 2021

s/ Patrick J. Coughlin
PATRICK J. COUGHLIN