ROBBINS GELLER RUDMAN & DOWD LLP
PATRICK J. COUGHLIN (111070)
STEVEN W. PEPICH (116086)
ALEXANDRA S. BERNAY (211068)
CARMEN A. MEDICI (248417)
LONNIE A. BROWNE (293171)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
patc@rgrdlaw.com
stevep@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com
lbrowne@rgrdlaw.com

Attorneys for Plaintiff Persian Gulf Inc.
[Additional counsel appear on signature page.]

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERSIAN GULF INC., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> BP WEST COAST PRODUCTS LLC, et al., <br><br> Defendants. | Case No. 3:15-cv-01749-TWR-AGS <br><br> <u>CLASS ACTION</u> <br><br> DATE: July 28, 2021 <br> TIME: 1:30 p.m. <br> CTRM: 3A/Third Floor <br> JUDGE: Hon. Todd W. Robinson <br> **Special Briefing Schedule Ordered** |
| RICHARD BARTLETT, et al., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> BP WEST COAST PRODUCTS LLC, et al., <br><br> Defendants. | Lead Case No. 18-cv-01374-TWR-AGS (consolidated with No. 18-cv-01377-TWR-AGS) <br><br> <u>CLASS ACTION</u> |

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO JOINT MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS CHEVRON U.S.A. INC., PHILLIPS 66, EQUILON ENTERPRISES LLC (D/B/A SHELL OIL PRODUCTS US), AND VALERO MARKETING AND SUPPLY CO.

**[REDACTED]**

4827-1942-6539.v1

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...................................................................................... 1

II. LEGAL STANDARDS ............................................................................. 4

III. THE EVIDENCE UNCOVERED WOULD LEAD A JURY TO CONCLUDE DEFENDANTS CONSPIRED ............................................... 9

    A. Defendants Routinely Exchanged Confidential, Proprietary Information............................................................................................. 9

        1. Defendants, And Especially Their Traders, Routinely Shared Confidential Information with Their Competitors ....... 10

        2. Defendants Colluded at Trade Association Events .................. 13

        3. Defendants' Sharing of Information Regarding Refinery Outages and Maintenance Gave Them an Unfair Advantage ................................................................................ 15

        4. Defendants Had Superior Information Compared to Would-be Competitors ............................................................ 20

    B. Defendants Took Extreme Actions Against Self Interest.................. 22

        1. Rather than Compete, Defendants Provided Favors to Each Other and Maintained the Status Quo ........................... 22

        2. Defendants Perpetually Ran Their Refineries Below Capacity, Strangling Output ...................................................... 26

        3. Defendants Engaged in Collusive Action Regarding Coordinating and Discouraging Imports of Gasoline............... 28

        4. Defendants Engaged in Collusive Efforts to Export Gasoline out of California ....................................................... 33

        5. Exchange Agreements were Used and Abused By Defendants to Monitor and Police the Conspiracy.................. 37

    C. Suspect Trading Practices Demonstrate Collusion............................ 45

        1. Selective Price Reporting ....................................................... 45

        2. Wash Trades ........................................................................... 47

    D. Defendants' Actions in Response to the ExxonMobil Torrance Outage in 2015 Demonstrates the Conspiracy.................................. 49

IV. DEFENDANTS' REMAINING ARGUMENTS FAIL ............................. 53

    A. There Are Triable Issues of Fact as to Antitrust Injury .................... 53

3:15-cv-01749-TWR-AGS

|  |  | **Page** |
|---|---|---|
| | B. California Attorney General Investigation and Findings of the CEC are Not Relevant | 56 |
| V. | PLAINTIFFS' EVIDENTIARY OBJECTIONS | 57 |
| | A. Defendants' Declarations Suffer From Serious Infirmities | 57 |
| VI. | CONCLUSION | 60 |

4827-1942-6539.v1

3:15-cv-01749-TWR-AGS

**CASES**

*Aguilar v. Atl. Richfield, Co.*,
    25 Cal. 4th 826 (Cal. 2001) ........................................................................................ 39

*Aguilar, Aguilar v. Atl. Richfield, Co.*,
    2000 WL 1475849 (Cal. July 31, 2000) ...................................................................... 39

*Alvarez v. Hill*,
    518 F.3d 1152 (9th Cir. 2008) ...................................................................................... 7

*Am. Timber & Trading Co. v. First Nat'l Bank of Or.*,
    690 F.2d 781 (9th Cir. 1982) ........................................................................................ 7

*Apex Oil Co. v. Di Mauro*,
    822 F.2d 246 (2d Cir. 1987) ....................................................................................... 12

*B & R Supermarket, Inc. v. Visa, Inc.*,
    2016 WL 5725010 (N.D. Cal. Sept. 30, 2016) ............................................................ 13

*Bank Melli Iran v. Pahlavi*,
    58 F.3d 1406 (9th Cir. 1995) ...................................................................................... 58

*Barthelemy v. Air Lines Pilots Ass'n*,
    897 F.2d 999 (9th Cir. 1990) ...................................................................................... 58

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
    620 F.2d 1360 (9th Cir. 1980) ...................................................................................... 5

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*,
    974 F.2d 1358 (3d Cir. 1992) ....................................................................................... 5

*Boyd v. City of Oakland*,
    458 F. Supp. 2d 1015 (N.D. Cal. 2006) ...................................................................... 58

*Burch v. Regents of Univ. of Cal.*,
    433 F. Supp. 2d 1110 (E.D. Cal. 2006) ...................................................................... 60

*Casey v. Lewis*,
    4 F.3d 1516 (9th Cir. 1993) ........................................................................................ 59

4827-1942-6539.v1

| | Page |
|---|---|

*Commonwealth of Kentucky v. Marathon Petroleum Co., LP*,
191 F. Supp. 3d 694 (W.D. Ky. 2016) ................................................................. 39

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ............................................................................................... 5

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
773 F.2d 1506 (9th Cir. 1985) ............................................................................. 54

*FDIC v. N.H. Ins. Co.*,
953 F.2d 478 (9th Cir. 1991) ............................................................................... 58

*Friedman v. Live Nation Merch., Inc.*,
833 F.3d 1180 (9th Cir. 2016) ............................................................................... 4

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016) ................................................................................ 12

*Groppi v. Barham*,
157 F. App'x 10 (9th Cir. 2005) ........................................................................... 60

*Hom, Tr. of the Allen Ernest Hom Tr. v. RBB Bancorp*,
2019 WL 4266557 (S.D. Cal. Jan. 24, 2019) ........................................................ 5

*Home Depot, U.S.A., Inc. v. E.I. DuPont de Nemours & Co.*,
2019 WL 3804667 (N.D. Cal. Aug. 13, 2019) ............................................ *passim*

*Hoye v. City of Oakland*,
653 F.3d 835 (9th Cir. 2011) ............................................................................... 58

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) ................................................................................ 20

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) ........................................................................... 5, 6

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
801 F.3d 758 (7th Cir. 2015) .......................................................................... 19, 20

4827-1942-6539.v1

**Page**

*In re Ethylene Propylene Diene Monomer (EDPM) Antitrust Litig.*,
681 F. Supp. 2d 141 (D. Conn. 2009) ...................................................................... 38

*In re Flash Memory Antitrust Litig.*,
643 F. Supp. 2d 1133 (N.D. Cal. 2009) ................................................................... 13

*In re High-Tech Emp. Antitrust Litig.*,
856 F. Supp. 2d 1103 (N.D. Cal. 2012) ..................................................................... 5

*In re Lidoderm Antitrust Litig.*,
2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ............................................................ 54

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
988 F. Supp. 2d 696 (E.D. La. 2013) ...................................................................... 40

*In re Processed Egg Prods. Antitrust Litig.*,
81 F. Supp. 3d 412 (E.D Pa. 2015) .......................................................................... 55

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
2010 WL 5141861 (N.D. Cal. Dec. 13, 2010) ........................................................ 55

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
264 F.R.D. 603 (N.D. Cal. 2009)
*amended in part*, 2011 WL 3268649
(N.D. Cal. July 28, 2011) ......................................................................................... 53

*In re Sunset Bay Assocs.*,
944 F.2d 1503 (9th Cir. 1991) .................................................................................. 59

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2012 WL 6708866 (N.D. Cal. 2012),
*aff'd*, 637 F. App'x 981 (9th Cir. 2016) .................................................................... 7

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
267 F.R.D. 583 (N.D. Cal. 2010) ............................................................................. 53

*In re Titanium Dioxide Antitrust Litig.*,
959 F. Supp. 2d 799 (D. Md. 2013) ....................................................................... 6, 8

4827-1942-6539.v1

**Page**

*In re Urethane Antitrust Litig.*,
166 F. Supp. 3d 501 (D.N.J. 2016) ..................................................................55

*Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce,
Fenner & Smith Inc.*,
340 F. Supp. 3d 285 (S.D.N.Y. 2018) ..............................................................12

*Kleen Prods. LLC v. Int'l Paper*,
276 F. Supp. 3d 811 (N.D. Ill. 2017) ...............................................................20

*Krehl v. Baskin-Robbins Ice Cream Co.*,
664 F.2d 1348 (9th Cir. 1982) ..........................................................................20

*Marathon Oil Co. v. Mobil Corp.*,
669 F.2d 378 (6th Cir. 1981) ............................................................................39

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ............................................................................................9

*Orr v. Bank of Am.*,
285 F.3d 764 (9th Cir. 2002) ............................................................................59

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*,
945 F.3d 1076 (9th Cir. 2019) ............................................................................7

*Pashoian v. GTE Directories*,
208 F. Supp. 2d 1293 (M.D. Fla. 2002) ...........................................................59

*Persian Gulf Inc. v. BP W. Coast Prods. LLC*,
324 F. Supp. 3d 1142 (S.D. Cal. 2018) ..........................................................1, 9

*Petruzzi's IGA Supermarkets, Inc. v. Darling – Delaware Co., Inc.*,
998 F.2d 1224 (3d Cir. 1993) ..........................................................................5, 8

*Ricks v. BMEzine.com, LLC*,
727 F. Supp. 2d 936 (D. Nev. 2010) .................................................................60

*Safeway v. Abbott Lab's*,
761 F. Supp. 2d 874 (N.D. Cal. 2011) ................................................................7

3:15-cv-01749-TWR-AGS

4827-1942-6539.v1

| | Page |
|---|---|
| *School Dist. No. 1J v. ACandS, Inc.*,<br>5 F.3d 1255 (9th Cir. 1993) | 59 |
| *St. Louis Condo. Ass'n v. Rockhill Ins. Co.*,<br>2019 WL 2013136 (S.D. Fla. Mar. 7, 2019) | 59 |
| *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,<br>803 F.3d 1084 (9th Cir. 2015) | 5, 6, 9, 10 |
| *Tauscher v. Phx. Bd. of Realtors, Inc.*,<br>931 F.3d 959 (9th Cir. 2019) | 4 |
| *United States v. Apple Inc.*,<br>2013 WL 1845733 (S.D.N.Y. Apr. 30, 2013) | 9 |
| *United States v. Gen. Motors Corp.*,<br>384 U.S. 127 (1966) | 9 |
| *United States v. Masonite Corp.*,<br>316 U.S. 265 (1942) | 9 |
| *United States v. Perez*,<br>491 F.2d 167 (9th Cir. 1974) | 8 |
| *United States v. Zamorano-Leyva*,<br>220 F. App'x 557 (9th Cir. 2007) | 8 |
| *Wilcox v. First Interstate Bank of Or.*,<br>815 F.2d 522 (9th Cir. 1987) | 6 |
| *William Inglis & Sons Baking Co. v. Cont'l Baking Co.*,<br>942 F.2d 1332 (9th Cir. 1991),<br>*vacated in part on other grounds*, 981 F.2d 1023<br>(9th Cir. 1992) | 54 |
| *William Inglis Sons Baking Co. v. ITT Cont'l Baking Co.*,<br>668 F.2d 1014 (9th Cir. 1981) | 7 |
| *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,<br>395 U.S. 100 (1969) | 55 |

4827-1942-6539.v1

|  | **Page** |
|---|---|

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §1 ............................................................................................ 7, 8, 9
  §2 ................................................................................................... 7

Federal Rules of Civil Procedure
  Rule 26 .......................................................................................... 60
  Rule 56 .......................................................................................... 58

Federal Rules of Evidence
  Rule 602 ........................................................................................ 59
  Rule 801(2) .................................................................................... 11
  Rule 803 ........................................................................................ 11

**SECONDARY AUTHORITIES**

ABA Section of Antitrust Law, *Proof of Conspiracy Under Federal
  Antitrust Laws* (2010) .............................................................. 8, 40

William E. Kovacic, *et al.*, *Plus Factors and Agreement in Antitrust
  Law*, 110 Mich. L. Rev. 393, 423 (2011) ..................................... 38

ABA Section of Antitrust Law (2017),
  *Proving Antitrust Damages: Legal and Economic Issues*,
  3rd ed., American Bar Association, Ch. 4, §B ............................... 56

3:15-cv-01749-TWR-AGS

4827-1942-6539.v1

## I.    INTRODUCTION

Since at least 2012, Californians have paid higher gasoline prices than the rest of the nation, facing frequent price spikes.  This problem only intensified when the 2015 explosion of ExxonMobil's Torrance refinery provided Defendants with another scapegoat to blame for the effects of their longstanding collusion.  Far from a complicated, implausible scheme, Defendants' conspiracy had a simple goal: rather than risk competing, Defendants would cooperate to throttle gasoline supply in California, so that they could profit from supracompetitive prices.  To that end, they regularly shared detailed confidential information regarding refinery operations to guarantee they understood California's supply needs at any given time better than any outsiders.  They worked together to discourage imports, increase exports, keep their refineries running under capacity, and manipulate prices through their trading activity. And when one of the Defendants had an outage, the others were there to help through a network of exchange agreements, ensuring they would not be caught short or have to pay competitive prices to meet their needs.

Defendants have reaped billions in profits from their scheme, and the massive price spike seen after the Torrance explosion has never returned to normal.  The multi-billion dollar impact of Defendants' scheme was recognized by an academic with no connection to Plaintiffs or their counsel – Professor Severin Borenstein[1] of UC Berkeley – who demonstrated that factors internal to refiners, and not externalities, caused these higher prices.  In 2019, he calculated that nearly 40 cents of California's gasoline price above the national average could not be accounted for by any taxes.[2]

---

[1] Borenstein was appointed Chair of the California Energy Commission's Petroleum Market Advisory Committee dedicated to analyzing gasoline prices in California. Ex. 1, https://newsroom.haas.berkeley.edu/news-release/california-energy-commission-appoints-energy-institute-haass-severin-borenstein-chair/. References to "Ex." are to the exhibits attached to the Declaration of Alexandra S. Bernay, filed concurrently, unless noted otherwise. References to "ECF No." are to *Persian Gulf*, No. 3:15-cv-01749-TWR-AGS.

[2] Ex. 2, https://energyathaas.wordpress.com/2019/05/20/the-mystery-gasoline-surcharge-gets-some-respect/.

4827-1942-6539.v1

Borenstein calculated that the differential sat at 2 cents per gallon between 2000 and 2014, before skyrocketing in 2015 and perpetually staying over 20 cents in the years since. The number is extraordinary, considering over a billion gallons of gasoline are sold per month in California.[3] This financial impact has now been confirmed through the detailed econometric analyses of Plaintiffs' experts. While Professor Borenstein termed this California's "Mystery Gasoline Surcharge," (Ex. 2) the evidence developed in discovery, along with the analysis by Plaintiffs' experts, confirm that the cause of these billions of dollars in overcharges was Defendants' anticompetitive conduct.

Defendants' conspiracy was implemented in part by a tightly-woven network of their traders. These traders hold a critical role in the market, making sure the respective companies have adequate supply to meet ongoing commitments, as well as trading for speculative gain. In theory, these traders are bound by strict confidentiality rules when engaging with counterparties. But in reality, the traders in this conspiracy routinely shared confidential operational information and then used this illegitimately obtained information to coordinate their operations in the state, affecting refinery outages, imports, and exports. Defendants also used this superior information to shut out would-be competitors. This increased Defendants' profits by keeping California gasoline supply low and prices high.

Much of the improper inter-firm communications at the heart of this conspiracy revolve around planned maintenance and unplanned outages at Defendants' refineries. These frequent events have significant impacts on gasoline supplies and prices, and thus, a better understanding of these events provides a competitive advantage. Defendants shared information about these events, including the timing of when they would occur, how long they would last, and details about the impact of the events on

---

[3] Ex. 3, https://www.cdtfa.ca.gov/taxes-and-fees/MVF-10-Year-Report.xlsx.

- 2 -                    3:15-cv-01749-TWR-AGS

Defendants' ability to produce gasoline. This information allowed Defendants to calibrate their activities.

Defendants furthered the conspiracy by engaging in numerous actions against self-interest, designed to maintain supracompetitive pricing by achieving the conspiracy's goal of keeping gasoline supply low:

- Defendants worked together to ***disincentivize imports*** by manipulating spot prices, and divert incoming shipments of California's special blend of gasoline – CARBOB[4]. Similarly, they shared detailed import schedules. *See* III.B.3.

- Defendants ***coordinated exports***, sharing detailed operational schedules and exporting California's uniquely valuable CARBOB. *See* III.B.4.

- Defendants shared detailed ***confidential information about refinery outages*** and forward looking plans, allowing the companies to calibrate operations. *See* III.A.

- Defendants utilized their power over the California spot market to ***manipulate prices*** to serve their positions, and keep control of the market by bullying and refusing to transact with certain parties. *See* III.C.

- Defendants consistently ***ran their refineries below capacity***, while sharing real-time and future production rates, and cuts. *See* III.B.2.; and

- Defendants utilized an array of ***exchange agreements*** to allow them to maintain low inventories, while covering for each other on favorable terms when a co-conspirator's refinery had issues. *See* III.B.5.

Plaintiffs detail herein numerous examples of Defendants directly sharing and acting on confidential information and employing the above methods to control supply – conduct plainly forbidden by Defendants' own internal rules and by federal and state antitrust law. This direct evidence also establishes several plus factors used by courts assessing circumstantial evidence of a conspiracy, and convincingly excludes the possibility that Defendants acted independently.

---

[4] CARBOB is an acronym for California Reformulated Blendstock for Oxygenate Blending.

3:15-cv-01749-TWR-AGS

4827-1942-6539.v1

In response to this mountain of evidence, Defendants make a number of unsupported and unsupportable statements in their motions for Summary Judgment and ignore the bulk of Plaintiffs' damning case, relying for the most part on lawyer-written declarations overflowing with improper legal conclusions, hearsay and statements lacking any personal knowledge or other foundation. If anything, the self-serving declarations of Defendants' employees, including especially their traders – the very individuals whose conduct is at the heart of this conspiracy – demonstrate that there are material disputed issues of fact.

Defendants' multi-faceted conspiracy is further demonstrated by Plaintiffs' experts who have opined on both liability and damages. The high degree of confidence shown in the damages models, coupled with the specific and probative evidence gathered through extensive discovery, hamstrung at times by Defendants' spoliation of relevant evidence, plainly supports a denial of Defendants' Motions. These compelling facts and the meaning and import of those facts should be decided by a jury.[5]

## II. LEGAL STANDARDS

Defendants' broad-brush statements regarding the legal standards to be employed by the Court ignore long-standing and relevant Ninth Circuit precedent regarding summary judgment. When considering the evidence on Defendants' motions for summary judgment, the Court must draw all reasonable inferences in the light most favorable to Plaintiffs. *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1184 (9th Cir. 2016); *Tauscher v. Phx. Bd. of Realtors, Inc.*, 931 F.3d 959, 962 (9th Cir. 2019) ("Summary judgment is appropriate only if, taking the evidence and all reasonable inferences in the light most favorable to the non-moving party, there are no genuine issues of material fact, and the movant is entitled to judgment as a matter

---

[5] Plaintiffs respond in this opposition to the joint motion filed by P66, Chevron, Valero and Shell (joined by all Defendants) and provide additional responses to the separately filed motions of Defendants Alon, BP, Exxon and Tesoro as agreed in the joint stipulation signed by the Court. ECF No. 589.

3:15-cv-01749-TWR-AGS

4827-1942-6539.v1

of law.").[6]  "In antitrust cases, these general standards are applied even more stringently and summary judgments granted ***more sparingly***." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1364 (9th Cir. 1980).[7]

The Ninth Circuit recently reaffirmed that "context is key" when considering circumstantial evidence of a conspiracy. *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1089 (9th Cir. 2015). "In antitrust conspiracy cases, 'plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each . . . . [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole . . . .'" *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).[8]

Under the governing Ninth Circuit authority, the relevant question on Defendants' summary judgment motion is simply "whether all the evidence considered as a whole can reasonably support the inference that [the defendants] conspired . . . to fix prices" for California gasoline. *In re Citric Acid Litig.*, 191 F.3d 1090, 1097 (9th Cir. 1999). If a reasonable jury could conclude that Defendants agreed to fix prices, the Court must deny Defendants' motion. *Citric* confirms that Ninth Circuit law continues to require only evidence giving "'reasonable support to a

---

[6]  Citations are omitted and emphasis is added unless otherwise noted.

[7]  "'A non-movant's burden in defending against summary judgment in an antitrust case is no different than in any other case.'" *Petruzzi's IGA Supermarkets, Inc. v. Darling – Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993) (quoting *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992)).

[8]  *See also* Judge Sabraw's opinion in *Hom, Tr. of the Allen Ernest Hom Tr. v. RBB Bancorp*, 2019 WL 4266557, at *5 (S.D. Cal. Jan. 24, 2019) ("These arguments invite a myopic examination of the RBB merger and overlook Plaintiff's overarching theory of fraud – a potential 'forest for the trees' problem.  As discussed below, the trier of fact should be presented with all relevant evidence to fully evaluate Plaintiff's circumstantially based fraud claims.").

- 5 -                    3:15-cv-01749-TWR-AGS

4827-1942-6539.v1

finding of conspiratorial . . . behavior'" to resist summary judgment. 191 F.3d 1090, 1094 n.2. In *Citric*, a case involving a highly concentrated market similar to the highly concentrated market here, the court emphasized that "the evidence must, on summary judgment, be construed to ***the greatest extent reasonably possible in favor of finding an antitrust violation***." 191 F.3d at 1106 n.10. "Plaintiffs have presented evidence, not only of the large number of contacts [between defendants], but also of the content of these communications, that suggests cartel behavior. This is exactly the kind of circumstantial evidence that, when viewed in conjunction with the massive record in this case, could lead a jury to reasonably infer a conspiracy in restraint of trade." *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 830 (D. Md. 2013). Here, there is a rich factual record developed in discovery that supports the allegations and tends to exclude the possibility of independent, lawful conduct. In addition to substantial documentary and testimonial evidence, Plaintiffs also provide extensive expert analysis all of which support a broad-ranging and multipart conspiracy undertaken by Defendants.

The Ninth Circuit permits an inference of conspiracy when the evidence as a whole confirms the presence of "plus factors" like "product uniformity, exchange of price information, and opportunity to meet to form anti-competitive policies," *Wilcox v. First Interstate Bank of Or.*, 815 F.2d 522, 525-26 (9th Cir. 1987), and other "[m]arket conditions during a period of alleged collusion," *Stanislaus*, 803 F.3d at 1092 n.5, such as parallel pricing, all of which exist here. In the Ninth Circuit, plaintiffs need only present evidence showing "'that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [the plaintiff].'" *Stanislaus*, 803 F.3d at 1089; *Home Depot, U.S.A., Inc. v. E.I. DuPont de Nemours & Co.*, 2019 WL 3804667, at *4 (N.D. Cal. Aug. 13, 2019).[9]

---

[9] Defendants continue to complain of Plaintiffs' alleged "shifting" legal theories that are supposedly far afield from the claims in the Complaint. *See, e.g.*, ECF No. 629 at

4827-1942-6539.v1

Here, there is also significant evidence that "the alleged conspirators took actions against their economic self-interest." *Home Depot*, 2019 WL 3804667, at *9. In *Home Depot* the defendants sold titanium dioxide to each other at below market prices and swapped raw materials needed for manufacture, conduct that normally would not be expected between market rivals. "[W]hen DuPont shut down one of its plants in 2005 after Hurricane Katrina, DuPont announced that it would bring the plant back online slowly and would 'NOT flood the market with product,' and would 'not be aggressively pursuing their lost share' of the market." *Id.* Although the court noted that "[i]t is not clear why DuPont would not have attempted to recover its market share," internal emails and notes from one of Dupont's competitors, Millennium, show that at least from 2006 through 2008, Millennium consciously avoided competition with DuPont. *Id.* The defendants in *Home Depot* also shared confidential and commercially sensitive information through participation in a trade association, and its "Global Statistics Program" through which defendants shared

12. In so doing, Defendants wildly contort the record of this case. Although Plaintiffs must plead every claim for which it seeks relief, it need not plead the legal theories that support liability. *See, e.g.*, *Alvarez v. Hill*, 518 F.3d 1152, 1154 (9th Cir. 2008) ("[F]ederal complaints plead claims, not . . . legal theories."); *Am. Timber & Trading Co. v. First Nat'l Bank of Or.*, 690 F.2d 781, 786 (9th Cir. 1982) ("A party need not plead specific legal theories in the complaint, so long as the other side receives notice as to what is at issue in the case."). Plaintiffs' allegations and theories need only be encompassed within the original allegations made in the complaint. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1087 (9th Cir. 2019). Plaintiffs have pled, and discovered evidence supporting, a horizontal conspiracy to manipulate the California gasoline market in violation of §1 of the Sherman Act and California's Cartwright Act. *See Safeway v. Abbott Lab's*, 761 F. Supp. 2d 874, 890-91 (N.D. Cal. 2011) (noting plaintiff who pled claim for violation of §2 of the Sherman Act may proceed on predatory pricing theory of liability not raised until summary judgment because of allegation in complaint that "[company's] pricing excluded 'equally efficient producers of PIs'" and noting "[defendant] is well aware of what is at issue in this case."). Defendants have sufficient notice of Plaintiffs' claims. *William Inglis Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014 (9th Cir. 1981) (holding plaintiff had adequately placed the defendant on notice of its vertical conspiracy claim by naming the unnamed coconspirators in answers to interrogatories one year before trial and no prejudice found); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 6708866 (N.D. Cal. 2012) (discovery responses provided adequate notice to defendants regarding identity of co-conspirators, even though they were not identified in the complaint), *aff'd*, 637 F. App'x 981 (9th Cir. 2016).

- 7 -                           3:15-cv-01749-TWR-AGS

information regarding their titanium dioxide production and inventory levels. *Id.* The *Home Depot* court noted that in the related direct purchaser action in *Titanium Dioxide*, the court found evidence regarding the Global Statistics Program suggestive of collusion, recognizing "'knowledge of market share is the most important information to sustain a conspiracy.'" *Id.* at *9 (quoting *Titanium Dioxide*, 959 F. Supp. 2d at 828). The similarity of evidence suggestive of a conspiracy here with the evidence in *Titanium Dioxide* and *Home Depot* could not be more striking.

Additional "plus factors" have been sufficient for court to find an anticompetitive conspiracy: Plus factors identified by courts and commentators include (1) actions that would be against the defendants' self-interest if the defendants were acting independently, but consistent with their self-interest if they were acting in concert; (2) a motive to conspire; (3) an opportunity to conspire; (4) market concentration and structure conducive to collusion; (5) pretextual explanations for anticompetitive conduct; (6) sharing of price information; (7) signaling; and (8) involvement in other conspiracies. ABA Section of Antitrust Law, *Proof of Conspiracy Under Federal Antitrust Laws* (2010) ("Proof of Conspiracy") at 69-91 (collecting cases). There is no finite or exhaustive list of plus factors, and different courts articulate the relevant factors in different ways. *Id.* at 69. Plaintiffs have evidence of many of these plus factors, as detailed below.

Defendants seek to denigrate Plaintiffs' evidence by intimating that a lack of "smoking gun" evidence is somehow fatal, but this argument is wholly unavailing. "Circumstantial evidence is not 'inherently less probative than direct evidence.'" *United States v. Zamorano-Leyva*, 220 F. App'x 557, 558 (9th Cir. 2007) (quoting *United States v. Perez*, 491 F.2d 167, 171 (9th Cir. 1974)). Much of Plaintiffs' evidence fits well under the heading "smoking gun," but regardless, "[a] nonmovant plaintiff in a section 1 case does not have to submit direct evidence, *i.e.*, the so-called smoking gun, but can rely solely on circumstantial evidence and the reasonable inferences drawn from such evidence." *Petruzzi's*, 998 F.2d at 1230; *accord*

- 8 - 3:15-cv-01749-TWR-AGS

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Even if Plaintiffs' evidence is not considered direct evidence of the conspiracy, it nevertheless "'tends to exclude the possibility that the alleged conspirators acted independently.'" *Home Depot*, 2019 WL 3804667, at \*3 (citing *Stanislaus*, 803 F.3d at 1088).

In an effort to dismember Plaintiffs' case, Defendants argue that acts the Plaintiffs allege are suspect were performed in each Defendants' own economic self-interest. ECF No. 629 at 25. But this is not the relevant inquiry (and is contrary to the evidence in any case).[10] "It is of no consequence, for purposes of determining whether there has been a combination or conspiracy under §1 of the Sherman Act, that each party acted in its own lawful interest." *United States v. Gen. Motors Corp.*, 384 U.S. 127, 142 (1966); *see also United States v. Masonite Corp.*, 316 U.S. 265, 276 (1942) ("the fact that there were business reasons which made the arrangements desirable . . . would be no more a legal justification for price-fixing than were the 'competitive evils' in the *Socony-Vacuum* case"); *United States v. Apple Inc.*, 2013 WL 1845733 (S.D.N.Y. Apr. 30, 2013).[11]

## III. THE EVIDENCE UNCOVERED WOULD LEAD A JURY TO CONCLUDE DEFENDANTS CONSPIRED

### A. Defendants Routinely Exchanged Confidential, Proprietary Information

The multifaceted conspiracy alleged by Plaintiffs was driven largely by improper interfirm communications between the Defendants that had a central purpose – to maintain supracompetitive prices in California so that the small band of refineries could continue to dominate and manipulate the California gasoline market.

---

[10] Moreover, the only support for the claims of economic self-interest come from lay witness declarations, lacking personal knowledge regarding such issues. *See* discussion *infra* at §V and Appendix 1.

[11] The standards regarding claims under §1 of the Sherman Act apply equally to Plaintiffs' claims under California's Cartwright Act because the claims under the two statutes are based on the same conduct. *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 324 F. Supp. 3d 1142, 1156-57 (S.D. Cal. 2018) ("The Cartwright Act is 'California's equivalent to the Sherman Act,' and 'the analysis under the Cartwright Act is identical to that under the Sherman Act.'"

- 9 -                                         3:15-cv-01749-TWR-AGS

Defendants, primarily through their traders, openly shared confidential information with each other through text messages, instant messaging chats, emails, calls, and in-person meetings. They also used industry trade events as prime opportunities to further their collusive communications. The information gained in these ways, especially with respect to refinery outages and maintenance events, gave Defendants an unfair competitive advantage. These actions are routinely seen as significant plus factors in antitrust actions. "Interfirm communications . . . are a 'plus factor' that can bolster the inference of conspiracy." *Stanislaus*, 803 F.3d at 1093.

### 1. Defendants, And Especially Their Traders, Routinely Shared Confidential Information with Their Competitors

Sharing of confidential information amongst Defendants, particularly by their traders, was routine. This exchange was far beyond what was necessary to complete transactions. *See, e.g.*, ECF No. 647, Ex. 1, McCullough Rpt., ¶¶85-86. While Defendants suggest that "'communications between employees at [competing companies] could be understood as a part of a legitimate business relationship as readily as they could be understood as a part of a conspiracy'" (ECF No. 629 at 33), here there are numerous aspects of Defendants' interfirm communications that "'tend[] to show that the defendant[s] [were] not engaging in permissible competitive behavior.'" *Home Depot*, 2019 WL 3804667, at *6. Indeed, Defendants' exchange of information went far beyond that envisioned by their own policies. Far from the "legitimate[] exchange [of] information on the relevant real transaction," Defendants' exchanges tend more towards a systematic and ongoing exchange between and among the competitors, regardless of whether the recipient of competitively sensitive information was "directly related" to a "relevant" transaction, if any. *E.g.*, Ex. 4, SOPUS_PGI_01054804 at 4823.[12] Indeed, Defendants here used their role as each

---

[12] The vast majority of documents referenced in Plaintiffs' oppositions to the Defendants' motions for summary judgment, were produced by the Defendants. These documents are denoted by a Bates stamp prefix identifying the producing party. Plaintiffs have no reason to believe the documents produced by the Defendants are not

3:15-cv-01749-TWR-AGS

4827-1942-6539.v1

other's "customer[s] . . . as a 'cover' for more widespread information exchange." *Id.* Given the totality of the circumstances, these communications make "'the inference of conspiracy . . . reasonable in light of the competing inferences.'" *Home Depot*, 2019 WL 3804667, at *6.

The actions taken by Defendants' employees demonstrate that they engaged in wrongful conduct they sought to conceal. In fact, a few months after the ExxonMobil Torrance refinery explosion in 2015, a Tesoro vice-president wrote "***[t]he traders exchange a lot of information we probably wish they didn't exchange but that is part of their world and it makes for much less impact in the market place***." Ex. 5, TRMC-02482889. This information was very valuable for Defendants, as demonstrated by a Shell memorandum discussing Tesoro's traders that highlighted Shell's "great relationship with the Tesoro guys . . . . Eric Pestano is our main contact and he will tell us a lot about what is happening at his refineries, etc." Ex. 6, SOPUS_PGI_00152681 at 2683. This happened despite Shell's Trading Compliance Manual prohibiting such discussion. *See* Ex. 7, SOPUS_PGI_00755858; ECF No. 647, Ex. 1, McCullough Rpt., ¶¶87-88.

Defendants' information exchange was often in secret. A prime example of the covert nature of these exchanges is seen in an instant message ("IM") chat between BP and Phillips 66 ("P66") traders discussing how a Chevron trader they knew was willing to discuss certain issues sitting across from them at a dinner table but "probably no[t]" over the phone or IM. Ex. 8, PSXPGI04155090 at rows 2558-2561. The context of the communications is key: it reveals that the traders were sharing confidential information that was otherwise unavailable, often with cautions that it should not be shared. They include: "lips sealed[,] very much appreciated" (Ex. 9, VMSC_309423 at 9425), "[b]etween me and you" (Ex. 10, CUSA_PG-BAR-

authentic documents. Additionally, the produced documents are likely admissible as business records pursuant to Federal Rule of Evidence 803, or as an admission offered against an opposing party pursuant to Federal Rule of Evidence 801(2) or through other rules of evidence.

4827-1942-6539.v1

000960397 at 0397), or "pnc," trader shorthand for personal or private and confidential (*e.g.*, Ex. 11, SOPUS_PGI_01370921 at rows 78578, 159413; Ex. 8, PSXPGI04155090 at rows 906, 4879, 5709). Often times, communications surrounding market events began via IM, but were shifted to a private phone call, in an effort to hide the content and nature of the communications. Ex. 12, SOPUS_PGI_01361353 at rows 7832-7856.

The complete extent of the traders' communications will never be known, in part because documents were lost or destroyed. As Judge Schopler recognized in finding spoliation because Chevron lost or deleted certain instant messages of its trader Rick Pluimer, "[o]f course, we'll never know what the missing messages contained, but I think there's enough here to show prejudice, especially since it's logical to assume that the traders might be the frontline point of contact in any antitrust behavior between the parties." ECF No. 540 at 12. Similarly, Shell also lost or destroyed data on Shell traders Mike Kavalinas's and Jeff Marino's company-issued cell phones. ECF No. 599 at 8-9. The Court recognized that "the fact remains that there are messages of which the plaintiffs will never know the substance and content. There is some indication that text messages found on other employees' and custodians' phones were substantive in some capacity, discussing otherwise confidential and nonduplicative information." *Id.* at 16.[13]

Many of these communications, revealing important refinery and supply details, as discussed further herein, are plainly of a type that Courts have found demonstrate anticompetitive conduct. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781-82 (2d Cir. 2016); *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285 (S.D.N.Y. 2018); *Apex Oil Co. v. Di Mauro*, 822 F.2d 246,

---

[13] The spoliation was severe enough to warrant sanctions in both instances. *See* ECF No. 591 (regarding Shell) and ECF No. 524 (regarding Chevron).

- 12 -                    3:15-cv-01749-TWR-AGS

254 (2d Cir. 1987). And many of these communications were forbidden by Defendants' own internal policies.[14]

### 2. Defendants Colluded at Trade Association Events

Defendants used industry events as a front to meet and share confidential information in a more informal setting where their words would not be recorded. Participating in "trade association[s] . . . and attendance at industry events" has been viewed by courts as a factor demonstrating that "putative conspirators had the opportunity and means to develop and/or further their alleged collusive scheme." *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1148 (N.D. Cal. 2009); *B & R Supermarket, Inc. v. Visa, Inc.*, 2016 WL 5725010, at *7-*8 (N.D. Cal. Sept. 30, 2016) (recognizing as a "plus factor" that defendants had the "opportunity to collude" through several industry organizations showing more than "mere participation"). Here there is far more than "mere participation."

For example, Defendants attended conferences put on by the American Fuel and Petrochemical Manufacturers ("AFPM") trade association, though they were little more than an excuse for the informal meetings surrounding the conference itself. BP trader Yomtoob's comments to Phillips 66 trader Lockhart reflect how these informal meetings paid off. He said: "***I think that you gain a lot of market info talking to the guys, especially after they have a couple of drinks***," and Lockhart agreed, "***truth man***." Ex. 8, PSXPGI04155090 at rows 3166-3167.

Indeed, these events were a rich source of confidential information for Defendants. *See* ECF No. 647, Ex. 1, McCullough Rpt., ¶90. For example, BP trader Joshi internally shared his notes from an NPRA (the prior name for the AFPM) conference, including that Exxon "[h]as refinery maintenance in Apr/May." Ex. 19,

---

[14] *See* policy manuals at Ex. 13, PSXPGI00460392 at 0393-94; Ex. 14, VMSC_159816 at 9827-30; Ex. 15, PSXPGI00460327 at 0328-30; Ex. 16, CUSA_PG-BAR-001074251 at 4254; Ex. 4, SOPUS_PGI_01054804 at 4822-24; Ex. 7, SOPUS_PGI_00755858, at 5888; Ex. 17, TRMC-04220602 at 0611-12; Ex. 18, TRMC-04220493 at 0494-95; Ex. 18.1, EM_PG000222686.

4827-1942-6539.v1

TRMC-03547522. Chevron's trader Pluimer internally shared his notes from the AFPM conferences including information gathered from BP, Valero, and Tesoro, about their supply in various locations. Ex. 20, CUSA_PG-BAR-000902404. A Valero employee summarized his meetings at AFPM, including a discussion of pricing strategy from ExxonMobil, with explicit numbers provided for product margins, retail prices, and transportation costs. Ex. 21, VMSC_273121. Defendants exchanged confidential information at the AFPM meetings that they were hesitant to write-down, as recognized by Chevron employees, who, in the context of sharing their AFPM notes, worried about whether "it's safe to write all of it and communicate by email . . . thinking [it] may be better to just talk about it?" Ex. 22, CUSA_PG-BAR-001023610 at 3611; *see also* ECF No. 647, Ex. 1, McCullough Rpt., ¶¶91-147.

These discussion topics were inconsistent with legitimate competition and prohibited by antitrust law. ███████████████████ ██████████████████████████████████ *See* Ex. 23, Morgan Dep. Tr. at 98:8-23; *see also* Ex. 24, AFPM_000033. AFPM's designee testified ████████████████████████████ ████████████████████ Ex. 23, Morgan Dep. Tr. at 98:25-99:8, 116:4-14. But that is just what Defendants did.

These exchanges between Defendants permit the inference of a conspiracy because true competitors would not share such confidential proprietary information for fear it would be used to capture market share.[15]

[15] ████████████████████████████ to ██████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ 2824); Ex. 29, (STILLWATER000295); Ex. 30, (STILLWATER000021 ████████████████████████████████████ ████████████████████████████████████████

4827-1942-6539.v1

### 3. Defendants' Sharing of Information Regarding Refinery Outages and Maintenance Gave Them an Unfair Advantage

While Defendants attempt to distract the Court by reviving their strawman argument that Plaintiffs claimed Defendants sabotaged their own refineries, the Complaints have long alleged that it was the conduct around the outages, and the disproportionate price spikes that followed each one that made them suspicious. Discovery has confirmed that these outages were problematic, given that Defendants were openly sharing information with each other, and not the public, about the timing and nature of planned and unplanned maintenance events and outages. This is just what was alleged in the Amended Complaints – evidence indicated Defendants were receiving secret information, and acting on it, in advance: "The evidence indicates that the major oil companies likely had advance, secret notice that Exxon would report problems with its Torrance refinery in October 2012. . . . Instead, this run up would have happened only if ExxonMobil informed its competitors of operating problems prior to informing the regulators and media." ECF No. 76, ¶35.

Defendants' pervasive sharing of information afforded them a unique tool to manage and react to these planned and unplanned outages and maintenance events. Critically, traders shared this information almost exclusively within the circle of Defendants, giving them an informational edge over outsiders. Indeed, Defendants' themselves recognized the potential for market abuse that could result from the exchange of such information. "Outages and supply interruptions, both planned and unplanned, which are not widely known in the market, can affect liquidity and market prices and should not be used as an opportunity for speculative gain." *See* Ex. 7, SOPUS_PGI_00755858 at 5877.

Defendants' exchange of confidential information improved their ability to predict supply needs and plan accordingly, as demonstrated by an August 25, 2014

<span style="background:black;color:black">████████████████████████████████████████████</span>

4827-1942-6539.v1

Shell West Coast planning document. It showed that the Bay Area was trading a couple of cents per gallon ("cpg") under Los Angeles prices. Ex. 34, SOPUS_PGI_00006513. However, the analysis noted the "*[m]arket still doesn't know* about Tesoro's Oct maintenance. Recommend we continue to barge over conventional premium, carbob premium and add in some conventional regular. Leave the carbob reg in the Bay for now." *Id.* Here, despite the economic incentive to barge more CARBOB from the Bay Area to LA due to higher prices, Shell opted to keep some in the Bay, given its knowledge that Tesoro's refinery was undergoing maintenance within the next two months, with the expectation that the future value of regular CARBOB in the Bay would exceed any present-day gains in LA. This is a perfect example of the conduct proscribed in the "Market Abuse" section of Shell's own Compliance Manual. *See* Ex. 7, SOPUS_PGI_00755858 at 5875-78.

The dissemination and use of confidential information from other Defendants was institutionalized. When a Defendant trader shared information with another trader, it was not intended to stay with that individual, but to be passed along their chain of command. Documents reveal just how widely dispersed the information was, reaching even the highest echelons of management.

In one example, upon receiving information "confirmed via several sources including the USWC XOM crude trader," Tesoro's trader sent the information internally to dozens of recipients. *See* Ex. 35, TRMC-00220550 at 0550, including a Senior Vice President of Strategy & Business Development (Ex. 36, TRMC-00265611), Senior Director – Analysis (*id.*), Senior Director of Regional Development for PADD 5 (*id.*), Director of Regulatory Fuels (Ex. 37, TRMC-02473297), Vice President of Marine (Ex. 38, TRMC-04220355), and many others at Tesoro.

Defendants were routinely able to gain insight into when maintenance would occur or how long it would last. For example, in internal IM chats between Tesoro employees, a colleague asked Tesoro trader Pestano, "when was Valero supposed to

4827-1942-6539.v1

be back up?" Pestano answered, "this weekend . . . but traders indicating they are still struggling." Ex. 39, TRMC-02266230 at 6231. Similarly, a Chevron employee wrote that "[y]esterday I spoke to Stephanie, our gasoil trader, and she said that XOM [Exxon] Torrance has delayed their hydrotreater outage to May." Ex. 40, CUSA_PG-BAR-000008448 at 8448. In a 2015 email thread about "West Coast Gasoline Supply," Chevron trader Pluimer told a colleague "the [Shell] trader told me specifically they have no[t] begun their refinery work." Ex. 41, CUSA_PG-BAR-000959755 at 9755. In another example, discussing the impact of the strike at Tesoro's refinery just prior to the ExxonMobil Torrance refinery explosion, Shell trader Rodrick shared that "they were planning to begin the restart process this week. Pestano [Tesoro trader] said they would start to bring up one unit at a time with the cat [a refinery unit] being last. That was scheduled for next weekend." Ex. 42, SOPUS_PGI_00365768.

Traders also routinely discussed other operational details, including the scope of maintenance work or outages, or even the rates at which various refinery units were operating. Because certain refinery units are critical in the production of gasoline, information regarding which refinery units were affected by a given turnaround or outage was valuable information for Defendants' traders. For example, in a chat between BP trader Mury and Shell trader Marino in which BP inquired about product, Mury provided a detailed explanation as to why BP's Carson refinery did not have the product he sought, explaining that the refinery was keeping their fluid catalytic cracking unit [a critical refining unit] at minimum rates, "so they not gonna have supply." Ex. 43, BPWC-PG-02378766 at 8766. Similarly, a Tesoro employee shared information with his colleagues about a fire at a BP refinery – including the expected downtime and which units were running – all learned from an unrecorded call with a BP trader. Ex. 44, TRMC-03729748.

Defendants even shared confidential future trading strategies and internal forecasts for the region, providing insight into one another's internal planning

processes and incentives. BP's Yomtoob wrote to a Phillips 66 trader, "what are you guys seeing the next four weeks. [W]e have roughly flat stocks, maybe small builds." Ex. 8, PSXPGI04155090 at row 3608. The Philipps 66 trader replied with his company's internal forecast: "The analyst here are more bullish than me with some planned turnarounds. . . . ." *Id*. at row 3609. In 2017, a Chevron trader forwarded a detailed inventory breakdown to Phillips 66, including details as granular as to the quantity and method by which Chevron held inventory in regular unleaded gas ("RUL") not known to the public: "72 MB [thousand barrels] in total RUL inventory, spread around in 3 of our 5 RUL tanks. One tank had 24MB in it, and it was supplying the loading rack, the other two tanks had 19MB and 29MB in them." *See* Ex. 45, PSXPGI01218453 at 8455.

Exchanging information directly with one another regarding the timing and details of maintenance provided Defendants with an unfair advantage over other market participants who relied on media reports to gauge the market. For example, when BP employees discussed an article about whether a Chevron refinery restart was "actually based on fact or speculation," one of them shared "Chevy traders saying they do not have a firm date and are just going to continue to cover roughly a month out as they go forward." Ex. 46, BPWC-PG-00549196 at 9196-97.

Similarly, in January of 2014, in response to an Energy News Today ("ENT") article reporting that maintenance work at ExxonMobil's Torrance refinery had been moved up from March to February, Chevron trader Pluimer told a colleague, that "my brother-in-law confirmed." Ex. 47, CUSA_PG-BAR-000963771. Later, just a week before the ExxonMobil Torrance refinery explosion, Pluimer once again shared confidential information he learned from his brother-in-law, an employee of ExxonMobil. Pluimer told a colleague on February 11, 2015, "*[b]etween me and you* . . . my brother-in-law who works there says it's not a biggie over there." Ex. 10, CUSA_PG-BAR-000960397 at 0397. During his deposition, when asked whether he regularly obtained information about Exxon from his brother-in-law, Pluimer claimed

"I think it's just one time." Ex. 170, Pluimer Dep. Tr. at 169:14-170:8. Yet, there are multiple examples that we know of, even after Pluimer's chat messages were deleted. Further examples of similar conduct by Pluimer are included in §III.D.

While Defendants suggest that because they are "'each other's customers and suppliers'" anything they say to each other is proper (ECF No. 629 at 33-34), traders disclosed information about their activities that was not known to or shared with the market as a whole. A BP document shows a trader sharing that "P66 also has a reformer TAR in Feb/March (pnc) that is *unknown to the market*." Ex. 48, BPWC-PG-00039812 at 9851. Similarly, a Philipps 66 trader wrote about confidential information she had learned about a supposed competitor, saying "Chevron Richmond is having issues *which is not out in the market* and have been buying Alkylate." Ex. 49, PSXPGI01248391. BP's trader Yomtoob shared with others, "P66 tells us *pnc* that he has a leak on his Rodeo [Philipps 66's San Francisco Bay refinery] hydrocracker and may have to take it down for at least 5 days." Ex. 50, BPWC-PG-00023738 at 3792.[16] Similarly, traders disclosed information over and above what was necessary to close a deal, including after a deal was completed (*see* Ex. 52, TRMC-03173561), or related to no deal at all, communicating for the sole purpose of sharing information.

Defendants cite a litany of cases attempting to couch such conduct merely as idle 'shop talk.' *See* ECF No. 629 at 33. These cases are wholly distinguishable. Defendants cite *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758 (7th Cir. 2015), for the superficially compelling language about legitimate business

---

[16] Phillips 66 internal communications guide specifically forbad employees from sharing with ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ between competitors through backchannels here.

4827-1942-6539.v1

relationships and reasons to communicate. ECF No. 629 at 33. But Defendants conveniently gloss over the nature of those communications. There (unlike here) the Court noted that the subject of the communications was often unclear, or to the extent the substance was known, it comprised broad generalized topics. *Dairy Farmers*, 801 F.3d at 761. In stark contrast, Plaintiffs have provided a mass of substantive communications reflecting anticompetitive activity. Likewise *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811 (N.D. Ill. 2017) involved communications similarly lacking in substance. Nor does *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348 (9th Cir. 1982) help Defendants' cause. There the Court noted the evidence comprised "roughly a dozen isolated communications regarding prices over a seven-year period." *Id.* at 1357. Moreover, these were between people with no direct pricing responsibilities. *Id.* In contrast, here, Plaintiffs have presented voluminous, substantive communications amongst traders who directly control the pricing terms and product volumes for the deals they construct. Defendants also cite *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999), for its language condoning the practice of obtaining as "much information as possible of the pricing policies and marketing strategy of one's competitors." ECF No. 629 at 33. Plaintiffs have no quarrel with such practices in a lawful, competitive market, but that is far afield from this case. In *Baby Food*, the Third Circuit held that "[e]vidence of sporadic exchanges of shop talk among field sales representatives who lack pricing authority is insufficient to survive summary judgment." 166 F.3d at 125. Plaintiffs have produced copious communications evidencing the exchange of proprietary and inappropriate information among persons with control of the deal terms.

### 4. Defendants Had Superior Information Compared to Would-be Competitors

Defendants had a sizeable information advantage over outsiders because of the superior information they received through their collusive scheme. Other market participants were forced to rely on routinely and laughably incorrect information from

- 20 -                    3:15-cv-01749-TWR-AGS

the media and Defendants capitalized on this. In one example, a BP trader wrote to his colleagues, "#FAKENEWS dominates the WC [West Coast] today as ENT reports PBF shutting their CDU [coker distillate unit]." Ex. 53, BPWC-PG-00018552 at 8572. Similarly, in an effort to verify a story reporting an outage at a Phillips 66 refinery, BP's Yomtoob contacted the Phillips 66 trader who notified him that the story was wrong, and Yomtoob replied, "haha, they are always wrong." Ex. 8, PSXPGI04155090 at row 7782. Lockhart described his views of the media to the BP trader, "ENT are tabloids . . . it's like Dr. Evil sitting there with his pinky '1 MILLION barrels lost production.'" *See id.* at rows 3760-3761. In 2012, regarding an article about BP's Cherry Point refinery, rather than work to correct misinformation, BP staff celebrated the benefit of false information on the market, saying "they're off on several facts, which is good." Ex. 54, BPWC-PG-01510577 at 0577.[17] *See also* ECF No. 647, Ex. 1, McCullough Rpt., ¶85 (opining that "Refiners are distinctly aware of the information deficit for those who are not 'in the know,' emphasized by continuous communications between the defendants about incorrect news stories about California gasoline supply and operations.").

Defendants recognized inaccuracies in public reporting, but rather than trying to correct it, they presented information contrary to known facts in an effort to exploit this gap. For example, Valero's VP of Communications wrote, "We've said on the record that FCC should be at planned rates by mid-August. Off the record, we're looking at late this week/early next week." Ex. 56, VMSC_110737 at 0737.

---

[17]  Phillips 66's media representative Rich Johnson was asked whether he could recall a time where the company reached out to correct incorrect information in the news media – he could not. Ex. 55, Johnson Dep. Tr. at 52:15-53:8. He further testified to the limited nature of Phillips 66's public disclosure of operations, "It was my practice at the time when dealing with media relations issues for the refining business to only confirm whether or not planned maintenance was underway." *Id.* at 99:7-10. This informational blockade was reinforced by Defendants' own policies. *See* Ex. 51, PSXPGI00460654 at 60659-60, 60663, 60664.

4827-1942-6539.v1

### B. Defendants Took Extreme Actions Against Self Interest

#### 1. Rather than Compete, Defendants Provided Favors to Each Other and Maintained the Status Quo

True competitors work to gain an advantage over their rivals and take calculated risks to better their position in the marketplace. Defendants, on the other hand, avoided risk by sharing it amongst themselves, refusing to challenge the status quo. What Defendants did is akin to the "co-opertition" seen as a plus factor in *Home Depot*, where "they sold titanium dioxide to each other at below market prices and swapped raw materials needed for manufacture." 2019 WL 3804667, at *9. Crucially, this was "conduct that normally would not be expected between market rivals," *id.*, which can also describe much of Defendants' conduct here. ECF No. 647, Ex. 1, McCullough Rpt., ¶86 ("There is a distinct difference between information sharing that is necessary, and information sharing that provides unfair competitive advantage. For example, a refiner seeking a product next month would be expected to provide a bid for that product and the specified timing. Further information, such as what unit is down, current inventory status, and other non-public knowledge, should not be shared by a market actor acting in its best economic interests. Refiners are distinctly aware of the proper way to provide information to the public: uniform and clear press releases, which do occur from time to time. Unless shared to the greater market, this exchange of information has an anticompetitive effect in an isolated market such as California – those who know can profit from increasing prices.").

For example, following the explosion at ExxonMobil's Torrance refinery, Defendants treated ExxonMobil as a trusted friend rather than a rival. They refused to seize the obvious opportunity to take some of ExxonMobil's market share that presented itself from this major event in February of 2015 that "prevented [ExxonMobil's only California refinery] from refining gasoline until May 2016." ECF 631 at 1. This outage also caused massive gasoline price spikes. ECF No. 605,

4827-1942-6539.v1

Ex. D, McCullough Rebuttal Rpt., ¶¶8, 73.  This behavior is inexplicable absent a conspiracy.

Defendants' suggestion that Plaintiffs argue they should have collectively boycott ExxonMobil (ECF No. 629 at 14) misconstrues Plaintiffs' actual argument that one would expect ExxonMobil to have had difficulty covering such a massive supply loss absent a conspiracy.  Despite the outage, ExxonMobil was able to cover the shortage seemingly without difficulty.  In fact, less than a week after the Torrance explosion, ExxonMobil believed that Tesoro could cover 100% of local demand, without any indication that Tesoro was extracting significant concessions from them on price or terms.  Ex. 57, EM_PG000049842 at 9843.  Just six days after the explosion, ExxonMobil optimizers noted they should check with Tesoro because "If we [sic] they can cover 100% of our Vernon/Atwood demand that could be a more attractive local option."  *Id.*

Tesoro ended up doing a number of favors for ExxonMobil in the wake of the explosion.  In mid-2015, ExxonMobil's trader Perez described how Tesoro had agreed to use two Tesoro terminals in L.A. to help ExxonMobil, noting that "Tesoro has been ***extremely accommodating*** to us, even though they have a planned 45 day HC T/A underway at Carson.  They are a very good West Coast ***partner***."[18]  J.A. 381.  In another email in mid-2015, Perez acknowledged that "Tesoro has ***bent over backwards*** for us on the Products side to help out during the ongoing issues" at the Torrance refinery, once again calling them an "excellent ***partner***."  J.A. 383.  The same exchange recognized that Tesoro was "***asking quid pro quo action from us***, to maintain the counterparty relationship," given that "Tesoro's position is that they have not been holding ExxonMobil responsible for late interest payments from multiple late invoices for Mogas."  *Id.*  ExxonMobil approved waiving the late interest payment for Tesoro.  *Id.*  An internal Tesoro IM chat showed a Tesoro employee describing in

---

[18]  "J.A." are to Defendants' Joint Appendix, ECF No. 629.

3:15-cv-01749-TWR-AGS

4827-1942-6539.v1

April 2015 that their "[s]ystem [was] short in LA due to ***exxon short we have taken on***." Ex. 58, TRMC-02519758 at 9758.

This type of cozy behavior is closely akin to how supposed competitors in *Home Depot* "consciously avoided competition" with each other. 2019 WL 3804667, at *9.[19] BP asked Philipps 66 for help finding product when they "continue[d] to struggle" with their refinery equipment. Ex. 60, BPWC-PG-00197668 at 7669. The BP trader noted, "P66 has been helping us with some pinch points in the Bay and so a returning favor." *Id.* at 7669-7670. In a December 2016 email to other Shell personnel, Shell trader Kavalinas writes, "Shell has leveraged our relationship with Valero (via ops and trading) that we are their first call at the sign of trouble. Valero has indicated a turn-around in Feb 2017 where they will require Bay Carbob in support." Ex. 61, SOPUS_PGI_00578040 at 8041. In another instance, Shell was able to use its "relationship with Valero" to cover their short at no cost. "In the market this would have been a hurt of 3-4 cents." But thanks to a quid pro quo exchange with Valero, Shell was unaffected. Ex. 62, SOPUS_PGI_00347078. When Philipps 66's Gardena rack was down for two weeks, ExxonMobil trader Perez wrote to her colleagues, "we should accommodate them. They are big support for us when we have issues on our system." Ex. 63, EM_PG000023087 at 3087. Competitors compete, they do not accommodate one another and bend over backwards for each other.

---

[19] In contrast, when a party attempted to treat ExxonMobil the way one would expect in a competitive marketplace, it was immediately demonstrated that this was not the way the Defendants operated. Regarding a third party trader that some felt was harming margins, Defendants discussed actively refusing transacting with him. Yomtoob reached out to P66 trader Lockhart to ask "how did murph get those lol." *See* Ex. 8, PSXPGI04155090 at row 7301. Lockhart replied, "I am surprised that he could get any as most refiners will no longer sell to him." BP's trader replied with a confirmation, "they won't sell him anything" *See id.* at row 7303-7304. The trader in question, Murph Jones of IPC, an international company with a petroleum trading division, was cut out because he would not offer low enough prices to ExxonMobil after the Torrance outage. "Hearing IPC lost their exxon contract, Smurph wont have those bullets to fire into the market." *See* Ex. 59, PSXPGI04155687 at row 22. One trader described it, "I guess IPC rat effing exxon when they had their problem was the last straw." *See id.* at row 23.

3:15-cv-01749-TWR-AGS

4827-1942-6539.v1

Months before outages were to occur, while sharing confidential details about upcoming maintenance events, Defendants discussed 'holding' fuel for each other. This type of activity, which helped insulate Defendants from market forces, was against their own economic self-interest. "I had rat-holed some barrels for you." *See* Ex. 11, SOPUS_PGI_01370921 at row 1870. Messages between Shell's trader Rodrick and Tesoro's Pestano show that as early as February 9, 2015, Shell was already working to secure steady product from Tesoro for the following month. Rodrick wrote, "how much gas can you sell me in march? per cycle? just contingecy [sic], im [sic] not expecting you to commit . . . . . yet. . . . :-S." *See id.* at row 115340. Pestano responded that Tesoro could provide about 100 thousand barrels of CARBOB premium and regular per cycle, and soon after, their conversation was taken offline to the phones. *Id.* at rows 115340-115350. Defendants even denied others while holding barrels for one another, "yes sir, I am holding it for you . . . I had someone else asking but you are in line for 50m until you say no." *See* Ex. 64, PSXPGI04154980 at row 551.

In other instances, Defendants offered product to one another before making that product available to the general market. For example, Phillips 66 trader Lockhart writes to Shell trader Rodrick, "I have some bbls coming in and wanted to offer to you before I show to the market." Ex. 11, SOPUS_PGI_01370921 at row 13082. Defendants' IMs provide numerous examples of them engaging in the practice of holding, and/or providing each other first offers on product. Discussing a possible future exchange between Phillips and BP, BP's Yomtoob writes, "yeah between us we'll prob have it sometime in May but can look at holding it." Ex. 8, PSXPGI04155090 at rows 22-23. Similarly, Shell's IMs detail numerous occasions in which Defendants engaged in this type of back-scratching. In one instance, before offering product to the general market, Shell's trader gave first dibs to Defendants Tesoro and Valero. Ex. 65, SOPUS_PGI_01116387 at rows 15226-15231. In discussions surrounding Shell's need for premium CARBOB, Phillips 66's trader

4827-1942-6539.v1

confirmed, "ok, just let me know next week, I will hold the bbls for you." Ex. 11, SOPUS_PGI_01370921 at rows 9984-9990. In another, Shell trader Kavalinas offered to extend a contract for Tesoro "gratis," in other words, at no cost to Tesoro, or profit for Shell. Ex. 169, SOPUS_PGI_01361352 at rows 312480-312483. Rather than capitalize on a competitor's shortages and capturing market share, which results in price competition, Defendants freely shared confidential information regarding their respective refinery operations, discounted prices and held product from the market to cover one another in their continued efforts to insulate themselves from competitive forces.

### 2. Defendants Perpetually Ran Their Refineries Below Capacity, Strangling Output

Despite the extraordinary value of California gasoline, the Defendants regularly refused to run their facilities to capacity and make gasoline to compete for market share. Discussions between them in 2015 showed that even when huge portions of California capacity were offline, Defendants were able to increase production to make a sufficient amount of gasoline. In the wake of the ExxonMobil Torrance explosion, Tesoro's CEO commented, "[w]ith Torrance, Martinez [a Tesoro refinery in the San Francisco Bay area] and the maintenance activity in the PNW, it is interesting to see how the industry responds and is able to increase gasoline output." Ex. 66, TRMC-00314168 at 4168. In mid-2015, following the ExxonMobil Torrance explosion, an unnamed "West Coast gasoline trader" was quoted saying, "'We don't need more [gasoline]. . . . Look at PADD5 [West Coast] production the last five years. We are making the same amount with ExxonMobil down.'" Ex. 67, TRMC-00199646 at 9648.

In contrast, Defendants immediately recognized the very real threat to their conspiracy when PBF Energy purchased the Torrance refinery from ExxonMobil. In a September 2016 email from Mike Kavalinas, he wrote to colleagues, "Learned a lot about PBF, the trade is very frustrated. When [T]orrance was Exxon (when running)

3:15-cv-01749-TWR-AGS

4827-1942-6539.v1

they were predictable, much like they are in Chicago. PBF refuses to sell on Opis wraps or index, only on basis and is quite the bear in the mkt." Ex. 68, SOPUS_PGI_00934169 at 4169. Similarly, Lockhart wrote to BP's trader about PBF selling too much at one time, saying, "what is wrong with those people?" Ex. 8, PSXPGI04155090 at row 5433. PBFs purchase of the ExxonMobil refinery threatened to disrupt Defendants' control of the market, which included often not running their refineries at full capacity, largely content to maintain the status quo. ***ExxonMobil's Torrance refinery was run at 75%-80% capacity***, according to Chevron employees, who were frustrated that the refinery's new owners might actually utilize the full capacity of the refinery. "We expect USWC margins to remain relatively low as PBF takes over the Torrance refinery – they've indicated a plan to increase refinery runs from XOM [ExxonMobil] rates of 110-120 MBD to ~145 MBD." Ex. 69, CUSA_PG-BAR-001106334 at 6334.

Defendants' sharing of information about operations at each other's refineries allowed them to cooperatively reduce output. A Phillips 66 presentation included detailed sales information about their competitors, "Shell and TSO have PMI term contracts for gasoline. PSX, Shell, TSO, BP all rotate term contracts with various entities on diesel." *See* Ex. 70, PSXPGI00144115 at 4129. The company used this information to deduce that refinery utilization rates were expected to decline from "~85% to ~80%," while at the same time, "We expect exports to increase for West Coast refineries." *Id.* at 4118, 4128. Similarly, a Chevron presentation from 2015 discussed export strategies and noted that "production decreases may be necessary." Ex. 71, CUSA_PG-BAR-000244774 at slide 2. Tesoro was also assessing its options around this time, noting that Shell, Valero, and Philipps 66 were deciding between "Exports v. run cuts." Ex. 72, TRMC-00252440 at 2446.

Defendants also shared extraordinary information such as the dates, timing, and incentives for cutting production of CARBOB. This includes statements like, "If the refineries don't cut runs it could really get bad." *See* Ex. 8, PSXPGI04155090 at row

4827-1942-6539.v1

9061. In another example, BP's Yomtoob wrote to co-workers that, "P66 does confirm to us that they are trimming runs." Ex. 48, BPWC-PG-00039812 at 9857. Another day, Yomtoob asked a Phillips trader, "you guys seein run cut incentive yet in LA" to which Lockhart replied, "yes indeed. Bay and LA." Ex. 8, PSXPGI04155090 at rows 5832-5833. Yomtoob told Phillips 66 trader Lockhart: "The market is still well supplied even with the Exxon FCC down . . . [w]ith all the inbound cargoes of alkylate and carbob, the market will need another refinery mishap to improve." Ex. 73, PSXPGI01264568. Similarly, in another chat between Phillip and BP, Yomtoob discussed production run cuts, despite later testifying that "I know it's information that I would not share on behalf of BP as part of our code of conduct and trader guidelines, but I can't speak for those policies of other companies." Ex. 74, Yomtoob Dep. Tr. at 228:9-229:19; Ex. 8, PSX-PGI-04155090 at rows 3608-360; *see also* Ex. 169, SOPUS_PGI_01361352 at rows 1883-1885 (Shell trader discussing run cuts with BP trader).

### 3. Defendants Engaged in Collusive Action Regarding Coordinating and Discouraging Imports of Gasoline

Another aspect of the conspiracy, supported by significant record evidence sufficient to show numerous disputed material facts, relates to Defendants' activities regarding imports of gasoline during the relevant time period. Utilizing the close network of traders, the Defendants worked together to calibrate imports, disincentivize shipments from third parties, and divert cargoes heading for California. To counter Plaintiffs' evidence regarding imports, as they do with every aspect of Plaintiffs' case, Defendants rely almost exclusively upon deficient and improper declarations to claim that import decisions were based on individual business interests. *See, e.g.*, ECF No. 629 at 31 (citing employee declarations). As detailed *infra*, these lawyer-written, post-hoc declarations are not based on personal knowledge, improperly make legal conclusions and appear to present expert opinion, particularly regarding purported

- 28 - 3:15-cv-01749-TWR-AGS

economic interests. The factual record and the opinions of Plaintiffs' expert Robert McCullough paint a very different picture.

Defendants repeatedly passed highly confidential import schedules and plans to each other, allowing them to coordinate imports to avoid any oversupply. Defendants gave themselves a huge advantage by sharing with one another information not available to outsiders. As Plaintiffs' expert explains, "The exchange of import information gives refiners an edge, because they know the exact timing of shipments heading to California, and where supply will be allocated." ECF No. 647, Ex. 1, McCullough Rpt., ¶192.

Defendants tacitly acknowledge the value of this detailed import information, and the benefit it brings to their small community only. They highlight the difficulty of timing an import into California – "The reality is that foreign imports can take several weeks to arrive in California." ECF No. 629 at 32. "Supply conditions and market trends in California and elsewhere sometimes change in the interim, leading to decisions to redirect cargoes elsewhere." *Id*. These admissions illustrate just how valuable import information is.

It was common for the Defendants to exchange detailed import plans, while the rest of the market was in the dark or was fed misinformation. Notably, following the AFPM conference in 2017, BP's Yomtoob reported back on confidential import information that was shared with him at the conference, including: "P66 . . . Net short alkylate so imports some all summer, has one on the way in late April. . . . Shell . . . Has made 2-3 cargos of carbob out of Puget sound, they keep internal." Ex. 75, BPWC-PG-00537287 at 7287-7288. Indeed, it was Defendants' regular practice to communicate directly with one another to inquire about imports and strategize on market impacts. Pestano testified that it was his practice to call traders at other refiners to determine whether a vessel coming in was theirs, responding "If I feel like I have to do that, yes, to get – to clarify the information." Ex. 76, Pestano Dep. Tr. at 60:8-13. Similarly, when asked how he obtained

4827-1942-6539.v1

information regarding the timing for BP's arrival into California, Shell trader Rodrick responded, "I suspect that I got the timing from the BP trader, Hunter [Henderlite]." Ex. 77, Rodrick Dep. Tr. at 154:16-25. *See also* Ex. 78, SOPUS_PGI_00222786 at 2786 (Rodrick writes, "[g]uys, I was talking to P66 about their boat going Korea →Japan →USWC [U.S. West Coast].").

To counter the damning evidentiary record, Defendants erect a strawman, claiming that increased imports to the West Coast in 2015 somehow explain away any collusive activity. *See* ECF No. 629 at 31. Of course, Plaintiffs' claims regarding collusion connected to imports is not just about the quantities of gasoline, but rather how Defendants scheduled the imports, shared information about the operations, and which parties were excluded from importing into the state, outside the Defendants' exclusive club. Further, it is not inconsistent with the alleged conspiracy that Defendants attempted to capitalize on high prices by importing within their own tightly held network, while preventing third parties from capturing a foothold in the state.

Defendants undertook a number of strategies to keep competitors from importing gasoline into California. In a note to a Phillips 66's trader, BP's Yomtoob acknowledged that companies traded within a certain range to avoid imports, "problem to me is we are 5-6cpg away from more imports . . . so means we will be rangebound." *See* Ex. 8, PSXPGI04155090 at rows 852-853. In a market summary to his colleagues, Yomtoob wrote, "[c]ompletely dead in PADD 5 today. . . . everyone is becoming very cognizant that high prices will attract oil and has slowed down their buying as a result." *See* Ex. 48, BPWC-PG-00039812 at 9839. In other words, in an effort to keep out imports, Defendants slowed down their purchases to signal to the market that prices would not remain high so as to justify the cost to import product into California.[20]

---

[20] Defendants repeatedly referred to import opportunities for outsiders as the "bug light" being on. *See* Ex. 79, CUSA_PG-BAR-000078699 at 700; Ex. 80, CUSA_PG-

3:15-cv-01749-TWR-AGS

4827-1942-6539.v1

Defendant traders repeatedly communicated about keeping certain imports from non-conspirators out. In these discussions, they acknowledge that imports did not come to California because refiners would not work with them. Upon receiving news from BP's trader that an import by a third-party firm was being cancelled, Phillips 66's Lockhart replied, "very good. I had not heard that but didn't think it would happen if the refiners didn't help him out." *See* Ex. 8, PSXPGI04155090 at row 9520. In another instance, BP's Yomtoob reported to colleagues about a different import of CARBOB that would end up in South America, "They don't have logistics to bring this in on their own and I don't think anyone was really interested in helping them bring it in so guessing it ends up in Ecuador." *See* Ex. 50, BPWC-PG-00023738 at 3780.

In another example, Phillips 66 trader Lockhart explained how the Defendants would not bring fuel to their own market, but some trading firms might, "I do expect that a trading company will look to do that but I don't think that BP, Tesoro, Shell or us will put bbls into our own market to mess it up for our local refiners. Trading companies are a different story." *See* Ex. 83, PSXPGI04154107 at row 116. Other times, Defendants blatantly told importers to stay away. When asked if Phillips 66 would need a critical ingredient for CARBOB gasoline, Lockhart responded, "no and don't bring it to the WC". *See* Ex. 84, PSXPGI04154873 at rows 253, 259. Indeed, Defendants were well aware of the impact that imports had on prices in California. A short IM exchange between BP's Yomtoob and Phillips 66's Lockhart from 2017 captures the essence of Defendants' views on imports, albeit in boorish way. Discussing the possibility of imports of alkylate, a key component in the production of California grade gas, Yomtoob wrote to Phillips 66 trader Lockhart, "bigger issue is

BAR-000957828; Ex. 48, at BPWC-PG-00039812 at 9827, *see also* Ex. 81, CUSA_PG-BAR-000066184-185. Phillips 66 trader Larry Lockhart wrote to a BP counterpart, "Like bugs on a night light. I wish I had a bug zapper for them." *See* Ex. 82, PSXPGI04167235. Lockhart wrote to a Shell trader, "I think that a couple of cargoes just discharged and maybe one or 2 left but hopefully the bug light is off." Ex. 11, SOPUS_PGI_01370921 at row 134864.

4827-1942-6539.v1

teh [sic] guys who have stuff in ny/gc [New York/Gulf Coast].  Will be interesting if that comes in," to which Lockhart responds, "everyone will poop in our back yard, kill our market and leave us the dingle berries."  Ex. 8, PSXPGI04155090 at rows 592-595.

Import diversions were another method Defendants used to manipulate the California gasoline market through supply coordination. Defendants discussed and engaged in a concerted effort to divert shipments of CARBOB heading into California during the relevant period.  Despite the unique and valuable nature of CARBOB, Defendants repeatedly cancelled cargoes heading to the state, meaning the valuable fuel would be sold elsewhere.  "The import supply chain is backed up, however we were able to divert two cargos and should be back to a target by first half September."  Ex. 85, CUSA_PG-BAR-000261488.  Valero had similar cancellations, in order to 'dig a hole' before another import, "cancelled another 80mb barge of A1 to LA – digging a hole in LA for the Pembroke [import] bbls."  Ex. 86, VMSC_003193.  Chevron employees knew the taboo nature of diverting cargoes.  After a larger conversation, ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████  J.A. 30.  Shell similarly diverted CARBOB, "Carbob cargo from Rotterdam . . . divert the cargo to NYH."  Ex. 87, SOPUS_PGI_00006746.  Some of these cancelled trips caused large monetary losses.  *See* Ex. 88, SOPUS_PGI_00223178 ("down ($887k) on cancelled cargo from Rotterdam to LA moved to NYH"); *see also* Ex. 89, BPWC-PG-02362200 (BP's ongoing internal ship-tracking emails monitor possible CARBOB imports and whether the ships are able to be diverted.), Ex. 90, VMSC_358436 (Internal Valero document notes that they are working to cut CARBOB inventory).

Defendants specifically address a BP-Valero diversion, whereby Valero was importing CARBOB, but made an agreement to send the fuel elsewhere. (ECF No. 629 at 32).  In the deal, BP received the gasoline on the ship, while Valero received

4827-1942-6539.v1

CARBOB in California. *See* J.A. 915-16. This is a prime example of an agreement that is obviously against BP's self-interest, whereby BP received CARBOB that it would sell in a lower priced market. Indeed, through coordinated diversion tactics, Defendants falsely altered the supply of California gasoline from its natural economic level resulting in an abusive squeeze in the market, activities of which are proscribed by Defendants' own compliance manuals and antitrust law. *See e.g.*, Ex. 7, SOPUS_PGI_00755858 at 5877.

### 4. Defendants Engaged in Collusive Efforts to Export Gasoline out of California

Defendants utilized exports to continue to keep the inventory levels of gasoline in California low enough to cause supracompetitive pricing and price spikes. Despite the extraordinary value of California gasoline, Defendants chose to switch refinery production to non-California gasoline for export, or explicitly export gasoline that met California specifications.

BP and Phillips 66 traders repeatedly discussed exports as a means to maintain high prices. In one chat a Phillips 66 trader wrote, "Dec could be a S_ _ _ storm if exports don't clean us up," and BP's trader responds "agree." *See* Ex. 8, PSXPGI04155090 at rows 5787-5788. In another exchange from January 2018 between BP's Yomtoob and Phillips 66's Lockhart, Yomtoob wrote, "definitely looks like we need to export some volume," explaining the plan, "we draw down stock" and finally, "boom summer goes." *See id*. at rows 8329-8332. Exports were expected to impact inventory figures in the market, which directly impacts price. Lockhart wrote, "hopefully some of the current PMI exports will show up in the next week stats" continuing later, "we can have hope." *Id.* at rows 5418-5423. In another discussion, Yomtoob wrote about the expectation of future exports from Defendants, "[I] think we will structurally see more exports going forward" to which Lockhart replied, "and we need it". *Id.* at 4749-50.

- 33 -                3:15-cv-01749-TWR-AGS

Defendants repeatedly rely on an argument that the production of California gasoline produces byproducts that cannot be used to make CARBOB and must be sold abroad. *See* ECF No. 629 at 8. While there is no disagreement that some export volume must exist, Defendants do not explain the huge increases in exports – despite those refinery constraints not changing. Government data reveals exports of finished gasoline from the US West Coast more than doubled from an annual average of 6,271,000 barrels from 2000 to 2011, to 16,462,000 from 2012 to 2020. *See* Ex. 200, https://www.eia.gov/dnav/pet/PET_MOVE_EXP_DC_R50-Z00_MBBL_A.htm. Internal documents reveal the same increase, including a 174% increase noted by Chevron between 2012 and 2015. *See* Ex. 91, CUSA_PG-BAR-000109281. Further, Defendants own Motion notes that when pressed, Defendants actually can function without exporting at all. "ExxonMobil, Tesoro, Alon and Phillips 66 had zero gasoline exports from California to foreign countries in 2015." *See* ECF No. 629 at 3. The fuel exported by Defendants went far beyond what their refinery constraints demanded. One deponent explained, "it's coming from the same bucket. So you do an export, you necessarily have to reduce all the grades of gasoline, right?" Ex. 92, Pais Dep. Tr. at 224:16-19.

Defendants defend their ongoing and considerable exports by claiming they were required by "contractual obligations." *See* ECF No. 629 at 29. On page 30, they defend Chevron's especially large exports in 2015, claiming "they were necessary to fulfill Chevron's contractual commitments to long-standing customers." *Id.* This argument ignores the fact that Chevron and the other Defendants entered these agreements with knowledge of California's ongoing high prices and supply situation. Defendants cannot pretend they didn't forge these agreements themselves. Further, Defendants could have fulfilled these deliveries by purchasing cargoes from other trading firms or utilizing non-California refineries.

Defendants have a consistent pattern of downgrading CARBOB to less valuable grades of gasoline to sell in other locations. This practice, known as 'dual

- 34 - 3:15-cv-01749-TWR-AGS

certification', was shared and discussed among the Defendants. Tesoro's trader testified that CARBOB was dual certified as Arizona gasoline and shipped out of state. Ex. 76, Pestano Dep. Tr. at 168:3-169:11. Tesoro documents also indicate that their "carbob premium is dual certified for conventional." Ex. 93, TRMC-02213896.

███████████████████████████████████████████████████████

████████ *See* Ex. 94, BPWC-PG-02360536. In the context of discussing potential exports to Mexico in response to Shell trader Jeff Marino's questions regarding dual certification, Marino's colleague writes, "they would look to blend CARBOB with certain mix of ethanol to get to right Mexico recipe." Ex. 95, SOPUS_PGI_00931941 at 1946.[21]

Despite Defendants ongoing claims about the difficulty and expense of making CARBOB, it appears the companies routinely dumped it out of California, which had the effect of throttling supply and maintaining artificially inflated prices. A Phillips 66 deponent was asked whether documents showed exports of CARBOB to Nevada, and he admitted: "It does." Ex. 96, Sharum Dep. Tr. at 183:17-25. Documents produced by Defendants and third party Silverpeak show a pattern of certifying California gasoline for import as both CARBOB, and the less valuable, less stringent, RBOB. *See* Ex. 97, SILVERPEAK_0000018 at 0019, identifying the product on the vessel SCF Pechora as "RBOB," and the same vessel, tested as CARBOB, days later at Ex. 98, EM_PG000083170. Thus, prior sworn testimony and documentary evidence produced in this litigation directly refutes Defendants' assertions regarding exports, and specifically, exports of California grade gasoline.

---

[21] Defendants discussed these dual certifications with each other. Rodrick noted to a third party that he had inside information on the process, "Valero is duel [sic] certifying it – carbob to conv." *See* Ex. 11, SOPUS_PGI_01370921 at row 195143. Phillips 66's Lockhart wrote to the BP trader: "I can sometime [sic] dual certify my carbob prem to make the azrbob prem . . . ." *See* Ex. 8, PSXPGI04155090 at row 3073. Another Shell employee commented: "Valero has been bringing bbls from their Pembroke refinery but not certifying as CARBOB." *See* Ex. 99, SOPUS_PGI_01121313.

3:15-cv-01749-TWR-AGS

4827-1942-6539.v1

Critically, ***Defendants shared detailed export schedules with each other, further cementing the informational advantage of the companies above outside competitors***.  A news story in 2017 stated five export cargos were leaving the West Coast.  BP's Yomtoob and Phillips 66's Lockhart coordinated discussions with all the Defendants to ascertain the validity of the story. Lockhart reported: "Shell said no . . . eric [Tesoro] told me no."  Yomtoob continued: "I spoked [sic] to valero.  he says they did not sell any mex cargos either (pls keep between us)."  And finally, Yomtoob reported that Chevron also confirmed it wasn't them on the export, writing to Lockhart that, "between us, I spoke w rick [Pluimer], he did not sell PMI either.  so between the two of us I think we have polled all the WC refiners."  *See* Ex. 8, PSXPGI04155090 at rows 2551, 2554, 2684, 2742.  While the Defendant traders exchanged confidential export information, the rest of the market was referring to an incorrect article about the quantity of exports.  Indeed, Defendants freely exchanged their export schedules with one another throughout the proposed class period.  Rodrick confirmed during his deposition that he spoke with at least traders from BP, Exxon, and Phillips regarding their respective exports during his time as west coast gas trader.  Ex. 77, Rodrick Dep. Tr. at 152:20-153:5.[22]

Documents indicate that exports were made at a loss.  Defendants try to confuse the court by claiming if spot prices are higher in an export location than California – the export ***must*** make economic sense for the company.  ECF No. 629 at 29-30.  This is untrue.  Defendants are large vertically integrated companies, any potential extra gasoline would not be sold on the spot market in California, but on the highly elevated rack price.  *See* ECF No. 605, Ex. D, McCullough Rebuttal Rpt., ¶¶12-34.  Chevron documents indicate that at times even *making* Mexican gasoline is more expensive than making the complex CARBOB.  In other words, regular Mexico gasoline was 7

---

[22]  Defendants also discussed prices charged to export entities, and refusals to accept certain prices. "A round robin of all the refiners on the WC today confirms what I heard from PMI last week, none have booked as PMI has been unwilling to step up and pay WC prices." *See* Ex. 50, BPWC-PG-00023738 at 3766.

4827-1942-6539.v1

cents per gallon more expensive to produce relative to CARBOB. *See* Ex. 100, CUSA_PG-BAR-000074774. Importantly, Chevron's trader revealed export prices were typically based on CARBOB *minus* 11-14 cents per gallon. *See* Ex. 101, CUSA_PG-BAR-000014173 at 4174.

Defendants exported large amounts of gasoline throughout the relevant time period. This according even to Defendants' expert. *See* ECF No. 624, Ex. 3, Ordover Rpt. at Figures 16, 17 and 18 (detailing exports). In 2017, Tesoro exported large amounts of gasoline at far below the California price. In an extraordinary operation from August 2017 to October 2017, Tesoro utilized trucks to send over a million gallons across the border to Mexico. Tesoro's own document indicates that "Product Price per Gallon" for those truck trips averaged $1.72 per gallon, while California retail gasoline prices were over $3.00 per gallon. *See* Ex. 102, TRMC-04201727; Ex. 106, https://www.eia.gov/dnav/pet/pet_pri_gnd_dcus_sca_m.htm. Throughout that year, Tesoro also sent four large vessels by sea, carrying gasoline to Mexico at similar prices between $1.60 and $1.85 per gallon. *See* Ex. 102, TRMC-04201727 (based on the "Final Price Per BBL"). Similar exports at near these prices occurred in 2018.

### 5. Exchange Agreements were Used and Abused By Defendants to Monitor and Police the Conspiracy

Defendants structured a deep and wide net of exchange agreements in California. Defendants had dozens of exchange agreements with one another, crisscrossing the state and providing each other with easy access to fuel at nearly every supply source.[23] These exchange agreements provide a mechanism for

[23]  *See, e.g.*, the following non-exclusive list of convenience exchange agreements at locations throughout California: Ex. 114, EM_PG000186453 (Exxon and Shell); Ex. 115, EM_PG000186490 (Exxon and Tesoro); Ex. 116, CUSA_PG-BAR-000702667 (Chevron and Valero); Ex. 117, CUSA_PG-BAR-000702905 (Chevron and Valero); Ex. 118, CUSA_PG-BAR-000701841 (Chevron and Exxon); Ex. 119, TRMC-04202259 (Tesoro and Chevron); Ex. 120, CUSA_PG-BAR-001077348 (Chevron and Tesoro); Ex. 121, PSXPGI00460614 (Phillips and Shell); Ex. 122, PSXPGI00460628 (Phillips and Shell); Ex. 123, PSXPGI00460642 (Phillips and Valero); Ex. 124, BPWC-PG-02045887 (BP and Chevron); Ex. 125, PSXPGI01132958 (Phillips and BP); Ex. 126, TRMC-04201814 (Tesoro and Shell, Summary to Exchange Agreement reflecting 30 amendments since inception);

4827-1942-6539.v1

Defendants to exchange fuel on a barrel for barrel basis. There are two primary types of exchanges. Location based exchanges allow a company to give fuel to a counterparty in one location and receive it in return in another location. The second type of exchange is time based, where a Defendant will provide barrels today, and those barrels will be returned at some date in the future – with no money changing hands.[24]

This array of exchanges is another example of Defendants' collegial and collaborative approach to supplying the California market, where favors today are returned tomorrow and which allowed Defendants to share production capacity and gasoline across the state at favorable, non-volatile prices, and freeze out other competitors that would typically compete for transactions. A Shell employee writing to a Chevron employee about settling an old exchange balance, summed up the situation well: "***The whole point of the convenience exchange is to help each other out volumetrically without adverse financial impact***." Ex. 139, SOPUS_PGI_00546443 at 6445. This is not normal profit-maximizing behavior. *See Home Depot*, 2019 WL 3804667, at \*9; *In re Ethylene Propylene Diene Monomer (EDPM) Antitrust Litig.*, 681 F. Supp. 2d 141, 170 (D. Conn. 2009) (Defendant "selling [product] at a sub-market price to [rival] when [rival] was having supply issues, rather than simply selling the [product] to [rival's] customers at higher market prices" is an act against economic self-interest that supports an inference of collusive behavior); William E. Kovacic, *et al.*, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 423 (2011) ("In addition, if one seller buys anything from

---

Ex. 127, VMSC_426529 (Tesoro and Valero, Amendment #24 to original exchange agreement); Ex. 128, EM_PG000222590 (Phillips and Exxon); ECF No. 647, Ex. 1, McCullough Rpt., ¶¶276-277.

[24] *See, e.g.*, Ex. 123, PSXPGI00460642. The central component of convenience exchanges is the lack of fixed quantity and permissive nature of the agreements. *See* ECF No. 605, Ex. D, McCullough Rebuttal Rpt., ¶¶92-93.

3:15-cv-01749-TWR-AGS

4827-1942-6539.v1

another at nonmarket prices, then a resource transfer is made for which there is no reasonable noncollusive explanation.").

As Defendants acknowledge, courts recognize that "these types of agreements undoubtedly [can] be misused" as part of an unlawful conspiracy. *See* ECF No. 629 at 27 (citing *Aguilar v. Atl. Richfield, Co.*, 25 Cal. 4th 826, 863 (Cal. 2001)); *see also Commonwealth of Kentucky v. Marathon Petroleum Co., LP*, 191 F. Supp. 3d 694, 703 (W.D. Ky. 2016) ("[Defendant gasoline refiner] may be correct [that exchange agreements have procompetitive benefits], but that does not mean that all exchange agreements are procompetition. . . . '[M]any joint arrangements and operations in which members of the industry engage already may provide the opportunity for collusion on price and output.'") (quoting *Marathon Oil Co. v. Mobil Corp.*, 669 F.2d 378, 383 (6th Cir. 1981)). Here, the evidence establishes such misuse.[25]

The Defendants' network of exchange agreements is deep, wide, and with characteristically loose boundaries. The quantity or value of product that Defendants transferred to one another pursuant to these agreements is enormous. Between January 2011 and August 2018, Phillips received or delivered approximately 749 million gallons of gasoline pursuant to these agreements. *See* Ex. 130, PSXPGI00440654.

Further, Defendants treated the contracts with little formality. Finished spot transactions were added to exchanges, or other transfers removed from exchanges,

---

[25] By and large Defendants' procompetitive justifications are retread of arguments made over a decade ago in litigating *Aguilar*, but *Aguilar* is easily distinguishable on its facts. First, the upheaval (and important underlying thread running through much of the court's analysis in *Aguilar*) of the then-recent change to a cleaner burning, more expensive gasoline formulation, *i.e.*, CARBOB, is no longer a justification for Defendants' extensive exchange network. Moreover, the exchange network at issue in *Aguilar*, *Aguilar v. Atl. Richfield, Co.*, 2000 WL 1475849, at *8 (Cal. July 31, 2000), has grown since the time of that case. And all Defendants (save for Alon) now have agreements with all or nearly all of the other Defendants, often at various locations. Further, the record in *Aguilar* was devoid of the significant evidence here establishing Defendants' actions against their self-interest in supplying one another via exchanges and use of the exchanges to provide one another with sensitive, proprietary operating information.

- 39 -                     3:15-cv-01749-TWR-AGS

casually with agreement from each party. Valero and Exxon employees agreed to use a convenience exchange to transfer product not covered by the exchange, acknowledging they were "not following protocol." *See* Ex. 133, VMSC_198935. When a need for future supply became apparent, instead of transacting on the spot market, Defendants would often just amend an existing exchange agreement to cover the needed volume and timing, Chevron and Tesoro did just that in August 2014. *See* Ex. 134, TRMC-00636607. Valero and Shell discussed retroactively entered exchanges for prior transfers of fuel. *See* Ex. 135, VMSC_357532. The agreements are so informal that balances are often rolled over or left unpaid – sometimes for years. As of August 2014, Phillips had over 20,000 gallons of gasoline rolled over and left unpaid from May 2010, and over 60,000 gallons suboctane premium gasoline rolled over and left unpaid from February 2012. *See* Ex. 136, PSXPGI01168961, attaching Ex. 137, PSXPGI01168964; Ex. 138, PSXPGI01168965. This was common.[26]

These are not the behaviors of competitors – even oligopolistic ones, but rather, are actions against self-interest that do not make sense in the absence of a conspiracy. *See Home Depot*, 2019 WL 3804667, at *9. *See also In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 711 (E.D. La. 2013) (actions against self-interest generally considered the most important plus factor) (citing Proof of Conspiracy at 70 (collecting cases)); ECF No. 647, Ex. 1, McCullough Rpt., ¶¶291-293.

Convenience exchanges, in particular, are nothing more than a means to facilitate crony back-scratching in the form of short term borrowing of product. If, as Defendants explain, these agreements "assist[] them to guard against supply disruptions and thus ensure that they have sufficient product to cover their commitments to their own network of customers" (*see* ECF No. 629 at 28), then why

---

[26] *See* Ex. 139, SOPUS_PGI_00546443, attaching Ex. 140, SOPUS_PGI_00546447, Ex. 141, SOPUS_PGI_00446843, Ex. 142, VMSC_144068, Ex. 143, PSXPGI01153735, Ex. 144, BPWC-PG-02124654, Ex. 145, VMSC_140926; Ex. 146, EM_PG000169021.

4827-1942-6539.v1

would one Defendant competitor agree to cover another when it comes hat-in-hand in need of supply, and forego the opportunity to supply the in-need Defendant's customer directly? Presumably, faced with a supply shortfall for one reason or another, the in-need Defendant would be willing to pay more than the going rate to cover its short, but instead, it receives a bargain and is able to repay the barrels in kind at a later time when they are of comparably less value to the counterpart Defendant.

Consider the following example: On September 14, 2017, a Shell refinery "blip" left the company short CARBOB and unable to meet contracted for demand on the following day. Ex. 147, SOPUS_PGI_00695035 at 5037. Despite Phillips facing a supply "crunch" of its own, the company lent Shell 26 mb of gasoline on September 15, when the spot price was $1.79 per gallon, and Shell returned the barrels a few days later on September 19, when the spot price had dropped to $1.72 per gallon. *Id.* at 5035-36; Ex. 148, TRMC-03559287 ($1.79 spot price for carbob regular on Sept. 15, 2017); Ex. 149, TRMC-03559260 ($1.72 spot price for carbob regular on Sept. 19, 2017). Thus, in this exchange, Phillips bailed out its competitor Shell, receiving barrels that were far less valuable than the ones it gave to Shell four days earlier. Internally, Shell noted that the exchange allowed it to avoid transacting at market prices to cover its short, resulting in savings of $50,500. Ex. 147, SOPUS_PGI_00695035; *see also* Ex. 150, SOPUS_PGI_00683532 at 3532 (Shell again leverages an exchange agreement – this time with Valero – "to preclude spot purchase" to cover a supply shortfall, saving Shell (and presumably costing Valero) "2.77cpg or $29k"); ECF No. 647, Ex. 1, McCullough Rpt., ¶¶283-288; ECF No. 605, Ex. D, McCullough Rebuttal Rpt., ¶¶93-95.

And when exchanges are cash settled, the repayment is on favorable terms: typically based on monthly averages of OPIS prices instead of peak prices when Defendants are most likely to leverage their exchange agreements. *See, e.g.*, Ex. 151, PSXPGI00087271 at 7290 (describing convenience exchanges as "[t]ypically resolved within the same month, negating price exposure since they are negotiated based on

- 41 - 3:15-cv-01749-TWR-AGS

month-average pricing"); *see also* Ex. 96, Sharum Dep. Tr. at 35:23-36:7; Ex. 152, BPWC-PG-02124650 at 4652, 4654-55; Ex. 153, VMSC_156862.

Defendants acknowledge that avoiding the spot market (its prices and volatility) is an important objective of exchange agreements. Again, an example is illustrative here. On December 21, 2012, Valero found itself in a tight spot, experiencing issues with critical refinery units at the Wilmington refinery that caused a "short [of] about 37,000 of Carb Prem." Ex. 161, VMSC_849628 at 9628. Valero's Bethany Wright explained she was "working on covering that [short] via the convenience exchange" but noted "if I am unable to borrow the product we will be forced to either buy in the freeze on Wednesday [December 26, 2012] or cut the terminals and buy intank." *Id.* Wright was able to cover the short via an exchange agreement with Shell. Ex. 154, VMSC_855603. Wright wrote to Shell, "I know it is a lot to ask but I have to throw it out there," and upon completing the deal, "[t]hank you again for your help, I owe you BIG BIG BIG time!" Ex. 155, SOPUS_PGI_01032999 at 3000. As Valero noted, it would have paid a premium if it had transacted on the spot market, where most market participants purchase gasoline. *See* Ex. 156, BPWC-PG-02254384 at 4387 (OPIS West Coast Spot Market Report from December 26, 2012 noting "spot prices run higher on strong futures run"). While it may have made sense for Valero to agree to an exchange of product instead of pay this premium, it makes little sense for Shell to cut Valero this break.[27]

Given how Defendants used exchange agreements, it is not surprising that they often described the agreements as "favors" or a means to provide "help" to one

---

[27] Shell may point to the fact that it saw prices going higher in the next month, January 2013, in trying to explain how this transaction was in its individual economic interest (*see* Ex. 155, SOPUS_PGI_01032999 at 2999 (Gruver wrote to Shell's D. McEnany: "market is in contango since this is beneficial value-wise")), but this does nothing to explain the 11mb that Shell loaned to Valero without any expectation that it be repaid back (*see id.* at 2999-3000) (agreement between Shell and Valero was for Shell to source 36mb of Carb premium to cover Valero's short at the end of December in return for 25mb of Carb premium in January, leaving 11mb unaccounted for)). *See also* ECF No. 647, Ex. 1, McCullough Rpt., ¶¶277-278.

- 42 -                    3:15-cv-01749-TWR-AGS

another, as Valero's Wright did above.  In another example, on November 25, 2015 Chevron Trader Irene Gessling emailed Valero Trader Dwight Smith explaining Chevron's "good deed for the day" and Smith turned around and forwarded the message to others at Valero writing, "FYI.  Valero's Champion in distress."  Ex. 157, VMSC_387310; Ex. 158, VMSC_388997.  As Gessling explained, Chevron was bailing Tesoro out by covering, on convenience exchange, a 20mb short of conventional gasoline that Tesoro owed Valero.  Ex. 157, VMSC_387310, *see also* Ex. 159, SOPUS_PGI_00942349 at 2349 ("Tesoro is good to help us in a pinch so I wanted to help them . . . ."); Ex. 160, TRMC-02804429 ("we'll need to pull in exchange favors to meet shipments early next week").  Alternatively, Defendants also described these deals as "borrowing" barrels from one another, but there are no finance charges for these loans.  *See* Ex. 161, VMSC_849628 at 9628 ("I am working on covering that via the convenience exchange, if I am unable to borrow the product"); Ex. 162, TRMC-00070323 at 0323 ("Shell, Valero and Chevron are all asking to borrow barrels from us at Shell Carson"); Ex. 163, SOPUS_PGI_00351121 at 1122 (Shell "[c]hecking to see if you [Valero] might have [barrels] that I [can] borrow" on convenience exchange); *see also* Ex. 164, VMSC_423399 at 3401, 3403.

Like with other touchpoints between Defendants, conversations about exchanges and exchange agreements provided a forum for Defendants to share sensitive, proprietary information with one another.  Similar to trader discussions, conversations between Defendants in connection with exchanges often cover far more than basic price and location of delivery information, and include detailed operational information unavailable to the market and not necessary to complete the exchange. *See* Ex. 165, SOPUS_PGI_00950379 at 0379; Ex. 159, SOPUS_PGI_00942349 at 2350; Ex. 157, VMSC_387310; Ex. 164, VMSC_423399 at 3403; Ex. 135, VMSC_357532 at 7532.  This was a forbidden practice.  Ex. 4, SOPUS_PGI_01054804 at 4823 ("[Y]ou can legitimately exchange information on the relevant real transaction you are (trying to) achieve but it is not legitimate to

3:15-cv-01749-TWR-AGS

exchange that information with this customer/competitor that is not directly related to the relevant deal; you can not use the contract as a 'cover' for more widespread information exchange."); *see also* Ex. 13, PSXPGI00460392 at 0393-96.

In short, Defendants have created a web of exchange agreements that act as a separate, non-price-based market only available to them. The network is extensive and Defendants transact substantial quantities on this market, often turning to this market first when in need as a result of an outage or other problem resulting in a supply shortfall. As a result, other non-defendant market participants are cut out of a substantial segment of the market for gasoline sales in California. Through all of this Defendants share production capacity between themselves and limit the supply of gasoline in California.

Defendants do not argue with much of this. They admit that exchange agreements allow them to keep less inventory on hand and spread losses as a result of shortages among the Defendants. For example, Valero's Patrick Brooks testified that convenience exchange agreements allow Valero to efficiently supply its customers with product by being able to rely on other refiners' supply to make up for any shortfalls as a result of operational constraints or otherwise. Ex. 166, Brooks Dep. Tr. at 62:17-64:7. Similarly, Phillips 66's Miratsky, when asked if Phillips used "exchange agreements to avoid run-outs and maybe avoid oversupply of products in California," responded, "[t]hat would be a strategic way that my team would use them, yes." Ex. 167, Miratsky Dep. Tr. at 39:21-25; *see also* ECF No. 605, Ex. D, McCullough Rebuttal Rpt., ¶¶100-102. Rather, Defendants argue that exchange agreements are procompetitive or independent profit-maximizing decisions. Principle among the Defendants' arguments is that exchange agreements "reduce their costs, or . . . facilitate local supply." *See* ECF No. 629 at 28. Defendants point to a locational exchange between Shell and Chevron to describe the pro-competitive benefits of allowing a competitor to enter a local market. But they fail to explain any procompetitive aspect of a time-based exchange where companies allow only certain

- 44 -                    3:15-cv-01749-TWR-AGS

counterparties to 'borrow' gasoline. Their explanation fails to justify the extensive network of Defendant exchange agreements within California, especially between neighboring Defendant refiners. *See, e.g.*, Ex. 168, PSXPGI00080448 (an internal "Asset Map" showing "Exchange Partners" of Chevron, Exxon, Valero, Tesoro, and Shell at various supply points throughout Southern California). And it does nothing to explain away the wealth of evidence covered above showing the peculiar nature of these agreements, in the absence of a conspiracy.

### C. Suspect Trading Practices Demonstrate Collusion

#### 1. Selective Price Reporting

Defendant traders worked together to report only certain trades to pricing agencies such as OPIS. Some Defendants were required to report all trades to pricing agencies, while others were forbidden from doing so. Since brokers will report trades at the request of traders of the deal, Defendants selectively used brokers to get certain prices reported, essentially manipulating the price. Shell trader Kavalinas described the strategy flatly to PBF's trader, "do you mind if we have a broker write it up so the value is reported to opis? (i can't talk to opis)." Ex. 169, SOPUS_PGI_01361352 at row 295948. Likewise, as a workaround to Shell's policy against speaking to price reporting agencies, and notwithstanding the fact that he was unable to express any confidence in the accuracy of their reporting, Shell trader Rodrick had his own personal requirement that each of his trades be reported to OPIS by the counterparty to the transaction. "Every deal I do needs to go to opis." Ex. 11, SOPUS_PGI_01370921 at row 61501; Ex. 77, Rodrick Dep. Tr. at 48:11-22; 87:7-14.[28]

Similarly, Chevron forbade traders from reporting transactions, but had no rule forbidding directing brokers to do so (*see* Ex. 170, Pluimer Dep. Tr. at 124:3-8,

---

[28] Notably, Shell has price reporting requirements in place for other products traded, including crude oil, but not for California gasoline. Ex. 172, Harris Dep. Tr. at 227:21-229:22. Shell's Trading and Compliance manual provides that any traders reported "must be complete, accurate, and timely. Ex. 7, SOPUS_PGI_00755858, at 5884. "Selective reporting or reporting for purposes of distorting or manipulating prices is prohibited." *Id.*

4827-1942-6539.v1

125:14-126:7) meaning the company's traders could essentially choose which prices were reported. Chevron's Pluimer made a practice of following whether his trades were reported after concluding them with other Defendants. "I assume OPIS gets levels?" He wrote to a broker after completing a trade with Valero's Kyle Etter. Ex. 171, ICE000001 at row 325. After a deal with Tesoro, "I would like that deal reported as normal." *Id.* at row 9217. Likewise, Shell trader Rodrick often followed-up with brokers, "[p]lease make sure OPIS has that data!" Ex. 11, SOPUS_PGI_01370921 at row 53459. While other times, brokers were familiar with Rodrick's policy confirmed, "ok, buyer would like to keep it quiet for a while, but i'll make sure opis gets it for posting." *Id.* at row 80267. After some deals, Lockhart and Yomtoob decide "PNC please," before continuing, "would rather this one not get out to mkt." *See* Ex. 8, PSXPGI04155090 at rows 8113-8114.

Selective reporting of trades violates internal guidelines of at least several Defendants: Shell (*see* Ex. 7, SOPUS_PGI_00755858 at 5885), Phillips (*see* Ex. 173, PSXPGI00460242 at 0252), Valero (*see* Ex. 14, VMSC_159816 at 9836 ("you must not report . . . misleading price or volume figures")), and the FTC's Refinery Market Manipulation Rule. Conduct prohibited by the Rule includes: "[f]alse or misleading representations about the price or volumes of past transactions to a private price reporting service" and "[f]raudulent or deceptive transactions designed to disguise the actual liquidity or price of a particular asset or market for that asset." Ex. 201, https://www.ftc.gov/sites/default/files/documents/rules/prohibition-energy-market-manipulation-rule/091113mmrguide.pdf. In some cases, the selective reporting was flagrant, and occurred at critical times such as in February of 2015, as prices started to spike. On February 20th, after completing a trade via a broker between Phillips' Lockhart and Tesoro's Pestano, the broker asked, "do you want me to report this to OPIS? . . . or keep p and c." *See* Ex. 174, PSXPGI0415510 at rows 142-143. Lockhart replied, "report please." *Id.* at row 144.

- 46 -                    3:15-cv-01749-TWR-AGS

A week later, Shell's Rodrick and Tesoro's Pestano conduct three transactions directly in quick succession. During the discussion they decide to bring in a broker for only one of the deals – guaranteeing only one price was reported. Pestano noted the reason for using a broker was to "show" the new price differential. Later Pestano asked, "think it will make it to opis?" Ex. 11, SOPUS_PGI_01370921 at rows 122066-122092. Pestano even testified that certain trades were done via a broker based on whether he wanted the trade known to the market. When asked why he wouldn't use a broker in some cases, he stated, "[i]t would be blasted across to everybody, and now they see a – they see a buyer looking for 500,000 barrels of gasoline or, you know, 100,000 barrels of gasoline per cycle for the next five cycles." *See* Ex. 76, Pestano Dep.Tr. at 222:21-25.

### 2. Wash Trades

Defendants participated in manipulative trading schemes, including wash trades. Wash trades occur when a trader makes a purchase of gasoline with the express intent to sell it back to the counterparty – essentially 'cancelling out' the trade. These trades present to the market a false sense of demand, liquidity, and price.

Plaintiffs have compiled a list of wash trades, representing examples from the discovery record. Defendants deny that these trades, although clearly offsetting transactions, are wash trades. At the very least, this raises a disputed issue of fact. ECF No. 605, Ex. D, McCullough Rebuttal Rpt., ¶¶103-129. Defendants incorrectly proclaim that wash trades are irrelevant if the trades are not the highest trade of the day, as only the high and low price of the day are utilized by pricing service OPIS to calculate the daily price. ECF No. 629 at 49. This is untrue, as OPIS sends out price alerts throughout the day (*see* Ex. 169, SOPUS_PGI_01361352 at rows 16095, 16097-1098, 16735-16739, 17535, 182970-182982, 184510-184512) meaning any transaction reported to the agency would impact the market's view of prices and liquidity at that moment. Further, brokers similarly send out information on completed trades, meaning a wash trade would impact market assessment regardless

- 47 -                                   3:15-cv-01749-TWR-AGS

of whether it is the high or low of the day. *See* Ex. 171, ICE000001; Ex. 175, ICE000002.

In some instances, Defendants are obvious about their intention to raise prices through a flurry of trades. On April 20, 2015, Chevron's Pluimer discussed selling certain positions but only after another Chevron trader was able to push the price up through purchases in the following days, "we will also sell the 50mb swaps, but maybe after Miles is in buying for a couple of days." Ex. 176, CUSA_PG-BAR-000960060 at 0060. The next day, Chevron trader Jeff Miles sent a list of subsequent transactions to his colleagues. Miles made a series of 10 trades for LA gasoline, including seven purchases, and three sales. Many of these transactions were offsetting. Ex. 177, CUSA_PG-BAR-000013328. Pluimer admitted at his deposition that this was in order to raise the price, "so we thought he would be in the market and he would push the mark – he would have the market impact, and the market would possibly move up, and we would sell our swaps." Ex. 170, Pluimer Dep. Tr. at 216:14-17. This type of price manipulation is in direct violation of Defendants' policies and antitrust law. Trading data from that same day shows that a purchase of 25,000 barrels from Shell was sold *back* to Shell the very next day on April 21, 2015. Ex. 178, CUSA_PG-BAR-000955153 (Tab May 15 Rate (only accessible by "unhiding" this sheet). Just a few days later on April 23rd, Chevron's Pluimer confirmed that "Chevron/Tesoro in markets buying caused a big basis move." Ex. 179, CUSA_PG-BAR-000013470. Otherwise stated, Chevron's plan to influence the price of gas in the California market was successful.

Because they are vertically integrated, the Defendants benefitted from these trades because of their impact on downstream prices. Even if a trader makes a minor loss on the initial wash trade, the downstream profits can be enormous. The discovery record reveals that Defendants routinely conduct trades with each other that "cancel out." The companies do not actually deliver any gasoline on these contracts – but rather cancel out the transactions in what is known as a book transfer. *See* Ex. 180,

TRMC-00148440, Tab NOV'13 at rows 191-192, Tab DEC'13 at rows 50, 121, Tab AUG'14 at row 182, Tab Sep'14 at row 155, Tab Oct'14 at row 110, Tab Nov'14 at row 118; Ex. 181, PSXPGI00085865, Tab CARBOB Dtl at rows 29, 44-45.

Defendants were also part of an unofficial agreement between West Coast traders to limit trading hours, voted on by email in 2014. The "gentleman's agreement" as it was called, was supposedly meant to align trading hours with the hours that OPIS accepts trades for calculating the daily price. *See* J.A. 584-86. This informal agreement to institute arbitrary trading hours could act as a deterrent to traders in other parts of the world that may not operate at the hours identified. *See* ECF No. 647, Ex. 1, McCullough Rpt., ¶¶314-315.

### D. Defendants' Actions in Response to the ExxonMobil Torrance Outage in 2015 Demonstrates the Conspiracy

The conduct described above did not occur in a vacuum. Outages provided prime opportunities for the Defendants to capitalize on these strategies. When ExxonMobil's Torrance refinery suffered a massive explosion in February 2015, gasoline prices in California peaked. In response to the outage, Defendants utilized every tool in their playbook to collusively profit from the situation. By July, Californians were paying over $3.85, while the US Average remained close to $2.85. *See* Exs. 182, (CA) https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET &s=EMM_EPMR_PTE_SCA_DPG&f=W; Ex. 183, (US) https://www.eia.gov/dnav /pet/hist/LeafHandler.ashx?n=PET&s=EMM_EPMR_PTE_NUS_DPG&f=W.

By the end of the day of the outage, ExxonMobil traders were already sharing confidential information with other Defendant traders, including Shell's Rodrick, who wrote to colleagues, "[t]alked with the Exxon trader for a bit last night and I really think they have no idea how long they will be down." *See* Ex. 184, SOPUS_PGI_00458495. Immediately following the accident, ExxonMobil worked closely with the rest of the Defendants to cover their short positions. In an IM exchange on March 27, 2015, this time with Exxon trader Perez, Perez informed

4827-1942-6539.v1

Shell's trader Rodrick that Exxon was going to need premium CARBOB in May and Rodrick confirmed, "OK – we will have all you need in Ma[]y." *See* Ex. 11, SOPUS_PGI_01370921 at rows 132073-132074. This conduct included asking Tesoro to cover 100% of demand at certain locations. As discussed in §B.1, Tesoro did a number of favors for ExxonMobil. By April, Tesoro was internally describing their system was "short in LA" due to the responsibilities they had taken on in supplying ExxonMobil. *See* Ex. 58, TRMC-02519758 at 9758. Chevron similarly described ExxonMobil's predicament as being built into its system, "PSAT has taken a 300MB short to ExxonMobil in May that is built into system demands on ESE [El Segundo Refinery]." *See* Ex. 185, CUSA_PG-BAR-000008309 at 8309. Valero similarly worked hard to support ExxonMobil, activating its extensive array of exchange agreements. *See* Ex. 133, VMSC_198935 at 8935 (Exxon "appreciat[ive] [of] you all [Valero] helping us out today" and agreeing to use convenience exchange to transfer product not covered by the agreement, which as Valero noted internally was "***not following protocol***"). ExxonMobil repeatedly turned to other Defendants in a frenzy asking for additions to their agreements – which were often accepted. On February 25th, an Exxon employee wrote to counterparts at Valero, "▮ is asking me to send another batch of carbob reg to Fresno . . . 5kb. Can you accommodate?" *See* Ex. 186, VMSC_112935. Valero's Jeff Rogers replied, "[g]o ahead and add it in." *Id.* A month later, another request to Valero was made because "we could use the extra volume." Valero employees replied, "sure go ahead." Valero made no attempt to extract a higher price due to ExxonMobil's clear need and supply shortage.

In the days after the outage, some employees questioned why their companies were working to help ExxonMobil. Regarding an email about selling a large quantity of a gasoline ingredient to ExxonMobil, one employee replied, "[h]ave we thought through selling the alkylate from a competitive standpoint??? Why sell the alkylate now to a competitor??" *See* Ex. 187, CUSA_PG-BAR-000079927 at 9927.

3:15-cv-01749-TWR-AGS

4827-1942-6539.v1

Market information about the outage was astoundingly wrong, while the Defendants exchanged detailed information about the outage. ExxonMobil immediately imposed its typical policy of refusing to answer questions about refinery operations. *See* Ex. 188, EM_PG000139898. Over the 15-month outage, media reports repeatedly circulated about restart dates in July of 2015. *See* Ex. 189, BPWC-PG-01662554 (then "extended into September.") *See* Ex. 190, TRMC-00048927 (and eventually to "the first quarter of 2016.") *See* Ex. 191, TRMC-00049415 (all cited to anonymous refinery sources. All of these stories turned out to be false – the refinery would not return to service until mid-2016). However, Defendants, did not have to depend on this false information. Throughout the outage, Chevron trader Rick Pluimer relied on a member of his family who worked at the Torrance refinery to share confidential updates and information about the outage, telling his colleague, "[m]y brother-in-law told me this has nothing to do with the ESP [electric submersible pump] and they are still waiting for the permits to start to even look at it . . . they still have parts of the unit that exploded laying on top of other units." Pluimer had access to, and freely provided confidential details surrounding the explosion at Exxon's refinery, information that was not available in the OPIS article he shared in the same email. Ex. 192, CUSA_PG-BAR-000960110. When the facility did finally restart, Pluimer was given detailed information from ExxonMobil traders. While discussing a Genscape report about the refinery's FCC shutdown, one of Chevron's employees shared with Pluimer and others at Chevron that "The Exxon VGO trader told me today that they were expecting to start up around 4/21." Ex. 193, CUSA_PG-BAR-000056126. The misinformation in the media benefitted the Defendants, who had access to more accurate and detailed information, and could calibrate their operations accordingly.

BP trader Hunter Henderlite testified that the ways in which he obtained information about ExxonMobil's Torrance outage following the explosion in 2015

4827-1942-6539.v1

could have been "from counter-party information" or it "could be somebody internally heard something and told me." Ex. 194, Henderlite Dep. Tr. at 85:19-86:6.

During the outage, Defendants continued their practice of sharing outlook information, and requesting that information to be disseminated across each others' organizations. For example, Valero trader Smith wrote to Shell trader Rodrick, "go tell your supply group that gas in the bay is getting tight". *See* Ex. 65, SOPUS_PGI_01116387 at row 54167. Documents reveal just how widely dispersed the information was, and that even the highest echelons of management received the detailed information.

As demonstrated above, Defendants continued coordinating their outages by keeping each other acutely aware of operational changes. BP traders discussed the landscape following the Torrance refinery explosion in 2015, with BP's trader Henderlite noting that the "Wild Card" was whether Tesoro would keep a scheduled turnaround at the end of March, revealing that "[Tesoro's] [t]rader says they have been looking at delay but have not changed plans." Ex. 195, BPWC-PG-02203607. In a 2015 email thread about "West Coast Gasoline Supply," Chevron trader Pluimer told a colleague "the [Shell] trader told me specifically they have no[t] begun their refinery work." Ex. 41, CUSA_PG-BAR-000959755.

The informational disadvantage had an impact. Despite extraordinary retail prices in June 2015, a vessel full of gasoline, arrived in California, sat in the port for 10 days before turning around and delivering the fuel to Mexico. Ex. 196, CUSA_PG-BAR-000068726.

As was typical in the conspiracy, in July of 2015, Defendants appeared to share their sales and pricing information with each other. A Phillips employee wrote, "Tesoro and Chevron have been the featured buyers and reportedly combined, have sold Exxon one million barrels of CARBOB in Los Angeles floating priced on OPIS." *See* Ex. 49, PSXPGI01248391.

Defendants further shared detailed import and export information in 2015, allowing them to calibrate operations. BP and Shell traders discussed imports during the outage. *See* Ex. 11, SOPUS_PGI_01370921 at row 194801 (Kirsh (BP): "I've got a fairly steady stream of barges coming in thru the month to both gatx and shell carson"). The companies similarly worked together to divert import cargoes during this period. Valero diverted a cargo in June of 2015, at the height of the price spike. *See* ECF No. 647, Ex. 1, McCullough Rpt., ¶¶215-217. In December 2015 through February of 2016, BP worked closely with Valero to divert three imports of CARBOB heading into the state. *See id.*, ¶¶219-231.

This conduct closely resembles the allegations in Plaintiffs' complaints, that during this outage specifically, ". . . Exxon and the other large refiners in California calibrated the imports and exports of gasoline to inflate gasoline prices . . . [m]oreover, refiners hid information about imports and exports to create an unnecessarily volatile gas market and drive up prices." *See* ECF No.76, ¶71.

## IV. DEFENDANTS' REMAINING ARGUMENTS FAIL

### A. There Are Triable Issues of Fact as to Antitrust Injury

It is true that, in price-fixing conspiracies violating antitrust laws, a plaintiff must demonstrate an antitrust injury – *i.e.*, the impact of the defendants' unlawful activity. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 600 (N.D. Cal. 2010) (citing *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 610-11 (N.D. Cal. 2009)), *amended in part*, 2011 WL 3268649 (N.D. Cal. July 28, 2011). Defendants provide little guidance on what constitutes antitrust injury and proof of such injury for the purposes of summary judgment, citing to generalized standards.[29] ECF No. 629 at 54-55. Rather, Defendants seek to sidestep the factual

---

[29] Defendants make similar arguments here that are present in Defendants' Joint Motion to Exclude Expert Opinion Testimony of Paul Hanouna and Michael Williams (ECF No. 617) ("Motion to Exclude") at 31-35. Plaintiffs answer these arguments in

4827-1942-6539.v1

record in this litigation, along with the plethora of evidence set forth in numerous discovery responses and Plaintiffs' experts' reports, with conclusory arguments claiming a lack of a causal link between Defendants' anticompetitive acts and Plaintiffs' injury.

Plaintiffs have but one theory of liability and injury – Defendants conspired to fix California gasoline prices, causing the price of California gasoline to be artificially high, resulting in overcharges to the Plaintiffs' harm and injury. ECF No. 76 at 67-68; *Bartlett* ECF No. 44 at 48-49. Plaintiffs proof of liability and injury is detailed in the pleadings, depositions, answers to interrogatories, expert reports, and otherwise, as described throughout this opposition. For example, because the price spikes in May and October 2012, and beyond, were the results of Defendants' anticompetitive conduct, inflated prices paid by Plaintiffs constitute an illegal overcharge. This is a prototypical example of antitrust injury. *See, e.g.*, *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *8, *10 (N.D. Cal. Feb. 21, 2017) (the overcharge alleged is a "well-recognized type of antitrust injury").

The Ninth Circuit provides what is required on this issue at this point. In *William Inglis & Sons Baking Co. v. Cont'l Baking Co.*, 942 F.2d 1332, 1339 (9th Cir. 1991), *vacated in part on other grounds*, 981 F.2d 1023 (9th Cir. 1992), the Ninth Circuit rejected defendant's argument at summary judgment that there was not a basis to find the existence of a causal connection between the defendant's antitrust violation and loss of anticipated revenue. Plaintiff's expert provided evidence that plaintiff's profit would have been higher had defendant not engaged in below-cost pricing. *Id.* The court found that evidence satisfied the causation requirement by "'establish[ing] that the anticompetitive activities were a material cause of *some* of its injury.'" *Id.* (emphasis in original) (quoting *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,

---

an opposition to the motion filed contemporaneously with this opposition ("Opposition to Motion to Exclude").

3:15-cv-01749-TWR-AGS

4827-1942-6539.v1

773 F.2d 1506, 1510 (9th Cir. 1985)); *see also In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5141861, at *2 (N.D. Cal. Dec. 13, 2010) (in price-fixing conspiracy, plaintiffs' expert properly "opined that [d]efendants' collusive conduct and conditions in the SRAM market created a high probability that [plaintiffs] suffered injury through overcharges") (citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 (1969)); *In re Urethane Antitrust Litig.*, 166 F. Supp. 3d 501, 503-12 (D.N.J. 2016) (A causation objection rejected in price-fixing conspiracy case where "[p]laintiffs assert a single theory of antitrust liability – that Dow and at least one other entity conspired to fix urethane prices. They also assert a single theory of antitrust impact—that prices for urethanes were artificially inflated. [Plaintiffs' expert's] models purport to measure damages stemming from that single category of impact. . . . [Defendant's] argument conflates ***antitrust impact with the specific acts of wrongdoing that form the basis of an alleged antitrust violation***," which the court found was not required and thus rejected the *Daubert* challenge.); *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 434-37 (E.D Pa. 2015) (where single-overcharge regression model "bakes-in" the effect of supply on the price, thus any increase in price can be attributed to the unlawful restriction of supply).

McCullough's report concluded that the behavior surrounding the price spikes in February, May, and October 2012 suggested collusive conduct, the most plausible justification of which is price manipulation by Defendants. ECF No. 647, Ex. 1, McCullough Rpt., ¶¶25, 316, 334, 349, 353, 361. McCullough repeatedly opined that his expert evaluation of the industry and the market forces is highly suggestive of collusive activity in 2012, and economic and record evidence demonstrate collusive behavior in place by Defendants no later than February 2015. ECF No. 605, Ex. D, McCullough Rebuttal Rpt., ¶86.

Dr. Paul Hanouna, Persian Gulf's damages expert, used the widely known and accepted forecasting regression methodology to provide an estimation of counterfactual prices in a "but-for" world. *See* Opposition to Motion to Exclude,

- 55 -                        3:15-cv-01749-TWR-AGS

§4.C. Dr. Hanouna concluded that there were significant breaks in the relationship between the price of Brent Crude, which is the main driver of California gasoline prices, and the price of gasoline during the May and October 2012 periods, as well as the period of January 2015 through March 2020. ECF No. 608, Ex. B, Hanouna Rpt., ¶¶6.a.-6.c., Specifically, Dr. Hanouna's econometric model "determined, not assumed, that gasoline prices were significantly inflated, or were above their fundamental values" during the periods when Plaintiffs allege the unlawful conduct took place. ECF No. 608, Ex. H, Hanouna Rebuttal, ¶3.

Similarly, Dr. Williams explains in his expert reply report that his work "isolate[s] the effects of the challenged conduct so as to ascertain what would have happened 'but for' the defendant's unlawful activity." ECF No. 608, Ex. G, ¶64, quoting ABA Section of Antitrust Law (2017), *Proving Antitrust Damages: Legal and Economic Issues*, 3rd ed., American Bar Association, Ch. 4, §B. In other words, his regression model necessarily demonstrates that the Defendants' unlawful conduct is the cause for the overcharges the model estimates. Dr. Williams further showed that he did not assume that gasoline prices were elevated during the damages period and in fact ran the regression model to determine that very question. ECF No. 608, Ex. G, ¶65.

Accordingly, Plaintiffs' experts present, at the very least, a material issue of fact regarding whether the overcharge estimates provided in Drs. Hanouna and Williams's models – which cannot be explained by lawful supply and demand are the direct and immediate impact of Defendants' anticompetitive scheme.

**B.     California Attorney General Investigation and Findings of the CEC are Not Relevant**

Defendants point to statements by Gordon Schremp of the California Energy Commission ("CEC") to wrongly conclude there is no evidence of a conspiracy. As Schremp testified, the CEC findings regarding the California gas spikes were limited

4827-1942-6539.v1

to the information they were able to examine – not detailed confidential records of the type Plaintiffs have unearthed here. Ex. 197, Schremp Dep. Tr. at 226:21-227:10.

In fact, in a paper published in October 2019, titled "Additional Analysis on Gasoline Prices in California" the CEC *specifically deferred* making any claim absolving the Defendants, stating *they could not rule out the possibility of unlawful activities*. Ex. 198. The CEC concluded that "if competitors fix prices or employ false advertising practices, this may be unlawful. Additional investigation is necessary to determine whether either has occurred. *The CEC lacks the expertise to determine whether such behavior occurred*. The California Department of Justice is well equipped to investigate possible price fixing or false advertising." *Id.* at 10. There is no basis to conclude that the government's lack of public action to date by either the CEC or Attorney General is relevant.

Defendants further attempt to deflect from their role pointing at a lawsuit brought by the California Attorney General in May 2020 against trading firms Vitol and SK Energy. ECF No. 629 at 17-18. The fact the AG has filed a complaint against other firms says nothing about Defendants' conduct here. In fact, the Vitol/SK Energy complaint itself includes Doe defendants who well could be Defendants, as the Defendant traders did significant business with these firms. Ex. 199. There is no conclusion that can be drawn from this separate complaint.

## V. PLAINTIFFS' EVIDENTIARY OBJECTIONS

### A. Defendants' Declarations Suffer From Serious Infirmities

Defendants entire motion rests largely on 33 declarations of current and former employees. Plaintiffs here make their evidentiary objections to these improper declarations as required by the Court's Standing Order for Civil Cases, §III(B)(4)) and provide additional, specific objections in Appendix 1 as per the Court's Order Granting in Part *Ex Parte* Application Regarding Presentation of Evidentiary Matters Related to Summary Judgment and Motion to Seal (ECF No. 686).

4827-1942-6539.v1

Federal Rule of Civil Procedure 56 "requires that affidavits submitted in support of a motion for summary judgment must: (1) be made on the personal knowledge of an affiant who is competent to testify to the matter stated therein, (2) must state facts that would be admissible in evidence, and (3) if the affidavit refers to any document or item, a sworn or certified copy of that document or item must be attached to the affidavit." *Boyd v. City of Oakland*, 458 F. Supp. 2d 1015, 1023 (N.D. Cal. 2006). Thus, "[a] declarant must show personal knowledge and competency to testify [as to] the facts stated." *Id.* (citing *Bank Melli Iran v. Pahlavi,* 58 F.3d 1406, 1412 (9th Cir. 1995)). In other words, "[t]he matters must be known to the declarant personally, as distinguished from matters of opinion or hearsay"; thus, "[a] declarant's mere assertions that he or she possesses personal knowledge and competency to testify are not sufficient." *Id.* (citing *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999 (9th Cir. 1990)).[30]

The declarations submitted here suffer from many infirmities. They are hearsay-riddled and make statements far beyond any of the declarants' personal knowledge, contain unsupported and improper legal conclusions, consist of expert testimony by lay witnesses and often rely on documents unknown to Plaintiffs and not attached to the declarations, also in violation of the Rules. The Court may not consider those portions of the declarations and citations thereto that Plaintiffs describe herein and detail in Appendix 1. These evidentiary failures are of no small moment. In fact, many of Defendants' claimed refutations of Plaintiffs' allegations are based ***in total*** on obviously defective paragraphs in the submitted declarations. *See, e.g.*, ECF No. 629 at 22 n.8 (citing to declarations for support of claimed denials any Defendants entered into agreements); *id.* at 25 n.12 (claiming Defendants deny conspiracy and

---

[30] Plaintiffs are required to make these objections now, otherwise they might be waived. *See Hoye v. City of Oakland*, 653 F.3d 835, 841 n.3 (9th Cir. 2011) ("'Defects in evidence submitted in opposition to a motion for summary judgment are waived absent a motion to strike or other objection.'") (quoting *FDIC v. N.H. Ins. Co.*, 953 F.2d 478, 485-86 (9th Cir. 1991)).

3:15-cv-01749-TWR-AGS

further claiming each acted in its independent self-interest). *Id*. at 26 (citing only declarations for the claim that each Defendant made its own decisions about refinery maintenance); *id.* at 38 (relying on declarations to claim legitimacy of conduct at trade associations). "[A]ffidavits must be rooted in facts, rather than conclusory remarks." *St. Louis Condo. Ass'n v. Rockhill Ins. Co.*, 2019 WL 2013136, at *5 (S.D. Fla. Mar. 7, 2019); *see also Pashoian v. GTE Directories*, 208 F. Supp. 2d 1293, 1297 (M.D. Fla. 2002) ("[A]n affidavit must be stricken when it is a conclusory argument, rather than a statement of fact . . . .").

**Hearsay**: Hearsay evidence can be disregarded and excluded for summary judgment purposes. *See, e.g.*, *In re Sunset Bay Assocs.*, 944 F.2d 1503, 1514 (9th Cir. 1991) (party cannot introduce hearsay to defeat summary judgment motion); *Orr v. Bank of Am.*, 285 F.3d 764, 771 (9th Cir. 2002) (affirming the entry of summary judgment against plaintiff based on the district court's finding "that most of the evidence submitted by Orr in support of her opposition to BOA's motion for summary judgment was inadmissible due to inadequate authentication and hearsay"). **Lack of Personal Knowledge**: "Conclusory affidavits that do not affirmatively show personal knowledge of specific facts are insufficient." *Casey v. Lewis*, 4 F.3d 1516, 1527 (9th Cir. 1993). Fed. R. Evid. 602. For example, BP trader Henderlite claimed "BP has never agreed with any of the Defendants or anyone else to manipulate the price or supply of gasoline in the California markets." J.A. 9, ¶6. How would Mr. Henderlite be in a position to make such an all-encompassing statement, rife with legal conclusions? He is not and cannot. Mr. Yomtoob makes an identical, unsupported, improper claim. *See* J.A. 876, ¶5. **Failure to include documents relied upon**: *School Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1261 (9th Cir. 1993) ("Rule 56(e) requires that documents relied upon in an affidavit presented in a summary judgment motion or opposition thereto be attached to the affidavit."). Numerous paragraphs appear to refer to documents, but the documents are not provided. *See, e.g.*, J.A. 845, ¶48 (referring to "my review of records kept in the

- 59 - 3:15-cv-01749-TWR-AGS

ordinary course of BP's business and documents produced in this litigation . . .") *See also* J.A. 14, ¶25 (referring to the "applicable Area Operating Plan" but not attaching the plan). **Improper Legal Conclusions**: *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("[S]tatements in declarations based on speculation or improper legal conclusions . . . are not *facts* and likewise will not be considered on a motion for summary judgment") (emphasis in original). **Best Evidence Rule**: *Groppi v. Barham*, 157 F. App'x 10, 11-12 (9th Cir. 2005) ("The district court did not abuse its discretion in applying the best evidence rule to exclude [a doctor's] declaration because [Plaintiff] failed to provide the records upon which the declaration was based and failed otherwise to explain their absence.").[31]

The declarations suffer from additional infirmities, including relevance, a lack of foundation, unduly prejudicial statements and other evidentiary issues. Each is detailed in Appendix 1.

## VI. CONCLUSION

For the foregoing reasons, Defendants' motion must be denied.

---

[31] Defendants have also improperly submitted declarations of individuals who were not previously identified in initial or supplemental disclosures in violation of Fed. R. Civ. P. 26 which requires that a party disclose names of individuals likely to have discoverable information and to supplement initial disclosures on an ongoing basis. *See id.* Argument regarding the improper Tesoro witnesses is detailed in Plaintiffs' Opposition to Tesoro. Additionally, Plaintiffs seek to exclude the declarations of two additional witnesses who were deposed, but not listed in disclosures and as such, those declarations also should be stricken, as Plaintiffs could not anticipate that additional statements would be offered from those witnesses beyond their sworn deposition testimony. Plumier of Chevron and Rodrick of Shell were not disclosed and Defendants have provided no justification for failing to do so. *See Ricks v. BMEzine.com, LLC*, 727 F. Supp. 2d 936, 950 (D. Nev. 2010) (striking declaration submitted at summary judgment of witness who was not identified in initial disclosures finding "no justification for its failure to identify Walters as a witness").

3:15-cv-01749-TWR-AGS

4827-1942-6539.v1

DATED: May 28, 2021

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
STEVEN W. PEPICH
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
LONNIE A. BROWNE

s/ Alexandra S. Bernay
_____
ALEXANDRA S. BERNAY

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

HARTLEY LLP
JASON S. HARTLEY
101 West Broadway, Suite 820
San Diego, CA  92101
Telephone:  619/400-5822
619/400-5832 (fax)

Attorneys for Plaintiff Persian Gulf Inc.

DATED: May 28, 2021

ROBBINS LLP
GEORGE C. AGUILAR
MICHAEL J. NICOUD

s/ George C. Aguilar
_____
GEORGE C. AGUILAR

5040 Shoreham Place
San Diego, CA 92122
Telephone: 619/525-3990
619/525-3991 (fax)

Attorneys for Plaintiffs David Rinaldi,
Joshua Ebright, and Paul Lee

## SIGNATURE CERTIFICATION

Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures Manual, I hereby certify that the content of this document is

4827-1942-6539.v1

acceptable to the above signatories, and that I have obtained each of the foregoing person's authorization to affix his or her electronic signatures to this document.

Dated:  May 28, 2021        _____s/ Alexandra S  Bernay_____
                                              ALEXANDRA S. BERNAY

3:15-cv-01749-TWR-AGS

4827-1942-6539.v1