ROBBINS GELLER RUDMAN & DOWD LLP
ALEXANDRA S. BERNAY (211068)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
xanb@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERSIAN GULF INC., Individually and on Behalf of All Others Similarly Situated,<br><br>   Plaintiff,<br><br> vs.<br><br>BP WEST COAST PRODUCTS LLC, et al.,<br><br>   Defendants. | Case No. 3:15-cv-01749-JO-KSC<br><br><u>CLASS ACTION</u><br><br>DATE: May 7, 2024<br>TIME: 8:30 AM<br>CTRM: 4C<br>JUDGE: Honorable Jinsook Ohta |
| RICHARD BARTLETT, et al., Individually and on Behalf of All Others Similarly Situated,<br><br>   Plaintiffs,<br><br> vs.<br><br>BP WEST COAST PRODUCTS LLC, et al.,<br><br>   Defendants. | Lead Case No. 18-cv-01374-JO-KSC (consolidated with No. 18-cv-01377-JO-KSC)<br><br><u>CLASS ACTION</u> |

PLAINTIFF'S PRE-EVIDENTIARY HEARING BRIEF

4878-9034-6424.v2

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................... 1

II. LEGAL STANDARDS ................................................................................... 2

III. WHAT THE EVIDENCE WILL SHOW ........................................................ 2

    A. Relevant Procedural History ................................................................ 2

        1. Alon Introduced the 2012 Closures Table into the Record ........ 3

        2. Alon Embraced, Rather than Contested, the 2012 Closures Table in the Amended Complaint ............................... 3

    B. Plaintiff's Counsel's Investigation Prior to Amended Complaint ........ 5

    C. Alon's Belated Dispute of Paragraphs 37 and 137 ............................... 7

        1. Alon's Suspicious Refusal to Refine CARBOB Despite High Margins in the First Half of 2012 ..................................... 7

        2. Alon's Participation in the California Gasoline Refinery Market ......................................................................... 11

IV. CONCLUSION ............................................................................................. 15

# TABLE OF AUTHORITIES

Page

**CASES**

*In re Keegan Mgmt. Co., Sec. Litig.*,
   78 F.3d 431 (9th Cir. 1996) ................................................................................ 2

*Kohler v. Flava Enters., Inc.*,
   779 F.3d 1016 (9th Cir. 2015) ............................................................................ 2

*Tom Growney Equip., Inc. v. Shelley Irrigation Dev., Inc.*,
   834 F.2d 833 (9th Cir. 1987) .............................................................................. 2

*Townsend v. Holman Consulting Corp.*,
   929 F.2d 1358 (9th Cir. 1990) ............................................................................ 2

*United Nat'l Ins. Co. v. R&D Latex Corp.*,
   242 F.3d 1102 (9th Cir. 2001) ............................................................................ 2

**STATUTES, RULES, AND REGULATIONS**

28 U.S.C.
   §1927 .............................................................................................................. 1, 2

Federal Rules of Civil Procedure
   Rule 11 ....................................................................................................... 1, 2, 3

## I. INTRODUCTION

Per the Ninth Circuit's instructions, on May 7, 2024, the Court will "hold an evidentiary hearing to further develop the record as to what investigation Plaintiffs' counsel undertook" prior to making the allegations comprising ¶¶37 and 137 and after defendant Alon USA Energy, Inc. ("Alon") disputed these allegations years later. ECF 875 at 5-6/PageIDs 43150-51. The substance of these allegations is that: (1) during a spring 2012 supply shortage, Alon chose to supply less gasoline than it could have (¶37); and (2) Alon was a participant in the California "gasoline refinery market" (¶137). For years, Alon did not dispute these allegations because they are substantively indisputable. "Correcting" ¶37 would have **extended** the length of Alon's suspiciously timed period of non-operation. Likewise, "correcting" ¶137 would have meant elaborating that Alon's participation took different forms at different times (including refining, blending, selling, trading, and storing gasoline) but always included the capability to refine gasoline, which was a barrier to entry, as a resumption would have driven down prices.

As was true when the Court denied Alon's motion four years prior to the evidentiary hearing, Alon will not come close to carrying its burden of proving that ¶¶37 and/or 137 were frivolous (*i.e.*, **both** baseless **and** made without a reasonable inquiry), as Rule 11 requires. Nor has Alon ever, and will not now, present any evidence of subjective bad faith, as 28 U.S.C. §1927 requires. Plaintiff Persian Gulf Inc. ("Plaintiff") will present documentary and testimonial evidence demonstrating that Plaintiff's counsel's pre-Complaint and post-dispute investigations were thorough and conscientious. This evidence will show extensive corroboration of: (1) the report (including Alon's own statements), which remains substantively accurate, with no basis for doubting it (¶37); and (2) a widely held perception, backed by Alon's own acts and statements, that it was a participant in the California gasoline refinery market even in 2016, when Plaintiff filed the Amended Complaint.

## II. LEGAL STANDARDS

As the party seeking sanctions under Rule 11 of the Federal Rules of Civil Procedure, Alon bears the burden of proof.[1] *See Tom Growney Equip., Inc. v. Shelley Irrigation Dev., Inc.*, 834 F.2d 833, 837 (9th Cir. 1987). To meet its burden, Alon must prove that the allegations were "both baseless and made without a reasonable and competent inquiry." *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990); *see also In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 434 (9th Cir. 1996) (applying *Townsend* "to the factual basis for a claim"). Likewise, under 28 U.S.C. §1927, Alon bears the burden of "proving that the opposing party acted with 'subjective bad faith.'" *Kohler v. Flava Enters., Inc.*, 779 F.3d 1016, 1020 (9th Cir. 2015). The test is whether there is "***some*** plausible basis" for the allegation, which is satisfied even by "a weak one." *See United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1117-18 (9th Cir. 2001) (emphasis in original).

## III. WHAT THE EVIDENCE WILL SHOW

Although Alon bears the burden of proof, the parties have agreed that the evidentiary hearing will proceed more smoothly if Plaintiff presents first.

### A. Relevant Procedural History[2]

As Plaintiff will demonstrate, the procedural history here played a crucial role in Plaintiff's investigation and reliance on a table from a June 5, 2012 report (ECF 47-5 at 1-5/PageIDs 467-71) (the "June 2012 Report") that Robert McCullough ("McCullough") authored. The same table also appeared in a McCullough report from November 15, 2012 (ECF 47-4 at 1-27/PageIDs 440-66) (the "November 2012 Report"). In 2015, Plaintiff retained McCullough as an expert in this case.

---

[1] Unless otherwise noted, all emphasis is added, citations are omitted, and references to "¶" and "¶¶" are to the First Amended Complaint for Violations of the Sherman Act, California's Cartwright Act, and Unfair Competition Law (ECF 76) (the "Amended Complaint").

[2] Unless otherwise noted, all page references to ECF-stamped documents are to the ECF page numbers.

- 2 -  3:15-cv-01749-JO-KSC
4878-9034-6424.v2

### 1. Alon Introduced the 2012 Closures Table into the Record

Plaintiff filed its original complaint on March 24, 2016. Complaint for Violations of California's Cartwright Act and Unfair Competition Law Revised Pursuant to Order of the Court Dated March 18, 2016 (ECF 56) (the "Original Complaint"). Although the Original Complaint cited the June 2012 and November 2012 Reports, it did *not* include a table that had appeared in both reports, listing refinery closings in 2012 (the "2012 Closures Table"). *Alon* (and the other defendants) first put the 2012 Closures Table into the record when it asked the Court to take judicial notice of the entirety of the June 2012 and November 2012 Reports' "existence *and content*." ECFs 47-2 at 2-3/PageIDs 435-36; 47-4 at 8/PageID 447; 47-5 at 2/PageID 468. Although Alon criticized some aspects of the June 2012 and November 2012 Reports as based on speculation, it quoted far more from both reports than it criticized and asked the Court to rely on a graph from the November 2012 Report. ECF 47-1 at 23-25/PageID 424. Most critically, Alon did *not* criticize the 2012 Closures Table or indicate there was any reason that the Court should not rely on this "content."

The Original Complaint contained an allegation identical to what became ¶137 in the Amended Complaint. *Compare* ECF 56, ¶87 *with* ECF 76, ¶137. At no point either before or after Plaintiff filed the Original Complaint did Alon raise with Plaintiff informally or formally (*e.g.*, a Rule 11 safe harbor letter) any concerns or dispute over ¶87 of the Original Complaint.

### 2. Alon Embraced, Rather than Contested, the 2012 Closures Table in the Amended Complaint

The evidence will show that after the Court granted defendants' motion to dismiss with leave to amend, Plaintiff conducted an extensive investigation that included consulting McCullough regarding an amended complaint, as described below. On September 22, 2016, Plaintiff filed the Amended Complaint, which added

- 3 -  3:15-cv-01749-JO-KSC
4878-9034-6424.v2

several allegations of conduct attributable to Alon (and others), including those set forth in ¶¶4, 6, 13, 16, 17, 30, 35, 38, 42, 44, 72, 73, 97, 104, 108-110, 112.

The Amended Complaint, which again repeatedly cited the June and November 2012 Reports, also added ¶37, which largely tracked the information set forth in the 2012 Closures Table from both reports. ¶37. Alon and others responded with another motion to dismiss that included another request for the Court to take judicial notice of the June 2012 Report. ECF 81. Far from disputing ¶37 or the 2012 Closures Table on which it was based, ***Alon's motion embraced both*** and ***invited the Court to rely on them***:

> But the data provided by Plaintiff in the FAC flatly refutes these allegations. In fact, the chart of 2012 refinery operations (*id.* ¶37) reveals nothing "suspicious" whatsoever. None of the eight "outages" listed were suspicious in nature. Five were routine ***scheduled*** maintenance events and three were unscheduled outages arising from obviously unexpected conditions – the BP Cherry Point fire in February, the Chevron Richmond fire in August, and the Exxon Torrance power disruption in October.

ECF 81-1 at 24/PageID 1157 (emphasis in original) (citing the June 2012 Report). Alon's Bakersfield refinery shutdown listed in ¶37 is among the five closures that ***Alon itself*** represented to be a "routine ***scheduled*** maintenance event[]." *Id*. (emphasis in original). The Amended Complaint says nothing of the sort about this closure; rather, that is a characterization and representation by Alon (and the other defendants) exclusively. Obviously, Alon had access to extensive internal information about its own refinery's operations, in addition to publicly available information, and with that foundation, Alon still accepted the 2012 Closures Table and made arguments based on the information the table reflected. This is exactly what Plaintiff did, without the benefit of Alon's internal information.

Naturally, having embraced and elaborated on the fact of the closure allegation of ¶37, Alon did not formally or informally raise with Plaintiff any concerns about its accuracy. That is true throughout the remainder of 2016, all of 2017, all of 2018, and the first three months of 2019. In fact, after the Court denied Alon's motion to

dismiss on June 19, 2018 (ECF 86), Alon filed an answer that ***admitted*** the fact that its Bakersfield refinery was "not operating as of April 20, 2012." ECF 115, ¶37. Similarly, Alon did not dispute any aspect of ¶137, and instead answered that "because the Plaintiff fails to define the term 'California gasoline refinery market,' Alon lacks information sufficient to form a belief as to the truth of the allegations, which are therefore denied." *Id.*, ¶137.

### B. Plaintiff's Counsel's Investigation Prior to Amended Complaint

The evidence will show that Plaintiff's counsel's investigation prior to filing the Amended Complaint was extensive. Regarding ¶¶37 and 137, these allegations relate to all defendants, but given the time constraints, Plaintiff's presentation at the hearing will focus almost exclusively on how the investigation concerning these allegations related to Alon, and even as to Alon, Plaintiff will only have enough time to present ***examples*** of materials reviewed as part of this investigation, including Alon's public statements, numerous press reports, investigative reports, regulatory reports, consumer watchdog reports, as well as letters and press releases from elected officials. As will be demonstrated, these third-party sources corroborated the June 2012 and November 2012 Reports in several ways, including the following: expressly citing the reports without contesting, correcting, or reporting any reason to doubt any aspect of the reports, let alone the 2012 Closures Table; reporting information consistent with the reports; and reporting on the spring 2012 gasoline supply shortage and price spike, without any indication that Alon was the exception to the refineries that were closed at times during spring 2012. To ensure an efficient presentation, Plaintiff will use summary exhibits and highlights from these various forms of corroboration, all of which Plaintiff's counsel considered. Even an industry trade group that took aim at certain aspects of the June 2012 and November 2012 Reports did ***not*** dispute the 2012 Closures Table, which rebuttal Plaintiff will also present as another item its counsel considered.

Of course, proving a negative is impossible, but Plaintiffs will demonstrate that Alon's statements never mentioned the June 2012 and November 2012 Reports, and Alon never issued a press release or any other statement refuting the 2012 Closures Table, whose Bakersfield closure row was entirely reconcilable with Alon's statements, as presented more comprehensively below and at the hearing. Moreover, although Alon's statements could be charitably described as profoundly unreliable, they were all consistent with the most important facts: Alon acknowledged that high margins meant it should have been refining CARBOB in spring 2012; Alon acknowledged that it was capable of refining CARBOB in spring 2012; and Alon acknowledged that it did not refine CARBOB in spring 2012. Plaintiff's counsel considered these facts and the evidence of these facts.

Plaintiff will also present testimony concerning counsel's regular consultation with McCullough concerning the Amended Complaint. McCullough was an experienced economist with decades of experience and engagements with federal, state, and local governments, as well as many large private parties. He also played a prominent role in exposing the Enron fraud and testified before the California State Senate Select Committee on Bay Area Transportation to discuss issues related to his June and November 2012 Reports. Although Plaintiff's counsel did not work with McCullough on Enron, two of them spent years successfully prosecuting a case against Enron, which bolstered McCullough's bona fides. Most importantly, the 2012 Closures Table wasn't set forth as an opinion, but rather a compilation of facts that no one disputed for years despite wide-spread publicity and disputes over *other* aspects of the June and November 2012 Reports. As the evidence will show, there was every reason to trust the 2012 Closures Table's accuracy and no reason to doubt it.

As Plaintiff's evidence will also demonstrate, an important impediment to determining when refineries are/were/would be refining gasoline and when they are/were/would not shut down is that there is no definitive source for tracking or compiling such information. Even the press and industry experts must rely on

secondary sources, or the refiners themselves, to piece together such information. And as Plaintiff's evidence will demonstrate, Alon's years of slippery statements made this undertaking even more challenging.

### C. Alon's Belated Dispute of Paragraphs 37 and 137

On April 25, 2019, nearly three years after Plaintiff filed the Amended Complaint and long after Alon admitted the substantive portion of ¶37 and asserted that it could not form even a belief as to the truth of ¶137 because the Amended Complaint failed to define the term "California gasoline refinery market" (and over six years after publication of the June and November 2012 Reports) Alon's counsel wrote a letter to Plaintiff's counsel, proclaiming both paragraphs "had no evidentiary support" and demanded that "***you immediately dismiss all claims against Alon, with prejudice***." ECF 282-2 at 9/PageID 5591 (emphasis in original). While this was a serious accusation and an extreme demand, the letter itself comprised multiple half-truths and outright false assertions.

#### 1. Alon's Suspicious Refusal to Refine CARBOB Despite High Margins in the First Half of 2012

Alon's letter admitted that "it announced in November 2011 that it had scheduled *a two-week shutdown* of Bakersfield for [minor revisions] in December." ECF 282-2 at 5/PageID 5587. That would have put Bakersfield up and running again in January 2012. Yet, Alon's letter failed to cite a single statement prior to March 8, 2012, when its earnings release confessed that it was *still* not refining gasoline at Bakersfield. Worse, Alon's letter presented this admission as if Alon had told the market about this dramatic shift in December 2011: "Alon made the decision to shut down ***all*** of its California refineries in December 2011, with the expectation of restarting them early in the second quarter of 2012." *Id*. (emphasis in original) (citing a March 8, 2012 earnings release and a March 9, 2012 earnings call). Worse yet, even though Alon's letter cited its March 9, 2012 earnings call, it failed to acknowledge that in that same call, its CEO represented: "[W]e are happy with the progress that

- 7 -    3:15-cv-01749-JO-KSC
4878-9034-6424.v2

we've made to restart the Bakersfield refinery and integrate it with our Paramount facility" (ECF 282-6 at 142/PageID 6316) and that "if we had known [about improved margins following the February 17, 2012 BP fire] in advance, then we'd be running today." *Id*. at 144-45/PageIDs 6318-19. Even if Alon needed 30-45 days lead time after the February 17, 2012 BP fire, Bakersfield could have been up and running by early April at the latest. Yet, Alon continued to prolong the Bakersfield shutdown with no explanation or regard for its earlier representations. As Plaintiff will demonstrate, in November they were going to restart in January; in March, they were going to restart in April; in May, they were going to restart in May; and in August, they claimed to have operated only in the last two weeks of June.

Far from disproving the substance of Plaintiff's allegations, Alon's inexplicable obfuscation confirmed the suspiciousness of Bakersfield's closure. In this context, choosing to prolong a shutdown versus shutting down is a distinction without difference, as both equally supported Plaintiff's theory: "Plaintiff's theory of the case is that Defendants conspired to create a false impression of reduced supply [of gasoline and diesel fuel], when in fact they possessed the inventory and production capacity to supply the California market." ECF 86 at 7/PageID 1391.

The deeper Plaintiff's counsel dove into Alon's statements, the clearer it became that they (and Alon) were simply untrustworthy:

| | | |
|---|---|---|
| Aug. 5, 2011, Alon FQ2 2011 Earnings Call | ECF 282-6 at 102/PageID 6276 | We are happy to tell you that in California, the Bakersfield hydrocracker is up and running, and we are producing and selling car gasoline and diesel into the local market. We initiated the startup of the hydrocracker in early June. |
| Oct. 13, 2011, Alon Conference Presentation | ECF 282-6 at 111/PageID 6285 | We are running the Paramount, Long Beach and now together with the Bakersfield as one integrated refinery. We completed the acquisition of Bakersfield last year and completed the integration of the Bakersfield, actually the hydrocracker unit in Bakersfield only this quarter. So during the third quarter, we |

| | | |
|---|---|---|
| | | were shipping VGO produced out of Paramount to Bakersfield using railcars and trucks. Running the hydrocracker at about 14,000 barrels a day. That's a very significant improvement step for the California refinery. |
| Nov. 4, 2011, Alon FQ3 2011 Earnings Call | ECF 282-6 at 123/PageID 6297 | In California, we are continuing work to integrate the Paramount to Bakersfield facilities and to optimize the operation of the Bakersfield hydrocracker. Versus the same quarter last year, light oil [ph] production at our California system has increased by more than 25% as a percentage of total feedstock. Total feedstock charge to our California system increased just over 39,000 barrels per day from 21,000 barrels per day in the same quarter last year. Operating margins increased to $3.64 per barrel as compared to just $0.12 per barrel in the same quarter last year. We are pleased with what we've accomplished so far in California. However, there are opportunities to do even better than this, and we have plans to implement operational changes and minor equipment revisions in the hydrocracker to achieve these additional benefits. We expect to move towards a revised crude slate designed to optimize the hydrocracker yield structure. In addition, a relatively small amount of additional work needs to be done in the hydrocracker to fully achieve the desired results. We expect to do this work during the month of December. |
| Mar. 8, 2012, Alon Earnings Release | ECF 282-5 at 13/PageID 6031 | In June 2011 we completed a project to integrate the Bakersfield hydrocracker unit into the California refineries system to increase overall light product yields. Since the completion of the project, we have increased light product yields by approximately 25%. In light of the weak margin environment, we shutdown the California refineries in December to make minor revisions to the hydrocracker in preparation for receiving new crude blends that will further improve the liquid recovery and |

| | | | |
|---|---|---|---|
| | | | light product yields of these facilities. We expect to restart the California refineries at the beginning of the second quarter of 2012. |
| | Mar. 9, 2012, Alon FQ4 2011 Earnings Call | ECF 282-6 at 142, 144-45/PageIDs 6316, 6318-19 | Margins have improved on the West Coast, and we are in the process of preparing to restart the facilities. We are currently bringing small volumes of crude oil from lower-cost mid-continent sources to California and are working hard to increase our capacity to do so.<br><br>While this was a difficult year for us in California, we are happy with the progress that we've made to restart the Bakersfield refinery and integrate it with our Paramount facility. In the fourth quarter, our yield of gasoline and diesel from the combined facility was 63.4% as compared to 39.5% for the same quarter last year, prior to start-up of the hydrocracker.<br><br>\* \* \*<br><br>[M]argins have improved significantly on the West Coast, both as we got through this collapsed issue of these differentials, but then also with the shutdowns both for turnarounds and fires on the West Coast. We've seen significant improvements during the first quarter. And if we had known all that in advance, then we would be running today. But I think the issue is that this happened recently – fairly recently, and you have to gear up to start buying crude, and we've got a 30- to 45-day lead time to purchase crude and plan to get the facilities restarted. And that's why we're not running today – is because the change that we've seen in the markets has occurred in the last 30 or 45 – fairly recently, and we're gearing up to purchase the crude and restart the facilities, but so that's why we didn't – we're not running today. |
| | May 4, 2012, Alon FQ1 2012 | ECF 282-6 at 158/PageID | We've restarted Paramount and are restarting Bakersfield in May. We expect to run 55,000 |

| | | |
|---|---|---|
| Earnings Call | 3662 | barrels per day of crude at Big Spring, 67,000 barrels per day at Krotz Springs and 32,000 barrels per day in California during the second quarter. |
| July 3, 2012, Dow Jones Business News Release<br><br>**Non-Alon Statement** | ECF 282-7 at 106/PageID 6449 | A partial restart of Alon USA's 68,000 barrel-a-day refinery in Bakersfield, Calif., w[as] made June 29, according to marketers and traders doing business with the refinery. The on again and off again refinery ran the hydrocracker for three days in May, before going down and restarting the unit earlier this week with diesel for sale. |
| Aug. 9, 2012, Alon FQ2 2012 Earnings Call | ECF 282-7 at 5/PageID 6348 | In California, the Bakersfield hydrocracker operated for only 2 weeks during the last part of the quarter. |

At the evidentiary hearing, Plaintiff will establish that its counsel's investigation included consideration of this entire web of obfuscation.

Third-party sources also corroborated Plaintiff's theory that Alon chose not to refine gasoline at a time when that was the opposite of what would occur in a normally functioning competitive market (ECF 86 at 6/PageID 1390), as even its own CEO admitted on March 9, 2012 that Alon would have been refining gasoline right then – only to postpone doing so for over three more months. Plaintiff will review for the Court examples of third-party sources corroborating its theory, a timeline of Alon's increasingly incredible statements, and Alon's own emissions data that further undermined Alon's statements and buttressed the view that what the Amended Complaint alleged to be a suspiciously timed one-day shutdown was, in fact, a suspiciously timed months-long shutdown. Plaintiff's counsel's investigation included consideration of all this information.

### 2. Alon's Participation in the California Gasoline Refinery Market

In addition to recognizing that a key component of Plaintiff's theory was that Alon (and other refiners) manipulated the market by ***not*** refining gasoline or not

refining as much as gasoline as they could have, the Court's Order denying Alon's motion to dismiss also recognized, a "[l]ack of reliable information renders a concentrated market more susceptible to manipulation." ECF 86 at 6/PageID 1390. Therefore, it is apparent that Plaintiff's theory was that anyone *capable* of refining CARBOB in California was a "participant in the California Gasoline Refinery Market" regardless of whether they utilize 99% of their capacity or 0%. For years, Alon dangled before the market its seemingly imminent reopening of its refinery, which threat represented a major deterrent to any potential competitors because small changes in supply can have disproportionate impacts on pricing, as Plaintiff's evidence will demonstrate. Yet, Alon's letter completely disregarded its years-long flirtation with the market about restarting its Bakersfield refinery and its own statements about *ongoing* activities that were clearly part of the California Gasoline Refinery Market, including storing, blending, and trading gasoline – activities which extended for years beyond 2012. The evidence that Plaintiff's counsel's investigation considered will conclusively prove Alon's flirtation and participation, including the following.

| | | |
|---|---|---|
| Nov. 7, 2012, Alon FQ3 2012 Earnings Call | ECF 282-7 at 25/PageID 6368 | ==We are working on a project to bring light mid-continent crude oils to the West Coast==. There are 3 drivers for this project. First, we feel we can deliver higher-quality crude oil to the West Coast at a price that is competitive with other crude oils available in the region. Secondly, the mid-continent crude oils are lighter than our West Coast alternatives and will produce less asphalt. This improves our refining economics and allows us to run more crude in any given asphalt demand scenario. Finally, by running crude at Bakersfield, we can significantly lower our logistical costs on the West Coast. We've submitted our environmental permit applications to move this project forward. ==Longer term, we expect to replace rail barrels with increasing local shale oil production from== |

- 12 -

4878-9034-6424.v2

3:15-cv-01749-JO-KSC

| | | | |
|---|---|---|---|
| | | | the large Monterey field of Central California. |
| | Mar. 7, 2013, Alon FQ4 2013 Earnings Call | ECF 282-7 at 42, 45/PageIDs 6385, 6388 | As indicated previously, we've submitted the permit application that is required to develop the rail terminal and modify the refinery to run lighter crudes to Bakersfield. We remain optimistic that we can get these permits in the fourth quarter, which would allow us to restart the refinery and terminal beginning in 2014.<br><br>* * *<br><br>Yes, we didn't – we're not really doing anything at Bakersfield today. We have some capacity at Bakersfield that we're looking at options to utilize. We are currently doing transloading for people in Long Beach and the Willbridge. In Willbridge, it's approximately 6,000 barrels per day. In the Long Beach, it's 3,000 barrels a day. |
| | Aug. 8, 2014, Alon FQ2 2014 Earnings Call | ECF 282-7 at 54//PageID 6397 | In California, our permit application to construct a crude oil rail unloading facility and potentially restart our Bakersfield refinery has completed the public comment period. We are pleased for the support that we received for the project thus far from many segments of the Bakersfield community, and looking forward – and are looking forward to working with the community to address their comments. |
| | Mar. 5, 2015, Alon Earnings Release | ECF 282-5 at 57/PageID 6075 | In California, we are progressing with the engineering and project development for our Bakersfield rail facility and the potential revamp and restart of the Bakersfield refinery. Commercial discussions are ongoing, and we now expect the rail facility to start up in 2016. |
| | Mar. 6, 2015, Alon FQ4 2014 Earnings Call | ECF 282-7 at 68-69, 71, 77/PageIDs 6411-12, 6414, 6420 | We were able to get a permit to construct a unit train unloading facility at our Bakersfield plant and also to revamp the refinery to process light crude oils.<br><br>* * *<br><br>In California, we continue our efforts to |

| | | |
|---|---|---|
| | | develop the Bakersfield crude flexibility project. We have shortlisted the potential engineering firms to help us complete detailed engineering for the rail unloading terminal. In addition, we continue to have discussions with the railroad and potential customers at the facility and continue to evaluate the economics of restarting the Bakersfield refinery, which could potentially baseload the rail unloading facility. ==We now expect rail unloading to start-up in 2016==.<br><br>    \*    \*    \*<br><br>==Well, I think we feel like . . . the Bakersfield refinery is in . . . good shape – in a good position. Logistically, geographically and otherwise, to really be a key delivery point into California==. So, obviously, we're having discussions with other parties related to use of that facility and those discussions are ongoing. That's really all I can say at this point.<br><br>    \*    \*    \*<br><br>In the fourth quarter, we did about 7,000 barrels a day through the [Long Beach] terminal. That was up some from the prior quarter. |
| Feb. 21, 2017, Alon, Annual Report (SEC Form 10-K) | ECF 282-4 at 40/PageID 5889 | ==The California refineries utilize product pipelines, truck racks and terminals to distribute refined products==. The Paramount and Long Beach refineries are connected by pipelines that we own or lease.<br><br>The California refineries have a feedstock pipeline and terminal system that is capable of supplying mistreated vacuum gas oil and other unfinished products to other Los Angeles Basin refineries and third-party terminals. |

This portion of Alon's letter, and its sanctions argument, fail for two additional reasons. First, Alon failed to acknowledge let alone reconcile its answer to this allegation from July 2018 ("because the Plaintiff fails to define the term 'California

1 gasoline refinery market,' Alon lacks information sufficient to form a belief as to the truth of the allegations") with its April 2019 assertion that: "Even when Persian Gulf originally filed this case in 2015, that statement had already been inaccurate for two and a half years, since Alon had not refined oil in California since the end of 2012." ECF 282-2 at 8/PageID 5590. And second, even if the definition of "California gasoline refinery market" were defined so unreasonably as to include as participants only those who are actively refining gasoline (which would mean the California gasoline refinery market loses all its participants every evening, holiday, and weekend), Alon *still* would have been a participant in the market during a portion of the time relevant to the Amended Complaint and thus a properly included defendant. In other words, a defendant who causes only a portion of a plaintiff's damages is still a properly included defendant. Therefore, Alon's entire ¶137 argument is a hyper-technical (inaccurate) red herring.

## IV. CONCLUSION

As described above, and as will be shown in greater detail at the May 7, 2024 evidentiary hearing, Alon cannot possibly carry its burden of proof here, as Plaintiff's investigation related to ¶¶37 and 137 was thorough, competent, conscientious, and conducted in good faith.

DATED: April 30, 2024

Respectfully submitted,

s/ Jason A. Forge
JASON A. FORGE[3]

---

[3] On October 24, 2019, attorney Jason A. Forge "enter[ed] his special appearance in the above-captioned matter on behalf of Plaintiff Persian Gulf Inc. . . . for the limited purpose of litigating Defendant Alon USA Energy, Inc.'s Motion for Sanctions Under Rule 11 and 28 U.S.C. §1927." ECF 303 at 2/PageID 8053. This same motion is being revisited on remand, so counsel's previous limited special appearance applies to the current proceedings.

| | |
|---|---|
| 1 | ROBBINS GELLER RUDMAN |
| 2 |   & DOWD LLP |
| | ALEXANDRA S. BERNAY |
| 3 | 655 West Broadway, Suite 1900 |
| | San Diego, CA 92101 |
| 4 | Telephone: 619/231-1058 |
| | 619/231-7423 (fax) |
| 5 | |
| | HARTLEY LLP |
| 6 | JASON S. HARTLEY |
| | 101 West Broadway, Suite 820 |
| 7 | San Diego, CA 92101 |
| | Telephone: 619/400-5822 |
| 8 | 619/400-5832 (fax) |
| 9 | Attorneys for Plaintiff |